**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER,<br>ASSOCIATED BUILDERS AND<br>CONTRACTORS, INC., et al.,<br><br>               Plaintiffs<br><br>    v.<br><br>DISTRICT OF COLUMBIA,  a municipal<br>Corporation, VINCENT C. GRAY, in his official<br>capacity as Mayor of the District of Columbia,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)   No. 12-CV-00853 (EGS)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Paul J. Kierman
Karen Boyd Williams (Bar #456417)
HOLLAND & KNIGHT, LLP
800 17th Street, Suite 1100
Washington, DC  20006
(202) 955-5564

Nathan A. Adams (Of Counsel)
HOLLAND & KNIGHT, LLP
315 South Calhoun Street
Suite 600
Tallahassee, Florida 32301
(850) 224-7000 (phone)
(850) 224-8832 (fax)

Min K. Cho (Of Counsel)
HOLLAND & KNIGHT, LLP
200 South Orange Ave., Ste. 2600
Orlando, Florida 32801
(407) 425-8500 (phone)
(407) 244-5288 (fax)

# TABLE OF CONTENTS

**Page**

I.  RESPONSE TO DISTRICT'S "FACTUAL BACKGROUND" ........................................1

II.  ARGUMENT ........................................................................................................6

A.  THIS COURT SHOULD DENY THE RULE 12(B)(1) AND 12(B)(6) MOTIONS BECAUSE THE PLAINTIFFS HAVE STANDING. ........................................................................6

        i.  *Individual Plaintiffs*
        ii.  *Employers*
        iii.  *ABC-Metro Washington*

B.  THE COMPLAINT STATES A CLAIM UNDER THE PRIVILEGES AND IMMUNITIES CLAUSE. ..............................................................................................................16

        i.  *The First Source Act violations the fundamental rights of the individual plaintiffs.*
        ii.  *The First Source Act  does not further a substantial public purpose.*
        iii.  *The First Source Act is not narrowly tailored to advance any public interest.*
        iv.  *The District is not entitled to deference in identifying local "evils."*
        v.  *Virtually every residential preference hiring law has been struct down when challenged under the Privileged and Immunities Clause.*

C.  THE COMPLAINT STATES A COMMERCE-CLAUSE CLAIM. ....................................22

D.  THE COMPLAINT STATES A CLAIM UNDER THE EQUAL PROTECTION CLAUSE. ...................24

E.  THE COMPLAINT STATES A FIRST AMENDMENT CLAIM. ....................................26

F.  THE COMPLAINT STATES A DUE PROCESS CLAIM. ............................................28

        i.  *The First Source Act is void for vagueness.*
        ii.  *The First Source Act infringes the plaintiffs' property interest.*

G.  THE COMPLAINT STATES A CLAIM UNDER THE CONTRACT CLAUSE ..................................31

III.  CONCLUSION ..................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*A.L. Blades & Sons, Inc. v. Yerusalim,*
121 F.3d 865 (3ʳᵈ Cir. 1997) ................................................22

*Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006) ..............................................6

*Air Transp. Ass'n of Am. v. Exp.-Imp. Bank,*
Case No. 11-2024, 2012 WL 2914442 (D.D.C. July 18, 2012)........................2, 3, 5

*Allard v. Holder,*
840 F. Supp. 2d 269 (D.D.C. 2012) ........................................2

*Allied Structural Steel Co. v. Spannaus,*
438 U.S. 234 (1978)........................................................32

*Antilles Cement Corp. v. Fortuno,*
670 F.3d 310 (1st Cir. 2012)..............................................23

*Ashcroft v. Iqbal,*
556 U.S. 662 ...............................................................2

*Baldwin v. Montana Fish and Game Comm'n,*
436 U.S. 371 (1978)........................................................16

*Banner v. United States,*
303 F. Supp. 2d 1 (D.D.C. 2004) ..........................................20, 25, 26

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................7

*C.M. Windows Co., Inc., v. Bernardi,*
730 F.2d 486 (7th Cir. 1984) .............................................18, 21

*Center for Biological Diversity v. Dep't of Interior,*
563 F.3d 466 (D.C. Cir. 2009) ............................................10

*Chamber of Commerce v. EPA,*
642 F.3d 192 (D.C. Cir. 2011) ............................................9

*Committee for Full Emp't v. Blumenthal,*
606 F.2d 1062 (D.C. Cir. 1979) ...........................................8

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.,*
901 F.2d 107 (D.C. Cir. 1990) ............................................8, 14

*Conservation Force, Inc. v. Manning*,
    301 F.3d 985 (2002)....................................................................................10

*Fox Fuel, a Div. of Keroscence, Inc. v. Delaware County. Sch. Joint Purchasing Bd.*,
    856 F. Supp 2d 945 (E.D. Pa. 1994) ........................................................31

*Glickman v. Wileman Bros.*,
    521 U.S. 457 (1997)....................................................................................20

*Goguen v. Smith*,
    471 F.2d 88 (1st Cir.1972)..........................................................................29

*Gordon v. Nat'l Youth Work Alliance*,
    675 F.2d 356 (D.C. Cir. 1982) .....................................................................5

*Hazardous Waste Treatment Council v. U.S. Envtl. Prot. Agency*,
    861 F.2d 270 (D.C. Cir. 1988) ...................................................................14

*Health Research Group. v. Kennedy*,
    82 F.R.D. 21 (D.D.C. 1979)........................................................................14

*Hicklin v. Orbeck*,
    437 U.S. 518 (1978)............................................................................. passim

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977).................................................................................6, 14

*J.P. Mascaro & Sons, Inc. v. Bristol*,
    497 F. Supp. 625 (E.D. Pa. 1980) ..............................................................31

*Johanns v. Livestock Mktg. Ass'n*,
    544 U.S. 550 (2005)....................................................................................20

*Laborers Local Union No. 374 v. Felton Constr. Co.*,
    654 P.2d 67 (Wash. 1982)...........................................................................10

*Libertarian Party v. Dist. of Columbia Bd. of Elections and Ethics*,
    768 F. Supp. 2d 174 (D.D.C. 2011) ...........................................................17

*Loughlin v. United States*,
    230 F. Supp. 2d 26 (D.D.C. 2002) ...............................................................2

*Martha's Vineyard/Dukes County Fishermen's Ass'n v. Locke*,
    811 F. Supp. 2d 308 (D.D.C. 2011) .............................................................2

*McBurney v. Young*,
    667 F.3d 454 (4th Cir. 2012) .....................................................................3, 4

*Merit Constr. Alliance v. Quincy*,
    2012 WL 1357656 (D. Mass. 2012) ........................................................................20

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    539 F. Supp. 2d 331 (D.D.C. 2008) ........................................................................6

*Naturist Soc'y, Inc. v. Fillyaw*,
    958 F.2d 1515 (11th Cir. 1992) ........................................................................4

*New Energy Co. of Ind. v. Limbach*,
    486 U.S. 269 (1988).........................................................................................24

*New Hampshire v. Piper*,
    470 U.S. 274 (1985).........................................................................................16

*Noble v. U.S. Parole Comm'n*,
    194 F.3d 152 (D.C. Cir. 1999) ........................................................................17

*Northeastern Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993)...........................................................................................8

*Perry v. Sindermann*,
    408 U.S. 593 (1972)...........................................................................................31

*Phillips v. Bureau of Prisons*,
    591 F.2d 966 (D.C. Cir. 1979) ..........................................................................7

*Rayco Constr. Co., Inc. v. Vorsanger*,
    397 F. Supp. 1105 (D.C. Ark. 1975)...................................................................31

*Robison v. Francis*,
    713 P.2d 259 (Alaska 1986)..........................................................................10, 21

*Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*,
    547 U.S. 47 (2006)........................................................................................19. 28

*Salla v. County of Monroe*,
    399 N.E.2d 909, *cert. denied*, 446 U.S. 909 (N.Y. 1979).......................................21

*Service Emps. Int'l Union, Local 82 v. Dist. of Columbia*,
    608 F. Supp. 1434 (D.D.C. 1985) ....................................................................16

*Smith v. Goguen*,
    415 U.S. 566 (1974)........................................................................................ 29

*South Coast Air Quality Mgmt. Dist. v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006) ..........................................................................15

*Stephenson v. Davenport County Sch. Dist.,*
    110 F.3d 1303 (8th Cir. 1997) ....................................................................29

*Supreme Court v. Friedman,*
    487 U.S. 59 (1988) ....................................................................................17

*Tasini v. N.Y. Times Co.,*
    184 F. Supp. 2d 350 (D.N.Y. 2002) ........................................................2, 5

*Telecomm. Research & Action Car*, 806 F.2d 1095  (D.C. Cir. 1986)..........................16

*Toomer v. Witsell,*
    334 U.S. 385 (1948) ..............................................................................19, 21

*United Bldg. and Constr. Trades v. Camden,*
    465 U.S. 208 (1984) ..................................................................................17

*United States Sec. and Exchange Comm'n v. Brown,*
    740 F. Supp. 2d 148 (D.D.C. 2010) ............................................................7

*United States Trust Co. v. New Jersey,*
    431 U.S. 1 (1977) ......................................................................................32

*United States v. Philip Morris USA, Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) ................................................................26

*United States v. Playboy Entm't Group.,*
    529 U.S. 803 (2000) ..................................................................................27

*United States v. Reese,*
    92 U.S. 214 (1875) ....................................................................................30

*Utility Contractors Ass'n of New England, Inc. v. City of Fall River,*
    2011 WL 4710875 (D. Mass. 2011) ......................................................8, 12

*Warth v. Seldin,*
    422 U.S. 490 (1975) ..................................................................................13

*Western Power Trading Forum v. Fed. Energy Regulatory Comm'n,*
    245 F.3d 798 (D.C. Cir. 2001) ....................................................................4

*Wisconsin Dep't of Indus., Labor and Human Relations v. Gould,*
    475 U.S. 282 (1986) ..................................................................................24

## STATUTES

D.C. Official Code § 2-1401.01 ....................................................................22

D.C. Official Code § 2-219.01 *et. seq*, Workforce Intermediary Establishment and
   Reform of First Source Amendment Act of 2011 (the "Amended Act") ...............1, 13, 15, 20

**RULES**

Fed. R. Civ. P. 8 ...................................................................................................................7

Fed. R. Civ. P. 12(b)(1) ................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ................................................................................... passim

Fed. R. Civ. P. 56 ...................................................................................................................5

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The District of Columbia (the "District") uses circular logic and makeweight arguments to try to avoid this substantive challenge to an invalid law. The District's 12(b)(1) motion ignores the well-pleaded facts demonstrating both the plaintiffs' standing and the ripeness of the current challenge. The District's 12(b)(6) motion similarly ignores persuasive precedents which demonstrate why the First Source Act should be declared invalid.

But the District is surprisingly blunt in its major premise: frustrated by the Congressional determination that it cannot enact a commuter tax, the District argues that it can enact one by a different name. Indeed, the District labels the Congressional prohibition of a commuter tax as a "peculiar evil" and a "local evil," which the District can "address" by discriminating against employers and nonresident employees like the plaintiffs.[1] And because the District chafes under this "structural imbalance" created by authorized Congressional action, it now deems itself free to ignore Constitutional limitations. The District's argument is unsupportable.

The Complaint states plausible bases for the invalidation of the First Source Employment Agreement Act (the "Act"), as amended by the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (the "Amended Act"), D.C. Official Code § 2-219.01 *et seq*. (collectively "First Source Act"). The named plaintiffs satisfy the standing and ripeness requirements. They have been injured by an act that violates the Constitution and need the Court's aid.

## I.     RESPONSE TO DISTRICT'S "FACTUAL BACKGROUND"

Although this is a 12(b)(1) and 12(b)(6) motion, nowhere in the "Factual Background"

---

[1] Memorandum in Support of District of Columbia's Motion to Dismiss (Document 6, filed July 19, 2012) (hereinafter "Memo."), at 22, 25.

section of its brief does the District cite a single paragraph of the Complaint. Instead, the District provides a lengthy digression about why it thinks the First Source Act is a good idea. That is not the issue on a motion to dismiss as presented under either Rule 12(b)(1) or Rule 12(b)(6).

Although the District's Rule 12(b)(1) and 12(b)(6) motions are analytically distinct, the standard of review is the same when a defendant makes a "facial attack," as opposed to a "factual attack" on a complaint. "Where a motion to dismiss under Rule 12(b)(1) makes a facial attack on the complaint, the court 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Allard v. Holder*, 840 F. Supp. 2d 269, 274 (D.D.C. 2012) (*citing Ord v. Dist. of Columbia*, 587 F. 3d 1136, 1140 (D.C. Cir. 2009)); *Martha's Vineyard/Dukes Cnty. Fishermen's Ass'n v. Locke*, 811 F. Supp. 2d 308, 313 (D.D.C. 2011); *Loughlin v. United States*, 230 F. Supp. 2d 26, 35-36 (D.D.C. 2002).[2] The same rule applies for both types of motions. *See e.g. Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) ("in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader").

A complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678(2009) (internal quotation marks omitted). As discussed below, the Complaint states facts supporting a plausible claim for relief—invalidation of the Act as unconstitutional.

The suit is brought on behalf of a trade association, several private employers, and several individual employees. The Complaint alleges that these employers and employees are

---

[2] The gist of the District's argument seems to be that, accepting all of the allegations of the Complaint as true, subject matter is wanting, rather than that the allegations themselves are erroneous. *Accord Tasini v. N.Y. Times Co*., 184 F. Supp. 2d 350, 354 (D.N.Y. 2002) (referring to a similar challenge as a "facial attack").

engaged in the construction trades and that they regularly bid on or work on projects in the District of Columbia which are affected by the requirements of the First Source Act. (Compl. ¶¶ 5-7, 14-16, 68, 74, 80). The trade association, Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington") alleges that its members, including the employer-plaintiffs, are engaged in the construction industry in the Washington metropolitan area. The organization promotes the philosophy of individual merit and reward and has fought preference-based laws like the First Source Act because of the adverse impact of such laws on its membership. (Compl. ¶¶ 4-6, 15-17, 20, 26, 32, 41, 72, 76, 86,105, 110).

The Complaint alleges that members of ABC-Metro Washington, including the employer plaintiffs, have had to fulfill statutory obligations under the First Source Act which have cost them money and been contrary to their economic or organizational values. Those impacts—those damages—are alleged in much more detail than is required under the pleading rules. For example, plaintiff Miller & Long Concrete Construction, Inc. ("Miller & Long") has incurred increased recruiting and training costs to deal with the strictures of the First Source Act; it has been forced to discriminate against its own employees who reside outside the District; and it has suffered competitive disadvantage by incurring costs to comply with the First Source Act, which costs then increase their bids for jobs compared to other companies. (*See, e.g*., Compl. ¶¶ 16, 17, 23). ABC-Metro Washington has alleged facts about how its members have suffered similar injuries because they have already been required under the First Source Act to incur costs and undertake expensive procedures to comply. (Compl. ¶¶ 15-17, 21, 27-28, 33).

As noted, the Complaint alleges that the plaintiffs suffered damages under both the original and amended Acts. The Amended Act retains core aspects of the Act such as requirements related to employment agreements, "new hire" construction contracts, targeted-

hiring contracts, and reporting. The Amended Act continues to regulate in these areas, but contains much more far-reaching, intrusive, and unlawful requirements than its predecessor. (Compl. ¶ 35). These additional requirements have already harmed the plaintiffs to an even greater extent than was true under the Act. (Compl. ¶¶ 52-53, 58-59, 64, 70-72, 75, 76).  For example, the new obligations of the Amended Act stemming from Amended Employment Agreements, Amended Construction Contracts, and Amended Targeted-Hiring Contracts have chilled and affected the bidding process for new work and caused Plaintiff Miller & Long to determine that it can only perform two concrete jobs in the District at a time with its existing workforce. (*See, e.g.*, Compl. ¶¶ 42, 53, 59, 84-85). The substantive requirements of the Amended Act dispel any inference that simply because an act has been in place for 30 years, the recent amendment must be valid. [3]

The federal rules do not require a plaintiff to plead evidence, just sufficient facts to support a plausible claim. Plaintiffs here have alleged with specificity how the First Source Act has affected the individuals' ability to be employed, as well as the employers' decisions about whom to employ. (*See, e.g.*, Compl. ¶¶ 14, 15-16, 23, 43). The Complaint alleges how the requirements to track employees by residence and thereafter deploy them in order to comply with

---

[3] The District erroneously suggests that plaintiffs' claims seeking redress for the illegality of the original Act might be moot. An amendment that leaves the key challenged features of a bill in place without fundamentally altering them leaves a challenge to the law justiciable. *Western Power Trading Forum v. Fed. Energy Regulatory Comm'n*, 245 F. 3d 798, 802 (D.C. Cir. 2001) (*citing Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F. 3d 449, 458-59 (D.C. Cir. 1998); *Naturist Soc'y, Inc. v. Fillyaw*, 958 F. 2d 1515, 1520 (11th Cir. 1992) ("superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law.  To the extent that those features remain in place…the case is not moot."); *accord Northeastern Fla. Ch. of Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 661-62 (1993) (holding that repeal of a challenged ordinance and enactment of a replacement statute after the Supreme Court granted certiorari, but before it issued a decision did not render the case moot because the new statute disadvantaged the plaintiffs "in the same fundamental way").

the First Source Act have harmed the employers and their decisions to hire people or bid on jobs. (*See, e.g.*, Compl. ¶¶ 15. 23, 29, 60, 83).

The District cannot credibly argue that the Complaint is lacking in factual allegations sufficient to support a claim for relief. Instead, the District pads its Motion with a long discussion about the concededly lawful decision by Congress to prohibit the District from imposing a tax on the income generated by nonresidents. The District's Motion quotes a number of studies and statistics regarding the "commuter tax" issue, almost all of which are hearsay and were generated long after the Act was initially passed and even after the Amended Act was adopted. (Memo., at 2-3, 9-12). It is hard to discern why these materials are relevant to the Motion; they do not address any of the concerns alleged in the Complaint.

More to the point, the District's "Factual Background" does not quarrel with the facts alleged in the Complaint about what the First Source Act requires or means for individuals and companies in the position of the plaintiffs. None of the "legislative history" or the discussion about the commuter tax can inform this Court's analysis of whether the Complaint states a plausible claim for relief, or whether the plaintiffs have standing to bring this action. Although on a 12(b)(1) motion, a court has authority to take into consideration extrinsic evidence, the evidence must still be relevant and competent. The court may not consider hearsay or conclusory statements. *See Tasini*, 184 F. Supp. 2d at 357 n.8 (articles and newspaper clippings do not rise to the level of competent evidence, and should not be considered in determining subject-matter jurisdiction). None of the extrinsic materials cited in the Motion qualifies under these criteria.[4]

---

[4] It is not proper for this Court to consider extrinsic evidence based on a facial challenge under Rule 12(b)(1) to the Complaint, but were this Court to decide the District has made a factual attack on the Complaint and to consider extrinsic evidence "it should inform the parties and set a schedule for submitting additional affidavits and documents if the parties wish." *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 361 (D.C.Cir.1982). Under Rule 12(b)(1), "procedural safeguards equivalent to those in Rule 56 are required." *Id.* at 360.

But even if the legislative history and the cited reports and articles in the District's Motion were considered, the materials are still irrelevant to the issues of standing and sufficiency of pleading raised in the 12(b)(1) Motion.

## II.     ARGUMENT

The District moves to dismiss the Complaint under Rule 12(b)(1) and Rule 12(b)(6). Under Rule 12(b)(1), the District argues that none of the plaintiffs has standing because the Complaint fails to allege facts demonstrating injury stemming from the First Source Act. But the Complaint plainly sets out those factual allegations identifying who these plaintiffs are and how they have been injured by the unconstitutional Act. To the extent that the District is also alleging that the dispute is not ripe, the Complaint plainly and repeatedly sets forth how the First Source Act has already injured the plaintiffs and threatens them with immediate and continued injury. Moreover, ABC-Metro Washington handily satisfies the test for organizational standing to pursue this claim on behalf of its members.

On the merits, the Complaint alleges facts from which the Court can conclude that the First Source Act violates the Privileges and Immunities Clause, the Commerce Clause, the Equal Protection Clause, the First Amendment, the Due Process Clause, and the Contracts Clause. The District has not advanced a cogent argument to support employee nonresidency as a rational basis for imposition of the additional hiring, training, paperwork, and operational requirements on individuals or companies seeking to do business in the District. The District's Motion barely acknowledges and does not effectively rebut the core Privileges-and-Immunities Clause argument advanced by the individual plaintiffs.

A.     <u>This Court Should Deny the Rule 12(b)(1) and 12(b)(6) Motions Because the Plaintiffs Have Standing.</u>

A complaint need only set forth a short and plain statement of the claim, giving the

defendant fair notice of the claim and the grounds upon which it rests. *See* Fed. R. Civ. P. 8. Under *Iqbal* and *Twombly*, a complaint should supply facts upon which a plausible claim for relief is based: "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). Plaintiffs' Complaint more than satisfies the standards for pleading under Rule 8 and the corresponding requirements for surviving a facial challenge under Rule 12(b)(1) and a challenge based on Rule 12(b)(6).

The District's Motion goes far afield from the normal motion to dismiss. As if it were filing an answer or a motion for summary judgment, the District argues that facts such as the District's "structural deficit," "highest taxes in the nation" and "highest in the region unemployment" provide "ample justification for the legislation challenged here." (Memo., at 2-3). This line of argument is inappropriate in a motion to dismiss. *See Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979) ("The posture of the case constrained the District Court as it does us to accept the truth of the well-pleaded factual allegations of the complaint.") Indeed, as this Court recently stated in denying a motion to dismiss a fraud case (where a heightened pleading standard applies), denial of the motion is appropriate if the complaint pleads "sufficient facts to put Defendants on notice of the plaintiff's claims … [A] plaintiff does not need to recite the evidence or plead detailed evidentiary matters." *United States Sec. and Exchange Comm'n v. Brown,* 740 F. Supp. 2d 148, 162 (D.D.C. 2010) (citations omitted).

> i.    *Individual plaintiff*

The District argues that the individual plaintiffs lack standing because they fail to allege "the type of individualized harm necessary to support standing." (Memo. at 17). But the

Complaint alleges the facts supporting such standing for each plaintiff. To establish standing, a plaintiff must ultimately show that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F. 3d 882, 895 (D.C.Cir. 2006) (*citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

For the individual plaintiffs and employers, standing is supported by the allegations that the provisions of the First Source Act have adversely affected their ability to bid for or secure work on District projects in the past <u>and</u> will likely continue to do so, and make matters worse under the Amended Act. Such factual allegations have supported standing in other cases in which hiring preference laws were challenged. In *Utility Contractors Ass'n of New England, Inc. v. City of Fall River,* 2011 WL 4710875 (D. Mass. 2011), the court rejected the city's argument that the nonresident contractor lacked standing, even though the contractor did not actually bid on the dam project for which the residential hiring preference ordinance was enacted and the city voluntarily chose not to enforce the challenged ordinance. Rather, "the fact that [plaintiff] did not actually bid on the dam project is irrelevant. In the bidding context, 'injury in fact' is the ability to compete on an equal footing in the bidding process, not the loss of a contract." *Id (quoting Northeastern Fla. Chapter of Ass'd Gen'l Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 657 (1993)). Having asserted that "they were not able to compete fairly in the Fall River bidding process," the plaintiffs in *Utility Contractors* had established their standing to challenge the ordinance. *Id.*

Here, the individual plaintiffs have specifically alleged that the First Source Act hampers their ability to find employment. (*See, e.g*., Compl. ¶¶ 7, 14, 23, 43, 53, 59, 83, 89). The individual plaintiffs have alleged facts to support the conclusion that they do not stand on an equal footing with other workers because, for example, they cannot register on the First Source list, do not satisfy the residence hiring requirements, and, therefore, can never be in the preference pool that the First Source Act creates. (Compl. ¶ 14). Besides the injuries they have already suffered under the First Source Act, they have alleged ongoing and imminent injuries caused by the Amended Act, not merely conjectural or contingent future injuries such as the District relies upon to contend the Plaintiffs lack standing. *Cf. Chamber of Commerce v. Envtl. Prot. Agency*, 642 F. 3d 192, 201 (D.C. Cir. 2011) (standing arises from impending, imminent future injury for which there is a "substantial … probability").

The individual plaintiffs here specifically allege competitive harm that they "are at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list." (Compl. ¶ 14). In fact, this is the precise type of competitive economic injury that this Court recently found sufficient to satisfy the Article III "injury-in-fact" requirement. *Air Transp. Ass'n of Am. v. Exp.-Imp. Bank*, Case No. 11-2024, 2012 WL 2914442 at *9-11 (D.D.C. July 18, 2012) (plaintiffs, including trade association, have standing to challenge loan commitments made by the Ex-Im Bank in favor of foreign airline because of the competitive economic injury). "It is clear … that the injury-in-fact requirement may be satisfied before an injury from increased competition actually occurs." *Air Transp., 2012 WL 2914442,* at *10. Furthermore, evidence that prior government action has injured the plaintiffs "provides some support for their argument" that new similar government action will imminently cause them injury. *Id*. at *11. "Because increased competition almost surely injures" a plaintiff, he does

9

not have to "wait until 'allegedly illegal transactions…hurt [him] competitively' before challenging the regulatory…governmental decision that increases competition." *Id*.

This is precisely the situation in which the plaintiff nonresident construction workers and the ABC-Metro Washington members find themselves vis-à-vis residents and persons exempt under the First Source Act: at a competitive disadvantage. The effect of the First Source Act is similar to the effect of the subsidy found sufficient to support competitor standing in *Air Transp.*, without regard to whether the effect was on new or existing competitors. *Id*. at *12-15.

The District also argues that the individual plaintiffs are without standing because they cannot link the Act to particular individual harm. (Memo., at 18). The District cites *Center for Biological Diversity v. Department of Interior*, 563 F.3d 466 (D.C. Cir. 2009), where the court found that petitioners were without "substantive standing" when they did not demonstrate a causal link between Interior's initial approval of offshore oil and gas leasing and petitioners' enjoyment of arctic wildlife. The Court deemed too "tenuous" the connection between Interior's approval and climate change affecting wildlife—and the chain was too dependent upon numerous third-party actors. 563 F.3d at 478.

But the District takes this noncontroversial proposition and applies it to the individual plaintiffs in a slick and unprincipled way—namely, arguing that these workers are not harmed by the Act so long as they avoid situations in which the Act applies:

> Nothing in the First Source Act "prohibits [plaintiffs] from pursuing [their] profession in [the District], or regulates [their] ability as a noncitizen to enter or engage in business there." *McBurney v. Young*, 667 F.3d 454, 465 (4th Cir. 2012). The individual plaintiffs may continue to seek work on any construction project in the District that will hire them; those projects involving District funds have requirements regarding District residents that apply only to contractors and subcontractors, not to the individual plaintiffs. Thus, the effect of First Source on the individual plaintiffs is too "indirect and tangential" to constitute a legally cognizable harm.

(Memo., at 19-20).

Of course this argument is sheer nonsense. The whole purpose of the First Source Act is to promote District resident employment at the expense of nonresident employment. To a man facing an additional hurdle to be employed at a construction site because of where he lives, saying to him, you "may continue to seek work on any construction project in the District that will hire [you]" is cold comfort. And to label his position as "tangentially" and "indirectly" related to the First Source Act is preposterous. If the First Source Act is intended to increase the employment of residents, as the District contends, it must also certainly have a direct effect on nonresidents seeking those same jobs.[5]

Because the impact of preferential hiring laws is far from "tangential," individual plaintiffs have been held to have standing in similar cases. For example, the plaintiffs in *Hicklin v. Orbeck,* 437 U.S. 518, 520 (1978) were "individuals desirous of securing jobs covered by the Act but unable to qualify for the necessary resident cards…." Plaintiffs here have alleged virtually the same thing. (*See* Compl. ¶ 14) ("The individual plaintiffs, as nonresidents of the District of Columbia, are prohibited from registering on the First Source list, do not satisfy the residency hiring requirements, and, therefore, are at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list.").

---

[5] The District's quotation from *McBurney v. Young,* 667 F.3d 454, 465 (4th Cir. 2012), in support of its "indirect and tangential" argument is startlingly misleading. *McBurney* was a nonresident's challenge to Virginia's FOIA law and the Court was considering whether the restrictions on nonresidents affected a right protected by the Privileges and Immunities Clause, including the right to "pursue one's calling." In that substantive context—not standing—the Fourth Circuit wrote that *"*[n]othing in the language of the [Virginia FOIA law] prohibits [plaintiff] from pursuing his profession in Virginia…." *Id.* But the First Source Act is *intended* to affect the ability of nonresident workers to pursue their calling in the District by penalizing employers who choose to engage them instead of engaging District residents.

ii.    *Employers*

The District argues that the employer-plaintiffs also lack standing because their injuries are "speculative." (Memo., at 19). But the Complaint alleges facts regarding the costs, expenses, and disruption to their business already caused by the First Source Act. (*See, e.g.*, Compl. ¶¶ 15-17, 21, 27-28, 33). There is nothing "speculative" about past injuries or competitive economic injuries. ABC-Metro Washington's members have alleged that they suffer a competitive disadvantage in comparison to various other construction companies such as those that receive waivers or exemptions. (Compl. ¶¶ 18, 28, 34, 44, 54, 65, 72). It will be more difficult for them to be successful bidders and to participate in successful bids on projects subject to the Act. (Compl. ¶ 70). This is the type of competitive harm that always confers standing upon plaintiffs. *Air Transp., 2012 WL 2914442,* at *10.

The District also argues that the injuries are "speculative" because the District has chosen not to seek fines for noncompliance. (Memo., at 19). That argument fails to address the allegations in the Complaint that the plaintiffs have already incurred costs and expenses and disruption to business. (Compl. ¶¶ 16-17, 21-22, 27-28, 33, 42, 52, 58, 64, 71, 75-76). Furthermore, the District's voluntary decision not to enforce the First Source Act does not defeat the plaintiffs' standing. *See, e.g.*, *Utility Contractors Ass'n v. Fall River*, 2011 WL 4710875 at *3 ("A party who must comply with a law or face sanctions has standing to challenge its application and therefore a party need not show that the law is being enforced or will be enforced.'") (citations omitted). It is the First Source Act's provisions themselves, and the harm they cause, which are to be evaluated with respect to plaintiffs' standing, not the District's voluntary decision not to seek penalties against the named plaintiffs.

iii.    *ABC-Metro Washington*

ABC-Metro Washington has organizational standing on its own behalf as well as representational standing on behalf of its members. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy.") For itself, ABC-Metro Washington has alleged how the Act conflicts with ABC-Metro Washington's mission and core individual-merit philosophy by forcing construction companies to hire on the basis of District residency, as opposed to competency and skill, and to solicit contracts for reasons besides safety, quality, and value. (Compl. ¶¶ 4, 110).

ABC-Metro Washington has also suffered injury as a result of having to spend resources to inform its members of and to participate in the rule-development process relating to the Amended Act. (Compl. ¶¶ 4, 87). Either one of these factors is a proper foundation for organizational standing. *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 539 F. Supp. 2d 331, 338-39 (D.D.C. 2008) (organizational standing may be premised upon increased expenditures devoted to counteracting the defendants' illegal practices including increased education efforts) (*citing National Taxpayer's Emp. Union v. U.S.*, 101 F. 3d 1423, 1429-30 (D.C. Cir. 1996)); *Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 469 F. 3d 129, 133 (D.C. Cir. 2006) (organizational standing may be premised upon a direct conflict between the defendant's conduct and the organization's mission).

In addition, ABC-Metro Washington has representational standing on behalf of its members. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The "associational standing doctrine represents a very limited exception to the fundamental Article

13

III requirement that the plaintiff before the court 'be himself among the injured.'" *Health Research Group. v. Kennedy*, 82 F.R.D. 21, 25 (D.D.C. 1979) (*citing Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972)). An association has standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*See Hunt*, 432 U.S. at 343; *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F. 2d 107, 111 (D.C. Cir. 1990); *South Coast Air Quality Mgmt. Dist. v. Envtl. Prot. Agency*, 472 F. 3d 882, 895 (D.C. Cir. 2006); *Hazardous Waste Treatment Council v. U.S. Envtl. Prot. Agency*, 861 F. 2d 270, 273 (D.C. Cir. 1988).

"The first prong of the *Hunt* test will be satisfied if the organization shows that its members have personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury can be fairly traced to the challenged action and is likely to be redressed by a favorable decision." *Hazardous Waste Treatment*, 861 F. 2d at 273. ABC-Metro Washington has set forth allegations of standing that match those found adequate in *Hunt*. There, the Washington State Apple Advertising Commission had associational standing, because (1) the statutory purpose and the actual activities of the Commission established that it served "a specialized segment of the State's economic community which is the primary beneficiary of its activities"; (2) because the apple growers and dealers possessed "all of the indicia of membership in an organization," the Commission "[i]n a very real sense…represent[ed] the State's growers and dealers"; and (3) there was a "financial nexus between the interests of the Commission and its constituents," which made it possible that the

Commission's own interests would be affected by the ligation's outcome. *Kennedy*. 92 F.R.D. at 26 (*citing Hunt*, 432 U.S. at 344-45).

Here, ABC-Metro Washington is comprised of over 400 member companies and, as alleged, these companies support bidding, hiring, and contracting decisions based on merit, not factors such as residency. (*See, e.g.*, Compl. ¶¶ 4-6, 15). The members are commercial construction companies dedicated to hiring based on individual merit. The First Source Act impinges upon the companies' ability to operate according to their "individual merit, level playing field business philosophy by hiring or staffing individuals based on where they live instead of exclusively because of the qualifications for the job." (Compl. ¶15). The Amended Act threatens greater concrete injury to include, without limitation, preventing companies from winning District contracts or, at least, from contracting with the most qualified personnel, as well as fines and debarments that could affect their operations. (*See, e.g.*, Compl. ¶¶ 39, 42, 76, 79).

The second requirement for associational standing is that the interests the organization seeks to protect are germane to the organization's purpose. "Germaneness is satisfied by a 'mere pertinence' between litigation subject and an organization's purpose." *Competitive Enter.*, 901 F. 2d at 111. ABC-Metro Washington has pleaded the facts sufficient to demonstrate germaneness, because the association and its members are dedicated to a free-market hiring and contracting philosophy, which is impinged by the First Source Act. (*See, e.g.*, Compl. ¶¶ 15, 86, 110).

ABC-Metro Washington has also pleaded facts to support the last requirement for associational standing: neither the claim asserted nor the relief requested by way of injunction or declaratory relief requires the participation of individual members in the lawsuit.[6] In sum, the

_____

[6] Associational standing is not permitted if individual members of the organization are indispensable parties to the suit. *Committee for Full Emp't v. Blumenthal*, 606 F. 2d 1062, 1067 (D.C. Cir. 1979). Furthermore, associations may not assert standing to seek monetary, as distinguished from injunctive or declaratory relief on behalf of an organization's members. *United Food & Commercial*

District's arguments about standing are contrary to the facts alleged in the Complaint. The Plaintiffs have alleged how they have suffered injury-in-fact as well as the basis for future injuries if the First Source Act is not voided. The manner in which the First Source Act is unconstitutional is discussed in the next sections.

B.    The Complaint States a Claim under the Privileges and Immunities Clause.[7]

   i.    *The First Source Act violates the fundamental rights of the individual plaintiffs.*

Under Article IV of the Constitution, the citizens of each state "shall be entitled to all Privileges and Immunities of Citizens in the several States." The Clause prevents states from enacting measures which discriminate against the residents of other states for reasons of economic protectionism. *See New Hampshire v. Piper*, 470 U.S. 274, 285 n. 18 (1985). These protections apply to fundamental rights involving "basic and essential activities, interference with which would frustrate the purposes of the formation of the Union."  *Baldwin v. Montana Fish and Game Comm'n*, 436 U.S. 371, 387 (1978).  "It is therefore not surprising that this Court repeatedly has found that 'one of the privileges which the Clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State." *Piper,* 470 U.S. at 280. More specifically, the Supreme Court determined many years ago that the right to pursue one's common calling in the construction industry is a fundamental right

---

*Workers*, 517 U.S. at 554; *Telecomm. Research & Action Car*, 806 F. 2d at 1095; *Committee for Auto Responsibility*, 603 F. 2d at 998 n.13. Neither of these impediments is presented here.

   [7] The District concedes for purposes of this motion that the Privileges and Immunities Clause applies to the District. (Memo., at 20). That concession is in line with cases which, while not holding that the Clause binds the District, nevertheless apply the Clause and the cases interpreting the Clause. *See, e.g.*, *Service Emps. Int'l Union, Local 82 v. Dist. of Columbia*, 608 F.Supp. 1434 (D.D.C. 1985) (challenge to District's imposition of higher bond requirements on nonresident vendors made under both the Commerce Clause and the Privileges and Immunities Clause; Court analyzed the issue using both clauses in striking down disparate bond requirement as applied to nonresidents). *See id.* at 1439-40 (quoting *Toomer v. Witsell*, 334 U.S. 385 (1948)).

entitled to protection under the Privileges and Immunities Clause. *See Hicklin v. Orbeck*, 437 U.S. 518, 524-25 (1978) and *United Bldg. and Constr. Trades v. Camden*, 465 U.S. 208, 222-23 (1984).[8] The Complaint alleges very clearly that by discriminating against nonresidents who are seeking to practice their trades, the First Source Act facially violates the Privileges and Immunities Clause.

               *ii.*    *The First Source Act does not further a substantial public purpose.*

Because hiring provisions that impose a residence preference encroach on an interest that is "fundamental to the promotion of interstate harmony," the Supreme Court has made it clear that the law will be struck down *unless* there is (1) a "substantial reason" for the differential treatment and (2) the "degree of discrimination" bears a "close relation" to that "substantial reason." *United Bldg. and Constr. Trades Council of Camden Cnty. v. Mayor and Council of City of Camden*, 465 U.S. 208, 218, 222 (1984)*; see also Hicklin v. Orbeck*, 437 U.S. 518 (1978) (striking down Alaska's resident employment statute).[9] The First Source Act cannot survive this test.

First, there is no question that the individual plaintiffs have alleged that they seek employment from private contractors that are working on projects administered by the District or funded in whole or in part by the District, and that the First Source Act infringes on their

---

[8] In addition to the federal precedent supporting Plaintiffs' claim in this case, many state courts have also invalidated enactments which grant an employment preference to local workers. *See Laborers Local Union No. 374 v. Felton Constr. Co.,* 654 P.2d 67 (Wash. 1982); *Salla v. Cnty. of Monroe,* 399 N.E.2d 909, *cert. denied*, 446 U.S. 909 (N.Y. 1979).

[9] The District attempts to dispute the narrow tailoring requirement under the Privileges and Immunities Clause (Memo., at 23), but this standard is well-established. *See Hicklin v. Orbeck*, 437 U.S. 518 (1978) (striking down Alaska's resident employment statute as not "narrowly tailored"); *Supreme Court v. Friedman*, 487 U.S. 59, 65 (1988) (same); *Conservation Force, Inc. v. Manning*, 301 F.3d 985 (2002); *Salla v. Monroe County,* 399 N.E.2d 909, 913-14 (N.Y. 1979) ("In the end, nothing less than a unique link between the interest served and the discrimination practiced will do"); *Robison v. Francis,* 713 P.2d 259, 264-65 (Alaska 1986).

fundamental right to pursue their common calling. (*See, e.g.*, Compl. ¶¶ 7, 14, 23, 43, 53, 59, 83, 89-92).

After the Supreme Court's decision in *Camden,* the Seventh Circuit stuck down the "Illinois' Preference to Citizens on Public Works Projects Act" as a *prima facie* violation of the Privileges and Immunities Clause. *C.M. Windows Co., Inc., v. Bernardi,* 730 F.2d 486, 497-98 (7th Cir. 1984). While Illinois had offered no evidence to establish a substantial justification for the facial discrimination of its hiring-preference law, the Court outlined just how difficult it would be to show that a hiring-preference law was adequately targeted at the "peculiar source of evil" caused by nonresidents, by showing that the challenged law both increases residential employment and has an overall beneficial impact on residents:

> The preference law might have no effect on the unemployment rate in Illinois. Worse, it could boomerang, and actually increase unemployment in the construction industry. Suppose for example that a public construction project would cost $1 million if it employed both Illinois residents and nonresidents and $1.2 million if it employed only Illinois residents. If the higher price were more than the school district or other public agency was willing to pay, the project would not be authorized and the Illinois residents who would have worked on it would have to seek work elsewhere.

*Id.*

Plaintiffs have alleged that the First Source Act is essentially a "job-shifting" law, which moves work from individuals who are not paying District income taxes to people who do. (Compl., ¶81). In other words, the Act does not create more employment, just more tax revenue from the same jobs because of who the employees are. Indeed, the District essentially concedes the point with its multiple references to the commuter tax and the "structural imbalance"--caused not by lower employment but by the identity of the employees (namely, nonresident employees not paying District taxes).

"More tax revenue" does not suffice as a "substantial reason" for preferential-hiring laws. If it did, every preferential-hiring requirement would be valid, but, of course, they are not. The justification for the discrimination has to be substantial and linked to the "evil" the government seeks to cure. "More tax revenue" has never been found sufficient to establish any of the necessary elements to defend a discriminatory law like the First Source Act and the District has not cited any cases in which that alone was found to be a substantial public purpose sufficient to justify a residential preference.

iii.   *The First Source Act is not narrowly tailored to advance any public interest.*

The First Source Act is also "not narrowly tailored to advance a public interest" because "nonresidents are not a peculiar source of unemployment in the District, nor are they the source of any other local 'evil.'" (Compl. ¶¶ 93, 114). In *Hicklin*, the Court determined that the preferential hiring statute at issue failed to be narrowly tailored. The court noted the inadequacy of Alaska's "across-the-board" grant of a job preference to all Alaskan residents, including "the habitually unemployed and the employed, those in job training programs, the well trained or poorly trained." *Id.* at 527-28. Much like in Alaska, the nonresidents employed in the District are not the cause of unemployment among District residents but a symptom of the shortage of qualified workers in the District due to other various social and economic ills which have not been caused by nonresidents. (Compl. ¶ 81). "The skill levels of in-migrants and seasonal workers are generally higher than those of the unemployed or under-employed resident workers. *Their ability to command jobs in Alaska is a symptom of, rather than the cause of conditions resulting in high unemployment rates*, particularly among Alaska Natives. Those who need the jobs the most tend to be undereducated, untrained, or living in areas of the state remote from job opportunities." *Hicklin*, 437 U.S. at 527.

19

The District specifically says that the District's inability to enact a commuter tax is a 'peculiar source of the evil' the District is attempting to address." (Memo., at 25). Apparently, the District is arguing that Congress' exercise of its plenary authority under the Constitution to legislate for the District of Columbia has created an "evil," which the District declares itself authorized to "address" with a discriminatory law. The District cites no precedent or authority for the position that Acts of Congress create "evils" which local jurisdictions can "address" by adopting residence-preference laws. In fact, this argument makes no sense, since Congress acts as the District's local government when it legislates in this manner. *See Banner,* 303 F. Supp. 2d at 14 (*"*District residents are not unrepresented citizens of the taxing legislature as plaintiffs claim, instead, they have 'adopted the whole body of Congress for [their] legitimate government.'") (*quoting* <u>Loughborough v. Blake,</u> 18 U.S. (5 Wheat.) 317, 324 (1820)).

iv. *The District is not entitled to deference in identifying local "evils."*

The District argues that it is entitled to "considerable leeway in analyzing local evils and prescribing appropriate cures" because it is "merely setting conditions on the expenditure of funds it controls." (Memo., at 21-25) But as the District must concede,some of the projects subject to the First Source Act are only partially funded by the District. (Memo., at 26). And, as the Complaint points out, the First Source Act impacts far more than the expenditure of the District's own funds. (Compl. ¶¶ 11, 37-38). The First Source Act makes clear that it also affects funds which "the District government administers." *D.C. Official Code* § 2-219.01(1)(A)-(1)(B) (2011).

Additionally, the case law does not support granting any deference to the District to violate the Privileges and Immunities Clause. "Because a 'market participant' determination is

irrelevant in a case which is litigated under the privileges and immunities clause, [the government's] reliance on the 'market participant' analysis…is misplaced." *People ex rel. Bernardi,* 464 N.E.2d 1019, 1022 (Ill. 1984) For example, the "'Alaska Hire' statute struck down in *Hicklin*…is an example of a case in which the proprietary interest of the state was entitled to little or no deference.  An example where more leeway is due might be a case in which a state law requires residency as a qualification for important non-elective public offices." *See Robison v. Francis*, 713 P.2d at 264-65.

        v.      *Virtually every residential-preference hiring law has been struck down when challenged under the Privileges and Immunities Clause*

In defending the First Source Act, the District confronts a mountain of cases that have condemned various residence preference laws as unconstitutional under the Privileges and Immunities Clause. *See e.g. Hicklin,* 437 U.S. at 525-26; *Toomer,* 334 U.S. at 398; *Piper,* 105 S.Ct. at 1279; *Robison,*  713 P.2d at 265; *Utility Contractors Ass'n of New England, Inc. v. City of Fall River,* 2011 WL 4710875 (D. Mass. 2011). In their attempts to defend these laws, many states and cities have pointed to conditions similar to those highlighted by the District, including their dire financial circumstances and high unemployment and poverty rates. *See also Salla,* 399 N.E.2d at 913-14; *Merit Constr. Alliance v. Quincy,* 2012 WL 1357656, *3 (D. Mass. 2012). However, the courts have rejected these arguments for the very reason that the District's arguments must be rejected: residence preference laws amount to economic protectionism targeted at a nonresident's protected right—the right to pursue one's calling anywhere in the nation, without discriminatory barriers erected at state and local borders. As set forth by the court in *Utility Contractors Ass'n of New England, Inc. v. Worcester,* "[i]t is more than a stretch to suggest that nonresident employment on public construction projects—or in the construction sector generally—is responsible for the far-reaching economic problems the City describes.

Discrimination predicated on such a finding smacks of the very interstate protectionism that the Privileges and Immunities Clause is intended to combat." 236 F. Supp. 2d 113, *120 (D.Mass. 2002) (citing Piper, 470 U.S. at 285 n. 18, 105 S.Ct. 1272* (noting that the Privileges and Immunities Clause prohibits discriminatory measures aimed at making in-staters more competitive).

The District's attempt to characterize its situation as "unique" (Memo., at 2, 23), and its assertion that more District-resident jobs means more District-resident tax revenue (Memo., at 25) cannot possibly make its discrimination constitutional. There is nothing unique about cities having greater social needs than diminishing tax revenues can cover. *See A.L. Blades & Sons, Inc. v. Yerusalim,* 121 F.3d 865, 872 (3rd Cir. 1997) (affirming district court's holding that the rate of "unemployment among Pennsylvania construction workers ... [is not] unique, and is not a 'local problem' justifying 'protectionist' measures relative to other states"). If that were enough to justify these types of discriminatory laws, then these arguments would have already saved the many residence preference laws which have been struck down.

C.      The Complaint States a Commerce-Clause Claim.

In seeking to dismiss the Commerce-Clause claim, the District simply ignores the facts pleaded in the Complaint and the language of the First Source Act itself. The First Source Act does not simply regulate transactions in which the District has entered into a contract to spend its own money. Among other things, the Amended Act governs the actions of a "recipient" of "government economic development action," which includes a grant or a tax abatement or tax-increment financing. D.C. Official Code § 2-219.01 (2011) (discussed in Compl. ¶¶ 11, 37-38). Where the District is attempting to control this wide range of construction projects to which it has only a slight financial contact, it is not a private purchaser exempt from the Commerce Clause in its discriminatory requirements, but rather a market regulator enforcing discriminatory

regulation on the broader market. See *Antilles Cement Corp. v. Fortuno,* 670 F.3d 310, 330 (1st Cir. 2012) (finding that Commonwealth fit within market participant exception under statute because law had no bearing on private construction projects that were <u>subsidized</u> by the Commonwealth, otherwise "then arguably it would be acting as a market regulator, and the outcome of this appeal might be different.") (emphasis added).

The District said it best: the dispositive factor here is that "Plaintiffs allege that the District 'has acted and is acting as a market regulator' through the First Source Act, which impermissibly burdens interstate commerce." (Compl. ¶¶ 96-99). (Memo., at 25-26). Plaintiffs back up this claim with specific, factual allegations regarding the broadly regulatory nature of the First Source Act, which includes detailed requirements about recruiting, advertising, and reporting on projects the District does not even fund and which apply to several tiers of subcontractors, with the result that the First Source Act's requirements reach down to companies and individuals who are subcontractors to other subcontractors. (*See, e.g.*, Compl. ¶¶ 12, 29-31, 37-38, 45, 47, 51, 60-61, 73).

Even with respect to a state acting as a market participant, "a state-proprietor may discriminate against foreign commerce only within the narrow market realm in which it operates." *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 330 (1st Cir. 2012)*; see also South–Central Timber,* 467 U.S. at 99 (holding that a state "may not avail itself of the market-participant doctrine to immunize its downstream regulation of [a] market in which it is not a participant"). Through the First Source Act, the District reaches far beyond the parties with whom it directly contracts for construction services and reaches out to regulate the recruiting, hiring, and compliance reporting and to levy potential fines and debarments on virtually every subcontractor in the Washington metropolitan area. (*See, e.g.*, Compl. ¶¶ 48, 51, 61). By

regulating behavior that is unrelated to its own purchase of development services, the District has "acted more like a sovereign than a private company." *See South Cent. Timber,* 467 U.S at 99; *see also New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 277–78 (1988) (holding that when a state is acting as a regulator rather than as a market participant, it cannot institute discriminatory policies).

In *Wisconsin Dep't of Indus., Labor and Human Relations v. Gould,* 475 U.S. 282 (1986), the court held that the market-participant exception did not apply to a statute that debarred repeat offenders of the NLRA from bidding on future state contracts.  "[B]y flatly prohibiting state purchases from repeat labor law violators Wisconsin simply is not functioning as a private purchaser of services; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation."  *Id.* at 289. "Where, as here, the market participant exception does not apply and where Congress has not spoken otherwise, state laws that on their face discriminate against foreign commerce are almost always invalid." *Antilles Cement,* 670 F.3d at 330 *(citing Fulton Corp. v. Faulkner,* 516 U.S. 325, 331 (1996)).

    D.    <u>The Complaint States a Claim under the Equal Protection Clause.</u>

The Equal Protection Clause requires "that the government not treat similarly situated individuals differently without a rational basis."[10] *Noble v. U.S. Parole Comm'n*, 194 F.3d 152, 154 (D.C. Cir. 1999). As discussed above, the First Source Act does not provide a rational basis for treating nonresident employers and employees differently than resident employers and employees. Unless the District's ability to "address" the "evil" of not having a commuter tax states a reasonable basis for government action—which it does not—there is no rational basis for the conceded discrimination.

---

[10] The equal-protection guarantee in the Fourteenth Amendment is applied to the District through the Fifth Amendment. *Libertarian Party v. Dist. of Columbia Bd. of Elections and Ethics*, 768 F. Supp. 2d 174, 177 n.4 (D.D.C. 2011).

The allegations of the Complaint are sufficient to state an equal-protection claim. The Complaint plainly identifies the plaintiffs' proper comparators--individuals who are residents of the District or employers who have sufficient resident employees to satisfy the First Source Act and who do not object to the type of discriminatory conduct the First Source Act requires. (Compl. ¶¶ 18, 28, 34, 44, 54, 65, 72, 105, 106, 107). The fact that the Complaint does not name XYZ Company or Mr. John Smith as "similarly situated" does not make the Complaint defective any more than would failing to identify by name individuals who have not been discriminated against for purposes of a claim for racial discrimination. The District is arguing that the evidence must be set forth in the Complaint, but that is not a pleading requirement.

Throughout its brief, the District misquotes and misuses *Banner v. United States,* 303 F. Supp. 2d 1 (D.D.C. 2004), in an attempt to shore up its arguments. For example, in asserting that plaintiffs do not have a valid equal-protection claim, the District cites *Banner* for the proposition that "District residents who work here are not similarly situated to out-of-state residents employed here." *Banner*, 303 F. Supp. 2d at 16. But the quotation is misused by the District. The court in *Banner* was considering a challenge to a federal law based on the District residents' lack of a congressional representative to vote for or against that law. *See Banner,* 303 F. Supp. 2d at 14 ("It is thus impossible to accept plaintiffs' premise that the Prohibition is subject to attack based on a lack of representation in Congress, given that this very lack of suffrage is constitutionally derived."). In that respect, District residents *are* differently situated than the citizens of other states, but not in the sense that the District's Motion to Dismiss tries to suggest.[11]

---

[11] The District also inaccurately cites *Banner* for the proposition that "'the District is the only jurisdiction in the United States denied the benefit of taxing income within its borders.' *Banner*, 303 F. Supp. 2d at 3." (Memo., at 10). The court merely quotes plaintiffs' allegation to this effect without finding as such as follows: "*Amici for plaintiffs argue that* the District is the only jurisdiction…." *Id.* (emphasis

A simple reading of *Banner* makes it clear that that case has no bearing upon this one. The First Source Act discriminates against the individual plaintiffs who do not reside in the District, although they are otherwise similarly situated to construction workers who live in the District and are applying for the same construction jobs. These allegations are clearly set forth in the Complaint. (*See, e.g.*, Compl. ¶14). Therefore, plaintiffs have sufficiently alleged an equal-protection claim.

E.   The Complaint States a First Amendment claim.

Plaintiffs have alleged the necessary facts to establish that the First Source Act violates plaintiffs' right to free speech. The District concedes two categories of valid First Amendment challenges, both of which are pled in the complaint: "compelled speech" and "compelled subsidy" challenge. *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). With respect to the former, "[t]he First Amendment protects against government infringement on 'the right to speak freely and the right to refrain from speaking at all.'" *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095 (D.C. Cir. 2009). Indeed, the "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 61 (2006). A speaker typically "has the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 573 (1995). And, in fact, "[f]or corporations as for individuals, the choice to speak includes within it the choice of what not to say." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 16 (1986). Thus, where a statute "mandates speech that a speaker would not otherwise make," that statute "necessarily alters the content of the speech." *Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006). When, as in this case, the compelled speech is

---

added). The District also misuses *Banner* by suggesting that the court made a finding or held that the inability to impose a commuter tax was the cause of the District's deficit (Memo., at 10), when, once again, the court was only discussing plaintiffs' *allegations*. *See id.* at 8.

not purely factual and uncontroversial information,[12] content-based regulations are subject to strict scrutiny analysis. *R.J. Reynolds*, 823 F. Supp. 2d at 46; *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000). To survive strict scrutiny, the government must demonstrate that the statute is "narrowly tailored to promote a compelling Government interest." *Id.* at 811.  Even compelled factual and uncontroversial information may not be "unjustified or unduly burdensome." *R.J. Reynolds*, 823 F. Supp. 2d at 45.

As stated in the Complaint, the First Source Act forces the employer plaintiffs to engage in speech, such as compelling them to plan for and adopt policies and provide detailed reports on their employees and on their business practices solely on the basis of the residence of those employees. (*See, e.g.*, Compl. ¶ 111). It requires plaintiffs to submit "employment plans" outlining their strategy to meet the District's hiring requirements contrary to their business philosophy. (Compl. ¶¶ 49(e), 66-67, 69, 71, 73). Plaintiffs must post job information on the District's website and District newspapers (in order to be considered for a "good faith" waiver) seeking exclusively District residents. (Compl. ¶¶ 45, 49(b)) (citing D.C. Official Code § 2-219.03(e)(3)(B)). Plaintiffs are required not merely to fund government speech, but to themselves adopt, promote, and be identified with it such that the speech on the issue of residence and who should get jobs is attributed to them. (Compl. ¶113). *Cf. Johanns*, 544 U.S. at 565 ('if it were established…that individual beef advertisements were attributed to respondents," then the parties could state a claim for violation of the First Amendment); *accord* 544 U.S. at 568 ("if the advertisements associated [the government's] pro-beef message with either the

---

[12] The line of cases involving non-ideological speech about purely factual information necessary to protect consumers from confusion or deception such as proper labeling is not relevant to the District's compelled discriminatory speech about residency. *See Glickman v. Wileman Bros.*, 521 U.S. 457, 475 (1997) (generic fruit advertising "not used to fund ideological activities.")  Furthermore, unlike *Johanns*, 544 U.S. at 559, the steps the Plaintiffs must take to comply with the First Source Act are not minimal or of negligible monetary value; they disqualify Plaintiffs altogether from working on projects.

individual or organization respondents, then respondents would have a valid as-applied First Amendment challenge.") (J. Thomas, concurring). The content of this compelled speech through reports, advertisement, education, and other communications is inconsistent with plaintiffs' beliefs promoting free enterprise, open competition, individual merit, and a level-playing-field philosophy in the construction industry. (Compl. ¶ 110). The First Source Act has as a purpose to impose a differential adverse impact upon the opposite viewpoint, namely the viewpoint of ABC-Metro Washington and their members that they should be free to hire qualified works and to staff their jobs as they see fit without regard to the residency of the employees. (Compl. ¶ 113). It requires the plaintiffs to choose between contracting with the District and espousing the District's discriminatory and unlawful message and thereby infringes plaintiffs' constitutional rights. *Rumsfeld*, 547 U.S. at 59. Accordingly, this is much different from the facts of *Rumsfeld* involving law schools not required to speak at all or limited in any respect as to what they could say, but merely required to grant equal access to military recruiters. The First Source Act affirmatively requires discriminatory speech and conduct.[13] *Id*. at 60. Therefore, Plaintiffs have sufficiently alleged a free-speech claim.

      F.      <u>The Complaint States a Due Process Claim.</u>

            i.      *The First Source Act is void for vagueness.*

Plaintiffs have also provided the factual allegations to establish a valid claim that the First Source Act is so vague that it is constitutionally deficient under the Due Process Clause. (*See, e.g*., Compl. ¶¶123-26). "The void-for-vagueness doctrine is embodied in the due process clauses

---

[13] In contrast to this case, the outcome in *Rumsfeld* also depended on a connection with Congress' power to provide for the common defense.  *Rumsfeld*, 547 U.S. at 59 (Art. I, s. 8, Cls. 1, 12-13, U.S. Constitution). Also, in *Rumsfeld*, the court made clear that Congress could directly require universities to provide military recruiters equal access to their students, so there was no unconstitutional condition confronted by the law schools. *Id*. In contrast, the District cannot validly require discrimination against nonresidents either indirectly (by conditioning related funding on it) or directly.

of the [F]ifth and [F]ourteenth [A]mendments." *Stephenson v. Davenport Cnty. Sch. Dist.,* 110 F.3d 1303, 1308 (8th Cir.1997) (*quoting D.C. and M.S. v. City of St. Louis, Mo.,* 795 F.2d 652, 653 (8th Cir.1986)). The due-process doctrine under the Fourteenth Amendment "incorporates notions of fair notice or warning." *Smith v. Goguen,* 415 U.S. 566, 572 (1974) (*Goguen II*). Indeed, "the essence of the due process clause of the Fourteenth Amendment, is the rule that all persons 'are entitled to be informed as to what the state commands or forbids.'" *Goguen v. Smith,* 471 F.2d 88, 94 (1st Cir.1972) (quoting *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162 (1972)).

The First Source Act violates these fundamental constitutional rights in several ways. For example, as plaintiffs allege, the D.C. Human Rights Act and the First Source Act impose conflicting requirements upon the employer-plaintiffs.[14] The former requires employers not to discriminate "by reason of ... place of residence or business, *see D.C. Official Code* § 2-1401.01, whereas the First Source Act requires the opposite. (Compl. ¶ 124). The First Source Act "requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application....'" *Stephenson,* 110 F.3d at 1308 (*quoting Goguen II,* 415 U.S. at 573, 94 S.Ct. 1242).

Moreover, the First Source Act should be struck down as unconstitutional because the void-for-vagueness doctrine prevents arbitrary and discriminatory enforcement of the laws. *Id.* Legislatures must set reasonably clear guidelines for law-enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement. *Goguen II,* 415 U.S. at 573.

---

[14]   Mayor's Order 2006-151, amending Mayor's Order 2002-175, states: "All documents that recite the District of Columbia's policy against discrimination shall fully enumerate all [19] categories of discrimination protected from discrimination by the Human Rights Act of 1977....The following language shall be stated in all such documents. "The District of Columbia does not discriminate on the basis of actual or percieved: race, color, religion...place of residence or business."  At a minimum, these factors make it necessary for a person of common intelligence to guess as to how to apply the discriminatory provisions of the First Source Act, such that the statute is unconstitutionally vague.

Otherwise, a "vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis...." *Stephenson,* 110 F.3d at 1308 (*quoting Grayned v. City of Rockford,* 408 U.S. 104, 108-09 (1972)); *see also United States v. Reese,* 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.")

The Complaint provides numerous allegations concerning the unfettered discretion the First Source Act accords the Mayor to grant various waivers, require alternatives to construction contracts, and decide what fines to impose. (*See, e.g.*, Compl. ¶¶ 39, 55, 62, 78-79, 125). It is up to the Mayor to decide essentially without guidance whether contractors have made a "good-faith effort" to comply with the First Source Act. (Compl. ¶¶ 39, 50, 57, 62, 78, 125). Likewise, "*[w]henever the Mayor determine[s]* that the goal of increasing employment opportunities for District residents may be better served," he may exempt projects or contracts from various requirements, favoring certain businesses over others for political or other reasons. (Compl. ¶ 24, 55). And the First Source Act does not explain how or when the Mayor can determine that the goal could be "better served." (Compl. ¶ 24, 55). This discretion is not the result of mere imprecision in language as the District alleges, but of intentionally and unlawfully delegating to the Mayor the authority to preempt entire sections of the First Source Act. Especially where a statute's literal scope, as here, "is capable of reaching expression sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts." *Goguen II,* 415 U.S. at 573.

> ii.     *The First Source Act infringes the plaintiffs' property interest.*

Plaintiffs challenge the First Source Act as a violation of their rights protected under the

Due Process Clause by showing either (1) that they have a property interest in a contract that can only be cancelled "for cause," *Perry v. Sindermann*, 408 U.S. 593, 599-601 (1972), or (2) that they have a liberty interest in (a) their status as a responsible bidder and/or their freedom from debarrment penalties, *see J.P. Mascaro & Sons, Inc. v. Bristol*, 497 F. Supp. 625, 628 (E.D. Pa. 1980), or (b) their avoidance of the stigma created by fines or a bad reputation for allegedly violating the First Source Act that would deprive them of their freedom to take advantage of other business opportunities. *See Fox Fuel, a Div. of Keroscence, Inc. v. Delaware Cnty. Sch. Joint Purchasing Bd.*, 856 F. Supp 2d 945, 950-51 (E.D. Pa. 1994) *(citing  Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972)); s*ee also Rayco Constr. Co., Inc. v. Vorsanger*, 397 F. Supp. 1105, 1110-11 (D.C.Ark. 1975) (in response to the state's contention that the bidding preference served the alleged financial interest of increasing tax revenues, the court struck down the statute under the rational basis test, stating that "the trouble with that proposition is that its truth is not self-evident, and there is no evidence before us tending to show that the preference has in fact served the fiscal interests of State and local government in Arkansas in any significant way or that it is likely to do so in the future"). Plaintiffs' Complaint sets forth factual allegations that establish the violation of their substantive due process rights under the Constitution. (Compl. ¶¶ 118-120).

Consequently, the plaintiffs have stated a claim for violation of the Due Process Clause.

G.    The Complaint States a Claim under the Contract Clause

Plaintiffs have set forth allegations in their Complaint that establish a valid Contract Clause claim against the District. (*See, e.g*., Compl. ¶¶ 128-34). Specifically, plaintiffs have alleged that the District violated the Contract Clause by enacting the Amended Act and applying it retroactively to impair contract rights with respect to contracts entered into between the parties prior to the effective date of the Amended Act. (*See, e.g*., Compl. ¶¶ 80, 119). "It long has been

established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 (1977) (*citing Fletcher v. Peck,* 6 Cranch 87, 137-139, 3 L. Ed. 162 (1810); *Dartmouth College v. Woodward,* 4 Wheat. 518, 4 L. Ed. 629 (1819)).

When a state passes a law that modifies its own contractual obligations, the Supreme Court has held that it must meet a higher level of scrutiny. *See United States Trust Co.,* 431 U.S. at 29 ("[A] State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors. We can only sustain the [legislative action] if that impairment was both reasonable and necessary to serve the admittedly important purposes claimed by the State."); *see also Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 244 (1978) ("The threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'") Plaintiffs' allegations establish that the District's retroactive application of the Amended Act's requirements to construction service contracts entered into under the prior Act substantially impaired their contractual relationship and that impairment is neither reasonable nor necessary. (Compl. ¶¶ 80, 119, 128-134).

## III.    CONCLUSION

Plaintiffs' Complaint asserts a valid constitutional challenge to the First Source Act. The District's Motion to Dismiss does not provide the necessary showing of deficient allegations with respect to any of plaintiffs' counts. Instead, the District uses its motion to detail the District's significant economic and social challenges, including the congressional ban on a District commuter tax. Other than as support for the District's assertion that it is unique and, therefore, somehow justified to enact a discriminatory law, it is unclear how its argument is relevant to its assertion that the Complaint fails to state a claim or that plaintiffs lack standing. The District has

certainly not met the significant burden imposed on a party seeking to dismiss a complaint under 12(b)(6) or 12(b)(1).

The District's law prevents the individual plaintiffs from exercising their fundamental right to pursue their common calling in the District of Columbia, erecting artifical jurisdicitional boundaries of the very type that the Privileges and Immunities Clause is meant to prevent. Moreover, the First Source Act discriminates against all of the plaintiffs by violating several of their constitutional rights. The Complaint sets forth allegations that adequately establish its claims that the First Source Act is unconstitutional as a violation of the Privileges and Immunities Clause, the Commerce Clause, the Equal Protection Clause, the First Amendment, the Due Process Clause and the Contracts Clause. Additionally, the Complaint provides clear support for standing with respect to the individual plaintiffs, the employer-plaintiffs and the associational plaintiff.

For all the foregoing reasons, plaintiffs respectfully request that this Court deny Defendant's Motion to Dismiss and direct the District to file its answer to the Complaint.

Respectfully submitted,

_____
          /s/
Paul J. Kiernan (Bar #385627)
Karen Boyd Williams (Bar #456417)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (fax)

33

Nathan A. Adams (Of Counsel)
HOLLAND & KNIGHT, LLP
315 South Calhoun Street
Suite 600
Tallahassee, Florida 32301
(850) 224-7000 (phone)
(850) 224-8832 (fax)

Min K. Cho (Of Counsel)
HOLLAND & KNIGHT, LLP
200 South Orange Ave
Suite 2600
Orlando, Florida 32801
(407) 425-8500 (phone)
(407) 244-5288 (fax)

## **CERTIFICATE OF SERVICE**

      I HEREBY certify that on August 27, 2012, I electronically filed the Opposition to Defendant's Motion to Dismiss with the Clerk of Court for the United States District Court for the District of Columbia by using the ECM-ECF System.

      I CERTIFY that all participants in the case are registered CM-ECF users and that service will be accomplished by the ECM-ECF System.

                          /S/

                        Karen Boyd-Williams