UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
METROPOLITAN WASHINGTON CHAPTER,    )
ASSOCIATED BUILDERS AND             )
CONTRACTORS, INC., *et al.*,        )
                                    )
        Plaintiffs,              )
                                    )
    v.                            )    Civil Action No. 12-CV-00853 (EGS)
                                    )
DISTRICT OF COLUMBIA,               )
                                    )
        Defendant.               )
_____)

## DEFENDANT THE DISTRICT OF COLUMBIA'S
## REPLY

      The District of Columbia is the only jurisdiction in the United States denied, by law, the ability to tax the income of 70% of the jobs in the city. Plaintiffs do not (because they cannot) dispute that dispositive fact. The structural budgetary imbalance resulting largely from the District's inability to tax those non-resident commuters "'constitute[s] a peculiar source of the evil at which the [First Source Act] is aimed.'" *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 222 (1984) (quoting *Toomer v. Witsell*, 334 U.S. 385, 398 (1948)).

      Plaintiffs' Opposition provides a "response" to the District's extensive discussion of the factual background here, but fails to dispute or challenge those facts in any way, or to address the District's arguments on public-record documents and the Court's review of materials outside the pleadings. Those arguments (and facts) thus stand unrebutted, and should be deemed conceded. *See, e.g., Wiley v. Glassman*, 5111 F.3d 151, 160–61 (D.C. Cir. 2007) (affirming trial court's grant of summary judgment to defendant, despite the fact that the court "considered 'matters outside the pleading'" and "did not convert what was ostensibly a 12(b)(6) motion to one for summary

judgment" because "we are assured that both sides had a reasonable opportunity to present evidence and there are no genuine issues of material fact."). *Cf. George v. Bank of America, N.A.*, 821 F.Supp.2d 299, 301 (D.D.C. 2011) (granting motion to dismiss per Rule 12(b)(6) and considering "those 'documents upon which the plaintiff's complaint necessarily relies . . . produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss . . . .") (citations omitted).

Plaintiffs appear to assume that the Court can ignore the facts presented by the District and reject the District's motion simply because "the allegations in the complaint should be construed favorably to the pleader." P.Opp. at 2 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Not so. In fact, the Court need not accept as true "'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint." *Air Transp. Ass'n of Am. v. Export-Import Bank of the United States*, ___ F.Supp.2d ___, 2012 WL 2914442, *5 (D.D.C. July 18, 2012) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)). That, however, describes the bulk of plaintiffs' allegations here—legal conclusions of economic and organizational injuries couched in generic, undetailed terms. *Id.*

*Plaintiffs Lack Standing.*

Although plaintiffs aver that their standing is clear, they spend almost one-third of their brief in a *post hoc* effort to "explain," *i.e.*, further detail, their allegations. Such an effort is inappropriate. *See, e.g., Hajjar-Nejad v. George Wash. Univ.*, 802 F.Supp.2d 166, 175 (D.D.C. 2011) ("[i]t is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.") (quoting *Arbitraje Casa de Cambio, S.A. de C.V. v. USPS*, 297 F.Supp.2d 165, 170 (D.D.C. 2003)).[1]

---

[1] Plaintiffs also now state that they alleged that the First Source Act "moves work from individuals who are not paying District income taxes to people who do." P.Opp. at 18

The lead plaintiff claims that it "has fought preference-based laws like the First Source Act" P.Opp. at 3, but where? That organization's members have gladly accepted the District's tax dollars for literally decades before mustering enough political gumption to suddenly discover constitutional violations.

Plaintiffs again make indistinct assertions of injuries to their "economic or organizational values" *id.*, but again fail to provide any specifics or details beyond conclusions and adjectives, which is insufficient to demonstrate standing. Indeed, plaintiffs fail entirely even to use the dollar sign except when recounting the threshold requirements of the First Source Act. Consequently, the Court is left with conclusory assertions of financial "damages." *See City of Waukesha v. EPA*, 320 F.3d 228, 236 (D.C. Cir. 2003) ("To the extent that the demonstration of standing requires substantial specificity and particularity on the part of plaintiffs seeking to establish injury-in-fact, it is arguable that [plaintiff's] initial affidavit falls short.") (citations omitted); *Brown v. FBI*, 793 F.Supp.2d 368, 374 (D.D.C. 2011) ("nondescript and conclusory allegations of injury are not the type of general factual allegations from which the Court may presume the specific facts necessary to ensure that the plaintiff has standing, and are insufficient to meet the plaintiff's burden of alleging an injury in fact that is concrete and particularized.") (citation omitted).

Here, of course, plaintiffs failed to provide an affidavit, verified complaint, or any other extra-pleading indication that they have suffered any injury in fact. *See, e.g., Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (organizational "standing must be established independent of the lawsuit filed by the plaintiff.") (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) (citing, *inter alia, Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C. Cir. 1990)).

---

(citing Complaint ¶ 81). This is not true. *See* Complaint ¶ 81 (First Source "tr[ies] to shift to a preferred group of people—District residents—first dibs on jobs already created.").

*The Lead Plaintiff Lacks Organizational Standing.*

Plaintiff ABC-Metro Washington asserts that it has standing on its own behalf, because the First Source Act "conflicts with [its] mission and core individual-merit philosophy" and as a result of that organization "having to spend resources to inform its members of and to participate in the rule-development process relating to the Amended Act." P.Opp. at 13.

ABC-Metro Washington does not have standing. To show organizational standing, a group must demonstrate "a direct conflict between the defendant's conduct and the organization's mission." *Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (citing *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). "Furthermore, an organization is not injured by expending resources to challenge the regulation itself; we do not recognize such self-inflicted harm." *Id.* (citing *Fair Employment Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276–77 (D.C. Cir. 1994)).

Contrary to applicable decisional precedent, ABC-Metro Washington has failed to allege any "direct conflict" between its mission and the First Source Act, asserting no more than a "harm" of expending resources "lobbying" against the legislation. Complaint ¶ 4; *see also id.*, ¶ 87 ("ABC-Metro Washington itself has incurred substantial damages associated with addressing on behalf of its members the impacts of the Act and the Amended Act, including training, legal fees, publicity to respond to false stories regarding the contracting community, and extra efforts to maintain membership of the organization."). Such injuries are insufficient to obtain standing. "The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Equal Rights Center v. Post Properties, Inc.*, 657 F.Supp.2d 197, 200 (D.D.C. 2009) (quoting *Nat'l*

4

*Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)), *affirmed*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (court should ask whether defendant's alleged conduct injured the organization's interest and whether organization used its resources to counteract that harm.).[2]

> Aside from asserting an abstract conflict between defendant's activities and plaintiffs' advocacy goals, plaintiffs have not alleged that their activities have been impeded in any way. [W]ere an association able to gain standing merely by choosing to fight a policy that is contrary to its mission, the courthouse door would be open to all associations.

*Long Term Care Pharm. Alliance v. United Health Group, Inc.*, 498 F.Supp.2d 187, 192 (D.D.C. 2007).

> When a complainant's standing is not "self-evident," he must "supplement the record to the extent necessary to explain and substantiate [his] entitlement to judicial review." [W]e put on notice all complainants whose standing is unclear that they must prove their standing by a "substantial probability," and that they should do so "by the submission of [their] arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding[.]" Our *Sierra Club* rule is rooted in notions of fairness and judicial economy not difficult to grasp: As the complainant is ordinarily in possession of the facts on which he relies for standing, making those facts manifest at the outset saves the parties and the court from squandering time and energy, either by "flail[ing] at the unknown in an attempt to prove the negative" or by needlessly wrangling over an uncontested point.

*National Ass'n of Home Builders v. United States Army Corps of Eng.*, 417 F.3d 1272, 1286 (D.C. Cir. 2005) (citing and quoting *Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002)).

Here, plaintiffs have failed to substantiate their standing, despite the fact that they are in the possession of all the relevant facts. *See Sierra Club*, 292 F.3d at 901 ("'[M]ere allegations' . . . are not evidence. That these particular allegations concern matters beyond the scope of counsel's personal knowledge—the concerns of the unidentified [plaintiff's] members, for example—serves

---

[2] *See also Rainbow/PUSH Coal. v. FCC*, 396 F.3d 1235, 1242 (D.C. Cir. 2005) (organization's "affidavit never even states, let alone explains how, the alleged [action by defendant] in particular affects [its] counseling and outreach efforts, reducing their effectiveness or requiring [it] to take concrete action in response.") (citations omitted).

only to illustrate why we require more than representations of counsel in order to establish a complainant's standing.").

*Past Injury vs. Future Injury*

"Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). The only indication of any "impending" injury from the amended First Source Act is plaintiffs' vague allegations of *past* injuries incurred from complying with the never-enforced, previous version of the decades-old law.

Plaintiffs fail to clear the injury-in-fact threshold necessary to show standing. *See Air Transp. Ass'n*, 2012 WL 2914442 at *11 (while evidence (in the form of declarations) that prior actions of defendant "provides some support for [plaintiffs'] argument that *this* [defendant action] will imminently cause them injury, it does not get them all the way there.") (citing, *inter alia*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("[P]ast wrongs do not themselves amount to that real and immediate threat of injury necessary to make out a case or controversy.")). *See also id.* at *14 ("Acknowledging the 'gulf between . . . the 'imminent' injury that suffices [to show standing] and the merely 'conjectural' one that does not . . .'") (quoting *DEK Energy Co. v. FERC*, 248 F.3d 1192, 1195 (D.C. Cir. 2001)). "The court cannot affirm the existence of standing based on an injury that hasn't happened and that the defendant's challenged conduct hasn't caused." *Citizens for Responsibility & Ethics in Washington v. Dep't of Ed.*, 538 F.Supp.2d 24, 31 (D.D.C. 2008).

*Competitor Standing*

Plaintiffs erroneously attempt to invoke the concept of "competitor standing" here. "The doctrine of competitor standing . . . recogniz[es] that economic actors "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition" against them." *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). Here, of course, the First Source Act does not "lift restrictions" on plaintiffs' competitors, or otherwise allow increased competition against them. The provisions of the First Source Act apply identically to all covered entities, both within and outside the District.

Notwithstanding this, the competitive "injuries" alleged here have not been sufficiently alleged to have been *caused* by the First Source Act. *See Ass'n of Flight Attendants v. United States Dep't of Transp.*, 564 F.3d 462, 465 (D.C. Cir. 2009) (rejecting as insufficient "the only 'evidence' supporting the causation prong of the standing test [*i.e.*,] the unsubstantiated allegations by [plaintiff's] members that [government action] at least partially caused other airlines to reduce flights and to cut back flight attendants' working hours. Without some underlying factual basis for attributing [the alleged injuries to increased competition]—rather than to other factors—we cannot accept these statements as anything other than conclusory and therefore inadequate . . . .").

Moreover, plaintiffs do not (and could not) allege that they have lost (or been disqualified for) any government contract or benefit because of noncompliance with the First Source Act.

*Plaintiffs Fail to State a Claim Under the Privileges & Immunities Clause.*

Plaintiffs make the nonsensical argument that the "structural imbalance" discussed by the District is caused by "the identity of the employees . . . ." P.Opp. at 18.[3] Despite plaintiffs' specious contention, there can be no dispute that the structural budget imbalance is caused largely by the District's inability to tax the income generated by some 70% of the District's jobs. Plaintiffs state baldly that "'[m]ore tax revenue' does not suffice as a 'substantial reason' for preferential-hiring laws[,]" *Id.* at 19, but cite no authority for the proposition.[4] Plaintiffs—literally—make no effort to dispute the utterly unique economic situation in which the District finds itself, merely asserting that that situation simply cannot be a sufficient reason for the First Source Act.

Plaintiffs also argue that the District "is not entitled to deference in identifying local 'evils[,]'" P.Opp. at 20, but utterly fail to confront (much less distinguish) *Camden*.[5] The principle that local legislatures are entitled to deference in "analyzing local evils and prescribing appropriate cures" applies in "*[e]very* inquiry under the Privileges and Immunities Clause.'" *Id.* at 222–23

---

[3] Plaintiffs imply that the District's assumption (which they erroneously term a "concession"), that the Privileges & Immunities Clause applies to the District, was *required* because it is "in line with cases[.]" P.Opp. at n.7. However, plaintiffs cite only one case, in which the plaintiff did not bring a Privileges & Immunities claim. *See SEIU, Local 82 v. District of Columbia*, 608 F.Supp. 1434 (1985). Otherwise, plaintiffs are incorrect. *See, e.g., Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Cir. 1939) ("[S]ection 2 of Article IV is inapplicable to the District of Columbia. It is a limitation upon the powers of the states and in no way affects the powers of Congress over the territories and the District of Columbia.").

[4] "More tax revenue" would *ordinarily* never even arise as a justification behind an allegedly "discriminatory" scheme, because States have long had the ability to tax the in-state income earned by out-of-state residents. *See, e.g., Shaffer v. Carter*, 252 U.S. 37, 52–53 (1920). Even if the First Source Act may be thought of as a "tax" on non-residents, the District's structural imbalance is a permissible "substantial reason for the difference in treatment." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 298 (1998).

[5] Plaintiffs also complain that the District "inaccurately cites" and "misuses" *Banner v. United States*, 303 F.Supp.2d 1 (D.D.C. 2004). *See* P.Opp. at n.11. Plaintiffs do not, however, bother to challenge the accuracy of *any* of the quoted statements.

8

(emphasis added) (quoting *Toomer*, 334 U.S. at 396). This is especially true "when a government body is merely setting conditions on the expenditure of funds it controls." *Id*. at 223.

Plaintiffs assert that "virtually" every resident-preference law challenged under the Privileges & Immunities Clause has been struck down, despite "many" jurisdictions citing "similar" reasons to those cited by the District, which amount to no more than forbidden "economic protectionism." *See* P.Opp. at 21. But plaintiffs use the wrong test, arguing that the District cannot show that "nonresident employment on public construction projects . . . is responsible for the far-reaching economic problems the City describes." *Id*. at 21 (quoting *Utility Contractors Ass'n of New England, Inc. v. Worcester*, 236 F.Supp.2d 113, 120 (D. Mass. 2002)).[6] The governing test, however, is whether the high percentage of nonresidents employed in the District, combined with the legal ban on a commuter tax, "'constitute[s] a peculiar source of the evil at which the [First

---

[6] It is clear from this language—and the assertion that "more tax revenue" is not a "substantial reason"—that plaintiffs do not understand the controlling test. A case on which plaintiffs rely concisely demonstrates their confusion. In *A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865 (3rd Cir. 1997), nonresidents brought a challenge under the Privileges & Immunities Clause to a Pennsylvania law requiring contractors on state-funded public works projects to employ *only* state residents. *Id*. at 867. Pennsylvania offered two reasons for the residency requirement: (1) the alleviation of high unemployment in its construction industry; and (2) the loss of economic benefits going out of state. *Id.* at 871. First, the Third Circuit noted that "peculiar" is defined as "belonging exclusively or esp[ecially] to a person or group . . . tending to be characteristic of one only; Distinctive." *Id*. at n.9 (quoting *Webster's Third Int'l Dictionary* 1663 (Philip Babcock Gove ed., 1964). The Third Circuit then found that unemployment in Pennsylvania's construction industry was not significantly higher than neighboring states. *Id*. 872. It also found that there was no evidence in the legislative record that "migration of economic benefits" was a "particular evil" the law was intended to address. *Id.* at 874. "[T]he Commonwealth's evidence is insufficient because the Privileges and Immunities Clause requires the nonresidents to be a peculiar source of the evil rather than merely a contributor to the problem." *Id*. at 875. Here, in contrast, nonresidents (and the District's inability to tax their income) are the *exact* source of the "evil" identified in the legislative record of the First Source Act. Unlike Pennsylvania, the District's law does not require *all* covered jobs to go to District residents, and the District has provided ample evidence of the "substantial reasons" for the differential treatment in the First Source Act, *i.e.*, taxes on the income of 70% of the jobs in the District, which the District is prohibited from collecting, and the high unemployment of District residents, in comparison to the surrounding region. *See* Doc. No. 6 at 3–12. These factors show that the First Source Act meets the "substantial relationship" test.

Source Act] is aimed.'" *United Bldg. & Constr. Trades Council v. Mayor of Camden*, 465 U.S. 208, 222 (1984) (quoting *Toomer v. Witsell*, 334 U.S. 385, 398 (1948)). *See also Supreme Court of N.H. v. Piper*, 470 U.S. 274, 284 (1985) (there must be a "substantial reason" for the difference in treatment beyond non-residency, which must "bear[] a substantial relationship to the [government's] objective.") (citing *Camden*, 465 U.S. at 222).

The District meets the test. Substantial reasons for the difference in treatment in the First Source Act include high unemployment of District residents and the stark fact that the District cannot tax the income generated by 70% of the jobs in the City.

The District has an obligation both to address the problem of high unemployment among residents and to collect sufficient tax revenues to balance the budget while also providing a sufficient level of public services. *See* D.C. Official Code §§ 1-206.03(c), (d) (2012 Supp.). The District must enact laws to address these problems and meet congressionally imposed requirements. The First Source Act is one such law, designed to increase District tax revenues by increasing the number of District residents with jobs.

Congress has tacitly approved the statutory scheme to enhance the District's tax base, of which the First Source Act is a component. That law and its subsequent amendments became effective without any disapproval by Congress. *See id.* at 1-206.02(c)(1). The instant plaintiffs have a legislative remedy here, because they are represented in a legislature (Congress) that can change the law. Congress has authority to legislate for the District in all cases whatsoever. U.S. Const. Art. I, § 8, cl. 17. The Supreme Court in *Camden* noted that the municipal-residency preference did not violate the Privileges & Immunities of other New Jersey residents because those residents "have a chance to remedy at the polls any discrimination against them." 465 U.S. at 217. In a typical Privileges & Immunities Clause challenge, plaintiffs are unable to seek a legislative remedy

10

because, by definition, they have no representation in the legislature that enacted the law. Here, however, uniquely, those claiming harm by the allegedly discriminatory Act are represented in a legislature that can repeal the law.

*First Source Does Not Violate the Commerce Clause.*

Plaintiffs argue that the First Source Act impermissibly "attempt[s] to control [a] wide range of construction projects to which [the District] has only a slight financial contact," P.Opp. at 22, thereby rendering invalid the "market participant" exception. This is wrong as a matter of law, and it is telling that plaintiffs fail entirely even to mention (much less distinguish) the two controlling Supreme Court decisions cited by the District. In *White v. Massachusetts Council of Const. Employers, Inc.*, 460 U.S. 204 (1983), the Supreme Court held that cities may act as "market participants" under the Commerce Clause on public-works projects funded even partially by city funds, even those projects simply "administered" by the city, and may constitutionally require that the work be performed by a work force consisting of at least half city residents. *Id.* at 209.

Notwithstanding that, per *White*, the market-participant exception properly applies to those projects, the funds for which the District merely "administers," *see* D.C. Official Code §§ 2-219.01(1)(A), (5), plaintiffs claim that the First Source Act impermissibly "reaches out" to "virtually every subcontractor in the Washington metropolitan area." P.Opp. at 23. This is just unsupported rhetoric. By its terms, the First Source Act only applies to entities receiving some type of financial consideration from the District, in the form of construction contracts, or economic-development benefits. *See* D.C. Official Code § 2-219.01(1)(B). Needless to say, plaintiffs have cited no case where a State's provision of economic-development benefits was found to

11

invalidate the State's invocation of the market-participant exception to Commerce Clause challenges.

Twenty-five years after *White*, the Supreme Court reiterated the broad scope of the market-participant exception, rejecting a challenge to a State's income-tax structure, which exempted interest on State bonds from State income tax, but did not so exempt bonds from other states. *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 357 (2008). Although Kentucky's regulation of the income-tax market is clearly more far-reaching than the District's regulation of the relevant construction (or other) markets here, Kentucky was *also* recognized as a market participant ("the usual situation," *id.* at 348), hence the Court rejected the Commerce Clause challenge.

> State and local governments that provide public goods and services on their own, unlike private businesses, are "*vested with the responsibility of protecting the health, safety, and welfare of [their] citizens*," and laws favoring such States and their subdivisions may "be directed toward any number of legitimate goals *unrelated to protectionism.*"
>
> [Courts should] find out whether the preference was for the benefit of a *government fulfilling governmental obligations* or for the benefit of private interests, favored because they were local. Under *United Haulers*, governmental *public preference is constitutionally different from commercial private preference*, and we make the governmental responsibility enquiry to identify the beneficiary as one or the other.

*Id*. at 340 & n.9 (emphasis added) (quoting and discussing *United Haulers Assn., Inc. v. Oneida–Herkimer Solid Waste Management Authority*, 550 U.S. 330, 342, 343 (2007)).

The District's goal in the First Source Act, like that in *Department of Revenue* and *United Haulers*, is to protect and improve the public welfare, *not* for the protection of some private, commercial interests. Plaintiffs have failed to state a claim under the Commerce Clause.

*Plaintiffs Fail to State an Equal-Protection Claim.*

Plaintiffs' discussion of Equal Protection is even more attenuated. Plaintiffs' allegations remain circular; plaintiffs argue that "[t]he fact that the Complaint does not name XYZ Company or Mr. John Smith as 'similarly situated' does not make the Complaint defective any more than would failing to identify by name individuals who have not been discriminated against for purposes of a claim for racial discrimination." P.Opp. at 25. But plaintiffs fail to cite any cases or other authority for this seemingly obvious conclusion. Plaintiffs' "unsupported and conclusory allegations are not enough" to make out an equal protection claim, "in the absence of actual evidence of disparate treatment . . . ." *Texas Border Coal. v. Napolitano*, 614 F.Supp.2d 54, 65–66 (D.D.C. 2009) (citing *Bois v. Marsh*, 801 F.2d 462, 466 n.5 (D.C. Cir. 1986) (noting in equal protection context that "vague allegations, especially when unsupported by an affidavit or other evidence . . . are insufficient to state a claim")).

Simply put, "nonresidents" are not a suspect class. *Baldwin v. Fish & Game Comm'n of Mont.*, 436 U.S. 371, 389–90 (1978). "The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

"In the absence of any claims of distinction having been made based on 'race, alienage, or natural origin,' and none is asserted in this litigation, '[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" *Texas Border Coal.*, 614 F.Supp.2d at 65 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).

Plaintiffs, in their opposition, assert merely that "there is no rational basis for treating nonresident employers and employees differently than resident employers and employees." P.Opp.

at 24. But "[e]ven at the motion to dismiss stage, a plaintiff alleging an equal protection violation must plead facts that establish that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'" *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cir. 2012) (quoting *Dumaguin v. Sec'y of Health & Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)). For all the reasons amply laid out in the District's Motion, the First Source Act's classifications are rationally related to a number of legitimate governmental interests; the District has a legitimate interest in insuring that its substantial investment in public-works and economic-development projects ultimately benefits its own taxpayers. *Chance Mgmt., Inc. v. South Dakota*, 97 F.3d 1107 (8th Cir. 1996). *See also Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1322–23 (4th Cir. 1994) (statute was rationally related to legitimate interest in directing benefits generated by state purchases to state's own citizens); *Associated Gen'l Contractors of Cal., Inc. v. City and County of San Francisco*, 813 F.2d 922, 943 (9th Cir. 1987) ("city may rationally allocate its own funds to ameliorate disadvantages suffered by local business;" preference "is an attempt to remove or to lighten a burden San Francisco businesses must bear that is not shared by others."), *overruled on other grounds, City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989). *Cf. United States v. Cohen*, 733 F.2d 128, 139 (D.C. Cir. 1984) (*en banc*) (upholding federal law even though federal criminal defendants in the states were treated differently than those in the District).

*Plaintiffs Fail to State a First Amendment Claim.*

Plaintiffs' First Amendment allegations fair no better. Oddly, plaintiffs state "[w]hen, as in this case, the compelled speech is not purely factual and uncontroversial information, content-based regulations are subject to strict scrutiny analysis." P.Opp. at 27. But nowhere do plaintiffs explain

14

what "nonfactual" or "controversial" speech the First Source Act compels them to utter. Plaintiffs' argument is specious; plaintiffs cite no case (and the District is aware of none) where government disclosure requirements for recipients of contracts or economic-development benefits like those in the First Source Act have been struck down on First Amendment grounds.

There is simply no speech required of plaintiffs by the statute. The First Source Act "does not call for the employer to take a position or express a view on the law." *Nat'l Ass'n of Mfrs. v. NLRB*, 846 F.Supp.2d 34, 60 (D.D.C. 2012) (citing *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 88 (1980) (no compelled speech where speaker is "not . . . being compelled to affirm [a] belief in any governmentally prescribed position or view") and *Pacific Gas & Elec. Co. v. Public Utilities Comm'n of Cal.*, 475 U.S. 1, 16 n.12 (1986) (distinguishing situation where utility company is required to carry a third-party newsletter in its billings, compared to requirements that the company carry various factual notices and information mandated by the government)).

The First Source Act does not require any impermissible "compelled speech" prohibited by the First Amendment. Plaintiffs appear to want to stretch that doctrine to cover situations (like the instant one) where they would prefer not to comply with the law. Of course, the plaintiffs can easily avoid the strictures of First Source by simply not bidding on District-government projects. Plaintiffs' First Amendment claims should be dismissed.

*Plaintiffs Fail to State a Vagueness Claim.*

Plaintiffs' vagueness arguments are scarcely comprehensible, and wrong. Primarily, plaintiffs fail to acknowledge that "economic regulation is subject to a less strict vagueness test"

than other legislation. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).[7]

It is true, as plaintiffs assert, that laws must "establish minimal guidelines to govern law enforcement." *Gonzalez v. Carhart*, 550 U.S. 124, 150 (2007) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).[8] But the test for vagueness is not whether the language used is susceptible to different interpretations by enforcement officials. Instead, a law is unconstitutionally vague only when it "fails to provide such minimal guidelines" that it allows government enforcers to "pursue their personal predilections" without any constraints. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). *Cf. Armstrong v. District of Columbia Public Library*, 154 F.Supp.2d 67, 81 (D.D.C. 2001) (invalidating library regulation authorizing personnel to bar patrons based on "objectionable"

---

[7] *See also Milavetz, Gallop & Milavetz, P.A. v. United States*, ___ U.S. ___, 130 S. Ct. 1324, 1339 (Mar. 8, 2010) (where "the challenged provisions impose a disclosure requirement rather than an affirmative limitation on speech," a "less exacting scrutiny" applies). *Milavetz* rejected a First Amendment compelled-speech challenge to provisions of the federal Bankruptcy Abuse Prevention and Consumer Protection Act because "the disclosures entail only an accurate [factual] statement . . . and they do not prevent [parties like plaintiffs] from conveying any additional information." *Id*. at 1340. Similarly here, the First Source Act merely requires accurate factual employment information from covered entities, and does not prevent plaintiffs (or anyone else) from conveying any other information about their "beliefs promoting free enterprise, open competition, individual merit, and a level-playing-field philosophy in the construction industry." P.Opp. at 28. Even if the First Source Act *affirmatively* required beneficiaries to explicitly reject such beliefs as a condition of receipt of government funds, it would *still* be constitutional. *See DKT Int'l, Inc. v. USAID*, 477 F.3d 758, 762 (D.C. Cir. 2007) (rejecting First Amendment challenge to government condition on grants to private organizations to fight AIDS/HIV that grantee "oppose prostitution and sex trafficking") ("the government may . . . constitutionally communicate a particular viewpoint through its agents and require those agents not convey contrary messages."). In any event, the Act has no such requirements.

[8] To the extent plaintiffs purport to bring an as-applied vagueness challenge, it must be dismissed. *See id.* ("This is a preenforcement challenge, where 'no evidence has been, or could be, introduced to indicate whether the [Act] has been enforced in a discriminatory manner or with the aim of inhibiting [constitutionally protected conduct].'") (alterations in original) (quoting *Hoffman Estates*, 455 U.S. at 503).

appearance; "Because the regulation at issue is wholly dependent on the individual staff member's interpretation of what constitutes "objectionable" . . . its enforcement is unavoidably arbitrary).

Here, it is simply *not* true that the First Source Act gives the Mayor "unfettered discretion" to determine whether an applicant qualifies for a waiver, P.Opp. at 30, or that the Mayor is "essentially without guidance" in making that determination. *Id.* The First Source Act provides clear, objective guidelines for the enforcement of waivers:

> (B) The Department of Employment Services shall consider the following when making a determination of a good-faith effort to comply:
>
> > (i) Whether the Department of Employment Services has certified that there is an insufficient number of District residents in the labor market who possess the skills required to fill the positions that were created as a result of the project or contract;
> >
> > (ii) Whether the beneficiary posted the jobs on the Department of Employment Services job website for a minimum of 10 calendar days;
> >
> > (iii) Whether the beneficiary posted each job opening or part-time work needed in a District newspaper with city-wide circulation for a minimum of 7 calendar days;
> >
> > (iv) Whether the beneficiary has substantially complied with the relevant monthly reporting requirements set forth in this section;
> >
> > (v) For government-assisted projects or contracts covered by paragraph (1A) or (1C) of this subsection, whether the beneficiary has submitted and substantially complied with its most recent employment plan that has been approved by the Department of Employment Services; and
> >
> > (vi) Any additional documented efforts.

D.C. Official Code §§ 2-219.03(e)(3)(B).

These standards are sufficiently detailed, and no different than the thousands of other laws or regulations giving enforcement discretion to the Executive. *See, e.g., Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (it is "simply 'common sense that *all* police officers must use some discretion in deciding when and where to enforce city ordinances.") (emphasis in original)

17

(quoting *Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999)); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("As always, enforcement requires the exercise of some degree of police judgment . . . .").[9]

Enforcement of the First Source Act—which has, to date, not occurred, *see* n.8, *supra*—does not impermissibly link liability with "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008). *Cf. Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 93 (1st Cir. 2004) ("[t]he mere fact that a regulation requires interpretation does not make it vague.").

*Plaintiffs Fail to State a Claim for Violation of Substantive Due Process or the Contracts Clause.*

Finally, plaintiffs' lack of any serious argument in support of their substantive due-process and Contracts Clause claims is practically a concession. *See, e.g., Tsitrin v. Lettow*, ___ F.Supp.2d ____, 2012 WL 3715391, *3 (D.D.C. Aug. 29, 2012) ("An argument in a defendant's dispositive motion that a plaintiff fails to address in response may be deemed to be conceded.") (citations omitted); *Hopkins v. Women's Div., Gen. Bd. of Global Ministries*, 284 F.Supp.2d 15, 25 (D.D.C. 2003) ("[W]hen a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997)).

---

[9] The ordinance struck down in *Morales* prohibited "'criminal street gang members' from 'loitering' with one another or with other persons in any public place." 527 U.S. at 45–46. That regulation left it to the complete discretion of the police to decide what activities constituted loitering, and thus "entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat." *Id*. at 60–61. Plaintiffs' assertion that the First Source Act's waiver provisions are similarly unconstrained is simply unsupportable, and is foreclosed by the specific guidance provided by the text of the statute.

Indeed, plaintiffs fail to mention, distinguish, address, or cite *any* of the controlling cases cited by the District in its discussion of substantive due process. Plaintiffs' allegations, accepted as true, cannot reasonably be characterized as "egregious," hence cannot state a substantive due process claim. *See George Washington Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003) ("[T]he doctrine of substantive due process constrains only egregious government misconduct." (citing *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (doctrine prevents only "grave unfairness")).

Similarly, plaintiffs make no effort to demonstrate how the First Source Act "operate[s] as a substantial impairment of a contractual relationship[,]" *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). Plaintiffs mere assert that it is so. Such conclusory assertions are insufficient to withstand the District's motion.

*Conclusion*

As this Court has previously recognized, "[t]he unfairness of the District's situation is obvious and regrettable." *Banner*, 303 F.Supp.2d at 3.[10] Plaintiffs' attempt to downplay the District's justifications should be rejected; the District is not merely *characterizing* its situation as unique. *See* P.Opp. at 22. *Cf. District of Columbia v. Carter*, 409 U.S. 418, 432 (1973) ("[u]nlike either the States or the Territories, the District is truly *sui generis* in our governmental structure.").

---

[10] Indeed, this "unfairness" has been most recently recognized by the Chair of the House Oversight and Government Reform Committee. *See* Ben Pershing, "Rep. Darrell Issa proposes hearing on D.C. commuter tax," WASH. POST, July 19, 2012, *available online at* http://www.washingtonpost.com/blogs/dc-wire/post/darrell-issa-proposes-hearing-on-dc-commuter-tax/2012/07/19/gJQA4PMOwW_blog.html ("'I think we should, after the election, start thinking about how we're going to deal with the only place that doesn't have the ability to tax people who earn their income in that place,' Issa said.")

This unique unfairness, caused by the District's structural imbalance, is sufficient justification for the First Source Act as a matter of law. The District's motion to dismiss should be granted.

Dated: September 17, 2012            Respectfully submitted,

                                     IRVIN B. NATHAN
                                     Attorney General for the District of Columbia

                                     ELLEN EFROS
                                     Deputy Attorney General
                                     Public Interest Division

                                     /s/ Grace Graham
                                     GRACE GRAHAM, D.C. Bar No. 472878
                                     Chief, Equity Section
                                     441 Fourth Street, NW
                                     Sixth Floor South
                                     Washington, DC 20001
                                     Telephone: (202) 442-9784
                                     Facsimile: (202) 741-8892
                                     Email: grace.graham@dc.gov

                                     /s/ Andrew J. Saindon
                                     ANDREW J. SAINDON, D.C. Bar No. 456987
                                     Assistant Attorney General
                                     441 Fourth Street, N.W., 6th Floor South
                                     Washington, D.C. 20001
                                     Telephone: (202) 724-6643
                                     Facsimile: (202) 730-1470
                                     Email: andrew.saindon@dc.gov