# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al. ) ) ) ) ) | |
| Plaintiffs, ) ) | |
| v. ) ) | Civ. Action No. 12-853 (EGS) |
| DISTRICT OF COLUMBIA, ) ) | |
| and ) ) | |
| VINCENT C. GRAY, in his official capacity as Mayor of the District of Columbia, ) ) ) ) | |
| Defendants. ) ) | |

## MEMORANDUM OPINION

In 1984, the District of Columbia (hereinafter "District")
enacted the First Source Employment Agreement Act (hereinafter
"First Source Act" or "Act"), a residential preference statute
for the construction industry mandating that certain percentages
of construction jobs on projects funded in whole or in part, or
administered by the city, be filled by District residents.  The
Act was amended in 2011 by the Workforce Intermediary
Establishment and Reform of First Source Amendment Act of 2011,
which was signed by Mayor Vincent C. Gray and passively approved
by Congress.  The First Source Act, both as enacted and amended,
is intended to address the unique position in which the District

finds itself as the only jurisdiction in the country that is legally barred from imposing a commuter tax on non-residents who come into the city to work. Nearly 70 percent of jobs in the District are held by non-residents and this inability to levy a commuter tax allegedly results in a significant financial shortfall for the District, especially because the unemployment rate in the District is much higher than in surrounding jurisdictions. Plaintiffs, a non-profit commercial organization, two construction companies, and four individuals who live in Maryland and Virginia challenge the law as enacted and amended as a violation of their constitutional rights. They argue that for the purposes of judicial review of the First Source Act, the District must be treated as if it is a state. They contend that treating the District as a state would render the First Source Act unconstitutional.

This case thus represents something of a twist in the long line of cases in which the District has repeatedly confronted the uncontroverted fact that its unique constitutional status prevents it from enjoying benefits states take for granted. For instance, in this nascent century alone, the District has been told (yet again) that its citizens cannot elect representatives with voting rights to the Congress of the United States, *Adams v. Clinton*, 90 F. Supp. 2d 35 (D.D.C. 2000); cannot levy a commuter tax, *Banner v. United States*, 303 F. Supp. 2d 1 (D.D.C.

2004); and cannot control expenditures of locally derived funds, *Council of the District of Columbia v. Gray*, No. 14-655, 2014 U.S. Dist. LEXIS 68055 (D.D.C. May 19, 2014). Further, the District is also prohibited from, *inter alia*, prosecuting its own crimes, D.C. Code § 23-101(c); enacting legislation without Congressional approval, D.C. Code §§ 1-204.04(e); 1-206.02(c)(1); regulating its own courts or appointing its own judges, D.C. Code §§ 1-204.33(a); and enacting zoning regulations without submission to the National Capital Planning Commission for review, D.C. Code § 6-641.05. These restrictions apply to the District for the precise reason that it is not a state, but rather an "exceptional" constitutional creation, over which Congress retains ultimate legislative authority.

Even when the District finally gained some measure of autonomy with the passage of the Home Rule Act in 1973, the extent of home rule was limited; the grant of legislative authority to the District in the Home Rule Act is cabined by the power of Congress to determine what is in the best interest of the District and its residents. In practice, since the enactment of the Home Rule Act, this limited ability to legislate has often meant that the prerogatives of the District's locally elected representatives are subordinate to those of Congress. This year alone, Congress has blocked the District's ability to decriminalize marijuana possession, spend

its own money on abortions for poor residents, and has cut funds for D.C. police officers to drive their police cruisers to and from their homes if they live outside the District by adding riders to the Congressional appropriations bill.[1]  These actions by Congress are widely understood as further setbacks for home rule in the District.

The Court is aware that similar state statutes, when challenged under the Privileges and Immunities Clause of the Constitution, have all been struck down as unconstitutional. However, the District, unlike every other jurisdiction in the country that imposes an income tax on its own residents, is barred by the Home Rule Act from levying a commuter tax on income earned by non-residents working here.  While that fact alone would result in a structural imbalance in any city, the magnitude of the problem is *unique* in the District, where approximately 70 percent of jobs are held by non-residents. This structural imbalance is exacerbated by the fact that the unemployment rate in the District is extremely high – higher than both the national average and that of the entire Washington metropolitan area – thus requiring the city to spend an

---

[1] *See* Aaron C. Davis, *House Republicans block funding for D.C. marijuana decriminalization*, WASHINGTON POST, June 25, 2014, http://www.washingtonpost.com/local/dc-politics/house-republicans-block-funding-for-dc-marijuana-decriminalization/2014/06/25/d6854ba8-fc6e-11e3-8176-f2c941cf35f1_story.html (last accessed July 11, 2014).

inordinate amount of its resources on social welfare services in an attempt to aid its un- and under- employed population.

These circumstances put the District in a different position than other cities that have tried to enact similar residence preference legislation.  No other jurisdiction can lay claim to being a unique constitutional community, and thus, no other jurisdiction, by operation of our very constitutional structure, could possibly face the challenges faced by the District.  Nevertheless, the District has not provided any competent evidence that the First Source Act, as enacted and amended, is a narrowly tailored means to address this unique evil.  Thus, having carefully considered the Defendants' motion to dismiss, the response and reply thereto, the supplemental briefing, the applicable law, the oral argument, and the record as a whole, Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART.**

## I.    Background

In 1984, the District enacted the First Source Employment Agreement Act to "provide employment opportunities in entry-level positions in District of Columbia government-assisted projects for unemployed residents."  31 D.C. Reg. 2545 (May 25, 1984).  In 2011, the Council of the District of Columbia unanimously amended the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (hereinafter

"Amended Act"), which became effective in 2012. The law, as enacted and amended, was to counteract the effects of the "District's Congressionally-imposed ban on taxing any of the income that leaves the city," which results in "$1 billion to $2 billion a year in lost revenue." Council of the Dist. of Columbia, Comm. on Hous. and Workforce Dev., "Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011," B19-50, Oct. 14, 2011, at 3, *available at* http://dcclims1.dccouncil.us/images/00001/20120130131015.pdf (last accessed Jul. 4, 2014) (hereinafter "Committee Report"). The Act is administered by the District of Columbia Department of Employment Services ("DOES"). Plaintiffs challenge four elements of the First Source Act as enacted and amended: (1) employment agreements; (2) construction contracts; (3) targeted-hiring contracts; and (4) reporting requirements. Compl. ¶ 9.

**A.  The First Source Employment Agreement Act of 1984**

The First Source Act requires that all "beneficiaries" of a "government-assisted project" or contract enter into an Employment Agreement with the District that provides that the beneficiary will first attempt to fill jobs and vacancies from the First Source Register, on which only District residents can be listed. Compl. ¶¶ 10-12; *see* D.C. Code § 2-219.03(a)(1).[2]

---

[2] For the purposes of this section, all citations to the First Source Act are to the version of the Act in effect prior to

Under the Act, a beneficiary is defined as, *inter alia*, (a) the signatory of a contract executed by the Mayor that involves District funds or funds administered by the District, or (b) a beneficiary of a District governmental action, including contracts, grants, and loans, that results in a financial benefit of $100,000 or more. *Id.* § 2-219.01(1)(A)-(1)(B). A "government-assisted project" is one that is funded in whole or in part by District funds or funds administered by the District, and for which the District is a signatory to any contractual agreement. *Id.* § 2-219.01(5).

The Act imposes additional requirements on government-assisted projects that cost more than $100,000. For these projects, 51 percent of new employees must be District residents unless: (1) the beneficiary made a good faith effort to comply; (2) the beneficiary is located outside of the "Washington Standard Metropolitan Statistical Area" and none of the contract is performed inside that area; (3) the beneficiary enters into a workforce-development training program with DOES; or (4) DOES certifies that there are not enough qualified District residents to staff the project. Compl. ¶ 19; D.C. Code § 2-219.03(e)(3). Beneficiaries that willfully breach an Employment Agreement may be subject to penalties, which can include "monetary fines of 5%

February 24, 2012, the date which the amendments to the Act became effective.

of the total amount of the direct and indirect labor costs of the contract." Compl. ¶ 13 (quoting D.C. Code § 2-219.03(e)(4)).

The Act also provides that "[w]henever the Mayor determines that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects," the Mayor can provide for increased hiring in specific categories by entering into agreements with beneficiaries or their contractors and subcontractors. D.C. Code § 2-219.03a(a). A violation of this provision of the Act is "treated in the same manner as a violation of any other requirement" of the Act. *Id.*

The Act includes reporting requirements for beneficiaries. Every month, beneficiaries must submit a contract compliance report to DOES. Compl. ¶ 29. This report must include, among other things, the following for each covered project: (1) the number of employees needed; (2) the number of current employees transferred; (3) the number of job openings created; (4) the number of job openings listed with DOES; (5) the number of District residents hired during the reporting period; (6) the cumulative number of District residents hired; (7) the total number of employees hired during the reporting period; (8) the cumulative number of employees hired; and (9) the name, social

security number, job title, hire date, residence, and referral source information for all new hires. D.C. Code § 2-219.03(d). Upon submission of a final request for payment from the District, at the conclusion of a project, the beneficiary must document compliance with the Act or submit a request for a waiver, which includes material demonstrating good faith efforts to comply, referrals, and job advertisements listed with DOES and others. *Id.* § 2-219.03(e)(2). Failure to submit the required data could result in the imposition of penalties, including "monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *Id.* § 2-219.03(e)(4).

**B.    The Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011**

The Council of the District of Columbia passed the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 and it was enacted by Mayor Gray on December 21, 2011. The Amended Act was transmitted to Congress for review, and after the expiration of the requisite 30-day passive review period with no joint resolution of disapproval by Congress, it became effective on February 24, 2012. Defendants' Motion to Dismiss (hereinafter "Defs.' MTD") at 5-6. The Amended Act broadens the definition of "beneficiary" and "government-assisted project." Like the previous version of the

Act, a beneficiary is defined as a signatory to a contract
executed by the Mayor that involves D.C. funds or funds
administered by the District.  D.C. Code § 2-219.01(1)(A).[3]  For
a project valued in excess of $300,000, a beneficiary is

> [a] recipient of District government economic
> development action including contracts, grants, loans,
> tax abatements, land transfers for redevelopment, or
> tax increment financing that results in a financial
> benefit of $300,000 or more from an agency, commission
> instrumentality, or other entity of the District
> government, including a financial or banking
> institution which serves as the repository for $1
> million or more of District of Columbia funds.

*Id.* § 2-219.01(1)(B).  A "government-assisted project or
contract" includes

> any construction or non-construction project or
> contract receiving funds or resources from the
> District of Columbia, or funds or resources which, in
> accordance with a federal grant or otherwise, the
> District of Columbia government administers, including
> contracts, grants, loans, tax abatements or
> exemptions, land transfers, land disposition and
> development agreements, tax increment financing, or
> any combination thereof, that is valued at $300,000 or
> more.

*Id.* § 2-219.01(5).

The Amended Act also expands the applicability of the
Employment Agreements that each beneficiary must enter into with
the District.  Under the Amended Act, Employment Agreements must
include a provision that the first source for finding employees

---

[3] For the purposes of this Section, all citations are to the
Workforce Intermediary Establishment and Reform of the First
Source Amendment Act of 2011, not the original version of the
Act passed in 1984.

to fill all jobs created by the project or contract (or any vacancy occurring during the job) will be the First Source Register. *Id.* § 2-219.03(a)(1)-(a)(2). The Employment Agreement must also include a provision that 51 percent of employees hired will be District residents unless the Mayor waives the requirement. A waiver is available if (1) DOES has certified that the beneficiary made a good faith effort to comply; (2) the beneficiary is located outside the area; none of the work is performed in the area; the beneficiary published each available job in a city-wide newspaper for 7 calendar days and DOES certifies that there are not enough applicants from the First Source Register for the job, or the eligible applicants are not available for part-time work or do not have the means to travel to the job site; or (3) the beneficiary enters into workforce development training or placement arrangement with DOES. *Id.* § 2-219.03(e)(3)(A)(i)-(A)(iii).

DOES will consider a number of factors in deciding whether a beneficiary has made a good faith effort to comply sufficient to justify a waiver, including:

> (i) Whether [DOES] has certified that there is an insufficient number of District residents in the labor market who possess the skills required to fill the positions that were created as a result of the project or contract;
>
> (ii) Whether the beneficiary posted the jobs on the [DOES] job website for a minimum of 10 calendar days;

(iii) Whether the beneficiary posted each job opening or part-time work needed in a District newspaper with city-wide circulation for a minimum of 7 calendar days;

(iv) Whether the beneficiary has substantially complied with the relevant monthly reporting requirements set forth in this section;

(v) Whether the beneficiary has submitted and substantially complied with its most recent employment plan that has been approved by [DOES]; and

(vi) Any additional documented efforts.

*Id.* § 2-219.03(e)(3)(B). A beneficiary can choose whether the 51 percent District hiring requirement will be cumulative of all new hires, including employees hired by subcontractors, or met by each beneficiary or individual subcontractor. *Id.* § 2-219.03(e)(1)(B)(i)-(B)(ii). The targeted hiring and reporting requirements have not changed in the Amended Act. Compl. ¶¶ 55, 60-62.

For projects or contracts receiving $5 million or more of government assistance, the Amended Act includes several additional hiring, including that District residents perform: (1) at least 20 percent of journey worker hours by trade; (2) at least 60 percent of apprentice hours by trade; (3) at least 51 percent of skilled laborer hours by trade; and (4) at least 70 percent of common laborer hours. *Id.* § 2-219.03(e)(1A)(A). In addition, bids for these projects must include "an initial employment plan outlining the bidder or offeror's strategy to

12

meet the local hiring requirements" as well as other information
about health and retirement plans, ongoing efforts to hire
District residents, and past compliance with the Act. *Id.* § 2-
219.03(e)(1A)(F)(i).  The winning bidder must also submit a
revised employment plan for approval prior to the commencement
of work. *Id.* § 2-219.03(e)(1A)(F)(ii).

The Amended Act calls for the imposition of harsher
penalties for noncompliance.  In addition to a penalty equal to
5 percent of the direct or indirect labor costs for the project
or contract for willful breach of the employment agreement, *id.*
§ 2-219.03(e)(4)(A), failure to meet reporting requirements or
obtain a good faith waiver could result in imposition of a
penalty equal to 1/8 of 1 percent of the direct or indirect
labor costs for the project or contract for each percentage that
the beneficiary is deficient in meeting the hiring requirements,
*id.* § 2-219.03(e)(4)(B).  Further, two violations can result in
debarment from the award of District projects or contracts for a
period not to exceed five years. *Id.* § 2-219.03(e)(4)(D).

C.  **Effect on Plaintiffs**

Plaintiffs allege that the additional requirements imposed
by the Amended Act have created a situation in which
"contractors cannot possibly comply with the Act's hiring and
quota requirements, and they are threatened with job losses,
business failures, and debarment from government contracting."

13

Compl. at 3. While the aim of the First Source Act is to
promote employment in the District, Plaintiffs contend that it
"uses unlawful and unconstitutional means to try to shift to a
preferred group of people — District residents — first dibs on
jobs already created." *Id.* ¶ 81. They allege that the real
issue with employment in the District is not a shortage of jobs,
but rather a shortage of qualified applicants. *See id.*

Members of Plaintiff ABC-Metro Washington (hereinafter
"Metro Washington"), including the two Corporate Plaintiffs,
have been or will be "beneficiaries" as defined by the Act and,
as such, have allegedly been or will be "forced to deviate from
their individual-merit, level-playing-field business philosophy"
because they must assess prospective employees based on where
they live rather than their ability to do the work. Compl. ¶¶
15, 20, 41, 68, 69. According to Metro Washington, its members
typically hire a permanent workforce, as opposed to a project-
based one. *Id.* ¶ 15. As a result, complying with the Act
"essentially requires" its members to either withhold work from
non-District residents or decline to bid on certain projects
because of a shortage of qualified District residents. *Id.*
Metro Washington's members also purportedly incur increased
recruiting, training, hiring, and supervision costs as a result
of compliance with the Act. Compl. ¶¶ 16, 17, 42, 52, 58.

Metro Washington alleges that but for the Act, its members would have not have incurred these costs.

The Act has allegedly resulted in a host of other problems for Metro Washington's membership, including less productivity, higher overall labor costs, decrease in morale among non-District employees, higher legal fees, debarment for violations, fewer projects, layoffs, and higher costs associated with preparing bids for projects.  Compl. ¶¶ 16, 17, 64, 71, 75, 76, 79.  Metro Washington alleges that the Amended Act will also make it more difficult for its members to bid on projects that receive more than $5 million in government assistance.  *Id.* ¶ 70.  Moreover, Metro Washington and the Corporate Plaintiffs claim they will incur additional costs in training employees on the requirements of the Act, engaging with the District government and leadership, and public relations.  The Corporate Plaintiffs further allege that they are discriminated against because they are unable to assign trained employees to projects if they cannot satisfy the 51 percent District hiring requirement.  *Id.* ¶¶ 23, 43, 53, 59.

Metro Washington argues that in addition to the harm to its members, its own membership will decrease as its members will be forced to reduce the amount of business they conduct because of the increased cost of complying with the Amended Act.  *Id.* ¶ 75.  Furthermore, Metro Washington alleges that its members that

cannot afford to comply with the Act will allegedly be forced to close, thus further reducing membership. *Id.* ¶ 76. According to Metro Washington, its members are allegedly at a significant disadvantage as compared to contractors who choose not to comply with the Act; are not bothered by compliance; are able to secure a waiver; or already offer retirement benefits, health plans, and training. *Id.* ¶¶ 44, 54, 72. Plaintiffs claim that no general contractor has been able to meet, on a regular basis, the 51 percent requirement for new hires. *Id.* ¶ 22. According to Plaintiffs, this is the result of a number of factors, including: (1) an insufficient number of skilled workers who are District residents; (2) DOES's failure to vet and screen candidates and provide candidates with appropriate skills for a particular job; (3) District residents' lack of transportation, which makes it difficult for them to report to job-sites on time; (4) the disproportionately high number of District residents who fail required drug tests; and (5) the disproportionate number of District residents who quit within the first few weeks or are let go because of poor attendance or performance. Compl. ¶ 22. If the Act is upheld, Metro Washington and the Corporate Plaintiffs contend that they will be "forced" to bid on fewer projects in the District, and will also have to increase their prices in order to cover the cost of compliance with the Act. *Id.* ¶ 85.

The Individual Plaintiffs cannot be listed on the First
Source Register because they are not District residents, which
they allege places them at a significant disadvantage when
competing for jobs that are subject to an Employment Agreement
as defined by the Act. *Id.* ¶¶ 14, 43, 53, 59. They allege that
this results in discrimination and excludes them "from
consideration as part of a team of laborers on significant
District jobs not because of their skills but simply because
they do not live in the District." *Id.* ¶ 83.

## II. Standard of Review

### A. Rule 12(b)(1)

A federal district court may only hear a claim over which
is has subject matter jurisdiction; therefore, a Rule 12(b)(1)
motion for dismissal is a threshold challenge to a court's
jurisdiction. On a motion to dismiss for lack of subject matter
jurisdiction, the plaintiff bears the burden of establishing
that the Court has jurisdiction. *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 561 (1992). In evaluating the motion, the Court
must accept all of the factual allegations in the complaint as
true and give the plaintiff the benefit of all inferences that
can be drawn from the facts alleged. *See Thomas v. Principi*,
394 F.3d 970, 972 (D.C. Cir. 2005). However, the Court is "not
required . . . to accept inferences unsupported by the facts
alleged or legal conclusions that are cast as factual

allegations." *Cartwright Int'l Van Lines, Inc. v. Doan*, 525 F.
Supp. 2d 187, 193 (D.D.C. 2007) (internal quotation marks and
citations omitted).

**B.   Rule 12(b)(6)**

A motion to dismiss pursuant to Rule 12(b)(6) tests the
legal sufficiency of the complaint. *Browning v. Clinton*, 292
F.3d 235, 242 (D.C. Cir. 2002).  In order to be viable, a
complaint must contain "a short and plain statement of the claim
showing that the pleader is entitled to relief, in order to give
the defendant fair notice of what the . . . claim is and the
grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550
U.S. 544, 555 (2007) (internal quotation marks and citations
omitted).  The plaintiff need not plead all of the elements of a
prima facie case in a complaint, *Swierkiewicz v. Sorema N.A.*,
534 U.S. 506, 511-14 (2002), nor must the plaintiff plead facts
or law that match every element of a legal theory. *Krieger v.
Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (citation omitted).

However, despite these liberal pleading standards, to
survive a motion to dismiss, "a complaint must contain
sufficient factual matter, accepted as true, to state a claim
for relief that is plausible on its face." *Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009) (internal quotation marks and citation
omitted); *Twombly*, 550 U.S. at 570.  A claim is facially
plausible when the facts plead in the complaint allow "the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). While this standard does not amount to a "probability requirement," it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).

"[W]hen ruling on a defendant's motion to dismiss [pursuant to Rule 12(b)(6)], a judge must accept as true all of the factual allegations contained in the complaint." *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). The court must also give the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Despite this, a court need not "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Id.* Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not sufficient to state a claim. *Iqbal*, 556 U.S. at 678.

"In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508

F.3d 1052, 1059 (D.C. Cir. 2007) (internal quotation marks and citations omitted).  Among the documents subject to judicial notice on a motion to dismiss are "public records." *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004).

## III. Analysis

### A.   Standing

Article III restricts the power of federal courts to the adjudication of actual "cases" and "controversies."  U.S. Const. art. III, § 2; *see also Allen v. Wright*, 468 U.S. 737, 750 (1984).  This requirement has given rise to "several doctrines . . . 'founded in concern about the proper — and properly limited — role of the courts in a democratic society.'"  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "In order to establish the existence of a case or controversy within the meaning of Article III, [a] party must meet certain constitutional minima," including a "requirement that . . . [the party] has standing to bring the action."  *Gettman v. DEA*, 290 F.3d 430, 433 (D.C. Cir. 2002).  Indeed, standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan*, 504 U.S. at 560, and is an essential inquiry into whether the plaintiff is entitled to have the Court decide the merits of the dispute, *Allen*, 468 U.S. at 750-51 (citing *Warth*, 422 U.S at 498).

To establish the "irreducible constitutional minimum" of standing, a plaintiff must demonstrate three things:  (1) "injury in fact," which is (a) concrete and particularized and (b) actual or imminent; (2) that there is a causal connection between the complained of conduct and the injury alleged that is fairly traceable to the defendant; and (3) that it is likely, and not merely speculative, that a favorable decision will serve to redress the injury alleged.  *See Lujan*, 504 U.S. at 560-61 (internal quotation marks and citations omitted).  Where, as here, a plaintiff seeks prospective declaratory or injunctive relief, allegations of past harm alone are insufficient.  *See, e.g.*, *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Rather, a plaintiff seeking declarative or injunctive relief "must show he is suffering an ongoing injury or faces an immediate threat of [future] injury."  *Id.*

Plaintiffs are a trade organization, two corporations that provide contracting services, and four individuals who work in the construction industry.  Plaintiff Metro Washington maintains that it has both associational and organizational standing.  *See* Plaintiffs' Opposition to Motion to Dismiss (hereinafter Pls.' Opp'n) at 13.  The District contends that the Individual and Corporate Plaintiffs have failed to allege an injury in fact sufficient to be the basis for Article III standing.  Defs.' MTD at 17-18.  Moreover, the District argues that Metro Washington

has failed to establish both associational and organizational standing because the two Corporate Plaintiffs have not established standing, and because Metro Washington has "failed to allege any 'direct conflict' between its mission and the First Source Act." Defs.' MTD at 18; Defendants' Reply in Support of Motion to Dismiss (hereinafter "Defs.' Reply") at 4.

### 1. Individual Plaintiffs

The four Individual Plaintiffs reside outside of the District of Columbia but allegedly work on projects within the District. They claim that the Act has "adversely affected their ability to bid for or secure work on District projects in the past *and* will likely continue to do so, and make matters worse under the Amended Act." Pls.' Opp'n at 8 (emphasis in original). They also argue that they do not "stand on an equal footing" with other workers because they cannot register on the First Source Register. *Id.* at 9. Thus, they are not part of the hiring pool created by the Act and are at a "significant disadvantage" in competing for jobs on projects that are subject to the Act's requirements. *Id.* at 9; *see also* Compl. ¶ 83 ("For . . . the individual Plaintiffs, the impact of the Act is to exclude them from consideration as part of a team of laborers on significant District jobs not because of their skills or desires but simply because they do not live in the District."). These

injuries, according to the Individual Plaintiffs, are "ongoing and imminent."  Pls.' Opp'n at 9.

The District argues that this harm, such as it is, is not the type of particularized injury required to support standing. According to Defendants, the injuries that the Individual Plaintiffs allege "are entirely derivative of alleged injuries to their unnamed employer(s)."  Defs.' MTD at 17.  The District also argues that the Individual Plaintiffs' claims are "fatally attenuated" because the Complaint does not specify who they worked for, when they worked, or where they worked.  *Id.* at 18. The District does not dispute that if the Individual Plaintiffs have alleged an injury in fact, they would satisfy the remaining standing requirements.

The majority of the requirements of the First Source Act as enacted and amended do not directly apply to the Individual Plaintiffs.  Rather, the Act arguably impacts the bidding, hiring, and reporting procedures for construction companies that work on or bid for projects or contracts fully or partially funded or administered by the District.  The Individual Plaintiffs argue that their ability to secure work is nonetheless adversely affected by the Act's requirements, despite the fact that those requirements do not appear to apply to them.  *See* Pls.' Opp'n at 8.  They argue that this type of injury has been found sufficient to confer standing in similar

cases. *Id.* (citing *Util. Contractors Ass'n of New England, Inc. v. City of Fall River*, No. 10-10994-RZW, 2011 U.S. Dist. LEXIS 114333 (D. Mass. Oct. 4, 2011)). In *Fall River*, the court considered a challenge to a local ordinance that required that a certain percentage of workers on projects funded by local funds, federal grants, or loans be Fall River residents. 2011 U.S. Dist. LEXIS 114333, at *2-3. The court held that the individual plaintiff in the case had standing because he alleged that he could not compete fairly in the bidding process. *Id.* at *7-8. According to the court, in the context of standing, it is immaterial whether the plaintiff has actually bid on or applied for a job at a project covered by the ordinance, rather, "'injury in fact is the inability to compete on an equal footing.'" *Id.* at *8 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993)) (internal quotation marks omitted).

The Court finds that the individual Plaintiffs have alleged a sufficient injury in fact for the purposes of Article III standing. They have alleged a concrete injury – namely, that as non-District residents, they cannot register for the First Source Register and that their ability to compete for construction jobs therefore has been and will continue to be

adversely impacted by the Act.[4]  As the Supreme Court instructed

in *Lujan*, "[a]t the pleading stage, general factual allegations

of injury resulting from the defendant's conduct may suffice,

for on a motion to dismiss [courts] 'presume that general

allegations embrace those specific facts that are necessary to

support the claim.'"  504 U.S. at 561 (quoting *Lujan v. Nat'l

Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

Indeed, the Individual Plaintiffs are in a similar position

as the plaintiffs found to have standing in *Northeastern Florida

Chapter of Associated General Contractors of America v. City of

Jacksonville, Florida*, 508 U.S. 656 (1993).  There, an

association of contractors challenged a local ordinance that

"set aside" contracts for minorities and women on equal

protection grounds.  In that context, the Supreme Court held

that "[w]hen the government erects a barrier that makes it more

difficult for members of one group to obtain a benefit than it

is for members of another group, a member of the former group

seeking to challenge the barrier need not allege that he would

---

[4] The District's argument to the contrary is unavailing.  The
District contends that the Act does not prohibit the individual
Plaintiffs from pursuing their profession in the District or
regulate their ability to engage in business in the District as
non-citizens.  Defs.' MTD at 19-20.  However, as the discussion
of *Northeastern Florida* indicates, the issue is whether the
Individual Plaintiffs are in a less competitive position vis a
vis their District counterparts on projects covered by the First
Source Act.  That they are still eligible for employment on
those projects does not defeat their standing.

have obtained the benefit but for the barrier in order to establish standing." *Id.* at 666. Instead, the "injury in fact" is the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* In a challenge to a residential preference statute like the First Source Act, "the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of contract." *Id.* (citing *City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493 (1989)).

Thus, the Individual Plaintiffs have established standing because they have demonstrated that they are able and ready to work on projects covered by the First Source Act and that the Act prevents them from doing so on an equal basis. *Id.; see also Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1015-16 (D.C. Cir. 1997) (finding that a plaintiff that would not have qualified for the Small Business Association's set-aside program and did not wish to participate in the program nevertheless had standing because its injury was "its lack of opportunity to compete for Defense Department contracts reserved" for firms that could participate in the program).

The Individual Plaintiffs have also established causation and redressability. Plaintiffs cannot be listed on the First Source Register because only District residents can be listed. And, but for the Act, the Individual Plaintiffs would not have

to contend with preferential hiring requirements for District residents on projects valued at less than $5 million, or by trade for certain large-scale projects for which the District's financial assistance is more than $5 million.  It does not defeat their standing, as the District argues, that they have "failed to alleged [sic] any specifics as to when or how their employment choices have been affected by any _other_ entity's regulation by the District."  Defs.' MTD at 18 (emphasis in original).

2.  <u>Metro Washington and the Corporate Plaintiffs</u>

Because Metro Washington is an association, it may sue in its own right or on behalf of its members.  Metro Washington argues that it has satisfied the requirements for both associational and organizational standing.  Because the two Corporate Plaintiffs are members of Metro Washington, the Court will consider their standing in the context of Metro Washington's associational standing.

"[A]n association may have standing to assert the claims of its members even where it has suffered no injury from the challenged activity."  _Hunt v. Wash. State Apple Adver. Comm'n_, 432 U.S. 333, 342 (1977) (citations omitted).  A plaintiff has associational standing to sue on behalf of its members if:  "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect

are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011); *see also Hunt*, 432 U.S. at 343.

The Corporate Plaintiffs are both members of Metro Washington and claim to adhere to the organization's philosophy of rewarding employees based on individual merit and performance. Compl. ¶¶ 4-6. They have been beneficiaries as defined by the Act and anticipate that they will continue to be beneficiaries for future projects. They allege that the Act has made it more difficult for them to bid on projects that the District funds in whole or in part, or that it administers, and that they have had to increase the time spent on administrative matters as a result of their compliance with the First Source Act. *Id.* ¶ 16. For instance, Plaintiff Miller and Long alleges that its experience under the First Source Act has been that it has to screen approximately 60 District applicants to hire 25 workers, the majority of whom are not employed six months later. *Id.* It contends that this screening number is three times higher for District residents than for residents of Maryland and Virginia.[5] *Id.*

---

[5] There are no specific allegations regarding Plaintiff Hawkins Electrical Construction of D.C.

In addition to these administrative costs, the Corporate Plaintiffs allege that the requirements of the Act have imposed additional costs that they would not have incurred but for the Act, such as decreased productivity and morale, higher legal fees, and costs associated with meeting reporting obligations. *Id.* ¶¶ 17, 33, 42. The Corporate Plaintiffs also claim that they "suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."[6] *Id.* ¶¶ 18, 28, 34, 44, 54. The Corporate Plaintiffs allege that they will continue to incur such costs into the future under the Amended Act. *Id.*

The Corporate Plaintiffs further allege that they have suffered a competitive economic injury because they have incurred costs (for training, recruiting, hiring, and supervision) and a disruption in business as a result of complying with the Act. Pls.' Opp'n at 12 (referencing specific portions of the Complaint). According to Plaintiffs, such a showing is sufficient to establish that they have suffered

---

[6] The Corporate Plaintiffs do not seem to be alleging that they could not secure such waivers, though they compare themselves to hypothetical contractors who are able to secure waivers where they are not.

injury in fact. *Id.* Finally, the Corporate Plaintiffs argue that they have been injured by the prospect of incurring the penalties in the Amended Act; however, they have not alleged that they have paid any penalties under the Act as enacted.[7] According to the Corporate Plaintiffs, however, the "District's voluntary decision not to enforce the First Source Act does not defeat" their standing. *Id.* (citing *Util. Contractors*, 2011 U.S. Dist. LEXIS 114333, at *8 (holding that the fact that defendant decided not to enforce the challenged regulation did not defeat plaintiffs' standing)).

In support of their argument, Plaintiffs cite to *Air Transport Association of America v. Export-Import Bank*, where the court determined that an association representing several member airlines had alleged that its members had suffered a competitive injury sufficient to confer standing. 878 F. Supp. 2d 42, 55-63 (2012). The Air Transport Association ("ATA") challenged the decision of the Export-Import Bank to provide loan guarantees to Air India, arguing that the guarantees violated the Export-Import Bank Act. Before reaching the merits, the court considered whether the ATA had associational standing to proceed on behalf of nine member airlines by

---

[7] Nor could they, according to the District, because "the imposition of penalties for noncompliance has never occurred" and no contractor has been fined for noncompliance since the law was enacted. Committee Report at 7.

assessing whether its members going forward would have standing to sue in their own right. 878 F. Supp. 2d at 54. The ATA argued that the Bank's allegedly unlawful loan guarantees had injured its members in the past and that the guarantees at issue would imminently injure its members because foreign airlines would be allowed to borrow at cheaper rates, thus increasing competition in international travel. *Id*. at 56. In deciding whether the ATA had competitor standing, the court explained that in order to invoke competitor standing, a plaintiff need not show that the injury from increased competition has already occurred. *Id.* at 56. To the contrary, as long as a plaintiff can "demonstrate an 'imminent increase in competition,' the court recognizes that that 'increase . . . will almost certainly cause an injury in fact." *Id.* (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998)). Nevertheless, the court stressed that the increase in competition must be imminent and not merely speculative for a plaintiff to invoke competitor standing. *Id.* Thus, to demonstrate "a constitutionally sufficient competitive injury, a plaintiff must show that the challenged action has the clear and immediate potential to cause competitive harm." *Id.* (internal citations and quotation marks omitted).

Plaintiffs' reliance on *Air Transport* is misplaced. Unlike the Corporate Plaintiffs here, the ATA provided detailed factual

information about how new planes for foreign airlines would
compete with ATA member airlines on particular routes between
India and the United States. *Id.* at 58-59. This argument was
supported by declarations of industry experts. *Id.* On the
basis of this factual showing, the court held that the ATA had
alleged an appropriate injury. *Id.* at 63. No Plaintiff has
made such a factual showing here. Indeed, as Defendants argue,
the Complaint fails to provide any details about specific
projects or the impact of the Act on the Corporate Plaintiffs'
costs for those projects. Defs.' MTD at 15 n.25, 17.

Defendants argue that the injuries claimed by the Corporate
Plaintiffs are thus not only speculative, but also that they are
nothing more than allegations of future injury that cannot
satisfy the requirements of Article III standing. Defs.' Reply
at 6. Further, the District contends the Plaintiffs' invocation
of competitor standing, which "recognize[es] that economic
actors 'suffer [an] injury in fact when agencies lift regulatory
restrictions on their competitors or otherwise allow increased
competition' against them," is legally deficient. *Id.* at 7
(quoting *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010)
(quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367
(D.C. Cir. 1998)). According to the District, the "First Source
Act does not 'lift restrictions' on plaintiffs' competitors, or
otherwise allow increased competition against them" because the

"provisions of the First Source Act apply identically to all covered entities, both within and outside the District." *Id.*

Defendants are correct that the Corporate Plaintiffs have not established a competitive injury sufficient to confer standing, especially because the Act applies to all actors in the market, and does not differentiate between contractors. However, to the extent that the Corporate Plaintiffs have alleged that they must incur additional costs to comply with the Act, they have alleged a sufficient injury. For instance, in *Investment Co. Institute v. United States CFTC*, the court found that plaintiffs who alleged that they would face an "increased regulatory burden and the associated costs of that regulation" had alleged an injury in fact for the purposes of Article III standing. 891 F. Supp. 2d. 162, 185 (D.D.C. 2012). The court also held that a decision that invalidated the challenged regulation would "fully redress" the injuries alleged. *Id.* Similarly, here, the alleged additional administrative and other costs alleged by the Corporate Plaintiffs are directly traceable to their current and future compliance with the First Source Act, and a decision by this Court invalidating the Act, thereby removing the requirement that they incur those costs, would directly redress their injuries. Thus, the Corporate Plaintiffs' allegations of mandatory compliance with the First Source Act, and the administrative requirements that are

necessary for compliance, are sufficient to satisfy the
constitutional requirement of injury in fact.  *See Ass'n of Am.*
*R.R.S. v. Dep't of Transp.*, 38 F.3d 582, 585-86 (D.C. Cir. 1994)
(stating that "there is undeniably a live, concrete 'case or
controversy'; the [plaintiffs] allege that they are materially
harmed by the additional regulatory burden imposed upon them as
a result of a federal agency's unlawful adoption of a rule, and
seek to have that rule overturned.  We hold under the
circumstances that the [plaintiffs] ha[ve] standing"); *Chevron*
*U.S.A., Inc. v. FERC*, 193 F. Supp. 2d 54, 60-61 (D.D.C. 2002)
(holding that compliance with reporting obligations was
sufficient injury in fact to confer standing on plaintiffs).

Under these circumstances, the Court holds that the
Corporate Plaintiffs have standing.  Therefore, because they can
bring this action in their own right; because Metro Washington
has alleged that its individual merit philosophy is germane to
its purpose; and because the participation of its members is not
required to provide them with the relief they seek, the Court
finds that Metro Washington also has associational standing to
proceed.[8]

---

[8] Because the Court finds that Metro Washington has associational
standing, it need not consider whether it also has
organizational standing.

## B. Privileges and Immunities Clause

Plaintiffs contend that the First Source Act violates the Privileges and Immunities Clause of the Constitution, which provides that the "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."[9] U.S. Const. art. IV, § 2, cl. 1. The Clause prevents states from enacting legislation that would discriminate against residents of other states in favor of their own. *See Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 285 n.18 (1985). Defendants argue that Plaintiffs have failed to state a claim with respect to the Privileges and Immunities Clause because, assuming that the Clause applied to the District, the First Source Act does not violate the Clause.

As an initial matter, the parties disagree over whether the Privileges and Immunities Clause applies to the District of Columbia because, by its express terms, it references "[c]itizens of each State." U.S. Const. art. IV, § 2, cl. 1. Because the District is not a state, it is an open question whether the Clause applies to it. *See Banner v. United States*,

---

[9] The Privileges and Immunities Clause does not apply to corporations, thus the two Corporate Plaintiffs and Metro Washington do not have standing to challenge the First Source Act under the Clause. *See W. & S. Life Ins. Co. v. Bd. of Equalization of Cal.*, 451 U.S. 648, 656 (1981); *Hemphill v. Orloff*, 277 U.S. 537, 548-50 (1928). However, the Individual Plaintiffs do have standing to challenge the First Source Act under the Privileges and Immunities Clause.

303 F. Supp. 2d 1, 25 (D.D.C. 2004). In their motion to dismiss, Defendants did not address the applicability of the Clause to the District, stating instead in a footnote that: "While the District does not concede that the Clause applies to it, for the purposes of this Motion, the District assumes that it does." Defs.' MTD at 20 n.29. Plaintiffs construed this footnote as a concession that the Clause applied for the purposes of Defendants' motion to dismiss, Pls.' Opp'n at 16 n.7, which Defendants disputed in their reply, Defs.' MTD at 8. On the basis of this dispute, the Court ordered supplemental briefing on the issue of whether the Privileges and Immunities Clause applies to the District. *See* March 23, 2013 Minute Order. The parties filed supplemental responses in April 2013 - - Defendants argued that the Clause did not apply to the District, whereas Plaintiffs argued that it did. *See* Defs.' Supp. P&I Mem.; Pls.' Supp. P&I Mem.

The D.C. Circuit has only addressed the applicability of the Privileges and Immunities Clause to the District on two occasions, both prior to the enactment of the Home Rule Act in 1973. First, in *Duehay v. Acacia Mutual Life Insurance Co.*, the court held that the Clause was inapplicable to the District because "[i]t is a limitation upon the powers of the states and in no way affects the powers of Congress over the territories and the District of Columbia." 105 F.2d 768, 775 (D.C. Cir.

1939).  The Circuit again found that the Clause did not apply to the District the following year in *Neild v. District of Columbia*, 110 F.2d 246 (D.C. Cir. 1940).  There, citing *Duehay*, the Court noted in a footnote that the "privileges and immunities clause is a limitation upon the states only and in no way affects the powers of Congress over the District of Columbia or the territories."  110 F.2d at 249 n.3.  Since 1940, the Supreme Court has found that the Clause does apply to certain territories, though crucially, the organic acts for those territories include a provision making the Privileges and Immunities Clause applicable.  *See Chase Manhattan Bank v. South Acres Dev. Co.*, 434 U.S. 236 (1978) (noting that Congress explicitly extended the Privileges and Immunities Clause to Guam in its Organic Act); *Mullaney v. Anderson*, 342 U.S. 415 (1952) (holding that the clause applied to Alaska, which was a territory on its way to becoming a state).  The Home Rule Act contains no similar language; and the District, unlike other territories, is partially governed by Congress.

The District has not moved to Dismiss on the grounds that the First Source Act is a valid residence based classification because the Privileges and Immunities Clause is not a bar on District action.  Rather, it argues that the First Source Act is a valid residence preference under the Privileges and Immunities Clause.  Thus, for the purposes of this motion, the Court need

not reach the question of whether the Privileges and Immunities Clause applies to the District because the District has not sought relief on that issue.

The Supreme Court has long held that the "the privileges and immunities clause is not an absolute." *Toomer v. Witsell*, 334 U.S. 385, 396 (1948). Equal treatment for citizens, residents, and nonresidents has only been required "with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity." *Baldwin v. Fish and Game Comm'n of Montana*, 436 U.S. 371, 383 (1978). When determining whether a particular residency classification violates the Privileges and Immunities Clause, the court must conduct a two-step analysis. First, the activity purportedly threatened by the classification must be "sufficiently basic to the livelihood of the Nation" as to fall within the "purview" of the clause. *Supreme Court of Virginia v. Friedman*, 487 U.S. 59, 64 (1988) (internal quotation marks and citations omitted). Second, if the "challenged restriction deprives nonresidents of a protected privilege," it is constitutionally impermissible if "the restriction is not closely related to the advancement of a substantial state interest." *Friedman*, 487 U.S. at 65 (citing *Piper*, 470 U.S. at 284).

The first step of the analysis requires the court to consider whether the Act burdens a privilege or immunity

protected by the Clause. *United Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 218 (1984). Because not all residency classifications are constitutionally suspect, the court must determine whether the non-resident's interest is fundamental to promoting interstate harmony and thus covered by the Clause. *See Baldwin*, 436 U.S. at 387 (explaining that the protections of the Clause apply to fundamental rights, which are those involving "basic and essential activities, interference with which would frustrate the purposes of the formation of the Union"). The Supreme Court has held that the ability to pursue a common calling is "one of the most fundamental of those privileges protected by the Clause." *Camden*, 465 U.S. at 219 (citing *Baldwin*, 436 U.S. at 387).

Here, Plaintiffs argue that the First Source Act unconstitutionally impedes their ability to pursue their common calling. Compl. ¶ 90; Pls.' Opp'n at 16-17. Though public employment is distinct from private employment, the Supreme Court has recognized that employment on public works projects is a fundamental right protected by the Privileges and Immunities Clause. Indeed, "[t]he opportunity to seek employment with such private employers is sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause even though the contractors and subcontractors themselves are engaged in projects funded in whole or in part by

the city." *Camden*, 465 U.S. at 221-22. (internal quotation marks and citations omitted). Nevertheless, this is not the end of the inquiry – a regulation that discriminates against a protected privilege may nonetheless be valid "where there is a 'substantial reason' for the difference in treatment." *Id.* at 222.

Where a protected privilege or immunity is implicated by a particular state law or regulation, the state can defeat the challenge by demonstrating that there is "something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Hicklin v. Orbeck*, 437 U.S. 518, 526 (1978); *see also Camden*, 465 U.S. at 222. The Supreme Court has explained that the Privileges and Immunities Clause "does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it." *Toomer*, 334 U.S. at 396. In those cases where such reasons exist, the inquiry "must be concerned with whether . . . the degree of discrimination bears a close relation to them." *Id.* Courts must also give "due regard [to] the principal [sic] that the States should have considerable leeway in analyzing local evils and prescribing appropriate cures." *Id.*

The District contends that the First Source Act is necessary to counteract the grave economic disparity that it faces as a result of its inability to levy a commuter tax on

non-residents, who hold 70 percent of jobs in the District. Defs.' MTD at 22; *see also Banner*, 303 F. Supp. 2d at 26. This situation, legally mandated by Congress in the Home Rule Act, creates a structural imbalance unlike that faced by any other jurisdiction in the country, one which the First Source Act aims to alleviate. *Id.*

Plaintiffs argue to the contrary that the District has not provided a substantial reason for the discrimination caused by the First Source Act. According to Plaintiffs, "more tax revenue" is not a sufficient reason for discriminating against non-residents. Pls.' Opp'n at 17-19. Further, Plaintiffs claim the Act is not narrowly tailored to combat a particular source of evil because "nonresidents are not a peculiar source of unemployment in the District, nor are they the source of any other local 'evil.'" *Id.* at 19 (quoting Compl. ¶¶ 93, 114). The fact that there are more non-residents than residents working in the District, according to Plaintiffs, is a symptom of other social and economic ills. *Id.*

Plaintiffs point out that virtually every other residence preference law that has been challenged on Privileges and Immunities grounds has been found to be unconstitutional. Plaintiffs are correct about the state of Privileges and Immunities Clause jurisprudence. Every case of which the Court is aware has found that the jurisdiction involved used the

residence preference law primarily as a means for economic
protectionism.  Unlike the District, however, none of these
jurisdictions are legally barred from raising revenue through
the imposition of taxes, nor are they required to submit local
legislation to Congress for review.

For instance, plaintiffs challenging a Worcester,
Massachusetts law that required all contractors on public
projects to allocate 50 percent of all employee work hours to
city residents were granted a preliminary injunction against
enforcement of the law.  *Util. Contractors Ass'n of New England,
Inc. v. City of Worcester*, 236 F. Supp. 2d 113 (D. Mass. 2002).
In finding that the plaintiffs were likely to succeed on the
merits, the court considered the constitutionality of the
ordinance.  Though the city argued that adverse employment
conditions in Worcester were a substantial reason that justified
the discrimination, the court could not accept that nonresident
employees on public projects were the particular source of the
city's employment issues.  *Id.* at 119-20.  In ruling for the
plaintiffs, the court also considered whether the law had cured
the employment problems it was enacted to remedy.  *Id.*  Similar
ordinances have also been struck down in Fall River and Quincy,
Massachusetts.  *See Merit Constr. Alliance V. City of Quincy*,
No. 12-10458, 2012 U.S. Dist. LEXIS 54210 (D. Mass. April 18,
2012) (finding, on a motion for preliminary injunction, that a

city ordinance requiring that 33 percent of employees on public
agency projects be city residents would violate the Privileges
and Immunities Clause despite the city's argument that city
residents should see a return on investment through jobs from
projects that their tax dollars were funding); *Util. Contractors
Ass'n of New England v. City of Fall River*, No. 10994-RZW, 2011
U.S. Dist. LEXIS 114333 (D. Mass. Oct. 4, 2011) (holding, in
granting a motion for preliminary injunction, that a city
ordinance that required 100 percent of apprentices and 50
percent of all other employees on public works projects be city
residents would be invalid, especially because the city had
offered no justification for the classification).[10]

---

[10] Plaintiffs also cite to *Camden*, in which the Supreme Court
reversed and remanded a case involving a Privileges and
Immunities Clause challenge to a municipal ordinance providing
that at least 40 percent of the employees of contractors and
subcontractors working on city funded or administered projects
be city residents. 465 U.S. at 223. The city of Camden argued
that the ordinance was constitutional because it was "necessary
to counteract grave economic and social ills," including
unemployment, a decline in population, and a reduction in the
number of businesses located in the city. *Id.* at 222.
According to the city, the particular evil that the ordinance
was intended to address was non-Camden residents employed on
city public works projects. *Id.* The Court did not invalidate
the statute, but remanded the case for further factual findings
because it could not assess the city's justification on the
record before it. *Id.* at 222-23. In remanding the case, the
*Camden* Court emphasized that the fact that Camden was "expending
its own funds or funds it administers in accordance with the
terms of a grant" was "perhaps the crucial factor [] to be
considered in evaluating whether the statute's discrimination
violates the Privileges and Immunities Clause." *Id.* at 221. In
the wake of *Camden*, one court has upheld a residence preference

Similarly, in *W.C.M. Window Co., Inc. v. Bernardi*, a three judge panel of the Seventh Circuit ruled that an Illinois residence based classification violated the Privileges and Immunities Clause.  730 F.2d 486 (7th Cir. 1984).  The Illinois statute required that contractors on public works projects for the state or municipalities employ Illinois laborers.  *Id.* at 489.  Under the law, an Illinois laborer was defined as any worker who had been a resident of the state for at least one year.  *Id.* at 494.  In arguing the law was constitutional, the state failed to provide any evidence of the benefits of the residential preference.  *Id.* at 497-98.  The court thus ruled that because the Illinois law implicated a fundamental right protected by the Clause, and because the state had not satisfied its "burden of justifying the discrimination," the law was found to be unconstitutional.  *Id.* at 498.

These cases, while instructive, simply do not describe the situation presented here.  The fact that the District is the only jurisdiction in the country that cannot tax commuters[11] puts

law as furthering a state's interest in combating unemployment disparities.  *State v. Antonich*, 694 P.2d 60 (Wy. 1985) (holding that a state residence preference law narrowly addressed the goal of reducing unemployment and therefore did not violate the Privileges and Immunities Clause).

[11] The Supreme Court recognized the right of one state to tax the income of non-residents in 1920 in *Shaffer v. Carter*, 252 U.S. 37 (1920).  The Court held that a state may levy a tax on a nonresident who holds a job or operates a business in a state so

it in a unique position compared to other jurisdictions that have enacted similar legislation, and indeed, it is a particular evil that only the District confronts.[12]  The Supreme Court has made clear that "[e]very inquiry under the Privileges and Immunities Clause must . . . be conducted with due regard for the principle that the states have considerable leeway in analyzing local evils and in prescribing appropriate cures," especially when a "government body is merely setting conditions on the expenditure of funds it controls."  *Camden*, 465 U.S. at 222-23 (internal quotation marks and citations omitted); *see also Hicklin*, 437 U.S. at 529.  The District's determination that the First Source Act is an appropriate response to the unique burden placed on the District by the Congressionally-

---

long as that tax is no more onerous than that levied on a state resident.  *Id.* at 52.  The Court reasoned that a non-resident had an obligation to pay for the cost of the state's government, from which the nonresident derived a benefit.  *Id.* at 52-53.  Following the rule of *Shaffer*, every state in the country that levies an income tax on its own citizens imposes a tax on nonresidents who work or do business in the state.  *See* CCH State Tax Guide ¶¶ 15-157.  Some states have reciprocal agreements with surrounding states whereby each agrees not to tax the income of nonresidents.  *Id.*

[12] Plaintiffs contend that the actual source of evil that the District confronts is Congress and the ban on a commuter tax in the Home Rule Act.  While the Home Rule Act may be the legal source of the ban, the effect of the ban is only felt when a nonresident holds a job in the District and carries that revenue back to his or her home state.

imposed commuter tax ban is therefore entitled to some deference.[13]

Thus, according to the District, the inability to impose a commuter tax is District's unique evil; however, the Court must determine "'whether the degree of discrimination bears a close relation'" to that evil. *Camden*, 465 U.S. at 222 (quoting *Toomer*, 334 U.S. at 398). The District argues that it cannot tax commuters by the terms of the Home Rule Act, resulting in a particularly acute problem because approximately 70 percent of the jobs in the District are held by commuters. Defs.' MTD at 22. The District also argues that the unemployment rate in the District exceeds that of surrounding jurisdictions and the country as a whole – as of August 2011, when the amendments to the Act were being considered, the unemployment rate in the District as a whole was 11.1 percent. Committee Report at 3. In some wards of the city, it was as high as 30 percent. *Id.*

---

[13] At oral argument, Plaintiffs urged the Court to decide that the District cannot even determine what constitutes a local evil for the purposes of a privileges and immunities challenge. According to Plaintiffs, when Congress determined that the District could not enact a commuter tax, it apparently determined that this ban was not a local evil as well. While Congress may dictate much of what the District may do, it cannot dictate which problems the District characterizes as most severe – as local evils. *See Camden*, 465 U.S. at 222; *Toomer*, 334 U.S. at 396 (explaining that courts must give "due regard [to] the principal [sic] that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures").

The unemployment rate in the Washington metropolitan area, by contrast, was 5.3 percent in May 2012. Defs.' MTD at 7. According to the District, this results in a permanent structural imbalance in the budget, whereby there is a "gap between the cost of providing services and its capacity to raise revenue." Defs.' MTD at 11 (citing a GAO report from 2003). The District claims that the "First Source Act was enacted in an effort to remedy the very real, significant, and well-established structural imbalances in the District's budget," *id.* at 12, presumably, by placing a modest thumb on the scale in favor of District residents with respect to hiring in a narrow subset of the District economy – construction jobs funded or administered by the District government.

While the Court could be persuaded that the inability to levy a commuter tax could be a peculiar evil that could justify the residential preference in the First Source Act, the Court finds "it impossible to evaluate the [District's] justification on the record as it now stands." *Camden*, 465 U.S. at 223; *see also Dynalantic Corp. v. Dep't of Def.*, 503 F. Supp. 2d 262, 267 (D.D.C. 2007) (denying motions for summary judgment in a case evaluating the constitutionality of the Small Business Association's set aside program for small businesses owned and controlled by disadvantaged individuals because the parties had not demonstrated whether the asserted compelling government

interest had a strong basis in evidence).  At this stage in the
litigation, the District has not provided sufficient substantive
evidence for the Court to determine whether the First Source
Act's residential hiring preferences for construction projects
funding in whole or in part by the District are narrowly
tailored to address the unique evil of the District's inability
to levy a commuter tax.  This is a fact-intensive inquiry that
cannot be resolved on a motion to dismiss -- there have been no
findings of fact made in this case, nor has there been any
discovery and no declarations have been filed by anyone.  And it
would not be appropriate for the Court to make factual findings
or take judicial notice of the impact of the First Source Act at
this juncture.  Thus, the District's motion to dismiss
Plaintiffs' privileges and immunities claim is hereby denied
without prejudice.

> **C.  Commerce Clause**

Plaintiffs also argue that the First Source Act violates
the Commerce Clause, which is "an implicit restraint on state
authority, even in the absence of a conflicting federal
statute." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste
Mgmt. Auth.*, 550 U.S. 330, 338 (2007).  This restraint, known as
the Dormant Commerce Clause, prevents states from interfering
with Congress's power to regulate interstate commerce.  However,
for state action to implicate the Dormant Commerce Clause, the

action must take the form of regulatory activity. "Some cases run a different course, however, and an exception covers States that go beyond regulation and themselves 'particpat[e] in the market' so as to 'exercis[e] the right to favor [their] own citizens over others.'" *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008) (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976)). Because "[t]here is no indication of a constitutional plan to limit the ability of States themselves to operate freely in the free market," *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980), the Dormant Commerce Clause is inapplicable. "[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause." *White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 208 (1983), and the state may preference local interests. Thus, "in this kind of case there is 'a single inquiry: whether the challenged program constitute[s] direct state participation in the market.'" *Id.* (quoting *Reeves*, 447 U.S. at 436 n.7).

The District argues that Plaintiffs fail to state a claim because the First Source Act does not violate the Commerce Clause. First, the District notes that the Act only applies to projects that are funded, in whole or in part, or administered by the District. Thus, according to the District, the First Source Act does not apply to wholly private transactions.

Defs.' MTD at 26.  Further, the District contends that through
the First Source Act, it is acting as a market participant, not
a market regulator.  Thus, under Supreme Court precedent, the
Dormant Commerce Clause does not apply.  *Id.*  According to the
District, a state may act as a market participant even where it
also regulates the relevant market.  *Id.* at 27 (citing *Davis*,
553 U.S. at 348).

    In *Hughes v. Alexandria Scrap Corp.*, the Supreme Court
first articulated the principle of a state as a market
participant for the purposes of the Dormant Commerce Clause.
426 U.S. 794 (1978).  There, the state of Maryland used its own
funds to encourage the removal of automobile hulks from state
streets and junkyards.  *Id.* at 796-97.  The state eventually
amended the bounty statute to require different, more
cumbersome, documentation from out of state scrap processors
than in state processors.  *Id.* at 800-01.  The district court
invalidated the amendment on the grounds that it violated the
Commerce Clause.  The Supreme Court reversed, first noting that
Maryland was not regulating or prohibiting the flow of
automobile hulks, but was instead entering the market to bid up
their price.  *Id.* at 806.  The Court thus held that the state
was a market participant and that "[n]othing in the purposes
animating the Commerce Clause prohibits a State, in the absence
of congressional action, from participating in the market and

exercising the right to favor its own citizens over theirs."
*Id.* at 810.

The Supreme Court again addressed the market participant exception in *White*.  There, the Court considered a Boston city ordinance that required that on all construction projects funded in whole or part by city funds, or projects the city administered, at least half of the work force be comprised of city residents.  460 U.S. 204 (1982).  The Court held that "[i]nsofar as the city expended only its own funds in entering into construction contracts for public projects, it was a market participant and entitled to be treated as such."  *Id.* at 214 (citing *Hughes*, 426 U.S. 784).  Therefore, the Dormant Commerce Clause did not apply, and the regulation was a valid exercise of the state's authority.  *Id.* at 214-15.

The District argues that the First Source Act is consistent with this line of cases, as the "District is simply favoring the use of District labor as a condition of the District's purchase of construction services."  Defs.' MTD at 27.  The relevant market here, according to the District, is the market for construction services, and it is insisting on using its own residents.  This choice, the District argues, "does not violate the Commerce Clause," nor does it "impermissibly burden interstate commerce, as it only affects District projects in the District."  *Id.* at 27-28.

Plaintiffs argue that the First Source Act does violate the Commerce Clause because, contrary to the District's claims, the District is acting as a market regulator, not a market participant. Pls.' Opp'n at 22-23. In making this argument, Plaintiffs ignore the binding precedent of *Hughes, White*, and their progeny, and instead focus on cases that are wholly inapposite. For instance, Plaintiffs argue that the First Source Act is invalid because the 2011 amendments provide for a period of debarment for repeated violations of the Act. Plaintiffs cite to *Wisconsin Dep't of Indus. Labor and Human Relations v. Gould*, 475 U.S. 282 (1986), for the proposition that the market participant exception does not apply to a state statute that provides for debarment. However, the statute at issue in *Gould* provided for debarment for repeat offenders of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, a federal statute that preempted the conflicting state statute. 475 U.S. at 289-90. Plaintiffs cite to no cases that support their position that the District is a market regulator.

Despite their best efforts, Plaintiffs cannot credibly dispute the fact that the District is acting as a market participant with respect to city-funded construction projects. The First Source Act thus plainly does not violate the Commerce Clause. *See Shayne Bros., Inc. v. District of Columbia*, 592 F. Supp. 1128, 1133-34 (holding that a District statute regarding

solid waste disposal that preferenced District waste providers and provided for period of debarment after violations was not a violation of the Commerce Clause).  Accordingly, Defendants' motion to dismiss Plaintiffs' Commerce Clause claim is granted.

**D.  Equal Protection Clause**[14]

"The Equal Protection Clause provides a basis for challenging legislative classifications that treat one group of persons as inferior or superior to others, and for contending that general rules are being applied in an arbitrary or discriminatory way." *Jones v. Helms*, 452 U.S. 412, 423-24 (1981).  Accordingly, courts apply strict scrutiny when the challenged classification jeopardizes the exercise of a fundamental right or categorizes individuals on the basis of an inherently suspect characteristic such as race, alienage, or national origin.  *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999); *Banner v. United States*, 428 F.3d 303, 307 (D.C. Cir. 2005).  However, "if a law neither burdens a fundamental right nor targets a suspect class," it will be upheld "so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996); *Hettinga v. United States*, 677

---

[14] The Equal Protection Clause of the Fourteenth Amendment applies only to the states.  Although the Fifth Amendment, which does apply to the District, does not contain an equal protection component, the Supreme Court has held that the Due Process Clause of the Fifth Amendment does contain one and that it applies to the District. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).

F.3d 471, 478 (D.C. Cir. 2012) ("A statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.") (internal quotation marks and citations omitted)).  Rational basis review is thus "highly deferential," *Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000), and it "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," *Heller v. Doe*, 509 U.S. 312, 319 (1993).

Plaintiffs contend that they have stated an Equal Protection claim because the First Source Act impermissibly discriminates against the Individual Plaintiffs who do not reside in the District.  They are therefore treated differently than similarly situated individuals on the basis of their state of residency.  Compl. ¶ 106; Pls.' Opp'n at 25-26.  Plaintiffs concede that such a classification, based on state of residency, should be scrutinized under rational basis review.  Compl. ¶ 107; *see Heller v. Doe*, 509 U.S. at 319-20 (explaining that "a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose").

Plaintiffs make no real effort to defend their Equal Protection claim. In their opposition, they state only that "the First Source Act does not provide a rational basis for treating nonresident employers and employees differently than resident employers and employees." Pls.' Opp'n at 24. They also argue that the District incorrectly relies on *Banner*, but fail to explain how. *Id.* at 25-26. These conclusory allegations are insufficient to survive a motion to dismiss.

The District is correct that Plaintiffs cannot state an Equal Protection claim "because they cannot overcome the presumption of rationality." Defs.' MTD at 31. As the District points out, resident preferences similar to those embodied in the First Source Act have been upheld by other courts. *Id.* (citing *Chance Mgmt., Inc. v. South Dakota*, 97 F.3d 1107, 1115 (8th Cir. 1996) (applying rational basis review and upholding a residency requirement for obtaining a license as a video lottery machine operator and explaining that "the state has a legitimate interest in insuring that the state's substantial investment in its video lottery business ultimately benefits the South Dakota taxpayers. The legislature could have rationally concluded that a residency requirement would further this interest"); *Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel*, 20 F.3d 1311, 1322-24 (4th Cir. 1994) (affirming the decision of a district court sustaining two South Carolina statutes that

provided for resident preferences requiring that state
educational and administrative bodies purchase South Carolina
goods if available because the statute was rationally related to
the state's interest in "channelling tax dollars back into the
community"); *Associated Gen. Contractors of Cal., Inc. v. City
and Cnty of San Francisco*, 813 F.2d 922, 943 (9th Cir. 1987)
(upholding a city and county ordinance that gave preference to
locally owned businesses) *overruled in other part by City of
City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989)).

Thus, the Court grants Defendants' motion to dismiss with
respect to Plaintiffs' Equal Protection claim; the District's
goal of directing local funds to local residents is rationally
related to the means used by the Act.

**E.    First Amendment**

The First Amendment protects against "compelled speech" in
two distinct areas: "true 'compelled-speech' cases, in which an
individual [or entity] is obliged [] to express a message he
disagrees with, imposed by the government; and 'compelled-
subsidy' cases, in which an individual [or entity] is required
by the government to subsidize a message he disagrees with."
*Johanns v. Livestock Mktg Ass'n*, 544 U.S. 550, 557 (2005).

Plaintiffs allege that the First Source Act violates their
right to free speech under the First Amendment because it
"compel[s]" them to "express support" for the goals of the Act.

Compl. ¶ 112.  According to the Corporate Plaintiffs, the First

Source Act forces them to "engage in speech," such as

"compelling them to plan for and adopt policies and provide

detailed reports on their employees and on their business

practices solely on the basis of the residence of those

employees."  Pls.' Opp'n at 27.  They are also required to

submit "employment plans" to the District that are contrary to

their individual merit employment philosophy and to post various

information regarding jobs on District and newspaper websites.

*Id.*  As a result, they argue that they are "required not merely

to fund government speech, but to themselves adopt, promote, and

be identified with it such that the speech on the issue of

residence and who should get jobs is attributed to them."  *Id.*

However, despite these arguments, it is clear that the

First Source Act does not require Plaintiffs to speak, in a

literal sense.  They remain free to express their views opposing

the Act.  The speech that they argue they are compelled to

engage in is incidental to the First Source Act's regulation of

their conduct.  Indeed, "it has never been deemed an abridgment

of freedom of speech or press to make a course of conduct

illegal merely because the conduct was in part initiated,

evidenced, or carried out by means of language, either spoken,

written, or printed."  *Rumsfeld v. Forum for Academic &*

*Institutional Rights, Inc. (FAIR)*, 547 U.S. 47, 62 (2006)

(quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).  In *FAIR*, the Supreme Court held that speech compelling a law school to send out emails informing students of military recruiting on campus did not violate the First Amendment and that such speech was fundamentally different from unconstitutional compelled speech, such as "forcing a student to pledge allegiance."  *Id.*  Similarly, the First Source Act, which does not dictate the conduct of the speech, does not violate the First Amendment.

**F.  Due Process**

1.  <u>"Void for Vagueness"</u>

"[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008).  The vagueness doctrine does not require "perfect clarity and precise guidance."  *Ward v. Rock Against*

*Racism*, 491 U.S. 781, 794 (1989). Regulations "cannot, in reason, define proscribed behavior exhaustively or with consummate precision." *United States v. Thomas*, 864 F.2d 188, 195 (D.C. Cir. 1988).

Plaintiffs argue that the First Source Act is vague because it gives "unfettered discretion" to the Mayor "to grant various waivers, require alternatives to construction contracts, and decide what fines to impose." Pls.' Opp'n at 30. According to Plaintiffs, the language of the statute is fatal because it states that exemptions can be made "[w]henever the Mayor determine[s]" that such an exemption is necessary. *Id.* This discretion, Plaintiffs contend, is not due to mere imprecision in language, but rather is the result of "intentionally and unlawfully delegating to the Mayor the authority to preempt entire sections of the First Source Act." *Id.*

Plaintiffs' vagueness challenge to the First Source Act "is simply a garden-variety claim of uncertainty as to how the law will be enforced." Defs.' MTD at 34. While the statute grants authority to the Mayor to grant waivers, it provides objective guidelines for the granting of those waivers. *See* D.C. Code § 2-219.03(e)(3)(A)(i)-(A)(iii) (explaining that a waiver is available if (1) DOES has certified that the beneficiary made a good faith effort to comply; (2) the beneficiary is located outside the area; none of the work is performed in the area; the

beneficiary published each available job in a city-wide newspaper for 7 calendar days and DOES certifies that there are not enough applicants from the First Source Register for the job; or the eligible applicants are not available for part-time work or do not have the means to travel to the job site; or (3) the beneficiary enters into workforce development training or placement arrangement with DOES).  When the section of the statute regarding the fact that the Mayor can grant a waiver is read in conjunction with the section of the statute providing for standards by which waivers are granted, it is clear that the statute is not vague.  *See Initiative & Referendum Inst. v. U.S. Postal Serv.*, 741 F. Supp. 2d 27, 40 (D.D.C. 2010) (holding that a portion of a statute challenged as vague must be read in context).  It is simply "common sense that [officials] must use some discretion in deciding when and where to enforce city ordinances."  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005).  The First Source Act, contrary to Plaintiffs' claims, does not link "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306.

The Due Process Clause does not prevent officials from exercising discretion at all, but rather it prevents officials from exercising discretion with no clear objective or standard. *See Armstrong v. D.C. Pub. Library*, 154 F. Supp. 2d 67, 80-82

(holding that a District regulation that barred entry to public libraries based on the appearance of entrants and allowed library personnel to deny entrance to potential patrons with an objectionable appearance, but providing no guidelines for the exercise of that discretion by library officials, was void for vagueness and thus invalid under the Due Process Clause). Plaintiffs reading of the Due Process Clause would render city officials incapable of exercising any discretion.  Because the Mayor has "explicit guidelines [] to avoid arbitrary and discriminatory enforcement" of the First Source Act, it is not unconstitutional.  *Big Mama Rag, Inc. v. United States*, 631 F.2d 1030, 1035 (D.C. Cir. 1980).

> 2. <u>Substantive Due Process</u>

Plaintiffs also argue that their Complaint "sets forth factual allegations that establish the violation of their substantive due process rights under the Constitution."  Pls.' Opp'n at 31.  However, apart from this statement in their opposition, and three paragraphs in their Complaint alleging that the First Source Act is overbroad, burdens constitutionally protected conduct, and applies retroactively, Plaintiffs do not explain how their Substantive Due Process rights are violated. Compl. ¶¶ 118-120.  While Plaintiffs allege a violation of Substantive Due Process in their complaint, they only cite cases that relate to Procedural Due Process in their opposition to

Defendants' motion to dismiss.  Thus, they have provided no basis, conclusory or otherwise, for their claim.  Plaintiffs' confused allegations are simply insufficient to state a claim.

To the extent that Plaintiffs do attempt to state a claim for a violation of Substantive Due Process, they have failed. Substantive Due Process constrains government conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).  In this Circuit, Substantive Due Process "normally imposes only very slight burdens on the government to justify its actions. . . ." *George Washington Univ. v. District of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003).  The First Source Act is simply not the type of egregious government conduct that is barred by Substantive Due Process.  *See Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988) (holding that to show unfairness that violates the substantive component of the Due Process Clause, a plaintiff must show "a substantial infringement of state law prompted by personal or group animus, or a deliberate flouting of the law that trammels significant personal or property rights").

### G.  Contracts Clause

"Article I, § 10 of the Constitution provides in pertinent part that '[n]o state shall . . . pass any . . . law impairing the Obligation of Contracts.'" *Washington Serv. Contractors*

*Coal. v. District of Columbia*, 54 F.3d 811, 818 (D.C. Cir. 1995). A law that substantially impairs contractual relationships is thus invalid if the impairment to the contractual relationship is substantial. *Id.* (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978) and *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)).

Plaintiffs have failed to state a claim pursuant to the Contracts Clause of the Constitution. They allege that the Amended Act "has the effect of rewriting those contracts to include later-enacted limitations regarding hiring, and reporting." Compl. ¶ 128. They do not identify which contracts would be impaired, only that some hypothetical contracts that some Plaintiff is a party to will be impacted.[15] That is not sufficient to state a claim.

## IV. Conclusion

For the reasons stated above, the Court **GRANTS** Defendants' motion to dismiss and dismisses Plaintiffs' complaint with prejudice. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

Signed:  **Emmet G. Sullivan**
         **United States District Judge**
         **July 14, 2014**

---

[15] At the oral argument on June 25, 2014, Plaintiffs also conceded that the Amended Act did not apply retroactively.