UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**METROPOLITAN WASHINGTON**                )
**CHAPTER, ASSOCIATED BUILDERS**           )
**AND CONTRACTORS, INC.,**                 ) Civil Action
                                           ) No. 12-853
          **et al.,**                      )
                                           ) June 25, 2014
       **Plaintiffs,**                     ) 12:20 p.m.
                                           )
       **v.**                              ) Washington, D.C.
                                           )
**DISTRICT OF COLUMBIA,**                  )
                                           )
          **et al.,**                      )
                                           )
       **Defendants.**                     )

*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE EMMET G. SULLIVAN,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

  For the Plaintiffs:     **Paul J. Kiernan, Esq.**
                          HOLLAND & KNIGHT LLP
                          800 17th Street, NW
                          Suite 1100
                          Washington, DC 20006
                          (202) 663-7276
                          Fax: (202) 955-5564
                          Email: Paul.kiernan@hklaw.com

  For the Defendants:     **Andrew J. Saindon, Trial Attorney**
                          D.C. OFFICE OF ATTORNEY GENERAL
                          441 4th Street, NW
                          Sixth Floor South
                          Washington, DC 20001-2714
                          (202) 724-6643
                          Fax: (202) 730-1470
                          Email: Andy.saindon@dc.gov

APPEARANCES:   Cont.


Court Reporter:                  **Scott L. Wallace, RDR, CRR**
                                 Official Court Reporter
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, JUNE 25, 2014**</u>

(10:36 a.m.)

THE COURTROOM CLERK:  Your Honor, this is Civil Action 12-853, *Metropolitan Washington Chapter Associated Builders and Contractors, Inc. et al., versus District of Columbia, et al.* Will all parties please come forward and identify yourselves for the record, please.

MR. KIERNAN:  Good morning, Your Honor, Paul Kiernan on behalf of the plaintiffs.

THE COURT:  Good morning, Counsel.

MR. SAINDON:  Good morning, Your Honor, Andrew Saindon on behalf of the District of Columbia, and with me at counsel table is Ms. Grace Graham.

THE COURT:  All right.  Good morning to you both.

Let me invite plaintiffs' counsel back to the microphone just a second.  I recognize this is the defendants' motion, but I just have a couple of questions.

Before we start, let me just also recognize, we have a number of law students who traveled here from China.  Good morning.  Welcome to the Court.  I know I'm scheduled to have lunch with you.  I'm looking forward to that, and that's at 12:30.  All right.  I may be a little delayed, but we'll get there.  Welcome.  Welcome to the court.  It's great to have you here.

Let me ask you, Counsel:  It's not clear which plaintiffs

1    are bringing which claims here.  Can you clarify that?

2         MR. KIERNAN:  Certainly.  The privileges and immunities

3    claim is brought on behalf of the individual --

4         THE COURT:  Only.

5         MR. KIERNAN:  Well, yes, and as in the Camden case, the

6    Supreme Court Camden case where the association brought it on

7    behalf of their members, we have identified Metropolitan

8    Associated Builders and Contractors in that count because, as in

9    the Camden case, where the -- it was the association that

10   advanced the privileges and immunities claims on behalf of

11   employees.

12        THE COURT:  So the Camden case, the Supreme Court Camden

13   case is, you contend, authority for your argument that the

14   corporation can bring a privileges and immunities claim; is that

15   right?

16        MR. KIERNAN:  The association is doing -- the privileges

17   and immunities right clearly belongs to the individuals --

18        THE COURT:  Right.

19        MR. KIERNAN:  -- not the corporations, but the

20   association --

21        THE COURT:  Can bring it because the individuals --

22        MR. KIERNAN:  -- because it's the individuals that are

23   acted ultimately.

24        THE COURT:  All right.

25        MR. KIERNAN:  But we have individuals as well, yes.

```
 1          THE COURT:  All right.  Okay.  All right.  Thanks.  I
 2   appreciate that.  I'll give you a chance.  All right.
 3          MR. KIERNAN:  Okay.
 4          THE COURT:  But not right now.
 5          MR. KIERNAN:  Okay.
 6          THE COURT:  But they're the moving party, they've got a
 7   burden here.  All right.
 8          MR. KIERNAN:  Thank you, Your Honor.
 9          THE COURT:  All right.
10          MR. SAINDON:  Good morning, Your Honor.
11          THE COURT:  Good morning.
12          MR. SAINDON:  Thank you.  Andrew Saindon.
13          THE COURT:  Let's talk about this privileges and
14   immunities issue.  In the footnote in your preliminary brief,
15   which caught our attention, the City took a position that maybe
16   privileges and immunities applies, maybe it doesn't, but make an
17   assumption, which the Court did not want to do, but maybe it's
18   appropriate for the Court to make an assumption one way or the
19   other.  In your most recent supplemental -- in one of the most
20   recent supplemental pleadings, the City takes the position that
21   Privileges and Immunities Clause does not apply to the District;
22   is that right?
23          MR. SAINDON:  That's right, Your Honor.
24          THE COURT:  Although that's not a position that the City
25   has universally taken in prior litigation, right?
```

1      MR. SAINDON:  That's probably true, Your Honor.

2      THE COURT:  All right.  Is that appropriate to say, okay,

3  we're a state today but not a state tomorrow and -- I mean, is

4  that appropriate?

5      MR. SAINDON:  Well, it clearly depends on context, Your

6  Honor.  In the analysis in this case, in looking closely at it,

7  we've come to the conclusion that it doesn't apply.

8      THE COURT:  Good.  All right.  So if privileges and

9  immunities doesn't apply, the City should not be recognized as a

10  state, and therefore that has some consequences, though, for the

11  residents of the City, does it not, if the Court were to agree

12  with that?

13      MR. SAINDON:  It will have consequences, Your Honor.

14      THE COURT:  Adverse?

15      MR. SAINDON:  Well, they may be adverse, they may be

16  positive, but the law is what it is.  As my boss eloquently

17  argued before you last month in the Budget Autonomy Act case,

18  when Congress passed the Home Rule Act, they delegated extensive

19  authority to the District and established exclusive limitations

20  on that authority.  If Congress had intended to make the

21  Privileges and Immunities Clause applicable to the District, it

22  knew how to do so.

23      THE COURT:  What could it have done?

24      MR. SAINDON:  It could have said the Privileges and

25  Immunities Act -- the Privileges and Immunities Clause is

1   applicable to the District.  And it did that in other non-state

2   territories as we pointed out in our briefs, Guam, Virgin Islands

3   and Puerto Rico.  When, interestingly, if you look at Section 302

4   of the Home Rule Act, they grand the legislative power of the

5   District the language is, "The legislative power of the District

6   shall extend to all rightful subjects of legislation."

7        The Organic Act of Guam contains the same language, "The

8   legislative power of Guam shall extend to all rightful subjects

9   of legislation."

10        The same thing for the Virginia Islands, "The legislative

11   authority and power of the Virgin Islands shall extend to all

12   rightful subjects of legislation."

13        And in the Organic Acts of Guam and Virgin Islands,

14   Congress specifically made the Privileges and Immunities Clause

15   applicable to it.  They didn't do that to the District.  And I

16   think we have to assume that Congress acted deliberately because

17   of the history with these non-state territories, and defining --

18        THE COURT:  What's the time frame, though?  The Home Rule

19   Act was enacted in the early '70s.  The other acts that you're

20   referring to were subsequent to that, correct?

21        MR. SAINDON:  They were prior to that, Your Honor.

22        THE COURT:  Prior to that?

23        MR. SAINDON:  Yes.  Guam -- I think the Organic Act of

24   Guam was 1950, the Virgin Islands was 1954, so that's the time

25   frame.

```
 1         THE COURT:  So the Congress wanted to -- so Congress had

 2    that before it when it enacted the Home Rule Act?

 3         MR. SAINDON:  Absolutely, Your Honor.  The history is

 4    there.  But again, as we argue, even if the Privileges and

 5    Immunities Clause applies, the First Source Act complies with it.

 6    If I can move on to that section of the argument?

 7         THE COURT:  Well, I mean, does the Court have to reach

 8    that argument, privileges and immunities?

 9         MR. SAINDON:  I don't think so, Your Honor.  Clearly, our

10    first argument is that plaintiffs lack standing here.  All

11    plaintiffs lack standing.

12         THE COURT:  Well, assuming -- well, standing is not

13    something the Court can assume, but for purposes of our

14    discussion, let's assume that the individuals and the

15    corporations have alleged enough to satisfy standing issues.

16    And, quite frankly, I think they probably have.  So for purposes

17    of our discussion, assuming that they have standing, then what?

18    Then the Court has to address it then, correct?

19         MR. SAINDON:  Yes, Your Honor.

20         THE COURT:  I can't -- I can't find standing and then

21    further -- not further assume, because the Court can no longer

22    assume standing either.  If I -- if the Court finds standing

23    individually or associational standing or whatever, then the

24    Court has to, as a matter of law, deal with privileges and

25    immunities.  I cannot make an assumption there; is that right?
```

1          MR. SAINDON:  I think that's right, Your Honor.

2          THE COURT:  All right.  Why can't I make an assumption

3     there?

4          MR. SAINDON:  Well, I guess it would depend on if they can

5     have standing for some claims and not others.  As the case law is

6     clear, corporations don't have standing on a Privileges and

7     Immunities Clause.  Those -- those rights belong to individuals.

8          THE COURT:  What about what counsel just said?  That's why

9     I wanted him to tell me what his authority was.  He relies on the

10    Supreme Court Camden opinion for that authority.  What's wrong

11    with that?

12         MR. SAINDON:  Well, Your Honor, we believe, as we've

13    argued, the lead plaintiff lacks organizational standing.

14    They've failed to allege any direct contact --

15         THE COURT:  All right.  So if we -- beyond that, though,

16    let's assume that the Court finds standing.  Now I'll hear more

17    from you about that and plaintiffs' counsel, but we're beyond

18    that.

19         So let's assume that there's not a doubt that there is

20    standing.

21         MR. SAINDON:  All right.  Assuming they have standing,

22    Your Honor, the Court can invalidate a law under the Privileges

23    and Immunities Clause only if it's not closely related to the

24    advancement of substantial state interests.

25         THE COURT:  Do I have to give some deference to this law?

1      MR. SAINDON:  Absolutely, Your Honor.

2      THE COURT:  The law's been on the books for how long now,

3  what, 30 years?

4      MR. SAINDON:  Over 30 years.  I believe it became

5  effective in 1984.

6      THE COURT:  There have been no prior challenges?

7      MR. SAINDON:  Not that I'm aware of, no.

8      THE COURT:  But because there was, what, an amendment a

9  year or two or so ago --

10      MR. SAINDON:  That's right.

11      THE COURT:  So the law's been on the books.  For purposes

12  of the MTD, the plaintiff says I can't consider the impact of the

13  law -- I think that's probably correct.  Do you disagree with

14  that, for purposes of MTD, without converting to a summary

15  judgment?

16      MR. SAINDON:  Well, certainly it provides background as to

17  whether or not the First Source Act has a substantial

18  relationship to an important government interest.

19      THE COURT:  Yeah, but isn't that set forth in the

20  legislative history or not?

21      MR. SAINDON:  It absolutely is, Your Honor.

22      THE COURT:  Right.  So why do I need to deal with the

23  impact of the law?  Is that more appropriate impact how it's been

24  working, whether or not there have been penalties, waivers,

25  et cetera?  Is that more appropriate at the summary judgment

1    stage if we get that far?

2         MR. SAINDON:  I think it probably is, Your Honor, but what

3    I found interesting was plaintiffs' response to your request for

4    supplemental briefing.  I think it tied into the standing

5    argument, in that the case has been pending for two years and

6    they haven't shown the injuries that they needed to demonstrate

7    standing.  The Supreme Court in a unanimous decision that was

8    just issued last week, the Susan B. Anthony List case, it tackled

9    the perennial question:  How do you show standing, Article III

10   standing, show the injury, in fact, element?  And they said there

11   are two sub-elements that you have to show.  You have to show --

12   you have to allege an attempt to engage in conduct that will

13   violate the law, or that will likely violate the law, and a

14   credible threat of prosecution.  And our belief is that both of

15   those elements are missing here.

16        THE COURT:  Well, aren't there penalties, though, for

17   violations?

18        MR. SAINDON:  Yes, there are penalties for violations

19   here, Your Honor, but --

20        THE COURT:  All right.  Why doesn't that satisfy the

21   plaintiffs' concern?

22        MR. SAINDON:  Well, the Susan B. Anthony List case, like

23   this one, is a pre-enforcement challenge, Your Honor.  The record

24   is clear.  Even before the declaration of Mr. Hubbard, the

25   committee report said no penalties have ever been imposed under

1    the First Source Act case, and Mr. Hubbard confirmed that.  That,

2    I think, greatly reduces the idea that there's a credible threat

3    of prosecution here.

4         And as to the first element, they -- plaintiffs never

5    indicated that they violated the law.  They've indicated that

6    it's hard to comply with, it imposes burdens and costs, but

7    they've never indicated any intent to engage in actions that will

8    violate the law.  We don't think that -- that is sufficient for

9    standing.

10        THE COURT:  So the fact that it's on the books and could

11   be applied if there's a violation, is not a sufficient --

12        MR. SAINDON:  Not a sufficient showing of imminent injury,

13   Your Honor.

14        THE COURT:  Is that like arguments that people used to

15   make in DR cases that parties could not invoke Fifth Amendment if

16   adultery is alleged because that would give rise to a

17   prosecution?  You know, for years, people would attempt to

18   invoke -- there'd be third-party defendants brought in as the

19   whatever, co-conspirator or whatever, and that person invariably

20   would attempt to invoke the Fifth saying I could be prosecuted

21   for adultery, recognizing that -- I mean, I don't know if the

22   people are prosecuted or not.  I've not heard of them.

23        Is that the same type of analyses?  Is that appropriate?

24        MR. SAINDON:  Well, Your Honor, I think it breaks down --

25   Justice Thomas addressed this in the Susan B. Anthony List

```
 1   decision.  You don't -- the plaintiffs don't actually --
 2        THE COURT:  Is that what, adultery?
 3        MR. SAINDON:  Well, no, not that directly, Your Honor.
 4   But you don't have to actually --
 5        THE COURT:  What about my question?  Answer my question
 6   first before you start up with your answer.  All right.
 7        MR. SAINDON:  Well, what I was going to say was, Your
 8   Honor, what he said was you don't have to violate the law to show
 9   standing, but there has to be something more than just imminence,
10   just something more that the law being on the books.  There has
11   to be a credible threat of prosecution.  And in that case --
12        THE COURT:  But how does that -- how does the -- how's
13   that demonstrated, a credible threat of prosecution?  I mean, as
14   I understand it, there's not been any prosecutions.
15        MR. SAINDON:  Right.  That's right, Your Honor.
16        THE COURT:  So does that mean there's a credible threat?
17        MR. SAINDON:  No.  That means there's no credible threat
18   of prosecution, Your Honor.  In the Susan B. Anthony List case,
19   the political action committees that chose to challenge the law
20   had already been cited for their speech under the same provisions
21   they were challenging.  That was a credible threat.  Public
22   statements that the Government will begin to enforce is a
23   credible threat.  And those kinds of things are lacking here.
24        THE COURT:  What about the individuals?  They can't --
25   they can't bid on this work.  They can't --
```

1           MR. SAINDON:  Of course they can, Your Honor.  That -- you

2    know, we believe that the individual plaintiffs failed a second

3    element of standing.  Their injuries are not fairly traceable to

4    the defendants' conduct.  They're all derivatives of the

5    employers for whom they work.

6           THE COURT:  You agree, though, this law does discriminate

7    against nonresidence, in favor of residence?

8           MR. SAINDON:  It does.

9           THE COURT:  So why isn't that in and of itself sufficient

10   injury to a nonresident who's ready, willing and able and

11   qualified to perform this work?

12          MR. SAINDON:  It is -- it's derivative of the employers,

13   Your Honor.  It's not directly ascribable to the First Source

14   Act.  None of the individual plaintiffs here have alleged that

15   they couldn't get jobs because of the First Source Act or it was

16   harder for them to get jobs or they were turned down because

17   their employers, the contractors, had to hire somebody who was a

18   District resident.  They haven't alleged those injuries, Your

19   Honor.

20          THE COURT:  But they're alleging, though, that citizens of

21   D.C. are given preferential treatment, though, aren't the?

22          MR. SAINDON:  Yes, Your Honor, in a general sense.

23          THE COURT:  And that's not enough?

24          MR. SAINDON:  It's not enough, Your Honor.

25          THE COURT:  So what else is required?  They have to apply

```
 1   for the jobs themselves?

 2        MR. SAINDON:  I think they have to show a more direct link

 3   between their alleged injuries and the law.  If you look in the

 4   complaint, paragraph 7 --

 5        THE COURT:  I mean, it seems like it's almost directly

 6   impacted by the Dynalantic case, and it strikes me as fairly

 7   similar to Dynalantic where a corporation and, indeed,

 8   individuals, if I recall correctly, had -- were unable to apply

 9   for work under the ADA program because of set-asides.  And they

10   said, you know what, that's keeping us out of the opportunity to

11   proceed with our trade.

12        Why isn't that -- why isn't Dynalantic instructive here?

13        MR. SAINDON:  I don't think I'm familiar with the facts of

14   that case, Your Honor, but there was another case cited by

15   plaintiff that I think may be similar, and I think it's easily

16   distinguishable.  It was the Northeastern Florida Chapter of the

17   Association --

18        THE COURT:  Well, if the City wants to weigh in on the

19   applicability of the Dynalantic arguments, then I'll leave the

20   record open for a day or two.

21        MR. SAINDON:  I appreciate that, Your Honor.

22        THE COURT:  Probably not longer than that, but it's a case

23   that went up to the circuit where my original decision was -- on

24   standing, was that they didn't have any standing.  And the

25   two-to-one decision that came back, and then on a more fully
```

1    developed record, the Court had to deal with the issues.  That

2    case has finally been resolved, *Dynalantic versus United States*.

3    Maybe the rationale's applicable; maybe not.

4         MR. SAINDON:  We could submit something.  The case --

5         THE COURT:  But the -- but you agree, do you not, that the

6    nonresident plaintiffs cannot be listed on this first source

7    register?

8         MR. SAINDON:  That's correct.

9         THE COURT:  All right.  So that's -- but that's not

10   enough, though?

11        MR. SAINDON:  That's not enough, Your Honor.  I was going

12   to distinguish from what I heard from the Dynalantic case, the

13   case cited by plaintiffs, the Jackson --

14        THE COURT:  You know what, I've not read Dynalantic

15   recently, but -- and I'll take another look at it, but it's --

16   something you said just struck me as acutely similar to

17   Dynalantic, but I may have misspoken.  But I'll give the City and

18   also the plaintiff a chance to address the applicability or not

19   of the Dynalantic decision.

20        MR. SAINDON:  I appreciate that, Your Honor.

21        THE COURT:  All right.

22        MR. SAINDON:  It sounded similar to a case the plaintiff

23   cited, the Northeastern Florida Chapter --

24        THE COURT:  And not the first decision.  If you say I

25   agree with the first decision, then you're wrong.  That was

```
 1    reversed.  So I agree with the one that finally was decided on

 2    the merits.  Actually, look at the circuit opinion that reversed

 3    on standing grounds and addressed the applicability of the

 4    circuit's opinion here.  Okay?

 5         MR. SAINDON:  I will do that, Your Honor.

 6         THE COURT:  Okay.  All right.

 7         MR. SAINDON:  In the Jacksonville case that plaintiff

 8    cites, that's 508 U.S. 656, in there the City of Jacksonville had

 9    a 10 percent set aside for minority contracts.  And the City

10    argued in 11th Circuit -- I agreed with them -- that plaintiffs

11    lacked standing because they couldn't demonstrate that any member

12    would have bid successfully on these contracts.  And the Supreme

13    Court said, no, that's wrong.  The injury, in fact, in a equal

14    protection case -- and that was an equal protection case and not

15    a Privileges and Immunities Clause case -- the injury was the

16    denial of equal treatment from the imposition of the barrier.

17    They only had to demonstrate that they're able and ready to bid,

18    but the policy prevented it.  The City said you can't bid on

19    10 percent of the contracts.  Those are reserved for minorities.

20         THE COURT:  Right.

21         MR. SAINDON:  That's what the injury was, but that's not

22    existing here.  All the plaintiffs members can bid on any of

23    these contracts they want.

24         THE COURT:  But they can't be on the first source

25    register, though, and that's what they're complaining about.  If
```

```
1   they're on the first source register they can be picked, and
2   there's no preferential treatment for D.C. citizens, right?
3          MR. SAINDON:  That's right, Your Honor.
4          THE COURT:  So it sounds like a set aside to me.  It's a
5   set aside for D.C. residents.  I'm not saying it's illegal, but
6   isn't it?  Isn't it a set aside?
7          MR. SAINDON:  It's not a set aside.  A set aside, Your
8   Honor, is a reservation --
9          THE COURT:  Well, a set aside is a trick of words anyway.
10  I mean, you know what, here's what -- this boils down to this:
11  This law -- another trigger word -- discriminates against,
12  allegedly discriminates against nonresident citizens, and -- in a
13  manner that favors D.C. residents and/or citizens.  They don't
14  have to be citizens.  They can just be residents of D.C.
15         MR. SAINDON:  Yes, Your Honor.
16         THE COURT:  And one of the reasons for this law, if I
17  understand the legislative history, is because the City contends
18  that 70 percent of people who have jobs in the District of
19  Columbia and earn a wage in the District of Columbia are
20  nonresidents, right?
21         MR. SAINDON:  Yes, Your Honor.
22         THE COURT:  All right.  And that's somehow or another,
23  quote, a peculiar source of evil in the District; is that right?
24         MR. SAINDON:  That's right, Your Honor.
25         THE COURT:  It sounds pretty harsh, peculiar source of
```

1    evil.  And that's the phrase that's been kicked around in these

2    cases, right?

3         MR. SAINDON:  We're not contending they're evil in the

4    general sense of a horror movie villin evil, but that was the

5    phrase used by the Supreme Court originally in the Tumor case and

6    reiterated in the Camden case.

7         THE COURT:  Right.  Yeah.  And that's the City's argument

8    here, that that's the kind of evil that's being rooted out here.

9         MR. SAINDON:  We meet that test, Your Honor.

10         THE COURT:  Well, Judge Gertner didn't agree with that

11    when she issued her opinion.  See, that's a stretch because it's

12    a peculiar source of evil.  Why is it -- and I read everything

13    that Judge Gertner writes more than once.

14         Why should I be persuaded by her rationale rejecting that

15    peculiar source of evil?

16         MR. SAINDON:  Judge -- I'm sorry, Your Honor?

17         THE COURT:  Judge Gertner in the Massachusetts case.  I'm

18    sorry, there's a better cite for it.  It's --

19         MR. SAINDON:  Is that a utility contractor's case?

20         THE COURT:  I think it is.

21         THE CLERK:  No.

22         THE COURT:  Right.  It is, yes.  Yes, sir.

23         MR. SAINDON:  I think your clerk disagrees, Your Honor.

24         THE LAW CLERK:  (Inaudible.)

25         THE COURT:  That's the Wooster case, right?

1    Massachusetts, right, Wooster.

2         MR. SAINDON:  Okay.

3         THE COURT:  Judge Gertner's a district court judge in

4    Boston, or was, and she rejected that, yeah.

5         MR. SAINDON:  I don't have the facts of the Wooster case

6    with me, Your Honor, but I think --

7         THE COURT:  It was a request for a preliminary injunction,

8    and in opinion issued in 2002 she granted the request for a PI,

9    not enforcing an analogous law.  We're not sure what happened

10   after this.  The PI case seems to have dropped off the radar

11   screen.  I assume it settled, but I'm -- you're not aware of what

12   happened?

13        MR. SAINDON:  I'm not aware, Your Honor.

14        THE COURT:  That was plaintiffs' counsel, and it's not --

15   there's nothing else that's picked up.  There's no subsequent

16   history at all.

17        MR. SAINDON:  I'm not aware, Your Honor.  The District is

18   unique, like I said, the --

19        THE COURT:  Oh, unique, okay.  All right.  Let's get into

20   that, unique and exceptional, right?

21        MR. SAINDON:  It is, Your Honor, yes.

22        THE COURT:  Everyone always wants to tell the City what to

23   do, how to spend its money, everything, right?

24        MR. SAINDON:  That's right, Your Honor.  It's a very

25   interesting --

1        THE COURT:  Because it's not a state, that's why.

2        MR. SAINDON:  That's right, Your Honor.  But a very

3    interesting study was conducted last year by the Census Bureau of

4    daytime population shifts, and the two cities with the highest

5    shifts were Manhattan and the District of Columbia.

6        THE COURT:  What do you mean the highest shift?

7        MR. SAINDON:  Based on population, people coming in,

8    working and then leaving.

9        THE COURT:  All right.

10       MR. SAINDON:  The population of Manhattan almost doubled,

11   94.7 percent increase, and the District was 79 percent increase.

12       THE COURT:  Does Manhattan have one of these laws?

13       MR. SAINDON:  I don't know, Your Honor, but what I found

14   interesting --

15       THE COURT:  It might be interesting to find that out,

16   whether or not they tried to enacted it, whether it was struck

17   down or so.

18       MR. SAINDON:  Right.

19       THE COURT:  Oh.

20       MR. SAINDON:  They may not --

21       THE COURT:  Connally tells me, whoops, they have a

22   commuter tax.

23       MR. SAINDON:  I was just going to say, Your Honor --

24       THE COURT:  And that's also a trigger word in this case,

25   isn't it, commuter tax?

 1          MR. SAINDON:  That -- that's a --

 2          THE COURT:  Because the defendants say that's what this

 3     is, a disguised commuter tax.

 4          MR. SAINDON:  Well, it's not a disguised commuter tax,

 5     Your Honor, because we don't tax commuters.  We can't tax

 6     commuters.  Congress says that we can't do that in the Home Rule

 7     Act.  But that sets the District apart, Manhattan, New York City,

 8     other cities, cannot enact a Commuter Act to try and recover

 9     some -- to try and tax some of the nonresidents' income derived

10     from work done within the jurisdiction.

11          THE COURT:  Right.

12          MR. SAINDON:  The District can't do that.

13          THE COURT:  So why isn't that a peculiar source of evil

14     for the City to enact a law where it precludes nonresidents from

15     being on a first source, this first source register, and if they

16     earn money, they take it out of the City, and the City derives no

17     tax revenue, so the City says, all right, we'll deal with that,

18     that's pretty evil.  So we're going to have this preferential

19     treatment for our citizens because if they're hired first, they

20     live here, they'll be taxed here and essentially, you know, the

21     City thumbs its nose at the nonresident employees who can't get

22     jobs or who are less preferred than its own citizens.

23          MR. SAINDON:  Obviously, Your Honor, we like the language

24     "less preferred" than "thumbs your nose," but that's really --

25     you've hit the nail on the head.  This is chronic structural

1    malice in the District's budget.  There's a gap between the cost

2    for providing services and the ability of the District to raise

3    revenue.  In 2003 when the GAO did their study, it also entered a

4    significant constraints on our taxing authority.  We can't tax

5    federal property, and we can't tax commuters.  This structural

6    budget and balance back then was somewhere between $470 million

7    and $1 billion.

8          THE COURT:  Um-hmm.

9          MR. SAINDON:  And in 2006 there was another study done

10   that said if the District could tax commuters, that would raise

11   about $2 billion in additional revenues.

12         We think this unique circumstance, plus the inability to

13   tax 70 percent of the jobs in the jurisdiction, are a peculiar

14   source of evil that the First Source Act is designed to address.

15         Plaintiffs, in their supplemental brief -- or, I'm sorry,

16   the District, in its supplemental brief, we raised the Turner

17   Broadcasting cases.  The District doesn't have to show that the

18   law works, that the law has the intended effect, we just have to

19   show that the legislature, the District counsel, their reasonable

20   inferences, are supported by substantial evidence in the record,

21   and we contend that it is.

22         THE COURT:  Are there any jurisdictions that have enacted

23   this type of law that have withstood judicial scrutiny?

24         MR. SAINDON:  Well, Your Honor, in the --

25         THE COURT:  And at a stage other than the preliminary

1    injunction stage, on the merit stage?

2         MR. SAINDON:  I'm not aware of any off the top of my head,

3    Your Honor.  In our supplemental brief there are -- we cited a

4    couple of places, San Francisco, Boston, Minneapolis, that have

5    similar programs.  And they're extended now, but I don't know if

6    they have been challenged legally.

7         THE COURT:  All right.  So your argument has to be, then,

8    that the District's unique status enables it to do something

9    that, arguably, other states can't do?  Is that your argument:

10        MR. SAINDON:  That's the argument, Your Honor, yes.

11        THE COURT:  The City's unique.  It can't impose a commuter

12   tax, like any other juris- -- can every jurisdiction impose a

13   commuter tax, or is the City the only jurisdiction in this

14   country that cannot impose a commuter tax?

15        MR. SAINDON:  As far as I'm aware, Your Honor.  I mean,

16   the Supreme Court ruled, I think whatever case that was, I think

17   it was the Landings case in 1920, that said that this was

18   permissible, commuter taxes were permissible.  And I think the

19   District, as far as I'm aware of, are the only --

20        THE COURT:  For states to do, right?

21        MR. SAINDON:  That's right, Your Honor.  And I think it

22   also extends to cities, but I'm -- the District is the only

23   jurisdiction that I'm aware of that is prohibited from doing that

24   explicitly in the Home Rule act.

25        THE COURT:  Well, if the Supreme Court said that cities

1    can do it, why does the City not let us -- why is the City not

2    able to do it?

3         MR. SAINDON:  Because of the explicit prohibition on a

4    commuter tax in the Home Rule Act.

5         THE COURT:  I'm reminded, though, by Judge Huvelle's

6    brilliant opinion --

7         MR. SAINDON:  In the Banner case, yes, Your Honor.

8         THE COURT:  -- that the District is the only jurisdiction

9    in the United States denied the benefit of taxing income earned

10   within its borders, and that even the Federal Government profits

11   from the income earned by foreigners within the nation's borders.

12        MR. SAINDON:  And I take the --

13        THE COURT:  That'll be a footnote somewhere in the

14   opinion, I'm sure.

15        MR. SAINDON:  Yes.  I think Judge Huvelle was citing the

16   plaintiff's complaint there, but that plaintiff, in that case,

17   wasn't the District, I mean, challenging the commuter tax and the

18   inability to tax --

19        THE COURT:  Did the City attempt to seek cert in that

20   case?

21        MR. SAINDON:  I do not know, Your Honor.

22        THE COURT:  Right.  All right.  So, again -- so the City

23   is unique, it's exceptional, you can't impose a commuter tax.

24   It's the only jurisdiction in the country that cannot impose a

25   commuter tax, and it's an act of this law that's been on the

1    books for 30 years.  It's never been challenged.

2         MR. SAINDON:  That's right, Your Honor.

3         THE COURT:  And whatever the amendments were, which were

4    not significant amendments, were they, two years ago?

5         MR. SAINDON:  I didn't think they were, Your Honor, but

6    attorney for plaintiffs disagree, and that's what prompted them,

7    they claim, to file the lawsuit.

8         THE COURT:  Right, right.  But the fact of the matter is

9    that, so what?  If there's not been any challenges in 30 years,

10   that's neither here nor there in determining whether or not the

11   law is -- simply can stand on its own, right?

12        MR. SAINDON:  Yes, Your Honor.

13        THE COURT:  Um...

14        MR. SAINDON:  I can turn to the commerce clause, if you'd

15   like, Your Honor, but I think those --

16        THE COURT:  Yeah, if the City were a state, though, you

17   couldn't do this, could you?

18        MR. SAINDON:  No, we couldn't, Your Honor.

19        THE COURT:  You concede that?

20        MR. SAINDON:  Yes.  I mean, the Privileges and Immunities

21   Clause says it applies to the states, so we couldn't do it,

22   clearly.

23        THE COURT:  So there's some logic there, since everyone

24   says the City's unique and exceptional, doesn't have

25   Congressional representation, everyone, including the Court, has

1   license tags that say "taxation without representation," can't

2   vote in Congress, can't spend its own money without asking

3   Congress how to spend $40 billion of revenue earned every year,

4   and it does something to enhance the ability of its residents and

5   citizens to get jobs because, what, the unemployment rate is

6   higher; is that right --

7           MR. SAINDON:  Yes.

8           THE COURT:  -- than in other locales?

9           MR. SAINDON:  That's right, Your Honor.

10          THE COURT:  Right.  But is that reflected in the

11  legislative history?  Was that a reason for this?

12          MR. SAINDON:  Absolutely, Your Honor, originally and

13  during the amendments.  It's well established, the District's

14  unemployment rate runs higher than surrounding jurisdictions.

15          THE COURT:  So are those the only unique and exceptional

16  reasons:  The lack of commuter tax; the high employment rate; the

17  City's trying to do something, and would like to do more, I

18  assume?  What could it do more?  What more could it do if it were

19  not exceptionally unique and under the control of Congress?

20          MR. SAINDON:  I guess I'm not sure I understand your

21  question, Your Honor.  I mean, clearly the minority preferences,

22  business preferences, District resident preferences for District

23  jobs --

24          THE COURT:  Right.

25          MR. SAINDON:  -- those kinds of things fall on the same

1    categories.

2         THE COURT:  Right.  Right.

3         MR. SAINDON:  I mean, I think that's how we distinguish

4    this case in the commerce clause cases of Department of Revenue

5    of Kentucky and United Haulers.  You know, the District is trying

6    to protect and approve the public welfare, not protect some

7    private industry or commercial interests.

8         THE COURT:  Well, this law applies only to construction

9    projects, right?

10        MR. SAINDON:  Right, and it applies --

11        THE COURT:  -- applied in whole or in part where

12   administered by this city, right?

13        MR. SAINDON:  That's right, Your Honor.

14        THE COURT:  Do nonresidents account for a larger share of

15   construction jobs and other jobs; that is, do they account for

16   more than 70 percent of the construction jobs?

17        MR. SAINDON:  I don't know that, Your Honor.

18        THE COURT:  That's not reflective in the legislative

19   history?

20        MR. SAINDON:  No, no.  The law treats all private

21   companies the same, Your Honor, so it doesn't discriminate

22   against interstate commerce.

23        THE COURT:  Well, how reliable, then, is that unemployment

24   figure?  It's one thing to say that there's unemployment in the

25   construction industry by a certain percentage, but it seems to me

1  the City argues that the unemployment rate is higher and has a

2  percentage, but that includes construction projects funded either

3  in whole or in part by the City and other unemployment, right?

4      MR. SAINDON:  Yes, Your Honor.

5      THE COURT:  So how reliable is that figure, then, to

6  combat this so-called peculiar source of evil?

7      MR. SAINDON:  Well, Your Honor, I wish it was more

8  reliable.  As we indicated in the supplemental brief, the Federal

9  Government, the Bureau of Labor Statistics says to break it down

10  by industry by state.  It's just nationwide, so we don't really

11  have the numbers.  I mean, yeah, we absolutely would like to do

12  this studies, it looks like, but there hasn't been one yet as far

13  as the different industries in the District in construction and

14  how those jobs are broken down.

15      THE COURT:  If the Court were to find standing and decide

16  that there is standing, both associational and individual

17  standing, would this case be more appropriately decided on

18  summary judgment grounds?

19      MR. SAINDON:  I'm not sure, Your Honor.  Certainly we

20  could do it.  We don't think plaintiffs have alleged enough to

21  show standing, and --

22      THE COURT:  But let's assume that -- let's assume that's

23  decided.  Then what?

24      MR. SAINDON:  I think --

25      THE COURT:  Does the case go forward for discovery or does

1  there still exists a basis for dismissal on 12(b) grounds?

2      MR. SAINDON:  Assuming the Court finds discovery, I think

3  there is --

4      THE COURT:  No, standing.

5      MR. SAINDON:  I'm sorry.  If the Court finds standing,

6  there's still a basis for dismissal, Your Honor.  I don't think

7  there are material facts in dispute.  Plaintiffs have not

8  disputed any of the underlying economic facts that we've stated

9  at all.

10      THE COURT:  And they've not -- see, as they've not filed a

11  56(f) affidavit, they've not said we need some discovery here.

12      MR. SAINDON:  Right.  They complain about it in the

13  supplemental brief that they didn't have a chance to do

14  discovery, but they didn't -- they've never asked for it, and

15  they certainly don't need discovery to demonstrate the harms to

16  them that the First Source Act has allegedly had.  They can come

17  forward with an affidavit.  They could have amended their

18  complaint, but they haven't ever done that, Your Honor.  I think

19  this really is a pure question of law as to whether or not the

20  law violates the Privileges and Immunities Clause and whether

21  that clause applies to the District.

22      THE COURT:  That's the big issue in this as far as the

23  City's concerned, right?

24      MR. SAINDON:  Absolutely, Your Honor.

25      THE COURT:  All right.  Assuming that the plaintiffs can

1    get over the standing hurdle?

2          MR. SAINDON:  Yes.

3          THE COURT:  The City argues that as a result of

4    unemployment in D.C. and its inability to impose this commuter

5    tax and collect revenue there, that it must expend a larger share

6    of its resources to welfare services than it would absent those

7    two factors.  Is there any evidence that the First Source Act has

8    decreased the funds spent for welfare services because more

9    District residents who are employed, or does that get into the

10   impact issue?

11         MR. SAINDON:  I think that gets into the impact issue,

12   Your Honor.  There's no direct link that we could find.  I mean,

13   it's really more a matter of logic that the more D.C. residents

14   who are employed, the less they'll have to spend on these safety

15   net services.

16         THE COURT:  And you're not aware of any resident

17   preference laws being upheld on privilege and immunities ground,

18   do you?

19         MR. SAINDON:  Not after legal challenge, Your Honor, no.

20   I mean, the Camden case, which both parties obviously discussed

21   extensively, that was remanded because the record was

22   insufficient, and it was -- and I have not been able to find out

23   what happened in that case, Your Honor, whether the parties

24   settled, or -- but it doesn't look like Camden still has --

25         THE COURT:  What about the Commerce Clause argument?  Is

1   the District a market regulator for the purposes of that clause?

2       MR. SAINDON:  Yes, Your Honor, and it's also a market

3   participant, and that immunizes it from a Commerce Clause

4   challenge here.

5       THE COURT:  How so?

6       MR. SAINDON:  Well, that's the usual situation, as the

7   Supreme Court said, in the Department of Revenue of Connecticut

8   case.  We're just favoring the use of D.C. labor as a condition

9   of the District's purchase of construction services.  Plaintiffs

10  essentially concede that by never even mentioning the White or

11  the Kentucky cases.

12      THE COURT:  All right.  So getting back to summary

13  judgment, you're not convinced -- the City's not convinced or not

14  persuaded that if standing is proven and alleged -- and that's

15  all they have to do is allege it at this point, they don't have

16  to prove it at this point -- but if it's alleged, the case still

17  should not move forward because there's no lawful basis for these

18  other challenges to be sustained, right?

19      MR. SAINDON:  I think that's right, Your Honor.  These are

20  legal questions.  I can't see the need for discovery.  You know,

21  plaintiffs would harass the District with discovery, we'd have to

22  go after them to find out what the damages and harms are.  I

23  mean, to the extent that facts are relevant, we think they're

24  relevant as to what plaintiffs have failed to allege as to the

25  impacts of the law on them.  But answering six months or a year

1    of discovery as to what benefits the law has had on the District,

2    I don't think would improve the Court's consideration of the

3    issue.

4        THE COURT:  All right.  Let me do this.  Let me take about

5    a ten-minute recess, and then I'll hear from plaintiffs' counsel.

6        Anything else you want to say about these other -- what

7    about the First Amendment?  Anything else briefly you want to say

8    about these other challenges?

9        MR. SAINDON:  I think we can rely on our briefs, Your

10   Honor.  The plaintiffs allege that the First Source Act compels

11   them to support the goals, but they never identify what speech

12   they have to utter.  And just like the Rumsfeld case, at the most

13   it's a disclosure of purely factual information.  It only

14   regulates what companies have to do, not what they can say.  The

15   First Source -- the First Amendment --

16       THE COURT:  The plaintiffs can say anything they want to

17   say, right?

18       MR. SAINDON:  Right.  The First Amendment claim is

19   meritless, we think.

20       THE COURT:  How would you -- how would you -- how would

21   you describe the next strongest claim, if there is one, just for

22   purposes of discussion that plaintiffs have, after privileges and

23   immunities?  Commerce Clause?

24       MR. SAINDON:  I don't think Commerce Clause, Your Honor.

25   Perhaps the Contract Clause, but then that fails also because

1    they haven't alleged -- there's no eminent -- there's no

2    contract they have now or no contract that they plan to go into

3    that's going to be impaired.  I mean, the law, like you said, has

4    been on the books for three decades, so even if the impact was

5    substantial, which we don't think it is, there's an important

6    public purpose behind it.

7         THE COURT:  All right.  The Court will take a ten-minute

8    recess and then give plaintiffs an opportunity to speak.  All

9    right.

10        MR. SAINDON:  Thank you, Your Honor.

11        THE COURT:  Sure.

12        (Thereupon, a break was had from 11:13 a.m. until

13   11:40)

14        THE COURT:  All right.  Let me hear from plaintiffs'

15   counsel.

16        MR. KIERNAN:  Thank you, Your Honor.

17        THE COURT:  Let me you ask you this:  So does the Court --

18   can the Court assume -- make an assumption with respect to

19   privileged immunity without deciding legally whether it applies

20   or not, or -- do I have to deal with that?

21        MR. KIERNAN:  I -- I think you have to deal with it.  I

22   don't see how you not, because -- and the reason is because every

23   case that I have found, that I -- and I gather from the

24   District's position, every one they've looked at, when a

25   Privileges and Immunities Clause problem rears its head, these

1     ordinances always get struck down.  And the reason is because

2     it's exactly the kind of economic protectionism that the

3     Constitution says states can't do.  I mean, I heard --

4          THE COURT:  Yeah, but D.C.'s not a state, though.  I'm

5     actually surprised that the City said I have to deal with this

6     issue.  I'm not so sure the City wants a ruling on the

7     applicability of privileges and immunities because it could come

8     back to haunt them in other contexts, but, I mean, his answer's

9     not binding, but I was actually somewhat surprised that the

10    City's position is the Court couldn't assume applicability, and

11    nevertheless find that it's legal, but --

12         MR. KIERNAN:  Again, I think -- but I also heard counsel

13    acknowledge that any state of the union couldn't enact this law.

14         THE COURT:  Yeah, right.

15         MR. KIERNAN:  They wouldn't be allowed to.

16         THE COURT:  Right.

17         MR. KIERNAN:  So then the question is --

18         THE COURT:  So if we all agree that the City's not a

19    state -- let's assume we all agree to that.  So what's the

20    impediment, then, to the City enacting it?

21         MR. KIERNAN:  The Privileges and Immunities Clause.

22         THE COURT:  It doesn't apply to it.  It's not a state.

23         MR. KIERNAN:  That's not the -- I -- respectfully, that's

24    not the test for whether certain Constitutional rights apply to

25    the District or not.  And there's a lot of cases, Your Honor,

1    that --

2        THE COURT:  This is the latest version of Whac-A-Mole, you

3    know.  Everyone always wants to tell the City what to do with

4    this money, everything, how to enact its laws, when to enact the

5    law, when not to enact the law, you can't spend your money

6    without going to Congress.  And your argument is this is -- this

7    law that's been on the books for 30 years -- and by the way,

8    before I go on, why is there a challenge now?

9        MR. KIERNAN:  The challenge now is because the amendments

10   in 2011 that became effective in 2012 broaden both the scope and

11   the risk to --

12       THE COURT:  You have to pay more money now, right, medical

13   costs, right?

14       MR. KIERNAN:  There's more than that.  First of all --

15       THE COURT:  Well, you have to pay more money than you had

16   before, correct, as a result of the amendments?

17       MR. KIERNAN:  Well, there are amendments that raise the

18   penalties.  There are amendments, contrary to what I think was

19   discussed earlier.  Now, this is not limited to construction

20   contracts anymore.  It is expanded to nonconstruction contracts.

21   It is also expanded to a role of the City, not simply when the

22   City is spending its dollars --

23       THE COURT:  Well, you don't have any standing to challenge

24   the applicability of the law to nonconstruction contracts, do

25   you?

1          MR. KIERNAN:  And you're asking why do we challenge it

2     now --

3          THE COURT:  But just answer my question:  You don't have

4     any standings to challenge that, do you?

5          MR. KIERNAN:  We haven't raised that.  We've raised it in

6     the complaint that these are among the changes in the law.  But

7     Your Honor, I would note, too, in the Gertner -- Judge Gertner's

8     case up in Wooster, Mass, that law has been on the book 18 years

9     when the challenge brought.  And the judge noted on page 120 of

10    her opinion, she said, look, "18 years of the residency

11    requirement ordinance have not resolved the economic and social

12    conditions that, according to the City, required its enactment.

13    Wooster identifies substantially the same conditions today as the

14    counsel did in 1984, clearly the residency requirement ordinances

15    discrimination is not closely related to the problem."

16         THE COURT:  You're reading from her opinion granting the

17    PI; is that right?

18         MR. KIERNAN:  Correct.

19         THE COURT:  There was a subsequent opinion, the record --

20    the docket's a little murky there, but apparently she issued a

21    subsequent opinion that's not reported on summary judgment

22    grounds.  Have you seen that?

23         MR. KIERNAN:  I don't think I have, Your Honor.

24         THE COURT:  And I don't think the City has.  We just found

25    it, and I'm not -- it wasn't because there was any discovery

1     conducted, but it's there, and we haven't had a chance to read

2     it, so I'm not sure if we're able to get a copy.  And I guess we

3     can print it out at some point, I guess.  I might ask counsel to

4     comment on that, but I'm not going to keep the record open for an

5     extensive period of time.

6          MR. KIERNAN:  But I think to go back to your question,

7     Your Honor.

8          THE COURT:  Yeah.

9          MR. KIERNAN:  It's raised now because the stakes were

10    raised when the amendments were enacted that were affected in

11    2012.  And as we said in our complaint, for the years that this

12    has been otherwise on -- the earlier one was on the books, people

13    figured out how to deal with it.  There were real impacts.  We've

14    alleged in the complaint, it's cost our association and our

15    clients money, opportunities, having bid on jobs, have had to

16    spend money on workforce training, have had to file reports and

17    have had to do all sorts of things contrary to what they wanted

18    to do otherwise, but the stakes get raised and that's what

19    brought the lawsuit.

20         THE COURT:  Let's assume that I agree with your argument,

21    and I probably do, that there's standing for individuals and

22    maybe -- can individuals belong to this organization, to this

23    plaintiffs' organization, the Metropolitan Washington?

24         MR. KIERNAN:  We have some sole proprietors in the group,

25    and I think it's alleged in page 4, I don't -- none of them are

```
1    parties to the case.  We do -- yeah, paragraph 4.  We do have
2    some sole proprietorships, you know, trading as, members.
3           THE COURT:  All right.  Does the associational standing
4    argument, is that impacted by the fact that you have individual
5    members as opposed to corporate members?
6           MR. KIERNAN:  I think it's probably helped to some extent,
7    but I don't -- I don't think it's dispositive.
8           THE COURT:  You disagree -- let me go back to my question.
9           MR. KIERNAN:  Okay.
10          THE COURT:  Let's assume I agree with you about the
11   standing, and I probably do -- and I'd be interested in
12   everyone's views about the applicability of Dynalantic to this
13   case.  I think -- I'll leave the open record for a day or two.
14          Is this case more appropriately decided on summary
15   judgment grounds, if I agree withstanding, as a matter of law?
16          MR. KIERNAN:  Either summary judgment or on an injunction
17   hearing, yes.
18          THE COURT:  You haven't filed for an injunction.
19          MR. KIERNAN:  No.  It's pled in our complaint, but we
20   haven't filed that motion yet.
21          THE COURT:  Yeah, so I'm not going to schedule a hearing
22   on something that's not even before me.  The question is --
23          MR. KIERNAN:  But it probably --
24          THE COURT:  The question is whether or not this case is
25   more appropriate to be decided on Rule 56 grounds, as opposed to
```

1    MTD grounds if I -- if I find as a matter of law that there's

2    standing.

3          MR. KIERNAN:  And again, I think, through the colloquy

4    this morning and I think through the papers, we've also boiled

5    down the fact that at the end of the day, if the Privileges and

6    Immunities Clause applies here, I don't think the District will

7    quarrel with the fact that this law would not survive if it's

8    analyzed through the privileges and immunities lens.  So I'm not

9    sure even what a summary judgment --

10         THE COURT:  I think what the City said, in fairness to the

11   City, was that if the City were to state it couldn't enact this

12   law.

13         MR. KIERNAN:  Right.

14         THE COURT:  That's what this city said.

15         MR. KIERNAN:  Okay.

16         THE COURT:  But the City concedes that its unique

17   status -- and you heard the arguments, just as well as I did --

18   it's unique status enables it to pass a law that deals with

19   this -- with these peculiar sources of evil, whatever they may

20   be.

21         MR. KIERNAN:  And I'm not sure where that ultimately takes

22   the District, because if the City is not a -- the District is not

23   a state for this analysis, then I don't think its residents can

24   be considered resident citizens of the state for purposes of the

25   analysis.  And it just seems so topsy-turvy to me.  I mean, the

1    Privileges and Immunities Clause is a right we have as Americans.

2    It's an individual right to live in a country where, when I cross

3    the border into Maryland, I'm treated with the same rights as if

4    I lived in Maryland.  I don't get special rights, but I don't get

5    discriminated against when I cross the border.  And for the

6    District to say that somehow silently when Congress enacted Home

7    Rule it intended to give the members of the counsel and the mayor

8    of the District of Columbia a level of ability to discriminate

9    against the rest of the country that nobody else in the country

10   has, just frankly is -- it's impossible.  It can't -- that can't

11   be the right answer.  The Home Rule Act says that the legislative

12   power has to be enacted consistent with the Constitution, not

13   that the mayor or the City council have a level of authority

14   greater than anybody else in the country.  And all the

15   territorial cases and so forth, all fall by the wayside because

16   at the end of the day, in every single instance, the immunity

17   doesn't apply.

18        THE COURT:  What territorial cases are you referring to

19   besides Alaska?

20        MR. KIERNAN:  We talked about the Alaska case.  I think

21   there was a reference earlier to the Virgin Islands case maybe.

22   Guam was in the papers as well.

23        But at the end of the day, nobody found that the

24   Privileges and Immunities Clause didn't apply.  And the Malaney

25   case, I believe, is in the Supreme Court, which involved whether

1    you could charge, I think it was $5 for a fishing license to a

2    resident of Alaska, but it was, you know, $500 to an out of

3    state.  The Supreme Court noted, well, that would make no sense

4    that you would empower a territorial government with a power that

5    the states don't even have.

6         So I -- it just seems to me that once this case was framed

7    as a Privileges and Immunities Act case, not only the weight of

8    all the authorities that we all can find everywhere in the

9    country where this residency requirement -- and they've all been

10   struck down.  And the logic of it is sound, and so the only thing

11   that the District is left with is the argument that because of a

12   sort of technical issue -- which I don't think is sound, but this

13   is their argument -- that somehow they are some sort of free

14   trade zone, that there's some sort of safe space in our

15   Constitutional system where the District of Columbia can treat

16   the rest of the country differently -- now, you may think

17   politically that they're entitled to it, but that's --

18        THE COURT:  But everyone treats the District of Columbia

19   differently.

20        MR. KIERNAN:  Yeah, I don't --

21        THE COURT:  They don't -- they don't have a lot of the

22   privileges that other states have.  They have no votes in

23   Congress.  They don't have a lot of things that other --

24        MR. KIERNAN:  But yet --

25        THE COURT:  Just a minute, let me finish.

1        MR. KIERNAN:  Sorry, Your Honor.

2        THE COURT:  They don't have a lot of things that other

3   residents of states have.  And by enacting this law, they -- the

4   City has addressed in its view the fact that, uncontroverted at

5   this point, that significant revenue is derived from people who

6   don't even live here.  The City can't tax that revenue.  There's

7   a high unemployment rate for its own residents and the City wants

8   to do something about it.  So why is all that illegal?  Because

9   the Privileges and Immunities Clause that applies to states only;

10  is that right?  That's your answer, isn't it?

11       MR. KIERNAN:  That's my answer.  It's unconstitutional.

12  It's -- I'm not saying -- I don't think anybody's in favor of

13  high unemployment or even the commuter tax.  I mean, that's a

14  different issue, but constitutionally, illegally, it's not --

15       THE COURT:  Well, every jurisdiction in a city in this

16  country is an act of the commuter tax, with the exception of the

17  District of Columbia, and yet, it's still another distinction

18  that the City, unfortunately has.  It can't enact a commuter tax.

19  If it could, they would tax your clients to the full extent

20  appropriate, but it can't.  So your clients can come in and make

21  all the money they want to and leave nothing behind in terms of

22  tax revenue.

23       MR. KIERNAN:  Well, it's still -- I mean, they can provide

24  jobs, they can do all sorts of things.

25       But, I mean, the fact that the City is not allowed to

1    enact a commuter tax doesn't mean they're allowed to enact what

2    would clearly be unconstitutional anywhere else.

3        THE COURT:  Why are the two even mentioned in the same

4    sentence?

5        MR. KIERNAN:  Because the justification raised by the

6    District for -- this is my words not theirs -- a concededly

7    unconstitutional enactment, namely a residential -- residency

8    requirement like this, that their justification for it is they're

9    entitled to do it because of the peculiar source of evil of not

10   being allowed to have a commuter tax puts a unique burden on the

11   District that they -- that this evil -- that this act is supposed

12   to address.  That's why the commuter tax is in this case because

13   the District, both in 1984 and more recently, had cited that as

14   the reason why they survived the privileges and immunities

15   challenge.  It's because, in their view, there's a local evil of

16   being unable to have a commuter tax.  And our response is, that's

17   not their decision to make.  Respectfully, it's not their

18   decision that that's an evil.  Congress, constitutionally, has

19   the ultimate authority in the District.  Congress said in the

20   Home Rule Act you may act -- enact laws consistent with the

21   Constitution, you may not enact a tax on the income of people who

22   come into the City.

23       THE COURT:  All right.  Aside from the commuter law aspect

24   of this, did Congress raise any concern about this law when it

25   was enacted over 30 years ago?

1      MR. KIERNAN:  Not that I'm aware -- they didn't.

2      THE COURT:  No.  Did Congress raise any concern, with

3   respect to the amendments within the past two years, the reasons

4   probably why your clients have filed this lawsuit?

5      MR. KIERNAN:  Not that I'm aware.  There wasn't --

6      THE WITNESS:  What does that mean legally, then, that

7   Congress has not articulated any concern about either the law as

8   enacted or the amendments to the law?

9      MR. KIERNAN:  I'm not aware that it has any, if you're

10   looking for precedential or some other value.  I mean, the fact

11   that Congress -- if during the layover period Congress doesn't

12   act, that doesn't make it a congressional enactment under the

13   precedence, and I don't think it provides any basis for the Court

14   to say Congress approves it, doesn't approve it.  All they did is

15   they didn't act on it.  It actually --

16      THE COURT:  That doesn't mean anything, for Congress to

17   put in place a system that essentially doesn't mean anything?

18      MR. KIERNAN:  No, it's not that it doesn't mean anything.

19   The fact that Congress did not intervene in the process and try

20   to change it or veto it or stop it from happening -- I don't --

21   any more than when the Supreme Court doesn't take certain on a

22   case, that doesn't mean they adopt it as theirs.  It's not a

23   congressional act just because Congress doesn't avail itself

24   during the layover period of changing it.  I don't think it -- I

25   don't think it bestows on the final enactment, you know, some

1   sort of additional, you know, approval by Congress.  And I

2   certainly don't think it -- so I don't think that the fact under

3   the precedence, I don't think that fact adds to the law or

4   somehow helps its constitutionality.

5       THE COURT:  This language that we've been kicking around,

6   I, quite frankly, don't particularly care for, "the peculiar evil

7   that emanates from Supreme Court precedent."

8       MR. KIERNAN:  Um-hmm.

9       THE COURT:  So because that's accepted jargon for these

10  types of cases, why isn't -- and because the City cannot impose a

11  commuter tax, then why isn't that an appropriate utilization of

12  that jargon here?  It can't impose a commuter tax.  Everyone

13  agrees with that, with the exception of the City, but they can't.

14  They can't do it, so why isn't that the kind of evil that all of

15  this precedential authority addresses, the fact that it can't tax

16  a significant amount of revenue that walks out of the District of

17  Columbia every day?

18      MR. KIERNAN:  I think it's because of the regulatory

19  nature of this act.  It's not -- this is not directed to keeping

20  the money in.  It is -- there's a -- the privileges and

21  immunities cases talk about --

22      THE COURT:  Well, it's enacted to enable District

23  residents to have a preferential opportunity to get jobs,

24  hopefully to earn money, which then can be taxed.  I mean, that's

25  one of the underlying purposes.  I don't think the City disagrees

1   with that.  It's enacted to enable the City to address what's

2   been uncontroverted, which is its alarmingly high rate of

3   unemployment.

4        MR. KIERNAN:  Right.  It is to gen- -- and taking that, it

5   is to generate more tax revenue.  It's intended to generate more

6   tax revenue.

7        THE COURT:  That's any purpose, is also to give citizens

8   of D.C. and residents of D.C. an opportunity to have preference

9   over trades people who live outside of D.C., who would otherwise

10  make income, earn income that can't be taxed.  I mean, that's --

11  you know, it's as simple as that.

12       MR. KIERNAN:  And the very same more tax revenue argument

13  was made in the Wooster case and in all these other cases.

14  It's -- I'm not saying it's a crazy argument.  It's why

15  government's act.  But it's the same argument, which is we need

16  more revenue because we've got needs in our city that are not

17  being met by the current employment, you know, profile.  I'm

18  not -- I'm not making a political statement, but it's not legally

19  sufficient under our system to then allow a city or a state to

20  enact an economic protectionism, which is what this really is, in

21  order to foster that.  That's what gets struck down --

22       THE COURT:  Looking at the Hicklin and Camden cases, the

23  Alaska case and the New Jersey case, the Court's supposed to give

24  deference to a challenged regulation or a statute that imposes

25  restrictions on the District's own expenditure of funds.

1          Does that deference apply here?

2          MR. KIERNAN:  I don't think it applies in the way that the

3    District is arguing, which is that the deference is that they can

4    identify Congress as being the source of the evil, because that's

5    ultimately the argument, which is Congress has prevented us from

6    the commuter tax; Congress, who in our Constitutional structure,

7    runs the entire District; it is the District of Columbia, if I

8    may; they're the course of the evil because they won't let the

9    City council enact a commuter tax, and therefore, we, the City

10   council, which is the creation, if you will, of the Home Rule

11   Act, can -- can enact something to address the fact that Congress

12   has ordered the way it is.  I mean, it's -- it's sort of flipping

13   the Constitutional hierarchy on its head to say Congress has

14   created -- or allowed the creation of a City council and a Home

15   Rule Act, and that the City can now say, yes, but because you

16   won't let us have a commuter tax in our structure, that is an

17   evil that we, the City council, can now take on ourselves to,

18   quote, fix or address through the mechanism of this statute.  And

19   I think, in fairness, that really is the District's line of

20   argument here, which is that they wound up on this side of that

21   commuter tax issue, and therefore -- but they have the right, not

22   withstanding the Constitutional structure, to enact something to

23   fix something that Congress itself said you can't do.  And that's

24   why I think it's -- that's why I think it's so problematic for --

25   that's why I think the District's argument is so problematic.  I

1   don't want to -- I don't want to say circular in a pejorative

2   sense, but circular almost in a visual sense.  Congress creates

3   the counsel, counsel doesn't like what Congress did, so now the

4   counsel is going to enact something that fixes what Congress

5   didn't do.  And I just don't think -- political judgments aside,

6   I just don't think that legally and structurally they can do

7   that.  And when the Home Rule Act says you act consistent with

8   the Constitution, it just doesn't seem possible, textually or

9   within the structure of the act or the constitution, to say that

10  Congress intended to give the City council and the mayor an

11  authority denied to everybody else in the country, and they did

12  it silently by not sort of specifically dealing with this

13  Privileges and Immunities Clause applicably.  The right belongs

14  to District citizens as American citizens.  And that, I just --

15  it's just not textually supportable that somehow the Home Rule

16  Act meant to change that.

17       THE COURT:  What -- to what extent, if any, is the court's

18  recent decision applicable here?

19       MR. KIERNAN:  The one regarding the budget -- I mean, I

20  think it is similar in the sense of the Court looked at what is

21  the Constitutional authority -- again, leaving aside judgments

22  about the politics or the wisdom or even the fairness of it all,

23  but legally and structurally -- and said this is not allowable

24  under our system, and your remedy may be elsewhere, your remedy

25  may be statehood, it may be somewhere else, but you can't do

1    this.  And it may be a great idea, but you can't do this.  And

2    that's -- you know, in some sense it's the same issue we have in

3    this case.  It may be a wonderful idea, but it's not allowed

4    under the law.  It's not allowed under our constitutional system

5    to create this kind of economic protection for the District's

6    residents and to discriminate against other Americans.  It's just

7    not allowed.

8         THE COURT:  You know, it just seems to me that if not this

9    type of law, then what type of law?  Because, see, everyone says

10   the City's unique, you can't do certain things.  The City's

11   unique.  It's distinguishable from other states.  It can't do

12   this, it can't do that, it can't do that.  So the City says

13   because now we're exceptional, we are unique, and it's because of

14   our uniqueness and the fact that we can't enact a commuter tax

15   and do other things that we are enabled to enact this type of

16   law.  But you say it's nonetheless illegal?  It doesn't fit?

17        MR. KIERNAN:  It doesn't flow.  It does not fit that way.

18   And I think that's in part because of the nature of what the

19   Privileges and Immunities Clause protects, and it is -- the

20   reason why only individuals have the right is because it is an

21   individual right, ultimately.  It's the --

22        THE COURT:  There's no jurisdiction anywhere in this

23   country that's been able to enact this type of law.

24        MR. KIERNAN:  Not that I -- we cited all the cases that

25   have been -- I mean, you know, I'm always --

1          THE COURT:  It boggles the mind that this law has been on

2     the books for over 30 years and no one's ever challenged it.

3          MR. KIERNAN:  Well, I -- well, we mentioned in our

4     complaint, Your Honor -- again, it's not necessary to the

5     resolution of the case, but we've mentioned that politically,

6     obviously, going after this law is not very popular because it's

7     perceived as a, quote, jobs bill or something.  And that's why,

8     as I said earlier, for many years people have just sort of worked

9     through it, but when the City counsel amp'd up what it applied to

10    and the consequences of noncompliance --

11         THE COURT:  It increased medical care costs.

12         MR. KIERNAN:  All of that.

13         THE COURT:  Cost money and it started hurting then, didn't

14    it?

15         MR. KIERNAN:  It cost money, and you're at risk, and do I

16    bid for a job or not bid for a job, do I -- can I find enough

17    people to do this?  What other jobs do I not do?  Because

18    remember, in practical terms, as an employer, if I'm going to bid

19    for a job covered by this act, I then have to go through my

20    roster of people, where's my master electrician, where's my --

21    you know, all my different trades people.  Okay.  Now, you live

22    in Prince George's County, I can't include you.  You live in the

23    District, all right, I'm going to hold you, but that means I

24    can't put you anywhere else.  I can't use you on another job

25    because I have to put you on the bench and get you ready to go if

1    I get the District job, because I'm counting on having you there

2    to meet the requirement that I'm agreeing I'm going to commit to.

3    I mean, that's why it's so -- and so when you then amp up or

4    increase what projects it applies to, what District actions it

5    accounts for -- because, again, in 2011 amendments it went

6    beyond -- it went to if the project involves a tax increment

7    financing, if it involves a grant that the District is

8    administering on behalf of the Federal Government, and it

9    increased the projects within its scope, increases the penalties,

10   broadens its application, that's when -- at least our clients --

11   had the view of, I can't risk this anymore, I could sort of work

12   through the old system for a while, but I can't do that, anymore.

13         And so, you know, politically it's not popular to be

14   standing where I am today, but it's also a necessity --

15         THE COURT:  Because you're attacking the creation of jobs,

16   right?

17         MR. KIERNAN:  Well, you know --

18         THE COURT:  Right?  I mean, you said it.

19         MR. KIERNAN:  I mean, that's why -- you asked why, and as

20   we put in the sort of beginning of our complaint, that's why

21   people have just sort of said I don't want to buck -- you're not

22   going to find a politician in town, a City council member in town

23   who's going to say, hey, he's right, you know, it's

24   unconstitutional.  And it's just -- again, it's sort of like the

25   Budget Autonomy Act, you know, ultimately somebody has to say I

1   understand this may not be popular, but it's the law and it's our

2   constitutional system.

3        THE COURT:  Yeah, but it didn't take 30 years for someone

4   to say it either.

5        MR. KIERNAN:  Oh, I know.  I know.

6        THE COURT:  I mean, people have been complying with this

7   law for 30 years, not that that makes it more legal, but it's

8   very interesting that no one's ever challenged it.

9        MR. KIERNAN:  I agree.

10       THE COURT:  I'm sure there probably was some thoughts

11  about challenging it, I'm sure.

12       MR. KIERNAN:  Yeah.

13       THE COURT:  You make an argument in your opposition that

14  doesn't have much explanation.  Under White, is the District not

15  clearly a market participant?

16       MR. KIERNAN:  Under -- in some ways the District is a

17  market participant, but our argument is that primarily here they

18  are a market regulator, at least as far as --

19       THE COURT:  What's the difference between the two?

20       MR. KIERNAN:  Market participant, I think, is when the

21  District is spending its own money.  You know, they've raised the

22  money and they're spending it, and they're buying services.  And

23  clearly, the Supreme Court has given governments some latitude to

24  prefer its own residents when it's their own money spent.

25       Our argument is this isn't just when the District is

1    buying services.  It's also on projects in which the District is

2    not spending its money at all.  For example, a tax income and

3    financing situation or some other situation where it's not like

4    the City is writing a check.  And because of the nature of this,

5    it's not -- let me put it this way, Your Honor:  It's not simply

6    the District saying I'm going to go buy service X or school

7    building Y, it is they are regulating a whole thing.  They're

8    going to the contracting community and staying, you need to have

9    reports, you need to look at our first source list, you need to

10   have proof --

11        THE COURT:  Right, but these are all -- unless I'm missing

12   something, though, these are all because someone has indicated a

13   willingness to contract with the District and persuade the

14   District to pay it X amount of money, though.  That's the reason

15   why it's a participant.  I mean, we're not talking about

16   scenarios not involved in an expenditure of D.C. funds, are we?

17        MR. KIERNAN:  Well, what I was trying to make the point,

18   Your Honor, and maybe I didn't say it clearly enough, is we are

19   talking about situations where the District is not expending its

20   funds.  For example, when it is administering a federal grant

21   where it's the person -- the party in-between the federal money

22   and the --

23        THE COURT:  All right.  And no D.C. funds involved at all?

24        MR. KIERNAN:  Right, when they're -- I mean, when they're

25   administering somebody else's funds.

1       THE COURT:  Right.

2       MR. KIERNAN:  That's the --

3       THE COURT:  All right.  So the Federal Government

4  hypothetically gives a grant of $10 million or whatever for the

5  City to do something, and the City has to put it up for bids, I

6  guess; is that right?

7       MR. KIERNAN:  Well, it depends on the natural of the

8  project.

9       THE COURT:  All right.  Well, whatever, whatever.  I'm not

10 an expert in that area, but if the City has to -- if the City has

11 this pot of money, and contractors can bid on doing work for it,

12 no expenditure of D.C. funds at all, none, Federal Government, so

13 this is regulated also, according to plaintiffs, under the First

14 Source Act; is that right?

15      MR. KIERNAN:  Yes, it is.

16      THE COURT:  So that would mean that the City is still a

17 participant, though, correct?

18      MR. KIERNAN:  Yes.

19      THE COURT:  I mean, it's a regulator.  I mean, you know,

20 does it really make a difference what we call it?  I mean, it's a

21 participant for all these scenarios, whether it's its own funds

22 or whether it's the Federal Government's funds.

23      MR. KIERNAN:  And I get -- in that sense, yes, Your Honor.

24      THE COURT:  All right.

25      MR. KIERNAN:  Yes, it is.  But in the sense of the

1    Commerce Clause cases that seek to draw distinction between when

2    the City is, if you will -- or when a government is the purchaser

3    of, you know, services or resources, when they're going out to

4    buy pencils, you know, for the school, that's sort of the market

5    participant, as opposed to a market regulator, which is where

6    we've got a governmental structure that is dealing with, not just

7    when we go out and buy pencils and we can prefer the pencil

8    manufacturer that's in our state, then that kind of market

9    participant where there is --

10           THE COURT:  All right.  Bear with me a little longer.  If

11   the Boston ordinance at issue in White didn't violate the

12   Commerce Clause, then what's the strong argument for why the

13   First Source Act violates it?

14           MR. KIERNAN:  Under the Commerce Clause, I think the

15   strong argument is that it reaches conduct in which the District

16   funds itself were not at issue --

17           THE COURT:  All right.

18           MR. KIERNAN:  -- and where the District is not, for

19   example --

20           THE COURT:  And that's straight forward, if the money

21   comes from another source?

22           MR. KIERNAN:  Another source, or as is true -- as is true

23   under the law, if it is two private -- if it is a private party

24   doing something, but there is, for example, a tax abatement, or

25   there is something where it's not the District's funds being

```
 1   spent to purchase a good or service, and those are all covered
 2   now under the act.
 3          THE COURT:  On another note, I just -- before we came back
 4   to court, I just noticed a fleet of, what appears to be, hundreds
 5   of taxicabs circling the Congress.  Is that the next lawsuit?
 6   Are you representing them?  When you leave here are you going to
 7   file a lawsuit to tell the City what to do?
 8          MR. KIERNAN:  I think that's the Uber people.
 9          THE COURT:  Oh, really?
10          MR. KIERNAN:  I think they're mad at the Uber people
11   because they've been doing that all --
12          THE COURT:  Oh, you know what, I just assumed they were
13   challenge -- they were going to challenge the opinion
14   requirement.  I think all cabs have to be painted a certain color
15   now, I think red.
16          MR. KIERNAN:  I didn't see it this morning what it was,
17   but I do know that there have been these protests all over the --
18          THE COURT:  I just saw the cabs.
19          MR. KIERNAN:  Yeah.
20          THE COURT:  That's what it is, Uber.  We'll wait until
21   it's filed.  I'm sure that's -- because something else is brewing
22   there.  But when you leave here, you're not filing a lawsuit on
23   their behalf?
24          MR. KIERNAN:  And I'm not grabbing a cab, apparently,
25   either, so...
```

1      THE COURT:  With respect to -- I don't want to deal with

2  standing.  I firmly -- I'm not going to concede it.  Give me a

3  couple of minutes of your strongest argument for individual

4  standing and association for standing.  I'm not just going to

5  give it away, but I think there's probably a standing there.

6      MR. KIERNAN:  And again, I won't repeat what's in our

7  papers.

8      THE COURT:  No, don't do it.

9      MR. KIERNAN:  But pages 234 of our opposition really takes

10  you right to the paragraphs of the complaint that we think

11  support our position to the motion to dismiss.

12      THE COURT:  At this point -- at this stage you just have

13  to allege, correct?

14      MR. KIERNAN:  Right.  And the way we structured the

15  complaint, Your Honor, is because we -- again, when we filed

16  this, the amended act had just become affected.  So what we said

17  was, under the prior act, these have been the injuries we have

18  suffered, these have been the impacts on our bidding of jobs, the

19  costs we've incurred, and so on and so forth.  And we've alleged

20  that the -- both the individuals and the companies are ones who

21  have had and will be seeking work on projects covered by both the

22  old act and the new act.  Obviously, when we filed, you know, as

23  we understood, factually it hadn't happened yet, but we thought

24  it was.  To the standing point, it is important to note that we

25  already had been affected and here's how the new act was, we

1    thought, going to impact us even more.  We also at that time in

2    our complaint pointed out that there was some substantial

3    uncertainly at the District level to what projects the new act

4    was going to be applied, and specifically whether it was going to

5    be applied retroactively; in other words, to projects that were

6    already in the pipeline.

7         So again, I think we have covered the injury in fact, the

8    causal relationship to the statute.

9         And to one other point Your Honor alluded to, you know,

10   for the individuals, I don't think -- and there's another utility

11   contractors' case, this is the Fall River case, where the Court

12   specifically said you don't have to bid -- you don't have to put

13   your bid up if you've chilled from bidding, if you basically --

14   and I think this phrase came up earlier:  If there's a barrier to

15   your participation, that also is enough injury.

16        But we didn't simply rest on a theoretical possibility.

17   We took the Court back to what had been our experience under the

18   law to that point.  So I think we've covered the standing, both

19   the damage, obviously, the redress ability with this -- unless

20   you need to hear about that, but I think that's --

21        THE COURT:  Your biggest -- your strongest argument, I

22   assume, is the privileged immunities argument.

23        MR. KIERNAN:  I think that's what this case is about.

24        THE COURT:  What's the next one?

25        MR. KIERNAN:  The Commerce Clause, Commerce Clause.

1          THE COURT:  All right.

2          MR. KIERNAN:  We hopefully put them in order.

3          THE COURT:  First Amendment, I don't get it.  I don't see

4    it.

5          MR. KIERNAN:  The First Amendment issue is -- I'll concede

6    is a little tricky.  The issue there is, under the law, in order

7    for the employers to comply, we have to go out in the community

8    and say we are looking for District residents.  We, you know --

9    we're not looking for the best men and women, we're looking for

10   District residents.  We're an organization, Associated Builders

11   and Contractors, and our members that -- doesn't go for that

12   stuff.  We like individual merit.  We like, you know, that we

13   should be able to get the best person, not the person who's --

14   you know, whose father had the job before, and not the one based

15   on where they live, or anything else.  And for us to have to,

16   both file reports and actively go out in the community and say we

17   are holding a job fair for people that live in the City, is --

18   you know, is in some sense a compelled speech.  We're being

19   compelled to speak about something and to actively work for a

20   position that we don't hold and wouldn't otherwise take and don't

21   otherwise take.  You know, is that argument number one in this

22   case?  No.  No, but that's the essence of the argument.

23         THE COURT:  Is that the last argument?

24         MR. KIERNAN:  I think it wasn't last, it was near the

25   back.

1          THE COURT:  Yeah.  Oh, okay.

2          MR. KIERNAN:  Right.

3          THE COURT:  All right.  So that's the compelled speech.

4     We're forced to look for D.C. residents.

5          MR. KIERNAN:  Well, we're forced -- it's not that we're

6     forced to look for D.C. residents.  We're forced to go out in the

7     community and take the position that we want to -- you know, we

8     want to come get this -- that's the argument.  That's the

9     compelled speech part.  And it's not simply reporting ingredients

10    on a label.  It's not that kind of compelled speech.  It is, we

11    have to affirmatively spend our time and money going out to do

12    things that we would otherwise not do but for this law.

13         THE COURT:  What's so offensive about looking for D.C.

14    residents who are qualified to work?

15         MR. KIERNAN:  There's nothing offensive about that, Your

16    Honor.  The question is:  Can the -- should the Court -- I mean,

17    should the Government be compelling people to do that if they --

18         THE COURT:  Is it concerned about its high unemployment

19    rate and the fact that money's walking out the door every day for

20    which it can't do anything else?  I mean, it sounds like this is

21    a community, a unique community, that's doing something unique

22    and distinctive to help its citizenry so they'll become wards of

23    the Government.  It seems to me.  I don't know.

24         MR. KIERNAN:  I hear Your Honor, and that's what the

25    City's position is.  I just come back to --

```
 1          THE COURT:  And if you were a politician, you'd agree with
 2   that, right?
 3          MR. KIERNAN:  To circle back to where we were earlier,
 4   which is why the law is probably on the books and why people
 5   haven't been able to --
 6          THE COURT:  Yeah.  Right.  You know, I'm just -- I've been
 7   reading the pleadings and the cases, and, you know, it's just
 8   like, what's so apparently wrong here?  The City's not a state.
 9   I actually -- I had to think about that argument, too.  You know,
10   footnote, well, maybe you are.  But when the City says let's
11   assume something, no, you've got to do more than that.  You have
12   to take a position, and the City did.  And it's not necessarily
13   the same position that it's taken in other cases, and it may not
14   be the same position taken in the future, but it deals with the
15   applicability of certain things to its citizenry as to whether or
16   not it should be considered a state for certain purposes.  And
17   the City can't even prosecute for its own crimes.  It can't do a
18   lot of things, but here it's trying to do something, arguably,
19   inherently good, not evil.
20          What about the -- you can respond to that if you want to.
21   You may have already.
22          MR. KIERNAN:  Yeah.  I don't want to belabor the point.
23   There's a constitutional --
24          THE COURT:  Yeah, I understand that.  You know, they can't
25   do it in privileged communities, and not a state applies anyway
```

```
 1   because it applied to those cities, right?

 2          MR. KIERNAN:  It applied to the cities.

 3          THE COURT:  Yeah.

 4          MR. KIERNAN:  And it's ultimately a right of the citizens.

 5   It's an individual person's right.  It's not a right of the

 6   state, and it's not a right of a state, it's not a right of the

 7   individuals.

 8          THE COURT:  The due process arguments, I'll give you a

 9   couple of minutes, but are they beneath the First Amendment ones?

10          MR. KIERNAN:  No, they were -- we put them earlier.

11          THE COURT:  All right.

12          MR. KIERNAN:  Is that -- the issue there is -- it's a

13   couple.  Number one, it has to do with the overbreadth of the

14   statute.  When we filed the complaint there was an issue at the

15   time about retroactive application, which obviously wouldn't do

16   that.  And again, because the motion's been pending, because Your

17   Honor stayed the proceedings, we haven't gone further on that.  I

18   think, you know, after today, if we were going to amend the

19   complaint or revise it or something, we'd probably take out the

20   retroactive part because with the passage of time I think we can

21   safely say that has not been a problem.

22          And then there's an issue of sort of vagueness and

23   conflict.  As we pointed out from our first pleading, you know,

24   we have a D.C. Human Rights Act that says you can't discriminate

25   on the basis of residence.  And we've got a First Source Act that
```

1    says, well, yeah, you should.  And so you put people in a

2    potential, you know, conflict situation between two district

3    enactments based on residence, and so there's at least a due

4    process issue there.  Again, it's been a long morning already for

5    Your Honor, but this case turns on the privileges and immunities,

6    and I think secondarily, the Commerce Clause issue.

7         THE COURT:  Let me ask you this:  I've peppered you and

8    your opposing counsel with a lot of questions.  In the minute or

9    two we have left, anything else that you have a burning desire to

10   say in support of your opposition to the MTD?

11        MR. KIERNAN:  I don't think so, Your Honor.  I mean, we've

12   given you extensive papers and a lot to chew on, and I think, you

13   know, you got to the cases I wanted you to get, you know, to

14   think about and look at.  And I think the analysis -- and I think

15   we've boiled it down.  We've got standing and we've got

16   privileges and immunities, and, you know, at the end of the day

17   if this statute wouldn't survive scrutiny if they enacted it in

18   Annapolis or Richmond or Harrisburg or New York City.

19        THE COURT:  Those are cities and states, though.

20        MR. KIERNAN:  Or New York City or Camden or Wooster, I

21   just don't see how it can survive here.

22        THE COURT:  All right.  Thank you.

23        MR. KIERNAN:  Thank you, Your Honor.

24        THE COURT:  Let me give the City a couple of minutes.

25   Anything you want to respond to?

1          MR. SAINDON:  Thank you, Your Honor, yes.  I'll try to be

2     brief.  Two main points I wanted to clarify.  We're not

3     suggesting that the District is the only place in the country

4     that could do this.  The District is certainly unique, but other

5     cities have these laws and they haven't been invalidated.

6          There are unique challenges here that validate the

7     counsel's legislative prerogatives, but that doesn't mean that

8     other jurisdictions can't do it.  There are certain peculiarities

9     in the District that make it more likely that the law is

10    permissible.

11         THE COURT:  Such as?

12         MR. SAINDON:  Well, again, the inability to tax the income

13    of commuters for one; and the Home Rule Act language that did not

14    apply the Privileges and Immunities Clause to it.  And that leads

15    to my other point:  Plaintiffs provide no authority for the

16    proposition that Congress did not --

17         THE COURT:  Let me make sure I understand something.  You

18    said when Congress enacted the Home Rule law.  When that law was

19    passed, the law as enacted did not have certain language

20    associated with it that Congress had reserved and used for

21    legislation of -- in Guam, I believe; is that correct?

22         MR. SAINDON:  Yes, Your Honor, and the Virgin Islands.

23         THE COURT:  And the Virgin Islands.

24         MR. SAINDON:  And Puerto Rico.

25         THE COURT:  All right.

1      MR. SAINDON:  So plaintiffs provide not authority for the

2  proposition that Congress did not intend to exempt from the

3  Privileges and Immunities Clause, but Congress chose not to apply

4  it.  Did Congress make a mistake?  I mean, are we to assume that

5  we're to act like a state always, even when we're clearly not a

6  state?  I think we have to assume that Congress' choices were

7  deliberate.  And Congress certainly recognizes that the District

8  is unique.

9      The last point that I'd like to make, Your Honor, is, I

10  believe opposing counsel is incorrect on the market and

11  participant discussion.  The Supreme Court in the White case said

12  the market participant exception applies -- I'm sorry, Your

13  Honor.  *White versus Massachusetts*, Counsel, 460 U.S. 204.  The

14  Supreme Court said that market participant exception applies even

15  to funds simply administered by the City, not its own funds, but

16  funds administered, and that covers the District's First Source

17  Act here.

18      THE COURT:  All right.  So this law is on the books in

19  other jurisdictions and has not been challenged?

20      MR. SAINDON:  A similar law appears to be, Your Honor,

21  yes.  We could certainly do more briefing on it, since it has

22  been a couple of years, if you'd like, Your Honor, but if it was

23  that -- if these residency preference laws were that repugnant as

24  plaintiffs claimed, they would have been challenged, and I think

25  we'd have more recent --

 1        THE COURT:  Well, I don't know.  Plaintiffs' counsel says,

 2   you know, it's really not a popular issue that a lot of people

 3   want to take up.

 4        MR. SAINDON:  It's possible.  I mean, in the White case

 5   that was just challenged under the Commerce Cause.  It was not

 6   challenged under privileges and immunities, and so we have a

 7   Boston residence preference law today.  So again, I understand

 8   it's not politically popular, but it is --

 9        THE COURT:  And there is a similar law in Boston; is that

10   correct?

11        MR. SAINDON:  I believe there is, Your Honor, yes.

12        THE COURT:  And no one's gone back to Judge Gertner and

13   said -- well, actually, Judge Gertner retired, didn't she?

14        MR. SAINDON:  Yeah.

15        THE COURT:  How long has that law been on the books?

16        MR. SAINDON:  In Boston?

17        THE COURT:  Yeah.

18        MR. SAINDON:  I don't know, Your Honor.  The White case

19   was from 1983, so some version of it has been on the books since

20   then.

21        THE COURT:  All right.  I may have -- I may ask for some

22   supplemental briefing, not extensive, on the applicability of the

23   rationale for Dynalantic decisions, send the case back for -- the

24   Circuit Court disagreed with the District Court about standing

25   and sent it back.

1        MR. SAINDON:  Shall we wait to hear from you, Your Honor?

2        THE COURT:  Yeah.  I'll -- we'll talk about it, and I'll

3   issue -- if I need it, I'll issue an order.  I raised it, so

4   maybe -- I don't want to rely upon that rationale without giving

5   counsel a chance to tell me whether it's wrong or not to rely on

6   it.  But you need not do anything, and I'm not going to require

7   any significant briefing either on that issue.

8        Is it the City's position that the capital -- the State of

9   Maryland could enact a law?

10        MR. SAINDON:  The city of Annapolis, Your Honor?

11        THE COURT:  Well, you notice I didn't say the City, right?

12   So I didn't want to be wrong.  But if Annapolis is, indeed, the

13   capital, all right, so be it.

14        MR. SAINDON:  I think if cities could do it, Annapolis

15   could do it.

16        THE COURT:  If cities can do it, Annapolis can do it.

17        MR. SAINDON:  Sure.

18        THE COURT:  If cities can do it.

19        MR. SAINDON:  Right.  Privilege and Immunities Clause

20   applies to states.  And again, the Supreme Court suggested in

21   Camden that it would extend to municipalities because their power

22   derives from the power of the state.

23        THE COURT:  So could anyone fashion an argument that says

24   the citizens that -- that Annapolis could not enact a law that

25   would withstand privileges and immunities because all the

1    residents and citizens of Annapolis are, indeed, residents and

2    citizens of the state?

3         MR. SAINDON:  I think someone could fashion that argument,

4    Your Honor, yes.

5         THE COURT:  Would it be a winner?

6         MR. SAINDON:  Again, it's a hypothetical, but it's

7    possible.  I mean, the argument -- that's a similar argument

8    made --

9         THE COURT:  It seems to me the City's argument would be:

10   Absolutely not, the citizens could not do that, at which

11   distinguishes -- further distinguishes the District of Columbia

12   because we aren't residents of the state either.  I don't know,

13   but I don't want to make that argument for the City, but it seems

14   to me that's your argument; am I wrong?

15        MR. SAINDON:  No, that is your argument, Your Honor.

16        THE COURT:  But I told you that's the argument.

17        MR. SAINDON:  Yes, Your Honor.  But it ties into the Home

18   Rule Act and the fact that the Privileges and Immunities Clause

19   and the Constitution applies only to states.

20        THE COURT:  You know what, I just don't -- I'm sorry, I

21   just don't see how a city enacting that type of law for its

22   residents, who are also residents of a state, could withstand a

23   privilege and immunities challenge, but I may be wrong.  That's

24   not the issue here, but it seems to me an argument could be made

25   that maybe they could, maybe they couldn't.  But we don't have

1    that problem here because the citizens of D.C. are not residents

2    of any state whatsoever, period, in your argument --

3         MR. SAINDON:  That's right, Your Honor.

4         THE COURT:  -- without even getting into the murky issue

5    of --

6         MR. SAINDON:  Right.

7         THE COURT:  -- whether or not the City could enact it.

8         MR. SAINDON:  I hate to beat the uniqueness dead horse --

9         THE COURT:  Because all city residents are residents,

10   indeed, of the state, and the state couldn't enact it, right?

11        MR. SAINDON:  Yes.

12        THE COURT:  So how could a city?

13        MR. SAINDON:  I mean, the Supreme Court alluded to that in

14   the Camden case, but again, it remanded without actually

15   deciding, so...

16        THE COURT:  Right.  Yeah.  Very interesting issue, very

17   important, fairly unique.  It hadn't been raised in 30 years and

18   it's distinctive.

19        All right.  Thank you for spending the morning with me.  I

20   appreciate it.

21        MR. SAINDON:  Thank you, Your Honor.

22        THE COURT:  All right.  If I decide I need some more

23   guidance on the Dynalantic issue I'll issue an order.  All right?

24        MR. KIERNAN:  Thank you, Your Honor.

25        MR. SAINDON:  Thank you, Your Honor.

1    (Proceedings adjourned at 12:27 p.m.)

2    THE COURT:  I have another question -- and I'll probably

3    issue a minute order -- and that is:  Whether or not this law was

4    affirmatively approved by Congress in 1984?  You know, the

5    Congressional policy changed after that with the Chadha case, but

6    it may well be that Congress approved this affirmatively.  I'm

7    not sure.

8    MR. SAINDON:  I don't know off the top of my head, Your

9    Honor.  That's a good question.

10    THE COURT:  Yeah.  All right.  We'll probably issue a

11    minute order, but the question would be:  So what's the legal

12    consequence of that?  If Congress approves it, I mean, it's --

13    that's significant also.

14    MR. SAINDON:  It would have some weight, I would think,

15    Your Honor.

16    THE COURT:  Well, I would think so.  We'll issue a minute

17    order.  Okay.  Thank you.

18    (Proceedings adjourned at 12:28 p.m.)

19

20

21

22

23

24

25    **C E R T I F I C A T E**

*Scott L. Wallace, RDR, CRR, Official Court Reporter*
*(202)354-3196 * scottlyn01@aol.com*

1

2          I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
3  proceedings in the above-entitled matter.

4

5  ------------------------------      ----------------
     Scott L. Wallace, RDR, CRR       Date
6      Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25