## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | Civil Action No. 12-00853 (EGS) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs allege that the First Source Act impermissibly discriminates against non-District residents. But discovery revealed that only one of the four remaining plaintiffs has suffered any "injury" at all in complying with the law. And the evidence also shows that the District's unique budgetary predicament—imposed by Congress in the Home Rule Act—was a substantial reason for the disputed legislation, which amply justifies the negligible burdens imposed on those companies who seek to do business with the District.

A proposed Order is attached for the Court's consideration, as is the District's Statement of Undisputed Material Facts (SMF).

Dated: December 5, 2016.          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

1

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON
D.C. Bar No. 453765
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, DC 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov

Counsel for the District of Columbia

---

* Appearing pursuant to LCvR 83.2(f).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>     Plaintiffs,<br><br>     v.<br><br>DISTRICT OF COLUMBIA,<br><br>     Defendant. | Civil Action No. 12-00853 (EGS) |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs challenge the First Source Act as a violation of their constitutional rights, alleging that it impermissibly discriminates in favor of District residents.[1] Congress imposed a unique burden on the District by prohibiting it from imposing a commuter tax. To counteract this financial burden, the District must find ways to make up the structural imbalance placed on its budget if it is to provide an average level of public services at average tax rates. The First Source Act is one such way. It requires a company seeking work on District of Columbia public-works projects (or

---

[1]     The plaintiffs are the Metropolitan Washington Chapter of the Associated Builders and Contractors, Inc. (MWC), a trade organization for the construction industry; Miller & Long Company, Inc. (Miller & Long), a construction company; Emmett Morris, Jr., a resident of Virginia and a "qualified Carpenter Foreman;" and Dairon Upshur, a resident of Maryland and a construction safety manager. *See* Amended Complaint (Doc. No. 46) ¶¶ 4–5, 7.

benefiting from economic-development funds) to make good faith efforts to hire unemployed District residents for new positions created by those projects.

Plaintiffs lack standing to object to the law; most have suffered no injury in fact and the "burden" on the one who has, Miller & Long, has been negligible. The Court also previously dismissed all of plaintiffs' constitutional challenges except that brought under the Privileges and Immunities Clause, stating that it could not resolve that claim without additional briefing and evidence. The Privileges and Immunities Clause does not apply to the District of Columbia. Moreover, the principles in that clause do not apply indirectly to the District "through" the Due Process Clause or equal protection. The Court has *already* found that the District's legitimate purpose of addressing its budget shortfalls and its residents' needs were rationally related to the minimal burden the First Source Act imposes on non-residents.

Even if the First Source Act is reviewed under intermediate scrutiny, the most stringent possible review, the District is entitled to summary judgment. The law's requirements bear a "substantial relationship" to the "peculiar evil" of that congressionally created structural imbalance, being reasonably well fitted to promoting the District's important interest in addressing its budgetary problems and doing so by imposing only modest burdens on the companies that choose to compete for the District's business.

The minimal inconvenience visited on companies seeking work on District of Columbia public-works projects or benefiting from economic-development funds is

thoroughly justified by the unique legal and financial situation facing the District, and that is more than sufficient to uphold the law under the governing constitutional principles and grant summary judgment to the District.

## PROCEDURAL BACKGROUND

On May 25, 2012, plaintiffs filed suit, alleging that the First Source Act, as amended, D.C. Code §§ 2-219.01 *et seq.*, violated their constitutional rights. Specifically, plaintiffs alleged that the Act violated the Privileges and Immunities Clause in Article IV, Section 2 of the Constitution, because it "deprived [them] of their fundamental right to pursue a common calling in a state or local jurisdiction (the District of Columbia) in which they are not a resident[.]" Original Complaint (Doc. No. 1) ¶ 90. Plaintiffs also alleged that the First Source Act violated the Commerce Clause and Equal Protection. *Id.*, Counts II and III. Plaintiffs also alleged that the Act violated their rights to free speech under the First Amendment, and the substantive component of Due Process. *Id.*, Counts IV and V. Finally, plaintiffs alleged that the First Source Act was void for vagueness and a violation of the Contracts Clause. *Id.*, Counts VI and VII.

In July 2012, the District filed a Motion to Dismiss (Doc. No. 6), which plaintiffs duly opposed. The Court subsequently directed the parties to submit supplemental briefing "discussing whether the Privileges and Immunities Clause applies to the District of Columbia." Minute Order (Mar. 23, 2013). The Court later directed the parties to submit supplemental briefing "regarding the economic impacts of the First Source Act and 2011 Amendments[.]" Minute Order (Jun. 23, 2014).

The Court heard argument on the District's motion on June 25, 2014, and by Memorandum Opinion (Doc. No. 23) and Order (Doc. No. 21) dated July 14, 2014, the Court dismissed with prejudice all but two counts of plaintiffs' complaint. *Metropolitan Wash. Ch., Associated Builders & Contractors, Inc. v. District of Columbia*, 57 F. Supp. 3d 1 (D.D.C. 2014) (*MWC*).

The Court dismissed the plaintiffs' Commerce Clause claims, holding that the District is acting as a "market participant." *Id.* at 27. The Court also dismissed plaintiffs' Equal Protection count, holding that "the District's goal of directing local funds to local residents is rationally related to the means used by the Act." *Id.* at 29. The Court dismissed plaintiffs' First Amendment claims, holding that the First Source Act does not "compel" speech. *Id.* at 30.

The Court held that the Act is not vague, *id.* at 31, and that it "is simply not the type of egregious government conduct that is barred by Substantive Due Process." *Id.* (citing *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988). The Court also found that plaintiffs had failed to state a claim under the Contracts Clause. *Id.* at 32. The Court also found that the individual plaintiffs had alleged a sufficient injury to support standing, *i.e.*, that they could not sign up on the First Source Register because they were not District residents. *MWC*, 57 F. Supp. 3d at 16. The Court also found that the corporate plaintiffs and plaintiff MWC lacked standing to challenge the First Source Act under the Privileges and Immunities Clause, because that provision does not apply to corporations. *Id.* at 20 n.9 (citations omitted).

4

The Court determined that it "need not reach the question of whether the Privileges and Immunities Clause applies to the District because the District has not sought relief on that issue." *Id.* at 21. And assumed that the Clause did, in fact, apply to the District, when it held that the District had "not provided sufficient substantive evidence" to enable the Court to weigh the justifications advanced for the First Source Act against the asserted harms it was enacted to counter. *Id.* at 25–26. According to the Court, such a "fact-intensive inquiry" could not be resolved on a motion to dismiss. *Id.* at 26. The Court thus denied the District's motion to dismiss the Privileges and Immunities Clause claim without prejudice. *Id.*

Immediately after the Court's decision, the District filed an Answer, and a motion for judgment on the pleadings and to stay discovery in the matter (Doc. No. 26), explicitly arguing that the Privileges and Immunities Clause does not apply to the District.

By Minute Order of September 18, 2014, the Court, "*sua sponte* … appoint[ed] Dean Erwin Chemerinsky as amicus curiae to respond to the parties' arguments and address the issue of whether the Privileges and Immunities Clause applies to the District of Columbia." By Minute Order of November 3, 2014, the Court ordered additional briefing on "whether the Privileges and Immunities Clause is incorporated against the District by the Fifth Amendment."

At the motions hearing held on December 4, 2015, the Court directed plaintiffs to file an amended complaint and the District to file a verified amended

answer. Minute Order (Dec. 4, 2015).[2] On January 8, 2016, the Court denied the District's Motion for Judgment on the Pleadings as moot "in light of Plaintiffs' Amended Complaint[.]" Minute Order (Jan. 8, 2016); Doc. No. 49.

The parties subsequently began discovery. Pursuant to Fed. R. Civ. P. 26(a)(2)(C), the District named as its expert Dr. Fitzroy Lee, its Chief Economist and Deputy Chief Financial Officer. *See* Declaration of Fitzroy Lee (Nov. 29, 2016) (copy attached as Defendant's Exhibit No. (DEx.) 1) (Lee Decl.). Plaintiffs did not name an expert witness.

## FACTUAL BACKGROUND

*The Evidence: Legislative History*

After more than a year of study, the Council of the District of Columbia undertook in 2011 to amend the First Source Act, which has been the law of the District for over 30 years. *See* Council of the District of Columbia, Committee on Housing and Workforce Development, Report on Bill 19-50, the "Workforce

---

[2]     Plaintiffs' Amended Complaint was filed in redline to highlight the changes to the original Complaint, "to clarify and streamline the issues that remain before the Court" and "to facilitate a decision on the merits of their claim that the First Source Employment Act is unconstitutional under the Due Process Clause[.]" Doc. No. 47-1 at 2 & n.1. The Amended Complaint dropped Warren N. Weems, Tron Hill, Sr., and Floyd Armwood as plaintiffs, and added Dairon Upshur. *Id.* at 1. The Amended Complaint also omitted the previous Commerce Clause, Equal Protection, First Amendment, Substantive Due Process, Vagueness, and Contracts Clause counts. *Id.* at 38–45. Plaintiffs now seek an injunction and a declaration that the First Source Act, as amended, "violate[s] the Due Process Clause of the Fifth Amendment to the United States Constitution, which incorporates the protections of the Privileges Immunities Clause[.]" *Id.* at 38.
        On June 27, 2016, plaintiffs dismissed Hawkins Electrical Construction of Washington DC, LLC. Doc. No. 53.

Intermediary Establishment and Reform of First Source Amendment Act of 2011,"

October 14, 2011, at 1–2 (Comm. Rep.).[3]

Following its extensive study, the Committee made a number of findings in

its recommendation that the Council adopt the Act:

> High levels of unemployment have persisted citywide for multiple
> years now, the rate has experienced large fluctuations and as of August
> 2011 was 11.1% as reported by the US Department of Labor. In some
> Wards of the city the unemployment rate is estimated to be over 30%.
> Sustained high levels of unemployment typically lead to severe
> financial hardships for those affected.
>
> [T]he District's Congressionally-imposed ban on taxing any of the
> income that leaves the city means that the District is subsidizing
> surrounding jurisdictions to the tune of $1 billion to $2 billion a year in
> lost revenue. The District's sustained rate of high unemployment, the
> sharp increase in the demand for social services, and the inability to
> tax income at the source, puts the city in a unique situation that
> makes local hiring critical to the overarching health of the jurisdiction.

*Id.* at 3.[4] SMF ¶¶ 2, 3.

The Committee further explained that some of the proposed revisions to the

First Source Act were "based on successful construction projects such as the

baseball stadium and the convention center hotel." Comm. Rep. at 4. Additionally,

the Committee clearly explained its policy reasoning:

---

[3] Available online at *http://dcclims1.dccouncil.us/images/00001/20120130131015.pdf* (last visited Nov. 22, 2016). The Committee Report runs to 118 pages, and contains, among other things, copies of written testimony provided by the dozens of witnesses heard by the Committee, including representatives of MWC and Miller & Long. *See* Comm. Rep. at 12.

[4] Similar concerns animated the enactment of the original 1984 legislation. *See* Council of the District of Columbia, Committee on Housing and Economic Development, Report on Bill 5-341, "First Source Employment Agreement Act of 1983," March 14, 1984.

> Many other factors have been explored in analyzing these types of statutes, including the unemployment rate in the jurisdiction, the cost of unemployment to the jurisdiction, and the cost differential between providing safety net services for unemployed workers compared to the potential cost savings of hiring nonresidents. The District consistently records the highest unemployment rate in the region and more than 70% of our jobs are filled by nonresidents. This, coupled with city's inability to tax the income of nonresidents, along with several other related negative indicators, supports the argument that the District is in a unique position, and more likely than other jurisdictions, to provide the courts with compelling reason for this type law.

*Id*. at 9.

Ultimately, the Committee received hours of testimony in public hearings and held over 30 meetings on the legislation with numerous stakeholders (including the corporate plaintiffs here). *Id*. at 9, 12. The legislation was approved unanimously by the Council, signed by the Mayor on December 21, 2011, and transmitted to Congress for review. 59 D.C. Reg. 2239 (Mar. 23, 2012). The Act became effective on February 24, 2012. *Id. See MWC*, 57 F. Supp. 3d at 8–9. SMF ¶ 1.

The Act requires beneficiaries of District projects resulting in a financial benefit greater than $300,000 to enter into an employment agreement with the District, specifying that the beneficiary will use good-faith efforts to fill jobs created by the project with unemployed District residents selected to interview from the First Source Register. D.C. Official Code §§ 2-219.02, 2-219.03(a), 2-219.03(e)(3)(A).[5]

---

[5]    "Beneficiary" includes any signatory to a contract "which involves any District of Columbia government funds, or funds which, in accordance with a federal grant or otherwise, the District government administers" and any "recipient of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for redevelopment, or tax increment financing" and includes "a financial or banking institution which serves as the

Beneficiaries of projects receiving government assistance valued between $300,000 and $5 million must agree to use good-faith efforts to ensure "that at least 51% of new employees hired to work on the project or contract shall be District residents." *Id.*, § 2-219.03(e)(1)(A).[6] *MWC*, 57 F. Supp. 3d at 11.

The Act's requirements may be waived for a number of reasons, including when "there are insufficient eligible applicants from the First Source Register that possess the skills required by the positions[.]" *Id.*, § 2-219.03(e)(3)(A)(ii)(IV). Waivers may also be granted when the beneficiary is located outside the Washington metro area, *id.*, § 2-219.03(e)(A)(ii), or the beneficiary enters into a special agreement with the Department of Employment Services (DOES), *id.*, § 2-219.03(e)(A)(iii).

*The Evidence: Unemployment and Poverty in the District*

The District has traditionally suffered from a higher unemployment rate than surrounding jurisdictions. SMF ¶ 4. As the District noted in its Motion to

---

repository for $1 million or more of District of Columbia funds." D.C. Official Code § 2-219.01(1). *See MWC*, 57 F. Supp. 3d at 10–11.

[6]      Beneficiaries of projects greater than $5 million are subject to more detailed requirements "based on successful construction projects such as the baseball stadium and the convention center hotel." Comm. Rep. at 4. The beneficiaries of such large projects must agree to use good-faith efforts to ensure that "[a]t least 20% of journey worker hours by trade[;] [a]t least 60% of apprentice hours by trade[;] [a]t least 51% of the skilled laborer hours by trade[;] and [a]t least 70% of common laborer hours shall be performed by District residents." D.C. Official Code § 2-219.03(e)(1A)(A). Beneficiaries of these large projects also have reporting requirements regarding the number of new jobs created, *etc. Id.*, § 2-219.03(e)(1)(C). *See MWC*, 57 F. Supp. 3d at 11–12.

9

Dismiss, the District's unemployment rate in 2011 was 10.2%; for the Washington Metro area as a whole, the rate was about half that—5.8%, while surrounding jurisdictions had similar levels: Arlington County, Va. (3.8%); Montgomery County, Md. (5.2%); Prince George's County, Md. (7.0%); Alexandria City, Va. (4.8%); Fairfax County, Va. (4.3%). Doc. No. 6 at 7–8.

The unemployment rate in the District in September of this year was again higher than all surrounding jurisdictions, at 6.5%, compared to an unemployment rate of 4.8% of the United States as a whole and 4.0% for the Washington Metro area.[7] SMF ¶ 4. The unemployment rate for Arlington County, Virginia was 2.7%, and the unemployment rate for both Fairfax City, Virginia, and Montgomery County, Maryland, was 3.2%. *Id.* The unemployment rate for Prince Georges County, Maryland was 4.1%. *Id.*

From 2000 to 2014, the poverty rate in the District was more than a third higher than in the rest of the United States. *See* D.C. Office of Planning, State Data Center Monthly Brief: *Poverty in the District of Columbia 2014* (*Poverty in the District*), at 1 (18.5% versus 13.8%).[8] SMF ¶ 5. In 2014, 9.1% of District residents

---

[7]     *See* Bureau of Labor Statistics, Unemployment in the Washington Area by County—September 2016 (available online at *http://www.bls.gov/regions/mid-atlantic/news-release/unemployment_washingtondc.htm*) (last visited November 22, 2016).

[8]     Available online at *planning.dc.gov/node/1135561* (last visited Nov. 23, 2016). The data from the study were obtained from the American Community Survey of the U.S. Census Bureau. *See id.*

were living in "deep poverty" (incomes less than half of the federal poverty threshold), compared to 6.8% nationwide. *Poverty in the District* at 1.

> In the District of Columbia, those who had full time employment were unlikely to find themselves living below the poverty line. [O]nly 2 percent of those with a full time job had an income below the poverty level in 2014. Those with part time work experienced a rate of poverty of 22.1 percent. One in three people (36.2 percent) without work found themselves living below the poverty line.

*Id.* at 5.

A substantial portion of the District's budget goes to alleviating poverty and its effects. Indeed, the single largest line-item in the budget, by appropriation title, is "Human Support Services." *See* D.C. Office of the Chief Financial Officer, FY 2017 Proposed Budget and Financial Plan, Vol. 1 *Executive Summary*, at p. 1-10.[9] SMF ¶ 6. Of $13.4 billion in gross funds expenditures for FY 2017, Human Support Services accounted for $4.6 billion, more than 34%. *Id.*[10] The next-largest appropriation was about half that amount—the Public Education System, at $2.4 billion. *Id.*

"[T]he general goal [of the First Source Act] was to employ or—make sure more residents were working on District jobs which would translate into [a] tax

---

[9] Available online at *http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_FY17_Budget_vol_1.pdf*) (last visited Nov. 23, 2016).

[10] "Human Support Services" encompasses all economic-security benefits such as Temporary Assistance for Needy Families, Food Stamp Employment and Training programs, services for the homeless, unemployment compensation, and Medicaid. *See* D.C. Office of the Chief Financial Officer, FY 2017 Proposed Budget and Financial Plan, *Agency Budget Chapters – Part 3*, at 50 (available online at *http://cfo.dc.gov/node/289642*) (last visited Nov. 23, 2016).

base increase, less dependence on other District programs and other general benefits." DEx. 2 (Excerpt, Deposition Transcript of Drew Hubbard (Oct. 24, 2016)) at 19:3–7. *See also id.* at 47:4–8 ("[I]ncreasing the number of District residents working would positively impact our tax base and everything that went along with, you know, having to provide less services.").

*The Evidence: The Commuter Tax Prohibition, the District's Structural Budget Imbalance, and Expert Testimony*

The District is the only jurisdiction that cannot tax commuters who come into the city to work but reside elsewhere. *MWC*, 57 F. Supp. 3d at 24 & n.11 (citing *Shaffer v. Carter*, 252 U.S. 37 (1920)). When Congress granted the District limited home rule, it explicitly prohibited the District from imposing a "commuter tax," *i.e.*, a tax on non-residents who work in the District. D.C. Official Code § 1-206.02(a)(5) (2006 Repl.). SMF ¶ 7. *See also Banner v. United States*, 303 F.Supp.2d 1 (D.D.C. 2004) (rejecting constitutional challenge to prohibition on commuter tax), *affirmed*, 428 F.3d 303 (D.C. Cir. 2005).

More than 70% of the jobs in the District are held by commuters. SMF ¶ 8. United States Census data from 2006 to 2010 show that 71.5% of individuals working in the District live outside the city. *See* U.S. Census Bureau, Table 2: Residence County to Workplace County Flows for the United States and Puerto Rico Sorted by Workplace Geography: 2006–2010.[11] District residents only earned about

---

[11]    Available online at *http://www.census.gov/population/metro/files/commuting/Table2.xlsx*. Of the estimated 754,615 jobs in the District, 539,543 are held by non-residents. *Id.*

28% of the wages and salaries earned in the city. Yesim Sayin Taylor, *District's labor market and workforce are intertwined with Maryland and Virginia*, District, Measured: Posts from the District of Columbia's Office of Revenue Analysis, at 1 (Dec. 3, 2015).[12] Moreover, District residents hold a disproportionate share of the lower-paying District jobs, holding 44% of jobs that pay less than $30,000 annually. *Id.* at 2.

In 2003, the U.S. Government Accountability Office (GAO) found that the District has a permanent "structural imbalance" in its budget, *i.e.*, a gap between the cost of providing services and its capacity to raise revenue. United States Government Accountability Office (GAO), *District of Columbia: Structural Imbalance and Management Issues*, GAO Report No. GAO-03-666 (2003) (GAO Report) at 1.[13] SMF ¶ 9. The GAO report found that the cost of delivering an average level of services per capita in the District "far exceeds" that of the average state, due to factors such as high poverty and a high cost of living. GAO Report at 2. The District's "cost of providing an average level of public services exceeds the amount of revenue it could raise by applying average tax rates." *Id.* Ultimately, the GAO estimated that in 2003 this "structural deficit" was between $470 million and

---

[12]    Available online at *https://districtmeasured.com/2015/12/02/districts-labor-market-and-workforce-are-intertwined-with-maryland-and-virginia/* (last visited Nov. 23, 2016).

[13]    Available online at *http://www.gao.gov/assets/160/157444.pdf* (last visited Nov. 22, 2016). *See id.* at 3 ("A fiscal system is said to have a structural imbalance if it is unable to finance an average (or representative) level of services by taxing its funding capacity at average (or representative) rates.").

$1.1 billion per year. *Id. See also* Lee Decl. ¶¶ 15–17. Subsequent studies confirmed the GAO's conclusions.[14]

Over a decade ago, Dr. Natwar Gandhi, then-CFO for the District, testified at a hearing before the Senate on the structural budget imbalance. *See* Testimony of Natwar M. Gandhi, *Hearing on the Structural Imbalance of the District of Columbia*, Subcommittee on the District of Columbia Committee on Appropriations of the United States Senate (Jun. 22, 2004) (Gandhi Testimony).[15] Dr. Gandhi testified that the GAO report "verifies what we have long argued—that there is a large, long-term imbalance between the cost of services needed by District residents and guests and the revenue the District can raise at reasonable rates to cover these costs." *Id.* at 1. Dr. Gandhi agreed with the GAO that "the District does not have a sufficient tax base to pay for an adequate ('average') level of services at reasonable (or 'average') tax rates." *Id.* at 3. "The cost of delivering an average level of services is 75 percent to 85 percent higher in D.C. than the average state system." *Id.* at 4. *See also* GAO Report at 8.

---

[14]    *See* Ed Lazere and David Garrison, *A New Federal Contribution to the District of Columbia? The Need, Likely Impact, and Some Options* (DC Fiscal Policy Institute & The Brookings Institution, Nov. 2005), at 2 ("most reasonable estimate" of annual structural imbalance, using GAO's assumptions, "is between $900 million and $1.1 billion.") (available online at *https://www.brookings.edu/research/a-new-federal-contribution-to-the-district-of-columbia-the-need-likely-impact-and-some-options/* ) (last visited Nov. 22, 2016). The Lazere/Garrison study also noted that 60% of the Washington Metro area's homeless population lives in the District (and hence creates demand for—and receives—government services there). *Id.* at 2.

[15]    Available online at *http://app.cfo.dc.gov/news/pdf/gandhi062204.pdf* (last visited Nov. 23, 2016).

One of the many problems caused by the District's structural budget imbalance is "the state of disrepair of infrastructure due to the inability to fund capital borrowing." Gandhi Testimony at 6. Because the District is required by the Home Rule Act to have a balanced budget each year, longer-term needs—such as repair of infrastructure and capital improvement—tend to be deferred in favor of short-term spending. Lee Decl. ¶ 17.[16] So the District then borrows to meet capital needs, Gandhi Testimony at 6, but because the District has the capital needs of a city, county, and State, it must borrow more than other cities. *Id.*

One recent study using data from the Census Bureau determined that the District, as of 2012, had the highest debt-per-capita of any State, almost 14% higher than the next-highest jurisdiction, Massachusetts. Jared Walczak, *Where Does Your State Stand on State & Local Debt Per Capita?*, Tax Foundation, Sep. 10, 2015.[17] Wall Street closely monitors debt-per-capita, and the District's high rate limits its credit-worthiness. Gandhi Testimony at 6. And delaying infrastructure spending does not eliminate the problem, merely pushes it down the road, at a higher ultimate cost. *See id.* at 7; Lee Decl. ¶ 17. Metro is currently struggling to address the impact of years of neglect resulting from such a policy.

---

[16]    "The District continues to defer major infrastructure projects and capital investment because of its structural imbalance and its high debt level." GAO Report at 2.

[17]    Available online at *http://taxfoundation.org/blog/where-does-your-state-stand-state-local-debt-capita* (last visited Nov. 23, 2016).

Dr. Fitzroy Lee, the District's Chief Economist and Deputy Chief Financial Officer at the Office of the Chief Financial Officer (OCFO), served as an expert here and is intimately familiar with all aspects of the District's economic and fiscal situation, as his team is responsible, among other things, for developing revenue estimates for the District's annual budget and financial plan. Lee Decl. ¶ 2. Councilmember Jack Evans, Chair of the Board of Directors of the Washington Metropolitan Area Transportation Authority, recently asked the OCFO to estimate how much money the District could raise if it could impose a commuter tax. *Id.* ¶ 18. Currently, Maryland and Virginia do not impose income taxes on District residents who work in those States. *Banner*, 303 F. Supp. 2d at n.17. Assuming the District could impose a 1% tax on commuters from Maryland and Virginia, and assuming that those States immediately retaliated with similar reciprocal taxes, Dr. Lee estimated that the District could still raise an additional $406.5 million in tax revenue.[18]

Another study estimated that, in FY 2006, if the District could have taxed commuter income at current statutory rates, the District could have raised over $2 billion in additional revenue.[19] That $2 billion represents almost 60% of the federal

---

[18]    According to online sources, income tax rates on non-resident commuters vary from 1% (Pittsburgh), to 1.25% (Baltimore and Detroit), to 2.1% (Cincinnati), to as high as 3.47% (Philadelphia).

[19]    *See* Testimony of Robert Ebel, Deputy Chief Financial Officer, before the Council of the District of Columbia, Special Committee on Statehood and Self-Determination, Public Oversight Roundtable on the Economic and Financial Impacts of District of Columbia Statehood (July 13, 2009), at 5 (available online at

contribution to the District's budget (including Medicaid), and about 15% of the District's general operating budget.[20] *See also Banner*, 303 F.Supp.2d at 6 (quoting statement of Chairman of D.C. "Control Board," in 1997, that "foregone nonresident income taxes" were "estimated to be $1.2 billion annually[.]").

"In 2014, the District paid more in federal taxes than 22 states and paid nearly the same amount as South Dakota, Alaska, Montana, Wyoming and Vermont combined." Ryan M. McDermott, *D.C. uses federal tax payments to argue for statehood*, Wash. Times, Apr. 27, 2016 ("District residents and businesses paid about $26.4 billion in federal taxes … but received only $3.5 billion from the federal government[.]").[21]

Dr. Lee also opined that "the First Source Act, as amended, has had a net positive effect on District revenues." Lee Decl. ¶ 6. Even ignoring the secondary economic benefits brought about by the spending of employed (or better-employed) District residents, the First Source Act increases District revenues because it generates more taxable income. *Id*. Using data from DOES and the Census Bureau,

---

http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/release_content/attachments/17626/F iscal%20Impact%20of%20Statehood%20Testimony.pdf) (citing Yesim Yilmaz, "The Effect of Federal Preemption on the District of Columbia's Tax Revenue," *State Tax Notes*, Jan. 5, 2009, p. 31).

[20]    Government of the District of Columbia, *FY 2017 Proposed Budget and Financial Plan* (Vol. 1, Executive Summary), at 1-8 (available online at http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DCOCFO_F Y17_Budget_vol_1.pdf).

[21]    Available online at http://www.washingtontimes.com/news/2016/apr/27/dc-argues-for-statehood-uses-federal-tax-payments/ (last visited Nov. 23, 2016).

Dr. Lee projected that the Act results in at least $3.7 million annually in additional District income tax revenues in the construction industry alone. *Id.*, ¶ 12, and Exhibit A.

## LEGAL STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "complete failure of proof concerning an essential element of the non-moving party's case necessarily renders other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

It is insufficient, to avoid summary judgment, that some factual issues remain in the case; an issue must be both *genuine* and *material* to preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248 (1986). "A dispute about a material fact is 'genuine' … if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016) (quoting *Liberty Lobby*, 477 U.S. at 248).

"A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Landmark Legal Foundation v. Department of Justice*, ___ F. Supp. 3d ___, 2016 WL 5676706, *3 (D.D.C. Sep. 30, 2016) (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).

## ARGUMENT

The First Source Act was enacted to lessen the effect of the very real, significant, and well-established structural imbalance in the District's budget. It has been benefiting District residents since 1984.

The evidence shows that the Council could reasonably conclude that the First Source Act would help alleviate some of the problems associated with unemployment in the District, help unemployed District residents get jobs, reduce District spending on poverty-relief programs, and improve the District's bottom line in the form of tax revenues, in the face of Congress's prohibition on a commuter tax on the more than 70% of the jobs in the District that are held by non-residents. These goals are modest and easily withstand rational basis, to say nothing of intermediate scrutiny. The law is therefore constitutional, and the Court should award summary judgment to the District.

"[T]he inability to tax commuters 'is the substantial cause of the District's structural deficit' that forces it to overtax its residents and to reduce necessary public services." *Banner*, 303 F.Supp.2d at 9 (quoting the complaint). "[E]very one of the 41 states in the United States that has an income tax imposes the tax on income earned in the state by residents and nonresidents alike."[22] "But for the prohibition

---

[22]     PR 15-368, "Sense of the Council in Support of Litigation Challenging the Constitutionality of the Congressional Prohibition on the District's Ability to Tax All Income Earned Within District Borders Emergency Declaration Resolution of 2003," § 2(c). Available online at *http://dcclims1.dccouncil.us/images/00001/20030717105700.pdf* (last visited Nov. 22, 2016).

[on taxing commuters], the Council would enact a law to reduce income tax rates on its overtaxed residents and impose a fair and reasonable income tax on nonresidents."[23]

## I.  The Individual Plaintiffs Lack Standing to Maintain this Action Because They Are Employed by Miller & Long.

The Court should dismiss the individual plaintiffs because they have not established that they have standing. Not only have they failed to provide any actual evidence of injury in fact, one of "the irreducible constitutional minimum[s] of standing," they have testified that they lack such an injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

As both the Court and plaintiffs have noted, the First Source Act imposes its limitations on *new* hires, not existing employees. *See MWC*, 57 F. Supp. 3d at 12 (plaintiffs "must assess *prospective* employees based on where they live") (emphasis added); Doc. No. 46 at ¶ 23 ("As a direct result of the 'new hires' requirements of the Act, the individual Plaintiffs have been discriminated against in *obtaining* employment opportunities[.]") (emphasis added). *See also* D.C. Code § 2-219.03(e)(1) (mandating percentages and reporting "of the new employees hired"). The individual plaintiffs rest their claims on their exclusion from the First Source Register. *See* DEx. 3 (Plaintiffs' Responses and Objections to Defendants' First Set

---

[23]     PR 15-369, "Sense of the Council in Support of Litigation Challenging the Constitutionality of the Congressional Prohibition on the District's Ability to Tax All Income Earned Within District Borders Emergency Resolution of 2003," § 2(12). Available online at *http://dcclims1.dccouncil.us/images/00001/20030717130051.pdf* (last visited Nov. 22, 2016).

of Interrogatories) at 4 ("Because the individual plaintiffs are not residents of the District of Columbia, they cannot be included on the First Source List.") The Court earlier held that the individual plaintiffs had standing for this reason. *MWC*, 57 F. Supp. 3d at 17.

In fact, however, the individual plaintiffs lack standing *because they are already employed by Miller & Long* (and have been so for years). The First Source Register "consists of the names of unemployed District residents," D.C. Code § 2-219.02(a). Regardless of their jurisdiction of residence, the individual plaintiffs would *never* be able to sign up to put their names on the First Source Register, because that list exists to connect the *unemployed* with *new* construction jobs.[24] Plaintiffs Upshur and Morris have been employed by Miller & Long for years, and so have always been ineligible for the First Source Register.

Similarly, the individual plaintiffs assert that they are "treated differently than their peers" and are at "a significant disadvantage" because of where they live, and "are more susceptible to being laid off or let go[.]" DEx. 3 at 5. But discovery revealed that neither individual plaintiff has suffered *any* injury as a result of the operation of the First Source Act.

### i.  Emmett Morris, Jr., Has Suffered No Injury from the First Source Act.

Plaintiff Morris, a lifelong Virginian, has worked for Miller & Long for 35 years. DEx. 4 (Excerpt, Deposition of Emmett Morris, Jr., Oct. 25, 2016) at 10:21–

---

[24]    *See also id.*, § 2-219.03(a)(1) (First Source Register is for "all jobs *created by* the government-assisted project or contract[.]") (emphasis added).

11:1; SMF ¶ 10. Mr. Morris, therefore, has been employed by Miller & Long throughout the time the First Source Act has been in effect. He has not been unemployed or laid off during that time. DEx. 4 at 15:12–16 ("Q: Do you work as much as you'd like? A: Yes. Q: Have you had any extended periods of unemployment? A: No."); 14:8–19 and 17:2–18:8 (he once took a pay cut, in the early 90s, rather than being laid off; it was gradually eliminated over the ensuing five years).

Plaintiff Morris directly refutes plaintiffs' allegation that he and other non-District residents are "at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list." Doc. No. 46 ¶ 14; *see also id.* ¶ 23 ("discriminated against in obtaining employment opportunities"); ¶ 43 (same); ¶ 53 ("the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District"); ¶ 59 (same); ¶¶ 84, 91–92, and 94. In fact, Mr. Morris has "never" "felt that it's ever harder for [him] to get work." DEx. 4 at 16:2–5. Mr. Morris has never been "treated differently from [his] peers because of the First Source Act." *Id.* at 15:17–20. He has never "been sent away from a job site because [he] lived in Virginia." *Id.* at 19:9–12.

He has suffered no injury in fact, actual or imminent, and he has always been employed, so he has never been eligible to be listed on the First Source Register. Thus, he lacks standing.

### ii.  Dairon Upshur Has Suffered No Injury from the First Source Act.

Plaintiff Upshur has been employed by Miller & Long for more than five years. DEx. 5 (Transcript, Deposition of Dairon Upshur, Oct. 25, 2016) at 10:20–11:6; SMF ¶ 10. He has worked consistently for them with only one exception during that time. DEx. 5 at 16:9–17:17. That one time, Miller & Long sent him to the Marriott Marquis construction site, sent him away from there, and then assigned him to another project. *Id.* and 19:19–22:3. But as plaintiffs have conceded, the Marriott Marquis project was not covered by the First Source Act. Doc. No. 46 at ¶ 78. Mr. Upshur, then, has also never been eligible to be listed on the First Source Register and has suffered no injury in fact traceable to the First Source Act.

Mr. Upshur's sole evidence of alleged discrimination derived from an error by Miller & Long in sending him to the wrong site (*i.e.*, the Marriott Marquis) that was corrected within "a day or two." DEx. 5 at 25:12–15. Any injury he may have suffered in this one instance was an indirect result of an injury allegedly suffered by Miller & Long, but that injury was apparently based on a misunderstanding. *Cf.* Doc. No. 46 at ¶ 78 (First Source Act does not apply to that project). "[E]mployees generally do not have standing to assert claims of the corporation because they lack direct injury." *J.F. Shea Co. v. Chicago*, 992 F.2d 745, 749–50 (7th Cir. 1993) (rejecting employee's argument that he was injured directly by local business preference because his company would go out of business and he would lose his employment and his "livelihood." "This claim is not based on any injury suffered

directly by [him]. His claim is based on the injury of a third party, [his employer. He] is not subject to the local business preference, and because he has not attempted to contract with the City, he cannot allege a direct injury."). *See also Lojo v. Paulos*, 1997 U.S. App. LEXIS 3174, 1997 WL 68544 (D.C. Cir. Jan. 16, 1997) (*per curiam*) (employees lack standing, where their injury "was incidental to corporation's injury"). Mr. Upshur has alleged no direct injury to his own interests or legal rights and has no standing to maintain this action.

## II. Plaintiff Metropolitan Washington Chapter Has Asserted No Injury to Itself or Any of Its Members Aside From Miller & Long.

Plaintiff MWC has no organizational standing because it is aware of no injury suffered by itself or any of its members aside from Miller & Long. The Court laid out the standard for an organization to assert associational standing, *i.e.*, its standing based on the rights of its members, in its Order on the District's motion to dismiss. *MWC*, 57 F. Supp. 3d at 17 (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 342 (1977) and *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011)). For purposes of ruling on the motion to dismiss, the Court assumed that MWC's allegations were true. That it need no longer do.

Metropolitan Washington Chapter has about 550 member companies. DEx. 6 (Excerpt, Deposition Transcript of Robert Henley, Oct. 21, 2016) at 10:8–12. During his 30(b)(6) deposition, MWC's corporate representative, Chairman Robert Henley,

testified that he did not know of any injury resulting from compliance with the Act to any company other than Miller & Long. *Id.* at 17:14–18:10.[25]

He could not name a single project on which a member had declined to bid because of the First Source Act. *Id.* at 20:13–22:2.[26] Plaintiffs alleged that they were placed at "a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions." Doc. No. 46 at ¶¶ 18, 28, 44, 54. Yet MWC could not name a single company that competes for First Source Act jobs that does not try to comply with the Act. DEx. 6 at 23:16–25:17. Mr. Henley was, in contrast, confident that there were multiple companies that do not oppose entering into Employment Agreements, meaning companies that do not consider the First Source Act an unconstitutional burden, including, probably, even some members of MWC. *Id.* at 25:3–17.[27]

---

[25]   Mr. Henley claimed that his own company, Henley Construction, would spend 60 percent of its human resources costs on First Source Act compliance. *Id.* at 18:15–20. However, he went on to say that Henley Construction had never worked on a project under the First Source Act. *Id.* at 19:3–15. It is unclear what can be made of that information, but it is clear that Henley Construction, the only company other than Miller & Long about which Mr. Henley had some knowledge in this area, has suffered no actual injury in fact. *Lujan*, 504 U.S. at 560 (injury must be "actual or imminent, not conjectural or hypothetical") (quotation marks omitted).

[26]   Mr. Henley asserted that Keller Brothers Inc. had done so, but could not provide any details about what that project might have been, only stating the general nature of Keller Brothers' business. *Id.* at 21:14–22:2.

[27]   Mr. Henley said he did not know of any companies that had requested a waiver from the First Source Act, contradicting plaintiffs' claims in the Amended Complaint. *Cf. id.* at 29:22–30:3 to Doc. No. 46 ¶¶ 18, 28, 44, 54. For example,

### III.   <u>The First Source Act Imposes a Negligible Burden on Miller & Long.</u>

The District sought, in discovery, to determine the extent of the asserted "burden" on plaintiffs of complying with the Act. Plaintiffs provided no evidence of any such burden for any member of MWC aside from plaintiff Miller & Long. Miller & Long asserted that it spends "roughly 30% of its human-resources efforts" (approximately $200,000 annually) to comply with the "unique requirements of the District's First Source Act." DEx. 3 at 5.

But discovery also revealed that Miller & Long earned between $███████ and $██████ annually in revenues each year for the last decade. DEx. 7; SMF ¶ 11. Thus, even in Miller & Long's worst year, its expenditures on First Source Act compliance amounted to less than ██% of its revenues. From another perspective, in the last decade, Miller & Long earned between $███████ and $███████ in annual revenues just on First Source Act-covered projects. DEx. 7; SMF ¶ 11. Thus, in its worst year, Miller & Long's expenditures on First Source Act compliance amounted to less than █% of just their First Source Act revenues.

This evidence shows that the "burdens" imposed by the First Source Act are negligible, especially when compared to the benefits gained by the District, its residents, and companies like Miller & Long.

---

Bozzuto Construction broke ground on a mixed-use project for So Others Might Eat (SOME) in 2015 after SOME received a First Source Act exemption. *SOME Begins Construction on the Future Conway Center*, Bus. Wire. (Dec. 17, 2015), available at *http://www.businesswire.com/news/home/20151217005881/en/Begins-Construction-Future-Conway-Center* (last accessed Nov. 22, 2016); DEx. 8 (special hiring agreement produced to plaintiffs beginning at Bates No. DC-MWC00000226).

## IV. The Privileges and Immunities Clause Does Not Apply—Directly or Indirectly—to the District.

The District, in earlier briefing, demonstrated that the Privileges and Immunities Clause does not apply directly to the District. Amicus concurred in that result. *See* Doc. No. 34 at 2–5.

In a recent decision, the D.C. Court of Appeals assumed without deciding that the Privileges and Immunities Clause applies to Congress when it legislates for the District, and rejected a challenge to D.C. Code § 15-703, a law allowing defendants in lawsuits in the District to require non-resident plaintiffs to post security for litigation costs and fees. *Landise v. Mauro*, 141 A.3d 1067, 1070 (D.C. 2016). That court found that the justification advanced for the law (to discourage non-meritorious suits by nonresidents and to avoid compelling District residents to file suit in a foreign jurisdiction in order to collect costs awarded in the District) was a "substantial reason for the difference in treatment" between residents and nonresidents, and thus "bears a substantial relationship" to the law's goals. *Id.* at 1076 (quoting *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 284 (1985)). The court also found that the law "imposes a relatively minor hardship," *id.*, especially when compared to those cases where laws substantially impinged on a nonresident's ability to pursue their livelihood, such as by imposing larger license fees on nonresidents. The court also noted that the plaintiff could cite no authority for her alternative argument that the Privileges and Immunities Clause applied in the District "through" the Due Process Clause of the Fifth Amendment. *Id.* at n.3.

The District shows—in this motion—that the First Source Act imposes a relatively minor hardship on plaintiffs and is thus constitutional.

### a. The Privileges and Immunity Clause Does Not Apply Indirectly To The District Through the Due Process Clause.

The Court should reject amicus's suggestion that the "principles" of the Privileges and Immunities Clause should be applied wholesale to the District "through" the Fifth Amendment. Doc. No. 34 at 8. "Due Process" is not a one-size-fits-all provision allowing courts to strike down laws plaintiffs find objectionable. This argument was tacitly rejected by the D.C. Circuit in *Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768 (D.C. Cir. 1939) and *Neild v. District of Columbia*, 110 F.2d 246 (D.C. Cir. 1940), both holding that the Privileges and Immunities Clause did not apply to the District and denying its protections to those plaintiffs. If the Circuit thought that the "principles" of privileges and immunities applied to the District through some other provision of the Constitution, it would have said so.

### b. The Due Process Clause does not incorporate all general rules governing society.

Amicus's argument that the Privileges and Immunities Clause is applicable to the District though the Due Process Clause of the Fifth Amendment is dependent on one clause of one sentence from a 1921 Supreme Court case characterizing the Due Process Clause as requiring "that every citizen shall hold his life, liberty, property, and immunities under the protection of the general rules which govern society." *Truax v. Corrigan*, 257 U.S. 312, 332 (1921). Doc. No. 34 at 8–9. From there, amicus reasons that the protection extended to individuals by the Privileges

and Immunities Clause is just such a general rule governing society, citing *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.D.D.C. 1821). Thus, amicus concludes, the Fifth Amendment incorporates the individual rights encompassed in the Privileges and Immunities Clause. Doc. No. 34 at 9–10. The essential flaw in this argument is that *Truax* does not mean that every general rule of society is encompassed by the Due Process clause, and amicus does not cite any authority interpreting *Truax* in this way in the near-century since its issuance. 257 U.S. at 317.

  *Truax* was a labor dispute in which the owners of a restaurant sought an injunction against their employees for picketing the restaurant and interfering with their business. A state law limited the state court's authority to grant injunctive relief in employer-employee disputes. The restaurant owners claimed that the law deprived them of property without due process of law and the equal protection of the laws. *Id.* at 322. The Supreme Court noted that the plaintiffs would have had a right to an injunction against, for example, other restaurant owners who interfered with their business in a similar fashion, but were barred from suing their employees for the same conduct. *Id.* at 331. In this context, the Supreme Court wrote that the

> due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society.

*Id.* at 331–32. The quoted language relates to the plaintiffs' entitlement to proceed to court against their employees, as against anyone else who harmed them. Each clause following "benefit of the general law" modifies "the general law," not "the due

process clause." *Truax* does not say that *all* substantive societal rules are encompassed by the Due Process Clause.

### c. Neither *Bolling* nor *Windsor* supports the argument that the Fifth Amendment incorporates the individual rights encompassed within the Privileges and Immunities Clause.

As amicus correctly notes, the Supreme Court held in *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), that the Fifth Amendment's Due Process clause can incorporate equal-protection principles. Doc. No. 34 at 9. But it does not follow that the Fifth Amendment incorporates *all* individual rights encompassed within the Privileges and Immunities Clause.

*Bolling* prohibited segregation based on race in the District's schools and was a companion case to *Brown v. Board of Education*, 347 U.S. 483 (1954) (Equal Protection Clause of Fourteenth Amendment prohibits states from maintaining racially segregated public schools). The Supreme Court concluded in that context that "discrimination may be so unjustifiable as to be violative of due process." 347 U.S. at 498. The Court noted that "equal protection of the laws" and "due process of law" are not "always interchangeable phrases" but that classifications based on race specifically were so fundamentally suspect and contrary to long-established principles of equality as to amount to a deprivation of liberty in violation of the Due Process Clause. *Id.* at 499–500. This case is not remotely like *Bolling*. Fundamental racial classifications, which quite rightly receive strict scrutiny, are not at issue here.

### d. The Due Process Clause Does Not Prohibit All Discrimination of Any Kind in Favor of Residents and Indeed Permits Reasonable Protections for Residents.

Amicus's argument misreads Fifth Amendment precedent. To the extent Amicus relies on *Bolling* and *United States v. Windsor*, 133 S. Ct. 2675 (2013) to argue that the Fifth Amendment prohibits *all* discrimination of any kind, including that against non-residents, such an argument is overbroad. Such a reading would mean—implausibly—that the *implied* reach of the Fifth Amendment would exceed the scope of an *express* provision, rendering the Privileges and Immunities Clause surplusage (at least as of the time the Fourteenth Amendment was adopted and the States became subject to its Due Process Clause). This cannot be correct; the implicit reach of the Fifth Amendment cannot provide *more* protection than the explicit text of the Constitution. Moreover, the Privileges and Immunities Clause has not been interpreted to bar *all* discrimination against non-residents. *See, e.g., Toomer v. Witsell*, 334 U.S. 385, 396 (1948) ("[T]he privileges and immunities clause is not an absolute."). *See also Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 383 (1978) (Privileges and Immunities Clause "has been interpreted to prevent a State from imposing *unreasonable* burdens on citizens of other States in their pursuit of common callings within the State[.]") (emphasis added) (citing *Ward v. Maryland*, 12 Wall. 418, 20 L.Ed. 449 (1871)). As the Court noted in *Pollack v. Duff*, 958 F.Supp.2d 280, 291 (D.D.C. 2013), "while the Fifth Amendment contains

no equal protection clause, it does forbid discrimination that is *so unjustifiable* as to be violative of due process."[28]

That phrase, "so unjustifiable," which comes from *Bolling*, is clearly not a categorical ban on *all* differential treatment. Rather, it sets a threshold beyond which States may not discriminate. The Supreme Court there held that the racial classifications at issue "must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." 347 U.S. at 499 (footnote omitted). That highest level of scrutiny does not apply to the interests at stake in a challenge based on the Privileges and Immunities Clause. Indeed, while "the pursuit of a common calling" has been described as "one of the most fundamental of those privileges protected by the [Privileges and Immunities] Clause[,]" *United Building & Construction Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 219 (1984) (*Camden*), the Supreme Court to our knowledge has never applied "strict scrutiny" to an equal-protection challenge to laws similar to those at issue here.

Moreover, defining the asserted interest as "the right to pursue a common calling" is too broad. Rather, the liberty interest at stake must be narrowed to the right to work on government public-works contracts. "[W]e have a tradition of carefully formulating the interest at stake in substantive-due-process cases." *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997). The right to government employment is *not* fundamental. "Neither the Supreme Court nor this court has

---

[28]     *Affirmed*, 793 F.3d 34 (D.C. Cir. 2015).

ever recognized an interest in public employment as fundamental. [T]he right that plaintiffs allege is thus not one 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.' Accordingly, rational basis review applies[.]" *AFGE, AFL-CIO v. United States*, 330 F.3d 513, 523 (D.C. Cir. 2003) (citations omitted). *See also Camden*, 465 U.S. at 219 ("[T]here is no fundamental right to government employment[.]"). "[N]o citizen has a 'right,' in the sense of a legal right, to do business with the government." *Gonzalez v. Freeman*, 334 F.2d 570, 574 (D.C. Cir. 1964) (citing *Perkins v. Lukens Steel Co.*, 310 U.S. 113 (1940)).

### e. The Framers deliberately did not impose a privileges-and-immunities requirement on the federal government or the District, and that choice must be respected.

Accepting amicus's argument would lead to the incongruous conclusion that the Framers applied privileges-and-immunities principles *implicitly* to the federal government through the Fifth Amendment. The Framers could have applied privileges and immunities directly to the federal government *expressly* if that had been their intent, especially if they intended the implied Fifth Amendment version to be more stringent than the express Privileges and Immunities Clause. But they did not and this choice should be presumed purposeful. *Cf. Duehay*, 105 F.2d at 775 ("Section 2 of Article IV … is a limitation upon the powers of the states and in no way affects the powers of Congress over the territories and the District of Columbia."). Because the District government's authority is derived from Congress, it would make little sense to conclude that these principles apply to the District

government, the delegee of federal government authority over the local governance of the nation's capital.

### f. The Court should not recognize substantive due process protections that would duplicate express constitutional provisions.

There is another good reason against interpreting the Due Process Clause to incorporate a privileges-and-immunities equivalent. The Supreme Court has counseled repeatedly against recognizing substantive due process protections that would duplicate other, express constitutional provisions. *See Moore v. District of Columbia*, 79 F. Supp. 3d 121, 130 & n.12 (D.D.C. 2015) ("if a constitutional claim is covered by a specific constitutional provision … the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process") (quoting *United States v. Lanier*, 520 U.S. 259, 272, n.7 (1997)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

The Privileges and Immunities Clause is not incorporated against the District by the Fifth Amendment, because the Fifth Amendment does not prohibit all discrimination of any kind in favor of residents, only *invidious* discrimination that is "so unjustifiable" as to violate substantive due process.

34

### g. Congress's treatment of other non-states reflects that privileges-and-immunity principles are not encompassed by the Due Process Clause.

As detailed in earlier filings, Congress explicitly imposed a privileges-and-immunities rule in other contexts for other non-states (as in Puerto Rico, the Virgin Islands, and Guam, *see* Doc. No. 14 at 3–6; Doc. No. 34 at 5–7) in the decades before it contemplated granting the District home rule, reflecting that Congress did not believe the Fifth Amendment inherently prohibited all discrimination proscribed by the Privileges and Immunities Clause. Congress did not extend the privileges-and-immunities rule in the District's Home Rule Act, although it plainly knew how to do so. This Court should respect that choice made by Congress.

## V. Assuming Privileges-and-Immunities Principles Apply To The District Through The Fifth Amendment, The First Source Act Passes Constitutional Muster.

### a. Rational basis review applies and this Court has already upheld the law against such review.

To the extent that privileges and immunities principles apply to the District through the Fifth Amendment, those principles cannot be *more* onerous than the due-process principles that already apply or the privileges and immunities analysis that courts apply to the States. The analysis is not *more* rigorous here because it applies in the District.

The cases discussed above reflect that equal protection-type challenges to residency requirements and restrictions are generally subject to rational basis review. *Baldwin*, 436 U.S. at 383 (Privileges and Immunities Clause prevents state from imposing unreasonable burdens on citizens of other States).

Here, the Court has *already* upheld the First Source Act against plaintiffs' equal-protection challenge using rational-basis scrutiny, finding that the District's legitimate purposes were rationally related to the minimal burden imposed on non-residents. *See MWC*, 57 F. Supp. 3d at 28–29 (citing cases). *See also, e.g., NASA v. Nelson*, 562 U.S. 134, 147–48 (2011) (for alleged violation of unenumerated constitutional rights that were not "fundamental," something less than strict scrutiny was required).

Economic legislation like that at issue here is reviewed only for arbitrariness or irrationality. Such legislation need not be effective or even logically consistent in every respect with its specified aims to survive judicial review. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical*, 348 U.S. 483, 488 (1955). "[U]nder the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means." *Concrete Pipe & Prods. v. Construction Laborers Pension Trust*, 508 U.S. 602, 639 (1993). The District's differential treatment of residents and non-residents in the First Source Act is amply supported by the evidence. *Cf. Nelson*, 562 U.S. at 162 (Scalia, J., concurring) ("Courts should not use the Due Process Clause as putty to fill up the gaps they deem unsightly in the protections provided by other constitutional provisions.").

> **b. Even assuming more rigorous scrutiny is appropriate, the most rigorous level that could be appropriate is intermediate scrutiny.**

In *Piper*, the Supreme Court struck down (as violating the Privileges and Immunities Clause) the residency requirement of the New Hampshire Bar, employing a test substantively similar to "intermediate scrutiny." 470 U.S. at 284 (discrimination against non-residents is permissible if there is a "substantial reason" for the difference in treatment, and the discrimination has a "substantial relationship" to the State's objective) (citing *Camden*, 465 U.S. at 222). But the First Source Act is unlike the laws invalidated in *Piper* and other cases, which placed burdens on—or prevented engagement in—an entire occupation or line of work. *See, e.g., Toomer*, 334 U.S. at 391 (commercial shrimp fishing); *Hicklin v. Orbeck*, 437 U.S. 518 (1978) (invalidating law that purported to apply to *all* Alaskan oil and gas leases, easements or right-of-way permits for oil and gas pipelines); *Supreme Ct. of Va. v. Friedman*, 487 U.S. 59 (1988) (practice of law).

Here, the law imposes only minimal costs on those companies who choose to accept District tax dollars for certain projects; it does not purport to apply to *every* participant or transaction in a particular industry. This "discrimination" simply does not meet the "so unjustifiable" threshold of *Bolling*. This fact, and the analysis employed by the Supreme Court in *Piper*, suggests that, if the Court proceeds as urged by amicus, it should *at most* examine the First Source Act under an analysis no more searching than intermediate scrutiny. A law survives that review if it is "substantially related to an important governmental objective." *Heller v. District of*

*Columbia*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (*Heller II*) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). In other words, intermediate scrutiny requires that the challenged law "promotes a substantial government interest that would be achieved less effectively absent the regulation" and that "the means chosen are not substantially broader than necessary to achieve that interest." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 782–83 (1989)).

"[T]he fit between the challenged regulation and the asserted objective [need only] be reasonable, not perfect." *Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013). In assessing this "fit," a court must afford "substantial deference to the predictive judgments" of the legislature. *Id.* (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994) (*Turner I*). Indeed, the Court should not review de novo "the District's evidence of the harm to be prevented and the likely efficacy of the regulation in preventing that harm." *Heller v. District of Columbia*, 801 F.3d 264, 272 (D.C. Cir. 2015) (*Heller III*) (citing *Turner I*, 512 U.S. at 666). Rather, the Court should "determine only whether the District 'has drawn reasonable inferences based on substantial evidence'" and if it has done so and the means chosen are not overbroad, "'summary judgment … is appropriate regardless of whether the evidence is in conflict.'" *Id.* (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 185, 195–96 (1997) (*Turner II*)).

### c. <u>The First Source Act comfortably withstands intermediate scrutiny.</u>

The District's unique economic situation—and the ample evidence produced— enables the First Source Act to withstand intermediate scrutiny. The fact that more

than 70% of District jobs are held by commuters, together with the structural imbalance resulting largely from the District's inability to tax those commuters, abundantly demonstrates that the First Source Act bears a "substantial relationship" to the "peculiar evil" addressed therein. The longstanding relative poverty of the District, compared to adjacent jurisdictions, also counsels in favor of the constitutionality of the First Source Act.

The District's distinctive economic and legal situation, the fact that it is expending its own funds, and the extensive evidence here, clearly distinguish this matter from the facts of *Camden*, and provide a "substantial reason" that permits the District in this circumstance to permissibly discriminate in favor of its own residents, and demonstrates a justification for the legislation that was lacking in *Camden*.[29]

The District's high unemployment and its inability to tax commuters' incomes are the source of the "evil" attempted to be ameliorated by the First Source Act. *Camden*, 465 U.S. at 222. The District of Columbia is the only jurisdiction in the United States denied, by federal law, the ability to tax the income of more than 70% of the jobs in the city. The structural budgetary imbalance resulting largely from the District's inability to tax those non-resident commuters "'constitute[s] a peculiar

---

[29]    Moreover, the law challenged in *Camden* required that, for public-works contracts, no "less than forty percent (40%) of the *entire labor force* be residents of the City of Camden." *Camden*, 465 U.S. at 211 (emphasis added). In contrast, as already discussed, the First Source Act only requires good-faith efforts to hire unemployed District residents for 51% of the *new positions* created by the project or contract. D.C. Code § 2-219.03(e)(1)(A).

source of the evil at which the [First Source Act] is aimed.'" *Camden*, 465 U.S. at 222 (quoting *Toomer*, 334 U.S. at 398).

The evidence—in the legislative record and that developed in discovery— clearly demonstrates a substantial relationship between the modest attempts by the First Source Act to capture some of the millions of income tax dollars that leave the District each year, and the constraints imposed by the structural budget imbalance on the District's ability to generate tax revenues at average rates (or even rates that are comparable to surrounding jurisdictions). The problems addressed by the First Source Act are not new. *See, e.g.,* Mayor's Order No. 92-138 (Nov. 12, 1992), 39 D.C. Reg. 8580 (Nov. 27, 1992), "Employment Agreement Goals and Objectives for the Department of Public Works Construction and Service Contracts," at 1 (discussing the "high rates of unemployment and underemployment" in the District and noting that "the District expends substantial sums of money derived from federal and local taxes paid by District residents on projects in the District . . . District residents are entitled to receive some direct benefit from such expenditures").[30]

> [W]hen DC residents earn income, the District benefits from taxes on
> that income. [The Committee Chair] noted, however, that Congress

---

[30]     Indeed, Congress in 1946 required the District to establish an Apprenticeship Council, to approve training programs in construction and other building trades to improve employment opportunities for District residents in those occupations. 60 Stat. 204, ch. 267 (May 21, 1946), *codified as amended at* D.C. Code §§ 32-1402 *et seq.* (2014 Supp.). That law remains in effect. *See also* DEx. 2 at 64:9–64:15 ("[A]n apprenticeship program basically is the entry-level point for workers to get into the trades in a construction sense. It's broader—apprenticeship is used in other industries, but the majority of apprenticeship programs in the District are with construction companies and union, trade unions.").

> forbids the District from taxing the income of non-residents, which leads to millions of dollars in lost tax revenue annually. [She] juxtaposed the District to cities such as Philadelphia, which levies a 3.7 percent tax on income earned in Philadelphia by residents who are not residents of Philadelphia.

Council of the District of Columbia, Committee on Workforce Development and Government Operations, Report on Bill 17-185, the "Jobs for D.C. Residents Amendment Act of 2007," June 28, 2007, at 3.[31]

Under intermediate scrutiny, the District need only present "some meaningful evidence" that the First Source Act "can reasonably be expected to promote" an important governmental interest. *Heller*, 670 F.3d at 1259. "[W]e have permitted litigants to justify … restrictions [under intermediate scrutiny] by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history,

---

[31]    *Available    online    at*    http://dcclims1.dccouncil.us/images/00001/20090903100105.pdf (last visited Nov. 22, 2016). *See also* Council of the District of Columbia, Committee on Public Services, Report on Bill 14-27, the "51% District Residents New Hires Amendment Act of 2001," Feb. 21, 2001, at 5:

> Bill 14-27 takes an important step to enhance the economic vitality of the District. If District residents are employed in jobs created by government-assisted projects, their personal wealth will increase. Furthermore, over time, this program will result in increased District revenues when government-assisted projects hire unemployed District residents who pay local income taxes. For example, each unemployed District resident who is hired and has a taxable income of $20,000, $30,000 or $40,000, would pay $1,252, $2,202, or $3,152, respectively, in taxes.

*Id.* (*available    online    at*    http://dcclims1.dccouncil.us/images/00001/20100426160929.pdf) (last visited Nov. 22, 2016).

consensus, and simple common sense." *Heller III*, 801 F.3d at 284 (quoting *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555, (2001) (internal quotation marks omitted)).

Where the law requires a "fit" between the means chosen and the results to be achieved that fit need only be reasonable, not perfect. *See, e.g., Board of Trustees of SUNY*, 492 U.S. at 480 (even in First Amendment context, narrow tailoring means "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served."). The First Source Act is a method tailored to improve the economy of the District and the employment rate of its residents.[32] It imposes modest burdens on those companies who choose to do business with the District, and— similarly modestly—helps redirect a small portion of the substantial outflow of District tax dollars back into the city.

The District must have "considerable leeway" here in addressing the "local evils" of nonresident workers and the commuter-tax ban. The First Source Act is an "appropriate cure" for these problems, and does not violate the Constitution. *Camden*, U.S. at 223. The District has cited extensive evidence in support of the First Source Act and the problems it was enacted to address. That evidence confirms that the Council could reasonably conclude that the First Source Act would assist unemployed District residents and modestly increase District tax revenues.

---

[32]     District residents with full time jobs are much less likely to be living in poverty, *see* p. 11 & n.8, above, and thus less likely to require poverty-relief services. *Id.*

That evidence withstands intermediate scrutiny, the highest-level review the Court should apply.

The District's expert concluded, based on very simple assumptions, that the First Source Act has had a net positive impact on the District's tax revenues, of almost $4 million annually, in the construction industry alone. DEx. 1, ¶ 12.[33] Moreover, plaintiffs have suffered only negligible injuries, if any. The First Source Act survives intermediate scrutiny.

<u>CONCLUSION</u>

Based on the foregoing reasons, the  District requests that the Court grant its motion for  summary judgment and dismiss the Amended Complaint.

DATE: December 5, 2016.          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

---

[33]     While generally thought of as applying primarily to construction or public-works projects, the First Source Act applies to all government contracts above a certain threshold. The District spent over $1.2 billion on capital projects in FY2015. Declaration of John McGaw, Nov. 23, 2016, ¶ 16 (copy attached as DEx. 9). The capital expenditures made by District agencies vary as widely as the missions of those agencies, and include: the redevelopment of McMillan Park, the Maine Avenue Fish Market, and St. Elizabeths Hospital; the purchase and replacement of fire-fighting vehicles and equipment and the modernization of firehouses; construction of a consolidated forensics laboratory and evidence facility; the renovation of Eastern Market and the Georgetown Library; the development of the D.C. United Soccer site; the renovation and modernization of numerous schools, the Union Station parking garage, the South Capitol Street/Frederick Douglass Bridge, and the 11th Street Bridge. *Id*, ¶¶ 9–15.

     If the First Source Act was fully enforced for every qualifying contract entered by the District, the increase in the District's income-tax revenue would likely add up to many millions of dollars.

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON
D.C. Bar No. 453765
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, DC 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov


Counsel for the District of Columbia

---

* Appearing pursuant to LCvR 83.2(f).

44