UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., <br><br>      Plaintiffs <br>v. <br><br>DISTRICT OF COLUMBIA, <br>      Defendant. | No. 12-CV-00853 <br>(EGS) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

The record fully supports the conclusion that these plaintiffs have standing to challenge the First Source Act and have demonstrated that the Act in its creation and in its operation has failed the constitutional test that applies to legislation that discriminates against nonresidents. Even giving the District of Columbia the benefit of the evidence it has produced in support of its motion for summary judgment, it is crystal-clear that the Act was designed to scratch political itches, not to address the District's unemployment or poverty issues.

The District's *Opposition to Plaintiffs' Motion for Summary Judgment* (Doc. 67) does not undercut the conclusion that this Act is not narrowly tailored to address a unique local evil and cannot survive constitutional challenge. Instead, the *Opposition* raises strawman arguments to try to divert the analysis. But on each of these issues—state of the record, standing, constitutional test, legislative purpose of the Act—the record supports the plaintiffs' right to judgment.

**1. State of the summary-judgment record.** In several places in the *Opposition* and in several different ways, the District takes a swipe at the state of the

summary-judgment record. For example, in *Defendant's Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Issue*, the District writes that *Plaintiffs' Statement of Material Facts* violates the Court's rules and "liberally combines immaterial facts with argument and legal conclusions." (Doc 67-2 at 1). But the District has it all backwards. *Plaintiffs' Statement* does not contain argument and it has cites to admissible record evidence for every single paragraph and fact cited. The cites are to discovery responses, deposition testimony, and admissible documents. By contrast, in its *Defendants' Response*, the District fails to cite *any* record evidence, except for Paragraph 27 regarding the testimony of its expert witness, Dr. Lee. Indeed, on most of the paragraphs, the District does not dispute the correctness of plaintiffs' characterization of the evidence even when the District challenges whether the facts are material to the disposition of the case.

Surprisingly, the District points to *Davis v. District of Columbia*, 503 F.Supp.2d 104 (D.D.C. 2007) to criticize plaintiffs. But in *Davis*, the shoe was on the other foot because it was the nonmoving party (there the plaintiff) who failed to file a supported statement of disputed material facts after the moving party (defendant) filed a multi-page statement of undisputed material facts with "[e]very factual statement includ[ing] a citation to the record or depositions." 503 F.Supp. 2d at 115. Plaintiffs here did what Local Rule 7(h) required—identified the material undisputed facts and provided record support for each. In its *Opposition*, it is the District that has not responded as required by the rule.

One other point about the state of the record. The District complains that on many of the facts demonstrated by the plaintiffs, "their claims are supported solely by their own testimony," and cites the case of *Louis v. District of Columbia*, 59 F.Supp. 3d 135 (D.D.C. 2014). (*Opposition*, Doc # 67 at 6). Again, the shoe was on the other foot there because the court was criticizing the *nonmovant's* evidence in response to a supported motion for summary judgment: "a court should not consider a non-moving party's 'unsubstantiated allegations.'" 59 F.Supp. 3d at 141. The case is not applicable to the movant's case where there was record support for each and every allegation and assertion of undisputed facts. Moreover, there is nothing improper about claims supported by one side's testimony, especially when the other side fails to introduce competing testimony.

### 2. Plaintiffs have met the standing requirement.

The summary-judgment record supports the standing of all of the plaintiffs. There is no dispute in the record that each of the plaintiffs has suffered adverse impacts because of the Amended Act.

In its *Opposition*, the District raises two new legal arguments regarding the standing of specific plaintiffs but neither argument should prevail. First, the District does not dispute the facts about the individual plaintiffs, including their nonresidence, but seeks to change the subject by writing that the plaintiffs are not eligible to be included in the First Source Registry because they are employed. (*Opposition* at 9; *Defendant's Response to Plaintiffs' Statement of Material Facts* at ¶¶ 3-4.) This misses the point. In order to be on the Registry to be considered

3

for certain jobs or hours worked on certain projects, you must be a District resident. These plaintiffs are denied that option because they are nonresidents, not because they are otherwise employed. *Cf. Hicklin v. Orbeck*, 437 U.S. 518, 523 (1978)(individuals who cannot satisfy statutory definition of "resident" have continuing interest in restraining enforcement of law that discriminates in favor of residents).

The District also suggests that Miller & Long—whose standing the District does not otherwise challenge—has had its claims mooted. (*Opposition* at 11.) The record shows that Miller & Long, having already suffered substantial costs associated with compliance with the Act, has chosen not to bid on new jobs to which the Amended Act applies. Miller & Long has not chosen "to abandon the undertakings that gave rise to the controversy," as the District writes. (*Id.*, quoting *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1246 (D.C. Cir. 2004)). Rather, Miller & Long has been forced out of this bidding market by unconstitutional legislation and has mitigated its risks of incurring penalties for noncompliance with the Amended Act. This was not a voluntary cessation but rather the consequence of the stepped-up penalties and the increased obligations of the Amended Act forcing an otherwise qualified bidder to forgo the opportunity to acquire new work. Indeed, it was the prospect of a wider application of employment restrictions and the increase in potential penalties that prompted the filing of the initial complaint in this case immediately after the Amended Act went into effect. It has been held that there is an injury-in-fact in the "inability to compete on an equal footing in

the bidding process." *Northeastern Florida Chapter of the ACG of America v. City of Jacksonville*, 508 U.S. 656, 657 (1993).

The *Entergy* case relied upon by the District is inapposite. There, specific interconnection agreements (contracts) between parties were cancelled, some before suit was even filed. Obviously, the cases involving those cancelled contracts were moot because the rate terms to be challenged in the litigation "'disappeared into the regulatory netherworld when the certificates themselves entered the archives.'" 391 F.3d at 1245 (quoting *Northwest Pipeline Corp. v. FERC*, 863 F.2d 73, 76-77 (D.C. Cir. 1988)). Miller & Long has been challenging a statute that has hindered its ability to attract certain work and has exposed it to risk should it be successful in getting that work. Its claims are not mooted by its decision to mitigate the risk caused by the unconstitutional Amended Act. Should the Act be struck down, Miller & Long would be back in the bidding process again as it was before the Amended Act was adopted.

### 3. The proper constitutional lens for analysis.

The District does not give the Court the appropriate analytical path for the Court to apply. The path set out by the plaintiffs, and to a large extent by *amicus* Dean Chemerinsky, would focus the Court on the right standards.

The Amended Act establishes goals and requirements and a Registry that channel work on affected projects towards District residents and away from non-residents. Traditionally, such laws are analyzed for conformity with the Privileges and Immunities Clause, using the standards set forth by the Supreme Court and

other courts, all as discussed in earlier briefings and in *Plaintiffs' Motion for Summary Judgment*. This Court has determined that the Privileges and Immunities Clause does not apply in the District, a decision that Plaintiffs have respectfully but consistently disagreed with, including in our Amended Complaint. *See* Doc. 46 at 2 n.1.

But even if the Privileges and Immunities Clause does not apply in the District because the District is not a State within the meaning of that clause, nonresidents are not thereby demoted in terms of their constitutional rights. The right to pursue a common calling has been recognized as a fundamental right. *See, e.g., United Bldg & Construction Trades Council of Camden County & Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 219 (1984). The right to travel has been recognized as a fundamental right. *See Shapiro v. Thompson*, 394 U.S. 618 (1969). Those fundamental rights do not stop at the District's boundary stones. Laws impinging on those rights should be subject to strict scrutiny. Strict scrutiny should be applied when a restriction "jeopardizes exercise of a fundamental right." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

As the District of Columbia itself articulated when it was seeking judicial relief against the Home Rule Act's prohibition against enactment of a commuter tax, "the right of the nonresident is the right to equal treatment." *Banner v. United States*, 303 F.Supp. 2d 1, 11 n. 10 (D.D.C. 2004)(citing *Austin v. New Hampshire*, 420 U.S. 656 (1975)) (striking down tax that only applied to nonresidents).

If reviewed under strict scrutiny—as has usually been done in the face of challenges made under the Privileges and Immunities Clause—the government is

6

required to prove that the law "furthers a compelling interest and is narrowly tailored to achieve that interest." *Heller v. District of Columbia*, 670 F.3d 1244, 1256 (D.C. Cir. 2011)(quoting *Citizens United v. FCC*, 130 S.Ct. 876, 898 (2010)). If the law is reviewed under intermediate scrutiny, the government must show that the law is "substantially related to an important governmental objective," using the "narrowly tailored" or "tight fit" test. *See Heller*, 670 F.3d at 1258 (citations omitted). Plaintiffs submit that the District has failed to meet either test, as discussed in our *Motion for Summary Judgment* and further explained in Section 4 below.

In response to plaintiffs' point that the Court should use the template provided under *Hicklin v. Orbeck*, 437 U.S. 518 (1978) to assess the constitutionality of the law in order to achieve uniformity, *see Plaintiffs' Motion* at 17, 26, the District says that plaintiffs provided "no authority for that proposition." (*Opposition* at 14.) But as the District knows, this Court is confronted with a case of first impression on this issue. Previous courts—at least in the modern Home-Rule age—have assumed that the District was within the scope of the Privileges and Immunities Clause when it is the District, not Congress, enacting the legislation. *See, e.g., Davis v. Dep't of Consumer & Regulatory Affairs*, 561 A.2d 169, 171 (D.C. 1989)). The District itself did at the outset of the present case. Cases arising in all other American jurisdictions have been covered by the Privileges and Immunities Clause directly. *See also Plaintiffs' Motion* at 19-20 & n. 37.

The District has not put forth a rationale why the constitutional test should be different when a Maryland resident faces a discriminatory enactment from the

7

District on the one hand or a discriminatory enactment from Pennsylvania on the other hand. Yes, the District may be constitutionally different from other jurisdictions, *see Opposition* at 14, but the fundamental rights of Maryland residents do not vary across jurisdictional lines. That is the whole point of the Privileges and Immunities Clause as well as the nature of fundamental rights generally.

The District's suggestion that the Court should view the Act as just another species of revenue-raising legislation, and thereby reviewable under a lower standard, misses the whole point. The Act differentiates on the basis of residence (citizenship). It is not like a tax statute that applies to all people equally situated. Rather, it singles out certain people (nonresidents) for disparate treatment. Moreover, it does not raise revenue at all. It forces companies to hire District residents instead of employees who live elsewhere, with the hope that those residents in turn will pay taxes to the District. The Act and the Amended Act do not themselves raise revenue and have never created a single job.

### 4. The purpose of the Act and the record.

The District persists in mischaracterizing the scope of the Amended Act. The District says incorrectly that the Amended Act only affects "*new* jobs created by *new* projects." (*Opposition* at 16, emphasis in original). In fact, the Amended Act applies its constraints to *all* hiring requirements on new projects, even down to requirements about the number of hours to be worked by District residents for different trades. In the summary-judgment record, the District does not dispute that the Act applies to more than just new jobs, and the Court can confirm the

same for itself. *See D.C. Official Code* § 2-219.03(e)(1A)(A) (setting forth requirements by job title and hours for work on affected contracts; not restricted to new jobs). It was the broadening of the scope of the Act in 2012 beyond new jobs and the increase in potential penalties for violation that prompted the filing of this lawsuit.

The District also mischaracterizes both the record about the enactment of the Amended Act and the arguments that Plaintiffs have advanced. The District writes that "the record is clear that the non-taxable income of nonresidents is the primary component of the District's structural budget imbalance, which the First Source Act was enacted to remedy, along with chronic unemployment of District residents." (*Opposition* at 17.) That is a convenient argument point but, as set forth in Plaintiffs' Motion, it is simply not supported by the record.

When the Amended Act was being considered and was then adopted, the legislature did not review or analyze what the Act was intended to achieve in terms of tax revenues or employment. Plaintiffs so stated in their *Statement of Undisputed Material Facts* at ¶ 22—supported by the deposition testimony of the District's point person on First Source, Drew Hubbard. The District claimed that this assertion was "not material to the resolution of the instant matter," but did not provide a supported statement of fact in opposition to Plaintiffs' assertion. (*Defendants' Statement* (Doc. 67-2), at ¶ 22.) The Court can consider it conceded that the District did not do an analysis of the expected economic benefits of the Amended Act. *See* Local Rule 7(h)("[T]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a

9

fact is controverted in the statement of genuine issues filed in opposition to the motion.")

It is obviously material to the Court's consideration of the constitutionality of the Act that the legislature did not develop any analysis of the expected economic impacts of the legislation, especially when the District's defense is that the law was intended to address such issues. And, as explained in *Plaintiffs' Motion*, the District has not analyzed whether in fact the Amended Act has had an impact on employment or net revenues, although Dr. Lee performed an analysis that, making certain assumptions, posits that the District's revenue (not net revenue) has increased because of the Act from somewhere between $250,000 and $3 Million per year. While it is certainly true that a government is not required to prove that proposed legislation will achieve intended objectives, *see Opposition* at 18, it is also true that a government cannot assert that legislation is intended to achieve a specific purpose or goal when there is no record to support that conclusion. In other words, the District can defend its enactment by saying that it was not required to consider whether and how the law would affect a given situation, but it cannot argue that it did so consider it when it didn't.

All of which circles back to the main flaw in the District's position: identifying the "local evil" to which the Act is addressed. Nonresidents are not the source of a "local evil" of the District's alleged structural imbalance. If anything, Congress is or the law is. What the District labels as an "evil," has been found lawful and rational by the courts that have reviewed it. *See Banner v. U.S.*, 428 F.3d 303, 310 (D.C. Cir. 2005)(discussing plausible reasons for Congress's en-

actment of provision that prevents District from enacting a commuter tax). And the Act does not "solve" the "evil" of the District not being allowed under the law to impose an income tax on nonresidents. Rather, it imposes unique disabilities on nonresidents and the businesses that would hire those nonresidents. It has increased the "price of doing business" in the District by nonresidents and their employers or potential employers but has not generated one additional dollar of income tax from those nonresidents.

The District cites the case of *Finzer v. Barry* for the proposition that a legislature does not need to prove certain effects are likely to occur for a law to be constitutional or provide an analysis of why a law would be constitutional. *See Opposition* at 15, citing *Finzer v. Barry*, 798 F.2d 1450, 1488 n. 16 (D.C. Cir. 1986)). However, the cited material comes from the dissenting opinion of Chief Judge Wald, not the majority opinion, and the case was reversed in relevant part on appeal to the U.S. Supreme Court. *See Boos v. Barry*, 485 U.S. 312 (1988)(plurality opinion reversing sign provision of embassy-picketing statute but affirming anti-congregation section of statute). Moreover, in that case, the government had submitted to the trial court extensive evidence and affidavits about the security, international treaty, and other reasons for the statute. Here, by contrast, the District has relied upon argument without evidence, while the written legislative history undermines the position that the Amended Act was enacted to address a "local evil" attributable to nonresidents and their employers.

Judge Huvelle's scholarly analysis in *Banner v. United States*, 303 F.Supp.2d 1 (D.D.C. 2004), aff'd 428 F.3d 303 (D.C. Cir. 2005) also bears review

on the issue of what the District is entitled to do to address the "local evil" of no commuter tax. After considering the arguments advanced by the District and the other plaintiffs as to the unconstitutionality of the Home Rule Act's prohibition against enactment of a commuter tax, the Court acknowledged that when Congress legislates as the local legislature for the District, it has plenary authority and Congress has the authority to withhold from the District the power to impose income taxes altogether and certainly as to commuters. *See* 303 F.Supp. 2d at 15. Because of the unique position of the District in the constitutional scheme, and "[d]espite its apparent unfairness, the legislative scheme at issue here [no commuter tax allowed] is not unconstitutional." *Id.* at 26.

But the District appears to be taking this conclusion a step too far when it argues that because Congress has plenary authority, therefore the City Council and Mayor have inherited the ability to treat themselves differently in connection with locally enacted legislation. *See Opposition* at 21. That simply does not follow. It especially does not follow that having withheld from the District the power to enact a commuter tax, Congress silently authorized the Council to enact laws designed to treat nonresidents differently than residents regarding the ability to secure work or to travel here to work.

The legislative record of the Amended Act in particular makes clear that the District adopted the measure to soothe political concerns about nonresidents being employed on affected job sites. There was no demonstration that there were qualified District residents who were being passed over for jobs; or that nonresidents were competing for jobs unfairly; or even that there would be a correlation

between enactment of the Amended Act and an impact on either unemployment or tax revenues. As detailed in *Plaintiffs' Motion for Summary Judgment* and supporting materials, there is no evidence that the law was narrowly tailored to achieve a legitimate or compelling government interest, just a political one. If enacted anywhere else in this country, this act would be struck down on its face and on this record. This Court should do so too.

Dated: January 24, 2017　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　/s/ Paul J. Kiernan
　　　　　　　　　　　　　　　　　　　Paul J. Kiernan (Bar #385627)
　　　　　　　　　　　　　　　　　　　Christine N. Walz (Bar # 996643)
　　　　　　　　　　　　　　　　　　　HOLLAND & KNIGHT, LLP
　　　　　　　　　　　　　　　　　　　800 17th Street, N.W., Suite 1100
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　(202) 663-7276 (phone)
　　　　　　　　　　　　　　　　　　　(202) 955-5564 (facsimile)
　　　　　　　　　　　　　　　　　　　Paul.Kiernan@hklaw.com (email)
　　　　　　　　　　　　　　　　　　　Christine.Walz@hklaw.com (email)

## CERTIFICATE OF SERVICE

      I hereby certify that on January 24, 2017, this Reply Brief and supporting materials were served via the Court's electronic filing system on counsel of record.

                                      /s/ Paul J. Kiernan
                                      Paul J. Kiernan