UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL

+ + + + +

_____
                              :
IN THE MATTER OF:             :
                              :
METROPOLITAN WASHINGTON       :
CHAPTER, ASSOCIATED BUILDERS  :
AND CONTRACTORS, INC.,        :
et al.,                       :
                              :
          Plaintiffs,         :
                              :
     v.                       :   Civil Action No.
                              :   12-00853 (EGS)
DISTRICT OF COLUMBIA,         :
                              :
          Defendant.          :
                              :
_____:

Tuesday,
October 25, 2016

Washington, D.C.


DEPOSITION OF:

**EMMETT MORRIS**

called for examination by Counsel for the
Plaintiffs, pursuant to Fed. R. Civ. P. 30, in
the Office of the Attorney General, located at
441 4th Street, N.W., Suite 600 South,
Washington, D.C. 20001, when were present on
behalf of the respective parties:

2

APPEARANCES:

On Behalf of Plaintiffs:

PAUL J. KIERNAN, ESQ.
Holland & Knight, LLP
800 17th Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276
paul.kiernan@hklaw.com


On Behalf of Defendant:

ANDREW J. SAINDON, ESQ.
CONRAD RISHER, ESQ.
Office of the Attorney General
441 4th Street, N.W.
Suite 600 South
Washington, D.C. 20001
(202) 724-6643
andy.saindon@dc.gov

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Emmett Morris | 4 | 19 | 22 | |

| EXHIBIT NO. | | PAGE |
|-------------|---|------|
| 15    Notice of Deposition   . . . . . . . . | | 6 |

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE , N W
(202) 234-4433          WASHINGTON, D C  20005-3701          www.nealrgross.com

4

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                                          12:42 p.m.

3     WHEREUPON,

4                    EMMETT MORRIS, JR.

5     Was called as a witness by Counsel for the

6     Plaintiffs and, having been first duly sworn,

7     assumed the witness stand, was examined and

8     testified as follows:

9                    DIRECT EXAMINATION

10               BY MR. RISHER:

11        Q    Good morning, sir.  My name is Conrad

12    Risher.   We  met  just  a  moment  ago.   I'm

13    representing the District of Columbia today.

14    Would you state your name for the record?

15        A    Emmett Morris, Jr.

16        Q    Okay, and would you so kind as to

17    spell it?

18        A    E-M-M-E-T-T M-O-R-R-I-S Junior, J-R.

19        Q    And do you know why you're here today,

20    Mr. Morris?

21        A    Somewhat.

22        Q    Okay, well, let's try to flesh it out
```

1   and explain things.  What we're doing today is a

2   deposition, which means that I'm going to ask you

3   some questions.  These questions will be taken

4   down by the court reporter sitting here.  Because

5   he is taking them down by typing them up, we need

6   to make sure that our - that my questions and

7   your answers are all verbal rather than nodding

8   your head or saying "uh-huh."  We need you to say

9   yes or no.  Does that make sense?

10          A     Okay.

11          Q     Okay, if you need a break at any time,

12   just let me know.  My only request is if there's

13   a question pending, you answer that before we

14   take the break, okay?

15          A     Okay.

16          Q     And if you don't understand any of the

17   questions that I ask, just let me know, because

18   if you answer a question, I'm going to presume

19   that that's because you understood it.

20          A     Got you, okay.

21          MR. RISHER:  Will you mark this as, I

22   believe, 16?

1          MR. KIERNAN:   Which one will be

2    marked?

3          MR. RISHER:   The new one.   This is

4    just the Notice of Deposition.

5          MR. KIERNAN:   Isn't that 15?

6          MR. RISHER:   Oh, excuse me, I may have

7    given the wrong one.

8          MR. KIERNAN:   No, it's the same one.

9          MR. RISHER:   Okay, so, sorry, this

10   will be 15 actually.

11          COURT REPORTER:   15?

12          (Whereupon, the above-referred to

13   document was marked as Exhibit No. 15 for

14   identification.)

15          MR. RISHER:   And while we're at it,

16   can you just confirm for me, or if you recall the

17   amended complaint?

18          MR. KIERNAN:   14.

19          MR. RISHER:   That was 14.

20          MR. KIERNAN:   Yeah.

21          MR. RISHER:   Okay.

22          BY MR. RISHER:

1      Q      There's a document marked Exhibit No.

2   15.  Would you take a look at that and see if you

3   recognize it?

4      A      No.

5      Q      Okay, how did you find out that you

6   needed to be here today?

7      A      By my human resources.

8      Q      Okay, did they give you a call or send

9   you a letter?

10      A      They called me.

11      Q      Okay, and about when did they call

12   you?

13      A      They called me last week.

14      Q      Okay, and did you talk to your Counsel

15   about what you'd be doing today?

16           MR. KIERNAN:  Meaning our meeting.

17           MR. MORRIS:  Yes, yes, yes, of course.

18           BY MR. RISHER:

19      Q      Okay, and what did you do other than

20   talking with your Counsel to prepare for the

21   deposition today?

22      A      I was already ready for this.

1       Q      Okay, did you review any documents?

2       A      Yeah, I read some documents.

3       Q      Okay, what did you review?

4       A      Something about the residents, D.C.

5    residents, something like that, you know.

6       Q      Okay, were these documents that you

7    found on your own?

8       A      No, they were given to me.

9       Q      Okay, may I ask who gave them to you?

10      A      My Counsel.

11      Q      Okay, did you talk with anyone other

12   than your Counsel about what you'd say today?

13      A      No.

14      Q      Okay, where were you born, Mr. Morris?

15      A      In Fredericksburg, Virginia.

16      Q      Did you grow up there?

17      A      I grew up in Spotsylvania County which

18   is in Virginia also.

19      Q      And where else have you lived in the

20   course of your life?

21      A      Orange, Virginia.

22      Q      Okay, anywhere else?

1          A     No.

2          Q     Are you familiar with the First Source

3     Act?

4          A     A little bit.

5          Q     Okay,  are  you  aware  that  under  the

6     First Source Act, companies receive incentives to

7     hire certain workers?

8          A     Yes.

9          Q     Okay, did you know that one of those

10    groups  of  workers  are  so-called  hard  to  hire

11    workers?

12         A     I didn't know that.

13         Q     Okay,  so  the  group  of  hard  to  hire

14    workers includes people like ex-offenders, people

15    that have been on TANF benefits receiving help

16    from  the  state,  people  who  have  had  long-term

17    unemployment.   To your knowledge, have you ever

18    had any of those kinds of challenges that might

19    have qualified you as a hard to hire worker?

20         A     No.

21         Q     Okay,  so  let's  talk  about  your  work.

22    What kind of work do you do?

1        A        I'm a carpenter foreman for Miller &

2     Long.

3        Q        Okay, and what training do you have as

4     a carpenter?

5        A        I learned at an early age.

6        Q        About when did you start working as a

7     carpenter, or when did you start learning?

8        A        That was back in the '70s.

9        Q        Okay, can you give me a sense of how

10    old you were?

11       A        '70 - I was 19 years old.

12       Q        Okay, and how old are you now?

13       A        60.

14       Q        Do you have any classification that's

15    applied to you, the master level, or journeyman,

16    or something like that?

17       A        All of this was job-related.

18       Q        Okay, have you ever been a member of

19    any union?

20       A        No.

21       Q        And how long have you worked for

22    Miller & Long?

1        A    35 years.

2        Q    And how long have you held your

3  current position with Miller & Long?

4        A    Going on 10 years.

5        Q    And what was your title or position

6  before you -

7        A    Carpenter.

8        Q    And about how long were you a

9  carpenter?

10       A    Since I was 19 years old.

11       Q    Okay, so basically you've had just the

12  two positions during your whole time?

13       A    Correct.

14       Q    Okay, on what kind of job sites do you

15  usually work?

16       A    It could be in Virginia, it could be

17  in Maryland, or it could be in D.C.

18       Q    But what - and what kind of

19  construction is going on at these sites?

20       A    We build steel built high-rises.

21       Q    Okay, all of your work is on high-

22  rises?

1          A     Yes.

2          Q     Okay, do you have any idea of what the

3     average value of the projects you're working on?

4     Are these millions of dollars?

5          A     No.

6          Q     Sorry, I should have clarified.   No,

7     you don't know how much they're -

8          A     I don't know, no.

9          Q     Okay, did you happen to do any work on

10    construction of Nationals Park?

11         A     No.

12         Q     Okay, is all of your work in D.C.,

13    Maryland, or Virginia?

14         A     Yes.

15         Q     Do you have a sense over, say, the

16    last 10 years, what percentage of your work has

17    been in each of those three jurisdictions?

18         A     Mostly in D.C.

19         Q     And for the remainder of the work,

20    some has been Maryland and some Virginia or -

21         A     Yes.

22         Q     Okay, do you get assigned to a

1  particular site and only one site at a given

2  time?

3       A    The only time I do that is once I've

4  finished one project, then I get transferred

5  over.

6       Q    Okay, so you work on one project until

7  your work there is done, correct?

8       A    Yes.

9       Q    And are you working five days a week?

10      A    Yes.

11      Q    Is that always Monday through Friday?

12      A    Yes.

13      Q    And about how long do you typically

14  spend on a single job site?

15      A    40 hours a week.

16      Q    But how many weeks roughly would you

17  say, or days?

18      A    Well, it all depends on how big the

19  building is.

20      Q    Okay, can you give me a rough sense of

21  the range?  What's a very long -

22      A    Say this building is 12 stories high.

1    It will probably take six months.

2          Q     And what time do you typically start

3    in the morning?

4          A     7:00.

5          Q     Is your pay the same on all of the

6    jobs you work on?

7          A     Yes.

8          Q     Okay, and has your pay stayed the same

9    throughout the 10 years that you've been

10   carpenter foreman?

11         A     No, it's been up and down.

12         Q     What has triggered the changes?

13         A     Lack of jobs, and what do you call it,

14   when sometimes - most of the time when voting is

15   coming along, jobs get slack, and sometimes your

16   pay gets cut.

17         Q     Okay, are you saying -

18         A     Instead of getting laid off, you take

19   a cut.

20         Q     I see.  Do you get paid an hourly

21   rate?

22         A     Hourly rate.

1      Q      Okay, and if I understand correctly,

2   that the hourly rate fluctuates as well as the

3   number of hours in a given week may fluctuate?

4      A      Yes.

5      Q      Okay, and do you do any construction

6   work for anyone other than Miller & Long?

7      A      No.

8      Q      Okay, how do you find out when you are

9   moving from one job site to another?

10     A      My foreman, I mean, my superintendent

11  will let me know.

12     Q      Do you work as much as you'd like?

13     A      Yes.

14     Q      Have you had any extended periods of

15  unemployment?

16     A      No.

17     Q      That's pretty good for 35 years.  Have

18  you ever been treated differently from your peers

19  because of the First Source Act?

20     A      No.

21     Q      Does the First Source Act put you at

22  any kind of disadvantage?

1        A    What do you mean by disadvantage?

2        Q    Do you feel that it's ever harder for

3  you to get work?

4        A    No, I never have been through that,

5  no.

6        Q    Have you ever been discouraged from -

7  well, excuse me.  Do you ever make requests,

8  either to your supervisor or anyone else at

9  Miller & Long, that you want to work on a

10  particular project or that you don't want to work

11  on a particular project?

12       A    No.

13       Q    So you simply accept wherever they

14  tell you to go?

15       A    Yes.

16       MR. RISHER:  Got you.  All right,

17  Counsel, would you give us a moment?

18       MR. KIERNAN:  Sure, we can go off the

19  record.

20       (Whereupon, the above-entitled matter

21  went off the record at 12:57 p.m. and resumed at

22  12:59 p.m.)

1    BY MR. RISHER:

2   Q  You mentioned sometimes taking a cut

3 in pay to maintain your hours.  Can you give me a

4 sense of how significant a cut in pay you have

5 taken?

6   A  I've taken, I mean, back in the '90s,

7 I mean, a 20 percent cut.

8   Q  And was that typical of when you've

9 made that decision to take accept a cut in pay?

10   A  Yes, to keep a job.

11   Q  But, sorry, I meant is the amount of -

12 a 20 percent cut, is that about average for what

13 -

14   A  Yeah.

15   Q  And do you have a sense of how often

16 you've had to do this?

17   A  Only once.

18   Q  Only the once, okay, and you said that

19 was around 1990 or -

20   A  Yeah, in the '90s, yeah.

21   Q  In the '90s?

22   A  Yeah.

1    Q    And about how long do you recall was

2    that?

3    A    It lasted about five years, and I

4    gradually got my money back.

5    Q    So over the course of that five-year

6    period, the cut went from 20 percent down to zero

7    percent?

8    A    Yes.

9    Q    Okay, did you do any work on the

10   Marriott Marquis project?

11   A    Yes, a little bit, yeah.

12   Q    Okay, when you showed up at the site

13   on the first day, did anyone ask you where you

14   lived?

15   A    No.

16   Q    Okay, have you ever been asked by

17   anyone else on a job site, in the employment

18   context rather than just friendly talk amongst

19   people, where you live?

20   A    Yes.

21   Q    Okay, can you name an example of that

22   when you were asked?

1    A    One of my employees always asked me

2    that.

3    Q    Always, on every job site?

4    A    Yeah.

5    Q    Okay, and if I recall correctly, you

6    have responded to each of them that you lived

7    somewhere in Virginia?

8    A    Yes.

9    Q    Okay, have you ever been sent away

10   from a job site because you responded that you

11   lived in Virginia?

12   A    No.

13        MR. RISHER:   Okay, that's all of the

14   questions we've got.

15             CROSS EXAMINATION

16        BY MR. KIERNAN:

17   Q    Let me ask you a couple of follow-up

18   questions if I could.  So are you familiar with

19   something called the First Source register in the

20   District?

21   A    No.

22   Q    Okay, are you - how many other

1    carpenter foremen are there employed by Miller &

2    Long?  Do you know?

3         A    Not right off hand, but we do have, I

4    know, over 15.  I do know this, yeah.

5         Q    Over 15 that are the same job level as

6    you?

7         A    Some of them less than me.

8         Q    But the title of carpenter foreman?

9         A    Yes.

10        Q    Does your - does human resources at

11   Miller & Long, they know where you live, right?

12        A    Yes, they do.

13        Q    They know you live in Virginia?

14        A    Yes.

15        Q    Have you ever been told by - or let me

16   back up a second.  Were there any jobs that other

17   carpenter foremen went to that you didn't go to

18   because you live in Virginia that you know of?

19        A    I don't know about that.

20        Q    Okay, you said in response to Mr.

21   Risher's question about where you find work, you

22   go where you're asked to go, right?

1        A    Yes.

2        Q    And generally, who do you, nowadays,

3   who do you report to, or who tells you where to

4   go for jobs?

5        A    John P., the Vice President of the

6   company.

7        Q    Okay, does he know that you live in

8   Virginia?

9        A    Yes, he does.

10       Q    Also, Mr. Risher asked you something

11  about periods of unemployment, and asked you, I

12  think, did you - were there any - did you ever

13  have an extended period of unemployment.  I think

14  your answer was no.  Have you been employed by

15  Miller & Long for the last 35 years?

16       A    Straight.

17       Q    Uninterrupted, right?

18       A    Straight.

19       Q    So there was no point in there in

20  which you were not employed by Miller & Long?

21       A    No.

22            MR. KIERNAN:  Okay, I have nothing

1    further.

2              MR. RISHER:  Just one follow up.

3                   REDIRECT EXAMINATION

4              BY MR. RISHER:

5         Q    I  believe  you  said  -  you  made  a

6    reference to John P.?

7         A    John Paleologos.

8         Q    Would you spell the last name?

9         A    I can't spell that.

10             MR. KIERNAN:  That's probably why he's

11   known as John P.

12             BY MR. RISHER:

13        Q    You said that he's the Vice President

14   of Miller & Long?

15        A    Yes.

16             MR.  RISHER:   Okay,  I  have  no  other

17   questions.

18             MR. KIERNAN:  Thank you.

19             (Whereupon, the above-entitled matter

20   went off the record at 1:05 p.m.)

21

22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>        Defendant. | Civil Action No. 12- 00853 (EGS) |

NOTICE OF DEPOSITION OF PLAINTIFFS MILLER & LONG COMPANY, INC.
AND METROPOLITAN CHAPTER, ASSOCIATED BUILDERS AND
<u>CONTRACTORS, INC.</u>

TO:   Miller & Long Company, Inc.
      Metropolitan Washington Chapter, Associated Builders & Contractors, Inc.
      c/o Paul Kiernan, Esq.
      Holland & Knight LLP
      800 17th Street N.W., Suite 1100
      Washington, DC 20006
      paul.kiernan@hklaw.com

Pursuant to Fed. R. Civ. P. 30(b)(6), the District of Columbia will take the

deposition of plaintiff Miller & Long Company, Inc. ("Miller & Long") and plaintiff

Metropolitan Chapter, Associated Builders and Contractors, Inc. ("ABC Metro"), at

the offices of defendant's counsel specified below, on October 21, 2016, beginning at

10:00 A.M. (for ABC Metro), and on October 25, 2016, beginning at 10:00 A.M. (for

Miller & Long), continuing until completed, including adjournments to such times

and places as may be required.



1

The depositions will occur before an officer or other person duly authorized to administer oaths, and will be recorded by audio and stenographic means.

In accordance with Rule 30(b)(6), plaintiff Miller & Long and plaintiff ABC Metro, are each required to designate and fully prepare one or more officers, directors, managing agents or other persons with the most knowledge concerning the following designated matters, or other persons who consent to testify on their respective behalves, and whom plaintiffs will fully prepare to testify regarding the following designated matters and such information that is known or reasonably available to those plaintiffs:

<u>**SUBJECTS OF DEPOSITION**</u>

1. Plaintiffs' Responses and Objections to the Defendant's First Set of Interrogatories and Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission, and the efforts to respond to them.

2. Plaintiff Miller & Long's efforts to comply with the First Source Act and costs associated with those efforts.

3. Plaintiff ABC Metro's members' efforts to comply with the First Source Act and costs associated with those efforts.

4. Plaintiff ABC Metro's members' efforts to obtain a waiver from the requirements of the First Source Act.

5. Plaintiff ABC Metro's members who decided to "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint.

6. Plaintiff Miller & Long's operations over the last five years, including financial information (revenue, profits, losses), projects in the District (including those covered by the First Source Act), employee hiring and firing, and corporate structure.

DATE: October 12, 2016.         Respectfully submitted,

                               KARL A. RACINE
                               Attorney General for the District of Columbia

                               ELIZABETH SARAH GERE
                               Deputy Attorney General
                               Public Interest Division

                               /s/ Toni Michelle Jackson
                               TONI MICHELLE JACKSON
                               D.C. Bar No. 453765
                               Chief, Equity Section

                               /s/ Andrew J. Saindon
                               ANDREW J. SAINDON, D.C. Bar No. 456987
                               Senior Assistant Attorney General
                               441 Fourth Street, N.W., Suite 600 South
                               Washington, D.C. 20001
                               Telephone: (202) 724-6643
                               Email: andy.saindon@dc.gov

## CERTIFICATE OF SERVICE

I certify that, on October 12, 2016, a copy of this Notice was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW

Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Andrew J. Saindon
ANDREW J. SAINDON
Senior Assistant Attorney General

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., )<br><br>                      Plaintiffs )<br>    v. )<br><br>DISTRICT OF COLUMBIA, )<br><br>                      Defendant. ) | No. 12-CV-00853 (EGS) |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Request for Admissions, as follows:

## GENERAL OBJECTIONS

1.     Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.     Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

---

[1]     Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



3.      In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.  By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1:**  No plaintiff has been fined for a violation of the First Source Act.

**Response:**  Admit.

**REQUEST NO. 2:**  No member of plaintiff MWC has been fined for a violation of the First Source Act.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of this request.

**REQUEST NO. 3:**  No member of plaintiff MWC who requested a waiver under the First Source Act has been denied a waiver.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of this request.

**REQUEST NO. 4:**  Beginning in 2010, DOES developed an online system to allow qualifying companies to register and provide the data and information required by the First Source Act.

**Response:**  Admit.

2

**REQUEST   NO.   5 :**   The online system referenced in Request for Admission No. 4 reduced the administrative burden on qualifying companies, as compared to when the data and information was required to be submitted on paper.

**Response:**  Denied.


**REQUEST   NO.   6 :**   The online system referenced in Request for Admission No. 4 is easier and less time consuming, as compared to the previous, paper reporting requirements.

**Response:**  Denied.


Dated: June 27, 2016                    Respectfully submitted,

                                       /s/ Paul J. Kiernan
                                       Paul J. Kiernan (Bar #385627)
                                       Christine N. Walz (Bar # 996643)
                                       HOLLAND & KNIGHT, LLP
                                       800 17th Street, N.W., Suite 1100
                                       Washington, D.C. 20006
                                       (202) 663-7276 (phone)
                                       (202) 955-5564 (facsimile)
                                       Paul.Kiernan@hklaw.com (email)
                                       Christine.Walz@hklaw.com(email)

3

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

#46928422_v1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., | ) ) ) ) | |
| Plaintiffs | ) | No. 12-CV-00853 (EGS) |
| v. | ) ) | |
| DISTRICT OF COLUMBIA, | ) ) | |
| Defendant. | ) ) ) | |

### PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.     Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.     Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

3.     In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]     Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be called as an expert witness or your attorneys, having knowledge or information relating to the allegations set forth in the Amended Complaint, and describe that knowledge or information for each person identified.

**RESPONSE:**  Mike Burlas, Chief Financial Officer of Miller & Long, has information about the impact of the First Source Act on business, including what steps the company has taken to comply with the Act regarding tracking of employees, bidding on work, assignment of tasks, recruiting and retention programs, and experience with the Act. Mr. Burlas has also served on the Board of ABC-Metro Washington and has information about how the members of ABC-Metro Washington have been affected by the Act. He is aware of the lobbying and educational efforts undertaken by ABC-Metro Washington and information received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for human resources and employee-training programs at the company. He has information about the hiring efforts and attrition rates involving District of Columbia residents employed by Miller & Long. He also has information about the steps Miller & Long takes to comply with the Act and the costs associated with those efforts. He can also testify about the specific work

2

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.

**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**    The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:**  Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:**  Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:**  Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are therefore not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live. And individuals who live in Maryland or Virginia are more susceptible to being laid off or let go in the event that work subject to First-Source requirements predominates in the company's job list.

**INTERROGATORY NO. 6**: State all facts and circumstances supporting your contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:** Taking Miller & Long as an example, the company spends roughly 30% of its human-resources efforts to meet the unique requirements of the District's First Source Act. That is, the human-resources personnel of the company spend time participating in job fairs and similar recruiting efforts; compiling and tracking unique employee information; preparing, submitting, and following up on reporting requirements—all for First Source requirements. Similar efforts are not required to recruit and manage employees resident in Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to $200,000 on just the cost to the company of the additional work of its human-resources department to deal with First Source obligations. And that cost does not include the costs of actually running job fairs or advertising for positions limited to District residents or conducting apprenticeship programs or paying wages to new employees. The apprenticeship requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act. Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:**  The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**: State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:**  The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**: State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**: State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:** Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**: State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:** Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

9

Washington. The case was filed as the new Act was coming into effect, As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:** By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:** Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:**  Plaintiffs are not aware of any.

11

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury

that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my

knowledge, information, and belief.

Executed on June **24**, 2016.

Metropolitan Washington Chapter,
Associated Builders and Contractors, Inc.

By: *Debra D. Livingston*

#46959519_v1

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury

that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my

knowledge, information, and belief.

Executed on June 2-7, 2016.

Miller & Long Co., Inc.

By: M. Aul

MICHAEL BUILAS, CFO

Dated: June 27, 2016

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 996643)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)
Paul.Kiernan@hklaw.com (email)
Christine.Walz@hklaw.com (email)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., | ) ) ) ) |
| Plaintiffs | ) )     No. 12-CV-00853 (EGS) |
| v. | ) ) |
| DISTRICT OF COLUMBIA, | ) ) |
| Defendant. | ) ) ) |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.      Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.      Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

3.      In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]      Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.


EXHIBIT

By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be called as an expert witness or your attorneys, having knowledge or information relating to the allegations set forth in the Amended Complaint, and describe that knowledge or information for each person identified.

**RESPONSE:** Mike Burlas, Chief Financial Officer of Miller & Long, has information about the impact of the First Source Act on business, including what steps the company has taken to comply with the Act regarding tracking of employees, bidding on work, assignment of tasks, recruiting and retention programs, and experience with the Act. Mr. Burlas has also served on the Board of ABC-Metro Washington and has information about how the members of ABC-Metro Washington have been affected by the Act. He is aware of the lobbying and educational efforts undertaken by ABC-Metro Washington and information received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for human resources and employee-training programs at the company. He has information about the hiring efforts and attrition rates involving District of Columbia residents employed by Miller & Long. He also has information about the steps Miller & Long takes to comply with the Act and the costs associated with those efforts. He can also testify about the specific work

2

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.


**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**      The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:** Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:** Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:** Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are

therefore not eligible to be included by Miller & Long in its bids or proposals for projects

covered by the First Source Act for which certain quotas are required. They are treated

differently from their peers for purposes of being included on such projects, which places

them at a significant disadvantage based not on their skills or talents but based solely on

where they live. And individuals who live in Maryland or Virginia are more susceptible to

being laid off or let go in the event that work subject to First-Source requirements

predominates in the company's job list.

**INTERROGATORY NO. 6**:  State all facts and circumstances supporting your
contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:**  Taking Miller & Long as an example, the company spends roughly 30%

of its human-resources efforts to meet the unique requirements of the District's First Source

Act. That is, the human-resources personnel of the company spend time participating in job

fairs and similar recruiting efforts; compiling and tracking unique employee information;

preparing, submitting, and following up on reporting requirements—all for First Source

requirements. Similar efforts are not required to recruit and manage employees resident in

Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to

$200,000 on just the cost to the company of the additional work of its human-resources

department to deal with First Source obligations. And that cost does not include the costs of

actually running job fairs or advertising for positions limited to District residents or

conducting apprenticeship programs or paying wages to new employees. The apprenticeship

requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

5

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act. Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:** The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**: State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:** The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

8

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**:  State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:**  See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**: State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:**  Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**: State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:**       Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

Washington. The case was filed as the new Act was coming into effect, As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:**  By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:**  Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

10

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:**  Plaintiffs are not aware of any.

11

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June **24**, 2016.

Metropolitan Washington Chapter,
Associated Builders and Contractors, Inc.

By: _Debra D. Livingston_

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June 2̲4̲, 2016.

Miller & Long Co., Inc.

By: _____
MICHAEL BURAS, CFO

#46959507_v1

Dated: June 27, 2016

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 996643)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)
Paul.Kiernan@hklaw.com (email)
Christine.Walz@hklaw.com(email)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

13



3.  **First Source: Should the provisions of DC Code §§ 2-219.03 (e)(1A), (e)(1B), (e)(1C) and (e)(2) apply, then this proposal is withdrawn.**

4.  If the General Contractor uses an internet-based platform to post contract documents, MLDC must be notified when such changes are posted.

5.  This Bid is based on mutually agreeable contract terms and conditions to be executed in a contract

    a.  If the General Contractor chooses to use a standard contract form, MLDC's proposal shall be included as an attachment to that form.

    b.  MLDC reserves the right to negotiate a mutually acceptable contract.

    c.  This proposal assumes the previously negotiated standard contract including any exhibits, forms and attachments between MLDC and the General Contractor will be used, except that MLDC uses 2004 form (07/04) for Additional Insured.

    d.  The General Contractor is to provide a copy of the Builders Risk policy for the project to MLDC to verify that there is a waiver of subrogation on the policy, and that MLDC is included as an additional named insured on the policy.

    e.  Sales and use taxes are included.

    f.  This bid assumes a constant tax rate for the entire duration of MLDC's scheduled work.  If this rate, as established by the federal, state, or local authorities, changes during the course of MLDC's scheduled work, MLDC will adjust the Bid accordingly.

6.  MLDC assumes no design responsibility for any component of the project.

7.  MLDC specifically excludes any responsibility for liquidated damages. The General Contractor shall not be entitled to consequential damages resulting from any delays, or in any sum in excess of such amount as may be specifically named in this proposal. Liquidated damages, which are in lieu of all consequential and other damages, may be assessed against MLDC in the amount of $100.00 per day for unexcused delays. MLDC shall not be responsible for delays or defaults occasioned by any cause to the extent that such cause is beyond its control, including but not limited to: those caused by the Owner, general contractor, architect and/or engineers; delays in transportation; shortages of raw materials; civil disorders; labor difficulties; vendor allocations; fires; floods; accidents; or acts of God. It is understood that such causes would be applicable industry-wide, not exclusively associated with the MLDC. MLDC shall be entitled to equitable adjustment in the subcontract time and amount due to such unanticipated causes.  In the event that delays, defaults or interference to MLDC are caused by other subcontractors, the General Contractor warrants that terms are contained in other such subcontracts which allow MLDC to bring claims against other subcontractors through the General Contractor.

8.  MLDC shall be entitled to remittance of progress payments from the General Contractor within fifteen (15) days from the date of approval of its monthly invoices by the Owner, and final payment within fifteen (15) days from the date of approval of its final invoice. Payment shall be conditioned solely on the satisfactory performance of the work by MLDC in accordance with the contract documents. If the General Contractor does not receive payment from the Owner for any cause which is not the fault of MLDC, the General Contractor shall pay MLDC, on demand, a progress or final payment properly invoiced.

    a.  If for any reason not the fault of MLDC, a progress payment is not paid within seven (7) days after due, then MLDC, upon giving three (3) days written notice to the General Contractor, and without prejudice to and in addition to any of its other legal remedies, may stop work until payment of the full amount owing has been received. In such case, the contract sum shall be increased by the amount of MLDC's reasonable costs of shut down, delay, and start up, which costs shall be paid in the following billing period.

    b.  If MLDC's work has been stopped because MLDC has not received progress payments as required, or should the Owner suspend or terminate the General Contractor for default, MLDC may terminate further subcontract work under these agreements upon giving the General Contractor an additional seven (7) days written notice and recover its reasonable damages.

EXHIBIT
12
PENGAD 800-631-6989

EXHIBIT
12
PENGAD 800-631-6989

First Source Jobs Since 2005

| Year | Job site# | Name | Address |
|---|---|---|---|
| 2005 | 1-5800 | 1101 New York Ave. | 1101 New York Ave., NW Washington, D.C. 20005 |
| 2005 | 1-5830 | Capitol Plaza I | 1200  First Street NE, Washington, D.C. 20002 |
| 2005 | 1-5910 | Chase Point | 5401 Western Ave., NW Washington, D.C. 20015 |
| 2005 | 1-5410 | The Columbia Residences | 2425 L Street, NW Washington, D.C. 20037 |
| 2005 | 1-6150 | Senate Square Towers | 201 North I street, NE Washington, D.C. 20002 |
| 2006 | 1-5920 | Flats At Union Row | 2515 14th Street, NW Washington, D.C. 20009 |
| 2006 | 5-1290 | 1010 Massachusetts Ave. | 1010 Massachusetts Ave., NW  Washington, D.C. 20001 |
| 2006 | 1-6240 | Cityvista | 501 K Street, NW Washington D.C. 20001 |
| 2006 | 1-5810 | Kenyon Square Condos, | 1390 Kenyon Street, NW Washington, D.C. 20009 |
| 2006 | 1-6100 | Highland Park Condos | 1400 Irving Street, NW Washington, D.C. 20009 |
| 2006 | 1-6430 | Anacostia Gateway | 1800 Martin Luther King Ave., SE Washington, D.C. 20020 |
| 2007 | 1-6800 | 100 M Street | 100 M Street, SE Washington, D.C. 20003 |
| 2007 | 1-6720 | 1331 L Street | 1331 L Street, NW Washinton, D.C. 20002 |
| 2007 | 1-6640 | Station Palace 3 | 725 2nd Street, NE Washington, D.C. 20002 |
| 2008 | 1-7350 | 1015 Half Street | 1015 Half Street, SE Wahington D.C. 20003 |
| 2008 | 1-7360 | Waterfront Southwest- East BLDG | 401 M street, SW Washington D.C. 20024 |
| 2008 | 1-7250 | West End 1229- 25th Street | 1229 25th Street, NW Washington D.C. 20037 |
| 2008 | 1-7020 | 1999 K Street | 1999 K Street, NW Washington, D.C. 20006 |
| 2008 | 1-7390 | Woodrow Wilson Aquatic Center | 3950 Chesepeake Street, NW Washington, D.C. 20016 |
| 2009 | 1-7500 | 800 17th Street | 800 17th Street, NW Washington, D.C. 20006 |
| 2009 | 1-7515 | Square 54-Phase 3 Residential | 900 22nd Street, NW Washington, D.C. 20024 |
| 2009 | 1-7570 | Georgetown Safeway | 1855 Wisconsin Avenue, NW Washington D.C. 20007 |
| 2010 | 1-7720 | 733 10th Street | 733 10th Street, NW Washington, D.C. 20001 |
| 2010 | 1-7800 | Georgetown University Science Center | 3700 O street, NW Lot T Trailer, Washington, D.C. 20057 |
| 2010 | 1-7810 | Rhode Island Station | 919 Rhode Island Ave, NE Washington, D.C. 20001 |
| 2010 | 1-7830 | Waterfront Station- Phase 3 | 400 M street, SW Washington, D.C. 20024 |
| 2011 | 1-7880 | Meridian At Mount Vernon Square | 425 L Street, NW Washington, D.C. 20001 |
| 2011 | 1-7960 | 14th & W (YMCA) | 1325 W Street, NW Washington, D.C. |
| 2011 | 1-7980 | Janney Elementary School | 4130 Albemarle Street, NW Washington  D.C. 20016 |
| 2012 | 1-1010 | 2 M Street | 2 M Street, NE Washington, D.C. 20002 |

ML002

| 2013 | 1-7650 | Marriott Marquis | 90 Massachusetts Ave., NW Washington, D.C. 20001 |
| 2013 | 1-1070 | Washington Gateway | 100 Florida Ave., NE Washington D.C. 20002 |
| 2014 | 5-1270 | Republic Square Phase II | 660 North Capitol Street, NW Washington, D.C. 20001 |
| 2015 | 5-1310 | 1000 F Street | 1000 F Street, NW Washington, D.C. 20004 |
| 2015 | 5-1370 | The Lab School | 4759 Reservior Road, NW Washington, D.C. 20007 |
| 2015 | 5-1330 | The Wharf | 1100 Maine Ave, SW Washington, D.C. 20024 |
| 2015 | 5-1410 | Hine School North | 770 C Street, SE Washington, D.C. 20003 |
| 2015 | 5-1420 | Hine School South | 700 Pennsylvania Ave., SE Wahington, D.C. 20003 |

ML003

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER,<br>ASSOCIATED BUILDERS AND CONTRACTORS, INC.<br>1725 I Street, N.W.<br>Suite 300<br>Washington, D.C.  20006,<br><br>MILLER & LONG CONCRETE CONSTRUCTION, INC.<br>4824 Rugby Avenue<br>Bethesda, Maryland  20814<br><br>HAWKINS ELECTRICAL CONSTRUCTION<br>OF DC, LLC<br>3303 Stanton Road, S.E.<br>Suite J<br>Washington, D.C.  20020<br><br>EMMETT MORRIS, JR.<br>18016 Terrace Run Road<br>Orange, Virginia  22960,<br><br>DAIRON UPSHUR<br>9711 Skyhill Way #212<br>Rockville, MD 20850<br><br>        Plaintiffs,<br><br>        v.<br><br>DISTRICT OF COLUMBIA,<br>a municipal corporation,<br>MURIEL BOWSER, in her official<br>capacity as Mayor of the District of Columbia<br>1350 Pennsylvania Avenue, N.W., Suite 316<br>Washington, D.C.  20004,<br>            Defendant. | Case No. 1:12-cv-00853 |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs seek declaratory and injunctive relief against the Mayor and the District of Columbia

(the "District") to strike down as unconstitutional the District's First Source Employment Act and to block

its enforcement.  As discussed at the December 4, 2015 hearing on the District's Motion for Judgment on



EXHIBIT
14

the Pleadings, Plaintiffs submit this Amended Complaint for Declaratory and Injunctive Relief in order to clarify and streamline the issues that remain before this Court at this time.[1]

## INTRODUCTION

The right to pursue one's calling free from discrimination is a fundamental American right. Under the Constitution, a jurisdiction cannot erect barriers that prevent qualified workers who live in another jurisdiction from practicing their trades. But the District's First Source Employment Act imposes on employers and employees harmful discriminatory requirements. For employers, it creates an expensive and unworkable caste system in which some of their employees must be denied the right to work on certain projects because of where they live. It squeezes employers when they bid for work and when they deliver services to their clients and customers. Employers are subject to audits, threats from the District Government, and pressure to provide jobs, training, and work conditions that apply to District residents alone. For employees, the law burdens their ability to secure employment and denies them opportunities to succeed. For everyone, the law creates higher costs and attendant intrusive red tape, reports, and delays, while skewing the job market in a way that ultimately hurts District residents.

The District of Columbia's "employment problem" is not that there are too many residents chasing too few jobs. By some measures, there are over 800,000 jobs in this city of 600,000 people. The "problem" is that the District lags behind its neighbors in educating and training the workforce the construction industry needs.

The First Source Employment Act has never created a single job—and never will. Instead, it infringes on the fundamental American right to pursue employment free from discrimination. It violates

---

[1] Plaintiffs file this Amended Complaint to facilitate a decision on the merits of their claim that the First Source Employment Act is unconstitutional under the Due Process Clause, which incorporates the protections of the Privileges and Immunities Clause. By filing this Amended Complaint, Plaintiffs do not waive their rights to appeal the Court's July 14, 2015 Order dismissing Counts II-VII of Plaintiffs' Complaint. *See* Dkt. 21. As of this filing, the Court has not ruled on the District's Motion for Judgment on the Pleadings, where the District challenged the viability of a claim against the District based directly on the Privileges and Immunities Clause.

the Civil Rights Act and numerous constitutional protections, including the Privileges and Immunities Clause and the Due Process Clause of the Fifth Amendment, which incorporates the protections of the Privileges and Immunities Clause. Indeed, it is flatly inconsistent with the stated policy in the District's Human Rights Act that there should be "an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of ...place of residence or business."[2]

For too many years, developers, contractors, and other employers have been forced to endure and work around the Act, afraid of the public outcry that would follow if a purported "jobs bill" were challenged, and afraid of the retribution of District officials with a vested interest in pretending that the First Source Employment Act is a solution to the District's chronic underemployment in certain areas of the city. But with the recent amendments to the First Source Act, contractors cannot possibly comply with the Act's hiring and quota requirements, and they are threatened with job losses, business failures, and debarment from government contracting. The uncertainties surrounding how the District will enforce the Act—How does it apply to awarded contracts? Projects still being bid? How will the Mayor exercise her unfettered discretion in deciding whether contractors have made a "good-faith effort" to comply with the statute's requirements?—have further complicated the situation for ethical employers who would try to comply with the Act. And the business-destroying fines and penalties in the Amended Act have pushed this debate past a tipping point. The amended First Source Employment Act puts the plaintiffs' very livelihoods at risk, and they need judicial redress.

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343. This action arises under 42 U.S.C. § 1983 and the United States Constitution.

---

[2]      *See D.C. Official Code* §2-1401.01.

2.      Plaintiffs are asking this Court to declare their rights and other legal relations under the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

3.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

4.      Plaintiff Metropolitan Washington Chapter, Associated Builders and Contractors, Inc.

("ABC-Metro Washington") is a not-for-profit corporation organized under the laws of the State of

Maryland with offices in the District of Columbia and in Maryland.   ABC-Metro Washington is the

leading commercial-construction association in the Washington metropolitan area.   ABC-Metro

Washington has approximately 529 member organizations, including corporations and sole

proprietorships.   ABC-Metro Washington members function throughout the construction industry as

general contractors, specialty contractors, industry (professional) associates, and suppliers.   These

members live and work in the Greater Washington area, including in the District of Columbia, Virginia,

and Maryland.   Established in 1958, ABC-Metro Washington is one of 75 chapters in a nationwide

federation of more than 23,000 construction and construction-related firms with nearly two million

employees.   ABC-Metro Washington members are generally dedicated to free enterprise, open

competition, and having a level playing field in securing work.   Most ABC-Metro Washington members

tend to have permanent or long-term workforces.   ABC-Metro Washington has long stood for the

principles that companies should reward employees based on individual merit and performance and that

contracts should be awarded based on safety, quality, value, and results.   ABC-Metro Washington has

advocated for its members on these issues, including through lobbying government officials and

promoting business practices consistent with the organization's philosophy.  ABC-Metro Washington

played a lead role in lobbying against the amended First Source Employment Act.

5.     Plaintiff Miller & Long Concrete Construction, Inc. ("Miller & Long") is a privately held

corporation with its principal place of business in Bethesda, Maryland.  Miller & Long is a member of

ABC-Metro Washington and adheres to the organization's philosophy.  Miller & Long regularly bids on

work projects in the District of Columbia that are affected by the First Source Employment Act.

6.     Plaintiff Hawkins Electrical Construction of Washington, D.C., LLC ("Hawkins

Electrical") is a limited-liability company organized under the laws of the District of Columbia.  Hawkins

Electrical is a member of ABC-Metro Washington.  Hawkins Electrical provides professional electrical

construction and consulting services, primarily on commercial projects.  Hawkins Electrical is recognized

by the District as a Certified Business Enterprise.  Hawkins Electrical regularly bids on work projects in

the District of Columbia that are affected by the First Source Employment Act.

7.     Plaintiff Emmett Morris, Jr. is a resident of the Commonwealth of Virginia and is a

qualified Carpenter Foreman.  Plaintiff Dairon Upshur is a resident of the State of Maryland and is a

construction safety manager.  Each of these individual plaintiffs has worked on projects that are affected

by the requirements of the First Source Employment Act or has sought work on projects that are affected

by the requirements of the First Source Employment Act.  Each of these plaintiffs has demonstrated a

desire and ability to be employed on work projects that are affected by the requirements of the First Source

Employment Act.

8.     Muriel Bowser is the current Mayor of the District of Columbia and is sued in her official

capacity.  The District of Columbia is a municipal corporation.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. The First Source Employment Agreement Act of 1984

9.     In 1984, the District of Columbia adopted the First Source Employment Agreement Act (the "Act") (D.C. Law 5-93, currently codified at *D.C. Official Code* §2-219.01 *et seq.*)  This action seeks to strike down the Act as amended.  (The recent amendments are discussed in **Section B**, below.)  Plaintiffs are challenging on their face and as-applied the following four requirements or elements of the Act and the penalties associated with them: (i) employment agreements; (ii) construction contracts; (iii) targeted-hiring contracts; and (iv) reporting requirements.

### *(i)*     *Employment Agreements*

10.     The Act defines a "government-assisted project" as "any project funded in whole or in part with District of Columbia funds, or funds which, in accordance with a federal grant or otherwise, the District of Columbia government administers, and on which the District of Columbia is signatory to any agreement of a contractual nature, including leasing agreements of real property for 1 year or more, or the initial project, development, or construction facilitated by any street or alley closing pursuant to Chapter 2 of Title 9."  *See D.C. Official Code* § 2-219.01(5) (2011).

11.     The Act defines a "beneficiary" to include

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, ... and which details the number and description of all jobs created by a government-assisted project for which the beneficiary is required to use the First Source Register, [and]

(b) a beneficiary of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for public redevelopment, or tax increment financing that results in a financial benefit of $100,000 or more from an agency, commission,

instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds. *D.C. Official Code* § 2-219.01(1)(A)-(1)(B) (2011).

12.     Under the Act, the Mayor includes for every "government-assisted project" a requirement that the "beneficiary" enter into an employment agreement ("Employment Agreement") with the District with the beneficiary agreeing that (a) the first source for finding employees to fill all jobs created by the government-assisted project will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an Employment Agreement will be the First Source Register. *See D.C. Official Code* § 2-219.03(a) (2011). The "First Source Register" is "the Department of Employment Services Automated Applicant Files, which consists of the names of unemployed District residents registered with the Department of Employment Services." *D.C. Official Code* § 2-219.01(4) (2011). People who do not live in the District cannot be listed on the First Source Register.

13.     On government-assisted projects, Employment Agreements require contractors and subcontractors to fill jobs and vacancies from the First Source Register. In other words, the impact of the Act's requirements flow through to beneficiaries, contractors, and subcontractors. "Willful breach of the employment agreement," can be enforced by the Contracting Officer "through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C. Official Code* § 2-219.03(e)(4) (2011).

14.     The individual plaintiffs, as nonresidents of the District of Columbia, are prohibited from registering on the First Source list, do not satisfy the residency hiring requirements, and, therefore, are at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list.

7

15.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been "beneficiaries" within the meaning of the Act, and have also been required to execute or agree to be bound by Employment Agreements. Because of the Act, they have been obligated to fill jobs and vacancies from the First Source list. They therefore have been forced to deviate from their individual-merit, level-playing-field business philosophy by hiring or staffing individuals based on where they live instead of exclusively because of their qualifications for the job. And because ABC-Metro Washington's members typically have a permanent workforce (as distinct from a per-project workforce), the Act essentially requires ABC-Metro Washington members to withhold work from nonresident employees because they have to hire District residents to meet the Act's hiring quotas, or decline to bid on additional work because of the relative shortage of qualified District residents.

16.     As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred increased costs for employee recruiting, training, hiring, and supervision that they would not have had to incur absent the strictures of the Act. These additional costs include the expenses for additional staff committed solely to District-resident recruitment—such as attending job fairs targeted at District residents during the recession when construction workers from Maryland and Virginia are being laid off in large numbers. ABC-Metro Washington's members spend inordinate time and resources dealing with the administrative demands of dealing with the Department of Employment Services ("DOES") referral system; screening numerous District applicants trying to find employable ones; drug testing with respect to potential hires; committing significant resources to training newly hired District residents, only to have a large percentage of the new hires quit or fail to meet minimal job requirements such that they have to be fired; and the inefficiency and expense of having to repeat the entire recruitment process again in order to hire another District resident to replace the District resident employee that was terminated or left. (For example, Plaintiff

Miller & Long's experience under the First Source Act is that typically it has to screen about 60 District applicants in order to find 25 workers, the majority of whom wind up not being employed six months later. These screening numbers and percentages for District residents are approximately three times higher than for residents of other jurisdictions such as Maryland and Virginia.)

17.      As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred additional costs that they would not have had to incur absent the strictures of the Act including:

(a) less productivity on jobsites as the result of having to hire less-qualified or less-experienced employees in order to increase the percentage of District-resident employees required by the Act, creating higher overall labor costs to the subcontractors, general contractor, and the entire project;

(b) employee morale problems on the jobsite related to the more lenient treatment necessarily given to District-resident employees compared to other employees with respect to absenteeism, tardiness, attitude, and work performance;

(c) higher legal fees for legal guidance on the First Source rules and their attendant obligations, interpretations of the ABC-Metro Washington member's legal rights under the First Source Employment Agreements including possible modifications thereto and legal defenses should they be targeted with a First Source Act investigation and potential fines or other penalties;

(d) additional costs as contractors were publicly and falsely maligned for lack of compliance with the First Source, statements generated in part by the misinformation espoused by the City Council and repeated in the press that the 51% requirement for District-resident employment applied to the entire workforce on a project, not just to the new hires required for a particular job.

(e) the costs and impacts discussed in Paragraph 76, below.

18.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions.

### (ii)     *Construction Contract "New Hires" Requirement*

19.     The Act requires the Chief Procurement Officer and each District Contracting Officer to include in government-assisted projects costing $100,000 or more "the provision that 51% of the new employees hired for the project shall be District residents," unless the Contracting Officer waives this requirement upon a finding that:

(a) the beneficiary made a good-faith effort to comply;

(b) the beneficiary is located outside the Washington Standard Metropolitan Statistical Area (the "Area") and none of the contract work is performed inside the Area;

(c) the beneficiary enters into a special workforce-development training or placement arrangement with DOES; or

(d) DOES certifies that there are insufficient numbers of District residents in the labor market possessing the skills required by the positions created as a result of the contract.

*See D.C. Official Code* § 2-219.03(e)(3) (2011). Deliberate submission of falsified data may "be enforced by the Contracting Officer through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C. Official Code* § 2-219.03(e)(4) (2011).

20.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been construction contractors and subcontractors for beneficiaries of government-assisted projects costing in excess of $100,000. Consequently, the Act has required ABC-Metro Washington's members, contrary to their individual-merit and level-playing-field philosophy, to enter into construction contracts

("Construction Contracts") with the District or with beneficiaries which mandate that 51% of the new employees hired for the project be District residents.

21.     In an effort to comply fully with the Act, ABC-Metro Washington's members must also document good-faith efforts to hire District residents or enter into special workforce-development training or placement arrangements with DOES.  As a direct result of the "new hires" requirement of the Act, ABC-Metro Washington's members have incurred costs they would not have had to incur but for the strictures of the Act, including increased employee recruiting, training, hiring, reporting, and supervision costs.

22.     On information and belief, no general contractor has been able to meet on a regular basis the 51% new-hire requirement with respect to an overall project (that is, including all of the project's subcontractors).  There are subcontractors, such as Plaintiff Miller & Long, that have consistently made significant efforts to satisfy the First Source hiring requirements, but have still fallen short for reasons beyond their control, including:

(a) an insufficient number of skilled construction workers who live in the District;

(b) DOES's consistent failure to provide acceptable candidates for particular job requirements, and failure to adequately vet the candidates and their representations as to their skills—for example, sending an applicant who represents that he is a carpenter when he is not;

(c) District residents' lack of the transportation necessary to get to jobsites at the times required;

(d) the disproportionately high "fail" rate by District-resident applicants of required drug tests, and DOES's failure to screen the applicants before submitting them to prospective employers;

(e) disproportionate number of District-resident applicants who quit within the first few weeks or months on the job, break work rules about attendance; or have poor job performance and have to be terminated for that reason; and

11

(f) the burdens and costs of going through the screening process yet again whenever a District resident quits or is terminated.

23.     As a direct result of the "new hires" requirements of the Act, the individual Plaintiffs have been discriminated against in obtaining employment opportunities simply because they are not residents of the District, while the contractor Plaintiffs have been discriminated against because existing trained employees cannot be assigned to work on projects if they cannot help satisfy the "new hires" obligations. For example, Miller & Long favored District resident workers (over nonresidents) when it had to make layoffs during the recession of the last few years.  Plaintiff Miller & Long also made an effort to hire District residents, even when it was laying off nonresident employees because of the slowdown in construction work.

### (iii)     *Targeted-Hiring Contracts*

24.     Under the Act, "[w]henever the Mayor determines that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects," the Mayor can "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *See D.C. Official Code* § 2-219.03a(a) (2011).  The Act does not define how or when the Mayor can determine that the goal could be "better served," nor does the Act constrain the Mayor's discretion.

25.     Beneficiaries of government-assisted projects who enter into these targeted-hiring contracts ("Targeted-Hiring Contracts") routinely require their contractors and subcontractors to provide for increased hiring in specific job categories, so that the beneficiary may, in turn, comply with the Act. Noncompliance with a Targeted-Hiring Contract is "treated in the same manner as a violation of any other requirement" of the Act. *See D.C. Official Code* § 2-219.03a(a) (2011).  In other words, the impact of the

Act's requirements about Targeted-Hiring Contracts flows through the beneficiaries to contractors and subcontractors.

26.     ABC-Metro Washington's members, including the contractor Plaintiffs, have entered into Targeted-Hiring Contracts.  ABC-Metro Washington's members are also contractors and subcontractors for beneficiaries of government-assisted projects subject to Targeted-Hiring Contracts.  Consequently, ABC-Metro Washington's members have been required, contrary to their merit-shop philosophy, to enter into Targeted-Hiring Contracts with the District.

27.     As a direct result of the requirements of the Act and the Targeted-Hiring Contracts, ABC-Metro Washington and its members, including the contractor Plaintiffs, have incurred increased costs such as those alleged in Paragraphs 16 and 17.

28.     Because of the higher costs and the impact of the Act on their ability to bid and staff jobs, ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or argue for exemption.  They also suffer competitive disadvantage compared to companies that receive favorable treatment from the Mayor in the setting of specific job targets or that employ District residents in specific affected job categories.

*(iv)*     ***Reporting Obligations***

29.     The Act requires a "beneficiary" to submit to DOES every month following the execution of a contract subject to the Act, a contract-compliance report ("Contract-Compliance Report") for the project, including the following information:

(a) number of employees needed;

(b) number of current employees transferred;

13

(c) number of new job openings created;

(d) number of job openings listed with DOES;

(e) total number of all District residents hired for the reporting period and the cumulative total

number of District residents hired; and

(f) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including name, social-security number, job title, hire date, residence, and

referral source for all new hires.

*See D.C. Official Code* § 2-219.03(d) (2011).

30.    In addition, with the submission of the final request for payment from the District, the Act

requires the beneficiary to (a) document to the Contracting Officer its compliance with the Act, or (b)

submit a request to the Contracting Officer for a waiver of compliance.  The waiver request must include

(i) material demonstrating a good-faith effort to comply with the Act, (ii) referrals provided by DOES and

other referral sources, and (iii) advertisements of job openings listed with DOES and other referral sources.

*See D.C. Official Code* § 2-219.03(e)(3) (2011).

31.    Beneficiaries who are required to submit Contract-Compliance Reports to the District

routinely require contractors and subcontractors on these government-assisted projects to report the

information required of the beneficiary under the Act, so that the beneficiary may, in turn, try to comply

with the Act.  In other words, the impact of the Act's requirements flows through the beneficiary to

contractors.  The "failure to submit the contract compliance report…or deliberate submission of falsified

data" could "be enforced by the Contracting Officer through the imposition of penalties, including

monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C.*

*Official Code* § 2-219.03(e)(4) (2011).

32.     ABC-Metro Washington's members, including the contractor Plaintiffs, have to submit Contract-Compliance Reports and other reports on their compliance with the Act. Keeping and reporting such information is contrary to the members' individual-merit philosophy.

33.     As a direct and proximate result of the reporting obligations under the Act, ABC-Metro Washington's members have incurred reporting and other costs which they would not have had to incur absent the strictures of the Act, including increased costs for monitoring, reporting, and supervising related to the hiring of District residents. As an example, members incur higher administrative costs for the time spent completing the monthly reporting form required under the Act; adapting to the changes made by DOES—sometimes in the middle of a job—in the reporting requirements and the forms that are required; and engaging with DOES on reporting issues via phone, email, jobsite meetings and meetings at DOES' offices, as well as increased attorneys' fees related to interpreting the legal requirements for reporting under the Act.

34.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements, including the Act's reporting obligations.

**B.      The Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011**

35.     Effective on or about February 24, 2012, the District of Columbia amended the Act by adopting the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (the "Amended Act"). The Amended Act is more far-reaching, intrusive, and unlawful than its predecessor, including in the four respects carried over from the original Act. The Amended Act exacerbates unconstitutional discrimination, imposes onerous restrictions on the bidding process, threatens stiffer penalties, and burdens larger projects with new requirements as discussed below.

*(i)*     *Amended Employment Agreements*

36.     The Amended Act expands the applicability of Employment Agreements ("Amended Employment Agreements") by requiring the Mayor to include for every government-assisted project <u>or contract</u> a requirement that the beneficiary enter into an Employment Agreement with the District stating that: (a) the first source for finding employees to fill all jobs created by the government-assisted project or contract will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an employment agreement will be the First Source Register.  *See D.C. Official Code § 2-219.03(a)(1)-(a)(2) (2012) (amended).*

37.     For projects valued in excess of $300,000, the Amended Act defines "government assisted project or contract" more broadly as "any construction <u>or non-construction</u> project <u>or contract</u> receiving funds or resources from the District of Columbia, or funds or resources which, in accordance with a federal grant or otherwise, the District of Columbia government administers, <u>including contracts, grants, loans, tax abatements or exemptions, land transfers, land disposition and development agreements, tax increment financing, or any combination thereof, that is valued at $300,000 or more.</u>"  *D.C. Official Code § 2-219.01(5) (2012) (amended).*

38.     For projects valued in excess of $300,000, the Amended Act also defines a "beneficiary" more broadly to include not only a party who has signed a contract with the District but also "recipients" of District "actions."  The Act now reaches:

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, ... and which details the number and description of all jobs created by a government-assisted project <u>or contract</u> for which the beneficiary is required to use the First Source Register,

[and]

(b) a <u>recipient</u> of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for redevelopment, or tax increment financing that results in a financial benefit of $300,000 or more from an agency, commission, instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds.

*D.C. Official Code* § 2-219.01(1)(B) (2012) (amended)(emphasis added).

39.     The Amended Act threatens harsher penalties for noncompliance, including potential debarment. "Willful breach of the employment agreement," shall be enforced by the Mayor through the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A) (2012) (amended).  "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(D) (2012) (amended).

40.     ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts valued in excess of $300,000 and recipients of District-government economic-development action including contracts valued at in excess of $300,000, all within

the meaning of the Amended Act. ABC-Metro Washington's members, including the contractor Plaintiffs, also reasonably expect to be bidders on or contractors on government-assisted projects or contracts valued in excess of $300,000, and recipients of government economic-development actions affected by the Amended Act.

41.    ABC-Metro Washington's members, including the contractor Plaintiffs, will now be required by the Amended Act to enter into Amended Employment Agreements with the District of Columbia and to continue to fill jobs associated with government-assisted projects from the First Source Register, all contrary to the philosophy of the members and the organization to promote individual merit and a level playing field for all employers and employees.

42.    As a direct and proximate result of the Amended Act and the Amended Employment Agreements, ABC-Metro Washington's members will continue to incur costs of the type and nature identified above in Paragraphs 16 and 17. The threat of increased penalties, including the threat of debarment and the ripple effect of such a debarment on other contracting opportunities (including contracting with the federal government) will require ABC-Metro Washington's members to incur even more costs to ensure scrupulous adherence to the Amended Act. But adhering to the hiring requirements of the Amended Act is virtually impossible based on the scarcity of qualified District-resident workers. Thus, contractors have to gamble on obtaining a waiver at the end of the job, with no reliable way to predict whether the waiver will be granted. The Amended Act's continuation of the discriminatory requirements of the old law, its significant expansion of those hiring and reporting requirements, and the unpredictable and severe consequences of noncompliance, put employers and contractors in an even more perilous spot than under the original Act.

43.    As a direct result of the requirements of the Amended Act and the Amended Employment Agreements, the individual Plaintiffs are likely to be discriminated against in obtaining or retaining

employment simply because they are not residents of the District, while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act.  The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

44.      ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Employment Agreements that link hiring to residency, that do not have permanent workforces, or that are able to secure waivers or exemptions.

*(ii)*      ***Amended Construction Contracts***

45.      The Amended Act requires the Mayor to include in each government-assisted project <u>or contract</u> that receives government assistance totaling between $300,000 and $5 million, "a provision that at least 51% of the new employees hired to work on the project <u>or contract</u> shall be District residents," unless the Mayor waives this requirement upon additional findings that:

(a) DOES has certified that the beneficiary made a "good faith effort to comply";

(b) the beneficiary is located outside the Area, none of the contract work is performed inside the Area, the beneficiary published each job opening or part-time work needed for 7 calendar days in a District newspaper of city-wide circulation, and DOES certifies that there are insufficient eligible applicants from the First Source Register that possess the skills required by the positions, or the eligible applicants are not available for part-time work or do not have a means to travel to the onsite job; or

(c) the beneficiary enters into a special workforce development training or placement arrangement with DOES.

*See D.C. Official Code* § 2-219.03(e)(3)(A)(i)-(A)(iii) (2012) (amended).

19

46.     ABC-Metro Washington's members, including the contractor Plaintiffs, are contractors and subcontractors participating in government-assisted projects and entering into contracts that receive government assistance totaling between $300,000 and $5 million.  Consequently, the Amended Act will require ABC-Metro Washington's members, contrary to their employment philosophy, to enter into Amended Construction Contracts ("Amended Construction Contracts") with the District or beneficiaries, incorporating a requirement that 51% of the new employees hired for the project or contract shall be District residents.

47.     The Amended Act requires the Mayor to include in each government-assisted project or contract that receives government assistance totaling $5 million or more, a new provision that:

(a) at least 20% of journey worker hours by trade shall be performed by District residents;

(b) at least 60% of apprentice hours by trade shall be performed by District residents;

(c) at least 51% of the skilled laborer hours by trade shall be performed by District residents; and

(d) at least 70% of common laborer hours shall be performed by District residents.

*See D.C. Official Code* § 2-219.03(e)(1A)(A) (2012) (amended).

48.     Prior to DOES accepting the Amended Construction Contract, the beneficiary must choose whether the 51% of new employees hired will be (a) cumulative of all new hires, including those made by all subcontractors at any tier who work on the project or contract, or (b) met by each beneficiary covered by the paragraph and each individual subcontractor at any tier who works on the project or contract.  *See D.C. Official Code* § 2-219.03(e)(1)(A)(i)-(A)(iii) (2012) (amended).

49.     DOES must consider the following when making a determination of a "good faith effort to comply":

(a) whether DOES has certified that there is an insufficient number of District residents in the labor market who possess the skills required to fill the positions that were created as a result of the project or contract;

(b) whether the beneficiary posted the jobs on the Department of Employment Services job website for a minimum of ten calendar days;

(c) whether the beneficiary posted each job opening or part-time work needed in a District newspaper with city-wide circulation for a minimum of seven calendar days;

(d) whether the beneficiary has substantially complied with the relevant monthly reporting requirements set forth in this section;

(e) whether the beneficiary has submitted and substantially complied with its most recent employment plan that has been approved by the Department of Employment Services; and

(f) any additional documented efforts.

*See D.C. Official Code* § 2-219.03(e)(3)(B) (2012) (amended).

50.     "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the required hiring requirements (or failure to receive a good-faith waiver), (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

51.     The beneficiaries of these projects are compelled by the Amended Act's mandates to apply the local hiring requirement to all individual subcontractors at any tier that work on the project or contract, or pressure all subcontractors to come as close as possible to meeting the local hiring requirements. Consequently, ABC-Metro Washington's members must agree that (a) at least 20% of journey work hours by trade are performed by District residents, (b) at least 60% of apprentice hours by trade are performed by District residents, (c) at least 51% of the skilled-laborer hours by trade are performed by District residents; and (d) at least 70% of common-laborer hours are performed by District residents.

52.     As a direct result of the Amended Act, ABC-Metro Washington's members, including the contractor Plaintiffs, will incur costs of enhanced employee recruiting, training, hiring, reporting, and supervising costs that they would not have had to incur but for the strictures of the Amended Act and the Amended Construction Contracts, including of the types alleged in Paragraphs 16 and 17 above.

53.     As a direct result of the Amended Construction Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District, while the contractor Plaintiffs, face imminent discrimination and risk because they cannot satisfy the obligations of the Act.  The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

54.     ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Amended Construction Contracts or adhering to those requirements, or that are able to obtain waivers or exemptions.

### (iii)    *Amended Targeted-Hiring Contracts*

55.    Under the Amended Act, "[w]henever the Mayor determine[s] that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects or contracts," the Mayor may "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *D.C. Official Code* § 2-219.03a(a) (2012) (amended).  The Amended Act still does not define how or when the Mayor can determine that the goal could be "better served," nor does the Amended Act constrain the Mayor's unlimited discretion.

56.    ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts and District-government economic-development action. They are also contractors and subcontractors for beneficiaries of government-assisted projects or contracts and District-government economic-development action.   Consequently, ABC-Metro Washington's members will be required, contrary to their business philosophy, to enter into amended targeted-hiring contracts ("Amended Targeted Hiring Contracts") with the District.

57.    "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the required-hiring requirements (or failure to receive a waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

58.     As a direct and proximate result of the Amended Act, ABC-Metro Washington's members will incur costs including increased employee recruiting, training, hiring, reporting, and supervising costs, and other costs outlined above in Paragraphs 16 and 17.

59.     As a direct result of the Amended Targeted-Hiring Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act.   The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

### *(iv)*     *Amended Beneficiary Reporting Obligations*

60.     The Amended Act requires a "beneficiary" to submit to DOES every month following the start of the project or contract until construction is completed and a final certificate of occupancy has been issued, a hiring compliance report ("Amended Contract-Compliance Report") for the project or contract including additional information about the

(a) number of employees who worked on the project or contract;

(b) number of current employees transferred;

(c) number of new job openings created,

(d) number of job openings created by employee attrition;

(e) number of job openings listed with DOES;

(f) total monthly direct and indirect labor costs associated with the project or contract;

(g) total number of all District residents hired for the reporting period and the cumulative total number of District residents hired; and

(h) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including each employee's name, social-security number, job title, hire date,

residence, and referral source for all new hires.

*See D.C. Official Code* § 2-219.03(e)(1) (2012) (amended).

61.     In addition, for each government-assisted project or contract that receives government

assistance totaling $5 million or more, there is a new requirement that each month following the start of

the project or contract until construction is completed and a final certificate of occupancy has been issued,

beneficiaries submit to DOES copies of their monthly and cumulative certified payrolls, monthly and

cumulative certified payrolls from all subcontractors at any tier working on the project or contract, as well

as a report of the total monthly direct and indirect labor costs associated with the project or contract.  *D.C.*

*Official Code* § 2-219.03(e)(1A) (D)-(E) (2012) (amended).

62.     With each submission of a final request for payment from the District, the Amended Act

requires the beneficiary to (a) document in a report to the Mayor the beneficiary's compliance with the

Act, or (b) submit a request to the Mayor for a waiver of compliance incorporating (i) material supporting

the argument that there has been a good-faith effort to comply, (ii) referrals provided by DOES and other

referral sources, and (iii) advertisement of job openings listed with DOES and other referral sources.  *See*

*D.C. Official Code* § 2-219.03(e)(2) (2012) (amended).   The "failure to submit the required hiring

compliance report…or the deliberate submission of falsified data," shall be enforced by the Mayor through

the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the

project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A)

(2012) (amended).

63.     Beneficiaries require contractors and subcontractors on government-assisted projects or

contracts to report the information required of the beneficiary under the Act, so that the beneficiary may,

in turn, comply with the Act. Thus, the requirements of the Amended Act flow through to contractors and subcontractors, including ABC-Metro Washington's members, including the contractor Plaintiffs.

64.     Consequently, ABC-Metro Washington's members must submit Amended Contract-Compliance Reports and other reports supportive of the Act and contrary to their business philosophy.

65.     As a direct result of the Amended Act, ABC-Metro Washington and its members have and will incur additional costs, including reporting expenses and other costs which they would not have had to incur absent the reporting obligations of the Amended Act, including the costs described above in Paragraphs 16 and 17.

66.     ABC-Metro Washington's members also suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements.

### (v)     *Bids and Proposals*

67.     For government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, the Amended Act requires bids and proposals responding to a solicitation for them to "include an initial employment plan outlining the bidder or offeror's strategy to meet the local hiring requirements as part of its response to the solicitation. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended). The evaluation of the initial employment plan (the "Employment Plan") is worth 10% of the overall score of the bid or proposal. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended).

68.     The Employment Plan must include (a) descriptions of the health and retirement benefits provided to employees who worked on any of the bidder or offeror's past three completed projects or contracts; (b) a description of the bidder or offeror's efforts to provide District residents with ongoing employment and training opportunities after they complete work on the job for which they were initially hired; and (c) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act (40 U.S.C.

26

§ 3141 *et seq.*) ("Davis-Bacon Act"), where applicable, on projects or contracts completed within the last two years.  D.C. Official Code § 2-219.03(e)(1)(F)(i) (2012) (amended).

69.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been beneficiaries of government-assisted projects or contracts valued the contractor in excess of $5 million, and recipients of District-government economic-development actions including contracts valued in excess of $5 million, and they reasonably anticipate being beneficiaries or recipients within the meaning of the Amended Act in the near future.

70.     ABC-Metro Washington's members, including the contractor Plaintiffs, are qualified, licensed, and able bidders who are ready to respond to or participate in responses to future solicitations and bids on government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, except that the Amended Act requires ABC-Metro Washington's members, contrary to their business philosophy, to prepare Employment Plans outlining their strategy to meet local hiring requirements.

71.     As a direct result of the Amended Act, it will be more difficult for ABC-Metro Washington's members to be successful bidders or to participate in successful bids on government-assisted projects or contracts that receive government assistance totaling $5 million or more.

72.     In addition, ABC-Metro Washington and its members will incur additional costs, including the costs to prepare and reply to solicitations and bids on government-assisted construction projects incorporating Employment Plans, to offer health and retirement benefits to employees, and to offer member and employee training.

73.     ABC Metro's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that:

(a) do not share their philosophy of individual merit and a level playing field and do not oppose submitting Employment Plans requiring hiring employees on the basis of their residency,

(b) have a higher percentage of District residents as employees, or

(c) offer certain health and retirement benefits, and

(d) offer certain employee-training opportunities.

74.     The winning bidder, as well as beneficiaries of government-assisted projects or contracts that are not awarded through the contracting process, must submit a revised Employment Plan to the Mayor "for approval prior to beginning work associated with the relevant government project or contract." The revised Employment Plan has to include:

(a) a projection of the total number of hours to be worked on the project or contract by trade;

(b) a projection of the total number of journey worker hours, by trade, to be worked on the project or contract and the total number of journey worker hours, by trade, to be worked by District residents;

(c) a projection of the total number of apprentice hours, by trade, to be worked on the project or contract and the total number of apprentice hours, by trade, to be worked by District residents;

(d) a projection of the total number of skilled laborer hours, by trade, to be worked on the project or contract and the total number of skilled laborer hours, by trade, to be worked by District residents;

(e) a projection of the total number of common laborer hours to be worked on the project or contract and the total number of common laborer hours to be worked by District residents;

(f) a timetable outlining the total hours worked by trade over the life of the project or contract and an associated hiring schedule;

(g) descriptions of the skill requirements by job title or position, including industry-recognized certifications required for the different positions;

(h) a strategy to fill the hours required to be worked by District residents pursuant to this paragraph, including a component on communicating these requirements to contractors and subcontractors and a component on potential community outreach partnerships with the University of the District of Columbia, the University of the District of Columbia Community College, the Department of Employment Services, Jointly Funded Apprenticeship Programs, or other government-approved, community-based job training providers;

(i) a remediation strategy to ameliorate any problems associated with meeting these hiring requirements, including any problems encountered with contractors and subcontractors;

(j) the designation of a senior official from the general contractor who will be responsible for implementing the hiring and reporting requirements;

(k) descriptions of the health and retirement benefits that will be provided to District residents working on the project or contract;

(l) a strategy to ensure that District residents who work on the project or contract receive ongoing employment and training opportunities after they complete work on the job for which they were initially hired and a review of past practices in continuing to employ District residents from one project or contract to the next;

(m) a strategy to hire graduates of District of Columbia Public Schools, District of Columbia public charter schools, and community-based job training providers, and hard-to-employ residents;

(n) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act, where applicable; and

(o) the bidder or offeror's general District-resident hiring practices on projects or contracts completed within the last 2 years.

*See D.C. Official Code* § 2-219.03(e)(1A)(F)(ii) (2012) (amended).

75.    ABC-Metro Washington's members win bids and are awarded contracts outside the contracting process for government-assisted projects or contracts valued in excess of $5 million. ABC-Metro Washington's members reasonably anticipate bidding on and being awarded contracts following the effective date of the Amended Act.

76.    As a direct result of the requirements of the Amended Act, ABC-Metro Washington and its members, including the contractor Plaintiffs, will incur increased costs including increased employee recruiting, training, hiring, reporting, and supervising costs. The Association's additional costs include higher administrative costs to educate and train its members with respect to the new requirements under the Amended Act; increased communication costs for engaging the District of Columbia's Mayor and Councilmembers; public-relations damages related to allegations of lack of concern for District residents by association members and of noncompliance; decreases in membership as individual members are forced out of business or are forced to reduce their number of projects so that their income is reduced and they can no longer afford ABC-Metro Washington membership dues.

**C.    Damages and the Burdens of the Amended Act**

77.    As a direct and proximate result of the requirements of the Amended Act, ABC-Metro Washington's members will incur damages that they otherwise would not have incurred including

(a) Total loss of business.  Those firms that do not have sufficient District residents and who cannot get a waiver will be forced to close.

(b) Loss of volume of work and business earnings.  The Amended Act's requirements will limit how many jobs a company can bid on and perform, and fewer jobs means less profit.

(c) <u>Loss of work due to uneven bidding requirements</u>.  There is no way to bid ethically and intelligently when a bidder does not know in advance whether the "hours worked" requirements will be strictly enforced or will be ignored or waived by the District.  A bidder who assumes that "hours worked" requirements will be strictly enforced must submit higher bids to reflect the increased costs and risk of noncompliance; a bidder who assumes it will get a waiver or that the District will turn a blind eye will presumably bid lower.

(d) <u>Significant fines</u>.  The "hours worked" requirements of the Amended Act are not achievable on any kind of scale and the failure to meet the requirements results in fines and other penalties.

(e) <u>Debarment</u> after two violations.

(f)  <u>Increased costs of construction</u> for the developer members of ABC-Metro Washington, such that fewer projects may be proposed, financed, approved, or built, hurting every aspect of the construction industry in the District.

(g) <u>Increased bid costs</u> of general and specialty contractors as a result of (a) fewer bids being received per project (less competition) as subcontractors will bid fewer jobs in order to meet the hours requirements on the jobs they do bid, and (b) those bids that are received will reflect the increased labor costs resulting from the Amended Act's requirements.

(h) <u>Fewer projects</u> to bid or work on.  The significant increase in labor costs cannot be absorbed by deals made in today's very tight financing environment, so that a number of development deals simply will not go forward at the higher price tag, hurting all of the ABC-Metro Washington members.

(i) <u>Layoffs</u> of employees resulting from general contractors and subcontractors putting in fewer bids and less construction work being conducted overall.

(j) <u>Reduced productivity and profit</u> because of the incentive to lay off employees who are Maryland and Virginia residents first, as opposed to choosing which employees to retain based on merit and productivity alone.

(k) <u>Increased costs</u> to try to comply with requirements for labor. Specially trained workers cannot always be available among District residents and are often available only from outside the region. As a result, there have to be negotiations with DOES or the Mayor's Office over exceptions to the requirements for specialty contractors that perform, for example, exterior façade work, curtain walls, glass work/glazing, roofing, water-proofing, air barrier placement, steel erection and specialty flooring system installation, since these services require special training and/or certifications, sometimes available only from the manufacturer.

78.     The projected damages and ill effects of the Amended Act are readily apparent based on the experience of the downtown "Marquis" project. Although that project does not specifically incorporate the requirements of the Amended Act, as of January 2012 it was under construction with requirements similar to the Amended Act. Even at the early stages of the project, it has been widely reported that contractors have not been able to meet the District-resident worker percentages. Once the Amended Act is applied throughout the District, there are likely to be mass defaults on the District-resident hours requirements because the pool of labor is simply too shallow.

79.     "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the required-hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District

of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity

ineligible of consideration for government-assisted projects with the District of Columbia for a period of

not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C) (2012) (amended).

80.     As a direct result of the Amended Act, ABC Metro Washington's members, including the

contractor Plaintiffs, risk penalties, as well as disqualification or debarment from bidding on projects not

only in the District of Columbia, but also all other United States jurisdictions which inquire about

disqualification and debarments elsewhere.

81.     Furthermore, the District started to impose the Amended Act's extensive bid-and-proposal

requirements **retroactively** on ABC-Metro Washington's members as winning bidders or contract

awardees before they may begin work.  In fact, even before the Amended Act passed its Congressional-

review period, DOES informed ABC-Metro Washington members and staff that the new requirements

would apply to all ongoing projects at the conclusion of that period. Although the District may be re-

evaluating what provisions of the Amended Act will be enforced retroactively, it remains unclear what

impact the Amended Act has on current business.  As a direct result, ABC-Metro Washington's members

will incur increased costs to complete already bid projects, thus depriving them of their vested interests in

their contracts.

**D.      The Real-World Impact of the Act and the Amended Act.**

82.     The Act and the Amended Act have been touted as promoting job-creation.  Of course, the

Act does not create jobs and never could.  Instead, it uses unlawful and unconstitutional means to try to

shift to a preferred group of people—District residents—first dibs on jobs already created.  The Act does

not of itself increase the pool of qualified job applicants nor does it address underlying issues of education,

job-training, apprenticeships, or other matters which are needed to increase the number of qualified job

applicants.

83.     Unlike other jurisdictions where first-source legislation has been implemented (and, when challenged, almost always overturned), the District does not suffer from a shortage of jobs but a shortage of trained and ready applicants to fill the jobs. Indeed, by most studies, there are more jobs in the District than there are people. District employers must reach outside the city limits to fill all the jobs in the District. This is a far different situation from one where the residents outnumber the jobs and the jurisdiction seeks to channel limited jobs to its own residents first, although even in that situation, economic protectionism is unconstitutional.

84.     For nonresidents of the District, like the individual Plaintiffs, the impact of the Act is to exclude them from consideration as part of a team of laborers on significant District jobs not because of their skills or desires but simply because they do not live in the District. Moreover, their employers or potential employers cannot freely bid on or accept work if they do not believe that they can staff such jobs with the required District residents. Where a company has the overall capacity to work on, say, seven jobs at any given time, that same company could only support three jobs because of the requirements of the Act and the Amended Act and the inability to fulfill required staffing needs with District residents. This leads to an overall decrease in available work for all laborers regardless of where the laborers live. For employers, including the contractor Plaintiffs, the Act already adversely affects the workplace. The scarce District workers are given first choice on new work, and they enjoy a privileged position within the workplace. A company which has available to it only a finite number of District-resident employees has little choice but to hire, promote, train, and discipline them differently from nonresident employees.

85.     In response to the unrealistic expectations for District-resident work hours in the Amended Act, ABC Metro Washington's members will be forced to bid less work in the District, in order to have enough District residents to fulfill the requirements on those jobs. For example, Plaintiff Miller & Long has determined that it can only perform two concrete jobs in the District at a time with its existing

workforce.  Other members have reported that they will not bid on jobs if the new policies are required since they could not (or could only barely) satisfy the earlier, less-stringent standards.  The Act impacts job-staffing decisions of ABC-Metro Washington member organizations.  Bidders do not know how to account for the potential impacts of the Act.  Companies who hire and train employees then have to sideline their "star performers" because of where they live, thereby giving up the competitive advantage (talent) in which they have invested.  General contractors will similarly bid fewer jobs in the District, as they will be receiving fewer bids from their subcontractors.  This decrease in bidding means a decrease in competition for bids, which means higher prices.  Moreover, the uncertainty about the ability to secure a future waiver from unachievable employment targets makes the bidding process for contractors more perilous and more expensive.

86.     Contractors will also increase their prices to cover the cost of compliance, maybe even hiring District residents who they do not reasonably expect to perform much work but who will allow the contractor to meet the Amended Act's requirements.  Developers and general contractors will also pass along, via indemnification provisions to their subcontractors, the costs associated with their exposure to potential fines or other penalties existing under the Amended Act.  Likewise, the costs of covering these penalties will be built into the subcontractors' and general contractors' bids on a project—all leading to higher prices for the District projects and contracts paid for by District taxpayers.  While clearly discriminating against nonresidents, the Act does not even benefit the District's own residents.

87.     For ABC-Metro Washington and its members, the Act and the Amended Act are a direct assault on their economic philosophy, their financial viability, and their ability to recruit and retain members and employees.

88.     ABC-Metro Washington itself has incurred substantial damages associated with addressing on behalf of its members the impacts of the Act and the Amended Act, including training, legal fees,

publicity to respond to false stories regarding the contracting community, and extra efforts to maintain membership of the organization.

## COUNT I
## Violation of Substantive Due Process

89.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

90.     The Fifth Amendment of the United States Constitution incorporates the protections of the Privileges and Immunities Clause, including the fundamental right of nonresidents to pursue a common calling in any jurisdiction.

91.     The Act and the Amended Act discriminate against the individual Plaintiffs as well as members of ABC-Metro Washington based exclusively on their status as nonresidents of the District of Columbia.

92.     As a result of Defendants' acts, practices, customs, laws, and rules, the individual Plaintiffs have been deprived of their fundamental right to pursue a common calling in the District of Columbia in which they are not a resident or citizen, such right being protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

93.     ABC-Metro Washington's members have been deprived of their fundamental right to pursue a common calling as protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

94.     The Act and the Amended Act discriminate against ABC-Metro Washington's members and the individual Plaintiffs based on their status as noncitizens and nonresidents of the District of Columbia or employers of nonresidents of the District of Columbia.

95.     Defendants have no substantial justification for enacting and enforcing a program which discriminates against people on the basis of residence.  Nonresidents are not a particular source of

unemployment in the District, nor are they the source of any other local "evil" that the District may purport to remedy with the Act and Amended Act.

96.     The Defendants' acts, practices, customs, laws, and rules, including the Act and the Amended Act, are not closely tailored to achieve any legitimate local purpose.

WHEREFORE, Plaintiffs request that the Court (i) declare that the Act and the Amended Act violate the Due Process Clause of the Fifth Amendment to the United States Constitution, which incorporates the protections of the Privileges and Immunities Clause of the United States Constitution; (ii) issue a temporary restraining order and preliminary injunction preventing the District from enforcing the Act and the Amended Act; (iii) issue a permanent injunction preventing the District from enforcing the Act; and (iv) award Plaintiffs any other relief that the Court determines is appropriate.

## COUNT II
### Declaratory and Injunctive Relief

97.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

98.     Plaintiffs are in doubt as to their rights, privileges, and immunities with respect to the conduct at issue herein. Plaintiffs require a judgment declaring their rights, privileges, and immunities. There is a clear, present, actual, substantial, and bona-fide justiciable controversy between the parties.

99.     Plaintiffs have no adequate remedy at law. No amount of money damages could adequately compensate the Plaintiffs for the irreparable harm described herein. Plaintiffs in this case wish to exercise rights that are guaranteed to them under the United States Constitution. No legal remedy would ever suffice to properly address state action that ultimately results in denying citizens rights guaranteed by the Due Process Clause of the United States Constitution, which incorporates the rights protected by the Privileges and Immunities Clause.

100.    Plaintiffs and the public-at-large will suffer irreparable injury if injunctive relief is not granted and Defendants are further permitted to enforce the customs, policies, practices, and impermissible laws and rules at issue herein.

101.    The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of customs, policies, practices, laws and rules that are designed to and do exhibit a callous indifference to Plaintiffs' constitutional rights.

102.    All conditions precedent to the institution and maintenance of this cause of action has occurred or has been performed.

103.    The acts and practices of Defendants as set forth herein, were and are being performed under color of District law and, therefore, constitute state action within the meaning of the Fifth Amendment to the Constitution of the United States.

WHEREFORE Plaintiffs request entry of a judgment declaring that the Act and the Amended Act are unconstitutional and unenforceable, and that the Plaintiffs are not required to comply with the terms of these Acts. Plaintiffs request entry of temporary, preliminary, and permanent injunctive relief necessary to implement the judgment, and an award of attorneys' fees, costs, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 99664)
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)

Nathan A. Adams (Of Counsel)
HOLLAND & KNIGHT, LLP
315 South Calhoun Street
Suite 600
Tallahassee, Florida 32301
(850) 224-7000 (phone)
(850) 224-8832 (fax)

Min K. Cho (Of Counsel)
HOLLAND & KNIGHT, LLP
200 South Orange Ave
Suite 2600
Orlando, Florida 32801
(407) 425-8500 (phone)
(407) 244-5288 (fax)

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

/s/ Paul J. Kiernan
Paul J. Kiernan

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2015, I electronically filed the Joint Request for Status Conference via the ECM-ECF System.

I certify that all participants in the case are registered ECM-ECF users and that service will be accomplished by the ECM-ECF System.

/s/ Paul J. Kiernan
Paul J. Kiernan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>　　　　　*Plaintiffs*,<br><br>　　v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br>　　　　　*Defendant.* | Civil Action No. 12-853 (EGS) |

## <u>NOTICE OF DEPOSITION</u>

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Dairon Upshur shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of plaintiff Emmett Morris, Jr. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016　　　　Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section



EXHIBIT

15

PENGAD 800-631-6989

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.,*<br><br>   *Plaintiffs,*<br><br> v.<br><br>DISTRICT OF COLUMBIA, *et al.,*<br>   *Defendant.* | Civil Action No. 12-853 (EGS) |

## NOTICE OF DEPOSITION

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Emmett Morris, Jr., shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of the witness for Miller & Long. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016   Respectfully submitted,

           KARL A. RACINE
           Attorney General for the District of Columbia

           ELIZABETH SARAH GERE
           Deputy Attorney General

           /s/ Toni Michelle Jackson
           TONI MICHELLE JACKSON, Bar No. 453765
           Chief, Equity Section



EXHIBIT
15

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).