# In the Matter of:

# Associated Builders and Contractors, Inc., et al. v. DC

*October 26, 2016*
*Fitzroy Lee*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4   METROPOLITAN WASHINGTON        )
 5   CHAPTER, ASSOCIATED BUILDERS   )
 6   AND CONTRACTORS, INC., et al.,)
 7        Plaintiffs,              )
 8        -vs-                      ) No. 12-CV-00853
 9   DISTRICT OF COLUMBIA,          ) (EGS)
10        Defendant.                )
11   ----------------------------)
12
13
14            The deposition of Dr. Fitzroy Lee was
15   taken on Wednesday, October 26, 2016, commencing
16   at 10:06 a.m., at the office of Holland & Knight,
17   800 17th Street, N.W., Suite 1100, Washington,
18   D.C., before Tammy S. Newton, Notary Public.
19
20
21
22
```

---

2

```
 1              A P P E A R A N C E S
 2        ON BEHALF OF PLAINTIFFS:
 3            PAUL J. KIERNAN, ESQUIRE
 4            Holland & Knight
 5            800 17th Street, N.W.
 6            Suite 1100
 7            Washington, D.C. 20006
 8            (202) 663-7276
 9            paul.kiernan@hklaw.com
10
11        ON BEHALF OF DEFENDANT:
12            ANDREW J. SAINDON, ESQUIRE
13            CONRAD J. RISHER, ESQUIRE
14            Office of the Attorney General
15            For the District of Columbia
16            One Judiciary Square
17            441 4th Street, N.W.
18            Suite 600 South
19            Washington, D.C. 20001
20            (202) 724-6643
21            andy.saindon@dc.gov
22        (Index appears following the transcript.)
```

---

3

```
 1              P R O C E E D I N G S
 2              Dr. Fitzroy Lee,
 3   having been sworn by the notary, testified as
 4   follows:
 5       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 6   BY MR. KIERNAN:
 7       Q    Dr. Lee, good morning.
 8       A    Good morning.
 9       Q    Thank you for coming in this morning.
10   I'm going to be asking you a series of questions
11   associated with the First Source lawsuit and in
12   particular your potential testimony to the court
13   about the issues in the case.  If at any time
14   this morning you do not understand my question,
15   will you please tell me that?
16       A    Sure.
17       Q    And can I assume that when you answer
18   my question, you have understood it, and you have
19   given a full, complete answer to the best of your
20   ability?
21       A    Sure.
22       Q    Thank you.  Let me start with your
```

---

4

```
 1   current position with the District.  You're
 2   employed by the District.  What is your current
 3   position?
 4       A    I am the deputy CFO of the -- for the
 5   Office of Revenue Analysis.
 6       Q    How long have you had that position?
 7       A    Since 2008, I believe.  About eight
 8   years.
 9       Q    So with reference to our lawsuit here,
10   if I represent to you that the Amended First
11   Source Act was adopted in 2011, went into effect
12   in early 2012, is it correct that you were the
13   deputy CFO at the time of the amended act?
14       A    Yes.
15       Q    Did you have any personal involvement
16   in any financial analysis involving the Amended
17   First Source Act?
18       A    Not personally, no.
19       Q    And I'll come back to the offices.
20   What are your duties as the deputy chief
21   financial officer for the District?
22       A    So I oversee that office, the Office
```

---

1 (Pages 1 to 4)

Associated Builders and Contractors, Inc., et al. v. DC                          10/26/2016

---

5

1   of Revenue Analysis, which is responsible, one,
2   for doing the revenue forecast that is the basis
3   for the budget, and two, we analyze the fiscal
4   impact of legislation, and three, we -- we are
5   required to put out monthly publication that
6   monitors the District revenue and economy.
7       **Q    What are the other offices in the**
8   **CFO's office?  You mentioned the Office of**
9   **Revenue Analysis that you're in charge of.  What**
10  **are the other offices?**
11      A    So there's also the Office of Tax and
12  Revenue that administers the District tax laws.
13  There's an Office of Budget and Planning that
14  assists the Mayor and the Council with the
15  planning of the budget for the District.  There's
16  the Office of Financial Operation and Systems.
17  They are basically the financial controller that
18  maintains the accounts for the District.  And
19  then there's the Office of Finance and Treasury
20  that is responsible for issuing debt and
21  collecting cash, managing the cash position of
22  the District.

---

6

1       **Q    You mentioned that the Office of**
2   **Revenue Analysis is responsible for fiscal impact**
3   **statements regarding legislation?**
4       A    Right.
5       **Q    Is that the only office within the**
6   **CFO's office that does fiscal impact statements**
7   **for legislation?**
8       A    Yes.
9       **Q    And what is meant within the office by**
10  **a fiscal impact statement?**
11      A    So basically what a fiscal impact
12  statement does is we estimate the potential costs
13  of the legislation as it relates to the budget
14  and financial plan, and we determine whether or
15  not there are resources within that budget and
16  financial plan to implement that legislation,
17  and, you know, it in effect gives the chief
18  financial officer a veto over legislation because
19  if it cannot fit within the budget and financial
20  plan, then it cannot be implemented by -- and
21  this is by Congressional law.
22      **Q    And is the purpose of that to**

---

7

1   **determine whether there's any Antideficiency Act**
2   **issues, or is it broader than that?**
3       A    The Antideficiency rules are specific
4   to an agency.  This is broader.  It's just to
5   make sure that we never have a situation where
6   the resources are not available to cover a cost
7   of running the government.
8       **Q    How many people do you oversee**
9   **currently at the Office of Revenue Analysis?**
10      A    It's about -- right now about 21
11  people.
12      **Q    Are you -- do you also have the title**
13  **of the chief economist for the District?**
14      A    Yes.
15      **Q    Is that a separate mind, if you will,**
16  **or is that --**
17      A    No.  So there's a deputy CFO, for
18  example, of Office of Tax and Revenue, also the
19  tax administrator.  The deputy CFO for the Office
20  of Financial Operation is the financial
21  controller.  So it's an alternative title.  But
22  it's the same responsibilities.

---

8

1       **Q    So are there any additional**
2   **responsibilities as the chief economist in**
3   **addition to what you described?**
4       A    No.  That is -- those are the
5   responsibilities of the chief -- the chief
6   economist.
7       **Q    I understand that earlier you were**
8   **also the director of revenue estimation for the**
9   **District?**
10      A    Yes.
11      **Q    What is that?**
12      A    So that's the -- that's the section
13  within the Office of Revenue Analysis that does
14  the forecast, the revenue forecast that I alluded
15  to earlier.
16      **Q    And just in summary fashion, when a**
17  **revenue forecast is done for the District, what**
18  **are the sources of data that are consulted?**
19      A    So there are really several sources.
20  So we look at the -- we look at the economy as a
21  whole.  So we monitor data that are generated
22  by -- it's generated by a lot of the federal

---

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

9

1    agencies, the normal collection of jobs, wages,
2    real estate, but in addition, we also subscribe
3    to several private sources, Global Insight,
4    economy.com, which is really part of Moody's now.
5    And in addition to looking at the statistics that
6    are gathered by a lot of federal agencies, they
7    also do a forecast for the local economy, and we
8    use that in terms of looking into the future.
9         So part of our job is to look at what
10   has happened in the past, and that's the
11   statistics that are gathered by federal agency.
12   But the other part of it, because it's a
13   forecast, we have to look into the future.  So
14   the underlying income and jobs and forecast for
15   population growth, those we get from the
16   economy.com and our -- and our Global Insight.
17        But we also monitor very closely our
18   monthly cash receipts because that's an integral
19   part of forecasting the revenue, see what has
20   actually happened in terms of the collections.
21   So we use our own internal data that comes from
22   our accounting systems and from the Office of Tax

---

10

1    and Revenue.
2         Q    In obtaining data from, say, Global
3    Insight, do they present you data that is focused
4    strictly on the geographic boundaries of the
5    District, or do they look at a more regional --
6         A    They actually do both.  So the -- it's
7    a subscription service, and when you subscribe,
8    they -- depending on what option you choose, you
9    can get the local -- we do get the national
10   forecast.  This is for all -- what's happening in
11   the national economy, and we also get the local
12   forecast, which is centered on the District.  But
13   in addition, we also like to look at what's
14   happening in the neighboring states of Maryland
15   and Virginia.
16        Q    And same question for economy.com, is
17   the data that the office looks at in -- your
18   office looks at in doing a revenue forecast, is
19   it simply within the geographic boundaries of the
20   District or does it also include the metropolitan
21   area?
22        A    For the economy, that accounts

---

11

1    strictly the national economy and the geographic
2    boundaries of the District.
3         Q    I understand you taught at Tulane for
4    a few years, correct?
5         A    Mm-hmm.
6         Q    What did you teach there?
7         A    Economics and specifically -- well,
8    principles and then public finance, which is the
9    tax component but also expenditure component.
10        Q    And prior to that, I gather you
11   were -- worked at this Department of Agriculture?
12        A    Yes.
13        Q    Was that here in the District?
14        A    It was here in the District, Economic
15   Research Service.
16        Q    And you also spent a few years at the
17   information -- at the Jamaica Revenue Board?
18        A    Right.
19        Q    So when you came to the District to
20   start work in, as I understand it, July of 2001
21   as the director of revenue estimation, that was
22   your first employment for the District

---

12

1    government, correct?
2         A    Yes.
3         Q    I'm going to take you to -- the reason
4    you're here today -- actually, let me do this
5    first.
6         (Deposition Exhibit Number 16 was
7    marked for identification and attached to the
8    transcript.)
9    BY MR. KIERNAN:
10        Q    Showing you what I marked as Exhibit
11   16, which is a D.C. economic indicators -- I
12   think I may have marked it on the wrong side.
13   It's on both sides.  The first page is on the
14   flip side there.  Maybe we can move the sticker.
15        Is this what you're referring to as
16   the monthly reports that your office --
17        A    This is one of the monthly reports,
18   yes.
19        Q    And this one I picked up is from --
20   the month is February 2012, but it's reporting
21   statistics I think for the most recent available
22   month, which would have been December of 2011,

---

3 (Pages 9 to 12)

Lee
Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

13

1    right?
2        A    Right.
3        Q    It normally runs about that a month or
4    two --
5        A    Yeah, lag.
6        Q    And just at a very high level, looking
7    specifically at the "labor & industry" part on
8    the top of the first side of the exhibit there,
9    where does this data come from regarding the
10   level of employment?
11       A    That's from the Bureau of Labor
12   Statistics.
13       Q    That's the federal bureau?
14       A    Yeah, the federal -- the U.S. Bureau
15   of Labor Statistics.
16       Q    And it's got two columns there.  It's
17   got District of Columbia and metropolitan area.
18       A    Right.
19       Q    Do you know or maybe -- maybe you
20   recall it not for this time period.  What was
21   encompassed by metropolitan area?
22       A    So in the Bureau of Labor Statistics

---

14

1    there is what is called the metropolitan
2    statistics area, and I can't recall specifically
3    the geography, but I -- I think it is the
4    surrounding suburbs.  I don't know specifically
5    which jurisdictions are in that.  As I always
6    say, people -- even though you have that
7    delineated geographical boundary, a lot of what
8    happens in the area is -- from an economy point
9    of view is driven by how the movement of people
10   and jobs in and around regardless of boundaries.
11   But I don't know exactly what -- which
12   jurisdictions are specifically in that area, but
13   it is basically the District and a lot of the
14   surrounding suburbs from Maryland and Virginia.
15       Q    But is it correct though metropolitan
16   area is both the District plus some of the
17   surrounding jurisdictions?
18       A    Exactly.
19       Q    Then the labor categories that are
20   along the left-hand side, are those the Bureau of
21   Labor Statistics category?
22       A    Classifications, yes.

---

15

1        Q    Classifications, right.  Then on the
2    right-hand side of that upper half of the first
3    page of Exhibit 16, there are detailed employment
4    categories by manufacturing, construction, trade,
5    utilities, et cetera.
6        A    Industry level.
7        Q    Right.  So where do these employment
8    categories come from?
9        A    Again, they are all from the U.S.
10   Bureau of Labor Statistics.
11       Q    The bottom half of this report refers
12   to the revenue side, correct?
13       A    Right.
14       Q    And this is data that essentially all
15   comes from the CFO's office?
16       A    Exactly.
17       Q    If you turn over to "People & Economy"
18   on the flip side of Exhibit 16, this has the --
19   some statistics as well regarding GDP, personal
20   income, unemployment rate, and so forth.  And for
21   unemployment rate, it refers to sources the
22   Bureau of Labor Statistics, right?

---

16

1        A    Right.
2        Q    Does the CFO's office do its own
3    reports on unemployment rates?
4        A    No.
5        Q    Does anybody in the District
6    government do its own report regarding
7    unemployment rates?
8        A    I know that the Department of
9    Employment Services gathers statistics.  I am not
10   sure whether they actually calculate the
11   unemployment rate.
12       Q    Is it correct though that the CFO's
13   office when it does these reports does not look
14   to the Department of Employment Services for
15   those unemployment statistics, it looks to the
16   federal?
17       A    Federal.  That's exactly right.
18       Q    And then on the bottom, just to
19   complete it, is "Housing & Office Space"
20   statistics that come from the cited sources,
21   right?
22       A    Right.

---

4 (Pages 13 to 16)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

17

1    **Q**   And this report or a version of this
2  report is issued by the office every month?
3    A   Every month.
4    **Q**   Let me show you what we marked at an
5  earlier deposition as Exhibit 5. I don't know if
6  you brought yours, but I'll give you an extra
7  copy, which is the committee report. And this is
8  the -- this is the legislative committee report
9  from the Committee on Housing and Workforce
10  Development regarding the Amended First Source
11  Act. I'm going to ask you if you could turn
12  to page -- it says ABC53.
13    A   Okay.
14    **Q**   And it's dated November 1, 2011, and
15  it's a fiscal impact statement regarding what we
16  call here the Amended First Source Act.
17    A   Right.
18    **Q**   Are you familiar with this fiscal
19  impact statement?
20    A   Not personally, but it would have been
21  generated in my office by the director of fiscal
22  and legislative affairs.

---

18

1    **Q**   You recognize the format that this --
2    A   Yes.
3    **Q**   -- is the fiscal impact statement?
4    A   Yes.
5    **Q**   The report talks about, if you look at
6  the page that's Bates stamped ABC56, talks about,
7  as I think you told me earlier, the potential
8  cost and the resources available to implement the
9  law under a heading called "Financial Plan
10  Impact."
11    A   Right.
12    **Q**   And this is consistent with the way
13  fiscal impact statements are usually done?
14    A   Right.
15    **Q**   Are you aware of whether the CFO's
16  office prepared any sort of analysis before the
17  adoption of this Amended First Source Act about
18  the likely effects of the act on the District's
19  revenues?
20    A   No, we didn't do a report. I'm pretty
21  certain we didn't do such a report.
22    **Q**   And again, I'm focused on the likely

---

19

1  effects, in other words, an analysis of if you
2  adopt this law, here's what we'd expect to see on
3  the revenue side.
4    A   Right. No, we didn't do such an
5  analysis.
6    **Q**   Was there an analysis done by the
7  CFO's office about the likely effects of the act
8  on employment in the District or unemployment in
9  the District?
10    A   No.
11    **Q**   Was there an analysis done by the
12  CFO's office of the likely effect of the law on
13  the District's tax base?
14    A   No.
15    **Q**   Do you know if there was any analysis
16  or report done by the CFO's office as to the
17  hoped-for effects of the act on District
18  revenues?
19    A   No. Here -- the analysis here was
20  strictly a budgetary analysis, whether the
21  implementing agency would have the resources to
22  implement it, and that's what this speaks to but

---

20

1  not the economic effects, which would be the one
2  that would generate the revenue or have an impact
3  on the economy in general.
4    **Q**   And so let me broaden the question a
5  little bit then. Are you aware of any report or
6  analysis done by any office in the District of
7  Columbia before the adoption of this amended act
8  that looked at the likely effects of the act on,
9  for example, the District's employment or
10  unemployment?
11    A   None that I'm aware of.
12    **Q**   How about such a report from any
13  agency about the likely effect of the amended act
14  on the District's tax base?
15    A   Nothing that I'm aware of.
16    **Q**   And to anticipate a little later
17  today, I take it if you're not aware of such a
18  report, you've never -- you've not reviewed such
19  a report?
20    A   No.
21    **Q**   And you're not relying on any such
22  analysis from prior to the adoption of the act in

---

5 (Pages 17 to 20)

21

1    terms of your testimony in this case?
2        A    No.
3        Q    No, you're not?
4        A    I'm not relying on any such report.
5        Q    Let me mark as Exhibit 17.
6            (Deposition Exhibit Number 17 was
7    marked for identification and attached to the
8    transcript.)
9    BY MR. KIERNAN:
10       Q    Dr. Lee, I've marked as Exhibit 17 a
11   copy of a disclosure made by the District of
12   Columbia dated June 24th, 2016.  And I'd like to
13   direct your attention to Page 2 of this
14   disclosure, the paragraph that starts "Dr. Lee
15   will present evidence."
16       A    Mm-hmm.
17       Q    So first, let me ask you with
18   reference to the filing of this disclosure on
19   June 24th, did you review this disclosure before
20   it was filed?
21       A    Yes.
22       Q    And did you have a hand in helping to

22

1    prepare it?
2        A    Yes, a lot of the material here, yeah,
3    I actually sent Andy, yes.
4        Q    When -- and again, with reference to
5    the June 24th date on this, when were you first
6    asked to assist in the lawsuit regarding the
7    financial impact of the First Source Act program
8    on the District's economy?
9        A    To tell the truth, I can't recall.  I
10   know it was several months and back and forth.
11   So I don't know.  I can't remember exact date.
12       Q    Do you think it was likely this
13   calendar year 2016 or earlier?
14       A    I think it was likely this calendar
15   year.
16       Q    And I'll get -- come back to the basis
17   for your opinion, but reading the first sentence
18   of that paragraph, are you planning to testify to
19   offer an opinion that the First Source Act
20   program has had a net positive effect on the
21   District's economy?
22       A    Yes.

23

1        Q    And are you expected to offer an
2    opinion as to -- that the First Source Act
3    program is projected to have a greater positive
4    impact in the future?
5        A    I'm not sure about that -- about the
6    future.  I mean, we can say now based on the data
7    that we have now that it has -- in the past has
8    had a positive impact.
9        Q    Okay.  Let me talk about -- let me ask
10   you about what exactly your opinion is about the
11   financial impact of the First Source Act program
12   on the District's economy.  How would you state
13   your opinion?
14       A    So just to clarify, earlier you said
15   on the economy.  More specifically we are talking
16   about the net positive impact on the revenues.
17   That is in a nutshell.  What we're saying is that
18   based on the analysis that we have done, and to
19   get it very specific, of the past data we have
20   seen, we believe, based on the estimate, that it
21   has had a net positive impact on our revenues.
22       Q    So let me unpack that if I could then.

24

1    So the opinion -- to maybe tweak it a little bit,
2    what's stated in the written disclosure is the
3    financial impact of the First Source Act program
4    on the District's economy, but you're saying it's
5    really a focus on District's revenue, right?
6        A    Right.
7        Q    During what time period does your
8    opinion cover as to the net -- as to the
9    financial impact on the District's revenues?
10       A    Based on the data that we had from the
11   DOES, it was wrong.  2013 through 2015 where we
12   actually saw the effects of the First Source Act
13   program.  That's the data we examined.
14       Q    I'll come back to that in a minute.
15   You're looking at the period of time between the
16   middle of 2013 and the middle of 2015, correct?
17       A    That's exactly right.
18       Q    Does your opinion depend on whether we
19   are looking at projects under the old First
20   Source Act or the amended act?
21       A    Whatever period that -- that data
22   covered, which -- it was done in 2011.  So it

6 (Pages 21 to 24)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                                    10/26/2016

---

25

1      would have been the Amended First Source Act.
2      Whatever data that that period -- whichever act
3      was in force at the point where the data covers,
4      that's what the analysis would speak to.
5          **Q    Do you understand -- do you have an**
6      **understanding as to during that time period**
7      **whether there were projects that were still**
8      **governed by the terms of the old act and some**
9      **that were governed by the terms of the new act?**
10         A    No.  I don't know whether -- the
11     projects that were cited in the data that we
12     have, whether it was based on projects that was
13     covered by the old act or the new act.
14         **Q    Just to clarify, you didn't**
15     **differentiate between the impact of the old act**
16     **versus the new act, you just said whatever**
17     **projects are within that --**
18         A    Right.
19         **Q    -- time frame?**
20         A    Right.
21         **Q    When you say it was a net positive**
22     **impact on the District's revenues, I assume you**

---

26

1      **mean the District had more revenues, right?**
2          A    Right.
3          **Q    And does your opinion depend on**
4      **isolating the First Source Act component from the**
5      **overall District revenues?**
6          A    Yes.  Let me back up.  Can you repeat
7      that or clarify what you're asking here?
8          **Q    Sure.  During the period from 2013 to**
9      **2015, the District's revenues may have increased**
10     **for any number of reasons, right?  Do you agree**
11     **with that?  You have to say yes or no.**
12         A    Yes.
13         **Q    Thank you.  And I'm just trying to**
14     **understand, does your opinion rest on isolating**
15     **out of the overall increase of the District's**
16     **revenues a specific component associated with the**
17     **operation of the First Source Act?**
18         A    The answer to that is yes.
19         **Q    Going back to Exhibit 17, the**
20     **disclosure, on Page 2, you say -- strike that --**
21     **that the program has had a net positive impact.**
22     **How would you quantify the net positive impact?**

---

27

1          A    We actually did a range for that, and
2      it was anywhere from about a quarter of a million
3      dollars to over like three million.
4          **Q    So it is your opinion for the two**
5      **years between 2013 -- mid-2013 to mid-2015, the**
6      **District had an increase in revenues of somewhere**
7      **between $250,000 at $3 million associated with**
8      **the operation of the First Source Act?**
9          A    With operation of the First Source
10     Act, yes.
11         **Q    The disclosure also says that it may**
12     **be that the net -- may be projected to have a**
13     **greater positive impact as the program is more**
14     **fully implemented and enforced based on the**
15     **District's capital expenditures.  What does that**
16     **refer to?**
17         A    Well, so -- so the First Source Act
18     has to do -- target specifically construction
19     projects.  So these are projects, and these
20     projects are based on expenditures from our
21     capital -- capital side of the budget.
22              So as you implement more of those kind

---

28

1      of projects and the First Source which governs
2      these are put into effect, based on what the data
3      that we have seen, if it continues and are
4      enforced and so on, then you would see -- as more
5      capital projects are deployed, you'd see more of
6      the effects that we cited in the analysis of the
7      past data.
8          **Q    And again, in that answer, are you**
9      **differentiating -- are you differentiating**
10     **between projects in which the District is in fact**
11     **the owner of the project, a school, or a library,**
12     **something like that and that other projects covered by**
13     **the First Source Act?**
14         A    No, I'm not making any distinction.
15     So, you know, according to the First Source Act,
16     if the District gives assistance -- it
17     specifically states about District-assisted
18     projects.  So anyone covered by the First Source
19     Act and in which the kind of data that we've seen
20     in the past, if you project that pattern out,
21     then we expect to see more revenues being
22     generated as a result of that.

---

7 (Pages 25 to 28)

Associated Builders and Contractors, Inc., et al. v. DC                                        10/26/2016

29

1    Q    When you use the term "revenues" in
2  your opinion, are you talking about income tax
3  revenues?
4    A    Income tax revenues specifically
5  because that's what we analyze.
6    Q    And you're looking at individual
7  income tax revenues?
8    A    Individual income tax revenues.
9    Q    Only?
10   A    That's the only revenue source we
11  analyze in the analysis that we did.
12   Q    What about the costs or the expense
13  side of the First Source Act program regarding
14  the District's revenue picture?
15   A    Our analysis did not look at that.
16  This is why I clarified earlier that we were
17  specifically looking at the tax revenue and as
18  you correctly pointed out, the individual income
19  tax revenues specifically.
20   Q    You're not going to be offering an
21  opinion that the net impact on the District's
22  budget is positive or negative?

30

1    A    No.  What I'm saying is there's a net
2  positive individual income tax revenue based on
3  our analysis.  Sometimes it's not net of all the
4  other budgetary effects that the First Source
5  might -- it's specifically a net positive
6  individual income tax revenue effect that we
7  examined, and that's what I'm speaking to.
8    Q    Right.  So what I'm trying to just be
9  clear about, your analysis does not factor in the
10  money the District has spent through the First
11  Source program?
12   A    No.
13   Q    It's only looking at individual income
14  taxes associated with whom?  With whom?
15   A    Associated --
16   Q    Whose individual income taxes?
17   A    The District's individual income tax
18  by District residents.
19   Q    And the District residents, are you
20  saying that District residents are paying more
21  income taxes, or there's more residents paying
22  income taxes?

31

1    A    What we're saying, to the extent that
2  the First Source Act increases the employment of
3  District residents, with their associated wages
4  and salaries that generate income, we will get --
5  receive more revenue from that additional --
6  additional revenue that -- additional income
7  that's associated with the First Source Act.
8       So there's unemployment there.  You
9  hire people or District residents, and whether
10  they were doing other kind of job, the fact is
11  you're having a net addition to the overall
12  income.  And that net addition to the overall
13  income translates into net overall revenue to the
14  District.
15   Q    If you're only looking at the revenue
16  side, correct?
17   A    Correct.
18   Q    In your opinion, if more people get
19  jobs, more District residents get jobs because of
20  the First Source Act --
21   A    Or work more because they could be
22  working and this is additional work.  But they

32

1  work more hours.
2    Q    Work more hours.
3    A    So they generate more income.
4    Q    Then those -- then that should
5  generate more income tax revenue to the District?
6    A    That's right.
7    Q    Let me see -- we've marked previously
8  as Exhibit 7 the -- I've got a copy -- of the
9  District's responses to the discovery.  We
10  previously marked this as Exhibit 7, which is the
11  responses of the District of Columbia to the
12  discovery requests.  And if you would turn to the
13  very back of this exhibit, there is a series of
14  five pages, okay.  Before we go into them
15  in-depth, I just want to walk through what these
16  represent.
17       I understand these are related to
18  your -- the testimony on your opinion.  So the
19  first page is a spreadsheet that has at the top
20  some information from DOES, correct?
21   A    That's correct.
22   Q    And those numbers, I take it, are from

8 (Pages 29 to 32)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                          10/26/2016

33

1    -- we previously marked this as Exhibit 8 -- from
2    these charts, right?  Is that correct?
3            MR. SAINDON:  You have to say yes or
4    no.  She can't take down a nod.
5            THE WITNESS:  Yes.
6    BY MR. KIERNAN:
7        Q    So the top part of this, the job
8    openings listed and so forth, that's information
9    that came from DOES, and you took the years --
10    the reports, the semiannual reports from July 1,
11    '13 -- the four reports that are listed there,
12    right?
13       A    Yes.
14       Q    At the top of the chart is just
15    reprinting these reports, correct?
16       A    Yes.
17       Q    Now, what do you know about how these
18    reports, the one from DOES, how those were
19    prepared?
20       A    Not much.  We got the memo showing,
21    you know, that it was prepared at the Department
22    of Employment Services, and that's all we know.

34

1    So I don't -- I can't speak to how they were
2    collected.
3        Q    So you're relying on these numbers in
4    making -- in reaching your opinion, correct?
5        A    Yes.
6        Q    Without -- you didn't go behind the
7    numbers?
8        A    Right.  There's not much --
9        Q    If, for example, the column about
10    number of District residents reflects double
11    counting of people, you haven't accounted for
12    that one way or the other?
13       A    No.
14       Q    And the actual -- and whether these
15    projects were under the old act or the new act
16    percentages, you haven't accounted for that
17    either?
18       A    No.
19       Q    It's not a criticism.  I'm just trying
20    to make sure I understand.  So then the -- so
21    then going back to this first page that's
22    attached here, you have then, as I understand it,

35

1    you have tallied the number of agreements over
2    the two-year period and the job openings.  So you
3    basically summed them up and then divided into
4    two to come up with a one-year average, correct?
5        A    That's correct.
6        Q    What is the next part down here the
7    ACS resident percentage of industry jobs?
8        A    So that should be ACS -- it's the
9    Bureau of Census, American Community Survey.
10    They do an annual look at -- an annual survey
11    that looks at -- by industry they look at
12    which -- who is working.  So they look at all the
13    jobs in the District, and they make a calculation
14    about how many of those jobs are District
15    residents.  And we have it here by industry.
16            So what we have here is to calculate a
17    share of those jobs by sectors, and the
18    construction industry, for example, what it's
19    saying is that 18 percent of construction jobs
20    are -- are taken by District residents.
21    Sixty-three percent would be the other
22    professional, the technical services, or by

36

1    District residents.  So it's a share of those
2    jobs, total jobs, in these industries that are
3    occupied by District residents.
4        Q    And are these statistics, the
5    construction 18 percent, et cetera, those are
6    jobs that are in the District?
7        A    In the District, yes.
8        Q    Not metropolitan area jobs?
9        A    Not metropolitan.  These are jobs in
10    the District.
11       Q    And it's true, isn't it, that during
12    this time period, people in the construction
13    trades were leaving the District, not living in
14    the District?  That overall number was going down
15    anyway?
16       A    In the -- I'm trying to think.  I
17    mean, I don't -- I can't recall what the trend --
18    the trend data was for that.
19       Q    I'll come back to it.  Then -- so on
20    the industry average, if I can sum at the bottom
21    of this page, 32 percent of the jobs in the
22    District were being held at that point by

9 (Pages 33 to 36)

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

37

1   **District residents, right?**
2       A    That's correct.
3       **Q    And what is the time frame that you're**
4   **looking at these ACS statistics?**
5       A    This is the one year, 2015.
6       **Q    2015, okay.**
7       A    Yes.
8       **Q    The next item down here then is the --**
9   **and just for our -- before I leave that. So for**
10  **our purposes, looking at the construction line,**
11  **is that people in the construction industry**
12  **regardless of where they are on the -- from**
13  **unskilled labor up to skilled labor?**
14      A    Yes. That's the total -- the total
15  construction industry as classified by the Bureau
16  of Labor Statistics.
17      **Q    Then you've got the average annual**
18  **salaries. What is that information?**
19      A    That is taken from the Bureau of
20  Economic Analysis, the U.S. Department of
21  Commerce, and they do data on salaries and wages
22  and income. So this is just the average annual

---

38

1   salary of -- within the District.
2       **Q    In 2015 again?**
3       A    In 2015, yes.
4       **Q    Okay. And the average annual salary**
5   **in the District was what?**
6       A    That's the 87,000 that's here.
7       **Q    That's dollars, right?**
8       A    Yes.
9       **Q    And then behind that you've got the --**
10      A    Industry breakdown.
11      **Q    Thank you. So is the average of**
12  **87,000 done by averaging all these different**
13  **industry sectors?**
14      A    Yes. It would be a weighted average
15  of all the industry sectors, yes.
16      **Q    Weighted -- weighted how?**
17      A    I mean, it would be weighted by what
18  the share of those jobs is in the total number of
19  jobs. So one way you can do it is just to take
20  all the -- you know, all the jobs -- all the
21  salaries, the total salary, and divide it by the
22  total number of people working in those salaries.

---

39

1           But you could get the same effect by
2   looking at the shares of people working in each
3   of those jobs and the salaries within those jobs.
4   You would get the same outcome. So when I say --
5   you said if it's the average of all of these, but
6   it's not a simple average because you have to
7   weight it by the number of people working in
8   those jobs.
9       **Q    So was there a source that you were**
10  **looking at as to how many people were in, for**
11  **example, the construction industry -- employed in**
12  **the construction industry in 2015?**
13      A    No. When you go to the Bureau of
14  Economic Analysis side, they will have these
15  already -- all the calculations behind the scene
16  done. So they will have one for the annual
17  average salary of District, and then they break
18  it down. We know the process by which they do
19  it. It has to be weighted by the number of
20  workers. So they do that, the Bureau of Economic
21  Analysis. We didn't do it. We were just taking
22  the source directly from what they have done.

---

40

1       **Q    Let me come back, if I could, just to**
2   **the top of this same page here, the information**
3   **from what we had marked as Exhibit 8. Those**
4   **agreements and those higher numbers are not**
5   **broken down by industry, correct?**
6       A    No. We didn't have the industry
7   breakdown for those.
8       **Q    That's a global number of all the**
9   **industries?**
10      A    That's a global number, that's
11  correct. That's where the First Source was
12  applied.
13      **Q    Now, go back to the average annual**
14  **wage. Can you explain to me how is it that you**
15  **can determine the average annual wage if you**
16  **don't know how many people are in each labor**
17  **category?**
18      A    If I -- even though we don't know --
19  I'm not saying we don't know how many people are
20  in each labor category. I'm saying this data
21  here has already been compiled by the Bureau of
22  Economic Analysis. But if you go back to the ACS

---

10 (Pages 37 to 40)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

41

1    data that we have, it does show by categories the
2    number of -- number of people in each -- at least
3    we derived the 18 percent and the 63 percent by
4    the number of people in those categories.
5         So it's not that we don't know. We
6    don't have to do it because it's already done for
7    us by the Bureau of Economic Analysis. If you go
8    back to this, I guess, Exhibit 16, we do have --
9    we do have the number of people categorized by
10   industry. I'm just correcting that we -- we do
11   know what the number of people are in each
12   industry.
13        Q    Right. For purposes of your chart
14   here, was this information taken from an existing
15   report that the office had done or was it
16   generated for this report?
17        A    This particular information was
18   generated for this report.
19        Q    How did you know how to weight the
20   average wages for 2015?
21        A    The average wages here, we didn't
22   weight it. This is the Bureau of Economic

---

42

1    Analysis number.
2         Q    Okay.
3         A    This is the number that we got from
4    the Bureau. So when you go to their data, they
5    have the average wage for the District, and they
6    also have the industry breakdown. So we didn't
7    weight it. We just --
8         Q    You took it from their --
9         A    From their -- their database.
10        Q    Thank you for clarifying that. And
11   then at the bottom of Page 2 it says, "Source
12   Global Insight for calendar year 2015."
13        A    So.
14        Q    Is the Global Insight --
15        A    So Global Insight has a database that
16   compiles statistics from various federal
17   agencies, and it's a convenient way for us to
18   extract that data. So these are all Bureau of
19   Economic Analysis numbers as supplied to us by
20   the Global Insight.
21        Q    So taking these two pages, how do
22   these two pages factor into your opinion?

---

43

1         A    So if you go to I guess it's the last
2    page there.
3         Q    The hypothetical impact page?
4         A    Right. So this is where -- what we
5    did was -- and you will see the data with the
6    First Source -- just at a big picture level, what
7    we did was look at the average -- the share of
8    employment by different industries, which came
9    from the first page you were looking at. So a
10   good example here is construction. So if you
11   just look broadly at the District, 18 percent of
12   the -- 18 percent of the jobs in construction
13   from the broad source is occupied by District
14   residents or taken by District residents. That's
15   a share of District residents working in
16   construction.
17        Q    Maybe I misunderstood. I thought that
18   was the share of construction jobs in the
19   District held by District residents?
20        A    No. It's the share of District --
21   share of District residents holding jobs in that
22   industry.

---

44

1         Q    So 18 percent of the District's
2    residents have construction jobs?
3         A    Right.
4         Q    And where do you get that from?
5         A    That is from the American -- the
6    Bureau of Census, American Community Survey.
7         Q    Okay. I'm sorry. Let me come back
8    then, and I apologize. I may have misunderstood.
9    I thought this was if you took the industry jobs
10   in the District, for example, construction, 18
11   percent of those are held by District residents?
12        A    Yeah.
13        Q    Is it that or is it 18 percent of
14   District residents work in construction?
15        A    No. Eighteen percent of the jobs in
16   the District are held by District residents.
17        Q    Of the construction jobs?
18        A    Of construction jobs.
19        Q    Go ahead. So go back to the
20   hypothetical impact page.
21        A    So we took that share, and then we --
22   we looked at the First Source, and in the First

---

11 (Pages 41 to 44)

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

45

1    Source number, I mean we did a calculation here
2    that says the equivalent of all these jobs -- so
3    we took that data from DOES that says these are
4    the number of jobs that -- the number of listings
5    that came from the First Source.
6         So there was -- we looked at those two
7    years, and there was a total number of listings
8    for jobs based on the First Source agreement.
9    Then we looked at the number of hires that
10   resulted from the First Source agreement over the
11   two-year period, and then of those jobs we looked
12   at, what share of those jobs from the First
13   Source agreement were taken by District
14   residents.  And it turned out to be about 42
15   percent.
16        So then the next calculation where we
17   say hypothetical impact in construction industry,
18   so going back again of the construction industry,
19   18 percent of the construction jobs in the
20   District were held by District residents.  Here
21   what we're saying here is that if you were to
22   apply that ratio, the 42 percent ratio that we

46

1    see for all First Source jobs to the construction
2    industry, it would be a net addition because we
3    would increase the share from 18 percent to 42
4    percent.
5         So we didn't have -- what we didn't
6    have in the First Source, as you correctly point
7    out, was by industry.  But what we did -- and
8    this is why it's hypothetical.  What we said if
9    those -- if that same share was to be
10   replicated -- the 42 percent share of District
11   residents were replicated -- if all the First
12   Source jobs that we looked at were construction
13   industry jobs, then what we would have done is
14   increase the District residents share from -- of
15   those jobs from 18 percent to 42 percent, which
16   would result in a net additional jobs for
17   District residents.
18        And then this is where the wage -- if
19   you notice here, we're using not the overall
20   average wage but a wage for construction
21   industry, the average wage, and then we say to
22   the extent that the First Source increased the

47

1    number of District residents jobs, it would be
2    630.  If the share went up from 18 percent to 42
3    percent, it would be 630 new jobs for District
4    residents -- District residents working.
5         We used the share to calculate what
6    that would mean in terms of overall additional
7    wages to the District, and then we apply an
8    average tax rate.  We actually do a study each
9    year about what the average tax rate is for
10   District residents, and we apply that tax rate,
11   18.83 percent to that income.  And it generated
12   about 3.7 million in additional revenue to the
13   District.
14   **Q    So that I understand some of the**
15   **other -- some of the assumptions in here, this**
16   **assumes, does it not, that somebody is hired on**
17   **January -- for what -- let me back up a second**
18   **and start over.  The hypothetical impact chart,**
19   **and I'm just looking at what you covered so far,**
20   **is hypothetically for what year?**
21        A    So what we did when we did -- took the
22   First Source information was to calculate an

48

1    average for any given -- in any given year.  We
2    are saying on average, you would -- the First
3    Source is resulting in 42 percent more District
4    residents being hired -- let me take that back.
5    Not 42 percent more.  Resulting in a 42 percent
6    share of those First Source jobs to District
7    residents any given year.
8    **Q    I'm sorry.  I didn't mean to cut you**
9    **off.  That was based on your looking at the**
10   **mid-2013 to mid-2015 statistics?**
11        A    That's right.
12   **Q    So now based on that, you've now done**
13   **a hypothetical impact.  What year does this**
14   **hypothetical impact represent?**
15        A    So we didn't pick a year.  We would
16   say in -- pick any given year, if -- if we assume
17   that the 42 percent is true for any given year,
18   so that's an assumption we're making.  So you
19   pick any given year.  If the First Source data
20   that we look at, if the First Source program
21   operates the same way that it operated in the two
22   years that we looked at, any given year you would

12 (Pages 45 to 48)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

49

1   be getting 42 percent share of District residents
2   in First Source jobs.
3        **Q    And your assumption regarding salary**
4   **and ultimately taxes further assumes that the**
5   **person who gets the job keeps the job, right?**
6        A    Right.
7        **Q    And keeps it for a full year?**
8        A    Keeps it for a full year, yes.
9        **Q    And is there any analysis of whether**
10  **the hires made from the source material that you**
11  **looked at actually reflect a 12-month employment?**
12       A    No.  We didn't do any analysis as to
13  whether it was -- we looked at the data that says
14  over this period, this is how many District
15  residents were hired.
16       **Q    So if you assume with me an employer**
17  **comes in and says we hire 10 people and after 90**
18  **days only two of them work out, your analysis**
19  **still assumes that all 10 of those people have**
20  **been employed for 12 months and have made the**
21  **average salary and are paying taxes, right?**
22       A    That's correct.

---

50

1        **Q    And you would agree with me if the**
2   **actual experience reflects that even though**
3   **people are hired off the First Source program,**
4   **they don't tend to keep their jobs for a full**
5   **year, that would dramatically change your**
6   **analysis, right?**
7        A    Yes.  But what we have to remember
8   here that we're talking about averages.  So if
9   you're dealing with averages, it is true that
10  some people in those averages might -- we are
11  always thinking about distribution.  So there are
12  people here who are not keeping a job, and there
13  are people here who are keeping it for the
14  entire.
15           So the average is saying when -- when
16  we look at average, what we're saying is that the
17  average here is the average job over the period.
18  Remember, it was a two year that we adjusted for
19  one year.  So over that two year, there are
20  people who worked for -- in the distribution they
21  would have worked for 15 months, and there are
22  some who would have left -- worked for less than

---

51

1   that.  In the average we're taking, it's the
2   people -- it's averaging over people who would
3   have worked over the 12 months.
4        **Q    Your analysis assumes of the increased**
5   **number of D.C. residents due to First Source,**
6   **that 100 percent of those people worked for a**
7   **full calendar year at the average industry wage,**
8   **correct?**
9        A    Yes.
10       **Q    So you didn't average it out and say**
11  **well let's assume some succeed, some are there**
12  **for a full year, some leave after three weeks,**
13  **we'll pick a number six months or something.**
14       A    Again, let's come back.  Again, we're
15  dealing with averages.  So if you take any First
16  Source programs in a given year -- I'm going back
17  to that calculation where you said if in fact
18  somebody didn't work a full year, whether it
19  would change the analysis.
20           What I'm saying, it might or it might
21  not because we are dealing with averages.  And
22  even if some of the people in that group for the

---

52

1   data we looked at didn't work a full year, what
2   we're saying that over that period of -- over
3   that period of time, on average for the 12 month,
4   this is the share.  Here we're just using it to
5   calculate the share.
6            So even though there might have been
7   people in that data who work less than the full
8   year and there -- again, we were doing it over a
9   two-year period.  So there might have been people
10  that work for six months, but there might be
11  people who worked for 15 months, but it averages
12  out to 12 -- in the 12 month, this is how much
13  the share averaged out to.  So that share might
14  fluctuate.
15           If there are more people who are
16  working part time and people who weren't working
17  for the full year and there are other people who
18  were working more than the full year, but it's an
19  average.  So to go back to that answer, it might
20  not change the calculation at all if you
21  actually -- if you actually have people who are
22  working less than the full year because the

---

13 (Pages 49 to 52)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

53

1    nature of averages is that you could have people
2    on both sides of the spectrum in that, which
3    would maybe not change the average.  So I don't
4    know.
5         What I'm saying if you can't -- you
6    can't pick some particular person and say that
7    person -- or group of persons who didn't -- who
8    didn't work for the full year and says that would
9    change the analysis.  It would be -- it would
10   have to depend on what happened to the overall
11   distribution of workers in that year.
12        **Q    But you'd agree with me that nobody in**
13   **this analysis can work more than 12 months.  So**
14   **that's 100 percent employment would be for 12**
15   **months, right?**
16        A    Right.  So to answer your question,
17   this analysis assumed that they're working for
18   the full year.  That is true.
19        **Q    Your analysis, as I understand it,**
20   **also assumes that there is in fact a difference**
21   **between the percentage of First Source hires off**
22   **of the DOES information and your hypothetical.**

---

54

1    **And by that I mean, you're assuming that the**
2    **distribution of First Source hires off of the**
3    **DOES information tracks your industry**
4    **distribution of employment, right?**
5         A    Right.  So this is where the
6    hypothetical comes in.  We didn't have the First
7    Source data by industry, but what we're saying is
8    that if in fact -- so the assumption here in this
9    first calculation is that all the First Source
10   jobs were construction.  So if you assume that
11   all the jobs we look at were construction, this
12   is -- we would have made 3.7 million in
13   additional revenue, if all the jobs that were in
14   that data that we got from the First Source was
15   construction.  So that's the assumption we're
16   making.
17        **Q    Then maybe -- I'm sorry.  Maybe I**
18   **didn't understand it.  If I understood your**
19   **report, you're saying if the construction project**
20   **average percent of industry employees that are**
21   **D.C. residents is 18 percent --**
22        A    That's the -- so that's the raw data

---

55

1    from -- if we look at District wide, 18 percent
2    of construction jobs are held by District
3    residents.  That's the data apart from any First
4    Source.
5         **Q    Then --**
6         A    Or it might include First Source.
7         **Q    It might include First Source, right.**
8    **Then the next line, again I'm on the last page**
9    **here of Exhibit 7, you say, "Number of D.C.**
10   **residents at industry average without First**
11   **Source."  What is that calculation where it says**
12   **481?**
13        A    So that's the -- if you take -- if you
14   take the -- if you take the 18 percent and apply
15   that to the First Source -- the number of jobs
16   that are in the First Source program, you'd only
17   get 481.
18        **Q    So that's 18 percent of what number on**
19   **here, 2,672?**
20        A    Right.  The First Source -- yes --
21   well, I think we're applying it here to the
22   thousand because it's a year.

---

56

1         **Q    Eighteen percent of the 1,100 actually**
2    **hired, you're assuming are industry -- are**
3    **construction industry?**
4         A    Right.  So here we're -- in this first
5    calculation, we're just saying if all of these
6    1,111 were construction jobs, that's the
7    assumption that they're all construction jobs,
8    then we would hire 481 in the construction
9    industry.
10        **Q    Because 18 -- if you assume that**
11   **the -- make sure I understand.**
12        A    If there was no First Source.  We're
13   saying on average, you're hiring 18 percent.  So
14   don't apply any First Source program.  If
15   employers were free to go out and hire, on
16   average they would hire 18 percent of the First
17   Source program -- 18 percent of the jobs from the
18   First Source program would be District residents.
19        **Q    I'm sorry.  Let me make sure I've got**
20   **this right.  So you're saying if you assume there**
21   **are 1,111 District residents hired in a given**
22   **year and that 18 percent of them were in the**

---

14 (Pages 53 to 56)

Lee
Associated Builders and Contractors, Inc., et al. v. DC                              10/26/2016

57

1    construction business, that's what number?
2        A    481.
3        Q    That's not 18 percent of 1,100.
4    That's 18 percent of 2,672.
5        A    Yes.  It's 2,672 over the period, yes.
6        Q    So that's 18 percent of the total?
7        A    Eighteen percent of the total, yes.
8    Of the total -- if you assume all of these First
9    Source hires were construction industry, that's
10   2,672.
11       Q    Your own analysis -- I'm just trying
12   to --
13       A    Let me back up.  So what we're --
14       Q    Let me ask the question so that the
15   record's clear on this.  You have taken the
16   average annual number of hires associated with
17   the First Source program as 2,672, right?
18       A    Right.
19       Q    From your earlier calculation, you
20   have determined that in a given year, the average
21   percent that were hired that were D.C. residents
22   was 0.416, right?

58

1        A    Right.
2        Q    Which means that the number of D.C.
3    residents hired associated with First Source was
4    on average 1,111?
5        A    Right.
6        Q    So that part I think I have.  Let me
7    go to the next part.  So if the construction
8    project average percentage of industry employs
9    D.C. residents is 18 percent, you said -- is this
10   correct, you're saying if 18 percent of the 2,672
11   total First Source hires were in the construction
12   industry, we'd expect to see 481 District
13   residents being hired annually out of the 2,672
14   First Source jobs?
15       A    Yes.
16       Q    Right?  Instead you're saying -- we're
17   actually seeing 630 because that's the difference
18   between the 1,111 and the 481?
19       A    Yes.  We are hiring 630 more.  So we
20   would have hired --
21       Q    Higher than the average?
22       A    So we would have hired 481 anyway.

59

1        Q    If the industry average held?
2        A    Right.
3        Q    Right.
4        A    Right.  We would have hired 481
5    anyway.  What we're saying, as a result of the
6    First Source where I am hiring 630 more, and this
7    is why we get the 1,111.
8        Q    Then you -- then you have applied to
9    the 630 additional people --
10       A    Right.
11       Q    -- a 12 year -- a 12-month salary of
12   66,424?
13       A    That's correct.
14       Q    To say that would yield 41 million --
15   41.8 million in additional earnings?
16       A    Yes.
17       Q    To which you then applied an average
18   D.C. tax burden to come up with $3.6 million in
19   additional taxes if all those assumptions were
20   correct?
21       A    That's right.  That's exactly right.
22   That's the calculation.

60

1        Q    Okay.  And in doing this hypothetical
2    impact, what, if any, assumptions did you make
3    about the -- about whether people are moving in
4    or out of the District?  Are you assuming it's a
5    stationary population?
6        A    This one doesn't factor in -- let me
7    put it this way.  It doesn't directly factor in
8    the movement in and out of the District.  But
9    when you do -- the data that this was taken from
10   is the American Community Survey.  And they take
11   a snapshot each year, but it assumes that the
12   movement has occurred already.
13            So when you look at the jobs in the
14   District and the number -- and the number of
15   people who are in each industry, that has already
16   been factored into it because the base for hiring
17   people is changing each year.  So you asked
18   earlier about what has been the trends, and I
19   couldn't recall what the trend, but there would
20   be a trend over time.  Here we're just looking at
21   one particular year.  So there's not a lot of
22   opportunities for seeing how people are moving in

15 (Pages 57 to 60)

Lee
Associated Builders and Contractors, Inc., et al. v. DC                         10/26/2016

---

61

1  and out.  Over time if you're doing snapshots
2  year by year, then that might change the -- this
3  might change because there are less or more
4  District residents that share could change.
5  Although, to tell the truth, it has been fairly
6  stable.
7      I mean, the number of -- the overall
8  number of District residents that are in jobs in
9  the District, that share, the 32 percent we
10 calculated for -- has been pretty stable.  You
11 could use a rule of thumb that about one-third of
12 the jobs in the District are taken by District
13 residents.
14     Q    Well, the percentage has been stable,
15 but the breakdown of who those people are has
16 changed a lot, right?
17     A    When you say who those people are,
18 demographics?
19     Q    Demographics.
20     A    Yes.
21     Q    The percentage may be the same?
22     A    Yes.

---

62

1      Q    Because it's true --
2      A    That's true.
3      Q    Let's mark this as 18.
4         (Deposition Exhibit Number 18 was
5      marked for identification and attached to the
6      transcript.)
7  BY MR. KIERNAN:
8      Q    I show you what I marked as Exhibit
9  18.  Do you recognize this as being from the
10 CFO's website?
11     A    Yes.
12     Q    And this was a study done actually
13 only earlier this year, right?
14     A    Mm-hmm.
15     Q    That looked at the changing
16 demographics in the city?
17     A    Yes.
18     Q    Did you look -- were you part of this
19 study?
20     A    I wasn't part of it, but I review
21 these posts before they go out to our blog, yes.
22     Q    And the conclusion from the CFO's

---

63

1  office was -- well, there are several here.  One
2  is that the city is losing construction workers,
3  cashiers, child care workers, and other people in
4  low wage jobs and gaining people in high wage
5  jobs, right?
6      A    Right.
7      Q    And in fact, if you look at Page 4 of
8  this report that CFO just issued, during the
9  period from 2005 to 2009, of the metropolitan
10 area construction work, about 31 percent of the
11 people working in construction, laborers,
12 painters, et cetera lived in the District, and
13 that percentage had dropped down to 23 percent in
14 2010 to 2014, right?  You have to say yes or no.
15     A    Yes.
16     Q    And that's -- the CFO's conclusion
17 said that's a trend that's unsurprising given the
18 increasing cost of housing, right?
19     A    That's right.
20     Q    There's nothing in -- maybe you can
21 reconcile it or not.  How do you reconcile the
22 fact that people in the construction trades are

---

64

1  moving out of the city in light of the First
2  Source Act?
3      A    You said reconcile it?  I don't think
4  they're related at all.  I mean, the First Source
5  is not a program to attract people into the city.
6  It is for existing residents, to generate jobs
7  for existing residents.  So the trend -- it's --
8  my expectation is not that that would -- that's
9  not the driver of whether people stay or leave
10 the city.  As we stated here, the bigger -- the
11 bigger factor is always going to be the cost of
12 living in the city.
13     Q    And the analysis that you did with
14 your hypothetical did not assume -- you did not
15 take into account the fact that the population of
16 construction laborers, painters, et cetera have
17 in fact been moving out of the city, a trend that
18 your office said was unsurprising given the cost
19 of housing?
20     A    Right.  And in fact, here it was 23
21 percent.  In our analysis, that had gone down to
22 18 percent.  So we're saying the First Source

---

16 (Pages 61 to 64)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

65

1  might actually have a bigger impact in the future
2  if that number was lower because then -- for the
3  people living in the city.  So we used 18
4  percent, but say next year it goes down to 10
5  percent, then the application of the First
6  Source, which I mean what we have seen here is
7  that it results in higher number of people
8  working in those jobs than without the First
9  Source.
10        So I'm saying the -- our analysis is
11  true, you know, regardless of what's happening to
12  the trend because the analysis specifically is
13  looking at the question does First Source add to
14  the District revenue.
15      Q    But your analysis also assumes that
16  the people who would get a job associated
17  directly with First Source stay in the city?
18      A    Yes.
19      Q    Not move out of the city?
20      A    Yes.
21      Q    Right?
22      A    Yes.

---

66

1      Q    And the trend lines in the District
2  are the people in this industry are moving out of
3  the city?
4      A    That's the trend line for the lower
5  wage jobs or jobs associated with the
6  construction industry.  That's true.
7      Q    Off the record.
8        (A brief recess was taken.)
9  BY MR. KIERNAN:
10      Q    Dr. Lee, could you go back to Exhibit
11  7, the discovery answers.  I'm actually on your
12  hypothetical impact page.  Before we took a short
13  break, we were talking about the top part of that
14  chart.
15      A    Right.
16      Q    Can we walk through the rest of the
17  hypothetical impact chart?
18      A    I mean, they're basically the same.
19  Here so when we -- we did the first one, we said
20  if you assume all the First Source were
21  construction, and as economists, we like to see
22  the sensitivity across industry -- you know, we

---

67

1  were trying to give a range for what you could
2  expect.  And since, again, we did not have the
3  data from DOES by the First Source data by
4  industry, we just wanted to see what would be the
5  effects if you choose a different industry.
6        We kind of speculate that it's
7  probably just because of the nature of the act
8  that it is mostly construction, but what if it's
9  not.  If you look at business services, so the
10  second -- the second block there is looking at
11  business services.  And in that case we -- if
12  you -- the share of business services -- business
13  services jobs that are held by District residents
14  is 39 percent.  So you would expect a smaller
15  bump up in terms of going from 39 percent share
16  to 42 percent.  So you would only generate about
17  317 in revenue.  Then if you take one that's in
18  the middle -- this one just looks at all
19  industry.  We talk about 32 percent.
20        If you look at that, that's 32
21  percent.  Again, if you took all the jobs -- if
22  you said this represented the broad cross-section

---

68

1  of jobs in the District, then we are looking at
2  about $2 million in additional revenue.  So it
3  was just an exercise to see how sensitive this 3
4  million, and you could say it could go as low as
5  300,000 if the jobs that you are hiring from
6  First Source are business services to as -- on
7  average, you're talking about 2 million, if the
8  First Source jobs were weighted the same way it
9  is as the District jobs as a whole.
10      Q    And ultimately, that sensitivity is
11  the difference between the percentage as you went
12  over earlier of District residents holding jobs
13  in a particular industry, that number, versus 42?
14      A    Exactly.  Exactly.
15      Q    And then running that through an
16  average salary and assume 12-month employment, et
17  cetera?
18      A    Exactly.
19      Q    So the other pages then on this
20  exhibit, the page that says "Estimated net
21  revenue to D.C. if D.C. imposes a one percent
22  commuter wage tax and Maryland and Virginia

---

17 (Pages 65 to 68)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                                    10/26/2016

---

69

1  reciprocate,'' is this form a part of your
2  opinion?
3      A    So this was -- so my understanding of
4  the issue here is that --
5      Q    I'm sorry.  Let me back up.  First
6  question is, is this part of the opinion you're
7  going to testify about?
8      A    Not directly.
9      Q    Indirectly?
10     A    Well, indirectly because -- and this
11 is what I was explaining.  I understand that part
12 of the redress here is to redress structural
13 imbalance caused by the federal presence.  And
14 here this is -- this calculation is just a
15 measure of that imbalance, one measure of that
16 imbalance I should say.
17          So if the question -- if the question
18 is, is there -- is there -- does the federal
19 presence or restrictions from the federal
20 government cause the District to have less
21 revenue than it would otherwise have without
22 these restrictions, that's the answer to that

---

70

1  question.  But I don't know that it's a part of
2  what is being asked.  My understanding what was
3  being asked here is does the First Source program
4  redress this imbalance to the extent that it
5  exists.
6      Q    Did you prepare this page, this
7  estimated net revenue page?
8      A    Yes.
9      Q    And who asked you to prepare it?
10     A    Actually, this was prepared for a
11 separate -- it was at the respect -- at the
12 request of a councilmember.
13     Q    District councilmember?
14     A    District councilmember.
15     Q    Who requested this?
16     A    This was Councilmember Jack Evans.
17     Q    What were the circumstances that he
18 requested it?
19     A    The circumstances here actually was
20 looking at -- looking at the contributions to the
21 WMATA funding.  So you know -- there, again, is
22 some imbalance there because the idea here was

---

71

1  that the existence of the Metro is directly
2  benefiting the surrounding jurisdiction.  So I
3  think that was the context.  And we did it in
4  terms of if we were able to tax the income -- so
5  the question it is answering is, if we were able
6  to tax the income of District -- of District
7  workers, regardless of where they live, and at
8  the same time we know in the District have a
9  reciprocity agreement that we are prevented by
10 Congressional -- federal action from taxing the
11 incomes of District non-residents in the
12 District.  But we do have an agreement between
13 the state of Virginia and Maryland that they in
14 turn do not tax District residents.
15          So this -- this is another
16 hypothetical.  If we could tax the income of all
17 workers regardless of where they live and then
18 the reciprocity agreement is thrown out and they
19 were able to tax District residents who work in
20 Maryland and Virginia, what would be the net
21 fiscal effect, and this calculation shows what
22 that net fiscal effect from the District point of

---

72

1  view that it would result in about 406 million
2  more annual revenue for the District than we now
3  get.
4      Q    Do you know what year this particular
5  page looks at?
6      A    So here again, we're looking at the
7  American Community Survey, 2015 data.
8      Q    It's true, isn't it, that the actual
9  relative balance of -- excuse me -- that the
10 balance between nonresidents who come into the
11 District to work and the District residents who
12 go to Maryland or Virginia to work that that has
13 shifted dramatically over the last several years,
14 right?
15     A    The numbers have not really shifted
16 that much.  It's still one-third, two-thirds.  In
17 terms of the income generated, that has shifted.
18 It has -- we're now generating -- more of the
19 income that's generated here, at least from a net
20 point of view, is staying in the city if you look
21 compared to the surrounding region than has been
22 in the past.

---

18 (Pages 69 to 72)

Associated Builders and Contractors, Inc., et al. v. DC                     10/26/2016

---

73

1          MR. KIERNAN:  We'll mark this as 19,
2    please.
3          (Deposition Exhibit Number 19 was
4    marked for identification and attached to the
5    transcript.)
6    BY MR. KIERNAN:
7       Q    I've handed you what I marked as
8    Exhibit 19, and this is -- this is a report also
9    generated by the CFO's office last February,
10   right?
11      A    Yes.
12      Q    That reflects that the earnings of
13   reverse commuters, that is people that live in
14   the District and work --
15      A    In the --
16      Q    -- in Maryland and Virginia?
17      A    -- surrounding jurisdictions.
18         MR. SAINDON:  Don't talk over him.
19   She can't type both down.
20   BY MR. KIERNAN:
21      Q    The CFO's conclusion in 2015 was that
22   since 2011 reverse commuters, that is people

---

74

1    living in the District and working in Maryland
2    and Virginia, earn more than the other way
3    around, right?
4       A    Yes.
5       Q    And that that trend has been
6    increasing since roughly 2011 only?
7       A    Yes.
8       Q    And that the people living in the
9    District who work in Maryland and Virginia are
10   getting proportionally higher paying jobs than
11   they had been previously?
12      A    That's correct.
13      Q    Does the fact that District residents
14   who were able to work in Maryland and Virginia,
15   does that figure into your analysis at all?
16      A    Which analysis?
17      Q    Your analysis about the net positive
18   impacts on District revenues associated with
19   First Source.
20      A    The answer is yes, and again not
21   directly, but to the extent that the data from
22   the American -- the American Community Survey

---

75

1    that we used to do this analysis, to the extent
2    it already reflects that, I mean it's -- again,
3    it's just taking a snapshot.  We're not looking
4    at how it operates over a period of time.  It
5    does take into account that as of now, this is
6    what has happened, and this is the status quo
7    right now for 2015.
8       Q    When you talk about the structural
9    imbalance in -- you said earlier the structural
10   imbalance, what exactly do you mean by the
11   structural imbalance?
12      A    The structural imbalance means that
13   given the expenses that the District -- the
14   District has associated with providing services
15   to the citizens of the District, the citizens and
16   people who come in every day, police protection
17   and so on, that there is an imbalance in terms of
18   what ideally you would like to provide and the
19   resources available to pay for those services.
20      Q    Is that focus primarily over the years
21   on the capital needs of the city, that is
22   infrastructure and such like that?

---

76

1       A    No.  It's just focused on if you take
2    into account all the needs in terms of including
3    capital needs, what the resources would be.
4    So -- I'm not sure this is -- if you look at our
5    budget, we're required to produce a balanced
6    budget.
7          So the question is how is there a
8    structural imbalance if every year you're
9    generating enough revenue to cover the services
10   that you do provide.  And the answer is that you
11   can do it by deferring capital needs.  These are
12   things that you don't have to provide
13   immediately, but if you could, you would be
14   putting away enough savings to replace capital
15   and fixing infrastructure and so on.
16         So each year you have to restrict your
17   capital budget because that's one place you can
18   park it because you don't have to provide it
19   immediately.  So it's -- the result of the
20   structural imbalance is primarily reflected in
21   the deficit in terms of un -- deferred
22   infrastructure spending or deferred capital

---

19 (Pages 73 to 76)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

---

77

1    needs.
2       **Q    In the District's production of**
3    **documents in this case, they produced and you've**
4    **probably seen over the years the GAO report about**
5    **structural imbalance.  I don't know if we have to**
6    **mark it.  It's a May 2003 GAO report, and the Dr.**
7    **Gandhi's presentation about budget implications**
8    **of the growth of population from 2005.**
9       A    Yes.
10      **Q    And the Congressman DeWine's hearings**
11   **of 2004 about structural imbalance, you're**
12   **familiar with all this background?**
13      A    Yes.
14      **Q    And I will represent to you I read**
15   **through every page of all of that, and I didn't**
16   **see a single reference to First Source Act or**
17   **towards residential preference hiring.**
18      **Do you have an understanding what the**
19   **relationship is between a law like the First**
20   **Source Act with residential preference for**
21   **District of Columbia and what is called the**
22   **structural imbalance?**

---

78

1       A    So having -- just going back to those
2    documents.
3       **Q    I'm happy to show them to you.**
4       A    No, no. It's fine.  I was involved at
5    least in the production of a lot of those
6    documents.  There -- it was -- the presentation
7    there was to highlight the presence of the
8    structural imbalance, and, you know, we
9    highlighted -- the purpose there was to show the
10   federal government, and in fact, the big push
11   there was to look at policies that you could --
12   from the federal points of view, and this is why
13   a lot of the testimonies were to the federal.
14      It was a problem of the federal
15   government creation.  So they were looking to the
16   federal government -- that was the purpose of
17   those, to the federal government, what kind of
18   programs can you do to redress.  For example,
19   could you provide more for capital investment and
20   so on, schools and so on.
21      As I understand it and reading through
22   the First Source, one of the lines of the First

---

79

1    Source Act, this was one remedy.  Here we weren't
2    looked at an exhaustive list in those
3    presentation of remedies because it was focused
4    on getting a specific kind of remedy, which is
5    federal government intervention.  So we weren't
6    looking at all the local things that are done in
7    order to do this -- to remedy that.
8       **Q    And at that -- at the time of a lot of**
9    **these presentations in the early 2000s, it was in**
10   **connection with trying to get an increase federal**
11   **contribution, right?**
12      A    That's true.
13      **Q    Let me -- let's go ahead and mark this**
14   **one Exhibit 20.**
15      (Deposition Exhibit Number 20 was
16   marked for identification and attached to the
17   transcript.)
18   BY MR. KIERNAN:
19      **Q    Dr. Lee, I put in front of you Exhibit**
20   **20, which is a copy of a PowerPoint presentation**
21   **that Dr. Gandhi and Julia Friedman who I guess**
22   **preceded you in your job.**

---

80

1       A    Predecessor, yes.
2       **Q    Presented to a conference in Oklahoma**
3    **in 2005 about budget implications of the growth**
4    **and population and employment in the District.**
5    **Have you -- are you familiar with this?**
6       A    Mm-hmm, I am.
7       **Q    So in this -- in this particular**
8    **report, Dr. Gandhi with the CFO's office, if you**
9    **look at Page 7, said the "Four main job sectors**
10   **that have been growing and are major employment**
11   **areas in the District of Columbia have been**
12   **identified and analyzed:  retail trade,**
13   **professional services, business services, and**
14   **nonprofits."**
15      A    That's correct.
16      **Q    And then the report goes on to talk**
17   **about trying to add jobs in those four sectors,**
18   **right?**
19      A    That's correct.
20      **Q    That's what the point of this was.**
21   **There's no mention of the construction trades in**
22   **here, right?**

---

20 (Pages 77 to 80)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

81

1        A    No.
2        Q    And there was no -- at least as of
3    2005, no sense that there was a push to
4    create additional jobs in the construction
5    industry, but there was for other industries,
6    right?
7        A    That's right.
8        Q    And again, I'll represent to you --
9    you are welcome to read it.  I'll represent to
10    you there's no mention in here of any sort of
11    residential preference law as being something
12    that would be good to do.
13        A    No.
14        MR. KIERNAN:  21, please.
15        (Deposition Exhibit Number 21 was
16    marked for identification and attached to the
17    transcript.)
18    BY MR. KIERNAN:
19        Q    Dr. Lee, I'm showing you what I marked
20    as Exhibit 21, which is a briefing document that
21    came out of the Office of Revenue Analysis in
22    January of 2013, and the headline point here was

82

1    the "Commuter bite out of income earned in D.C.
2    is the smallest in 40 years," and notes the drop
3    in the commuter drain on the income tax base,
4    right?
5        A    That's right.
6        Q    And that had been a trend this report
7    noted that that trend had been declining over the
8    past dozen years, right?
9        A    That's correct.
10        Q    By the "commuter bite" what they are
11    talking about is the reduction in the amount
12    of -- if you look at Page 2, it walks through
13    what it is, but it's -- the flip side of it,
14    right.  They take the income earned by everyone
15    working in the District, regardless of where they
16    live.  If you back out the portion earned by
17    commuters, that is people coming from Maryland
18    and Virginia into the District, and you add the
19    amounts earned by D.C. residents who go elsewhere
20    to work, and you need to consider that delta,
21    that delta had been trending downward for the
22    dozen years prior to January of 2013, right?

83

1        A    That's correct.
2        Q    And that was the CFO's view in early
3    2013, right?
4        A    That's correct.
5        MR. KIERNAN:  Mark this as 22.
6        (Deposition Exhibit Number 22 was
7    marked for identification and attached to the
8    transcript.)
9    BY MR. KIERNAN:
10        Q    I put in front of you, Dr. Lee, a
11    six-page document, and for the record, it came
12    from the District's production starting at Bates
13    number 219.  I apologize.  The Bates don't come
14    up on the bottom of this.
15        Have you seen this document before?
16        A    I can't recall seeing this one.
17        Q    In preparing for being a witness in
18    this case, were you given any documents to review
19    to prepare?
20        A    No.  I mean, I did my calculation, and
21    you know -- with my initial contact, I had the
22    First Source -- the case that -- whatever the

84

1    result of what happened prior to that, and I read
2    through that.
3        Q    If I represent to you that this --
4    that this -- the six pages include references to
5    cases decided in 2005 and reports issued in 2007
6    and in 2012, can you help me determine when this
7    was prepared?
8        A    When this was prepared?
9        Q    Yes.
10        A    No.
11        Q    But your testimony is you don't recall
12    seeing this before or reading it before?
13        A    No.
14        Q    So I take it, it didn't form a portion
15    of your -- a basis for your opinion?
16        A    No.
17        (Deposition Exhibit Number 23 was
18    marked for identification and attached to the
19    transcript.)
20    BY MR. KIERNAN:
21        Q    Showing you what I marked as Exhibit
22    23, which is a spreadsheet entitled "New law

21 (Pages 81 to 84)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

85

1    project hours worked percentages statistics," and
2    it's in the production.  It's Bates number 9282
3    from the District's production.  Have you seen
4    this document before?
5        A    No.
6        Q    Do you recognize the -- any of the
7    projects listed down the left-hand side from your
8    personal experience with this?
9        A    No, not from -- I mean, I know
10   generally that we have been in a school
11   modernization.  I can recognize the name of the
12   school, but I don't know all the projects
13   specifically, no.
14       Q    Is it correct, Dr. Lee, that the
15   opinion that you would offer in this case is not
16   based on -- let me ask more affirmatively.  Is it
17   correct that the opinion you're offering in this
18   case relates to an analysis based on certain
19   hypotheticals or assumptions and not based on a
20   review of actual performance of the law?
21       A    The -- so it is based primarily on the
22   data that we get from DOES, which the assumption

86

1    is that it is generated by implementing the First
2    Source law.  So in that sense, it is some measure
3    of the performance of the law.  We go to -- if
4    the -- what we see in the data is that if the
5    purpose of the First Source is to increase the
6    hire of District residents above and beyond what
7    it would be without the law, then -- then --
8    based on the data that we have seen, then that is
9    true.  It is the performance.  It goes to the
10   performance of the law.
11           So if you forget the hypotheticals and
12   we just were able to just take that data and say
13   look, this is -- this is what has happened over
14   this two-year period and we compared that to the
15   shares without even going into a calculation,
16   we're saying that the First Source increased the
17   hiring relative to what would be without the
18   First Source, and I think of that as a measure of
19   performance.
20       Q    There's been no study that you're
21   aware of that tries to track either individual --
22   that purports to track individual experiences

87

1    with First Source, right?
2        A    No.
3        Q    And your -- your opinion is based on
4    the assumption --
5        A    The aggregate numbers.
6        Q    I'm sorry, let me finish.  Your
7    opinion is based on assumption that the DOES
8    information regarding the number of hires
9    translates into a certain amount of tax revenue
10   for the District, right?
11       A    Yes.
12       Q    And you've made that connection by
13   making certain assumptions that we reviewed
14   earlier about an average wage, a duration of
15   employment, a distribution within industries, and
16   so forth?
17       A    Yes.
18       Q    And we discussed this earlier I think
19   in the deposition, but let me just be clear about
20   it now.  You're not aware of any sort of analysis
21   like you've done for us here that preceded the
22   adoption of the law?

88

1        A    No.
2        Q    And you're not aware of any analysis
3    done by the District to try to compute the dollar
4    effect of this amended act during the legislative
5    process?
6        A    No.
7        Q    And certainly from the CFO's office,
8    you're not aware that any such analysis was ever
9    done prior to the adoption of the law?
10       A    No.
11       Q    Other than your opinion work for us
12   today, has the CFO's office undertaken to
13   determine the impact of the First Source Act?
14       A    No.
15       Q    By that I mean -- I know you've done
16   it for us today.  There isn't a report that the
17   CFO's office itself generated outside of this
18   litigation to look at the impact of the First
19   Source Act at least since it was amended?
20       A    No.
21       Q    You're not -- are you aware of any
22   report by any District agency that evaluated the

22 (Pages 85 to 88)

Associated Builders and Contractors, Inc., et al. v. DC                10/26/2016

---

89

1    impact of the Amended First Source Act?
2        A    No, I am not aware of such a report.
3        Q    If you give me two minutes and let me
4    check my notes, we might be done.
5            (A brief recess was taken.)
6    BY MR. KIERNAN:
7        Q    Are you aware of any study or analysis
8    conducted by the District at any time that showed
9    that the presence of nonresident workers, that is
10   workers who don't live in the District, was a
11   source of either unemployment or poverty inside
12   the District?
13       A    No.
14       Q    In your disclosure on Page 2 you say
15   that the -- you explain the District structural
16   budget imbalance, which I think you did, and you
17   said you were going to opine on the approximate
18   amount of that figure.
19       A    Right.
20       Q    What is that?  Do you have an opinion
21   as to what the approximate figure is?
22       A    So the calculation we did that shows

---

90

1    that balance is -- is what we -- what I'm
2    referring to here.
3        Q    You mean the one that was done for
4    Jack Evans, that one?
5        A    Yes.
6        Q    I'm sorry.  Maybe I didn't understand
7    that then.  Let me go back.  Can you go back to
8    that page then, the one that was prepared --
9        A    I got it.
10       Q    Does this chart, the estimated net
11   revenue to D.C. if there's a wage tax and there's
12   reciprocal, do you think this reflects the
13   approximate amount of the structural budget
14   imbalance?
15       A    Not the entire.  It speaks to the
16   portion that comes from the banning commuter tax.
17   There are other aspects to it that has to do with
18   not being able to tax federal land.  So this is
19   on our revenue side and specifically the commuter
20   tax ban but not the overall.  So there's several
21   elements to the structural imbalance.  And what
22   I'm speaking -- my opinion would speak to this

---

91

1    element, the computer tax ban.
2        Q    But there are a number of other
3    elements that --
4        A    That's correct.
5        Q    -- that the District has traditionally
6    talked about in terms of a structural imbalance,
7    right?
8        A    That's right.
9        Q    Federal lands that can't be taxed, for
10   example, right?
11       A    Right.
12       Q    And embassies and such that cannot be
13   taxed?
14       A    That's right.
15       Q    Commuter -- you talked about the
16   provision of services --
17       A    That's correct.
18       Q    -- for national or other things
19   associated being with the Nation's capital,
20   right?
21       A    That's right.
22       Q    There are also items that the federal

---

92

1    government covers that in a state -- the state
2    would otherwise cover, right?
3        A    That's correct.
4        Q    I mean, there was the Reconciliation
5    Act in the late '90s that took some things and
6    put them on the federal government's budget,
7    right?
8        A    That's correct.
9        Q    So the issue of the structural budget
10   imbalance has been a long-standing issue in the
11   District, right?
12       A    Right.
13       Q    And of that, what you're referring to
14   as the commuter wage tax issue is a portion of
15   that, right?
16       A    Right.
17       Q    And --
18       A    So in terms of the statement here, the
19   only thing I would say about it is that we know
20   from the most comprehensive study that is done,
21   which is the GAO study, that it ranged from
22   something close to half a billion to over one

---

23 (Pages 89 to 92)

Lee

Associated Builders and Contractors, Inc., et al. v. DC                              10/26/2016

---

93

1    billion.  And if you update that, it would be
2    something higher in today's dollars.  That's --
3    that's as much as I can -- that's the only source
4    that, you know, is a comprehensive study that has
5    been done.
6        **Q    I'm sorry.  I didn't mean to cut you**
7    **off.  Even though the District's CFO has noted**
8    **that reverse commuters are holding higher paying**
9    **jobs than they used to?**
10       A    Right.  I mean so -- what I'm saying
11   is that only -- in terms of an opinion on the --
12   the only comprehensive study that has been done,
13   which was 2005 or thereabouts, is that one GAO.
14   We haven't done one since.  So we don't know how
15   that has changed in relation to that.
16       **Q    And as far as you know, there was no**
17   **study or analysis done as to whether the Amended**
18   **First Source Act would address the structural**
19   **imbalance issue, right?**
20       A    Not in its entirety.
21       **Q    What do you mean by not in its**
22   **entirety?**

---

94

1        A    The First Source Act would not by
2    itself be able to solve that.  The numbers are
3    too big.  You see from our calculation we are
4    talking about at least -- at most three million a
5    year if you applied just the construction
6    industry, but we -- I mean, it's a big number.
7    If you take the one billion as a number, I mean
8    the First Source by itself would not address
9    that.  It would be programs like those that
10   would -- could help redress some of that
11   imbalance.
12       **Q    And how would it redress some of the**
13   **imbalance?**
14       A    To the extent that anything that adds
15   to the revenue side, and one you have noted
16   already, the trend -- we have done lots of things
17   that are attracting people to the city.  You made
18   reference to this.
19       To the extent we're getting higher
20   income people who are working in areas, that goes
21   towards addressing that imbalance.  So to the
22   extent that we have programs that hire District

---

95

1    residents that would otherwise not be working or
2    would be working less hours, that goes towards
3    addressing that imbalance as well.
4        **Q    That analysis as to the net effect of**
5    **the First Source Act, to your knowledge, has not**
6    **been done?**
7        A    No.
8        **Q    And you're not relying on such an**
9    **analysis in offering your opinion?**
10       A    No.
11       MR. KIERNAN:  I have nothing further.
12   Appreciate your time today.
13       MR. SAINDON:  We have no follow ups.
14   (Whereupon, the signature having been waived, the
15   deposition concluded at 12:01 p.m.)
16
17
18
19
20
21
22

---

96

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Tammy S. Newton, the officer before
3    whom the foregoing proceedings was taken, do
4    hereby certify that the foregoing transcript is a
5    true and correct record of the proceedings; that
6    said proceedings were taken by me
7    stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by
10   any of the parties to this case and have no
11   interest, financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set
13   my hand and affixed my notarial seal this 31st
14   day of October, 2016.
15   My commission expires:
16   7/31/2017
17
18   _____
19        Notary Public in and for the
20        District of Columbia
21
22

---

24 (Pages 93 to 96)

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

97

```
 1              C O N T E N T S
 2     EXAMINATION OF DR. FITZROY LEE          PAGE:
 3         By Mr. Kiernan              3
 4
 5     DEPOSITION EXHIBITS:              PAGE:
 6     Number 16 - Monthly Reports          12
 7     Number 17 - Defendant's Disclosures      21
 8     Number 18 - Post from the CFO's Website    62
 9     Number 19 - Post from the CFO's Website    73
10     Number 20 - PowerPoint Presentation      79
11     Number 21 - D.C. Office of Revenue
12           Analysis Briefing Document    81
13     Number 22 - Reference of Cases        83
14     Number 23 - Spreadsheet            84
15
16        (All exhibits attached to transcript.)
17
18
19
20
21
22
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Associated Builders and Contractors, Inc., et al. v. DC                10/26/2016

[ 98 ]

**A**

**a.m** 1:16
**ABC53** 17:12
**ABC56** 18:6
**ability** 3:20
**able** 71:4,5,19 74:14
  86:12 90:18 94:2
**account** 64:15 75:5
  76:2
**accounted** 34:11,16
**accounting** 9:22
**accounts** 5:18 10:22
**ACS** 35:7,8 37:4
  40:22
**act** 4:11,13,17 7:1
  17:11,16 18:17,18
  19:7,17 20:7,8,13
  20:22 22:7,19 23:2
  23:11 24:3,12,20
  24:20 25:1,2,8,9
  25:13,13,15,16
  26:4,17 27:8,10,17
  28:13,15,19 29:13
  31:2,7,20 34:15,15
  64:2 67:7 77:16,20
  79:1 88:4,13,19
  89:1 92:5 93:18
  94:1 95:5
**action** 71:10
**actual** 34:14 50:2
  72:8 85:20
**add** 65:13 80:17
  82:18
**addition** 8:3 9:2,5
  10:13 31:11,12
  46:2
**additional** 8:1 31:5
  31:6,6,22 46:16
  47:6,12 54:13 59:9
  59:15,19 68:2 81:4
**address** 93:18 94:8
**addressing** 94:21
  95:3
**adds** 94:14
**adjusted** 50:18
**administers** 5:12
**administrator** 7:19

**adopt** 19:2
**adopted** 4:11
**adoption** 18:17 20:7
  20:22 87:22 88:9
**affairs** 17:22
**affirmatively** 85:16
**affixed** 96:13
**agencies** 9:1,6 42:17
**agency** 7:4 9:11
  19:21 20:13 88:22
**aggregate** 87:5
**agree** 26:10 50:1
  53:12
**agreement** 45:8,10
  45:13 71:9,12,18
**agreements** 35:1
  40:4
**Agriculture** 11:11
**ahead** 44:19 79:13
**al** 1:6
**alluded** 8:14
**alternative** 7:21
**amended** 4:10,13,16
  17:10,16 18:17
  20:7,13 24:20 25:1
  88:4,19 89:1 93:17
**American** 35:9 44:5
  44:6 60:10 72:7
  74:22,22
**amount** 82:11 87:9
  89:18 90:13
**amounts** 82:19
**analysis** 4:5,16 5:1,9
  6:2 7:9 8:13 18:16
  19:1,5,6,11,15,19
  19:20 20:6,22
  23:18 25:4 28:6
  29:11,15 30:3,9
  37:20 39:14,21
  40:22 41:7 42:1,19
  49:9,12,18 50:6
  51:4,19 53:9,13,17
  53:19 57:11 64:13
  64:21 65:10,12,15
  74:15,16,17 75:1
  81:21 85:18 87:20
  88:2,8 89:7 93:17

95:4,9 97:12
**analyze** 5:3 29:5,11
**analyzed** 80:12
**ANDREW** 2:12
**Andy** 22:3
**andy.saindon@dc...**
  2:21
**annual** 35:10,10
  37:17,22 38:4
  39:16 40:13,15
  57:16 72:2
**annually** 58:13
**answer** 3:17,19
  26:18 28:8 52:19
  53:16 69:22 74:20
  76:10
**answering** 71:5
**answers** 66:11
**anticipate** 20:16
**Antideficiency** 7:1,3
**anybody** 16:5
**anyway** 36:15 58:22
  59:5
**apart** 55:3
**apologize** 44:8
  83:13
**appears** 2:22
**application** 65:5
**applied** 40:12 59:8
  59:17 94:5
**apply** 45:22 47:7,10
  55:14 56:14
**applying** 55:21
**Appreciate** 95:12
**approximate** 89:17
  89:21 90:13
**area** 10:21 13:17,21
  14:2,8,12,16 36:8
  63:10
**areas** 80:11 94:20
**asked** 22:6 60:17
  70:2,3,9
**asking** 3:10 26:7
**aspects** 90:17
**assist** 22:6
**assistance** 28:16
**assists** 5:14

**associated** 1:5 3:11
  26:16 27:7 30:14
  30:15 31:3,7 57:16
  58:3 65:16 66:5
  74:18 75:14 91:19
**assume** 3:17 25:22
  48:16 49:16 51:11
  54:10 56:10,20
  57:8 64:14 66:20
  68:16
**assumed** 53:17
**assumes** 47:16 49:4
  49:19 51:4 53:20
  60:11 65:15
**assuming** 54:1 56:2
  60:4
**assumption** 48:18
  49:3 54:8,15 56:7
  85:22 87:4,7
**assumptions** 47:15
  59:19 60:2 85:19
  87:13
**attached** 12:7 21:7
  34:22 62:5 73:4
  79:16 81:16 83:7
  84:18 97:16
**attention** 21:13
**Attorney** 2:14
**attract** 64:5
**attracting** 94:17
**available** 7:6 12:21
  18:8 75:19
**average** 35:4 36:20
  37:17,22 38:4,11
  38:14 39:5,6,17
  40:13,15 41:20,21
  42:5 43:7 46:20,21
  47:8,9 48:1,2
  49:21 50:15,16,17
  50:17 51:1,7,10
  52:3,19 53:3 54:20
  55:10 56:13,16
  57:16,20 58:4,8,21
  59:1,17 68:7,16
  87:14
**averaged** 52:13
**averages** 50:8,9,10

51:15,21 52:11
  53:1
**averaging** 38:12
  51:2
**aware** 18:15 20:5,11
  20:15,17 86:21
  87:20 88:2,8,21
  89:2,7

**B**

**back** 4:19 22:10,16
  24:14 26:6,19
  32:13 34:21 36:19
  40:1,13,22 41:8
  44:7,19 45:18
  47:17 48:4 51:14
  51:16 52:19 57:13
  66:10 69:5 78:1
  82:16 90:7,7
**background** 77:12
**balance** 72:9,10
  90:1
**balanced** 76:5
**ban** 90:20 91:1
**banning** 90:16
**base** 19:13 20:14
  60:16 82:3
**based** 23:6,18,20
  24:10 25:12 27:14
  27:20 28:2 30:2
  45:8 48:9,12 85:16
  85:18,19,21 86:8
  87:3,7
**basically** 5:17 6:11
  14:13 35:3 66:18
**basis** 5:2 22:16
  84:15
**Bates** 18:6 83:12,13
  85:2
**BEHALF** 2:2,11
**believe** 4:7 23:20
**benefiting** 71:2
**best** 3:19
**beyond** 86:6
**big** 43:6 78:10 94:3
  94:6
**bigger** 64:10,11 65:1
**billion** 92:22 93:1

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

[ 99 ]

94:7
**bit** 20:5 24:1
**bite** 82:1,10
**block** 67:10
**blog** 62:21
**Board** 11:17
**bottom** 15:11 16:18
36:20 42:11 83:14
**boundaries** 10:4,19
11:2 14:10
**boundary** 14:7
**break** 39:17 66:13
**breakdown** 38:10
40:7 42:6 61:15
**brief** 66:8 89:5
**briefing** 81:20 97:12
**broad** 43:13 67:22
**broaden** 20:4
**broader** 7:2,4
**broadly** 43:11
**broken** 40:5
**brought** 17:6
**budget** 5:3,13,15
6:13,15,19 27:21
29:22 76:5,6,17
77:7 80:3 89:16
90:13 92:6,9
**budgetary** 19:20
30:4
**BUILDERS** 1:5
**bump** 67:15
**burden** 59:18
**bureau** 13:11,13,14
13:22 14:20 15:10
15:22 35:9 37:15
37:19 39:13,20
40:21 41:7,22 42:4
42:18 44:6
**business** 57:1 67:9
67:11,12,12 68:6
80:13

**——— C ———**

**C** 2:1 3:1 97:1
**calculate** 16:10
35:16 47:5,22 52:5
**calculated** 61:10
**calculation** 35:13

45:1,16 51:17
52:20 54:9 55:11
56:5 57:19 59:22
69:14 71:21 83:20
86:15 89:22 94:3
**calculations** 39:15
**calendar** 22:13,14
42:12 51:7
**call** 17:16
**called** 14:1 18:9
77:21
**capital** 27:15,21,21
28:5 75:21 76:3,11
76:14,17,22 78:19
91:19
**care** 63:3
**case** 3:13 21:1 67:11
77:3 83:18,22
85:15,18 96:10
**cases** 84:5 97:13
**cash** 5:21,21 9:18
**cashiers** 63:3
**categories** 14:19
15:4,8 41:1,4
**categorized** 41:9
**category** 14:21
40:17,20
**cause** 69:20
**caused** 69:13
**Census** 35:9 44:6
**centered** 10:12
**certain** 18:21 85:18
87:9,13
**certainly** 88:7
**CERTIFICATE**
96:1
**certify** 96:4
**cetera** 15:5 36:5
63:12 64:16 68:17
**CFO** 4:4,13 7:17,19
63:8 93:7
**CFO's** 5:8 6:6 15:15
16:2,12 18:15 19:7
19:12,16 62:10,22
63:16 73:9,21 80:8
83:2 88:7,12,17
97:8,9

**change** 50:5 51:19
52:20 53:3,9 61:2
61:3,4
**changed** 61:16
93:15
**changing** 60:17
62:15
**CHAPTER** 1:5
**charge** 5:9
**chart** 33:14 41:13
47:18 66:14,17
90:10
**charts** 33:2
**check** 89:4
**chief** 4:20 6:17 7:13
8:2,5,5
**child** 63:3
**choose** 10:8 67:5
**circumstances**
70:17,19
**cited** 16:20 25:11
28:6
**citizens** 75:15,15
**city** 62:16 63:2 64:1
64:5,10,12,17 65:3
65:17,19 66:3
72:20 75:21 94:17
**clarified** 29:16
**clarify** 23:14 25:14
26:7
**clarifying** 42:10
**Classifications**
14:22 15:1
**classified** 37:15
**clear** 30:9 57:15
87:19
**close** 92:22
**closely** 9:17
**collected** 34:2
**collecting** 5:21
**collection** 9:1
**collections** 9:20
**Columbia** 1:2,9 2:15
13:17 20:7 21:12
32:11 77:21 80:11
96:20
**column** 34:9

**columns** 13:16
**come** 4:19 13:9 15:8
16:20 22:16 24:14
35:4 36:19 40:1
44:7 51:14 59:18
72:10 75:16 83:13
**comes** 9:21 15:15
49:17 54:6 90:16
**coming** 3:9 82:17
**commencing** 1:15
**Commerce** 37:21
**commission** 96:15
**committee** 17:7,8,9
**Community** 35:9
44:6 60:10 72:7
74:22
**commuter** 68:22
82:1,3,10 90:16,19
91:15 92:14
**commuters** 73:13
73:22 82:17 93:8
**compared** 72:21
86:14
**compiled** 40:21
**compiles** 42:16
**complete** 3:19 16:19
**component** 11:9,9
26:4,16
**comprehensive**
92:20 93:4,12
**compute** 88:3
**computer** 91:1
**concluded** 95:15
**conclusion** 62:22
63:16 73:21
**conducted** 89:8
**conference** 80:2
**Congressional** 6:21
71:10
**Congressman** 77:10
**connection** 79:10
87:12
**CONRAD** 2:13
**consider** 82:20
**consistent** 18:12
**construction** 15:4
27:18 35:18,19

36:5,12 37:10,11
37:15 39:11,12
43:10,12,16,18
44:2,10,14,17,18
45:17,18,19 46:1
46:12,20 54:10,11
54:15,19 55:2 56:3
56:6,7,8 57:1,9
58:7,11 63:2,10,11
63:22 64:16 66:6
66:21 67:8 80:21
81:4 94:5
**consulted** 8:18
**contact** 83:21
**context** 71:3
**continues** 28:3
**CONTRACTORS**
1:6
**contribution** 79:11
**contributions** 70:20
**controller** 5:17 7:21
**convenient** 42:17
**copy** 17:7 21:11
32:8 79:20
**correct** 4:12 11:4
12:1 14:15 15:12
16:12 24:16 31:16
31:17 32:20,21
33:2,15 34:4 35:4
35:5 37:2 40:5,11
49:22 51:8 58:10
59:13,20 74:12
80:15,19 82:9 83:1
83:4 85:14,17 91:4
91:17 92:3,8 96:5
**correcting** 41:10
**correctly** 29:18 46:6
**cost** 7:6 18:8 63:18
64:11,18
**costs** 6:12 29:12
**Council** 5:14
**councilmember**
70:12,13,14,16
**counsel** 3:5 96:9
**counting** 34:11
**court** 1:1 3:12
**cover** 7:6 24:8 76:9

Associated Builders and Contractors, Inc., et al. v. DC                                    10/26/2016

[100]

92:2
**covered** 24:22 25:13
  28:12,18 47:19
**covers** 25:3 92:1
**create** 81:4
**creation** 78:15
**criticism** 34:19
**cross-section** 67:22
**current** 4:1,2
**currently** 7:9
**cut** 48:8 93:6

**D**

**D** 3:1
**D.C** 1:18 2:7,19
  12:11 51:5 54:21
  55:9 57:21 58:2,9
  59:18 68:21,21
  82:1,19 90:11
  97:11
**data** 8:18,21 9:21
  10:2,3,17 13:9
  15:14 23:6,19
  24:10,13,21 25:2,3
  25:11 28:2,7,19
  36:18 37:21 40:20
  41:1 42:4,18 43:5
  45:3 48:19 49:13
  52:1,7 54:7,14,22
  55:3 60:9 67:3,3
  72:7 74:21 85:22
  86:4,8,12
**database** 42:9,15
**date** 22:5,11
**dated** 17:14 21:12
**day** 75:16 96:14
**days** 49:18
**dealing** 50:9 51:15
  51:21
**debt** 5:20
**December** 12:22
**decided** 84:5
**declining** 82:7
**Defendant** 1:10 2:11
**Defendant's** 97:7
**deferred** 76:21,22
**deferring** 76:11
**deficit** 76:21

**delineated** 14:7
**delta** 82:20,21
**demographics** 61:18
  61:19 62:16
**Department** 11:11
  16:8,14 33:21
  37:20
**depend** 24:18 26:3
  53:10
**depending** 10:8
**deployed** 28:5
**deposition** 1:14 12:6
  17:5 21:6 62:4
  73:3 79:15 81:15
  83:6 84:17 87:19
  95:15 97:5
**deputy** 4:4,13,20
  7:17,19
**derived** 41:3
**described** 8:3
**detailed** 15:3
**determine** 6:14 7:1
  40:15 84:6 88:13
**determined** 57:20
**Development** 17:10
**DeWine's** 77:10
**difference** 53:20
  58:17 68:11
**different** 38:12 43:8
  67:5
**differentiate** 25:15
**differentiating** 28:9
  28:9
**direct** 21:13
**directly** 39:22 60:7
  65:17 69:8 71:1
  74:21
**director** 8:8 11:21
  17:21
**disclosure** 21:11,14
  21:18,19 24:2
  26:20 27:11 89:14
**Disclosures** 97:7
**discovery** 32:9,12
  66:11
**discussed** 87:18
**distinction** 28:14

**distribution** 50:11
  50:20 53:11 54:2,4
  87:15
**District** 1:1,2,9 2:15
  4:1,2,21 5:6,12,15
  5:18,22 7:13 8:9
  8:17 10:5,12,20
  11:2,13,14,19,22
  13:17 14:13,16
  16:5 19:8,9,17
  20:6 21:11 26:1,5
  27:6 28:10,16
  30:10,18,19,20
  31:3,9,14,19 32:5
  32:11 34:10 35:13
  35:14,20 36:1,3,6
  36:7,10,13,14,22
  37:1 38:1,5 39:17
  42:5 43:11,13,14
  43:15,19,20,20,21
  44:10,11,14,16,16
  45:13,20,20 46:10
  46:14,17 47:1,3,4
  47:7,10,13 48:3,6
  49:1,14 55:1,2
  56:18,21 58:12
  60:4,8,14 61:4,8,9
  61:12,12 63:12
  65:14 66:1 67:13
  68:1,9,12 69:20
  70:13,14 71:6,6,8
  71:11,12,14,19,22
  72:2,11,11 73:14
  74:1,9,13,18 75:13
  75:14,15 77:21
  80:4,11 82:15,18
  86:6 87:10 88:3,22
  89:8,10,12,15 91:5
  92:11 94:22 96:20
**District's** 18:18
  19:13 20:9,14 22:8
  22:21 23:12 24:4,5
  24:9 25:22 26:9,15
  27:15 29:14,21
  30:17 32:9 44:1
  77:2 83:12 85:3
  93:7

**District-assisted**
  28:17
**divide** 38:21
**divided** 35:3
**document** 81:20
  83:11,15 85:4
  97:12
**documents** 77:3
  78:2,6 83:18
**doing** 5:2 10:18
  31:10 52:8 60:1
  61:1
**dollar** 88:3
**dollars** 27:3 38:7
  93:2
**double** 34:10
**downward** 82:21
**dozen** 82:8,22
**Dr** 1:14 3:2,7 21:10
  21:14 66:10 77:6
  79:19,21 80:8
  81:19 83:10 85:14
  97:2
**drain** 82:3
**dramatically** 50:5
  72:13
**driven** 14:9
**driver** 64:9
**drop** 82:2
**dropped** 63:13
**due** 51:5
**duration** 87:14
**duties** 4:20

**E**

**E** 2:1,1 3:1,1 97:1
**earlier** 8:7,15 17:5
  18:7 22:13 23:14
  29:16 57:19 60:18
  62:13 68:12 75:9
  87:14,18
**early** 4:12 79:9 83:2
**earn** 74:2
**earned** 82:1,14,16
  82:19
**earnings** 59:15
  73:12
**economic** 11:14

12:11 20:1 37:20
  39:14,20 40:22
  41:7,22 42:19
**Economics** 11:7
**economist** 7:13 8:2
  8:6
**economists** 66:21
**economy** 5:6 8:20
  9:7 10:11,22 11:1
  14:8 15:17 20:3
  22:8,21 23:12,15
  24:4
**economy.com** 9:4
  9:16 10:16
**effect** 4:11 6:17
  19:12 20:13 22:20
  28:2 30:6 31:8
  39:1 71:21,22 88:4
  95:4
**effects** 18:18 19:1,7
  19:17 20:1,8 24:12
  28:6 30:4 67:5
**EGS** 1:9
**eight** 4:7
**Eighteen** 44:15 56:1
  57:7
**either** 34:17 86:21
  89:11
**element** 91:1
**elements** 90:21 91:3
**embassies** 91:12
**employed** 4:2 39:11
  49:20 96:9
**employees** 54:20
**employer** 49:16
**employers** 56:15
**employment** 11:22
  13:10 15:3,7 16:9
  16:14 19:8 20:9
  31:2 33:22 43:8
  49:11 53:14 54:4
  68:16 80:4,10
  87:15
**employs** 58:8
**encompassed** 13:21
**enforced** 27:14 28:4
**entire** 50:14 90:15

**entirety** 93:20,22
**entitled** 84:22
**equivalent** 45:2
**ESQUIRE** 2:3,12,13
**essentially** 15:14
**estate** 9:2
**estimate** 6:12 23:20
**estimated** 68:20
　70:7 90:10
**estimation** 8:8 11:21
**et** 1:6 15:5 36:5
　63:12 64:16 68:16
**evaluated** 88:22
**Evans** 70:16 90:4
**evidence** 21:15
**exact** 22:11
**exactly** 14:11,18
　15:16 16:17 23:10
　24:17 59:21 68:14
　68:14,18 75:10
**EXAMINATION**
　3:5 97:2
**examined** 24:13
　30:7
**example** 7:18 20:9
　34:9 35:18 39:11
　43:10 44:10 78:18
　91:10
**excuse** 72:9
**exercise** 68:3
**exhaustive** 79:2
**exhibit** 12:6,10 13:8
　15:3,18 17:5 21:5
　21:6,10 26:19 32:8
　32:10,13 33:1 40:3
　41:8 55:9 62:4,8
　66:10 68:20 73:3,8
　79:14,15,19 81:15
　81:20 83:6 84:17
　84:21
**exhibits** 97:5,16
**existence** 71:1
**existing** 41:14 64:6
　64:7
**exists** 70:5
**expect** 19:2 28:21
　58:12 67:2,14

**expectation** 64:8
**expected** 23:1
**expenditure** 11:9
**expenditures** 27:15
　27:20
**expense** 29:12
**expenses** 75:13
**experience** 50:2
　85:8
**experiences** 86:22
**expires** 96:15
**explain** 40:14 89:15
**explaining** 69:11
**extent** 31:1 46:22
　70:4 74:21 75:1
　94:14,19,22
**extra** 17:6
**extract** 42:18

---

### F

**fact** 28:10 31:10
　51:17 53:20 54:8
　63:7,22 64:15,17
　64:20 74:13 78:10
**factor** 30:9 42:22
　60:6,7 64:11
**factored** 60:16
**fairly** 61:5
**familiar** 17:18 77:12
　80:5
**far** 47:19 93:16
**fashion** 8:16
**February** 12:20
　73:9
**federal** 8:22 9:6,11
　13:13,14 16:16,17
　42:16 69:13,18,19
　71:10 78:10,12,13
　78:14,16,17 79:5
　79:10 90:18 91:9
　91:22 92:6
**figure** 74:15 89:18
　89:21
**filed** 21:20
**filing** 21:18
**finance** 5:19 11:8
**financial** 4:16,21
　5:16,17 6:14,16,18

6:19 7:20,20 18:9
　22:7 23:11 24:3,9
　96:11
**fine** 78:4
**finish** 87:6
**first** 3:11 4:10,17
　11:22 12:5,13 13:8
　15:2 17:10,16
　18:17 21:17 22:5,7
　22:17,19 23:2,11
　24:3,12,19 25:1
　26:4,17 27:8,9,17
　28:1,13,15,18
　29:13 30:4,10 31:2
　31:7,20 32:19
　34:21 40:11 43:6,9
　44:22,22 45:5,8,10
　45:12 46:1,6,11,22
　47:22 48:2,6,19,20
　49:2 50:3 51:5,15
　53:21 54:2,6,9,9
　54:14 55:3,6,7,10
　55:15,16,20 56:4
　56:12,14,16,18
　57:8,17 58:3,11,14
　59:6 64:1,4,22
　65:5,8,13,17 66:19
　66:20 67:3 68:6,8
　69:5 70:3 74:19
　77:16,19 78:22,22
　83:22 86:1,5,16,18
　87:1 88:13,18 89:1
　93:18 94:1,8 95:5
**fiscal** 5:3 6:2,6,10,11
　17:15,18,21 18:3
　18:13 71:21,22
**fit** 6:19
**Fitzroy** 1:14 3:2
　97:2
**five** 32:14
**fixing** 76:15
**flip** 12:14 15:18
　82:13
**fluctuate** 52:14
**focus** 24:5 75:20
**focused** 10:3 18:22
　76:1 79:3

**follow** 95:13
**following** 2:22
**follows** 3:4
**force** 25:3
**forecast** 5:2 8:14,14
　8:17 9:7,13,14
　10:10,12,18
**forecasting** 9:19
**foregoing** 96:3,4
**forget** 86:11
**form** 69:1 84:14
**format** 18:1
**forth** 15:20 22:10
　33:8 87:16
**four** 33:11 80:9,17
**frame** 25:19 37:3
**free** 56:15
**Friedman** 79:21
**front** 79:19 83:10
**full** 3:19 49:7,8 50:4
　51:7,12,18 52:1,7
　52:17,18,22 53:8
　53:18
**fully** 27:14
**funding** 70:21
**further** 49:4 95:11
**future** 9:8,13 23:4,6
　65:1

---

### G

**G** 3:1
**gaining** 63:4
**Gandhi** 79:21 80:8
**Gandhi's** 77:7
**GAO** 77:4,6 92:21
　93:13
**gather** 11:10
**gathered** 9:6,11
**gathers** 16:9
**GDP** 15:19
**general** 2:14 20:3
**generally** 85:10
**generate** 20:2 31:4
　32:3,5 64:6 67:16
**generated** 8:21,22
　17:21 28:22 41:16
　41:18 47:11 72:17
　72:19 73:9 86:1

88:17
**generating** 72:18
　76:9
**geographic** 10:4,19
　11:1
**geographical** 14:7
**geography** 14:3
**getting** 49:1 74:10
　79:4 94:19
**give** 17:6 67:1 89:3
**given** 3:19 48:1,1,7
　48:16,17,19,22
　51:16 56:21 57:20
　63:17 64:18 75:13
　83:18
**gives** 6:17 28:16
**global** 9:3,16 10:2
　40:8,10 42:12,14
　42:15,20
**go** 32:14 34:6 39:13
　40:13,22 41:7 42:4
　43:1 44:19,19
　52:19 56:15 58:7
　62:21 66:10 68:4
　72:12 79:13 82:19
　86:3 90:7,7
**goes** 65:4 80:16 86:9
　94:20 95:2
**going** 3:10 12:3
　17:11 26:19 29:20
　34:21 36:14 45:18
　51:16 64:11 67:15
　69:7 78:1 86:15
　89:17
**good** 3:7,8 43:10
　81:12
**governed** 25:8,9
**government** 7:7
　12:1 16:6 69:20
　78:10,15,16,17
　79:5 92:1
**government's** 92:6
**governs** 28:1
**greater** 23:3 27:13
**group** 51:22 53:7
**growing** 80:10
**growth** 9:15 77:8

80:3
**guess** 41:8 43:1
  79:21

**H**

**half** 15:2,11 92:22
**hand** 21:22 96:13
**handed** 73:7
**happened** 9:10,20
  53:10 75:6 84:1
  86:13
**happening** 10:10,14
  65:11
**happens** 14:8
**happy** 78:3
**heading** 18:9
**headline** 81:22
**hearings** 77:10
**held** 36:22 43:19
  44:11,16 45:20
  55:2 59:1 67:13
**help** 84:6 94:10
**helping** 21:22
**hereunto** 96:12
**high** 13:6 63:4
**higher** 40:4 58:21
  65:7 74:10 93:2,8
  94:19
**highlight** 78:7
**highlighted** 78:9
**hire** 31:9 49:17 56:8
  56:15,16 86:6
  94:22
**hired** 47:16 48:4
  49:15 50:3 56:2,21
  57:21 58:3,13,20
  58:22 59:4
**hires** 45:9 49:10
  53:21 54:2 57:9,16
  58:11 87:8
**hiring** 56:13 58:19
  59:6 60:16 68:5
  77:17 86:17
**holding** 43:21 68:12
  93:8
**Holland** 1:16 2:4
**hoped-for** 19:17
**hours** 32:1,2 85:1

95:2
**housing** 16:19 17:9
  63:18 64:19
**hypothetical** 43:3
  44:20 45:17 46:8
  47:18 48:13,14
  53:22 54:6 60:1
  64:14 66:12,17
  71:16
**hypothetically**
  47:20
**hypotheticals** 85:19
  86:11

**I**

**idea** 70:22
**ideally** 75:18
**identification** 12:7
  21:7 62:5 73:4
  79:16 81:16 83:7
  84:18
**identified** 80:12
**imbalance** 69:13,15
  69:16 70:4,22 75:9
  75:10,11,12,17
  76:8,20 77:5,11,22
  78:8 89:16 90:14
  90:21 91:6 92:10
  93:19 94:11,13,21
  95:3
**immediately** 76:13
  76:19
**impact** 5:4 6:2,6,10
  6:11 17:15,19 18:3
  18:10,13 20:2 22:7
  23:4,8,11,16,21
  24:3,9 25:15,22
  26:21,22 27:13
  29:21 43:3 44:20
  45:17 47:18 48:13
  48:14 60:2 65:1
  66:12,17 88:13,18
  89:1
**impacts** 74:18
**implement** 6:16
  18:8 19:22 27:22
**implemented** 6:20
  27:14

**implementing** 19:21
  86:1
**implications** 77:7
  80:3
**imposes** 68:21
**in-depth** 32:15
**include** 10:20 55:6,7
  84:4
**including** 76:2
**income** 9:14 15:20
  29:2,4,7,8,18 30:2
  30:6,13,16,17,21
  30:22 31:4,6,12,13
  32:3,5 37:22 47:11
  71:4,6,16 72:17,19
  82:1,3,14 94:20
**incomes** 71:11
**increase** 26:15 27:6
  46:3,14 79:10 86:5
**increased** 26:9
  46:22 51:4 86:16
**increases** 31:2
**increasing** 63:18
  74:6
**Index** 2:22
**indicators** 12:11
**indirectly** 69:9,10
**individual** 29:6,8,18
  30:2,6,13,16,17
  86:21,22
**industries** 36:2 40:9
  43:8 81:5 87:15
**industry** 13:7 15:6
  35:7,11,15,18
  36:20 37:11,15
  38:10,13,15 39:11
  39:12 40:5,6 41:10
  41:12 42:6 43:22
  44:9 45:17,18 46:2
  46:7,13,21 51:7
  54:3,7,20 55:10
  56:2,3,9 57:9 58:8
  58:12 59:1 60:15
  66:2,6,22 67:4,5
  67:19 68:13 81:5
  94:6
**information** 11:17

32:20 33:8 37:18
  40:2 41:14,17
  47:22 53:22 54:3
  87:8
**infrastructure**
  75:22 76:15,22
**initial** 83:21
**inside** 89:11
**Insight** 9:3,16 10:3
  42:12,14,15,20
**integral** 9:18
**interest** 96:11
**internal** 9:21
**intervention** 79:5
**investment** 78:19
**involved** 78:4
**involvement** 4:15
**involving** 4:16
**isolating** 26:4,14
**issue** 69:4 92:9,10
  92:14 93:19
**issued** 17:2 63:8
  84:5
**issues** 3:13 7:2
**issuing** 5:20
**item** 37:8
**items** 91:22

**J**

**J** 2:3,12,13
**Jack** 70:16 90:4
**Jamaica** 11:17
**January** 47:17
  81:22 82:22
**job** 9:9 31:10 33:7
  35:2 49:5,5 50:12
  50:17 65:16 79:22
  80:9
**jobs** 9:1,14 14:10
  31:19,19 35:7,13
  35:14,17,19 36:2,2
  36:6,8,9,21 38:18
  38:19,20 39:3,3,8
  43:12,18,21 44:2,9
  44:15,17,18 45:2,4
  45:8,11,12,19 46:1
  46:12,13,15,16
  47:1,3 48:6 49:2

50:4 54:10,11,13
  55:2,15 56:6,7,17
  58:14 60:13 61:8
  61:12 63:4,5 64:6
  65:8 66:5,5 67:13
  67:21 68:1,5,8,9
  68:12 74:10 80:17
  81:4 93:9
**Judiciary** 2:16
**Julia** 79:21
**July** 11:20 33:10
**June** 21:12,19 22:5
**jurisdiction** 71:2
**jurisdictions** 14:5
  14:12,17 73:17

**K**

**keep** 50:4
**keeping** 50:12,13
**keeps** 49:5,7,8
**Kiernan** 2:3 3:6
  12:9 21:9 33:6
  62:7 66:9 73:1,6
  73:20 79:18 81:14
  81:18 83:5,9 84:20
  89:6 95:11 97:3
**kind** 27:22 28:19
  31:10 67:6 78:17
  79:4
**Knight** 1:16 2:4
**know** 6:17 13:19
  14:4,11 16:8 17:5
  19:15 22:10,11
  25:10 28:15 33:17
  33:21,22 38:20
  39:18 40:16,18,19
  41:5,11,19 53:4
  65:11 66:22 70:1
  70:21 71:8 72:4
  77:5 78:8 83:21
  85:9,12 88:15
  92:19 93:4,14,16
**knowledge** 95:5

**L**

**labor** 13:7,11,15,22
  14:19,21 15:10,22
  37:13,13,16 40:16

Case 1:12-cv-00853-EGS   Document 73-3   Filed 04/29/20   Page 32 of 72
Lee
Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

[103]

40:20
**laborers** 63:11
    64:16
**lag** 13:5
**land** 90:18
**lands** 91:9
**late** 92:5
**law** 6:21 18:9 19:2
    19:12 77:19 81:11
    84:22 85:20 86:2,3
    86:7,10 87:22 88:9
**laws** 5:12
**lawsuit** 3:11 4:9
    22:6
**leave** 37:9 51:12
    64:9
**leaving** 36:13
**Lee** 1:14 3:2,7 21:10
    21:14 66:10 79:19
    81:19 83:10 85:14
    97:2
**left** 50:22
**left-hand** 14:20 85:7
**legislation** 5:4 6:3,7
    6:13,16,18
**legislative** 17:8,22
    88:4
**let's** 51:11,14 62:3
    79:13
**level** 13:6,10 15:6
    43:6
**library** 28:11
**light** 64:1
**line** 37:10 55:8 66:4
**lines** 66:1 78:22
**list** 79:2
**listed** 33:8,11 85:7
**listings** 45:4,7
**litigation** 88:18
**little** 20:5,16 24:1
**live** 71:7,17 73:13
    82:16 89:10
**lived** 63:12
**living** 36:13 64:12
    65:3 74:1,8
**local** 9:7 10:9,11
    79:6

**long** 4:6
**long-standing** 92:10
**look** 8:20,20 9:9,13
    10:5,13 16:13 18:5
    29:15 35:10,11,12
    43:7,11 48:20
    50:16 54:11 55:1
    60:13 62:18 63:7
    67:9,20 72:20 76:4
    78:11 80:9 82:12
    86:13 88:18
**looked** 20:8 44:22
    45:6,9,11 46:12
    48:22 49:11,13
    52:1 62:15 79:2
**looking** 9:5,8 13:6
    24:15,19 29:6,17
    30:13 31:15 37:4
    37:10 39:2,10 43:9
    47:19 48:9 60:20
    65:13 67:10 68:1
    70:20,20 72:6 75:3
    78:15 79:6
**looks** 10:17,18 16:15
    35:11 67:18 72:5
**losing** 63:2
**lot** 8:22 9:6 14:7,13
    22:2 60:21 61:16
    78:5,13 79:8
**lots** 94:16
**low** 63:4 68:4
**lower** 65:2 66:4

_____

**M**

**main** 80:9
**maintains** 5:18
**major** 80:10
**making** 28:14 34:4
    48:18 54:16 87:13
**managing** 5:21
**manufacturing** 15:4
**mark** 21:5 62:3 73:1
    77:6 79:13 83:5
**marked** 12:7,10,12
    17:4 21:7,10 32:7
    32:10 33:1 40:3
    62:5,8 73:4,7
    79:16 81:16,19

83:7 84:18,21
**Maryland** 10:14
    14:14 68:22 71:13
    71:20 72:12 73:16
    74:1,9,14 82:17
**material** 22:2 49:10
**Mayor** 5:14
**mean** 23:6 26:1
    36:17 38:17 45:1
    47:6 48:8 54:1
    61:7 64:4 65:6
    66:18 75:2,10
    83:20 85:9 88:15
    90:3 92:4 93:6,10
    93:21 94:6,7
**means** 58:2 75:12
**meant** 6:9
**measure** 69:15,15
    86:2,18
**memo** 33:20
**mention** 80:21
    81:10
**mentioned** 5:8 6:1
**Metro** 71:1
**metropolitan** 1:4
    10:20 13:17,21
    14:1,15 36:8,9
    63:9
**mid-2013** 27:5
    48:10
**mid-2015** 27:5
    48:10
**middle** 24:16,16
    67:18
**million** 27:2,3,7
    47:12 54:12 59:14
    59:15,18 68:2,4,7
    72:1 94:4
**mind** 7:15
**minute** 24:14
**minutes** 89:3
**misunderstood**
    43:17 44:8
**Mm-hmm** 11:5
    21:16 62:14 80:6
**modernization**
    85:11

**money** 30:10
**monitor** 8:21 9:17
**monitors** 5:6
**month** 12:20,22
    13:3 17:2,3 52:3
    52:12
**monthly** 5:5 9:18
    12:16,17 97:6
**months** 22:10 49:20
    50:21 51:3,13
    52:10,11 53:13,15
**Moody's** 9:4
**morning** 3:7,8,9,14
**move** 12:14 65:19
**movement** 14:9 60:8
    60:12
**moving** 60:3,22 64:1
    64:17 66:2

_____

**N**

**N** 2:1 3:1 97:1,1
**N.W** 1:17 2:5,17
**name** 85:11
**Nation's** 91:19
**national** 10:9,11
    11:1 91:18
**nature** 53:1 67:7
**need** 82:20
**needs** 75:21 76:2,3
    76:11 77:1
**negative** 29:22
**neighboring** 10:14
**neither** 96:9
**net** 22:20 23:16,21
    24:8 25:21 26:21
    26:22 27:12 29:21
    30:1,3,5 31:11,12
    31:13 46:2,16
    68:20 70:7 71:20
    71:22 72:19 74:17
    90:10 95:4
**never** 7:5 20:18
**new** 25:9,13,16
    34:15 47:3 84:22
**Newton** 1:18 96:2
**nod** 33:4
**non-residents** 71:11
**nonprofits** 80:14

**nonresident** 89:9
**nonresidents** 72:10
**normal** 9:1
**normally** 13:3
**notarial** 96:13
**notary** 1:18 3:3 96:1
    96:19
**noted** 82:7 93:7
    94:15
**notes** 82:2 89:4
**notice** 46:19
**November** 17:14
**number** 12:6 21:6
    26:10 34:10 35:1
    36:14 38:18,22
    39:7,19 40:8,10
    41:2,2,4,9,11 42:1
    42:3 45:1,4,4,7,9
    47:1 51:5,13 55:9
    55:15,18 57:1,16
    58:2 60:14,14 61:7
    61:8 62:4 65:2,7
    68:13 73:3 79:15
    81:15 83:6,13
    84:17 85:2 87:8
    91:2 94:6,7 97:6,7
    97:8,9,10,11,13,14
**numbers** 32:22 34:3
    34:7 40:4 42:19
    72:15 87:5 94:2
**nutshell** 23:17

_____

**O**

**O** 3:1 97:1
**obtaining** 10:2
**occupied** 36:3 43:13
**occurred** 60:12
**October** 1:15 96:14
**offer** 22:19 23:1
    85:15
**offering** 29:20 85:17
    95:9
**office** 1:16 2:14 4:5
    4:22,22 5:8,8,11
    5:13,16,19 6:1,5,6
    6:9 7:9,18,19 8:13
    9:22 10:17,18
    12:16 15:15 16:2

Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

[104]

16:13,19 17:2,21
18:16 19:7,12,16
20:6 41:15 63:1
64:18 73:9 80:8
81:21 88:7,12,17
97:11
**officer** 4:21 6:18
96:2
**offices** 4:19 5:7,10
**okay** 17:13 23:9
32:14 37:6 38:4
42:2 44:7 60:1
**Oklahoma** 80:2
**old** 24:19 25:8,13,15
34:15
**one-third** 61:11
72:16
**one-year** 35:4
**openings** 33:8 35:2
**operated** 48:21
**operates** 48:21 75:4
**operation** 5:16 7:20
26:17 27:8,9
**opine** 89:17
**opinion** 22:17,19
23:2,10,13 24:1,8
24:18 26:3,14 27:4
29:2,21 31:18
32:18 34:4 42:22
69:2,6 84:15 85:15
85:17 87:3,7 88:11
89:20 90:22 93:11
95:9
**opportunities** 60:22
**option** 10:8
**order** 79:7
**outcome** 39:4 96:11
**outside** 88:17
**overall** 26:5,15
31:11,12,13 36:14
46:19 47:6 53:10
61:7 90:20
**oversee** 4:22 7:8
**owner** 28:11

————————
**P**
————————
**P** 2:1,1 3:1
**p.m** 95:15

**page** 12:13 15:3
17:12 18:6 21:13
26:20 32:19 34:21
36:21 40:2 42:11
43:2,3,9 44:20
55:8 63:7 66:12
68:20 70:6,7 72:5
77:15 80:9 82:12
89:14 90:8 97:2,5
**pages** 32:14 42:21
42:22 68:19 84:4
**painters** 63:12
64:16
**paragraph** 21:14
22:18
**park** 76:18
**part** 9:4,9,12,19
13:7 33:7 35:6
52:16 58:6,7 62:18
62:20 66:13 69:1,6
69:11 70:1
**particular** 3:12
41:17 53:6 60:21
68:13 72:4 80:7
**parties** 96:10
**pattern** 28:20
**PAUL** 2:3
**paul.kiernan@hk...**
2:9
**pay** 75:19
**paying** 30:20,21
49:21 74:10 93:8
**people** 7:8,11 14:6,9
15:17 31:9,18
34:11 36:12 37:11
38:22 39:2,7,10
40:16,19 41:2,4,9
41:11 49:17,19
50:3,10,12,13,20
51:2,2,6,22 52:7,9
52:11,15,16,17,21
53:1 59:9 60:3,15
60:17,22 61:15,17
63:3,4,11,22 64:5
64:9 65:3,7,16
66:2 73:13,22 74:8
75:16 82:17 94:17

94:20
**percent** 35:19,21
36:5,21 41:3,3
43:11,12 44:1,11
44:13,15 45:15,19
45:22 46:3,4,10,15
46:15 47:2,3,11
48:3,5,5,17 49:1
51:6 53:14 54:20
54:21 55:1,14,18
56:1,13,16,17,22
57:3,4,6,7,21 58:9
58:10 61:9 63:10
63:13 64:21,22
65:4,5 67:14,15,16
67:19,21 68:21
**percentage** 35:7
53:21 58:8 61:14
61:21 63:13 68:11
**percentages** 34:16
85:1
**performance** 85:20
86:3,9,10,19
**period** 13:20 24:7
24:15,21 25:2,6
26:8 35:2 36:12
45:11 49:14 50:17
52:2,3,9 57:5 63:9
75:4 86:14
**person** 49:5 53:6,7
**personal** 4:15 15:19
85:8
**personally** 4:18
17:20
**persons** 53:7
**pick** 48:15,16,19
51:13 53:6
**picked** 12:19
**picture** 29:14 43:6
**place** 76:17
**Plaintiffs** 1:7 2:2 3:5
**plan** 6:14,16,20 18:9
**planning** 5:13,15
22:18
**please** 3:15 73:2
81:14
**plus** 14:16

**point** 14:8 25:3
36:22 46:6 71:22
72:20 80:20 81:22
**pointed** 29:18
**points** 78:12
**police** 75:16
**policies** 78:11
**population** 9:15
60:5 64:15 77:8
80:4
**portion** 82:16 84:14
90:16 92:14
**position** 4:1,3,6 5:21
**positive** 22:20 23:3
23:8,16,21 25:21
26:21,22 27:13
29:22 30:2,5 74:17
**Post** 97:8,9
**posts** 62:21
**potential** 3:12 6:12
18:7
**poverty** 89:11
**PowerPoint** 79:20
97:10
**preceded** 79:22
87:21
**Predecessor** 80:1
**preference** 77:17,20
81:11
**prepare** 22:1 70:6,9
83:19
**prepared** 18:16
33:19,21 70:10
84:7,8 90:8
**preparing** 83:17
**presence** 69:13,19
78:7 89:9
**present** 10:3 21:15
**presentation** 77:7
78:6 79:3,20 97:10
**presentations** 79:9
**Presented** 80:2
**pretty** 18:20 61:10
**prevented** 71:9
**previously** 32:7,10
33:1 74:11
**primarily** 75:20

76:20 85:21
**principles** 11:8
**prior** 11:10 20:22
82:22 84:1 88:9
**private** 9:3
**probably** 67:7 77:4
**problem** 78:14
**proceedings** 96:3,5
96:6
**process** 39:18 88:5
**produce** 76:5
**produced** 77:3
**production** 77:2
78:5 83:12 85:2,3
**professional** 35:22
80:13
**program** 22:7,20
23:3,11 24:3,13
26:21 27:13 29:13
30:11 48:20 50:3
55:16 56:14,17,18
57:17 64:5 70:3
**programs** 51:16
78:18 94:9,22
**project** 28:11,20
54:19 58:8 85:1
**projected** 23:3
27:12
**projects** 24:19 25:7
25:11,12,17 27:19
27:19,20 28:1,5,10
28:12,18 34:15
85:7,12
**proportionally**
74:10
**protection** 75:16
**provide** 75:18 76:10
76:12,18 78:19
**providing** 75:14
**provision** 91:16
**public** 1:18 11:8
96:1,19
**publication** 5:5
**purports** 86:22
**purpose** 6:22 78:9
78:16 86:5
**purposes** 37:10

41:13
**push** 78:10 81:3
**put** 5:5 28:2 60:7
  79:19 83:10 92:6
**putting** 76:14

**Q**

**quantify** 26:22
**quarter** 27:2
**question** 3:14,18
  10:16 20:4 53:16
  57:14 65:13 69:6
  69:17,17 70:1 71:5
  76:7
**questions** 3:10
**quo** 75:6

**R**

**R** 2:1 3:1
**range** 27:1 67:1
**ranged** 92:21
**rate** 15:20,21 16:11
  47:8,9,10
**rates** 16:3,7
**ratio** 45:22,22
**raw** 54:22
**reaching** 34:4
**read** 77:14 81:9 84:1
**reading** 22:17 78:21
  84:12
**real** 9:2
**really** 8:19 9:4 24:5
  72:15
**reason** 12:3
**reasons** 26:10
**recall** 13:20 14:2
  22:9 36:17 60:19
  83:16 84:11
**receipts** 9:18
**receive** 31:5
**recess** 66:8 89:5
**reciprocal** 90:12
**reciprocate** 69:1
**reciprocity** 71:9,18
**recognize** 18:1 62:9
  85:6,11
**reconcile** 63:21,21
  64:3

**Reconciliation** 92:4
**record** 66:7 83:11
  96:5
**record's** 57:15
**redress** 69:12,12
  70:4 78:18 94:10
  94:12
**reduced** 96:7
**reduction** 82:11
**refer** 27:16
**reference** 4:9 21:18
  22:4 77:16 94:18
  97:13
**references** 84:4
**referring** 12:15 90:2
  92:13
**refers** 15:11,21
**reflect** 49:11
**reflected** 76:20
**reflects** 34:10 50:2
  73:12 75:2 90:12
**regarding** 6:3 13:9
  15:19 16:6 17:10
  17:15 22:6 29:13
  49:3 87:8
**regardless** 14:10
  37:12 65:11 71:7
  71:17 82:15
**region** 72:21
**regional** 10:5
**related** 32:17 64:4
  96:9
**relates** 6:13 85:18
**relation** 93:15
**relationship** 77:19
**relative** 72:9 86:17
**relying** 20:21 21:4
  34:3 95:8
**remedies** 79:3
**remedy** 79:1,4,7
**remember** 22:11
  50:7,18
**repeat** 26:6
**replace** 76:14
**replicated** 46:10,11
**report** 15:11 16:6
  17:1,2,7,8 18:5,20

18:21 19:16 20:5
  20:12,18,19 21:4
  41:15,16,18 54:19
  63:8 73:8 77:4,6
  80:8,16 82:6 88:16
  88:22 89:2
**REPORTER** 96:1
**reporting** 12:20
**reports** 12:16,17
  16:3,13 33:10,10
  33:11,15,18 84:5
  97:6
**represent** 4:10
  32:16 48:14 77:14
  81:8,9 84:3
**represented** 67:22
**reprinting** 33:15
**request** 70:12
**requested** 70:15,18
**requests** 32:12
**required** 5:5 76:5
**Research** 11:15
**resident** 35:7
**residential** 77:17,20
  81:11
**residents** 30:18,19
  30:20,21 31:3,9,19
  34:10 35:15,20
  36:1,3 37:1 43:14
  43:14,15,19,21
  44:2,11,14,16
  45:14,20 46:11,14
  46:17 47:1,4,4,10
  48:4,7 49:1,15
  51:5 54:21 55:3,10
  56:18,21 57:21
  58:3,9,13 61:4,8
  61:13 64:6,7 67:13
  68:12 71:14,19
  72:11 74:13 82:19
  86:6 95:1
**resources** 6:15 7:6
  18:8 19:21 75:19
  76:3
**respect** 70:11
**responses** 32:9,11
**responsibilities** 7:22

8:2,5
**responsible** 5:1,20
  6:2
**rest** 26:14 66:16
**restrict** 76:16
**restrictions** 69:19
  69:22
**result** 28:22 46:16
  59:5 72:1 76:19
  84:1
**resulted** 45:10
**resulting** 48:3,5
**results** 65:7
**retail** 80:12
**revenue** 4:5 5:1,2,6
  5:9,12 6:2 7:9,18
  8:8,13,14,17 9:19
  10:1,18 11:17,21
  15:12 19:3 20:2
  24:5 29:10,14,17
  30:2,6 31:5,6,13
  31:15 32:5 47:12
  54:13 65:14 67:17
  68:2,21 69:21 70:7
  72:2 76:9 81:21
  87:9 90:11,19
  94:15 97:11
**revenues** 18:19
  19:18 23:16,21
  24:9 25:22 26:1,5
  26:9,16 27:6 28:21
  29:1,3,4,7,8,19
  74:18
**reverse** 73:13,22
  93:8
**review** 21:19 62:20
  83:18 85:20
**reviewed** 20:18
  87:13
**right** 6:4 7:10 11:18
  13:1,2,18 15:1,7
  15:13,22 16:1,17
  16:21,22 17:17
  18:11,14 19:4 24:5
  24:6,17 25:18,20
  26:1,2,10 30:8
  32:6 33:2,12 34:8

37:1 38:7 41:13
  43:4 44:3 48:11
  49:5,6,21 50:6
  53:15,16 54:4,5
  55:7,20 56:4,20
  57:17,18,22 58:1,5
  58:16 59:2,3,4,10
  59:21,21 61:16
  62:13 63:5,6,14,18
  63:19 64:20 65:21
  66:15 72:14 73:10
  74:3 75:7 79:11
  80:18,22 81:6,7
  82:4,5,8,14,22
  83:3 87:1,10 89:19
  91:7,8,10,11,14,20
  91:21 92:2,7,11,12
  92:15,16 93:10,19
**right-hand** 15:2
**RISHER** 2:13
**roughly** 74:6
**rule** 61:11
**rules** 7:3
**running** 7:7 68:15
**runs** 13:3

**S**

**S** 1:18 2:1 3:1 96:2
  97:1
**SAINDON** 2:12
  33:3 73:18 95:13
**salaries** 31:4 37:18
  37:21 38:21,22
  39:3
**salary** 38:1,4,21
  39:17 49:3,21
  59:11 68:16
**savings** 76:14
**saw** 24:12
**saying** 23:17 24:4
  30:1,20 31:1 35:19
  40:19,20 45:21
  48:2 50:15,16
  51:20 52:2 53:5
  54:7,19 56:5,13,20
  58:10,16 59:5
  64:22 65:10 86:16
  93:10

**says** 17:12 27:11
    42:11 45:2,3 49:13
    49:17 53:8 55:11
    68:20
**scene** 39:15
**school** 28:11 85:10
    85:12
**schools** 78:20
**seal** 96:13
**second** 47:17 67:10
    67:10
**section** 8:12
**sectors** 35:17 38:13
    38:15 80:9,17
**see** 9:19 19:2 28:4,5
    28:21 32:7 43:5
    46:1 58:12 66:21
    67:4 68:3 77:16
    86:4 94:3
**seeing** 58:17 60:22
    83:16 84:12
**seen** 23:20 28:3,19
    65:6 77:4 83:15
    85:3 86:8
**semiannual** 33:10
**sense** 81:3 86:2
**sensitive** 68:3
**sensitivity** 66:22
    68:10
**sent** 22:3
**sentence** 22:17
**separate** 7:15 70:11
**series** 3:10 32:13
**service** 10:7 11:15
**services** 16:9,14
    33:22 35:22 67:9
    67:11,12,13 68:6
    75:14,19 76:9
    80:13,13 91:16
**set** 96:12
**share** 35:17 36:1
    38:18 43:7,15,18
    43:20,21 44:21
    45:12 46:3,9,10,14
    47:2,5 48:6 49:1
    52:4,5,13,13 61:4
    61:9 67:12,15

**shares** 39:2 86:15
**shifted** 72:13,15,17
**short** 66:12
**SHORTHAND** 96:1
**show** 17:4 41:1 62:8
    78:3,9
**showed** 89:8
**showing** 12:10
    33:20 81:19 84:21
**shows** 71:21 89:22
**side** 12:12,14 13:8
    14:20 15:2,12,18
    19:3 27:21 29:13
    31:16 39:14 82:13
    85:7 90:19 94:15
**sides** 12:13 53:2
**signature** 95:14
**simple** 39:6
**simply** 10:19
**single** 77:16
**situation** 7:5
**six** 51:13 52:10 84:4
**six-page** 83:11
**Sixty-three** 35:21
**skilled** 37:13
**smaller** 67:14
**smallest** 82:2
**snapshot** 60:11 75:3
**snapshots** 61:1
**solve** 94:2
**somebody** 47:16
    51:18
**sorry** 44:7 48:8
    54:17 56:19 69:5
    87:6 90:6 93:6
**sort** 18:16 81:10
    87:20
**source** 3:11 4:11,17
    17:10,16 18:17
    22:7,19 23:2,11
    24:3,12,20 25:1
    26:4,17 27:8,9,17
    28:1,13,15,18
    29:10,13 30:4,11
    31:2,7,20 39:9,22
    40:11 42:11 43:6
    43:13 44:22 45:1,5

45:8,10,13 46:1,6
    46:12,22 47:22
    48:3,6,19,20 49:2
    49:10 50:3 51:5,16
    53:21 54:2,7,9,14
    55:4,6,7,11,15,16
    55:20 56:12,14,17
    56:18 57:9,17 58:3
    58:11,14 59:6 64:2
    64:4,22 65:6,9,13
    65:17 66:20 67:3
    68:6,8 70:3 74:19
    77:16,20 78:22
    79:1 83:22 86:2,5
    86:16,18 87:1
    88:13,19 89:1,11
    93:3,18 94:1,8
    95:5
**sources** 8:18,19 9:3
    15:21 16:20
**South** 2:18
**Space** 16:19
**speak** 25:4 34:1
    90:22
**speaking** 30:7 90:22
**speaks** 19:22 90:15
**specific** 7:3 23:19
    26:16 79:4
**specifically** 11:7
    13:7 14:2,4,12
    23:15 27:18 28:17
    29:4,17,19 30:5
    65:12 85:13 90:19
**spectrum** 53:2
**speculate** 67:6
**spending** 76:22
**spent** 11:16 30:10
**spreadsheet** 32:19
    84:22 97:14
**Square** 2:16
**stable** 61:6,10,14
**stamped** 18:6
**start** 3:22 11:20
    47:18
**starting** 83:12
**starts** 21:14
**state** 23:12 71:13

92:1,1
**stated** 24:2 64:10
**statement** 6:10,12
    17:15,19 18:3
    92:18
**statements** 6:3,6
    18:13
**states** 1:1 10:14
    28:17
**stationary** 60:5
**statistics** 9:5,11
    12:21 13:12,15,22
    14:2,21 15:10,19
    15:22 16:9,15,20
    36:4 37:4,16 42:16
    48:10 85:1
**status** 75:6
**stay** 64:9 65:17
**staying** 72:20
**stenographically**
    96:7
**sticker** 12:14
**Street** 1:17 2:5,17
**strictly** 10:4 11:1
    19:20
**strike** 26:20
**structural** 69:12
    75:8,9,11,12 76:8
    76:20 77:5,11,22
    78:8 89:15 90:13
    90:21 91:6 92:9
    93:18
**study** 47:8 62:12,19
    86:20 89:7 92:20
    92:21 93:4,12,17
**subscribe** 9:2 10:7
**subscription** 10:7
**suburbs** 14:4,14
**succeed** 51:11
**Suite** 1:17 2:6,18
**sum** 36:20
**summary** 8:16
**summed** 35:3
**supervision** 96:8
**supplied** 42:19
**sure** 3:16,21 7:5
    16:10 23:5 26:8

34:20 56:11,19
    76:4
**surrounding** 14:4
    14:14,17 71:2
    72:21 73:17
**survey** 35:9,10 44:6
    60:10 72:7 74:22
**sworn** 3:3
**systems** 5:16 9:22

---

**T**

**T** 97:1,1
**take** 12:3 20:17
    32:22 33:4 38:19
    48:4 51:15 55:13
    55:14,14 60:10
    64:15 67:17 75:5
    76:1 82:14 84:14
    86:12 94:7
**taken** 1:15 35:20
    37:19 41:14 43:14
    45:13 57:15 60:9
    61:12 66:8 89:5
    96:3,6
**talk** 23:9 67:19
    73:18 75:8 80:16
**talked** 91:6,15
**talking** 23:15 29:2
    50:8 66:13 68:7
    82:11 94:4
**talks** 18:5,6
**tallied** 35:1
**Tammy** 1:18 96:2
**target** 27:18
**taught** 11:3
**tax** 5:11,12 7:18,19
    9:22 11:9 19:13
    20:14 29:2,4,7,8
    29:17,19 30:2,6,17
    32:5 47:8,9,10
    59:18 68:22 71:4,6
    71:14,16,19 82:3
    87:9 90:11,16,18
    90:20 91:1 92:14
**taxed** 91:9,13
**taxes** 30:14,16,21,22
    49:4,21 59:19
**taxing** 71:10

**teach** 11:6
**technical** 35:22
**tell** 3:15 22:9 61:5
**tend** 50:4
**term** 29:1
**terms** 9:8,20 21:1
  25:8,9 47:6 67:15
  71:4 72:17 75:17
  76:2,21 91:6 92:18
  93:11
**testified** 3:3
**testify** 22:18 69:7
**testimonies** 78:13
**testimony** 3:12 21:1
  32:18 84:11
**Thank** 3:9,22 26:13
  38:11 42:10
**thereabouts** 93:13
**thing** 92:19
**things** 76:12 79:6
  91:18 92:5 94:16
**think** 12:12,21 14:3
  18:7 22:12,14
  36:16 55:21 58:6
  64:3 71:3 86:18
  87:18 89:16 90:12
**thinking** 50:11
**thought** 43:17 44:9
**thousand** 55:22
**three** 5:4 27:3 51:12
  94:4
**thrown** 71:18
**thumb** 61:11
**time** 3:13 4:13 13:20
  24:7,15 25:6,19
  36:12 37:3 52:3,16
  60:20 61:1 71:8
  75:4 79:8 89:8
  95:12
**title** 7:12,21
**today** 12:4 20:17
  88:12,16 95:12
**today's** 93:2
**told** 18:7
**top** 13:8 32:19 33:7
  33:14 40:2 66:13
**total** 36:2 37:14,14

38:18,21,22 45:7
  57:6,7,8 58:11
**track** 86:21,22
**tracks** 54:3
**trade** 15:4 80:12
**trades** 36:13 63:22
  80:21
**traditionally** 91:5
**transcript** 2:22 12:8
  21:8 62:6 73:5
  79:17 81:17 83:8
  84:19 96:4 97:16
**translates** 31:13
  87:9
**Treasury** 5:19
**trend** 36:17,18
  60:19,20 63:17
  64:7,17 65:12 66:1
  66:4 74:5 82:6,7
  94:16
**trending** 82:21
**trends** 60:18
**tries** 86:21
**true** 36:11 48:17
  50:9 53:18 62:1,2
  65:11 66:6 72:8
  79:12 86:9 96:5
**truth** 22:9 61:5
**try** 88:3
**trying** 26:13 30:8
  34:19 36:16 57:11
  67:1 79:10 80:17
**Tulane** 11:3
**turn** 15:17 17:11
  32:12 71:14
**turned** 45:14
**tweak** 24:1
**two** 5:3 13:4,16 27:4
  35:4 42:21,22 45:6
  48:21 49:18 50:18
  50:19 89:3
**two-thirds** 72:16
**two-year** 35:2 45:11
  52:9 86:14
**type** 73:19
**typewriting** 96:8

**U**

**U.S** 13:14 15:9
  37:20
**ultimately** 49:4
  68:10
**un** 76:21
**underlying** 9:14
**understand** 3:14 8:7
  11:3,20 25:5 26:14
  32:17 34:20,22
  47:14 53:19 54:18
  56:11 69:11 78:21
  90:6
**understanding** 25:6
  69:3 70:2 77:18
**understood** 3:18
  54:18
**undertaken** 88:12
**unemployment**
  15:20,21 16:3,7,11
  16:15 19:8 20:10
  31:8 89:11
**UNITED** 1:1
**unpack** 23:22
**unskilled** 37:13
**unsurprising** 63:17
  64:18
**update** 93:1
**upper** 15:2
**ups** 95:13
**use** 9:8,21 29:1
  61:11
**usually** 18:13
**utilities** 15:5

**V**

**various** 42:16
**version** 17:1
**versus** 25:16 68:13
**veto** 6:18
**view** 14:9 72:1,20
  78:12 83:2
**Virginia** 10:15
  14:14 68:22 71:13
  71:20 72:12 73:16
  74:2,9,14 82:18
**vs-** 1:8

**W**

**wage** 40:14,15 42:5
  46:18,20,20,21
  51:7 63:4,4 66:5
  68:22 87:14 90:11
  92:14
**wages** 9:1 31:3
  37:21 41:20,21
  47:7
**waived** 95:14
**walk** 32:15 66:16
**walks** 82:12
**want** 32:15
**wanted** 67:4
**Washington** 1:4,17
  2:7,19
**wasn't** 62:20
**way** 18:12 34:12
  38:19 42:17 48:21
  60:7 68:8 74:2
**we'll** 51:13 73:1
**we're** 23:17 31:1
  45:21 46:19 48:18
  50:8,16 51:1,14
  52:2,4 54:7,15
  55:21 56:4,5,12
  57:13 58:16 59:5
  60:20 64:22 72:6
  72:18 75:3 76:5
  86:16 94:19
**we've** 28:19 32:7
**website** 62:10 97:8,9
**Wednesday** 1:15
**weeks** 51:12
**weight** 39:7 41:19
  41:22 42:7
**weighted** 38:14,16
  38:16,17 39:19
  68:8
**welcome** 81:9
**went** 4:11 47:2
  68:11
**weren't** 52:16 79:1,5
**WHEREOF** 96:12
**whichever** 25:2
**wide** 55:1
**witness** 33:5 83:17
  96:12

**WMATA** 70:21
**words** 19:1
**work** 11:20 31:21,22
  32:1,2 44:14 49:18
  51:18 52:1,7,10
  53:8,13 63:10
  71:19 72:11,12
  73:14 74:9,14
  82:20 88:11
**worked** 11:11 50:20
  50:21,22 51:3,6
  52:11 85:1
**workers** 39:20
  53:11 63:2,3 71:7
  71:17 89:9,10
**Workforce** 17:9
**working** 31:22
  35:12 38:22 39:2,7
  43:15 47:4 52:16
  52:16,18,22 53:17
  63:11 65:8 74:1
  82:15 94:20 95:1,2
**written** 24:2
**wrong** 12:12 24:11

**X**

**Y**

**yeah** 13:5,14 22:2
  44:12
**year** 22:13,15 37:5
  42:12 47:9,20 48:1
  48:7,13,15,16,17
  48:19,22 49:7,8
  50:5,18,19,19 51:7
  51:12,16,18 52:1,8
  52:17,18,22 53:8
  53:11,18 55:22
  56:22 57:20 59:11
  60:11,17,21 61:2,2
  62:13 65:4 72:4
  76:8,16 94:5
**years** 4:8 11:4,16
  27:5 33:9 45:7
  48:22 72:13 75:20
  77:4 82:2,8,22
**yield** 59:14

Case 1:12-cv-00853-EGS  Document 73-3  Filed 04/29/20  Page 37 of 72
Lee
Associated Builders and Contractors, Inc., et al. v. DC                    10/26/2016

[108]

**Z**

**0**

**0.416** 57:22

**1**

**1** 17:14 33:10
**1,100** 56:1 57:3
**1,111** 56:6,21 58:4
  58:18 59:7
**10** 49:17,19 65:4
**10:06** 1:16
**100** 51:6 53:14
**1100** 1:17 2:6
**12** 49:20 51:3 52:3
  52:12,12 53:13,14
  59:11 97:6
**12-CV-00853** 1:8
**12-month** 49:11
  59:11 68:16
**12:01** 95:15
**13** 33:11
**15** 50:21 52:11
**16** 12:6,11 15:3,18
  41:8 97:6
**17** 21:5,6,10 26:19
  97:7
**17th** 1:17 2:5
**18** 35:19 36:5 41:3
  43:11,12 44:1,10
  44:13 45:19 46:3
  46:15 47:2 54:21
  55:1,14,18 56:10
  56:13,16,17,22
  57:3,4,6 58:9,10
  62:3,4,9 64:22
  65:3 97:8
**18.83** 47:11
**19** 73:1,3,8 97:9

**2**

**2** 21:13 26:20 42:11
  68:2,7 82:12 89:14
**2,672** 55:19 57:4,5
  57:10,17 58:10,13
**20** 79:14,15,20
  97:10
**20001** 2:19

**20006** 2:7
**2000s** 79:9
**2001** 11:20
**2003** 77:6
**2004** 77:11
**2005** 63:9 77:8 80:3
  81:3 84:5 93:13
**2007** 84:5
**2008** 4:7
**2009** 63:9
**2010** 63:14
**2011** 4:11 12:22
  17:14 24:22 73:22
  74:6
**2012** 4:12 12:20
  84:6
**2013** 24:11,16 26:8
  27:5 81:22 82:22
  83:3
**2014** 63:14
**2015** 24:11,16 26:9
  37:5,6 38:2,3,5
  39:12 41:20 42:12
  72:7 73:21 75:7
**2016** 1:15 21:12
  22:13 96:14
**202** 2:8,20
**21** 7:10 81:14,15,20
  97:7,11
**219** 83:13
**22** 83:5,6 97:13
**23** 63:13 64:20
  84:17,22 97:14
**24th** 21:12,19 22:5
**250,000** 27:7
**26** 1:15

**3**

**3** 27:7 68:3 97:3
**3.6** 59:18
**3.7** 47:12 54:12
**300,000** 68:5
**31** 63:10
**317** 67:17
**31st** 96:13
**32** 36:21 61:9 67:19
  67:20
**39** 67:14,15

**4**

**4** 63:7
**40** 82:2
**406** 72:1
**41** 59:14
**41.8** 59:15
**42** 45:14,22 46:3,10
  46:15 47:2 48:3,5
  48:5,17 49:1 67:16
  68:13
**441** 2:17
**481** 55:12,17 56:8
  57:2 58:12,18,22
  59:4
**4th** 2:17

**5**

**5** 17:5

**6**

**600** 2:18
**62** 97:8
**63** 41:3
**630** 47:2,3 58:17,19
  59:6,9
**66,424** 59:12
**663-7276** 2:8

**7**

**7** 32:8,10 55:9 66:11
  80:9
**7/31/2017** 96:16
**724-6643** 2:20
**73** 97:9
**79** 97:10

**8**

**8** 33:1 40:3
**800** 1:17 2:5
**81** 97:12
**83** 97:13
**84** 97:14
**87,000** 38:6,12

**9**

**90** 49:17
**90s** 92:5
**9282** 85:2

## D.C. Economic Indicators
**February 2012**

Government of the District of Columbia
Vincent C. Gray, Mayor
Dr. Natwar M. Gandhi, Chief Financial Officer
Dr. Fitzroy Lee, Deputy CFO for Revenue Analysis

# Labor & Industry

➡ Jobs in D.C. for December 2011, up 7,000 (1.0%) from December 2010

➡ District resident employment for December 2011, up 1,800 (0.6%) from December 2010




Change in Total Wage and Salary Employment and Employed Residents
(percent change from prior year in 3-month moving average)

— Jobs in DC    - - Employed Residents

### Labor Market ('000s): December 2011[a]

| | District of Columbia | | | Metropolitan area | | |
| | Level | 1 yr. ch. (amt.) | 1 yr. ch. (%) | Level | 1 yr. ch. (amt.) | 1 yr. ch. (%) |
|---|---|---|---|---|---|---|
| Employed residents | 299.1 | 1.8 | 0.6 | 2,921.1 | 42.8 | 1.5 |
| Labor force | 333.0 | 5.6 | 1.7 | 3,092.7 | 40.9 | 1.3 |
| Total wage and salary employment | 720.1 | 7.0 | 1.0 | 3,007.7 | 13.4 | 0.4 |
| Federal government | 208.2 | -2.5 | -1.2 | 377.8 | -3.9 | -1.0 |
| Local government | 35.0 | -0.4 | -1.1 | 318.7 | 4.0 | 1.3 |
| Leisure & hospitality | 60.2 | 1.2 | 2.0 | 264.0 | 5.5 | 2.1 |
| Trade | 22.9 | -0.2 | -0.9 | 327.8 | -4.2 | -1.3 |
| Education and health | 113.9 | 2.9 | 2.6 | 369.5 | 6.2 | 1.7 |
| Prof., bus., and other services | 218.2 | 4.9 | 2.3 | 874.3 | 7.1 | 0.8 |
| Other private | 61.7 | 1.1 | 1.8 | 475.6 | -1.3 | -0.3 |
| Unemployed | 33.9 | 3.8 | 12.5 | 171.6 | -1.9 | -1.1 |
| New unempl. Claims | 1.7 | -0.05 | -2.7 | | | |

Sources: U.S. Bureau of Labor Statistics (BLS) & D.C. Dept. of Employment Services (DOES)
[a] Preliminary, not seasonally adjusted

### D.C. Hotel Industry[b]

| Dec. 2011 | Amt. | 1 yr. ch. |
|---|---|---|
| Occupancy Rate | 56.2% | 6.2% |
| Avg. Daily Room Rate | $164.67 | -$5.20 |
| # Available Rooms | 27,640 | 209 |
| Room Sales ($M) | $79.3 | $7.0 |

### Airport Passengers[c,d]

| Dec. 2011 | Amt.('000) | 1 yr. ch. (%) |
|---|---|---|
| DCA | 1,422.3 | -1.7 |
| IAD | 1,852.2 | -3.8 |
| BWI | 1,728.7 | -1.0 |
| Total | 5,003.2 | -2.2[e] |

[b] Source: Smith Travel Research  [c] Source: Metropolitan Washington Airports Authority & Maryland Aviation Administration Authority  [d] includes arrivals and departures  [e] Weighted average

### Detailed Employment ('000s): December 2011

| | Level | 1 yr. ch. (amt.) | 1 yr. ch. (%) | % of total |
|---|---|---|---|---|
| Manufacturing | 1.1 | -0.1 | -8.3 | 0.2 |
| Construction | 10.8 | 0.6 | 5.9 | 1.5 |
| Wholesale trade | 4.8 | 0.1 | 2.1 | 0.7 |
| Retail trade | 18.1 | -0.3 | -1.6 | 2.5 |
| Utilities & transport. | 4.3 | 0.1 | 2.4 | 0.6 |
| Publishing & other info. | 18.5 | -0.2 | -1.1 | 2.6 |
| Finance & insurance | 16.9 | 0.6 | 3.7 | 2.3 |
| Real estate | 10.1 | 0.1 | 1.0 | 1.4 |
| Legal services | 33.8 | 1.4 | 4.3 | 4.7 |
| Other profess. serv. | 70.8 | 1.0 | 1.4 | 9.8 |
| Empl. serv. (incl. temp) | 14.7 | 1.7 | 13.1 | 2.0 |
| Mgmt. & oth. bus serv. | 35.0 | 0.1 | 0.3 | 4.9 |
| Education | 51.0 | 0.3 | 0.6 | 7.1 |
| Health care | 62.9 | 2.6 | 4.3 | 8.7 |
| Organizations | 57.8 | 1.5 | 2.7 | 8.0 |
| Accommodations | 15.3 | 0.5 | 3.4 | 2.1 |
| Food service | 37.6 | 0.4 | 1.1 | 5.2 |
| Amuse. & recreation | 7.3 | 0.3 | 4.3 | 1.0 |
| Other services | 6.1 | -0.8 | -11.6 | 0.8 |
| Subtotal, private | 476.9 | 9.9 | 2.1 | 66.2 |
| Federal government | 208.2 | -2.5 | -1.2 | 28.9 |
| Local government | 35.0 | -0.4 | -1.1 | 4.9 |
| **Total** | **720.1** | **7.0** | **1.0** | **100.0** |

Source: BLS. Details may not add to total due to rounding.

# Revenue

➡ Total tax revenue before earmarking is expected to increase by 5.5% and 1.9% in FY2012 and FY2013 respectively

➡ Individual income tax revenue is estimated to grow by 11.6% in FY2012; this is expected to be followed by a decline of 2.8% in FY2013

➡ General sales tax revenue is expected to increase by 3.1% and 1.9% in FY2012 and FY2013 respectively

➡ All deed tax revenue is forecasted to experience a negligible decline in FY2012, followed by an increase of 0.4% in FY2013

➡ Real property tax revenue is expected to increase by 7.2% and 6.3% in FY2012 and FY2013 respectively



Percent Change in Revenue for Selected Taxes for FY's 2011 - 2013 (Est.)

■ %chg FY11 to FY12(Est.)    ■ %chg FY12 (Est.) to FY13 (Est.)

Total Tax Revenue    Real Property    Individual Income    General Sales    All Deed Taxes

### Revenue for Fiscal Year 2011 and Estimated Revenue for Fiscal Years 2012 and 2013 ($000)[a]
NOTE: REPORTING OF CASH COLLECTIONS WILL RESUME IN MARCH 2012 D.C. ECONOMICS INDICATORS RELEASE

| | FY'11[d] | FY'12[f] | FY'13[f] | % Chg. FY11-FY12 (Est.) | % Chg. FY12 (Est.)-FY13 (Est.) | Addenda: | % Chg. FY11-FY12(Est.) | % Chg FY12(Est.)-FY13(Est.) |
|---|---|---|---|---|---|---|---|---|
| Real Property | 1,715,069 | 1,838,290 | 1,953,196 | 7.2% | 6.3% | Convention Ctr. Transfer[b] | 2.8% | 3.0% |
| General Sales | 1,014,901 | 1,045,942 | 1,066,152 | 3.1% | 1.9% | Ind. Inc. Tax Withholding for D.C. residents | 9.4% | 2.9% |
| Individual Income | 1,296,598 | 1,446,449 | 1,406,185 | 11.6% | -2.8% | | | |
| Business Income | 359,684 | 387,938 | 400,090 | 7.9% | 3.1% | [a]Revenue amounts shown are before earmarks (JJF, Convention Ctr., Ballpark Fund, DDOT (parking tax and public space rental), Neighborhood Investment Fund, the Highway Trust Fund, the Housing Facility Quality of Care Fund, Healthy DC Fund, the Housing Production Trust Fund (WMATA), Hospital Fund, Stevie Sellows Quality Improvement Fund, Healthy Schools, ABRA). Variations in processing activities may affect year-to-date comparison. | | |
| All Deed Taxes[c] | 311,187 | 311,078 | 312,398 | 0.0% | 0.4% | | | |
| **Total Other Tax Revenue** | 627,821 | 587,984 | 582,961 | -6.3% | -0.9% | | | |
| Total Tax Revenue (before earmarking) | 5,325,260 | 5,616,181 | 5,720,982 | 5.5% | 1.9% | [b]Portion of sales tax on hotels and restaurants | | |
| Earmarked Tax Revenue | 419,489 | 397,369 | 413,237 | -5.3% | 4.0% | [c] Includes deed recordation, deed transfer and economic interest taxes | | |
| Total Tax Revenue (after earmarking) | 4,905,771 | 5,218,812 | 5,307,745 | 6.4% | 1.7% | [d]Comprehensive Annual Financial Report, 2011<br>[f] Estimated revenue for FY12 and FY13 is as of the February 2012 revenue estimates |  |  |

All data subject to revision.    [f] Indicates data revised by stated source since previous D.C. Economic Indicators.    See past editions at cfo.dc.gov



DEPOSITION
EXHIBIT
#16

PENGAD 800-631-6989

10/26/16

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 12- 00853 (EGS) |
| v. | |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

## DEFENDANT'S DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(2)(C)

As required by the Federal Rules of Civil Procedure (Rule) 26(a)(2)(C), defendant discloses the identity of a witness who may be used to present evidence under Federal Rules of Evidence 702, 703, or 705, and who does not have to provide a written report:

1.  Dr. Fitzroy Lee
    Office of the Chief Financial Officer
    Office of Revenue Analysis
    1101 4th Street, SW
    Suite W770
    Washington, D.C. 20024
    (202) 727-7816

Dr. Lee is the Deputy Chief Financial Officer and the Chief Economist at the Office of the Chief Financial Officer (OCFO) for the District of Columbia (the District). He has worked for OCFO in various positions since July 2001. In his current position, Dr. Lee's duties include managing a team of economists and fiscal



DEPOSITION
EXHIBIT
#17
10/26/16
PENGAD 800-631-6989

analysts who develop the baseline revenue estimates for the District's annual budget and financial plan, estimate the fiscal impact of legislative proposals, and conduct a broad range of fiscal and economic research. Dr. Lee regularly makes presentations to the Mayor, the Council, other District stakeholders, and analysts for the major Wall Street ratings agencies on the District's economic and fiscal outlook. Prior to working for the District, Dr. Lee was an Assistant Professor of Economics at Tulane University.

Dr. Lee earned a Ph.D in Economics in 1997 from Georgia State University, and earned a B.S. degree, with first class honors, in Computer Science and Applied Physics in 1986 from the University of the West Indies.

Dr. Lee will present evidence regarding the financial impact of the First Source Act program on the District's economy, and is expected to opine that that program has a net positive impact, and may be projected to have a greater positive impact as the program is more fully implemented and enforced, based on the District's capital expenditures. As a basis for his opinions, Dr. Lee will rely upon his education and almost 20 years of experience as an economist, his extensive personal knowledge of the many facets of the District economy, factual information about the First Source Act program obtained from DOES, and District budget information. Dr. Lee will draw on the foregoing to explain the District's "structural budget imbalance" and opine on the approximate amount of that figure. Dr. Lee also will opine on how much revenue the District could raise if it could tax non-resident commuters, as other jurisdictions do.

2

DATE: June 24, 2016.       Respectfully submitted,

                      KARL A. RACINE
                      Attorney General for the District of Columbia

                      ELIZABETH SARAH GERE
                      Deputy Attorney General
                      Public Interest Division

                      /s/ Toni Michelle Jackson
                      TONI MICHELLE JACKSON
                      D.C. Bar No. 453765
                      Chief, Equity Section

                      /s/ Andrew J. Saindon
                      ANDREW J. SAINDON, D.C. Bar No. 456987
                      Senior Assistant Attorney General
                      441 Fourth Street, N.W., Suite 600 South
                      Washington, D.C. 20001
                      Telephone: (202) 724-6643
                      Email: andy.saindon@dc.gov

## CERTIFICATE OF SERVICE

I certify that, on June 24, 2016, a copy of Defendant's Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2)(C) was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

                      /s/ Andrew J. Saindon
                      ANDREW J. SAINDON
                      Senior Assistant Attorney General

10/25/2016
D.C.'s Cashiers and Janitors Are More Likely to Live in the City than Other Workers, but That's Changing | District, Measured

Case 1:12-cv-00853-EGS Document 73-3 Filed 04/29/20 Page 42 of 72

# District, Measured

## Posts from the District of Columbia's Office of Revenue Analysis

# D.C.'s Cashiers and Janitors Are More Likely to Live in the City than Other Workers, but That's Changing

AUGUST 23, 2016AUGUST 25, 2016 ~ GINGER MOORED

Nearly 800,000 people work in the District of Columbia, yet only about 30 percent of the District's workers live in the city-proper. Workers in low-wage jobs are more likely to live in the city than those in middle- and high-wage jobs. Thirty-nine percent of D.C.'s workers in low-wage jobs lived in the city between 2010 and 2014, compared to 30 percent in middle-wage jobs and 27 percent in high-wage jobs.

We define a job as low-wage if its median wage was in the bottom 25 percent of median wages across all jobs in D.C (or below $44,000). High-wage jobs have median wages in the top 25 percent (or above $86,000) and middle-wage jobs are in between.

You can see how this plays out by occupation in the graph below. Cashiers, janitors, childcare workers and others in low-wage jobs are more likely to live in the city than most other workers, though people in a handful of middle- and high-wage occupations, like managers of social and community services, teachers, and chief executives, have relatively high rates of living in the city too. Registered nurses and police officers (which include transit and federal police) are the least likely to live in the city.



DEPOSITION EXHIBIT
#18
10/26/16
PENGAD 800-631-6989

*(click to interact) (https://public.tableau.com/profile/ginger.moored6701#!/vizhome/DRAFTD_C_WorkersinLow-WageOccupationsAreMoreLikelythanOtherstoLiveintheCity/Dashboard1)*





### Which D.C. Workers Live in the City?

*44 percent of cashiers working in DC-proper live in the city  compared to 14 percent of software developers*

Percent of D.C. workers who live in the city, by occupation (2010-2014)

DISTRICTMEASURED.COM

(http://public.tableau.com/profile/ginger.moored6701#!/vizhome/DRAFTD_C_WorkersinLow-WageOccupationsAreMoreLikelythanOtherstoLiveintheCity/Dashboard1)

Here's where these workers live:

10/25/2016    D.C.'s Cashiers and Janitors are More Likely to Live in the City than Other Workers, but that's Changing | District, Measured

Case 1:12-cv-00853-EGS Document 73-3 Filed 04/29/20 Page 44 of 72

*(click to interact)*

*(https://public.tableau.com/profile/ginger.moored6701#!/vizhome/DRAFTWhereD_C_sWorkersLivebyOccupation/*



## Where People Working in D.C.-Proper Live, by Occupation

*Occupation selected: Police officers'*

DISTRICTMEASURED.COM

*Dashboard1)*

*(https://public.tableau.com/profile/ginger.moored6701#!/vizhome/DRAFTWhereD_C_sWorkersLivebyO ccupation/Dashboard1)*

People in low-wage jobs tend to live in the city more than others, but that's been changing over the past decade, as you can see in the chart below. The city is losing construction workers, cashiers, childcare workers, and janitors, and gaining people in high-wage jobs, like managers of social and community services, operations research and management analysts, and economists.

In less than a decade, the workers most likely to live in the city shifted from cashiers, retail salespersons and clerks (50 percent lived in the city in 2005-2009) to managers of social and community services (47 percent lived in 2010-2014).

Meanwhile, over the same time period, the least likely to live in the city switched from software developers (9 percent in 2005-2009) to police officers (11 percent in 2010-2104).

## D.C.'s Low-Wage Workers are Becoming Less Likely to Live in the City

Change in percent of workers living in the city, by occupation. 2005-9 vs. 2010-14 (% point change)

| Occupation | Change in Percent Living in City | Wage | Percent Living in the City in: 2010-2014 | Percent Living in the City in: 2005-2009 |
|---|---|---|---|---|
| Construction laborers, painters | -8%* | low | 23% | 31% |
| Cashiers, retail salespersons, clerks | -6%* | low | 44% | 50% |
| Childcare workers, personal care & health aides | -6%* | low | 42% | 48% |
| Janitors, maids | -5%* | low | 42% | 48% |
| Waiters, bartenders | -4% | low | 42% | 45% |
| Teachers - elementary, middle, high | -3% | middle | 45% | 47% |
| Security guards | -1% | middle | 28% | 29% |
| Financial managers | -1% | high | 18% | 19% |
| Registered nurses | 1% | middle | 13% | 12% |
| Teachers - postsecondary | 1% | middle | 37% | 36% |
| Police officers** | 2% | middle | 11% | 10% |
| Administrative assistants, office managers | 2% | middle | 24% | 22% |
| Lawyers, judges | 2% | high | 35% | 33% |
| Accountants, auditors | 4% | high | 20% | 16% |
| Carpenters, electricians, construction supervisors | 4% | middle | 18% | 14% |
| Physicians, surgeons, dentists, pharmacists | 5% | high | 29% | 25% |
| Software developers | 6%* | high | 14% | 9% |
| Human resources workers | 6%* | middle | 22% | 16% |
| Chief executives, legislators | 8%* | high | 42% | 34% |
| Economists | 8%* | high | 40% | 32% |
| Operations research & management analysts | 9%* | high | 35% | 26% |
| Social and community service managers | 10%* | high | 47% | 37% |

*Statistically significant at a 90% or higher confidence level
**Includes transit police, federal police, and police who said they work for a private organization, in addition to local police

Note: Listed in the chart are all occupations with 3,000 or more people working in D.C.
Source: American Community Survey 2005-2009 & 2010-2014, Bureau of Labor Statistics Occupational Employment Statistics, May 2015

DISTRICTMEASURED.COM

As the graph below shows, this is part of a larger pattern of D.C. workers in middle- and high-wage jobs starting to show a preference for living in the city, and workers in low-wage jobs increasingly living in the suburbs – a trend that's unsurprising given the District's increasing cost of housing (https://districtmeasured.com/2015/12/09/the-rise-of-home-prices-in-d-c-s-central-corridor/). The percent of workers in low-wage jobs living in the city decreased from 43 percent to 39 percent between 2005-2009 and 2010-2014, while the percent of workers in high-wage jobs living in the city increased from 24 percent to 27 percent over the same time period. These changes may seem small, but they are statistically significant at the 99 percent confidence level.

## D.C.'s Low-Wage Workers are Moving Out of the City; Middle- and High-Wage Workers are Moving In

*From 2005-2009, 43 percent of D.C.-proper's low-wage workers lived in the city. The portion of low-wage workers living in the city dropped to 39 percent between 2010 and 2014.*

Percent of D.C. workers who live in the city, by occupation wage level



**2005-2009**                    **2010-2014**

Note: Changes at each wage level are statistically significant at the 95% confidence level. We assigned wage levels of low, middle, and high to occupations based on each occupation's median wage in D.C. in 2015. Source: American Community Survey, 2005-2009 and 2010-2014; Bureau of Labor Statistics Occupational Employment Statistics survey, May 2015.

DISTRICTMEASURED.COM

### What exactly is this data?

<u>Wage data:</u> Our wage data comes from the Bureau of Labor Statistics Occupational Employment Statistics survey of D.C. workers from May 2015. We define a job as low-wage if its annual median wage was in the bottom 25 percent of annual median wages across all jobs in D.C (or below $44,000). High-wage jobs have annual median wages in the top 25 percent (or above $86,000) and middle-wage jobs are in between.

<u>Percent of Workers Living in the City:</u> Our data comes from the American Community Survey PUMS data for 2005-2009 and 2010-2104. For our universe of D.C. workers we started with everyone living in D.C., Maryland, or Virginia who works in D.C., so we are excluding long-distance commuters who work in D.C. but live in places outside of D.C., Maryland, and Virginia. When we analyzed specific occupations, we looked at all occupations with 8,000 or more workers in D.C., with the exception of miscellaneous managers since the category is vague. We grouped some occupations together so they surpassed our 8,000 person threshold.

10/25/2016    D.C.'s Cashiers and Janitors Are More Likely to Live in the City than Other Workers, but That's Changing | District, Measured

Case 1:12-cv-00853-EGS   Document 73-3   Filed 04/29/20   Page 47 of 72

Map of Where Workers Live: This data comes from the American Community Survey PUMS data for 2014. We only look at workers who work in D.C. and live in either D.C., Maryland, and Virginia. All of the occupation groups in the map have 8,000 or more people working in the city.

Police Officers: Police officers in this case includes more than just people employed by the Metropolitan Police Department; it also includes transit police, federal police, and police who said they work for private organizations. In 2014, the Metropolitan Police Department released data (http://www.washingtoncitypaper.com/news/city-desk/blog/13069264/d-c-residents-make-up-less-than-20-percent-of-police-force) showing 17 percent of its officers live in the District.

Errors: The data in this post have various margins of error since the data comes from surveys. In most cases we used a five-year data set to reduce the errors, and only looked at occupations with 8,000 people or more. The errors are highest for the map of where people live because for that we had to use a one-year dataset (geographic boundaries changed within the five-year dataset, making a map more difficult to produce). The map is intended to give readers a general sense of where people live; we discourage people from using it for direct area-to-area comparisons. Our findings on the loss and gain of workers of different occupations and wage levels are in many cases statistically significant and we have noted this in the post.

POSTED IN UNCATEGORIZED

# One thought on "D.C.'s Cashiers and Janitors Are More Likely to Live in the City than Other Workers, but That's Changing"

1. Pingback: About 800,000 People Work In D.C., But Who Actually Lives Here? – Washington Metro Bugle

BLOG AT WORDPRESS.COM.

# District, Measured

## Posts from the District of Columbia's Office of Revenue Analysis

## Reverse commuters now hold higher paying jobs

FEBRUARY 25, 2015FEBRUARY 25, 2015 ~ YESIM SAYIN TAYLOR

We generally talk about the commuter bite (//cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/2013-1%20--%20Commuters.pdf)— income earned in the District by non-residents, which the District cannot tax—but rarely about the District residents who work in the suburbs and pay income taxes in the District. Let us call them reverse commuters.

Reverse commuters were thought to be residents who cannot find work in the District and therefore go to the suburbs, especially Maryland, to work jobs in retail, construction, or building and grounds maintenance. We have been seeing strong income growth (https://districtmeasured.com/2015/02/11/data-on-the-wages-earned-by-district-residents-tell-a-new-story/)among District residents, while job growth and wage growth in the District has been stagnant. This made us suspect that the nature of reverse commuters is changing.

We looked at data from the American Communities Survey and found the following:

- A quarter of the District residents who are employed work in the suburbs. This share has been relatively stable, varying between 24 percent and 27 percent since 2000.



DEPOSITION EXHIBIT
#19
10/26/16
PENGAD 800-631-6989



([https://districtmeasured.files.wordpress.com/2015/02/image0029.png](https://districtmeasured.files.wordpress.com/2015/02/image0029.png))

- **Personal earnings of reverse commuters have been increasing.** Until 2011, reverse commuters earned less than District residents with jobs in the District. Since 2011, reverse commuters, on average, earn more. This change would have come earlier had it not been for the federal stimulus after the great recession, and the consequent ramp up in federal hiring between 2009 and 2011.



([https://districtmeasured.files.wordpress.com/2015/02/image0045.png](https://districtmeasured.files.wordpress.com/2015/02/image0045.png))

- **Personal earnings of reverse commuters is higher because they now hold higher paying jobs**. In 2001, only one in five reverse commuters held jobs in the professional and business services area. In 2013, this share was almost one in three. The growth is coming from higher paying jobs in professional services such as lawyers, managers, scientists, or architects and not from lower paying

jobs in business services such as buildings maintenance, travel agencies, or administrative support.



(https://districtmeasured.files.wordpress.com/2015/02/image0061.png)

- ○ **A smaller share of reverse commuters work in retail, construction, and health sector jobs in Maryland or Virginia** while the share of such jobs held in the District by D.C. residents did not change since 2001. Finance sector jobs declined everywhere, but even more so in the District, suggesting that some of the reverse commuters successfully held on to such jobs in the suburbs.

Selected industries, change in share of total jobs, 2001 and 2013



(https://districtmeasured.files.wordpress.com/2015/02/image0081.png)

**What exactly is this data?** We used data from American Communities Survey between 2000 and 2001, looking at the place of work and personal earnings of DC residents who are employed. We focused on jobs in DC, MD, and VA. Some DC residents hold jobs in other states but it is not easy to make a reliable estimate about them. Their size in the sample is too small. We also looked at the industries DC residents hold jobs in, again focusing on DC, MD and VA. Detailed breakdowns of jobs are, once again, not reliable, given the small sample size. So we reported on broader industry areas, sticking to what we think are reliable estimates.

POSTED IN JOBS, LABOR MARKET CONDITIONS

# 6 thoughts on "Reverse commuters now hold higher paying jobs"

1. Pingback: DC labor market over the last 5 years: many more jobs for residents, modest cut in unemployment | District, Measured
2. Pingback: From 2008 peak to now: a dozen ways the District's economy has changed | District, Measured
3. Pingback: The federal government is a stabilizing factor in the District's economy, but its role is getting smaller | District, Measured
4. Pingback: For more than three years now, District's resident employment has grown faster than the jobs in the city | District, Measured

5. Pingback: <u>District's labor market and workforce are intertwined with Maryland and Virginia | District, Measured</u>

6.     **David Chandler**
   SAYS:
   <u>MAY 11, 2016 AT 8:15 PM</u>
   I am very interested in data on reverse commuting patterns re the ongoing District Rail Plan in which my organization, the Center for Neighborhood Technology is a member of the consulting team. If possible, please contact me to discuss the methodology used to extract this information from American Community Survey data and any other data sources you may have re reverse commuting in DOC.
   Thanks very much.

   Dave Chandler
   CNT
   773-269-4023
   <u>david@cnt.org</u>

   <u>Reply</u>

BLOG AT WORDPRESS.COM.



**Budget Implications of the Growth in Population and Employment in the District of Columbia**

Addressing the Effects of the Financial Structural Deficit

Julia Friedman, Chief Economist & Deputy CFO
Presented By: Farhad Niami, Director of Economics Affairs

Natwar M. Gandhi, CFO
Government of the District of Columbia

FTA Conference, October 2005 – Oklahoma City, OK.

---

## Budget Implications of Growth in Population & Employment in the District of Columbia

### - The Effect of Financial Structural Deficit -

- For at least 30 years, the District of Columbia ("District") has faced a chronic financial structural deficit affecting its long term budget stability. Recently measured at many hundreds of millions of dollars a year, this imbalance constrains the services that the government can provide at affordable tax-prices.

- No longer just a claim by the District, the structural imbalance is verified by the Government Accountability Office ("GAO") in its May 2003 report. The District's limited tax base is far exceeded by high service costs (due to resource prices and services loads). The size of the gap in FY2000 was between $470 million and $1.16 billion, or roughly $500 million to $1.2 billion in current dollars. On the low end, the range reflects revenues and service bundles more like those of states, while the high-end is more characteristic of urban revenues and services. Because the District is clearly a city from an economic perspective, we argue that the annual deficit is roughly $1 billion, based in 2000.

- In the 3 decades since the District achieved near political independence with "Homerule," this deficit has been manifest in various ways (including a financial collapse in the mid-1990s) and, always, by cutting short investment in infrastructure and capital maintenance. Depending on how it is measured, estimates of the future capital deficit alone can range upward to $30 billion dollars.

- The structural imbalance is measured after taking into account the special services granted to D.C. by the federal government (for examples the courts and prisons) in recognition of the District's city-without-a-state status. Contrary to common misperceptions, however, the District receives little special financial relief (some would say "pork") from the federal government. Indeed, with no voting representation in Congress D.C. is not likely ever to receive huge sums. Instead, the District must find other ways to pay the costs associated with the services it provides

- While there may be number of ways for the District to close the gap of structural imbalance, one particular alternative is to add net revenue producing jobs and/or population. To achieve such a goal the District may need to either encourage population growth, facilitate job growth, or a combination of both.

- The purpose of this discussion is to provide an analysis of how either of the alternatives can affect the District's budgetary base. As such, each of the alternatives are explored and explained in this study

2


PENGAD 800-631-6989

DEPOSITION
EXHIBIT
#20
10/26/16

DC-MWC00000020R



## FACTS

- GOA's May 2003 report verifies the existence of a prolonged structural imbalance

- This imbalance is due to the District's limited tax base and significant difference between the costs of services needed by its residents and guests and the revenue raised at reasonable rates to cover these costs

- The size of the gap in FY2000 was between $470 million and $1.6 billion, or roughly between $500 million and $1.2 billion in current dollars

3



## REDUCING THE STRUCTURAL IMBALANCE

- To close the gap of structural imbalance, the District can enhance revenue sources and control costs

- Three proposed ways of achieving this goal
  - Encourage population growth
  - Facilitate job growth
  - Combination of both

4

2

DC-MWC00000021R



## THE DISTRICT'S POPULATION AND JOBS

- The population of the District has declined since the 1950s

- During the last several years the District has been experiencing a strong demand for housing

- This demand may now signal population growth

- At the same time, current types of housing demands suggest a growth in the proportion of the population with a higher than average income

- The number of jobs in the District has been growing gradually

5

## Jobs and Population – Economic Development That Adds to Budget Stability for the District of Columbia

- The District of Columbia has gained employment and lost population for more than 50 years (an average annual employment growth of 0.6% vs. population decline of 0.7%)

- How to address this trend is a critical decision facing policy makers

- This analysis is about how the decision may affect the District's long-term structural (budgetary) imbalance



**Population and Employment in the District of Columbia, 1950-2005**

| | 1950 | 1955 | 1960 | 1965 | 1970 | 1975 | 1980 | 1985 | 1990 | 1995 | 2000 | 2005 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jobs in DC | 497.3 | 502.7 | 501.6 | 572.5 | 566.7 | 576.5 | 616.1 | 629.0 | 686.0 | 642.6 | 650.2 | 680.3 |
| Population of DC | 806.0 | 765.0 | 765.0 | 797.0 | 756.7 | 706.9 | 638.3 | 634.5 | 603.8 | 551.3 | 571.0 | 551.1 |

6

3

DC-MWC00000022R





DC-MWC00000023R

## INCOME DISTRIBUTION of Tax ilers

- Average income per filer is about $45,000
- Median (middle-most) household income is about $30,000 or 2/3 of average income
- The first half of income corresponds to the 85% of filers with adjusted gross income below $75,000

| TY2003 D.C. Adjusted Gross Income (rounded), form D-40 | | | | | | |
|---|---|---|---|---|---|---|
| | All Filers Up to Income Level: | | | | Income of Top 15% | Income of Top 5% |
| | $30K | $45K | $75K | $150K | | |
| Percent of Filers | 50% | 70% | 85% | 95% | 15% | 5% |
| Percent of DC AGI | 35% | | 50% | 80% | 50% | 20% |
| Percent of Tax | 8% | | 35% | 55% | 65% | 45% |
| Total Filers = 263,000 | Half of all filers ~$30,000 | Average income per Filer ~$45,000 | Half of All income | | Income ~$75,000+ | Income ~$150,000+ |

9

The Self-Sufficiency Standard for Selected Family Types --
District of Columbia, 2005

- Monthly Expenses and Shares of Total Budgets

| Monthly Costs | One Adult | | One Adult, One Preschooler | | One Adult, One Preschooler, One Schoolage | | Two Adult, One Preschooler, one Schoolage | |
|---|---|---|---|---|---|---|---|---|
| | Costs | % of total | Costs | % of total | Costs | % of total | Costs | % of total |
| Housing | $856 | 41 | $949 | 28 | $929 | 24 | $929 | 23 |
| Child Care | $0 | 0 | $899 | 26 | $1,211 | 31 | $1,211 | 27 |
| Food | $223 | 13 | $342 | 10 | $487 | 12 | $737 | 16 |
| Transportation | $114 | 6 | $114 | 3 | $114 | 3 | $229 | 5 |
| Health Care | $97 | 5 | $245 | 7 | $263 | 7 | $315 | 7 |
| Miscellaneous | $129 | 2 | $255 | 7 | $303 | 8 | $344 | 8 |
| Taxes | $370 | 21 | $770 | 23 | $872 | 22 | $959 | 21 |
| Earned Income | | | | | | | | |
| Tax Credit (-) | $0 | 0 | $0 | 0 | $0 | 0 | $0 | 0 |
| Child Care |  |  |  |  |  |  |  |  |
| Tax Credit (-) | $0 | 0 | -$33 | -2 | -$100 | -3 | -$100 | -2 |
| Child Tax Credit (-) | $0 | 0 | -$83 | -2 | -$167 | -4 | -$167 | -4 |
| Total Percent | --- | 100 | --- | 100 | --- | 100 | --- | 100 |
| Self-Sufficiency |  |  |  |  |  |  |  |  |
| Wage-Hourly ** | $10.05 | | $19.44 | | $22.35 | | $12.72 | per adult |
| Monthly | $1,769 | | $3,422 | | $3,934 | | $4,477 | per adult |
| Annual | $21,224 | | $41,063 | | $47,213 | | $53,723 | per adult |

Source: The Self-Sufficiency Standard for the Washington, D.C. Metropolitan Area 2005, Sept. 2005

10

5

DC-MWC00000024R

## INDIVIDUAL INCOME TAX FILERS FOR TY2003



**Individual Income Tax Filers, by DC AGI Category and Filer type, TY2003**

These returns represent 263,548 filers and an estimated 400,000 residents.
Remaining residents (about 30% of population) do not file returns because they are  1) students, 2) exempt from DC tax by federal/local policy,
3) too poor, 4) tax evaders, and other reasons

| | Est. Size Filer Household | Ave No. Income earners | Ave HH Income | Est Ave Inc per person | Pct past-year residents | Total Number Returns | Pct Returns < $50,000 |
|---|---|---|---|---|---|---|---|
| All filers | 1.5 | | $ 45,000 | $ 30,000 | 17% | 263548 | 72% |
| Single | 1 | 1 | $ 37,500 | $ 37,500 | 23% | 146,564 | 75% |
| Single Head of Household | 2.8 | 1 | $ 28,000 | $ 10,769 | 4% | 57,524 | 89% |
| Combined Separate | 2.4 | 2 | $ 127,000 | $ 52,917 | 8% | 14,592 | 19% |
| Married Joint | 2.4 | 2 | $ 86,000 | $ 35,833 | 13% | 27,940 | 47% |
| Married Separate | 1.2 | 1 | $ 48,000 | $ 40,000 | 15% | 7,934 | 70% |
| Dependent Returns | NA | 1 | | | | 7,452 | |

11

## IMPACT OF CERTAIN POPULATION CHANGES

- The current population mix of the District tax filers generates enough revenue to cover costs of services to them

- The more affluent population contributes more to the District's coffer and at a much lower cost to the city, since they require fewer services

- There is a negative net revenue impact associated with increase in the low-income population who would require more and costlier services and less revenues

- A mix of population growth resembling the current District demographics may neither help nor cost the city, as costs and revenues associated with this growth are in approximate balance

12

6

DC-MWC00000025R

## An Exercise to Determine the Impact of Certain Job Growths on the Budget

- Four main job sectors that have been growing and are major employment areas in the District of Columbia have been identified and analyzed

13

### THE TYPES OF JOBS

- Retail Trade

- Professional Services

- Business Services

- Non-Profit Associations

14

7

DC-MWC00000026R

## Adding Sufficient New Jobs to "Attract" 1,000 New Population

Estimated Earnings per new D.C. Resident from Growth in Employment

Sufficient net new jobs in DC to correspond to 1000 population affected by the new jobs:

TABLE (a): "Average" Income Jobs
based on REMI model for Washington Metropolitan Area

|  | May-04 Jobs in DC | Total Jobs after multipliers | Jobs for DC Residents | Wages to DC Residents | DC Wage per resident job |
|---|---|---|---|---|---|
| Retail Trade | 17,200 | 114 | 38 | $ | 30,667 |
| Legal & Prof Services | 97,200 | 803 | 236 | $ | 72,421 |
| Business Services | 36,900 | 254 | 80 | $ | 43,641 |
| Professional Assns | 49,900 | 358 | 109 | $ | 57,230 |
|  | 201,200 | 1529 | 463 | $ | 60,410 |

TABLE (b): "Median" Income Jobs

|  | May-04 Jobs in DC | Total jobs after multipliers | Jobs for DC Residents | Wages to DC Residents | DC Wage per resident job |
|---|---|---|---|---|---|
| Retail Trade | 17,200 | 114 | 38 | $ | 20,660 |
| Legal & Prof Services | 97,200 | 803 | 236 | $ | 48,522 |
| Bsn Services | 36,900 | 254 | 80 | $ | 29,239 |
| Professional Assns | 49,900 | 358 | 109 | $ | 38,344 |
|  | 201,200 | 1529 | 463 | $ | 40,474 |

15

## APPROXIMATED DC TAX REVENUE PER NEW JOB

| Est'd Total: Business Tax Revenue per job by industry, FY2002 | |
|---|---|
| Retail | $ 4,000 |
| Profession Services | $ 1,000 |
| Business Services | $ 3,750 |
| Professional Associations | $ 700 |

* Tax includes withholding, sales, personal & real property, franchise

16

8

DC-MWC00000027R

## THE IMPLICATIONS OF NEW JOBS FOR THE DISTRICT'S BUDGET WHEN EXPENDITURES ARE INCLUDED

- Retail Trade and Business Services
  - Make the most contributions by generating sales tax, in addition to other revenues
  - Result in the most positive net budgetary impact for the District

- Non-profit Sector
  - Employment growth is good for the District's economy
  - Not being considered as a source of budgetary improvement

- Professional Services Sector
  - The jobs neither hurt nor help the District's long term budgetary prospects

17

## APPROXIMATED BUDGETARY IMPACT FROM GROWTH IN EMPLOYMENT AND POPULATION -- 4 INDUSTRIAL SECTORS

- Assumes average wages in Retail and Business Services

- Assumes D.C. resident wages in Professional Services and Professional Associations are below industry averages. Current growth in the number of higher-income households may change this outcome

**Sufficient new employment to "attract" 1,000 new population to the District of Columbia**

| $M | Revenue from new households | Revenue from new jobs | Expenditure on new Population | Expenditure on jobs | Net Impact from New Jobs and New Population |
|---|---|---|---|---|---|
| Retail Industry | $ 1.8 | $ 4.9 | $ 3.6 | $ 1.4 | $ 1.6 |
| Professional Services Industry | $ 2.9 | $ 1.8 | $ 2.9 | $ 1.3 | $ 0.5 |
| Business Services Industry | $ 2.6 | $ 4.2 | $ 3.5 | $ 1.5 | $ 1.8 |
| Professional Associations | $ 1.8 | $ 1.2 | $ 3.5 | $ 1.5 | $ (2.0) |
| 4-Industry Mix | $ 2.3 | $ 3.0 | $ 3.5 | $ 1.4 | $ 0.4 |

18

9

DC-MWC00000028R



## CONCLUSION

- As long as the long term budgetary stability is concerned the followings are few among many factors that the District has to consider

- Reducing the structural imbalance by:
  - Encouraging population growth
  - Encouraging job growth
  - A combination of both

- The District should consider the costs and benefits of each of the above and the "environmental" factors that can influence the ultimate impact on the structural deficit in the District.  Not all growths are equally beneficial

19

10

DC-MWC00000029R



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**OFFICE OF THE CHIEF FINANCIAL OFFICER**
**OFFICE OF REVENUE ANALYSIS**

## D.C. Office of Revenue Analysis Briefing Document    *Number:* **2013-1**  *Date:* **January 2013**

*Vincent C. Gray, Mayor*                 *Natwar M. Gandhi, Chief Financial Officer*              *Fitzroy Lee, Deputy CFO & Chief Economist*

## *Commuter bite out of income earned in DC is the smallest in 40 years*

### *55% in FY 2012, the commuter net reduction in earnings had been above 63% from 1980 all the way to 2000*

The Here is another sign of the economic revival of the District of Columbia over the past decade: the commuter drain on DC's income tax base appears to be weakening.

Incomes earned in the Washington metropolitan area are taxed by place of residence. This means that the incomes earned by commuters coming into DC add to the Maryland and Virginia tax bases. Conversely, amounts earned by DC residents working in the suburbs are taxed in DC. Because so many more commuters come into DC than go the other way, the net result of the "tax-the-resident" policy is a lower income tax base available to DC. Personal Income data compiled by the US Bureau of Economic Analysis (BEA) suggests this adverse net impact has been declining for the past dozen years, although the net impact of commuting still means more than half of the income earned in DC is earned by non-DC resident commuters.

The percentage reduction in DC earnings due to the net impact of commuting over the past 40 years is shown in the accompanying graph. (See page 17 for details on the calculation.)  From 55% in FY 1972, the percentage rose to over 63% in 1980 and remained above that level (topping out at 64.6% in 1994) for the next two decades. It has since fallen fairly steadily, back to 55% in FY 2012.

What accounts for this recent reduction?  The explanation  *(continued on p. 2)*



**Percent reduction in DC earnings due to net impact of commuting: FY 1972 to FY 2012**



DEPOSITION
EXHIBIT
#21
10/26/16

**This briefing document was prepared by Stephen Swaim, DC Office of Revenue Analysis.**

*This brief first appeared in the January 2013 DC Economic and Revenue Trends.* District of Columbia briefing documents are prepared by the Office of Revenue Analysis, which is part of the Office of the Chief Financial Officer of the District of Columbia government. The purpose of these documents is to make information available that is not of a policy nature. *See also District of Columbia Economic and Revenue Trends* and *Economic Indicators* issued monthly by the D.C. Office of the Chief Financial Officer (www.cfo.dc.gov/Economy and Revenue).

For comment or further information, please contact Fitzroy Lee, Deputy Chief Financial Officer and Chief Economist, Office of Revenue Analysis, 1101 4th St., SW, Suite W770, Washington D.C.  20024, fitzroy. lee@dc.gov, 202-727-7775

- Over the past 10 years, earnings of DC residents grew 82.4%, outpacing the growth of amounts earned in DC (62.0%) and the commuter adjustment for residence (48.4%). The average annual compound rate of growth for the three measures were 6.2%, 4.9%, and 4.0%, respectively.

*About the data.* In estimating the earnings portion of DC Personal Income, BEA first estimates the amount of money earned by all persons working in DC. Earned income consists of wages and salaries, benefits, and proprietors' income. BEA then makes an adjustment, called the "resident adjustment", to take account of commuting. This adjustment involves two parts: subtracting the portion earned by commuters, and adding amounts earned outside of DC by DC residents. The resulting calculation is the net earnings of DC residents. The tables at the bottom of the page show the calculations involved for the years 1972, 1982, 1992, 2002, and 2012, and for each of the past 10 years. The tables also compare DC resident earnings and the commuter adjustment to the total amount earned in DC. It should be noted that the Personal Income earnings data should be viewed only as an approximation for the income tax base due to differences in definitions and the ranges of exemptions, credits, and rates that exist in the tax code.

—*Stephen Swaim, DC Office of Revenue Analysis*

### Earnings in DC by place of work, adjustment for residence, and net earnings of DC residents by selected years: 1972 to 2012

| | Level ($ million) | | | | | Change ($ million): | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1972 | 1982 | 1992 | 2002 | 2012 | 1972 to 1982 | 1982 to 1992 | 1992 to 2002 | 2002 to 2012 |
| Earnings in DC | 7,439 | 17,250 | 32,004 | 48,196 | 78,075 | 9,811 | 14,754 | 16,192 | 29,879 |
| Adjustment for residence (deduct) | 4,094 | 11,118 | 20,555 | 28,972 | 43,002 | 7,024 | 9,437 | 8,418 | 14,030 |
| Net earnings of DC residents | 3,345 | 6,133 | 11,450 | 19,224 | 35,073 | 2,788 | 5,317 | 7,774 | 15,849 |
| *Percent comparison to earnings in DC:* | | | | | | | | | |
| Net earnings of DC residents | 45.0 | 35.6 | 35.8 | 39.9 | 44.9 | 28.4 | 36.0 | 48.0 | 53.0 |
| Adjustment for residence | 55.0 | 64.5 | 64.2 | 60.1 | 55.1 | 71.6 | 64.0 | 52.0 | 47.0 |

*Note: Earnings include wages and salaries, benefits, and proprietors' income and exclude personal contributions for social insurance.*
*Source: US Bureau of Economic Analysis*

### Earnings in DC by place of work, adjustment for residence, and net earnings of DC residents: FY 2002 to FY 2012 ($ million)

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Earnings in DC | 48,196 | 50,334 | 54,271 | 57,968 | 61,137 | 64,483 | 67,990 | 69,441 | 72,564 | 76,258 | 78,075 |
| Adjustment for residence (deduct) | 28,972 | 30,388 | 32,556 | 34,405 | 35,824 | 37,300 | 38,590 | 39,322 | 40,783 | 42,392 | 43,002 |
| Net earnings of DC residents | 19,224 | 19,946 | 21,715 | 23,563 | 25,312 | 27,183 | 29,400 | 30,119 | 31,781 | 33,866 | 35,073 |
| *Percent comparison to earnings in DC:* | | | | | | | | | | | |
| Net earnings of DC residents | 39.9 | 39.6 | 40.0 | 40.6 | 41.4 | 42.2 | 43.2 | 43.4 | 43.8 | 44.4 | 44.9 |
| Adjustment by residence | 60.1 | 60.4 | 60.0 | 59.4 | 58.6 | 57.8 | 56.8 | 56.6 | 56.2 | 55.6 | 55.1 |
| *Index number: 2002 = 100* | | | | | | | | | | | |
| Earnings in DC | 100.0 | 104.4 | 112.6 | 120.3 | 126.9 | 133.8 | 141.1 | 144.1 | 150.6 | 158.2 | 162.0 |
| Net earnings of DC residents | 100.0 | 103.8 | 113.0 | 122.6 | 131.7 | 141.4 | 152.9 | 156.7 | 165.3 | 176.2 | 182.4 |
| Adjustment for residence | 100.0 | 104.9 | 112.4 | 118.8 | 123.7 | 128.7 | 133.2 | 135.7 | 140.8 | 146.3 | 148.4 |

*Source: US Bureau of Economic Analysis*

After more than a year of study, the Council of the District of Columbia undertook in 2011 to amend the First Source Act, which has been the law of the District for almost 30 years. *See* Council of the District of Columbia, Committee on Housing and Workforce Development, Report on Bill 19-50, the "Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011," October 14, 2011, at 1–2 ("Comm. Rep.").[1]

Following its extensive legislative study, the Committee made a number of findings in its recommendation that the Council adopt the Act:

> High levels of unemployment have persisted citywide for multiple years now, the rate has experienced large fluctuations and as of August 2011 was 11.1 % as reported by the US Department of Labor. In some Wards of the city the unemployment rate is estimated to be over 30%. Sustained high levels of unemployment typically lead to severe financial hardships for those affected. In the District over the last several years the Food Stamp program has increased by 54%, which is an increase of almost 25,000 households; the TANF caseload has increased by 18%, which is an increase of 2,652 households; the combined Medicaid and Healthcare Alliance caseload increased by 16%, which is an increase of 31,689 individuals; the number of homeless residents accessing services from our continuum of care has increased by 20%, which is an increase of 1,042 individuals; and the number of residents living in deep poverty (incomes less than half of the federal poverty rate or $11,000 a year for a family of 4) has increased by 37%, which is an increase of 14,000 residents.

> Labor market data shows that there are over 700,000 jobs in the District and yet approximately 72% of those jobs are held by people living outside of the city's borders. The District's Congressionally-imposed ban on taxing any of the income that leaves the city means that the District is subsidizing surrounding jurisdictions to the tune of $1 billion to $2 billion a year in lost revenue. The District's sustained rate of high unemployment, the sharp increase in the demand for

---

[1]    *Available online at* http://dcclims1.dccouncil.us/images/00001/20120130131015.pdf (last visited July 11, 2012). The Committee Report runs to almost 200 pages, and contains, *inter alia*, copies of written testimony provided by the dozens of witnesses heard by the Committee, including two of the instant plaintiffs. *See* Comm. Rep. at 12.



1

social services, and the inability to tax income at the source, puts the city in a unique situation that makes local hiring critical to the overarching health of the jurisdiction.

*Id.* at 3.[2]

The Committee further explained that some of the revisions to First Source were based on recent, successful experiences on major public projects. The revisions were

based on successful construction projects such as the baseball stadium and the convention center hotel. The actual hiring percentages achieved on the construction of Nationals Park, informed the proposed thresholds contained in the legislation. The measure used on the project departed from the new hire standard and captured the percentage of hours worked by District residents in identified categories. The project yielded 69% of hours worked by District resident apprentices and 26% of hours worked by District resident journey workers.

[U]nited Planning Organization, Goodwill, and many other job training providers are graduating hundreds of District residents from construction related programs, yet they are only placing approximately 50% of their graduates into jobs. Moreover, prior to the recession, in 2007, there were approximately 13,000 construction jobs in the District compared to the 11,000 construction jobs available today. *Clearly,*

---

[2]     Similar concerns animated the enactment of the original 1984 legislation:

The bill's purpose is predicated upon the fact that the unemployment rate for the District of Columbia has hovered around 11.0% since June, 1983, leaving some 36,000 District residents unemployed and some 20,000 more discouraged from seeking work because of the lack of employment opportunities. First source employment agreements, pursuant to this legislation, would ensure for District residents such employment opportunities.

Council of the District of Columbia, Committee on Housing and Economic Development, Report on Bill 5-341, "First Source Employment Agreement Act of 1983," March 14, 1984, at 1.

2

*there are many DC residents today without work that are qualified to fill these hiring requirements.*

The outcomes and lessons learned from these realities and experiences are the basis for the new bifurcated system. [I]t is worth noting that, as introduced, the legislation would have required the application of the new percentage-based hours worked framework on all projects over $300,000. The Committee feels that creating the bifurcated system places the correct emphasis on requiring enhanced hiring requirements on projects with higher amounts of government assistance.

*Id.* at 4–5 (emphasis added).

Additionally, the Committee clearly explained its policy reasoning, in the face of concerns about the legislation under the Privileges & Immunities Clause:

Many other factors have been explored in analyzing these types of statutes, including the unemployment rate in the jurisdiction, the cost of unemployment to the jurisdiction, and the cost differential between providing safety net services for unemployed workers compared to the potential cost savings of hiring nonresidents. The District consistently records the highest unemployment rate in the region and more than 70% of our jobs are filled by nonresidents. This, coupled with city's inability to tax the income of nonresidents, along with several other related negative indicators, supports the argument that the District is in a unique position, and more likely than other jurisdictions, to provide the courts with compelling reason for this type law.

*Id.* at 9.

Ultimately, the Committee received hours of testimony in public hearings and held over 30 meetings on the legislation with numerous stakeholders, including non-profits, organized labor, and businesses (including the two lead plaintiffs here). *Id.* at 9, 12.

The legislation was approved unanimously by the Council, signed by the Mayor on December 21, 2011, and transmitted to Congress for review. 59 D.C. Reg. 2239 (Mar. 23, 2012). After the expiration of the required review period, with no action or comment by Congress, the Act became effective on February 24, 2012. *Id.*

3

The Act requires beneficiaries of District projects resulting in a financial benefit greater than $300,000 to enter into an employment agreement with the District, specifying that the beneficiary will use good-faith efforts to fill jobs created by the project with unemployed District residents selected to interview from the "First Source Register." D.C. Official Code §§ 2-219.02, 2-219.03(a), 2-219.03(e)(3)(A).[3] Beneficiaries of projects receiving government assistance valued between $300,000 and $5 million must agree to use good-faith efforts to ensure "that at least 51% of new employees hired to work on the project or contract shall be District residents." *Id.*, § 2-219.03(e)(1)(A).[4]

The Act's requirements may be waived for a number of reasons, including when "there are insufficient eligible applicants from the First Source Register that possess the skills required by the positions . . . ." *Id.*, § 2-219.03(e)(3)(A)(ii)(IV). Waivers may also be granted when the beneficiary is located outside the Washington metro area, *id.*, § 2-219.03(e)(A)(ii), or the beneficiary enters into a special agreement with the Department of Employment Services, *id.*, § 2-219.03(e)(A)(iii).

---

[3]     "Beneficiary" includes any signatory to a contract "which involves any District of Columbia government funds, or funds which, in accordance with a federal grant or otherwise, the District government administers" and any "recipient of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for redevelopment, or tax increment financing" and includes "a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds." D.C. Official Code § 2-219.01(1).

[4]     Beneficiaries of projects greater than $5 million are subject to more detailed requirements "based on successful construction projects such as the baseball stadium and the convention center hotel." Comm. Rep. at 4. The beneficiaries of such large projects must agree to use good-faith efforts to ensure that "[a]t least 20% of journey worker hours by trade[;] [a]t least 60% of apprentice hours by trade[;] [a]t least 51% of the skilled laborer hours by trade[;] and [a]t least 70% of common laborer hours shall be performed by District residents." D.C. Official Code § 2-219.03(e)(1A)(A). Beneficiaries of these large projects also have reporting requirements regarding the number of new jobs created, etc. *Id.*, § 2-219.03(e)(1)(C).

The District's structural budget imbalance has long been the subject of study and debate. *See* United States Government Accountability Office, "District of Columbia: Structural Imbalance and Management Issues," GAO Report No. GAO-03-666 (2003) (available online at http://www.gao.gov/new.items/d03666.pdf); Ed Lazere & David Garrison, *A New Federal Contribution to the District of Columbia? The Need, Likely Impact, and Some Options* (DC Fiscal Policy Institute & The Brookings Institution, Nov. 2005) (available online at http://www.brookings.edu/~/media/research/files/reports/2005/11/cities-lazere/20051116_dcinfrastructure.pdf); Yesim Yilmaz, "The Effect of Federal Preemption on the District of Columbia's Tax Revenue," State Tax Notes, Jan. 5, 2009.

The trial court in *Banner v. United States*, 303 F.Supp.2d 1 (D.D.C. 2004), *affirmed*, 428 F.3d 303 (D.C. Cir. 2005), rejected plaintiffs' challenge to the ban on a commuter tax. The court quoted the then-Chair of the Control Board in estimating that, in 1997, the "forgone nonresident income taxes" were about $1.2 billion, and only expected to increase. 303 F.Supp.2d at 6. More recent estimates place that number at over $2 billion. *See* Testimony of Robert Ebel, Deputy Chief Financial Officer, before the Council of the District of Columbia, Special Committee on Statehood and Self-Determination, Public Oversight Roundtable on the Economic and Financial Impacts of District of Columbia Statehood (July 13, 2009) (available online at http://cfo.dc.gov/sites/default/files/dc/sites/ocfo/release_content/attachments/17626/Fiscal%20Impact%20of%20Statehood%20Testimony.pdf) (citing Yesim Yilmaz, "The Effect of Federal Preemption on the District of Columbia's Tax Revenue," State Tax Notes, Jan. 5, 2009, p. 31).

[W]hen DC residents earn income, the District benefits from taxes on that income. [The Committee Chair] noted, however, that Congress forbids the District from taxing the income of non-residents, which leads to millions of dollars in lost tax revenue annually. [She] juxtaposed the District to cities such as Philadelphia, which levies a 3.7 percent tax on income earned in Philadelphia by residents who are not residents of Philadelphia.

5

Council of the District of Columbia, Committee on Workforce Development and Government Operations, Report on Bill 17-185, the "Jobs for D.C. Residents Amendment Act of 2007," June 28, 2007, at 3.[5]

In other words, the District's resident-preference bears a "close relation" to such "substantial reasons" as the high unemployment and inability to recapture tax revenues from out-of-state contractors. *See* Comm. Rep. at 3–9. The greater the amount of personal, taxable income of District residents, the greater the tax base. Moreover, as a simple matter of logic, the more District residents that are employed, the less the District will have to spend to provide "safety net services" for unemployed workers and their families, and the more money the District will have in tax revenues to provide services for *all* people in the District, including the non-residents employed here.

---

[5]      *Available   online   at*   http://dcclims1.dccouncil.us/images/00001/20090903100105.pdf (last visited July 12, 2012). *See also* Council of the District of Columbia, Committee on Public Services, Report on Bill 14-27, the "51% District Residents New Hires Amendment Act of 2001," Feb. 21, 2001, at 5:

> Bill 14-27 takes an important step to enhance the economic vitality of the District. If District residents are employed in jobs created by government-assisted projects, their personal wealth will increase. Furthermore, over time, this program will result in increased District revenues when government-assisted projects hire unemployed District residents who pay local income taxes. For example, each unemployed District resident who is hired and has a taxable income of $20,000, $30,000 or $40,000, would pay $1,252, $2,202, or $3,152, respectively, in taxes.

*Id.*                    (available                    online                    at *http://dcclims1.dccouncil.us/images/00001/20100426160929.pdf)* (last visited July 18, 2012).

| | New Law Project Hours Worked Percentages Statistics | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Contractor | Journey Worker Hours Worked % Goal | Actual Journey Worker % | Apprentice Hours Worked % Goal | Actual Apprentice % | Skilled Laborer Hours Worked % Goal | Actual Skilled Laborer % | Common Laborer Goal | Actual Laborer % |
| Achievement Prep | 20% | 20.5% | 60% | 74.8% | 51% | 60.0% | 70% | 76.2% |
| Ballou High School | 20% | 25.0% | 60% | 74.0% | 51% | 43.0% | 70% | 67.0% |
| DC Scholar Charter School | 20% | 31.2% | 60% | 56.5% | 51% | 59.5% | 70% | 84.8% |
| Edgewood Terrace | 20% | 20.0% | 60% | 63.0% | 51% | 33.0% | 70% | 51.0% |
| Hearst Elementary School | 20% | 39.0% | 60% | 85.9% | 51% | 63.0% | 70% | 52.3% |
| Hyde Addison Elementary | 20% | 57.0% | 60% | 55.0% | 51% | 13.0% | 70% | 68.0% |
| Kramer Middle School | 20% | 59.0% | 60% | 80.0% | 51% | 76.0% | 70% | 67.0% |
| Langdon Education | 20% | 33.0% | 60% | 63.0% | 51% | 23.0% | 70% | 89.0% |
| Monument Academy | 20% | 28.8% | 60% | 83.9% | 51% | 83.0% | 70% | 81.6% |
| Plummer School | 20% | 37.0% | 60% | 57.0% | 51% | 43.0% | 70% | 74.0% |
| Powell Elementary | 20% | 26.0% | 60% | 96.0% | 51% | 51.0% | 70% | 42.0% |
| Roosevelt High School | 20% | 25.4% | 60% | 67.7% | 51% | 43.5% | 70% | 60.2% |
| Stanton Elementary | 20% | 24.0% | 60% | 49.0% | 51% | 34.0% | 70% | 61.0% |
| Woodridge Library | 20% | 27.0% | 60% | 53.0% | 51% | 14.0% | 70% | 0.0% |
| River Terrace | 20% | 27.2% | 60% | 80.0% | 51% | 58.0% | 70% | 51.4% |
| Stuart Hobson Middle School | 20% | 20.0% | 60% | 48.0% | 51% | 53.0% | 70% | 49.0% |
| Ron Brown Collegiate Prep. | 20% | 35.6% | 60% | 64.0% | 51% | 70.8% | 70% | 49.0% |
| Shepherd Elementary School | 20% | 32.9% | 60% | 81.0% | 51% | 30.8% | 70% | 62.8% |
| Van Ness Elementary School | 20% | 34% | 60% | 70% | 51% | 45% | 70% | 69% |



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
#23
10/20/16

**D.C. Economic Indicators**

Feb. 2012

# People & Economy

➡ D.C. unemployment rate for December: 10.4%, down 0.2% from last month & 0.8% higher than 1 year ago

➡ The conventional home mortgage rate decreased in December 2011 to 3.96% from 3.99% in November 2011.



**One-Year Treasury and Conventional Home Mortgage Interest Rates December 2009 to December 2011**

— 1-Year Treasury       — Conventional Home Mortgage

| U.S. GDP | % change for yr. ending | |
|---|---|---|
| Source: BEA | 4th Q 2011 | 3rd Q 2011 |
| Nominal | 3.7 | 3.9 |
| Real | 1.6 | 1.5 |

| Personal Income[a] | % change for yr. ending | |
|---|---|---|
| Source: BEA | 3rd Q 2011 | 2nd Q 2011 |
| Total Personal Income | 4.1 | 5.1[†] |
| U.S. | 4.7 | 5.3 |
| Wage & Salary Portion of Personal Income | | |
| U.S. | 2.9 | 3.4[†] |
| Earned in D.C. | 3.1 | 2.4[†] |
| Earned by D.C. residents[b] | 3.4 | 3.3[†] |

[a] Nominal   [b] Estimated   [c] Seasonally adjusted
† Indicates data revised by stated source since previous D.C. Economic Indicators.

| CPI | % change for yr. ending | |
|---|---|---|
| Source: BLS | Nov. 2011 | Sept. 2011 |
| U.S. | 3.4 | 3.9 |
| D.C./Balt. metro area | 3.3 | 3.4 |

| Unemployment Rate[c] | | |
|---|---|---|
| Source: BLS | Dec. 2011 | Nov. 2011 |
| U.S. | 8.5 | 8.7 |
| D.C. | 10.4 | 10.6 |

| Interest Rates | National Average | |
|---|---|---|
| Source: Federal Reserve | Dec. 2011 | Nov. 2011 |
| 1-yr. Treasury | 0.12 | 0.11 |
| Conv. Home Mortgage | 3.96 | 3.99 |

**D.C. Population**

Source: Census

| *Estimate for | Level | % chg. |
|---|---|---|
| 2000 | 572,059 | |
| 2002 | 579,585 | 1.3 |
| 2003 | 577,777 | -0.3 |
| 2004 | 579,796 | 0.3 |
| 2005 | 582,049 | 0.4 |
| 2006 | 583,978 | 0.3 |
| 2007 | 586,409 | 0.4 |
| 2008 | 590,074 | 0.6 |
| 2009 | 599,657 | 1.6 |
| 2010 | 604,912 | 0.9 |
| 2011 | 617,996 | 2.2 |

* July 1, except for 2000

**Distribution of Individual Income Tax by Income Category**

Source: D.C. Office of Tax and Revenue

| | 2007 | 2008 | 2009 |
|---|---|---|---|
| Less than $30,000 | 44.6% | 43.5% | 43.1% |
| $30,000-$50,000 | 20.5% | 20.4% | 19.9% |
| $50,000-$75,000 | 13.1% | 13.6% | 14.0% |
| $75,000-$100,000 | 7.1% | 7.3% | 7.7% |
| $100,000-$200,000 | 9.3% | 10.0% | 10.4% |
| $200,000-$500,000 | 4.0% | 4.1% | 4.0% |
| $500,000 and Over | 1.3% | 1.1% | 1.0% |

# Housing & Office Space

➡ There were 187 condos sold in December 2011, a 16.9% increase from 1 year ago

➡ The year to date median price increased 7.1% from 1 year ago for single family homes, and condos experienced a decrease of 2.3% in the year to date median price

➡ In the 4th quarter of 2011 vacant commercial office space decreased by 0.4 million square feet from that of the 3rd quarter of 2011



**Year Over Year Percent Change in the Median Price for a Single Family Home and Condominium in Washington, D.C.**

— — Median Price, Single Family Home       — Median Price, Condominium

**Housing Sales**

Source: MRIS[a]

| Completed contracts | Dec. 2011 | 1 yr. % ch. |
|---|---|---|
| Single family | 282 | -4.7 |
| Condo/Co-op | 187 | 16.9 |

| Prices ($000) | Dec. 2011 | 1 yr. % ch. |
|---|---|---|
| Single family | | |
| Average[b] | $617.8 | 1.7 |
| Median[c] | $450.0 | 7.1 |
| Condo/Co-op | | |
| Average[b] | $412.8 | -10.3 |
| Median[c] | $362.0 | -2.3 |

**D.C. Housing Permits Issued**

Source: U.S. Census Bureau

| | 4 Qs. ending | |
|---|---|---|
| Total housing units | 4th Q 2011 | 1 yr. ch. |
| | 3,853 | 3,149 |
| Single family | 236 | 98 |
| Multifamily (units) | 3,617 | 3,051 |

**Class A Apt.[d] and Condominium Units**

Source: Delta Associates

| Units under construction and/or marketing | 4th Q 2011 | 1 yr. ch. |
|---|---|---|
| Rental apartments | 7,500 | 3,045 |
| Condominiums[e] | 342 | -282 |

| Other units likely to deliver over the next 36 months[b] | | |
|---|---|---|
| Rental apartments | 7,945 | 1,967 |
| Condominiums | 827 | -155 |

**D.C. Commercial Office Space**

Source: Delta Associates

| Vacancy Rate (%) | 4th Q 2011 | 1 qtr. ch. |
|---|---|---|
| Excl. sublet space | 7.7 | -0.1 |
| Incl. sublet space | 8.4 | -0.3 |

| Inventory Status (in million square feet) | 4th Q 2011 | 1 qtr. ch. |
|---|---|---|
| Total inventory | 133.5 | 0.0 |
| Leased space[f] | 123.3 | 0.2 |
| Occupied space[f] | 122.3 | 0.4 |
| Vacant | 11.2 | -0.4 |
| Under construction or renovation | 2.8 | 0.4 |

[a] Metropolitan Regional Information System as reported by the Greater Capital Area Association of Realtors
[b] Average prices are annualized for the month from prior-to-date information   [c] Median prices are year-to-date   [d] Investment grade units, as defined by Delta
[e] Calculated from vac. rate excl. sublet   [f] Calculated from vac. rate incl. sublet   [g] Includes sold units   [h] Units in inventory will materialize

For additional information contact Betty Alleyne, Editor, Office of Revenue Analysis – 1101 4th St., SW – Suite W770 – Washington, DC 20024 – (202) 727-7775