# In the Matter of:

# Associated Builders and Contractors, Inc., et al. v. DC

*October 24, 2016*
*Drew Hubbard*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**1**

1          UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF COLUMBIA
3
4    METROPOLITAN WASHINGTON        )
5    CHAPTER, ASSOCIATED BUILDERS   )
6    AND CONTRACTORS, INC., et al.,)
7        Plaintiffs,               )
8        -vs-                      ) No. 12-CV-00853
9    DISTRICT OF COLUMBIA,          ) (EGS)
10       Defendant.                )
11   -----------------------------)
12
13
14          The deposition of Drew Hubbard was
15   taken on Monday, October 24, 2016, commencing at
16   10:00 a.m., at the office of Holland & Knight,
17   800 17th Street, N.W., Suite 1100, Washington,
18   D.C., before Tammy S. Newton, Notary Public.
19
20
21
22

**2**

1          A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS:
3        PAUL J. KIERNAN, ESQUIRE
4        Holland & Knight
5        800 17th Street, N.W.
6        Suite 1100
7        Washington, D.C. 20006
8        (202) 663-7276
9        paul.kiernan@hklaw.com
10
11   ON BEHALF OF DEFENDANT:
12       ANDREW J. SAINDON, ESQUIRE
13       CONRAD J. RISHER, ESQUIRE
14       Office of the Attorney General
15       For the District of Columbia
16       One Judiciary Square
17       441 4th Street, N.W.
18       Suite 600 South
19       Washington, D.C. 20001
20       (202) 724-6643
21       andy.saindon@dc.gov
22   (Index appears following the transcript.)

**3**

1          P R O C E E D I N G S
2          Drew Hubbard,
3    having been sworn by the notary, testified as
4    follows:
5          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
6    BY MR. KIERNAN:
7        Q    Good morning, Mr. Hubbard.  I
8    represent the plaintiffs in the First Source
9    lawsuit, as you know.  I'm going to be asking you
10   some questions today.  If at any point you do not
11   understand my question, will you please tell me
12   that?
13       A    Yes.
14       Q    And I'll assume if you give me an
15   answer that that's a full, complete answer to the
16   best of your ability.  Is that okay?
17       A    Yes.
18       Q    What is your current position with the
19   District government?
20       A    I am the chief administrative officer
21   at the D.C. Department of Housing and Community
22   Development.

**4**

1        Q    How long have you had that position?
2        A    Since January of this year.
3        Q    What do you do there?
4        A    I am in the senior leadership over
5    procurement activities, all physical building
6    functions, personnel, as well as other general
7    senior management duties.
8        Q    Is it correct that you no longer have
9    any association with the Department of Employment
10   Services?
11       A    I do not.
12       Q    There was a time when you did
13   obviously.  What were your positions with DOES?
14       A    I was the -- I was an associate
15   director at DOES.
16       Q    And how long did you hold that
17   position?
18       A    Three years.
19       Q    Overall, as I understand it, you have
20   worked for the District government since about
21   2005?
22       A    Yes.

1 (Pages 1 to 4)

Hubbard
Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

5

1     Q    Can you just tell me briefly what
2  positions you've had with the city?
3     A    Sure.  Beginning in 2005, I was a
4  legislative aide at the City Council.  For a
5  brief time moved to the Mayor's office, to the
6  Mayor's Policy Office, and then back to the City
7  Council as a committee director from roughly 2007
8  until I went over to DOES in 2013.
9     Q    And then you were at DOES from 2013
10 until you took your current position?
11    A    Correct.
12    Q    Can you describe for me what your
13 duties and responsibilities were while you were
14 employed at DOES?
15    A    Yes.  Beginning in 2013, I was the
16 associate director for First Source for roughly
17 about a year.  At that time, after about the
18 first year, a couple other programs were put
19 under my purview, including our apprenticeship
20 program and our business services unit.  So my
21 role was still associate director, but it
22 expanded to other programs.

6

1     Q    And were you still at the title of
2  associate director when you left at the end of
3  2015?
4     A    Yes.
5     Q    Is it correct then that when you
6  became the assistant director of DOES, the
7  Amended First Source Act had already come into
8  effect?
9     A    Yes.
10    Q    I know when you were at Council, you
11 were involved in the drafting of the -- what I'll
12 call the Amended First Source Act.  By that I
13 mean the 2011 act.
14    A    Yes.
15    Q    Describe for me what your involvement
16 was in the drafting or the committee work on that
17 legislation?
18    A    Sure.  The committee went through
19 various names, but at that point, I was director
20 for the Committee on Housing, and I believe it
21 was still that iteration.  In that role, I was
22 the principal staff person that did the drafting

7

1  and took the amended legislation through the
2  legislative process.
3     Q    Were you at that point a staffer for
4  the committee or for a member?
5     A    For the committee.
6     Q    When you say you did the staff work,
7  what exactly did that entail?
8     A    Research, convening meetings, actual
9  legislative drafting, procedural activities
10 around, including scheduling hearings, scheduling
11 mark-up, prep to the committee chairman, the
12 committee members, giving them background on what
13 was in the legislation, et cetera.
14    Q    When you were working at the Council,
15 was that your first encounter with workforce
16 development and related issues?
17    A    Yes.
18    Q    So -- by -- just clarify that what I
19 mean, you didn't have any prior either work
20 experience or academic experience in the area of
21 workforce development?
22    A    Besides a few courses maybe in law

8

1  school or related to employment law or something
2  like that.
3     Q    When you were working at the Council
4  for the committee in dealing with what became the
5  Amended First Source Act, did you participate in
6  discussions about the rationale for amending the
7  First Source Act?
8     A    Yes.
9     Q    Do you recall say the earliest one of
10 those discussions or an early discussion about
11 the subject, about the subject of amending the
12 First Source Act?
13    A    In this particular iteration or just
14 generally?
15    Q    I was thinking -- focusing on your
16 time when you were at the Council.
17    A    Sure.  Probably -- I mean, I became
18 aware of when I started dealing with First Source
19 my first year there in 2005, even before I became
20 committee staff.  The member -- I was working
21 directly for a member there who had a keen
22 interest in both local businesses, as well as

2 (Pages 5 to 8)

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

9

1    local hiring and activities around First Source
2    and other areas to make sure more District
3    residents were employed.
4        Q    You're here today to, as I understand
5    it, to be the designated witness for the District
6    of Columbia on certain topics; is that right?
7        A    Yes.
8        Q    Let me mark the record -- the
9    deposition notice.
10       (Deposition Exhibit Number 4 was
11   marked for identification and attached to the
12   transcript.)
13   BY MR. KIERNAN:
14       Q    That is the deposition notice for
15   today.  And if you turn to Page 2 regarding the
16   subjects of deposition, you understand -- what is
17   your understanding as to the areas on this list
18   of seven that you are here to be the witness for
19   the District about?
20       A    In particular, Items 1, 3, 4, 5, 6.
21       Q    Okay.  You skipped over Item 2
22   regarding -- you didn't mention Item 2,

10

1    "Employment rates in the District and the effect
2    of the Amended First Source Act's residential
3    hiring preferences."  Is that something you were
4    not prepared to testify about today on behalf of
5    the District?
6        A    I would say no.
7        Q    And same with Item 7, "The financial
8    impact of the Amended First Source Act."  You're
9    not here to be a witness about that today?
10       A    No.
11       Q    Tell me, if you would, what you did to
12   prepare yourself to be the witness for the
13   District today.
14       A    In my prior role, when I was still at
15   DOES, obviously I had some role in -- in the case
16   as it was going forward.  Looking back at some of
17   the instances when I was involved at that time,
18   going back through what I signed off as part of
19   the information that was shared and as part of
20   this case, just looking back at the different
21   items that were produced in the case.  Just
22   generally going over what was in, you know, my

11

1    possession as far as things related to the case.
2        Q    Other than -- other than talking to
3    counsel, did you talk with anyone else employed
4    by the District about -- to sort of prepare for
5    your testimony today?
6        A    No.
7        Q    Who currently has the job that you
8    used to have at DOES regarding First Source?  Who
9    currently holds that?
10       A    Michael Watts.
11       Q    Let me go back then to the issue of
12   the drafting of what became the Amended First
13   Source Act.  And in particular, I'm going to mark
14   as an exhibit -- mark this as Exhibit 5, please.
15       (Deposition Exhibit Number 5 was
16   marked for identification and attached to the
17   transcript.)
18   BY MR. KIERNAN:
19       Q    I've marked as Exhibit 5, Mr. Hubbard,
20   a pack of documents that is Bates labeled on the
21   bottom ABC16 through ABC133, and I'm going to ask
22   you whether you are familiar with this

12

1    compilation of documents.
2        A    Yes, I am.
3        Q    What is it or how would you describe
4    it?
5        A    This is the legislative committee
6    report that was required as a part of the process
7    for the Amended First Source legislation.
8        Q    Did you have -- did you personally
9    have a role in preparing this committee report?
10       A    I prepared this almost 100 percent
11   myself.
12       Q    Okay.  So briefly, can you tell me how
13   this document came to be, what this represents?
14       A    As a part of the regular legislative
15   process, we -- as legislation moves, this would
16   document what was the proposed bill's path
17   through legislative process.  It would include
18   the original draft of the bill, the version of
19   the bill that the Council voted on, version of
20   the -- I'm sorry, the fiscal impact statement,
21   the summary of testimony that happened related to
22   the required legislative hearing on the bill,

3 (Pages 9 to 12)

13

1   other background documents related to legislation
2   as it moved through the legislative process.
3       Q    And I'll direct you to Page 12 of your
4   report. It's ABC27 on the bottom. Does the
5   report reflect that the Associated Builders and
6   Contractors of Metropolitan Washington had
7   testified about being concerned about the amended
8   act?
9       A    Yes.
10      Q    And saying that it was unrealistic?
11      A    It does note that, yes.
12      Q    And also that the Miller & Long
13  company had -- had testified in opposition to the
14  amended act?
15      A    Yes.
16      Q    And you remember that happening at the
17  time, right?
18      A    Yes.
19      Q    In reading through this -- let me back
20  up a second first. If you could turn to page --
21  it's Bates stamped ABC70, which is the beginning
22  of a six-page written statement by Dr. Rochelle

14

1   Webb, who was at that point the acting director
2   of DOES. Do you see where I am?
3       A    Yes.
4       Q    And it's correct that Dr. Webb
5   testified in support of the amended act?
6       A    Yes.
7       Q    If you turn to Page ABC71, in her
8   statement, the fourth paragraph of her statement,
9   Dr. Webb wrote, "The intent of all these measures
10  -- to get District residents employed on projects
11  that are funded by the District -- is
12  commendable." Do you recall Dr. Webb testifying
13  to that effect before the committee when you were
14  working at the Council?
15      A    I don't specifically recall that. I
16  see it in her written submission which would have
17  represented what she presented.
18      Q    When you put together this report, the
19  committee report, is it fair to say that you try
20  to be -- that you tried to be both accurate and
21  comprehensive about what had happened before the
22  committee in terms of testimony and presentation?

15

1       A    Yes.
2       Q    So you put in both the pros and the
3   cons as it were?
4       A    Yes.
5       Q    If you could turn, please, to Page
6   ABC53, which is a five-page statement from Dr.
7   Gandhi, then the District CFO. Do you see that?
8       A    Yes.
9       Q    Can you tell me at least at the time
10  you were at the Council what a fiscal impact
11  statement was regarding pending legislation?
12      A    Part of our requirement in order to
13  move legislation is to have what amounts to
14  certification from the Office of the Chief
15  Financial Officer saying the funds are sufficient
16  to enact that legislation.
17      Q    And what does it mean by "the funds
18  are sufficient"?
19      A    That they are budgeted funds or
20  they're -- there is some budget mechanism that
21  accounts for any cost that the District might
22  incur due to new legislation being enacted.

16

1       Q    At least at that time, is it correct
2   that the financial impact statement did not try
3   to assess the net impact of the legislation, just
4   the cost of implementing it?
5       A    Yes. Correct.
6       Q    It didn't do an assessment of if you
7   pass the legislation, here's what we think the
8   impact on the District will be?
9       A    I believe that's correct, yes.
10      Q    In connection with proposed
11  legislation at least at that time in 2011, was
12  anybody responsible for preparing an analysis of
13  the impact overall of proposed legislation?
14      A    Not to my knowledge.
15      Q    So at the legislative stage, somebody
16  would, as Dr. Gandhi did, determine the
17  out-of-pocket costs as it were for the city to
18  implement a piece of legislation, right?
19      A    Yes.
20      Q    But there was nobody that did an
21  analysis at the time of what the expected
22  economic benefits of the legislation would be?

4 (Pages 13 to 16)

17

1      A    No, I don't believe so.  I can think
2  of instances where legislation was directly
3  related to taxes or something that was actually
4  still going to impact District government
5  functions through revenue or et cetera or other.
6      **Q    Well, and take a minute if you would**
7  **look through this.  Is there anything in the**
8  **committee report packet that you helped put**
9  **together that provides an analysis or an**
10 **assessment of the economic impact on the District**
11 **from what was then the proposed amendments to the**
12 **First Source Act?**
13     A    Under the background and rationale
14 section.
15     MR. SAINDON:  Give us a page number.
16     THE WITNESS:  Page 2.  I guess it
17 would be ABC017, 018.  Generally when we prepare
18 to look at this -- not prepare.  But throughout
19 the legislative process and actually in a prior
20 iteration of potential legislation, we looked at
21 the unemployment rate, how particular services at
22 the District provides to District residents, as

18

1  well as the number of jobs, and other financial
2  indicators generally would be affected by
3  increasing employment opportunities for District
4  residents in the city.  There were -- at that
5  time and I guess going forward, one of the
6  focuses was looking at the number of actual jobs
7  in the city versus the number of residents that
8  actually were working those jobs.
9  BY MR. KIERNAN:
10     **Q    Let me go back over what you just**
11 **said.  So is there something in particular that**
12 **you're looking at in the committee report that's**
13 **Exhibit 5 that references the expected or the**
14 **hoped for impact of the amended act?**
15     A    In particularly financial outcomes is
16 what you're asking?
17     **Q    Yes.  I'm just trying to focus on**
18 **whether this document reflects anywhere an**
19 **economic or financial analysis of if we pass this**
20 **law, here's what we expect it will do or the**
21 **impacts it will have economically on the**
22 **District.**

19

1      A    I'm not seeing a section where I can
2  explicitly point to that particular statement.  I
3  mean, the general goal was to employ or -- make
4  sure more residents were working on District jobs
5  which would translate into tax base increase,
6  less dependence on other District programs and
7  other general benefits.
8      **Q    Is there -- on this last point about**
9  **increasing the tax base and less dependence on**
10 **District programs, did you see that anywhere in**
11 **here which you were looking at?**
12     A    Page 3, I guess ABC018, again the
13 second full paragraph is the discussion about
14 unemployment rates, the increases at that time of
15 the use of food stamps, TANF, other District
16 services, including look at other safety net and
17 other District programs that supported low and
18 moderate income folks and, you know, how it
19 particularly looked in the District at that time.
20     **Q    And that's -- if I may, what you just**
21 **were testifying to was the report summary of sort**
22 **of current conditions, right?**

20

1      A    Yes.
2      **Q    Did somebody, to your recollection, do**
3  **an analysis of what they expected the conditions**
4  **would be if the amended act were adopted and put**
5  **into place?**
6      A    Not to my knowledge.
7      **Q    What was the -- at that time, what was**
8  **the Workforce Investment Council?**
9      A    The Workforce Investment Council is a
10 body that is required through federal law where
11 the majority of which are made up of appointees
12 from the business community, and roughly there,
13 their mandate is to help guide workforce policy
14 in the District in the use of federal funds and
15 workforce development.
16     **Q    Are you familiar with Mayor's Order**
17 **83-265?**
18     A    Not off the top of my head.
19     (Deposition Exhibit Number 6 was
20 marked for identification and attached to the
21 transcript.)
22 BY MR. KIERNAN:

5 (Pages 17 to 20)

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

---

21

1      Q    I show you what I marked as Exhibit 6,
2   which is Mayor's Order 83-265 dated November 9,
3   1983, signed by Mayor Barry. As you look at
4   that, are you familiar with this?
5      A    Yes.
6      Q    And what's your understanding of what
7   this order is or how it relates to First Source?
8      A    This is what would be the precursor to
9   the legislative enactment.
10     Q    When you were working at the
11  Department of Employment Services, is it correct
12  that the Mayor -- this Mayor's Order was still in
13  effect, had not been rescinded? Let me -- I
14  don't mean to make it mysterious.
15          During the time you were still at
16  DOES, isn't it correct that if somebody was not
17  in compliance, a notice went to them advising
18  them that they were not in compliance and cited
19  this order?
20     A    Yes.
21     Q    Along with the act?
22     A    Mm-hmm, yes.

---

22

1      Q    You referred in an earlier answer to
2   Mayor's Order 83-265 as being the precursor to
3   the First Source. What did you mean by that?
4      A    Actually, let me revisit that.
5      Q    Sure.
6      A    It actually, if I'm remembering
7   correctly -- no, I think -- that's a correct
8   characterization. The idea or the practice of
9   First Source before it was codified kind of
10  emanates from this document.
11     Q    And when you were the assistant
12  director at DOES, was part of your job to help
13  implement this Mayor's Order as well as the
14  legislation?
15     A    My time at DOES really was focused on
16  the legislative enactment, and the particulars in
17  the Mayor's Order were various iterations of law
18  that had been adopted into the legislative
19  enactment.
20     Q    The amended act was -- actually, let
21  me back up just a second here. Let me mark this
22  as Exhibit 7. Let me go back to this. For some

---

23

1   reason, I can't find my other copies. Let's do
2   this instead. Let's mark this as Exhibit 7,
3   please.
4          (Deposition Exhibit Number 7 was
5   marked for identification and attached to the
6   transcript.)
7   BY MR. KIERNAN:
8      Q    I put in front of you Exhibit 7, a set
9   of the responses of the District of Columbia to
10  the discovery request in this case. You have
11  reviewed these before, correct?
12     A    Correct.
13     Q    If you turn to Page 8, you're the
14  person who verified the Interrogatory answers on
15  behalf of the District, right?
16     A    Yes.
17     Q    Is it correct that since the -- and
18  for point of reference, the amended act went into
19  effect in the beginning of 2012.
20     A    Yes.
21     Q    That since the amended act was put
22  into place, the District has, to your knowledge,

---

24

1   not performed any evaluation of the impact of the
2   amended act on employment figures in the
3   District?
4      A    Not to my knowledge.
5      Q    If I understand correctly, dating back
6   to about 2013, there were discussions about
7   whether to conduct a study to look at the impact
8   of the amended act; is that right?
9      A    Yes.
10     Q    And so while -- and this suit was
11  filed I'll -- for your reference in the spring of
12  2012 as well. But while -- since the act was
13  enacted to the present, to the best of your
14  knowledge, the District has not done an
15  evaluation of the impact of the amended act?
16     A    No, not to my knowledge.
17     Q    Do you know of a reason why they
18  haven't done an analysis of the impact of the
19  amended act?
20     A    I do not.
21     Q    I know from an earlier declaration you
22  filed in this case that -- this was the

---

6 (Pages 21 to 24)

Hubbard

Associated Builders and Contractors, Inc., et al. v. DC                                    10/24/2016

25

1    declaration you filed back in June of 2014.  You
2    said, "Over the last year, DOES has taken
3    preliminary steps to explore the feasibility of
4    commissioning a study on the impact of the First
5    Source Act on unemployment for District residents
6    in the construction industry."
7         To your knowledge, have those
8    preliminary steps ever blossomed into any sort of
9    study on impact on unemployment in the
10   construction industry?
11        A    Not to my knowledge.
12        Q    So as the -- if you turn to Page 7 of
13   Exhibit 7, which is the discovery responses, and
14   I'm looking specifically at Response 9(b).  Take
15   a minute to read it.
16        It states that "The hoped-for
17   'effects' of the amended law are contained in its
18   legislative history.  DOES does not track 'the
19   net number of increased D.C. resident
20   employment.'  DOES has not evaluated the impact
21   of the Amended First Source Act, but it is
22   exploring ways to conduct the formal evaluation

26

1    and analysis."
2         So first, do you know what is meant by
3    "The hoped-for effects of the amended law are
4    contained in its legislative history"?
5         A    I'm sure the general intent to have
6    more D.C. residents work on D.C. funded projects.
7         Q    That is to make -- is it fair to say
8    one of the hoped-for effects was to make it
9    preferable for employers to hire D.C. -- District
10   residents than people that don't live in the
11   District?
12        A    To hire and retain D.C. residents.
13        Q    Hire and retain.  And is it fair to
14   say that the -- one of the hoped-for effects was
15   that employers would hire and retain District
16   residents instead of, for example, residents from
17   Maryland and Virginia for projects that were in
18   the District?
19        A    Yes.
20        Q    Let me mark this as Exhibit 8, please.
21        (Deposition Exhibit Number 8 was
22   marked for identification and attached to the

27

1    transcript.)
2    BY MR. KIERNAN:
3         Q    I marked as Exhibit 8 and stapled
4    together a series of documents.  For some reason,
5    the Bates number got cut off on the bottom.  It
6    starts on 31 of your production -- of the
7    District's production.  For some reason the Bates
8    number got cut off.
9         Do you recognize what these reports
10   are, Mr. Hubbard?
11        A    Yes.
12        Q    What are they?
13        A    These are semiannual reports --
14   semiannual First Source reports that were
15   required by legislation to be submitted to the
16   Council.
17        Q    Who prepares these reports?
18        A    The program staff, the First Source
19   program staff.
20        Q    At DOES?
21        A    Yes.
22        Q    And let's take the first page, and if

28

1    you could walk me through these categories, and
2    again this is a report covering the period
3    January 1, 2009 to June 30, 2009.  So the first
4    entry here, what does it mean by total number of
5    First Source employment agreements?
6         A    So that would be just the overall
7    number of agreements that were executed by the
8    agency for projects that triggered First Source
9    requirements.
10        Q    So would it be -- in the way these
11   reports are done, would these be the new First
12   Source employment agreements or all the ones that
13   were existing during that window?
14        A    It should be new.
15        Q    Okay.  And that's -- in this example,
16   1,301 new First Source employment agreements at
17   all levels, in other words, general contractor,
18   subcontractors, et cetera?
19        A    Yes.
20        Q    So some of them may be on the same
21   project?
22        A    Many of them were.

7 (Pages 25 to 28)

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

29

1    Q    Next line down, number of job openings
2  listed with DOES as a result of First Source
3  employment agreements, what is that category?
4    A    Basically job postings.  A company
5  subject First Source would post their job
6  openings on either our online website.  We have a
7  job board or DOES is basically a job board where
8  you can post openings.
9    Q    And who determines or how is it
10 determined that the number of job openings were
11 as a result of First Source employment
12 agreements?
13   A    These were jobs shared with us by
14 those companies who were looking for folks who
15 were working First Source required jobs.
16   Q    And again, for clarification, these
17 would be new job openings?
18   A    Yes.
19   Q    That's what's supposed to be
20 calculated there?
21   A    Yes.
22   Q    Third box down is total number of

30

1  individuals hired as a result of First Source
2  agreement.  That includes both District residents
3  and hires from other jurisdictions, right?
4    A    Right.  And really what this captures
5  is on a project or contract subject to First
6  Source, all of the folks that were hired
7  during -- during whatever that project or
8  contract time period was.
9    Q    So if I may, so if there were 1,301
10 agreements during this time frame, out of that,
11 6,693 individuals were hired of whom, going down
12 the next box, 2,077 were District residents,
13 right?
14   A    Yes.
15   Q    And then the final calculation is the
16 percentage hired is 31 percent, and that's --
17 2,077 is 31 percent of 66, right?
18   A    Yes.
19   Q    And is this -- this is -- and I'll
20 come back to how it changes a little bit over
21 time.  These -- you're familiar with these
22 reports from when you were at DOES?

31

1    A    Yes, and prior when I was at the
2  Council also.
3    Q    Is it correct then when you were
4  working at the Council in, for example, 2009,
5  2010, you would see or you did see these reports
6  that were submitted to the Council?
7    A    Yes.
8    Q    And 2009 according to -- first half of
9  2009, 31 percent of the jobs associated with
10 First Source employment agreements went to
11 District residents?
12   A    Yes.
13   Q    And the second half of 2009, that
14 number was up to 34 percent?
15   A    Yes.
16   Q    And then the first half of 2010, the
17 number was at 30 percent?
18   A    Yes.
19   Q    And in the second half of 2010, it was
20 up to 46 percent?
21   A    Yes.
22   Q    And so forth as we get to 2011, it's

32

1  at 44 percent and 36 percent, right?
2    A    Yes.
3    Q    So from where you were sitting on the
4  Council side at this point, 2009, 2010, what was
5  the take-away from these reports regarding how
6  First Source was working or not working?
7    A    The take-away was that there was room
8  for improvement.
9    Q    And what does that mean?
10   A    I'm looking at purely from the numbers
11 that the District needs to do more -- more
12 District residents were working on
13 District-funded projects and contracts.
14   Q    Were there backups to these reports or
15 just were the reports just these kind of raw
16 numbers?
17   A    What do you mean by "backup"?
18   Q    In other words, more explanation of
19 which projects and what -- you know, what level
20 people were being hired and whether they were
21 being retained.  You know, additional detail
22 about the people behind these numbers.

8 (Pages 29 to 32)

33

1       A     For this particular report, the code
2   section just calls for these raw numbers.  They
3   were pulled from -- from the data and just
4   aggregated.
5       Q     So in looking at -- is this correct?
6   In looking at this report, I'm looking at the
7   first page, January 1, 2009 to June 30, 2009, in
8   looking at this report, you can't really
9   determine whether the people that were hired
10  stayed on the job, right?  You don't know how
11  long they were retained for based on this report,
12  do you?
13      A     That's correct.
14      Q     And you don't know what type of --
15  what level of person was hired, a journeyman or a
16  skilled labor?  You can't tell from this report
17  who was hired?
18      A     That's correct.
19      Q     This report to the Council then was
20  a -- just a mathematical, if you will,
21  calculation of how many of the jobs that were
22  created during that time it resulted in a

34

1   District resident being hired?
2       A     Correct.
3       Q     Now, if you go ahead, please, turn on
4   the same Exhibit 8 to the report for July 2014 to
5   December 2014.  I'm sorry.  It doesn't have a
6   Bates number on the bottom.  You should be able
7   to -- okay.  This seems to be the first report
8   where a new line is added on the bottom which is
9   the number of names of unemployed District
10  residents on the First Source Register.  First of
11  all, what does that number signify or -- how is
12  that number derived?
13      A     The number is derived, there is an
14  online portal that captures unemployed residents
15  that are seeking employment through DOES.  This
16  would be the total universe of unemployed
17  residents looking for work that are -- that
18  presented to the District seeking help.
19      Q     Are these -- in this example, 16,265,
20  is that 16,265 separate individuals?
21      A     Yes.
22      Q     And these are individuals who have

35

1   come to the District's portal saying I am looking
2   for work?
3       A     Yes.
4       Q     You were at DOES at the time that this
5   line was added to the report.  Were you involved
6   in deciding to add this line?
7       A     Yes.
8       Q     And why did you -- why did you add
9   this line?
10      A     I mean, there were discussions about
11  trying to put more context in the reports, and I
12  believe this was correcting -- by adding this, we
13  were actually being more complete in what the
14  code section requires.  It talks about number of
15  people in the First Source Register.
16      Q     Is the 16,265 the total -- as of the
17  time of this report obviously, was that the total
18  number of names of unemployed people on the First
19  Source Register?
20      A     Yes.
21      Q     To be on the First Source Register, is
22  it correct you have to be a bona fide resident of

36

1   the District of Columbia?
2       A     I'm pausing because I'm not 100
3   percent sure.  So our -- our system is called
4   VOS, Virtual One Stop system, the District
5   system, and it acts as -- the register for the
6   District which also encompasses some of our
7   federal activity.  And under the federal law, we
8   can't turn away folks based on residency.
9       Q     I'm sorry.  Can you say that again?
10      A     Under our federal programs, we need to
11  service all folks, regardless of residency.  So
12  I'm sorry.  Go ahead.
13      Q     So I'm sorry.  So can you -- going
14  back to this exhibit from July 2014 to December
15  2014, the 16,265 people are the unemployed
16  District residents or -- is that right, or it
17  might be other people as well?
18      A     It possibly could be.
19      Q     And how could it possibly be other
20  people?
21      A     As -- as people come and register with
22  the workforce system in the District, it would

9 (Pages 33 to 36)

37

1    denote where they live.  But when they present
2    for services, it's not limited to District
3    residents under federal law.
4         Q    The -- in this report, the phrase
5    First Source Register is capitalized.  Is that
6    because the First Source Register is a term of
7    art at DOES?
8         A    It is actually mentioned in the
9    statute.
10        Q    Is it your understanding that -- what
11   is your understanding as to whether you can be on
12   the First Source Register under the statute if
13   you are not a District resident?
14        A    So the -- I'll say it this way.  The
15   register itself is a database.  It's searchable
16   by resident.  So we can isolate residents for the
17   purposes of using our overall system as a First
18   Source Register.
19        Q    Can people who are not District
20   residents participate in the benefits of the
21   First Source Act as District residents can?
22        A    No.

38

1         Q    But you're saying out-of-state
2    residents might wind up on the First Source
3    Register?
4         A    They might wind up in the Virtual One
5    Stop database.
6         Q    From which the First Source Register
7    is taken?
8         A    Correct.
9         Q    Got it.  Thank you.  Can you turn to
10   the last two pages of Exhibit 8 and tell me if
11   you recognize what these two pages are.
12        A    Yes.  So the amended law bifurcated
13   particularly how construction projects are
14   considered under First Source.  These last two
15   pages would relate to the requirements for
16   projects with more than $5 million worth of
17   District funding or benefit in them, which would
18   trigger the hours worked requirements.
19        Q    Do you know who prepared these two
20   pages?
21        A    If I remember correctly, it was the
22   program staff of First Source as a template as

39

1    how the tracking would happen.
2         Q    Do you recall whether you were already
3    at DOES when this monitoring compliance process
4    paperwork was put together?
5         A    Yes.  I was there.
6         Q    Once the new law was put into effect,
7    did it -- was it applied uniformly to all
8    projects across the city that were eligible?
9         A    There were legacy projects that had
10   begun before the law went into effect which fell
11   under what had been existing standards.  So that
12   included many projects where an agreement at the
13   developer level or the owner level had already
14   been assigned but construction hadn't actually
15   started until perhaps as much as years later.  So
16   instances where the project was already underway,
17   it was allowed to remain -- not allowed but it
18   was tracked under the standards under which it
19   commenced.
20        Q    What criteria was used to determine
21   whether a project was a legacy project?
22        A    The easiest bright-line test was if it

40

1    already had an executed agreement.  On other
2    cases, we -- we being DOES -- would rely on the
3    contracting or initiating agency to provide
4    evidence of, you know, that -- when those
5    projects actually started, when they received
6    initial approval or funding from the city, and
7    based on things like having predevelopment money
8    and having a project approved to the deputy mayor
9    for planning's office or another agency with
10   contracting authority based on when that
11   initiated.
12        Q    And was there an analysis done or
13   paperwork done to reflect what projects were
14   considered legacy versus not legacy?
15        A    So it would have been embodied in the
16   type of agreement they were signing.  I believe,
17   if I remember correctly, there was a letter
18   issued -- there was a letter -- cover letter
19   issued with new agreements as they went out, and
20   it would have indicated that they were legacy or
21   not.
22        Q    And was it a -- in your view, was it

10 (Pages 37 to 40)

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

---

41

1    a -- let me ask you this way.
2         Did the amended law give you guidance
3    as to which would be considered legacy, that is
4    governed by the old act, versus not legacy,
5    governed by the new act?
6         A    Not as much.  It just became a
7    function -- the majority it was projects that
8    were already in process.
9         Q    In response to the discovery request
10   that I think is Exhibit 7, Question Number 1
11   referred us to a spreadsheet containing
12   information about the -- which projects were
13   governed by the amended act, right?  And I've got
14   a copy of it.  If you want to see the spreadsheet
15   first, I can give you that.  That's what I was
16   pulling up.  I can just give you a copy of this.
17   Let's mark this as Exhibit 9.
18        (Deposition Exhibit Number 9 was
19   marked for identification and attached to the
20   transcript.)
21   BY MR. KIERNAN:
22        Q    Do you recognize this list as being

---

42

1    the projects that were -- that were subject to
2    the amended act -- Amended First Source Act?
3         A    Yes.
4         Q    Again, I'm happy to give you the --
5    the spreadsheet doesn't copy exactly right, but
6    I'm happy to let you look at the spreadsheet as
7    well.  But you do recognize that list here?
8         A    Yes.
9         Q    So many of these projects are school
10   projects, correct?
11        A    Yes.
12        Q    And the vast -- actually, the vast
13   majority of these are school projects, right?
14        A    Yes.
15        Q    For school projects, the District,
16   generally speaking, is using its own money to
17   repair its own facilities, correct?
18        A    Yes.
19        Q    And in that setting, the District
20   applied the Amended First Source Act to the
21   percentages that it sought to achieve regarding
22   different categories of labor?

---

43

1         A    Yes.
2         Q    There are a number of projects that
3    have -- that have been going on around town.
4    There's a lot of cranes around town that are not
5    on this list, but that came after the amended
6    act.  Two that come to mind are the Skyland
7    project and the Parks at Walter Reed that are not
8    on this list.  Was -- is that correct?
9         A    Yes.
10        Q    Those are both projects that came
11   after the effective date of the amended act?
12        A    They're projects that have been in
13   process, really if you talk about Skyland, for
14   decades.  Walter Reed not as long, but a
15   substantial amount of time.
16        Q    So were they considered legacy
17   projects?
18        A    Yes.
19        Q    Because of when the activity first
20   happened on them or what?
21        A    Yes.
22        Q    And then some of these obviously on

---

44

1    this list have not -- haven't started yet like
2    the soccer stadium is just starting I guess and
3    the new D.C. Water headquarters is just starting
4    now.
5         A    Yes.
6         Q    Is it fair to say that the
7    requirements under the amended act are harder to
8    achieve than under the earlier act?
9         MR. SAINDON:  Objection;
10   characterization.  You can answer.
11        THE WITNESS:  Harder to achieve?
12   BY MR. KIERNAN:
13        Q    Do you want me to rephrase it?  I can
14   do that.
15        A    Please.
16        Q    Sure.  Under the amended act, isn't it
17   correct that the percentage of hours for various
18   levels of laborers is generally higher than they
19   were under the old act?
20        A    It's somewhat apples to oranges.  As
21   you know, under the traditional standard, it was
22   almost counting heads.  You're talking about new

---

11 (Pages 41 to 44)

Hubbard

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

45

1    hires over any category.  The fact that it was
2    broken out into different types of work --
3    workers, the idea is to balance kind of what
4    those categories represent, i.e., journey workers
5    are your highest level of employees.  That's why
6    it would trigger the -- inversely the lowest
7    percentage.  And at the same time, we looked at
8    only attaching it to higher dollar value
9    projects.  The thought is scale.  You have a
10   better chance of actually reaching those numbers.
11   But it was an enhanced requirement on the higher
12   dollar projects.
13       Q    By "enhanced", do you mean higher
14   percentage to achieve?
15       A    Yes.
16       Q    Can you turn back to Exhibit 7 which
17   is the discovery responses, Mr. Hubbard.
18   Attached to those answers at the very back were
19   some spreadsheets that were done, and I just want
20   to make sure -- well, are these spreadsheets
21   something that you were involved in preparing?  I
22   can ask counsel.  Maybe this is Dr. Lee's.

46

1        MR. SAINDON:  Yes, they were Dr.
2    Lee's.
3    BY MR. KIERNAN:
4        Q    If you could turn to the very last
5    page, the one that says, "Hypothetical impact of
6    First Source program," can I just take you back
7    to again the crafting of the legislation here.  I
8    know it wasn't this report and these numbers.
9    Just as a concept, do you recall ever seeing or
10   hearing discussed an analysis like this where you
11   would run through potential impacts and kind of
12   run it through a tax analysis or something like
13   that?  Again, I'm focusing you on the time prior
14   to the amended act being adopted.
15       A    I will say specifically for First
16   Source, not to my knowledge.  In the general
17   committee work, we were focused on workforce
18   issues and issues around D.C. residents and
19   employment generally.  And we -- we did a lot of
20   research, some existing in the District, some on
21   similar programs in other jurisdictions that
22   looked at approaches to try to get to where we

47

1    wanted to go with increased District resident
2    work.  One of those was really around the idea of
3    over several studies, both academic and I guess
4    government prepared that increasing the number of
5    District residents working would positively
6    impact our tax base and everything that went
7    along with, you know, having to provide less
8    services.
9        Q    Take that last thought.  Can you
10   please explain to me a little more when you say
11   having more District residents employed would
12   increase the tax base, what do you mean by that?
13       A    Sure.  Over -- not particularly this,
14   but over the committee general work, we had
15   looked at numbers that indicate that anywhere
16   from two-thirds or more of the jobs that are
17   located inside the District are held by
18   non-District residents.  We are not able to tax
19   at the source.  We have been prohibited by
20   Congress to do that since Home Rule.  So the kind
21   of settled numbers vary on how much tax revenue
22   we lose going outside of our borders every day

48

1    because we cannot do that.
2        At the same time, just looking at
3    poverty, unemployment rates, especially in our
4    wards east of the river, the focus was looking at
5    strategies to, Number 1, impact District
6    residents directly for their own personal benefit
7    but then also the intended effects that would
8    inure to the city of increasing the amount of
9    wages that were earned by District residents that
10   would help the city generally also.
11       Q    So was the idea that the tax base
12   would be increased because you would have more
13   District residents paying taxes who are not
14   paying taxes?
15       A    Yes, and because they were under
16   employed, unemployed, over that whole kind of
17   scale of folks getting better jobs or retaining
18   good paying jobs.
19       Q    When you were at DOES, what sort of
20   programs were done to improve the training of the
21   potential workforce of the District -- let me
22   back up.  When you were at DOES, what programs

12 (Pages 45 to 48)

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

---

49

1    did the District run to try to improve the
2    training and employability, if you will, of the
3    District workforce?
4        A    Sure.  Particularly for construction,
5    the District is one of the few jurisdictions that
6    directly funds pre-apprenticeship programs.  So
7    the idea is to get D.C. residents ready to take
8    advantage of apprenticeship opportunities, to get
9    into the trades.
10          As you know, First Source covers other
11   areas of District contracting besides
12   construction.  We have other subsidized programs
13   that give residents work experience.  Our Project
14   Empowerment Program is a program where residents
15   with barriers to employment get both soft skills
16   training, meaning how to interview, how to dress,
17   that kind of thing, as well as some hard skills
18   training, coupled with work experience at a
19   private business, a nonprofit, or some employer
20   to help them holistically skill up.
21          Similarly, we, in the past, have run
22   on-the-job training programs that again are

---

50

1    similar to the program I just described but take
2    away the notion of barriers to employment.  It's
3    open to D.C. residents at various levels, whether
4    it's someone who's trying to change careers or
5    get a different job.  Again, we would look at
6    getting them on-the-job training to get them used
7    to whatever that industry is, that particular
8    company, et cetera, and skill up while they're
9    learning.
10          I mean, the other range of programs, a
11   lot of them, you know, run through our DOES as
12   our workforce system, generally including again
13   kind of what I talked about discrete soft skills
14   training, whether it's interviewing, training,
15   how to apply for a job, how to dress.  I'm trying
16   to think of some of the other ones.  And we --
17   we -- we, the District, also contracts out some
18   of the services to whether it's nonprofits or
19   other entities that focus on workforce readiness.
20       Q    Has the District undertaken an
21   analysis of the effectiveness of these workforce
22   readiness programs you just described?

---

51

1        A    I believe, yes.  Under what was the
2    Workforce Investment Act, which is the federal
3    workforce statute, which was recently supplanted
4    by WIOA, which is the Workforce Innovation
5    Opportunity Act.  A lot of our workforce funding
6    comes from federal government, and we have to
7    report outcomes.  So yes.
8        Q    And has -- are you thinking of a
9    particular analysis or report that's been done
10   about the effectiveness of those programs?
11       A    It's the routine reporting thing that
12   would go back to the federal government.
13       Q    What's the nature of those reports?
14       A    Part of it, again, our Virtual One
15   Stop system feeds directly, and that data is
16   pulled directly from our system and shoots up to
17   the federal government.  It's -- it is raw data
18   that's pulled from our system of record.
19       Q    And I apologize.  Maybe my question
20   wasn't clear.  I was trying to determine whether
21   someone had done an analysis of the effectiveness
22   of it, not simply the raw numbers of how many

---

52

1    people came to the portal or whatever.  Sort of a
2    qualitative assessment of the effectiveness of
3    the workforce readiness programs that you were
4    discussing.
5        A    I think built on the raw numbers, DOES
6    as the recognized workforce agency in the city
7    has to explain those numbers, you know, to the
8    federal government and then to even
9    administration and to the Council.
10       Q    And is there a --
11       A    So I can't point to a titled report.
12   But it is -- it is something that they have to
13   walk through with the federal government and the
14   local government.
15       Q    And focusing on the local government
16   piece of that, is there an annual report that is
17   made to the Council, like the reports we looked
18   at earlier in Exhibit --
19          MR. SAINDON:  Exhibit 8?
20   BY MR. KIERNAN:
21       Q    -- Exhibit 8.  Thank you.
22       A    I would say that a lot of that happens

---

13 (Pages 49 to 52)

Associated Builders and Contractors, Inc., et al. v. DC                          10/24/2016

---

53

1    during annual performance oversight hearings on
2    each agency, DOES included, which would happen in
3    the first part of each year before the next
4    budget process kicked off.
5         Q    Were the workforce readiness programs
6    you were just discussing earlier, had they been
7    in effect as long as the amended act has been in
8    effect?
9         A    Some have.  A lot of the --
10   particularly the construction, which a good
11   portion of -- good majority of the First Source
12   required projects are -- First Source and
13   apprenticeship are parallel programs with the
14   agency, and the agency has conducted funded
15   pre-apprenticeship programs for several years.  I
16   wouldn't say it goes -- it may not go as far back
17   as far as the funded pre-apprenticeship programs
18   as far as the original First Source enactment,
19   but it's been around for several years.
20        Q    At least during -- focusing on the
21   time while you were at DOES, were the workforce
22   readiness programs effective in helping to deal

---

54

1    with employment, unemployment issues in the
2    District?
3         A    For the ones that we ran, I believe
4    they were.  I can think of a particular
5    pre-apprenticeship program that we ran and funded
6    that pulled a cohort of all Ward 8 ex-offenders,
7    and I'm not recalling exact amount of individuals
8    that started the program, but it was in excess of
9    a dozen.  And I believe all but maybe one or two
10   actually matriculated into employment at the end
11   of the pre-apprenticeship program.
12        Q    Were the workforce readiness -- were
13   the workforce readiness programs that were in
14   place while you were at DOES, to your knowledge,
15   are they still continuing today?
16        A    Yes.
17        Q    And those workforce readiness
18   programs, am I correct, are separate from the
19   First Source?
20        A    They are, yes.
21        MR. KIERNAN:  Off the record.
22        (Discussion off the record.)

---

55

1         (A brief recess was taken.)
2         MR. KIERNAN:  We took a short break,
3    and thank you for your patience.  I had to copy
4    something that I thought I had copies of.  But
5    after the break you -- Andy, you indicated there
6    was something you wanted to clarify.
7         MR. SAINDON:  Yes.
8         THE WITNESS:  As I thought of it, I
9    mentioned his name, I actually did talk to
10   Michael Watts in preparation for the deposition.
11   BY MR. KIERNAN:
12        Q    And Mr. Watts is currently the person
13   in charge with the First Source program?
14        A    Yes.
15        Q    Did you go over anything with Mr.
16   Watts about what's happening currently in the
17   program?
18        A    We did, yes.
19        Q    What was the nature of what you
20   discussed?
21        A    Really just clarified process wise
22   that process is working virtually the same way as

---

56

1    when I left.  There was one clarification on
2    the SOME projects as in regionally what is listed
3    as having been exempted from First Source.
4         MR. SAINDON:  By SOME, you mean
5    S-O-M-E?
6         THE WITNESS:  Yes, S-O-M-E, So Others
7    Might Eat.  The Benning project was originally
8    listed as being exempted, and in discussion it
9    actually should have been noted as there was an
10   addendum done to their First Source agreement.
11   It was still subject to First Source but under
12   different negotiated requirements.
13   BY MR. KIERNAN:
14        Q    As I understand it, with the SOME
15   project, because they were making certain other
16   commitments to the city regarding supply support
17   services, et cetera that the exact parameters of
18   the First Source Act may not have been the same,
19   but there was other trade-offs and benefits,
20   right?
21        A    Yes, and pursuant there's a clause in
22   the statute that allows for alternative work

---

14 (Pages 53 to 56)

Hubbard

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

---

57

1  agreements.
2      Q    Thank you for that clarification.  Are
3  you familiar with something called the Office of
4  First Source Compliance?
5      A    Yes.
6      Q    What is that?
7      A    In fact -- I mean, it's the program
8  staff and really the program monitors that do the
9  actual day-to-day monitoring of contracts and
10  projects for -- under the law.
11      Q    And that -- that's an office within
12  DOES?
13      A    Yes.  I mean First Source is a
14  distinct unit within.
15      Q    Do you recall -- you may be aware on
16  the Council.  Do you recall there was a move at
17  one point by then Councilmember Barry and others
18  to create a separate Office of First Source
19  Compliance?
20      A    I think I do.
21          MR. KIERNAN:  Let me mark this as 10
22  please.

---

58

1          (Deposition Exhibit Number 10 was
2  marked for identification and attached to the
3  transcript.)
4  BY MR. KIERNAN:
5      Q    For the record, this is from the
6  Associated Builders and Contractors' production.
7  So I'm not saying -- this has not come from the
8  District's files directly.  So the first three
9  pages of this is a draft from June of 2008 of
10  creating the First Source -- this was the First
11  Source Compliance Act of 2008, but its main thing
12  was to, I think, create an Office of First Source
13  Compliance as a unit within DOES.  Was this ever
14  approved?  Do you know?
15      A    I'm not sure, but -- yes, I'm not
16  sure.
17      Q    Are you familiar with something called
18  the First Source Compliance Working Group?
19      A    Not off the top of my head.
20      Q    Okay.  Can you look at the pages that
21  are -- on Exhibit 10 that are Bates stamped ABC11
22  and 12.  Have you seen this before?

---

59

1      A    I'm not certain, but these programs
2  are several of the ones that we did research on.
3      Q    And I'll -- again, just so you're
4  clear, this -- these pages do not have a date on
5  them.  They do have a fax time stamp on top of
6  September 2008, and again, this was from ABC's
7  files, so not the District's files.
8          I think that would draw us to the 2008
9  time period for these two pages that are marked
10  11 and 12, "First Source Best Practice Review."
11  Understanding you were not at DOES in 2008, does
12  this -- do you know anything about this 2008
13  First Source Best Practices Review that's
14  reflected on these two pages?
15      A    I've independently looked at basically
16  all of these cities' programs over the years.  I
17  don't know if I particularly saw this document.
18      Q    Okay.  And you were talking earlier
19  about the goals for the District's programs, and
20  you talked about increasing the tax base by
21  having more people employed that reside in the
22  District.  And I'm just asking with reference to

---

60

1  maybe these cities that you said you yourself
2  looked at, do they have different goals than
3  that?  Do you know?
4      A    I mean, to my knowledge, a lot of
5  goals were similar, looking at their particular
6  residents, working on projects that are funded or
7  within their jurisdiction.  There's some
8  differences.  Boston has kind of a more
9  encompassing program that looks at development
10  generally as opposed to just municipal projects.
11      Q    Can you turn to Page 13 on the ABC
12  production.  Do you know what that is?  Have you
13  seen that before?  Do you know what that is?
14      A    No, I'm not familiar with it.
15      Q    I'll have you look at the last two
16  pages of this exhibit, 14 and 15, which appears
17  to be a fact sheet prepared by DOES, again I
18  think looking at the 2008 time period.  Are you
19  familiar with this?
20      A    Yes.  I've seen this before.
21      Q    What is the reason -- do you know why
22  this document was prepared?

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Hubbard

Associated Builders and Contractors, Inc., et al. v. DC                                10/24/2016

---

61

1     A     Sure.  It was prepared as a fact
2   sheet, FAQ, for employers who would have projects
3   or contracts that we subject First Source.  They
4   would have kind of a shorthand of what the
5   requirements were of the program.
6     Q     And looking at this, can you agree
7   that this is under the old act, not the amended
8   act, right?
9     A     Yes.
10    Q     And under legislative authority refers
11  to that Mayor's Order we looked at earlier, as
12  well as the original First Source Act, right?
13    A     Yes.
14    Q     And then it refers to the Way to Work
15  Amendment Act of 2006.  Do you know what that is?
16    A     I don't remember the particulars.
17  I've seen it referenced before, but I don't
18  remember the particulars of it.
19    Q     Within DOES, how are First Source
20  obligations monitored for compliance?
21    A     They are assigned to a particular
22  program monitor whose responsibility is to track

---

62

1   on a monthly basis the progress towards the goals
2   or towards the requirements.
3     Q     And in the documents that the District
4   produced in this case, there were a number of
5   examples of letters and e-mails saying you're not
6   meeting your requirements, et cetera.  Is that
7   the normal process where there would be a
8   letter --
9     A     Yes.
10    Q     -- or some sort of communication
11  you're not on track for your target?
12    A     Yes.
13    Q     As a general matter, did those notices
14  about potential noncompliance, did they go to the
15  general contractor, the subcontractor, both?
16    A     To my knowledge, they would go to both
17  the general contractor and a sub, if that's the
18  contractual relationship, as well as -- I
19  remember we were implementing that it would go to
20  the contracting agency also.
21    Q     So if District of Columbia Public
22  Schools was the contracting agency, the notice

---

63

1   would be copied to them as well?
2     A     Yes, whoever the project manager was.
3     Q     And sometimes those notices, were they
4   not, were for failing to file reports as opposed
5   to whether the goals had actually been met?
6     A     Yes.
7     Q     Is there a monthly reporting
8   requirement under the amended act?
9     A     Yes.
10    Q     And that's monthly reporting by whom?
11    A     Whichever -- whatever company is
12  subject to an executed agreement.
13    Q     Generally, are subcontractors or
14  sub-subcontractors required to sign First Source
15  agreements with the District?
16    A     If their contract amount triggers the
17  amount, yes.
18    Q     What is a registered apprenticeship
19  program?
20    A     A registered apprenticeship program is
21  a requirement of District law.  Any company that
22  has a half million dollars or more either single

---

64

1   contract or an aggregate over a 12-month period
2   in the area of construction must have a
3   registered apprenticeship program.  In order to
4   get registered, you would go before the D.C.
5   Apprenticeship Council, which is a body that is
6   appointed -- appointed by the Mayor and approved
7   by the Council, and their function is to approve
8   and renew apprenticeship programs.
9           So an apprenticeship program basically
10  is the entry-level point for workers to get into
11  the trades in a construction sense.  It's
12  broader -- apprenticeship is used in other
13  industries, but the majority of apprenticeship
14  programs in the District are with construction
15  companies and union, trade unions.
16    Q     What is the relationship between the
17  apprenticeship program and the First Source Act?
18    A     There are apprenticeship requirements
19  in First Source.  So the programs often dovetail,
20  and most of the apprenticeship programs tend to
21  relate to projects that are subject to First
22  Source.  So the two units work together on

---

16 (Pages 61 to 64)

Associated Builders and Contractors, Inc., et al. v. DC                10/24/2016

---

65

1  looking at apprenticeship compliance related to
2  First Source and generally about projects that
3  are District funded.
4        MR. KIERNAN:  Mark this as Exhibit 11.
5        (Deposition Exhibit Number 11 was
6  marked for identification and attached to the
7  transcript.)
8  BY MR. KIERNAN:
9        Q    I show you what I marked as Exhibit
10 11, a letter dated July 14th, 2016 from Alex
11 Underwood to Steve Sody at Sody Concrete
12 Construction.  I know you weren't at DOES at the
13 time of this letter because you had already moved
14 on.  But first of all, who's Alex Underwood?
15       A    Alex is one of the program monitors --
16 project monitors.  Particularly he has part of
17 the number of construction agreements.
18       Q    This letter is also cc'd to Anetta
19 Graham.  Who's that?
20       A    She's the supervisor of the overall
21 program.  So she's the front-line supervisor.
22       Q    Does she have the job you used to

---

66

1  have?
2        A    No.  She's in the same position she
3  held when I was there.
4        Q    Okay.  Thank you.  This letter refers
5  to the Woodridge Neighborhood Library project.
6  That would -- would that be a building that's
7  owned by the District?
8        A    Yes.
9        Q    And so all the construction work on
10 this project would have been paid for with
11 District funds, correct?
12       A    Correct.
13       Q    And in this letter, if you want to
14 read through it quickly -- have you had a chance
15 to read it?
16       A    Yes.
17       Q    So this letter appears to reflect that
18 the Sody Construction Company had not met its
19 requirements for skilled labor on the library
20 project, right?
21       A    Yes.
22       Q    And that in dealing with that, the

---

67

1  department had offered that on its next project
2  in the city, namely this one for Pepco, that
3  there might be a way for them to make-up, if you
4  will, the skilled labor hour shortage on another
5  project, right?
6        A    Yes.
7        Q    When you were at the office, was this
8  something that happened under your supervision,
9  this type of moving things between projects?
10       A    Yes.  In the context -- when you're
11 looking at the monitoring of these projects,
12 you're necessarily looking backwards, and
13 construction projects have a discrete timeline.
14 So as you near the end of certain phases or
15 overall project, there's only so much you can do
16 to increase or remedy the numbers on that
17 particular project.
18       A lot of the companies that are
19 subject to First Source do repeat business with
20 the city or are subs on projects that are at
21 least in part funded by the city.  So there were
22 instances where we looked at you have something

---

68

1  else upcoming, how can we look at D.C. residents
2  on that particular project.
3        In the case of a Pepco, it was -- and
4  in other like projects, if I remember this -- I'm
5  not quite sure what project they're referencing.
6  It was also beneficial where as a way to remedy
7  some of the shortcomings to look at
8  non-District-funded projects that they would
9  commit to hiring D.C. residents on as a way to --
10 as a good faith effort, which is the standard of
11 the legislation, look at hiring D.C. residents.
12       Q    So would this letter, Exhibit 11,
13 would this be considered within DOES a waiver or
14 something else?
15       A    It's not a waiver.  Waiver's an
16 explicit ask to excuse the company from the
17 requirements, the percentage requirements of the
18 act.  This would be more of -- especially since
19 the project was in process, some of the I guess
20 you would call it monitoring activity, you know,
21 to try to remedy whatever the situation was.
22 Here we're looking at the company being under

---

17 (Pages 65 to 68)

Hubbard
Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

---

69

1   percentage, required percentage, how do we remedy
2   that.
3           It's not a waiver.  It would be kind
4   of working together and seeing how they reference
5   this is not uncommon.  If a company was falling
6   short in a category or generally if they were
7   under the other standard to have a sit-down and
8   talk about what could happen moving forward to
9   remedy the situation.
10      Q   The -- under the amended act, there
11  are different categories of work, right?  Journey
12  workers, apprentices, skilled, common laborers,
13  right?
14      A   Yes.
15      Q   To your knowledge, does DOES have a --
16  does DOES know how many people, for example, in
17  the skilled labor category actually reside in the
18  District?
19      A   There -- over the last -- I'm not sure
20  of the time frame.  There has been a construction
21  specific database of D.C. residents looking for
22  work established at the department which asked

---

70

1   them to self-report experience levels, et cetera.
2   And with that, it was up to the staff to go
3   verify.
4           The area where this runs into a little
5   bit of a problem, skilled worker might be defined
6   differently in different trades.  So you don't
7   always have all those particular categories in a
8   particular trade.  So it really -- and depending
9   on -- a lot of this kind of backs up to federal
10  wage law and how those designations are applied
11  to particular projects.  But there is -- there is
12  an effort that's been ongoing at the agency to
13  keep track of a pool of construction workers and
14  know kind of what level they sit experience wise.
15      Q   And who within DOES keeps that list or
16  that pool?
17      A   It's -- it's kind of a split between
18  the apprenticeship program and First Source.  And
19  there was an initiative that started while I was
20  there called the Center for Construction Careers,
21  which kind of serviced both programs to look at
22  pools of workers.

---

71

1       Q   So when there's a First Source
2   employment agreement signed under the new act,
3   under the amended act, and there are certain
4   goals for, you know, apprentices or skilled
5   laborers or one of these categories, is there a
6   discussion between the District, DOES, and the
7   contractor or the sub, whoever, as to how those
8   percentage of hours are going to be reached
9   within District -- with District residents?
10      A   Sure.  You know, one of the standards
11  now is to try pre-meetings before work starts and
12  offer other services that the agency has to
13  identify residents.  That may be as simple as
14  providing names.  It could be target hiring
15  events, specifically for particular companies.
16  You're looking for 10 entry-level electricians to
17  go into an apprenticeship program.  We will help
18  you find them.
19      Q   And that -- sort of those pre-meetings
20  and those sorts of things from the agency's
21  perspective, do they count toward the good faith
22  attempt by the employers to meet the goals?

---

72

1       A   Yes.
2       Q   Who within DOES tracks sort of the
3   good faith efforts by contractors to meet their
4   goals?
5       A   It would be the program monitors that
6   are assigned to the particular projects or
7   companies, and, you know, working with them, the
8   person who is in my role now would make a final
9   determination if a waiver was requested.
10      Q   But is that -- are the good faith
11  efforts based on reporting by the contractor as
12  to what they have done, or is that based on
13  monitoring by the agency of what's been done?
14      A   It's a mix.  I mean, we would accept
15  evidence from the contractor saying I did this --
16  because some of the things are external that are
17  on the list of good faith.  For example, posting
18  jobs in a newspaper or local newspaper.  If they
19  come with an advertisement of something they've
20  done or the fact that they may have done their
21  own job fair for D.C. residents.  But more and
22  more it was a lot of the companies were seeking

---

18 (Pages 69 to 72)

Hubbard

Associated Builders and Contractors, Inc., et al. v. DC                                    10/24/2016

---

73

1    the department out to take advantage of programs
2    that they had in the past knowing that we
3    actually did.
4        Q    The determination as to whether an
5    employer has demonstrated enough good faith
6    effort so as to warrant a waiver, is that
7    decision ultimately made by DOES, or is it
8    ultimately made by someone else?
9        A    It's -- at DOES, based on how the good
10   faith effort is now enumerated in the amended
11   law.  In the previous version, it was a little
12   more subjective.
13       Q    And so if the director of DOE -- does
14   it go to the director who decides?
15       A    I believe it stayed at the associate
16   director level.
17       Q    The job you used to have?
18       A    Mm-hmm.
19       Q    So at the associate director level, if
20   you were -- hypothetically, if you were there
21   today and you were satisfied that an employer had
22   done enough to warrant a good faith -- had

---

74

1    demonstrated good faith to warrant a waiver from
2    the obligations of the amended act, that would be
3    a decision that you would make, and that would be
4    the final word?
5        A    Yes.
6        Q    To your knowledge, has -- strike that.
7    From your perspective, does the Department of
8    Employment Services enforce the amended act?
9        A    Yes.
10       Q    And it's part of its agency goals is
11   to enforce the act?
12       A    Yes.
13       Q    Would you agree with me that the
14   penalties for failing to comply with the
15   requirements of the law, that those penalties are
16   higher under the amended act than they were under
17   the old act?
18       A    Yes.
19       Q    Are you familiar with the Miller &
20   Long company?
21       A    Yes.
22       Q    Are you familiar with what efforts

---

75

1    they have made regarding trying to hire District
2    of Columbia residents on jobs on which they're
3    involved?
4        A    Yes.
5        Q    Would you characterize those efforts
6    in any way?
7        A    They have, over the years, taken the
8    requirements very seriously and actually worked
9    closely with the department to come up with ways
10   to find D.C. residents to put on their jobs.
11       Q    Over the years you're familiar with
12   the work of the Associated Builders and
13   Contractors --
14       A    Yes.
15       Q    -- regarding First Source issues,
16   right?
17       A    Yes.
18       Q    I think I saw in there somewhere you
19   were even a panelist at one of their
20   presentations to their members about First Source
21   Act, right?
22       A    Yes.  Yes.

---

76

1        Q    And that's -- the issue of the impact
2    of First Source on its members, you would agree
3    with me is a matter that you know Associated
4    Builders and Contractors has been very involved
5    in for many years?
6        A    Yes.
7        Q    Since the amended act was put in
8    effect, are you aware of any imposition of
9    penalties by the District for a company's failure
10   to comply with its First Source agreement?
11       A    To my knowledge, there have been no
12   penalties assessed.
13       Q    Again, I'm assuming you would not call
14   Exhibit 11 a penalty, right?
15       A    No.
16       Q    Has there been -- to your knowledge,
17   is there a reason why there have not been any
18   penalties imposed?
19       A    To my knowledge, I mean a lot of --
20   particularly when I was there, there were
21   concerted efforts by both general contractors and
22   subs to actually be proactive and come and meet

---

19 (Pages 73 to 76)

Hubbard
Associated Builders and Contractors, Inc., et al. v. DC                                    10/24/2016

---

77

1    with us beforehand and in process to look at how
2    we could meet the District's goals in this area.
3    Additionally, I think one of the things that has
4    been ongoing at the agency is building the -- an
5    online reporting system, and it's my
6    understanding that actually is going to roll out
7    soon to have that easy way to report.
8        Q    You mean by the employers or
9    contractors to report?
10       A    Yes.
11       Q    Would that be through the same online
12   system that you're using now or different one?
13       A    The system they are using now is
14   called LCPtracker which is an off-the-shelf
15   system that is really used nationally more so on
16   the Davis-Bacon Compliance Act, but it tracks a
17   lot of the same -- it tracks all the same basic
18   requirements that we would be looking at for
19   First Source purposes.
20       Q    If you know, what was the District's
21   record of imposing penalties under the old act?
22       A    To my knowledge, there's never been

---

78

1    any penalties applied, period.
2        Q    Is it fair to say they've been
3    threatened but not actually applied over the
4    years?
5        A    Yes.
6        Q    And the threat was sufficient to
7    either bring compliance or bring a resolution?
8        A    Yes.
9        Q    By saying that, you don't suggest that
10   the District couldn't bring penalties; they just
11   haven't historically done that yet?
12       A    Yes.
13           MR. KIERNAN:  I have no further
14   questions.
15           MR. SAINDON:  We have no follow up.
16   (Whereupon, the signature having been waived, the
17   deposition concluded at 12:03 p.m.)
18
19
20
21
22

---

79

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2          I, Tammy S. Newton, the officer before
3    whom the foregoing proceedings was taken, do
4    hereby certify that the foregoing transcript is a
5    true and correct record of the proceedings; that
6    said proceedings were taken by me
7    stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by
10   any of the parties to this case and have no
11   interest, financial or otherwise, in its outcome.
12         IN WITNESS WHEREOF, I have hereunto set
13   my hand and affixed my notarial seal this 31st
14   day of October, 2016.
15   My commission expires:
16   7/31/2017
17
18         _____
19         Notary Public in and for the
20         District of Columbia
21
22

---

80

1            C O N T E N T S
2    EXAMINATION OF DREW HUBBARD          PAGE:
3      By Mr. Kiernan            3
4
5    DEPOSITION EXHIBITS:           PAGE:
6    Number 4 - Notice of Deposition        9
7    Number 5 - Legislative Committee Report    11
8    Number 6 - Order 83-265         20
9    Number 7 - First Set of Interrogatories
10       and First Request for Production
11       of Documents           23
12   Number 8 - Semiannual Reports      26
13   Number 9 - List of Projects         41
14   Number 10 - Documents from ABC Production  57
15   Number 11 - July 14, 2016 Letter      65
16
17       (All exhibits attached to transcript.)
18
19
20
21
22

---

20 (Pages 77 to 80)

**A**

**a.m** 1:16
**ABC** 60:11 80:14
**ABC's** 59:6
**ABC017** 17:17
**ABC018** 19:12
**ABC11** 58:21
**ABC133** 11:21
**ABC16** 11:21
**ABC27** 13:4
**ABC53** 15:6
**ABC70** 13:21
**ABC71** 14:7
**ability** 3:16
**able** 34:6 47:18
**academic** 7:20 47:3
**accept** 72:14
**accounts** 15:21
**accurate** 14:20
**achieve** 42:21 44:8
   44:11 45:14
**act** 6:7,12,13 8:5,7
   8:12 10:8 11:13
   13:8,14 14:5 17:12
   18:14 20:4 21:21
   22:20 23:18,21
   24:2,8,12,15,19
   25:5,21 37:21 41:4
   41:5,13 42:2,2,20
   43:6,11 44:7,8,16
   44:19 46:14 51:2,5
   53:7 56:18 58:11
   61:7,8,12,15 63:8
   64:17 68:18 69:10
   71:2,3 74:2,8,11
   74:16,17 75:21
   76:7 77:16,21
**Act's** 10:2
**acting** 14:1
**activities** 4:5 7:9 9:1
**activity** 36:7 43:19
   68:20
**acts** 36:5
**actual** 7:8 18:6 57:9
**add** 35:6,8
**added** 34:8 35:5
**addendum** 56:10

**adding** 35:12
**additional** 32:21
**Additionally** 77:3
**administration** 52:9
**administrative** 3:20
**adopted** 20:4 22:18
   46:14
**advantage** 49:8 73:1
**advertisement**
   72:19
**advising** 21:17
**affixed** 79:13
**agency** 28:8 40:3,9
   52:6 53:2,14,14
   62:20,22 70:12
   71:12 72:13 74:10
   77:4
**agency's** 71:20
**aggregate** 64:1
**aggregated** 33:4
**agree** 61:6 74:13
   76:2
**agreement** 30:2
   39:12 40:1,16
   56:10 63:12 71:2
   76:10
**agreements** 28:5,7
   28:12,16 29:3,12
   30:10 31:10 40:19
   57:1 63:15 65:17
**ahead** 34:3 36:12
**aide** 5:4
**al** 1:6
**Alex** 65:10,14,15
**allowed** 39:17,17
**allows** 56:22
**alternative** 56:22
**amended** 6:7,12 7:1
   8:5 10:2,8 11:12
   12:7 13:7,14 14:5
   18:14 20:4 22:20
   23:18,21 24:2,8,15
   24:19 25:17,21
   26:3 38:12 41:2,13
   42:2,2,20 43:5,11
   44:7,16 46:14 53:7
   61:7 63:8 69:10

71:3 73:10 74:2,8
   74:16 76:7
**amending** 8:6,11
**Amendment** 61:15
**amendments** 17:11
**amount** 43:15 48:8
   54:7 63:16,17
**amounts** 15:13
**analysis** 16:12,21
   17:9 18:19 20:3
   24:18 26:1 40:12
   46:10,12 50:21
   51:9,21
**ANDREW** 2:12
**Andy** 55:5
**andy.saindon@dc...**
   2:21
**Anetta** 65:18
**annual** 52:16 53:1
**answer** 3:15,15 22:1
   44:10
**answers** 23:14 45:18
**anybody** 16:12
**apologize** 51:19
**appears** 2:22 60:16
   66:17
**apples** 44:20
**applied** 39:7 42:20
   70:10 78:1,3
**apply** 50:15
**appointed** 64:6,6
**appointees** 20:11
**apprentices** 69:12
   71:4
**apprenticeship** 5:19
   49:8 53:13 63:18
   63:20 64:3,5,8,9
   64:12,13,17,18,20
   65:1 70:18 71:17
**approaches** 46:22
**approval** 40:6
**approve** 64:7
**approved** 40:8
   58:14 64:6
**area** 7:20 64:2 70:4
   77:2
**areas** 9:2,17 49:11

**art** 37:7
**asked** 69:22
**asking** 3:9 18:16
   59:22
**assess** 16:3
**assessed** 76:12
**assessment** 16:6
   17:10 52:2
**assigned** 39:14
   61:21 72:6
**assistant** 6:6 22:11
**associate** 4:14 5:16
   5:21 6:2 73:15,19
**associated** 1:5 13:5
   31:9 58:6 75:12
   76:3
**association** 4:9
**assume** 3:14
**assuming** 76:13
**attached** 9:11 11:16
   20:20 23:5 26:22
   41:19 45:18 58:2
   65:6 80:17
**attaching** 45:8
**attempt** 71:22
**Attorney** 2:14
**authority** 40:10
   61:10
**aware** 8:18 57:15
   76:8

**B**

**back** 5:6 10:16,18
   10:20 11:11 13:19
   18:10 22:21,22
   24:5 25:1 30:20
   36:14 45:16,18
   46:6 48:22 51:12
   53:16
**background** 7:12
   13:1 17:13
**backs** 70:9
**backup** 32:17
**backups** 32:14
**backwards** 67:12
**balance** 45:3
**barriers** 49:15 50:2
**Barry** 21:3 57:17

**base** 19:5,9 47:6,12
   48:11 59:20
**based** 33:11 36:8
   40:7,10 72:11,12
   73:9
**basic** 77:17
**basically** 29:4,7
   59:15 64:9
**basis** 62:1
**Bates** 11:20 13:21
   27:5,7 34:6 58:21
**beginning** 5:3,15
   13:21 23:19
**begun** 39:10
**behalf** 2:2,11 10:4
   23:15
**believe** 6:20 16:9
   17:1 35:12 40:16
   51:1 54:3,9 73:15
**beneficial** 68:6
**benefit** 38:17 48:6
**benefits** 16:22 19:7
   37:20 56:19
**Benning** 56:7
**best** 3:16 24:13
   59:10,13
**better** 45:10 48:17
**bifurcated** 38:12
**bill** 12:18,19,22
**bill's** 12:16
**bit** 30:20 70:5
**blossomed** 25:8
**board** 29:7,7
**body** 20:10 64:5
**bona** 35:22
**borders** 47:22
**Boston** 60:8
**bottom** 11:21 13:4
   27:5 34:6,8
**box** 29:22 30:12
**break** 55:2,5
**brief** 5:5 55:1
**briefly** 5:1 12:12
**bright-line** 39:22
**bring** 78:7,7,10
**broader** 64:12
**broken** 45:2

**budget** 15:20 53:4
**budgeted** 15:19
**Builders** 1:5 13:5
 58:6 75:12 76:4
**building** 4:5 66:6
 77:4
**built** 52:5
**business** 5:20 20:12
 49:19 67:19
**businesses** 8:22

**C**

**C** 2:1 3:1 80:1
**calculated** 29:20
**calculation** 30:15
 33:21
**call** 6:12 68:20
 76:13
**called** 36:3 57:3
 58:17 70:20 77:14
**calls** 33:2
**capitalized** 37:5
**captures** 30:4 34:14
**careers** 50:4 70:20
**case** 10:15,20,21
 11:1 23:10 24:22
 62:4 68:3 79:10
**cases** 40:2
**categories** 28:1
 42:22 45:4 69:11
 70:7 71:5
**category** 29:3 45:1
 69:6,17
**cc'd** 65:18
**Center** 70:20
**certain** 9:6 56:15
 59:1 67:14 71:3
**CERTIFICATE**
 79:1
**certification** 15:14
**certify** 79:4
**cetera** 7:13 17:5
 28:18 50:8 56:17
 62:6 70:1
**CFO** 15:7
**chairman** 7:11
**chance** 45:10 66:14
**change** 50:4

**changes** 30:20
**CHAPTER** 1:5
**characterization**
 22:8 44:10
**characterize** 75:5
**charge** 55:13
**chief** 3:20 15:14
**cited** 21:18
**cities** 60:1
**cities'** 59:16
**city** 5:2,4,6 16:17
 18:4,7 39:8 40:6
 48:8,10 52:6 56:16
 67:2,20,21
**clarification** 29:16
 56:1 57:2
**clarified** 55:21
**clarify** 7:18 55:6
**clause** 56:21
**clear** 51:20 59:4
**closely** 75:9
**code** 33:1 35:14
**codified** 22:9
**cohort** 54:6
**Columbia** 1:2,9 2:15
 9:6 23:9 36:1
 62:21 75:2 79:20
**come** 6:7 30:20 35:1
 36:21 43:6 58:7
 72:19 75:9 76:22
**comes** 51:6
**commenced** 39:19
**commencing** 1:15
**commendable** 14:12
**commission** 79:15
**commissioning** 25:4
**commit** 68:9
**commitments** 56:16
**committee** 5:7 6:16
 6:18,20 7:4,5,11
 7:12 8:4,20 12:5,9
 14:13,19,22 17:8
 18:12 46:17 47:14
 80:7
**common** 69:12
**communication**
 62:10

**community** 3:21
 20:12
**companies** 29:14
 64:15 67:18 71:15
 72:7,22
**company** 13:13 29:4
 50:8 63:11,21
 66:18 68:16,22
 69:5 74:20
**company's** 76:9
**compilation** 12:1
**complete** 3:15 35:13
**compliance** 21:17
 21:18 39:3 57:4,19
 58:11,13,18 61:20
 65:1 77:16 78:7
**comply** 74:14 76:10
**comprehensive**
 14:21
**concept** 46:9
**concerned** 13:7
**concerted** 76:21
**concluded** 78:17
**Concrete** 65:11
**conditions** 19:22
 20:3
**conduct** 24:7 25:22
**conducted** 53:14
**Congress** 47:20
**connection** 16:10
**CONRAD** 2:13
**cons** 15:3
**considered** 38:14
 40:14 41:3 43:16
 68:13
**construction** 25:6
 25:10 38:13 39:14
 49:4,12 53:10 64:2
 64:11,14 65:12,17
 66:9,18 67:13
 69:20 70:13,20
**contained** 25:17
 26:4
**containing** 41:11
**context** 35:11 67:10
**continuing** 54:15
**contract** 30:5,8

 63:16 64:1
**contracting** 40:3,10
 49:11 62:20,22
**contractor** 28:17
 62:15,17 71:7
 72:11,15
**contractors** 1:6 13:6
 72:3 75:13 76:4,21
 77:9
**Contractors'** 58:6
**contracts** 32:13
 50:17 57:9 61:3
**contractual** 62:18
**convening** 7:8
**copied** 63:1
**copies** 23:1 55:4
**copy** 41:14,16 42:5
 55:3
**correct** 4:8 5:11 6:5
 14:4 16:1,5,9
 21:11,16 22:7
 23:11,12,17 31:3
 33:5,13,18 34:2
 35:22 38:8 42:10
 42:17 43:8 44:17
 54:18 66:11,12
 79:5
**correcting** 35:12
**correctly** 22:7 24:5
 38:21 40:17
**cost** 15:21 16:4
**costs** 16:17
**Council** 5:4,7 6:10
 7:14 8:3,16 12:19
 14:14 15:10 20:8,9
 27:16 31:2,4,6
 32:4 33:19 52:9,17
 57:16 64:5,7
**Councilmember**
 57:17
**counsel** 3:5 11:3
 45:22 79:9
**count** 71:21
**counting** 44:22
**couple** 5:18
**coupled** 49:18
**courses** 7:22

**COURT** 1:1
**cover** 40:18
**covering** 28:2
**covers** 49:10
**crafting** 46:7
**cranes** 43:4
**create** 57:18 58:12
**created** 33:22
**creating** 58:10
**criteria** 39:20
**current** 3:18 5:10
 19:22
**currently** 11:7,9
 55:12,16
**cut** 27:5,8

**D**

**D** 3:1
**D.C** 1:18 2:7,19 3:21
 25:19 26:6,6,9,12
 44:3 46:18 49:7
 50:3 64:4 68:1,9
 68:11 69:21 72:21
 75:10
**data** 33:3 51:15,17
**database** 37:15 38:5
 69:21
**date** 43:11 59:4
**dated** 21:2 65:10
**dating** 24:5
**Davis-Bacon** 77:16
**day** 47:22 79:14
**day-to-day** 57:9
**deal** 53:22
**dealing** 8:4,18 66:22
**decades** 43:14
**December** 34:5
 36:14
**decides** 73:14
**deciding** 35:6
**decision** 73:7 74:3
**declaration** 24:21
 25:1
**Defendant** 1:10 2:11
**defined** 70:5
**demonstrated** 73:5
 74:1
**denote** 37:1

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

[ 83 ]

department 3:21
  4:9 21:11 67:1
  69:22 73:1 74:7
  75:9
dependence 19:6,9
depending 70:8
deposition 1:14 9:9
  9:10,14,16 11:15
  20:19 23:4 26:21
  41:18 55:10 58:1
  65:5 78:17 80:5,6
deputy 40:8
derived 34:12,13
describe 5:12 6:15
  12:3
described 50:1,22
designated 9:5
designations 70:10
detail 32:21
determination 72:9
  73:4
determine 16:16
  33:9 39:20 51:20
determined 29:10
determines 29:9
developer 39:13
development 3:22
  7:16,21 20:15 60:9
differences 60:8
different 10:20
  42:22 45:2 50:5
  56:12 60:2 69:11
  70:6 77:12
differently 70:6
direct 13:3
directly 8:21 17:2
  48:6 49:6 51:15,16
  58:8
director 4:15 5:7,16
  5:21 6:2,6,19 14:1
  22:12 73:13,14,16
  73:19
discovery 23:10
  25:13 41:9 45:17
discrete 50:13 67:13
discussed 46:10
  55:20

discussing 52:4 53:6
discussion 8:10
  19:13 54:22 56:8
  71:6
discussions 8:6,10
  24:6 35:10
distinct 57:14
District 1:1,2,9 2:15
  3:19 4:20 9:2,5,19
  10:1,5,13 11:4
  14:10,11 15:7,21
  16:8 17:4,10,22,22
  18:3,22 19:4,6,10
  19:15,17,19 20:14
  23:9,15,22 24:3,14
  25:5 26:9,11,15,18
  30:2,12 31:11
  32:11,12 34:1,9,18
  36:1,4,6,16,22
  37:2,13,19,21
  38:17 42:15,19
  46:20 47:1,5,11,17
  48:5,9,13,21 49:1
  49:3,5,11 50:17,20
  54:2 59:22 62:3,21
  63:15,21 64:14
  65:3 66:7,11 69:18
  71:6,9,9 75:1 76:9
  78:10 79:20
District's 27:7 35:1
  58:8 59:7,19 77:2
  77:20
District-funded
  32:13
document 12:13,16
  18:18 22:10 59:17
  60:22
documents 11:20
  12:1 13:1 27:4
  62:3 80:11,14
DOE 73:13
dollar 45:8,12
dollars 63:22
dovetail 64:19
dozen 54:9
Dr 13:22 14:4,9,12
  15:6 16:16 45:22

46:1
draft 12:18 58:9
drafting 6:11,16,22
  7:9 11:12
draw 59:8
dress 49:16 50:15
Drew 1:14 3:2 80:2
due 15:22
duties 4:7 5:13

_____

E

E 2:1,1 3:1,1 80:1
e-mails 62:5
earlier 22:1 24:21
  44:8 52:18 53:6
  59:18 61:11
earliest 8:9
early 8:10
earned 48:9
easiest 39:22
east 48:4
easy 77:7
Eat 56:7
economic 16:22
  17:10 18:19
economically 18:21
effect 6:8 10:1 14:13
  21:13 23:19 39:6
  39:10 53:7,8 76:8
effective 43:11
  53:22
effectiveness 50:21
  51:10,21 52:2
effects 26:3,8,14
  48:7
effects' 25:17
effort 68:10 70:12
  73:6,10
efforts 72:3,11
  74:22 75:5 76:21
EGS 1:9
either 7:19 29:6
  63:22 78:7
electricians 71:16
eligible 39:8
emanates 22:10
embodied 40:15
employ 19:3

employability 49:2
employed 5:14 9:3
  11:3 14:10 47:11
  48:16 59:21 79:9
employees 45:5
employer 49:19
  73:5,21
employers 26:9,15
  61:2 71:22 77:8
employment 4:9 8:1
  10:1 18:3 21:11
  24:2 28:5,12,16
  29:3,11 31:10
  34:15 46:19 49:15
  50:2 54:1,10 71:2
  74:8
employment.' 25:20
Empowerment
  49:14
enact 15:16
enacted 15:22 24:13
enactment 21:9
  22:16,19 53:18
encompasses 36:6
encompassing 60:9
encounter 7:15
enforce 74:8,11
enhanced 45:11,13
entail 7:7
entities 50:19
entry 28:4
entry-level 64:10
  71:16
enumerated 73:10
especially 48:3
  68:18
ESQUIRE 2:3,12,13
established 69:22
et 1:6 7:13 17:5
  28:18 50:8 56:17
  62:6 70:1
evaluated 25:20
evaluation 24:1,15
  25:22
events 71:15
evidence 40:4 72:15
ex-offenders 54:6

exact 54:7 56:17
exactly 7:7 42:5
EXAMINATION
  3:5 80:2
example 26:16
  28:15 31:4 34:19
  69:16 72:17
examples 62:5
excess 54:8
excuse 68:16
executed 28:7 40:1
  63:12
exempted 56:3,8
exhibit 9:10 11:14
  11:14,15,19 18:13
  20:19 21:1 22:22
  23:2,4,8 25:13
  26:20,21 27:3 34:4
  36:14 38:10 41:10
  41:17,18 45:16
  52:18,19,21 58:1
  58:21 60:16 65:4,5
  65:9 68:12 76:14
exhibits 80:5,17
existing 28:13 39:11
  46:20
expanded 5:22
expect 18:20
expected 16:21
  18:13 20:3
experience 7:20,20
  49:13,18 70:1,14
expires 79:15
explain 47:10 52:7
explanation 32:18
explicit 68:16
explicitly 19:2
explore 25:3
exploring 25:22
external 72:16

_____

F

facilities 42:17
fact 45:1 57:7 60:17
  61:1 72:20
failing 63:4 74:14
failure 76:9
fair 14:19 26:7,13

44:6 72:21 78:2
**faith** 68:10 71:21
  72:3,10,17 73:5,10
  73:22 74:1
**falling** 69:5
**familiar** 11:22 20:16
  21:4 30:21 57:3
  58:17 60:14,19
  74:19,22 75:11
**FAQ** 61:2
**far** 11:1 53:16,17,18
**fax** 59:5
**feasibility** 25:3
**federal** 20:10,14
  36:7,7,10 37:3
  51:2,6,12,17 52:8
  52:13 70:9
**feeds** 51:15
**fell** 39:10
**fide** 35:22
**figures** 24:2
**file** 63:4
**filed** 24:11,22 25:1
**files** 58:8 59:7,7
**final** 30:15 72:8 74:4
**financial** 10:7 15:15
  16:2 18:1,15,19
  79:11
**find** 23:1 71:18
  75:10
**first** 3:8 5:16,18 6:7
  6:12 7:15 8:5,7,12
  8:18,19 9:1 10:2,8
  11:8,12 12:7 13:20
  17:12 21:7 22:3,9
  25:4,21 26:2 27:14
  27:18,22 28:3,5,8
  28:11,16 29:2,5,11
  29:15 30:1,5 31:8
  31:10,16 32:6 33:7
  34:7,10,10 35:15
  35:18,21 37:5,6,12
  37:17,21 38:2,6,14
  38:22 41:15 42:2
  42:20 43:19 46:6
  46:15 49:10 53:3
  53:11,12,18 54:19

55:13 56:3,10,11
  56:18 57:4,13,18
  58:8,10,10,12,18
  59:10,13 61:3,12
  61:19 63:14 64:17
  64:19,21 65:2,14
  67:19 70:18 71:1
  75:15,20 76:2,10
  77:19 80:9,10
**fiscal** 12:20 15:10
**five-page** 15:6
**focus** 18:17 48:4
  50:19
**focused** 22:15 46:17
**focuses** 18:6
**focusing** 8:15 46:13
  52:15 53:20
**folks** 19:18 29:14
  30:6 36:8,11 48:17
**follow** 78:15
**following** 2:22
**follows** 3:4
**food** 19:15
**foregoing** 79:3,4
**formal** 25:22
**forth** 31:22
**forward** 10:16 18:5
  69:8
**fourth** 14:8
**frame** 30:10 69:20
**front** 23:8
**front-line** 65:21
**full** 3:15 19:13
**function** 41:7 64:7
**functions** 4:6 17:5
**funded** 14:11 26:6
  53:14,17 54:5 60:6
  65:3 67:21
**funding** 38:17 40:6
  51:5
**funds** 15:15,17,19
  20:14 49:6 66:11
**further** 78:13

---G---
**G** 3:1
**Gandhi** 15:7 16:16
**general** 2:14 4:6

19:3,7 26:5 28:17
  46:16 47:14 62:13
  62:15,17 76:21
**generally** 8:14 10:22
  17:17 18:2 42:16
  44:18 46:19 48:10
  50:12 60:10 63:13
  65:2 69:6
**getting** 48:17 50:6
**give** 3:14 17:15 41:2
  41:15,16 42:4
  49:13
**giving** 7:12
**go** 11:11 18:10
  22:22 34:3 36:12
  47:1 51:12 53:16
  55:15 62:14,16,19
  64:4 70:2 71:17
  73:14
**goal** 19:3
**goals** 59:19 60:2,5
  62:1 63:5 71:4,22
  72:4 74:10 77:2
**goes** 53:16
**going** 3:9 10:16,18
  10:22 11:13,21
  17:4 18:5 30:11
  36:13 43:3 47:22
  71:8 77:6
**good** 3:7 48:18
  53:10,11 68:10
  71:21 72:3,10,17
  73:5,9,22 74:1
**governed** 41:4,5,13
**government** 3:19
  4:20 17:4 47:4
  51:6,12,17 52:8,13
  52:14,15
**Graham** 65:19
**Group** 58:18
**guess** 17:16 18:5
  19:12 44:2 47:3
  68:19
**guidance** 41:2
**guide** 20:13

---H---
**half** 31:8,13,16,19

63:22
**hand** 79:13
**happen** 39:1 53:2
  69:8
**happened** 12:21
  14:21 43:20 67:8
**happening** 13:16
  55:16
**happens** 52:22
**happy** 42:4,6
**hard** 49:17
**harder** 44:7,11
**head** 20:18 58:19
**headquarters** 44:3
**heads** 44:22
**hearing** 12:22 46:10
**hearings** 7:10 53:1
**held** 47:17 66:3
**help** 20:13 22:12
  34:18 48:10 49:20
  71:17
**helped** 17:8
**helping** 53:22
**hereunto** 79:12
**higher** 44:18 45:8
  45:11,13 74:16
**highest** 45:5
**hire** 26:9,12,13,15
  75:1
**hired** 30:1,6,11,16
  32:20 33:9,15,17
  34:1
**hires** 30:3 45:1
**hiring** 9:1 10:3 68:9
  68:11 71:14
**historically** 78:11
**history** 25:18 26:4
**hold** 4:16
**holds** 11:9
**holistically** 49:20
**Holland** 1:16 2:4
**Home** 47:20
**hoped** 18:14
**hoped-for** 25:16
  26:3,8,14
**hour** 67:4
**hours** 38:18 44:17

71:8
**Housing** 3:21 6:20
**Hubbard** 1:14 3:2,7
  11:19 27:10 45:17
  80:2
**Hypothetical** 46:5
**hypothetically**
  73:20

---I---
**i.e** 45:4
**idea** 22:8 45:3 47:2
  48:11 49:7
**identification** 9:11
  11:16 20:20 23:5
  26:22 41:19 58:2
  65:6
**identify** 71:13
**impact** 10:8 12:20
  15:10 16:2,3,8,13
  17:4,10 18:14 24:1
  24:7,15,18 25:4,9
  25:20 46:5 47:6
  48:5 76:1
**impacts** 18:21 46:11
**implement** 16:18
  22:13
**implementing** 16:4
  62:19
**imposed** 76:18
**imposing** 77:21
**imposition** 76:8
**improve** 48:20 49:1
**improvement** 32:8
**include** 12:17
**included** 39:12 53:2
**includes** 30:2
**including** 5:19 7:10
  19:16 50:12
**income** 19:18
**increase** 19:5 47:12
  67:16
**increased** 25:19
  47:1 48:12
**increases** 19:14
**increasing** 18:3 19:9
  47:4 48:8 59:20
**incur** 15:22

**independently**
59:15
**Index** 2:22
**indicate** 47:15
**indicated** 40:20 55:5
**indicators** 18:2
**individuals** 30:1,11
34:20,22 54:7
**industries** 64:13
**industry** 25:6,10
50:7
**information** 10:19
41:12
**initial** 40:6
**initiated** 40:11
**initiating** 40:3
**initiative** 70:19
**Innovation** 51:4
**inside** 47:17
**instances** 10:17 17:2
39:16 67:22
**intended** 48:7
**intent** 14:9 26:5
**interest** 8:22 79:11
**Interrogatories** 80:9
**Interrogatory** 23:14
**interview** 49:16
**interviewing** 50:14
**inure** 48:8
**inversely** 45:6
**Investment** 20:8,9
51:2
**involved** 6:11 10:17
35:5 45:21 75:3
76:4
**involvement** 6:15
**isolate** 37:16
**issue** 11:11 76:1
**issued** 40:18,19
**issues** 7:16 46:18,18
54:1 75:15
**Item** 9:21,22 10:7
**items** 9:20 10:21
**iteration** 6:21 8:13
17:20
**iterations** 22:17

___

**J**

**J** 2:3,12,13
**January** 4:2 28:3
33:7
**job** 11:7 22:12 29:1
29:4,5,7,7,10,17
33:10 50:5,15
65:22 72:21 73:17
**jobs** 18:1,6,8 19:4
29:13,15 31:9
33:21 47:16 48:17
48:18 72:18 75:2
75:10
**journey** 45:4 69:11
**journeyman** 33:15
**Judiciary** 2:16
**July** 34:4 36:14
65:10 80:15
**June** 25:1 28:3 33:7
58:9
**jurisdiction** 60:7
**jurisdictions** 30:3
46:21 49:5

___

**K**

**keen** 8:21
**keep** 70:13
**keeps** 70:15
**kicked** 53:4
**Kiernan** 2:3 3:6
9:13 11:18 18:9
20:22 23:7 27:2
41:21 44:12 46:3
52:20 54:21 55:2
55:11 56:13 57:21
58:4 65:4,8 78:13
80:3
**kind** 22:9 32:15 45:3
46:11 47:20 48:16
49:17 50:13 60:8
61:4 69:3 70:9,14
70:17,21
**Knight** 1:16 2:4
**know** 3:9 6:10 10:22
19:18 24:17,21
26:2 32:19,21
33:10,14 38:19
40:4 44:21 46:8
47:7 49:10 50:11

___

52:7 58:14 59:12
59:17 60:3,12,13
60:21 61:15 65:12
68:20 69:16 70:14
71:4,10 72:7 76:3
77:20
**knowing** 73:2
**knowledge** 16:14
20:6 23:22 24:4,14
24:16 25:7,11
46:16 54:14 60:4
62:16 69:15 74:6
76:11,16,19 77:22

___

**L**

**labeled** 11:20
**labor** 33:16 42:22
66:19 67:4 69:17
**laborers** 44:18
69:12 71:5
**law** 7:22 8:1 18:20
20:10 22:17 25:17
26:3 36:7 37:3
38:12 39:6,10 41:2
57:10 63:21 70:10
73:11 74:15
**lawsuit** 3:9
**LCPtracker** 77:14
**leadership** 4:4
**learning** 50:9
**Lee's** 45:22 46:2
**left** 6:2 56:1
**legacy** 39:9,21 40:14
40:14,20 41:3,4
43:16
**legislation** 6:17 7:1
7:13 12:7,15 13:1
15:11,13,16,22
16:3,7,11,13,18,22
17:2,20 22:14
27:15 46:7 68:11
**legislative** 5:4 7:2,9
12:5,14,17,22 13:2
16:15 17:19 21:9
22:16,18 25:18
26:4 61:10 80:7
**let's** 23:1,2 27:22
41:17

___

**letter** 40:17,18,18
62:8 65:10,13,18
66:4,13,17 68:12
80:15
**letters** 62:5
**level** 32:19 33:15
39:13,13 45:5
70:14 73:16,19
**levels** 28:17 44:18
50:3 70:1
**library** 66:5,19
**limited** 37:2
**line** 29:1 34:8 35:5,6
35:9
**list** 9:17 41:22 42:7
43:5,8 44:1 70:15
72:17 80:13
**listed** 29:2 56:2,8
**little** 30:20 47:10
70:4 73:11
**live** 26:10 37:1
**local** 8:22 9:1 52:14
52:15 72:18
**located** 47:17
**long** 4:1,16 13:12
33:11 43:14 53:7
74:20
**longer** 4:8
**look** 17:7,18 19:16
21:3 24:7 42:6
50:5 58:20 60:15
68:1,7,11 70:21
77:1
**looked** 17:20 19:19
45:7 46:22 47:15
52:17 59:15 60:2
61:11 67:22
**looking** 10:16,20
18:6,12 19:11
25:14 29:14 32:10
33:5,6,6,8 34:17
35:1 48:2,4 60:5
60:18 61:6 65:1
67:11,12 68:22
69:21 71:16 77:18
**looks** 60:9
**lose** 47:22

___

**lot** 43:4 46:19 50:11
51:5 52:22 53:9
60:4 67:18 70:9
72:22 76:19 77:17
**low** 19:17
**lowest** 45:6

___

**M**

**main** 58:11
**majority** 20:11 41:7
42:13 53:11 64:13
**make-up** 67:3
**making** 56:15
**management** 4:7
**manager** 63:2
**mandate** 20:13
**mark** 9:8 11:13,14
22:21 23:2 26:20
41:17 57:21 65:4
**mark-up** 7:11
**marked** 9:11 11:16
11:19 20:20 21:1
23:5 26:22 27:3
41:19 58:2 59:9
65:6,9
**Maryland** 26:17
**mathematical** 33:20
**matriculated** 54:10
**matter** 62:13 76:3
**mayor** 21:3,12 40:8
64:6
**Mayor's** 5:5,6 20:16
21:2,12 22:2,13,17
61:11
**mean** 6:13 7:19 8:17
15:17 19:3 21:14
22:3 28:4 32:9,17
35:10 45:13 47:12
50:10 56:4 57:7,13
60:4 72:14 76:19
77:8
**meaning** 49:16
**meant** 26:2
**measures** 14:9
**mechanism** 15:20
**meet** 71:22 72:3
76:22 77:2
**meeting** 62:6

Case 1:12-cv-00853-EGS   Document 73-4   Filed 04/29/20   Page 27 of 199
Hubbard
Associated Builders and Contractors, Inc., et al. v. DC                      10/24/2016

[ 86 ]

meetings 7:8
member 7:4 8:20,21
members 7:12 75:20
   76:2
mention 9:22
mentioned 37:8
   55:9
met 63:5 66:18
Metropolitan 1:4
   13:6
Michael 11:10 55:10
Miller 13:12 74:19
million 38:16 63:22
mind 43:6
minute 17:6 25:15
mix 72:14
Mm-hmm 21:22
   73:18
moderate 19:18
Monday 1:15
money 40:7 42:16
monitor 61:22
monitored 61:20
monitoring 39:3
   57:9 67:11 68:20
   72:13
monitors 57:8 65:15
   65:16 72:5
monthly 62:1 63:7
   63:10
morning 3:7
move 15:13 57:16
moved 5:5 13:2
   65:13
moves 12:15
moving 67:9 69:8
municipal 60:10
mysterious 21:14

**N**
N 2:1 3:1 80:1,1
N.W 1:17 2:5,17
name 55:9
names 6:19 34:9
   35:18 71:14
nationally 77:15
nature 51:13 55:19
near 67:14

necessarily 67:12
need 36:10
needs 32:11
negotiated 56:12
Neighborhood 66:5
neither 79:9
net 16:3 19:16 25:19
never 77:22
new 15:22 28:11,14
   28:16 29:17 34:8
   39:6 40:19 41:5
   44:3,22 71:2
newspaper 72:18,18
Newton 1:18 79:2
non-District 47:18
non-District-fund...
   68:8
noncompliance
   62:14
nonprofit 49:19
nonprofits 50:18
normal 62:7
notarial 79:13
notary 1:18 3:3 79:1
   79:19
note 13:11
noted 56:9
notice 9:9,14 21:17
   62:22 80:6
notices 62:13 63:3
notion 50:2
November 21:2
number 9:10 11:15
   17:15 18:1,6,7
   20:19 23:4 25:19
   26:21 27:5,8 28:4
   28:7 29:1,10,22
   31:14,17 34:6,9,11
   34:12,13 35:14,18
   41:10,18 43:2 47:4
   48:5 58:1 62:4
   65:5,17 80:6,7,8,9
   80:12,13,14,15
numbers 32:10,16
   32:22 33:2 45:10
   46:8 47:15,21
   51:22 52:5,7 67:16

**O**
O 3:1 80:1
Objection 44:9
obligations 61:20
   74:2
obviously 4:13
   10:15 35:17 43:22
October 1:15 79:14
off-the-shelf 77:14
offer 71:12
offered 67:1
office 1:16 2:14 5:5
   5:6 15:14 40:9
   57:3,11,18 58:12
   67:7
officer 3:20 15:15
   79:2
okay 3:16 9:21
   12:12 28:15 34:7
   58:20 59:18 66:4
old 41:4 44:19 61:7
   74:17 77:21
on-the-job 49:22
   50:6
Once 39:6
ones 28:12 50:16
   54:3 59:2
ongoing 70:12 77:4
online 29:6 34:14
   77:5,11
open 50:3
openings 29:1,6,8
   29:10,17
opportunities 18:3
   49:8
Opportunity 51:5
opposed 60:10 63:4
opposition 13:13
oranges 44:20
order 15:12 20:16
   21:2,7,12,19 22:2
   22:13,17 61:11
   64:3 80:8
original 12:18 53:18
   61:12
originally 56:7
out-of-pocket 16:17

out-of-state 38:1
outcome 79:11
outcomes 18:15
   51:7
outside 47:22
overall 4:19 16:13
   28:6 37:17 65:20
   67:15
oversight 53:1
owned 66:7
owner 39:13

**P**
P 2:1,1 3:1
p.m 78:17
pack 11:20
packet 17:8
page 9:15 13:3,20
   14:7 15:5 17:15,16
   19:12 23:13 25:12
   27:22 33:7 46:5
   60:11 80:2,5
pages 38:10,11,15
   38:20 58:9,20 59:4
   59:9,14 60:16
paid 66:10
panelist 75:19
paperwork 39:4
   40:13
paragraph 14:8
   19:13
parallel 53:13
parameters 56:17
Parks 43:7
part 10:18,19 12:6
   12:14 15:12 22:12
   51:14 53:3 65:16
   67:21 74:10
participate 8:5
   37:20
particular 8:13 9:20
   11:13 17:21 18:11
   19:2 33:1 50:7
   51:9 54:4 60:5
   61:21 67:17 68:2
   70:7,8,11 71:15
   72:6
particularly 18:15

19:19 38:13 47:13
   49:4 53:10 59:17
   65:16 76:20
particulars 22:16
   61:16,18
parties 79:10
pass 16:7 18:19
path 12:16
patience 55:3
PAUL 2:3
paul.kiernan@hk...
   2:9
pausing 36:2
paying 48:13,14,18
penalties 74:14,15
   76:9,12,18 77:21
   78:1,10
penalty 76:14
pending 15:11
people 26:10 32:20
   32:22 33:9 35:15
   35:18 36:15,17,20
   36:21 37:19 52:1
   59:21 69:16
Pepco 67:2 68:3
percent 12:10 30:16
   30:17 31:9,14,17
   31:20 32:1,1 36:3
percentage 30:16
   44:17 45:7,14
   68:17 69:1,1 71:8
percentages 42:21
performance 53:1
performed 24:1
period 28:2 30:8
   59:9 60:18 64:1
   78:1
person 6:22 23:14
   33:15 55:12 72:8
personal 48:6
personally 12:8
personnel 4:6
perspective 71:21
   74:7
phases 67:14
phrase 37:4
physical 4:5

Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

[ 87 ]

**piece** 16:18 52:16
**place** 20:5 23:22
  54:14
**plaintiffs** 1:7 2:2 3:5
  3:8
**planning's** 40:9
**please** 3:11 11:14
  15:5 23:3 26:20
  34:3 44:15 47:10
  57:22
**point** 3:10 6:19 7:3
  14:1 19:2,8 23:18
  32:4 52:11 57:17
  64:10
**policy** 5:6 20:13
**pool** 70:13,16
**pools** 70:22
**portal** 34:14 35:1
  52:1
**portion** 53:11
**position** 3:18 4:1,17
  5:10 66:2
**positions** 4:13 5:2
**positively** 47:5
**possession** 11:1
**possibly** 36:18,19
**post** 29:5,8
**posting** 72:17
**postings** 29:4
**potential** 17:20
  46:11 48:21 62:14
**poverty** 48:3
**practice** 22:8 59:10
**Practices** 59:13
**pre-apprenticeship**
  49:6 53:15,17 54:5
  54:11
**pre-meetings** 71:11
  71:19
**precursor** 21:8 22:2
**predevelopment**
  40:7
**preferable** 26:9
**preferences** 10:3
**preliminary** 25:3,8
**prep** 7:11
**preparation** 55:10

**prepare** 10:12 11:4
  17:17,18
**prepared** 10:4 12:10
  38:19 47:4 60:17
  60:22 61:1
**prepares** 27:17
**preparing** 12:9
  16:12 45:21
**present** 24:13 37:1
**presentation** 14:22
**presentations** 75:20
**presented** 14:17
  34:18
**previous** 73:11
**principal** 6:22
**prior** 7:19 10:14
  17:19 31:1 46:13
**private** 49:19
**proactive** 76:22
**Probably** 8:17
**problem** 70:5
**procedural** 7:9
**proceedings** 79:3,5
  79:6
**process** 7:2 12:6,15
  12:17 13:2 17:19
  39:3 41:8 43:13
  53:4 55:21,22 62:7
  68:19 77:1
**procurement** 4:5
**produced** 10:21
  62:4
**production** 27:6,7
  58:6 60:12 80:10
  80:14
**program** 5:20 27:18
  27:19 38:22 46:6
  49:14,14 50:1 54:5
  54:8,11 55:13,17
  57:7,8 60:9 61:5
  61:22 63:19,20
  64:3,9,17 65:15,21
  70:18 71:17 72:5
**programs** 5:18,22
  19:6,10,17 36:10
  46:21 48:20,22
  49:6,12,22 50:10

50:22 51:10 52:3
  53:5,13,15,17,22
  54:13,18 59:1,16
  59:19 64:8,14,19
  64:20 70:21 73:1
**progress** 62:1
**prohibited** 47:19
**project** 28:21 30:5,7
  39:16,21,21 40:8
  43:7 49:13 56:7,15
  63:2 65:16 66:5,10
  66:20 67:1,5,15,17
  68:2,5,19
**projects** 14:10 26:6
  26:17 28:8 32:13
  32:19 38:13,16
  39:8,9,12 40:5,13
  41:7,12 42:1,9,10
  42:13,15 43:2,10
  43:12,17 45:9,12
  53:12 56:2 57:10
  60:6,10 61:2 64:21
  65:2 67:9,11,13,20
  68:4,8 70:11 72:6
  80:13
**proposed** 12:16
  16:10,13 17:11
**pros** 15:2
**provide** 40:3 47:7
**provides** 17:9,22
**providing** 71:14
**Public** 1:18 62:21
  79:1,19
**pulled** 33:3 51:16,18
  54:6
**pulling** 41:16
**purely** 32:10
**purposes** 37:17
  77:19
**pursuant** 56:21
**purview** 5:19
**put** 5:18 14:18 15:2
  17:8 20:4 23:8,21
  35:11 39:4,6 75:10
  76:7

**Q**

**qualitative** 52:2

**question** 3:11 41:10
  51:19
**questions** 3:10
  78:14
**quickly** 66:14
**quite** 68:5

**R**

**R** 2:1 3:1
**ran** 54:3,5
**range** 50:10
**rate** 17:21
**rates** 10:1 19:14
  48:3
**rationale** 8:6 17:13
**raw** 32:15 33:2
  51:17,22 52:5
**reached** 71:8
**reaching** 45:10
**read** 25:15 66:14,15
**readiness** 50:19,22
  52:3 53:5,22 54:12
  54:13,17
**reading** 13:19
**ready** 49:7
**really** 22:15 30:4
  33:8 43:13 47:2
  55:21 57:8 70:8
  77:15
**reason** 23:1 24:17
  27:4,7 60:21 76:17
**recall** 8:9 14:12,15
  39:2 46:9 57:15,16
**recalling** 54:7
**received** 40:5
**recess** 55:1
**recognize** 27:9
  38:11 41:22 42:7
**recognized** 35:5
**recollection** 20:2
**record** 9:8 51:18
  54:21,22 58:5
  77:21 79:5
**reduced** 79:7
**Reed** 43:7,14
**reference** 23:18
  24:11 59:22 69:4
**referenced** 61:17

**references** 18:13
**referencing** 68:5
**referred** 22:1 41:11
**refers** 61:10,14 66:4
**reflect** 13:5 40:13
  66:17
**reflected** 59:14
**reflects** 18:18
**regarding** 9:15,22
  11:8 15:11 32:5
  42:21 56:16 75:1
  75:15
**regardless** 36:11
**regionally** 56:2
**register** 34:10 35:15
  35:19,21 36:5,21
  37:5,6,12,15,18
  38:3,6
**registered** 63:18,20
  64:3,4
**regular** 12:14
**relate** 38:15 64:21
**related** 7:16 8:1
  11:1 12:21 13:1
  17:3 65:1 79:9
**relates** 21:7
**relationship** 62:18
  64:16
**rely** 40:2
**remain** 39:17
**remedy** 67:16 68:6
  68:21 69:1,9
**remember** 13:16
  38:21 40:17 61:16
  61:18 62:19 68:4
**remembering** 22:6
**renew** 64:8
**repair** 42:17
**repeat** 67:19
**rephrase** 44:13
**report** 12:6,9 13:4,5
  14:18,19 17:8
  18:12 19:21 28:2
  33:1,6,8,11,16,19
  34:4,7 35:5,17
  37:4 46:8 51:7,9
  52:11,16 77:7,9

80:7
**REPORTER** 79:1
**reporting** 51:11
63:7,10 72:11 77:5
**reports** 27:9,13,14
27:17 28:11 30:22
31:5 32:5,14,15
35:11 51:13 52:17
63:4 80:12
**represent** 3:8 45:4
**represented** 14:17
**represents** 12:13
**request** 23:10 41:9
80:10
**requested** 72:9
**required** 12:6,22
20:10 27:15 29:15
53:12 63:14 69:1
**requirement** 15:12
45:11 63:8,21
**requirements** 28:9
38:15,18 44:7
56:12 61:5 62:2,6
64:18 66:19 68:17
68:17 74:15 75:8
77:18
**requires** 35:14
**rescinded** 21:13
**research** 7:8 46:20
59:2
**reside** 59:21 69:17
**residency** 36:8,11
**resident** 25:19 34:1
35:22 37:13,16
47:1
**residential** 10:2
**residents** 9:3 14:10
17:22 18:4,7 19:4
25:5 26:6,10,12,16
26:16 30:2,12
31:11 32:12 34:10
34:14,17 36:16
37:3,16,20,21 38:2
46:18 47:5,11,18
48:6,9,13 49:7,13
49:14 50:3 60:6
68:1,9,11 69:21

71:9,13 72:21 75:2
75:10
**resolution** 78:7
**response** 25:14 41:9
**responses** 23:9
25:13 45:17
**responsibilities** 5:13
**responsibility** 61:22
**responsible** 16:12
**result** 29:2,11 30:1
**resulted** 33:22
**retain** 26:12,13,15
**retained** 32:21
33:11
**retaining** 48:17
**revenue** 17:5 47:21
**Review** 59:10,13
**reviewed** 23:11
**revisit** 22:4
**right** 9:6 13:17
16:18 19:22 23:15
24:8 30:3,4,13,17
32:1 33:10 36:16
41:13 42:5,13
56:20 61:8,12
66:20 67:5 69:11
69:13 75:16,21
76:14
**RISHER** 2:13
**river** 48:4
**Rochelle** 13:22
**role** 5:21 6:21 10:14
10:15 12:9 72:8
**roll** 77:6
**room** 32:7
**roughly** 5:7,16
20:12
**routine** 51:11
**Rule** 47:20
**run** 46:11,12 49:1
49:21 50:11
**runs** 70:4

———————— S ————————
**S** 1:18 2:1 3:1 79:2
80:1
**S-O-M-E** 56:5,6
**safety** 19:16

**SAINDON** 2:12
17:15 44:9 46:1
52:19 55:7 56:4
78:15
**satisfied** 73:21
**saw** 59:17 75:18
**saying** 13:10 15:15
35:1 38:1 58:7
62:5 72:15 78:9
**says** 46:5
**scale** 45:9 48:17
**scheduling** 7:10,10
**school** 8:1 42:9,13
42:15
**Schools** 62:22
**seal** 79:13
**searchable** 37:15
**second** 13:20 19:13
22:21 31:13,19
**section** 17:14 19:1
33:2 35:14
**see** 14:2,16 15:7
19:10 31:5,5 41:14
**seeing** 19:1 46:9
69:4
**seeking** 34:15,18
72:22
**seen** 58:22 60:13,20
61:17
**self-report** 70:1
**semiannual** 27:13
27:14 80:12
**senior** 4:4,7
**sense** 64:11
**separate** 34:20
54:18 57:18
**September** 59:6
**series** 27:4
**seriously** 75:8
**service** 36:11
**serviced** 70:21
**services** 4:10 5:20
17:21 19:16 21:11
37:2 47:8 50:18
56:17 71:12 74:8
**set** 23:8 79:12 80:9
**setting** 42:19

**settled** 47:21
**seven** 9:18
**shared** 10:19 29:13
**sheet** 60:17 61:2
**shoots** 51:16
**short** 55:2 69:6
**shortage** 67:4
**shortcomings** 68:7
**shorthand** 61:4 79:1
**show** 21:1 65:9
**side** 32:4
**sign** 63:14
**signature** 78:16
**signed** 10:18 21:3
71:2
**signify** 34:11
**signing** 40:16
**similar** 46:21 50:1
60:5
**Similarly** 49:21
**simple** 71:13
**simply** 51:22
**single** 63:22
**sit** 70:14
**sit-down** 69:7
**sitting** 32:3
**situation** 68:21 69:9
**six-page** 13:22
**skill** 49:20 50:8
**skilled** 33:16 66:19
67:4 69:12,17 70:5
71:4
**skills** 49:15,17 50:13
**skipped** 9:21
**Skyland** 43:6,13
**soccer** 44:2
**Sody** 65:11,11 66:18
**soft** 49:15 50:13
**somebody** 16:15
20:2 21:16
**somewhat** 44:20
**soon** 77:7
**sorry** 12:20 34:5
36:9,12,13
**sort** 11:4 19:21 25:8
48:19 52:1 62:10
71:19 72:2

**sorts** 71:20
**sought** 42:21
**source** 3:8 5:16 6:7
6:12 8:5,7,12,18
9:1 10:2,8 11:8,13
12:7 17:12 21:7
22:3,9 25:5,21
27:14,18 28:5,8,12
28:16 29:2,5,11,15
30:1,6 31:10 32:6
34:10 35:15,19,21
37:5,6,12,18,21
38:2,6,14,22 42:2
42:20 46:6,16
47:19 49:10 53:11
53:12,18 54:19
55:13 56:3,10,11
56:18 57:4,13,18
58:10,11,12,18
59:10,13 61:3,12
61:19 63:14 64:17
64:19,22 65:2
67:19 70:18 71:1
75:15,20 76:2,10
77:19
**South** 2:18
**speaking** 42:16
**specific** 69:21
**specifically** 14:15
25:14 46:15 71:15
**split** 70:17
**spreadsheet** 41:11
41:14 42:5,6
**spreadsheets** 45:19
45:20
**spring** 24:11
**Square** 2:16
**stadium** 44:2
**staff** 6:22 7:6 8:20
27:18,19 38:22
57:8 70:2
**staffer** 7:3
**stage** 16:15
**stamp** 59:5
**stamped** 13:21
58:21
**stamps** 19:15

Associated Builders and Contractors, Inc., et al. v. DC                     10/24/2016

---

**standard** 44:21
68:10 69:7
**standards** 39:11,18
71:10
**stapled** 27:3
**started** 8:18 39:15
40:5 44:1 54:8
70:19
**starting** 44:2,3
**starts** 27:6 71:11
**statement** 12:20
13:22 14:8,8 15:6
15:11 16:2 19:2
**states** 1:1 25:16
**statute** 37:9,12 51:3
56:22
**stayed** 33:10 73:15
**stenographically**
79:7
**steps** 25:3,8
**Steve** 65:11
**Stop** 36:4 38:5 51:15
**strategies** 48:5
**Street** 1:17 2:5,17
**strike** 74:6
**studies** 47:3
**study** 24:7 25:4,9
**sub** 62:17 71:7
**sub-subcontractors**
63:14
**subcontractor** 62:15
**subcontractors**
28:18 63:13
**subject** 8:11,11 29:5
30:5 42:1 56:11
61:3 63:12 64:21
67:19
**subjective** 73:12
**subjects** 9:16
**submission** 14:16
**submitted** 27:15
31:6
**subs** 67:20 76:22
**subsidized** 49:12
**substantial** 43:15
**sufficient** 15:15,18
78:6

**suggest** 78:9
**suit** 24:10
**Suite** 1:17 2:6,18
**summary** 12:21
19:21
**supervision** 67:8
79:8
**supervisor** 65:20,21
**supplanted** 51:3
**supply** 56:16
**support** 14:5 56:16
**supported** 19:17
**supposed** 29:19
**sure** 5:3 6:18 8:17
9:2 19:4 22:5 26:5
36:3 44:16 45:20
47:13 49:4 58:15
58:16 61:1 68:5
69:19 71:10
**sworn** 3:3
**system** 36:3,4,5,22
37:17 50:12 51:15
51:16,18 77:5,12
77:13,15

---
**T**
---

**T** 80:1,1
**take** 17:6 25:14
27:22 46:6 47:9
49:7 50:1 73:1
**take-away** 32:5,7
**taken** 1:15 25:2 38:7
55:1 75:7 79:3,6
**talk** 11:3 43:13 55:9
69:8
**talked** 50:13 59:20
**talking** 11:2 44:22
59:18
**talks** 35:14
**Tammy** 1:18 79:2
**TANF** 19:15
**target** 62:11 71:14
**tax** 19:5,9 46:12
47:6,12,18,21
48:11 59:20
**taxes** 17:3 48:13,14
**tell** 3:11 5:1 10:11
12:12 15:9 33:16

38:10
**template** 38:22
**tend** 64:20
**term** 37:6
**terms** 14:22
**test** 39:22
**testified** 3:3 13:7,13
14:5
**testify** 10:4
**testifying** 14:12
19:21
**testimony** 11:5
12:21 14:22
**thank** 38:9 52:21
55:3 57:2 66:4
**thing** 49:17 51:11
58:11
**things** 11:1 40:7
67:9 71:20 72:16
77:3
**think** 16:7 17:1 22:7
41:10 50:16 52:5
54:4 57:20 58:12
59:8 60:18 75:18
77:3
**thinking** 8:15 51:8
**Third** 29:22
**thought** 45:9 47:9
55:4,8
**threat** 78:6
**threatened** 78:3
**three** 4:18 58:8
**time** 4:12 5:5,17
8:16 10:17 13:17
15:9 16:1,11,21
18:5 19:14,19 20:7
21:15 22:15 30:8
30:10,21 33:22
35:4,17 43:15 45:7
46:13 48:2 53:21
59:5,9 60:18 65:13
69:20
**timeline** 67:13
**title** 6:1
**titled** 52:11
**today** 3:10 9:4,15
10:4,9,13 11:5

54:15 73:21
**top** 20:18 58:19 59:5
**topics** 9:6
**total** 28:4 29:22
34:16 35:16,17
**town** 43:3,4
**track** 25:18 61:22
62:11 70:13
**tracked** 39:18
**tracking** 39:1
**tracks** 72:2 77:16,17
**trade** 64:15 70:8
**trade-offs** 56:19
**trades** 49:9 64:11
70:6
**traditional** 44:21
**training** 48:20 49:2
49:16,18,22 50:6
50:14,14
**transcript** 2:22 9:12
11:17 20:21 23:6
27:1 41:20 58:3
65:7 79:4 80:17
**translate** 19:5
**tried** 14:20
**trigger** 38:18 45:6
**triggered** 28:8
**triggers** 63:16
**true** 79:5
**try** 14:19 16:2 46:22
49:1 68:21 71:11
**trying** 18:17 35:11
50:4,15 51:20 75:1
**turn** 9:15 13:20 14:7
15:5 23:13 25:12
34:3 36:8 38:9
45:16 46:4 60:11
**two** 38:10,11,14,19
43:6 54:9 59:9,14
60:15 64:22
**two-thirds** 47:16
**type** 33:14 40:16
67:9
**types** 45:2
**typewriting** 79:8

---
**U**
---

**ultimately** 73:7,8

**uncommon** 69:5
**understand** 3:11
4:19 9:4,16 24:5
56:14
**understanding** 9:17
21:6 37:10,11
59:11 77:6
**undertaken** 50:20
**underway** 39:16
**Underwood** 65:11
65:14
**unemployed** 34:9,14
34:16 35:18 36:15
48:16
**unemployment**
17:21 19:14 25:5,9
48:3 54:1
**uniformly** 39:7
**union** 64:15
**unions** 64:15
**unit** 5:20 57:14
58:13
**UNITED** 1:1
**units** 64:22
**universe** 34:16
**unrealistic** 13:10
**upcoming** 68:1
**use** 19:15 20:14

---
**V**
---

**value** 45:8
**various** 6:19 22:17
44:17 50:3
**vary** 47:21
**vast** 42:12,12
**verified** 23:14
**verify** 70:3
**version** 12:18,19
73:11
**versus** 18:7 40:14
41:4
**view** 40:22
**Virginia** 26:17
**Virtual** 36:4 38:4
51:14
**virtually** 55:22
**VOS** 36:4
**voted** 12:19

Case 1:12-cv-00853-EGS   Document 73-4   Filed 04/29/20   Page 31 of 199
Hubbard
Associated Builders and Contractors, Inc., et al. v. DC                    10/24/2016

[90]

**vs-** 1:8

## W

**wage** 70:10
**wages** 48:9
**waived** 78:16
**waiver** 68:13,15
  69:3 72:9 73:6
  74:1
**Waiver's** 68:15
**walk** 28:1 52:13
**Walter** 43:7,14
**want** 41:14 44:13
  45:19 66:13
**wanted** 47:1 55:6
**Ward** 54:6
**wards** 48:4
**warrant** 73:6,22
  74:1
**Washington** 1:4,17
  2:7,19 13:6
**wasn't** 46:8 51:20
**Water** 44:3
**Watts** 11:10 55:10
  55:12,16
**way** 28:10 37:14
  41:1 55:22 61:14
  67:3 68:6,9 75:6
  77:7
**ways** 25:22 75:9
**we're** 68:22
**Webb** 14:1,4,9,12
**website** 29:6
**went** 5:8 6:18 21:17
  23:18 31:10 39:10
  40:19 47:6
**weren't** 65:12
**WHEREOF** 79:12
**Whichever** 63:11
**wind** 38:2,4
**window** 28:13
**WIOA** 51:4
**wise** 55:21 70:14
**witness** 9:5,18 10:9
  10:12 17:16 44:11
  55:8 56:6 79:12
**Woodridge** 66:5
**word** 74:4

**words** 28:17 32:18
**work** 6:16 7:6,19
  26:6 34:17 35:2
  45:2 46:17 47:2,14
  49:13,18 56:22
  61:14 64:22 66:9
  69:11,22 71:11
  75:12
**worked** 4:20 38:18
  75:8
**worker** 70:5
**workers** 45:3,4
  64:10 69:12 70:13
  70:22
**workforce** 7:15,21
  20:8,9,13,15 36:22
  46:17 48:21 49:3
  50:12,19,21 51:2,3
  51:4,5 52:3,6 53:5
  53:21 54:12,13,17
**working** 7:14 8:3,20
  14:14 18:8 19:4
  21:10 29:15 31:4
  32:6,6,12 47:5
  55:22 58:18 60:6
  69:4 72:7
**worth** 38:16
**wouldn't** 53:16
**written** 13:22 14:16
**wrote** 14:9

## X

## Y

**year** 4:2 5:17,18
  8:19 25:2 53:3
**years** 4:18 39:15
  53:15,19 59:16
  75:7,11 76:5 78:4

## Z

## 0

**018** 17:17

## 1

**1** 9:20 28:3 33:7
  41:10 48:5

**1,301** 28:16 30:9
**10** 57:21 58:1,21
  71:16 80:14
**10:00** 1:16
**100** 12:10 36:2
**11** 59:10 65:4,5,10
  68:12 76:14 80:7
  80:15
**1100** 1:17 2:6
**12** 13:3 58:22 59:10
**12-CV-00853** 1:8
**12-month** 64:1
**12:03** 78:17
**13** 60:11
**14** 60:16 80:15
**14th** 65:10
**15** 60:16
**16,265** 34:19,20
  35:16 36:15
**17th** 1:17 2:5
**1983** 21:3

## 2

**2** 9:15,21,22 17:16
**2,077** 30:12,17
**20** 80:8
**20001** 2:19
**20006** 2:7
**2005** 4:21 5:3 8:19
**2006** 61:15
**2007** 5:7
**2008** 58:9,11 59:6,8
  59:11,12 60:18
**2009** 28:3,3 31:4,8,9
  31:13 32:4 33:7,7
**2010** 31:5,16,19
  32:4
**2011** 6:13 16:11
  31:22
**2012** 23:19 24:12
**2013** 5:8,9,15 24:6
**2014** 25:1 34:4,5
  36:14,15
**2015** 6:3
**2016** 1:15 65:10
  79:14 80:15
**202** 2:8,20
**23** 80:11

**24** 1:15
**26** 80:12

## 3

**3** 9:20 19:12 80:3
**30** 28:3 31:17 33:7
**31** 27:6 30:16,17
  31:9
**31st** 79:13
**34** 31:14
**36** 32:1

## 4

**4** 9:10,20 80:6
**41** 80:13
**44** 32:1
**441** 2:17
**46** 31:20
**4th** 2:17

## 5

**5** 9:20 11:14,15,19
  18:13 38:16 80:7
**57** 80:14

## 6

**6** 9:20 20:19 21:1
  80:8
**6,693** 30:11
**600** 2:18
**65** 80:15
**66** 30:17
**663-7276** 2:8

## 7

**7** 10:7 22:22 23:2,4
  23:8 25:12,13
  41:10 45:16 80:9
**7/31/2017** 79:16
**724-6643** 2:20

## 8

**8** 23:13 26:20,21
  27:3 34:4 38:10
  52:19,21 54:6
  80:12
**800** 1:17 2:5
**83-265** 20:17 21:2

22:2 80:8

## 9

**9** 21:2 41:17,18 80:6
  80:13
**9(b)** 25:14

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

METROPOLITAN WASHINGTON CHAPTER,   )
ASSOCIATED BUILDERS AND   )
CONTRACTORS, INC., et al.,   )
  )
               Plaintiffs   )      No. 12-CV-00853 (EGS)
  v.   )
  )
DISTRICT OF COLUMBIA,   )
  )
               Defendant.   )
  )

### NOTICE OF DEPOSITIONS OF THE DISTRICT OF COLUMBIA AMD DR. FITZROY LEE

Pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiffs will take the deposition of Defendant the District of Columbia (the "District") at the offices of Plaintiffs' counsel specified below, on October 24, 2016, beginning at 10:00 A.M. (or at another mutually-agreed upon date and time), continuing until completed, including adjournments to such times and places as may be required.

Pursuant to Fed. R. Civ. P. 30, Plaintiffs will take the deposition of Dr. Fitzroy Lee at the offices of Plaintiffs' counsel specified below, on October 26, 2016, beginning at 10:00 A.M. (or at another mutually-agreed upon date and time), continuing until completed, including adjournments to such times and places as may be required. Dr. Lee will be examined regarding the matters that he has considered as a witness for the District, including his opinions and the basis for them, and the disclosure made by the District regarding his opinions.

The depositions will occur before an officer or other person duly authorized to administer oaths, and will be recorded by audio and stenographic means.

In accordance with Rule 30(b)(6), the District is required to designate and fully prepare one or more officers, directors, managing agents or other persons with the most knowledge concerning the following designated matters, or other persons who consent to testify on their behalf, and whom the



DEPOSITION
EXHIBIT
#4
10/24/16
PENGAD 800-631-6989

District will fully prepare to testify regarding the following designated matters and such information that is known or reasonably available to the District:

## SUBJECTS OF DEPOSITION

1. The discovery responses provided by the District.

2. Employment rates in the District from 2012-2016 and the effect of the Amended First Source Act's residential hiring preferences on those rates.

3. The District's application of the Amended First Source Act to construction and development projects from January 2012 to the present.

4. Any waivers of the requirements of the Amended First Source Act.

5. The District's consideration of alternatives to the Amended First Source Act to address issues arising from District's inability to levy a commuter tax (both before and after the enactment of the Amended First Source Act).

6. Any penalties imposed by the District for noncompliance with the requirements of the Amended First Source Act.

7. The financial impact of the Amended First Source Act.

Dated: October 14, 2016                     Respectfully submitted,

                                            /s/ Paul J. Kiernan
                                            Paul J. Kiernan (Bar #385627)
                                            Christine N. Walz (Bar # 996643)
                                            HOLLAND & KNIGHT, LLP
                                            800 17th Street, N.W., Suite 1100
                                            Washington, D.C. 20006
                                            (202) 663-7276 (phone)
                                            (202) 955-5564 (facsimile)
                                            Paul.Kiernan@hklaw.com (email)
                                            Christine.Walz@hklaw.com(email)

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2016, I served the foregoing Notice of Deposition vie electronic mail and first-class mail on:

Chad Wayne Copeland
Andrew J. Saindon
Conrad Risher
D.C. OFFICE OF ATTORNEY GENERAL
441 4th Street, NW
Sixth Floor South
Washington, DC 20001-2714
(202) 724-6643
Fax: (202) 730-1470
Email: chad.copeland@dc.gov
Email: andy.saindon@dc.gov
Email: conrad.risher@dc.gov


/s/ Christine N. Walz
Christine N. Walz

3

COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON HOUSING AND WORKFORCE DEVELOPMENT
**COMMITTEE REPORT**
1350 Pennsylvania Avenue, N.W., Washington, D.C. 20004

| | |
|---|---|
| **To:** | All Councilmembers |
| **From:** | Michael Brown, Chair, Committee on Housing and Workforce Development |
| **Date:** | October 14, 2011 |
| **Subject:** | B19-50, the "Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011" |

The Committee on Housing and Workforce Development reports favorably on B19-50 and recommends its adoption by the Council of the District of Columbia.

|  | SUMMARY OF CONTENTS | PAGE |
|---|---|---|
| I. | Purpose and Effect | 1 |
| II. | Committee Rationale | 2 |
| III. | Legislative History | 9 |
| III. | Summary of Testimony | 10 |
| IV. | Fiscal Impact | 14 |
| V. | Section-by-Section Analysis | 15 |
| VI. | Impact on Existing Law | 15 |
| VII. | Committee Action | 15 |
| VIII. | Attachments | 16 |

**I.    Purpose and Effect**

On January 18, 2011, B19-50, was introduced as the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011" by Councilmembers Michael Brown, Thomas and Chairman Kwame Brown. The bill was cosponsored by Councilmembers Alexander, Biddle, Barry, Cheh, Graham and Mendelson. A public hearing was held on the bill on March 14, 2011. On October 14, 2011, the Committee on Housing and Workforce Development met to consider and markup B19-50 and changed the name of the bill to the "Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011", to better reflect the purpose of the revised legislation.

The purpose of B19-50, the "Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011", is to amend the First Source Employment Agreement Act of 1984 to clarify and add definitions, to require that the Department of Employment Services (DOES) receive advance notice prior to any new First Source project moving forward, to



DEPOSITION
EXHIBIT
5
10/24/16

**ABC016**

increase the base subsidy level that triggers First Source agreements to $300,000 and to require that each construction project receiving government assistance totaling $5 million or more adhere to enhanced First Source hiring requirements. The legislation also updates reporting requirements associated with First Source projects and requires the Department of Employment Services to issue new hiring and reporting requirements for non-construction projects that receive government assistance of $5 million or more.

The new First Source program parameters will also allow beneficiaries to double-count hours worked by District residents who are hard to employ, clarify the duration of time beneficiaries are subject to First Source requirements, and allow beneficiaries to count hours that exceeded past hiring requirements towards their current requirements. In addition, beneficiaries with projects receiving government assistance totaling $5 million or more will be required to submit employment plans that identify specific details regarding associated jobs and strategies to meet their hiring requirements. The legislation will require the Mayor to review and report to the Council the appropriateness of the hiring and reporting requirements at least every 3 years.

The Department of Employment Services will gain the authority to consider altering the ratio of Journey Worker to Apprentice positions based on a compelling District resident hiring rationale. New requirements will replace the current standard by calling for specific documentation evidencing a good faith effort to comply with First Source agreements prior to obtaining a waiver from a First Source employment agreement. The legislation also includes additional pro-rated fines for failing to reach specific hiring requirements and a mandate to provide online public access to executed First Source employment agreements and the current compliance status of each project.

The final major provision of the bill establishes a workforce intermediary program. This entity shall act as an intermediary between employers and training providers to provide employers with qualified job applicants. In addition, the legislation establishes a workforce trust fund in which contributions and monetary fines for breach of First Source employment agreements shall be deposited for the purposes of establishing and operating a workforce intermediary program in the District.

## II.    Committee Rationale

### Background

The Committee on Housing and Workforce Development has been studying issues related the reform of the District's First Source law for over a year. This effort includes consideration of amendatory First Source legislation which was the subject of robust discussion and a Committee hearing during Council Period 18. This legislation ultimately died at the end of Council Period 18 but it set the stage for serious discussion on the subject among stakeholders. During the same time period, the Committee also devoted a considerable amount of time producing the Special Report on the State on the District's Workforce Programs (Special Report). The Special Report, which was the subject of a Committee roundtable, devoted an extensive section to the discussion of First Source. Research, witness testimony, and stakeholder feedback to initial versions of the Special Report, helped inform the First Source discussion

ABC017

therein. The Special Report was ultimately adopted by the Committee and thereafter it was well received by the full Council, the incoming Mayoral administration, the new leadership at the Department of Employment Services, regional US Department of Labor representatives, and the relevant stakeholder community. These activities led to the dissemination of a more accurate accounting of the workings of the current first source system and stimulated many recommendations for reforms.

Focusing on compliance within the District's First Source law has become the accepted short hand to refer to finding ways to get residents hired. While First Source cannot solve all the deficiencies related to the lack of job opportunities available for District residents, the concept is key because it governs contractual relationships where the District Government is in a strong negotiating position. Recognizing this and considering the annual volume of contracting, the District must use this leverage to focus on maximizing job opportunities whenever public funding is used.

High levels of unemployment have persisted citywide for multiple years now, the rate has experienced large fluctuations and as of August 2011 was 11.1% as reported by the US Department of Labor. In some Wards of the city the unemployment rate is estimated to be over 30%. Sustained high levels of unemployment typically lead to severe financial hardships for those affected. In the District over the last several years the Food Stamp program has increased by 54%, which is an increase of almost 25,000 households; the TANF caseload has increased by 18%, which is an increase of 2,652 households; the combined Medicaid and Healthcare Alliance caseload increased by 16%, which is an increase of 31,689 individuals; the number of homeless residents accessing services from our continuum of care has increased by 20%, which is an increase of 1,042 individuals; and the number of residents living in deep poverty (incomes less than half of the federal poverty rate or $11,000 a year for a family of 4) has increased by 37%, which is an increase of 14,000 residents.

Labor market data shows that there are over 700,000 jobs in the District and yet approximately 72% of those jobs are held by people living outside of the city's borders. The District's Congressionally-imposed ban on taxing any of the income that leaves the city means that the District is subsidizing surrounding jurisdictions to the tune of $1 billion to $2 billion a year in lost revenue. The District's sustained rate of high unemployment, the sharp increase in the demand for social services, and the inability to tax income at the source, puts the city in a unique situation that makes local hiring critical to the overarching health of the jurisdiction.

Conceptually, the prevailing attitude related to the use of District funding and other incentives is a united voice calling for the companies and organizations receiving these benefits to hire District residents. Practically, the current First Source law is limited in scope because the 51% District-resident requirement for entities under First Source agreements only applies to new hires. In addition, enforcement and applying proscribed penalties is nearly impossible because showing evidence of noncompliance with the statute's "best efforts" to meet the 51% new hire requirement is a very low legal standard. As currently written, our First Source law is essentially a goal that the city encourages our District contractors to reach.

The DC Auditor's 2010 Review of Compliance With the Living Wage Act and First Source Act Requirements Pursuant to the Compliance Unit Establishment Act of 2008 provides an excellent snapshot of the shortcomings of our First Source program, by reviewing a sample of District funded projects. The auditor's report highlights many of the problems that we have been

3

ABC018

aware of related to First Source and also shows that District residents who are lucky enough to get work on government-funded projects are not always getting fair compensation for their work. Of the former Anacostia Waterfront Corporation and National Capitol Revitalization Corporation projects that the auditor reviewed, only 4 of the 16 projects met or exceeded the First Source requirements. Furthermore, according to DOES data, approximately 2/3 of the jobs that were covered by First Source requirements were held by non-District residents.

Much of the time and energy spent discussing First Source tends to revolve solely around development and construction related projects. It goes without saying that publicly funded construction contracts are an integral part of an effective strategy to leverage District expenditures into job opportunities. At the same time the District spends hundreds of millions of dollars on other non-construction goods and services that also need to be considered. As with job training, the District cannot limit itself by only focusing on the construction industry. The scale of the District government itself and its facilities require large contracts for security, cleaning, maintenance and other essential services. District subsidies to new or existing businesses such as tax exemptions for a new hotel also speak to the scope of leveraging jobs with government expenditures. The reality is that not everyone is equipped or wants to hold employment in the construction sector. This fact speaks to the need to ensure that First Source is used to maximize job opportunities in all areas where the District expends funds with outside vendors or subsidizes private sector business development.

<u>Proposed Changes and Committee Reasoning</u>

The policy considerations and rational for the proposed changes outlined above are as follows:

1. Increases the base-subsidy level that triggers First Source agreements from $100,000 to $300,000. Setting a higher floor will serve to focus administrative monitoring on projects that will have larger job benefits. DOES officials and other stakeholders agree that more often than not, lower dollar value project are self-performed and do not lead to additional hiring. The new threshold will reduce the administrative burden on DOES and entities that receive smaller subsidies, allowing the program to focus on and capture projects that have the potential to create substantial job opportunities for District residents.

2. Requires each construction project receiving government assistance totaling $5 million or more to adhere to enhanced First Source hiring requirements based on successful construction projects such as the baseball stadium and the convention center hotel. The actual hiring percentages achieved on the construction of Nationals Park, informed the proposed thresholds contained in the legislation. The measure used on the project departed from the new hire standard and captured the percentage of hours worked by District residents in identified categories. The project yielded 69% of hours worked by District resident apprentices and 26% of hours worked by District resident journey workers.

4

ABC019

Following the successful District hiring initiative achieved on the stadium, the Council passed an amendment to the New Convention Center Hotel Amendment Act of 2009, which mandated that District residents work at least 60% of the total common labor, skilled laborer and apprentice hours and 25% of the total journey workers hours on the Convention Center Hotel project. Hensel Phelps, the general contractor on this project has made meeting these requirements a top priority. While the project is still in progress, the first eight months have yielded many positive lessons and in the estimation of DOES, this has been the single most transparent and collaborative public private partnerships in terms of District resident worker consideration. The company's close monitoring of its subcontractors, innovative outreach, and willingness to work with the District government has created a roadmap on how to successfully apply the enhanced requirements.

United Planning Organization, Goodwill, and many other job training providers are graduating hundreds of District residents from construction related programs, yet they are only placing approximately 50% of their graduates into jobs. Moreover, prior to the recession, in 2007, there were approximately 13,000 construction jobs in the District compared to the 11,000 construction jobs available today. Clearly, there are many DC residents today without work that are qualified to fill these hiring requirements.

The outcomes and lessons learned from these realities and experiences are the basis for the new bifurcated system. This new approach preserves the 51% new hire requirement on projects receiving government assistance between $300,000 and $5 million and applies the new enhanced category-based hours work standard on projects receiving $5 million or more in government assistance. This new enhanced category-based standard requires that at least 60% of common laborer hours shall be performed by District residents; at least 51% of the skilled laborer hours by trade shall be performed by District residents; at least 60% of apprentice hours by trade shall be performed by District residents; and at least 20% of journey worker hours by trade shall be performed by District residents. It is worth noting that, as introduced, the legislation would have required the application of the new percentage-based hours worked framework on all projects over $300,000. The Committee feels that creating the bifurcated system places the correct emphasis on requiring enhanced hiring requirements on projects with higher amounts of government assistance.

3. Mandates that DOES issue new hiring and reporting requirements by percentage of hours worked for wage earners and by percentage of total workforce for salaried employees for non-construction projects that receive government assistance of $5 million or more. The Committee has consistently heard discussion and agrees that First Source needs to be expanded to include a greater focus on government contracting on projects and services that are not construction related. Like the new approach to construction projects, the legislation creates the corresponding bifurcated system for non-construction projects at the same thresholds of government assistance. DOES will be charged with determining the appropriate hours-worked levels, by industry, through rulemaking. In addition, the

ABC020

bill requires the Mayor to analyze the hiring percentages at-least every 3 years to see if they are still appropriate.

4. Enhances hiring plans by requiring projects with government assistance totaling $5 million or more to submit employment plans that identify specific details regarding associated jobs and strategies to meet their hiring requirements as well as past compliance. For government contracts, initial plans will be required as part of their bid package and scored and used to inform contract awards, thus creating an incentive for businesses who meet or exceed their requirements to apply for more jobs

5. Strengthens monitoring and compliance by updating and streamlining reporting requirements associated with the hiring requirements including mandating the use of certified payrolls. The Committee and stakeholders agree that certified payrolls are the most incontrovertible and appropriate instrument to measure the enhanced First Source requirements on high dollar construction projects. Certified payrolls captured the relevant information on individual employees needed to determine compliance with First Source requirements. Due to the District's unique relationship to the Federal government, submission of certified payrolls are already required under the Davis Bacon Act to determine if proper wages are being paid. Using this method to capture information will spare businesses from incurring additional costs to show First Source compliance while providing the District with a robust tool proscribed by the Federal government.

6. Allows beneficiaries to double-count hours worked by District residents who are hard to employ thereby incentivizing the hiring of ex-offenders, TANF recipients, long-term unemployed, and other hard to employ populations. The legislation contains a provision that stipulates that double-counted hours can make up no more than 15% of the overall hiring requirement.

7. Allows beneficiaries to "roll-over" hours worked on past projects that were covered by First Source as long as those hours can be certified by DOES as above that project's hourly requirements. This provision rewards beneficiaries who exceed the minimum hiring requirements. The provision was adopted by the Committee at the suggestion of members of the business community who felt more incentives should be offered as a part of the First Source program.

8. Requires DOES to consider requests from beneficiaries regarding the Apprentice to Journey Worker ratio when a compelling resident-hiring case can be made. Allowing this consideration on a job by job basis will create a flexible approach when determining the correct ratio of these categories. The Committee feels this is necessary, especially in cases where it is determined that District-resident journey workers are not readily available in the labor pool in a particular trade.

6

ABC021

9. Removes street and alley closings as triggers for First Source in another attempt to focus administrative monitoring on projects that will have tangible hiring benefits. The Committee feels that pursuing a street or an alley closing should not trigger a First Source agreement. This type of action often is needed for projects of varying size, scope, and purpose. Smaller projects that trigger First Source requirements due to the current provision offer little more than administrative burden and larger projects will likely receive other government assistance that will trigger First Source provisions. In most cases, street and alley closings are incidental to the overall project and therefore should not warrant First Source requirements.

10. Improves accountability and clarity by requiring specific documentation evidencing best efforts to comply with First Source requirements prior to obtaining a waiver from a First Source employment agreement. This change was made by the Committee to directly address the issue that the current standard is so broad it reduces the rest of the First Source law nearly to the level of a goal or suggestion rather than a mandate on District resident hiring. Proscribing specific criteria to measure whether a beneficiary used best efforts to comply with the provisions of the statute is necessary to establish readily identifiable situations where penalties may be applied under the program or to grant a waiver of the provisions.

11. Preserves the fine for willful breach of First Source agreements at 5% (was increased to 10% in the introduced version) and includes additional pro-rated fines for not reaching specific hiring requirements. In addition the legislation strengthens enforcement by mandating that repeat violators of First Source agreements may be debarred for a period of 5 years. Over the history of the program, it is the Committee's understanding that the imposition of penalties for noncompliance has never occurred. This is mainly due to the loose best efforts standard that has governed the program to date. Taken as a whole, enhancing the best efforts standard and adding other structural and systemic changes to the existing law, will sharpen the focus of the program. The Committee feels that retaining the current 5% "claw back" provision, the new pro-rated fines based on the number of percentage points a beneficiary is lacking and adding a debarment provision for repeat violators, should deter noncompliance in a more meaningful way than simply keeping the current standard and doubling the percentage of the fine.

12. Enhances support for businesses looking for resident employees and residents looking for employment by establishing a workforce intermediary pilot program that will engage beneficiaries of proposed government-assisted projects to assist in connecting them with potential resident employees. Establishing a workforce intermediary compliments the mandated hiring measures of the First Source program by creating an entity charged with coordinating new and existing training opportunities to match job seekers to businesses and projects with job openings. The workforce intermediary model is successfully being used in other jurisdictions such as San Francisco, Minneapolis, and Boston as a strategic link between workforce development and economic development. The provisions of the bill establishing the intermediary have enjoyed universal support throughout this

7

legislative process and all sides have repeatedly stated that this will be the most innovative addition to the First Source program.

The Committee is pleased with the efforts by the executive to implement recent legislation regarding the establishment of a workforce intermediary in the District of Columbia. It is clear to the Committee that the recommendations that will be provided to the Mayor and Council by the Workforce Intermediary Task Force will provide needed input from all groups interested in the success of an intermediary including business, labor, advocates, as well as the District Government. Bill 19-50 provides for the statutory establishment of the intermediary based upon the recommendations of the task force. The Committee recognizes that the executive retains control over the formation and design of the workforce intermediary and looks forward to working with the executive to ensure the intermediary's success.

13. Establishes a workforce trust fund in which contributions and monetary fines for breach of First Source employment agreements shall be deposited for the purposes of establishing and operating a District of Columbia workforce intermediary program.

The Committee made several other enhancements to the current First Source provisions to support needed changes to the program including a provision that 7 days notice be given to DOES prior to the start of any new project that will be covered by First Source, with the stipulation that no work associated with the relevant government assistance can begin until a First Source Agreement has been approved by the agency. In addition, going forward, the legislation will require online public access to executed First Source employment agreements, the current compliance status of each project, and the contracting or compliance officer's contact information. The bill also requires the Mayor to identify an appeals process for non-contracted projects that receive fines for not meeting their requirements or obtaining a good faith waiver. Further, the bill sets the duration of time beneficiaries are subject to First Source requirements and clarifies that subcontractors are also covered on projects subject to First Source. Lastly, the bill clarifies that First Source Agreements cannot be waived through collective bargaining agreements.

<u>Constitutional and Process Concerns</u>

Some stakeholders have made the assertion that First Source is not permissible under the Privileges and Immunities Clause of the Constitution. In response, the Committee requested a legal opinion from the Council's General Counsel on the subject. The General Counsel's opinion supports the constitutionality of the District's First Source law. The General Counsel's opinion is based in part on a review of case law from other jurisdictions since, as far as the General Counsel is aware, no court has addressed the District's First Source law. Of note, the Wyoming Supreme Court rendered a decision upholding a law similar to the District's First Source law that was challenged on constitutional grounds. Court decisions that disagree with the Wyoming Court often find that the jurisdictions seeking to justify a preference law fail to demonstrate that "nonresidents were a 'peculiar source'... of the unemployment evil the

8

ABC023

residency statute was intended to address". Many other factors have been explored in analyzing these types of statutes, including the unemployment rate in the jurisdiction, the cost of unemployment to the jurisdiction, and the cost differential between providing safety net services for unemployed workers compared to the potential cost savings of hiring nonresidents. The District consistently records the highest unemployment rate in the region and more than 70% of our jobs are filled by nonresidents. This, coupled with city's inability to tax the income of nonresidents, along with several other related negative indicators, supports the argument that the District is in a unique position, and more likely than other jurisdictions, to provide the courts with compelling reason for this type law. (The General Counsel's opinion is included as an attachment to this report)

The Committee has spent considerable time ensuring that the concerns of various stakeholders were addressed. Since January, when the bill was introduced, the Committee has received hours of testimony through the hearing process and hosted over thirty meetings on the legislation. Input and suggested changes have come from various constituencies including the non-profit sector, organized labor, and the business community. Many within the business community, including the DC Chamber of Commerce, the Associated Builders and Contractors of Metro Washington, the Office and Apartment Building Association, and the DC Building Industry Association, met with the Committee for countless hours to help work through dozens of rewrites to the legislation. Similarly, the representatives from the Department of Employment Services, the Office of Contracting and Procurement, the Deputy Mayor for Planning and Economic Development, the Office of the City Administrator, and the Executive Office of the Mayor consistently provided insight and made great contributions toward crafting a balanced and carefully considered bill.

## III.   Legislative History

| | |
|---|---|
| January 18, 2011 | B19-50 introduced by Councilmembers M. Brown, Thomas, and Chairman K. Brown. |
| January 18, 2011 | B19-50 referred to the Committee on Housing and Workforce Development. |
| January 28, 2011 | Notice of Intent to Act on B19-50 published in the *District of Columbia Register*. |
| February 18, 2011 | Notice of Public Hearing published in the *District of Columbia Register*. |
| March 14, 2011 | Public Hearing on B19-50. |
| October 14, 2011 | Committee Mark-up of B19-50. |

9

ABC024

### III.   Summary of Testimony

**Government Witness**

1.   **Dr. Rochelle Webb, Acting Director, Department of Employment Services (DOES)**

Dr. Webb expressed her support for provisions in B19-50 that help to strengthen the enforcement of the District's First Source law.  She stated that employers who receive District funds but intentionally evade the law should not do business with the District.  Additionally, Dr. Webb expressed support for the creation of workforce intermediaries, which the bill provides, however she requested that the Council provide DOES with more time to evaluate the role of such workforce intermediaries before implementing them in the District.

**Public Witnesses**

1.   **Barbara B. Lang, President & CEO of DC Chamber of Commerce**

Barbara Lang focused her testimony on strategies that she believes are the most effective in tackling unemployment and creating jobs in the District.  She stated that the District needs a proper job readiness plan, and cautioned that the District should not rely on First Source Agreements to employ District residents.  She explained that lowering unemployment is best accomplished by promoting industries and helping them during economic downturns.  Lang concludes that the bill was well intended, yet premature until the District has the infrastructure to support this effort.

2.   **Merrick T. Malone, President, District of Columbia Building Association (DCBIA)**

Mr. Malone expressed discontent with the provisions relating to the First Source component of the legislation.  He states that the root cause of the disappointing results of First Source lies not in a shortage of jobs or some employer conspiracy, but in a mis-match of job requirements and the qualifications of First Source referrals.  On the other hand, Mr. Malone was supportive of the establishment of a Workforce Intermediary Task Force; he however urged that the scope and make-up of the task force be expanded so that there is a more comprehensive review of the best practices among other cities.

3.   **Roderic L. Woodson, Chair, DCBIA Legislative/Government Affairs Committee**

Woodson noted that the DCBIA believes that the idea of a workforce intermediary to connect graduates of programs operated by training providers has merit.  However, he states that there are other approaches to the intermediary other than the single entity approach.  With regard to provisions pertaining to the First Source law, Woodson urges The Council to reject the proposals in the current bill.

10

ABC025

4. **Robert H. Braunohler, Past President, DCBIA**

Mr. Braunohler offered DCBIA's support of the workforce intermediary task force, however he testified against the bill for the following reasons. Braunohler states that the underemployment of many District residents is not an issue of job availability. He goes on to state that the District has more than twice as many jobs in the District as the District has residents in the workforce. He explains that the bill takes a punitive approach to solving an underemployment problem and that the District's unemployment problem is caused by a skills mismatch between under-qualified workforce and the jobs that are available.

5. **Stephen White, Council 20 AFSCME**

Mr. White shed light on a pending complaint that the AFSCME plans to file against Aramark for failing to pay its janitorial workers who work for the Convention Center living wages. He stated that he wanted to bring to the Council's attention an, "example of the difficulty of making contractors abide by the District's laws."

6. **Camille Cormier, Director of Local Women in Trades Programs and Policies, Wider Opportunities for Women**

Ms. Cormier stated that the First Source program should be reformed through better accountability and monitoring of First Source contractors, strengthening the language and requirements around what constitutes a "good faith effort" to hire District residents, and that a broad-based workforce intermediary be established with due haste.

7. **Thomas Blanton, Mid-Atlantic Regional Council of Carpenters**

Mr. Blanton expressed his support of the bill and offered a few amendments that, "encourages employers to link up, provides opportunities to receive training, and encourages workforce development and stability that benefits Washington, DC.

8. **Stephen Courtien, Business/Legislative Representative, Washington DC Building Trades Council**

Mr. Courtien urged The Council to include the Construction Career Creation Amendment. The amendment provides a provision that requires potential bidders to submit a plan that explains how they will meet their first source requirement, he states that these plans can then be reviewed before a waiver is granted in order to make a determination that the best effort was given in trying to fulfill the hiring requirements by the contractor.

9. **Martha Ross, Deputy Director, Greater Washington Research at Brookings**

11

ABC026

Ms. Ross explained that First Source should provide value to employers by improving their access to a pool of qualified job candidates who are ready to be hired.  She states that First Source should also provide value to residents by linking them to job opportunities.  Ross states that the creation of a Workforce Intermediary Task Force is an important step to strengthening First Source's ability to meet employer needs and create job opportunities for District residents. She urges The Council to consider appointing several private sector employers to the task force.

12.   **Eric J. Jones, Associate Director of Government Affairs, ABC of Metro Washington**

Mr. Jones explained that the association is concerned with the newly mandated percentages included in the bill.  He stated that the new mandates are unrealistic considering the current business environment and will do little to create long term employment.  Jones, however, noted that the establishment of the District of Columbia Jobs Trust Fund is a great idea; he goes on to say that it is only part of the solution.

13.   **Michael Burlas, Vice President, Miller and Long Construction**

Mr. Burlas noted that Miller and Long strongly supports efforts to hire DC residents, however he states that mandating percentages will not achieve desired results.  Instead, Burlas encourages the District to put more money into life skills and workforce development programs.

14.   **Lawrence M. Prosen, Partner, K & L Gates, LLP**

Mr. Prosen testified that the bill on its may be illegal due to the proposed percentage mandates included in the bill.  Prosen included court cases from other jurisdictions that struck down state and local laws that that infringed on rights guaranteed by the Privileges and Immunities Claus of Article IV.

15.   **Marina Streznewski, Coordinator, DC Jobs Council**

Mrs. Streznewski explained that she applauds the effort to enforce the District's First Source law, but she cautions that First Source alone, even if fully enforced will not in and of itself solve the District's unemployment problem.  On another note, she applauded the inclusion of a workforce intermediary in the legislation and offered a few revisions on that section of the bill.

16.   **Sally Kram, Director of Public & Governmental Affairs, Consortium of Universities**

Ms. Kram testified that the Consortium cannot support the bill as drafted due to restrictions proposed by the bill that mandate DC resident set asides for all contracts greater than $300,000 in value and all construction projects funded by a "city benefit".  She further explains that the Consortium believes that job creation can best be achieved through augmentation of individuals' access to education rather than workplace related mandates.

ABC027

17.     **Walter Smith, Executive Director, DC Appleseed**

Mr. Smith stated that DC Appleseed strongly supports the two main goals of the legislation—improved First Source compliance and the establishment of a workforce intermediary.  He further explained that DC Appleseed believes that both are central to developing a better workforce development system in the District.

18.     **Jason Edwards. ONE DC**

Mr. Edwards focused his testimony on the barriers he has faced as an ex-offender.  He suggested that there be an incentive for employers to hire ex-offenders for construction related jobs.  Finally, he concluded that he hopes the District's First Source law will continue to benefit District residents.

19.     **Bernie Brill, Alliance for Construction Excellence**

Mr. Brill discussed the demands of sheet metal contractors in the District.  In addition, Mr. Brill stated that it is encouraging to hear city leaders discuss an incentive program whereby construction companies hiring D.C. workers would be properly rewarded.  He explains that businesses that actively recruit provide or support local training programs, should receive an advantage when it comes to winning city funded jobs.

20.     **Maria Macintyer, Alliance for Construction Excellence**

Ms. Macintyer testified that ACE member organizations recognize the importance of the District's First Source Agreement program.  However, she notes that despite many outreach and training programs implemented by ACE members, it is still difficult for them to comply with First Source Agreement Requirements.  She goes on to explain that when they find solid candidates, after an apprentice has a few years experience and is earning more money, he or she moves out of the District into surrounding suburbs.

21.     **Fred Codding, Alliance for Construction Excellence**

Mr. Codding highlighted that since 2005 the Joint Labor/Management Training committee for Local 5 has conducted a fourteen (14) week pre-apprenticeship training sessions for District of Columbia residents.  He stated that he has cited such efforts to reflect their commitment to actively recruit, train, and employ D.C. residents.

22.     **Bob Pohlman, Executive Director, CNHED**

Mr. Pohlman testified that the District must determine the number of positions that will be affected by this bill, assess whether there is an adequate supply of trained District workers to fill those positions, and if there are not, the District should commit to adult job training to prepare workers for available jobs.  In addition he suggests the Committee to consider the impact

13

ABC028

of the bill on smaller construction projects. Finally, he states that the District should move forward quickly to put a workforce intermediary in place to identify the need for various types of workers, assess the current supply of workers, ensure that there is adequate training for DC residents to qualify for jobs and match trained workers with jobs.

**23.    Elissa Silverman, DC Fiscal Policy Institute**

Ms. Silverman explained the importance of the workforce intermediary component of the bill and why it is important to include it into First Source reform. She states that mandating hiring targets and tightening enforcement of those targets will not be effective unless there is a workforce ready and able to take these jobs. She goes on to add that a workforce intermediary is critical because it plays the role of a broker by making sure that there is coordination and optimization of resources to make the transaction successful for all parties involved.

**24.    Sarah Oldmixon, Director of Workforce Initiatives, The Community Foundation for the National Capital Region**

Ms. Oldmixon focused her testimony on three themes. First, she notes that the District's First Source hiring requirements should be concise and easily understood. Second, she states that the District's First Source hiring policy should be kept at a manageable size. Finally, she explained that alone, First Source hiring targets are insufficient to connect District workers to job opportunities.

**25.    Larry Greenhill, Journeyman Electrician**

Mr. Greenhill expressed support of the B19-50 stating that the bill, "bottom-line, gives working families a fair chance." He acknowledged that the language in the bill needed to be further discussed, however, he urged the Committee not to let he bill die.

**27.    Heidi Shierholz, Board Member, D.C. Employment Justice Center**

Ms. Shierholz stated that B19-50 is necessary for a few reasons. First she explained that it modernizes the First Source recordkeeping and procedures. Secondly, she states that the bill establishes a Workforce Intermediary Task Force for the purpose of reviewing similar workforce development programs implemented across the country. Finally, she testified that the bill was necessary because it creates a Jobs Trust Fund for the purpose of establishing and operating the workforce intermediary and connecting District residents to jobs.

## IV.    Fiscal Impact

The fiscal impact statement prepared by the Chief Financial Officer is attached to this report, indicating that funds are sufficient to implement the provisions of this legislation.

ABC029

### V.    Section-by-Section Analysis

| | |
|---|---|
| Section 1 | Short and long titles. |
| Section 2 | Amends numerous sections of the First Source Employment Agreement Act of 1984 including provisions that govern the level and types of subsidy that trigger first source; creation of a two tiered system of hiring requirements on construction projects; creation of a two tiered system of hiring requirements on non-construction projects; creations of new requirements to show compliance with best efforts standard required by the statute; creation of new penalties for noncompliance with the statute; creation of a pilot workforce intermediary program. |
| Section 3 | Provides for rulemaking |
| Section 4 | Fiscal Impact Statement. |
| Section 5 | Effective date. |

### VI.    Impact on Existing Law

B19-50, the "District of Columbia Workforce Intermediary Establishment and Reform of First Source Act of 2011", amends numerous sections of the First Source Employment Agreement Act of 1984 including provisions that govern the level and types of subsidy that trigger first source; creation of a two tiered system of hiring requirements on construction projects; creation of a two tiered system of hiring requirements on non-construction projects; creations of new requirements to show compliance with best efforts standard required by the statute; creation of new penalties for noncompliance with the statute; and creation of a pilot workforce intermediary program.

### VII. Committee Action

On October 14, 2011, the Committee on Housing and Workforce Development met to consider and mark-up, B19-50, the "District of Columbia Workforce Intermediary Establishment and Reform of First Source Act of 2011". Chairperson Brown moved for approval of B19-50,

ABC030

the Draft Committee Report and the Draft Committee Print, with allowance for the Committee staff to make technical and conforming amendments.  Both passed unanimously.

Committee members voted as follows:
Committee members voting in favor:  Chairperson Michael Brown, Chairman Kwame Brown, Councilmember Vincent Orange

Committee members voting against:
Committee members voting present:
Committee members absent:  Councilmembers Phil Mendeslon and Harry Thomas Jr. (Mr. Thomas was present at the committee meeting and voiced strong support for the measure but he had to leave before the vote was called on the bill)

## VIII.  Attachments

A. Committee Print
B. Fiscal Impact Statement
C. B19-50 as introduced
D. General Counsel's 6/20/11 Legal Opinion on First Source
E. Testimony
F. Hearing Notice
G. Hearing Witness List

16

ABC031

B19-0050
COMMITTEE PRINT
COMMITTEE ON HOUSING AND WORKFORCE DEVELOPMENT
October 14, 2011

A BILL

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

B19-0050

To amend the First Source Employment Agreement Act of 1984 to clarify and add definitions, to require that the Department of Employment Services (DOES) receive 7 days notice prior to any new First Source project moving forward, to increase the base subsidy level that triggers First Source agreements to $300,000 and to require that each government-assisted construction project receiving government assistance totaling $5 million or more adhere to enhanced First Source hiring requirements, to update reporting requirements associated with the hiring requirements, to require DOES to issue new hiring and reporting requirements for government-assisted non-construction projects that receive government assistance of $5 million or more, to allow beneficiaries to double-count hours worked by District residents who are hard to employ, to clarify the duration of time beneficiaries are subject to First Source requirements, to allow beneficiaries to count hours that exceeded previous requirements towards their current requirements, to require bidders and offerors of government contracts valued at $5 million or more to submit initial employment plans that review past compliance and employment practices as part of their bid package that will be scored and will account for 10% of their total bid score, to require beneficiaries to submit a detailed employment plan that identifies specific details regarding associated jobs and strategies to meet their hiring requirements, to require the Mayor to review and report to the Council the appropriateness of the hiring and reporting requirements every 3 years, to allow DOES to consider altering the ratio of journey worker to apprentice positions based on a compelling District resident hiring rationale, to require specific documentation evidencing a good faith effort to comply with First Source requirements prior to obtaining a waiver from a First Source employment agreement, to include additional pro-rated fines for not reaching specific hiring requirements, to provide for the debarment of companies who have been found in violation 3 times over a 10 year period, and to provide online public access to executed First Source employment agreements, current compliance status of each project, and the contact information for the relevant compliance officer, to establish a workforce intermediary program that shall act as an intermediary between employers and training providers to provide employers with qualified job applicants, and to establish a workforce trust fund in which contributions and monetary fines for breach of First Source

1

ABC032

1　employment agreements shall be deposited for the purposes of establishing and operating a
2　District of Columbia workforce intermediary program.
3
4
5　　　BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

6　act may be cited as the "Workforce Intermediary Establishment and Reform of First Source

7　Amendment Act of 2011".

8　　　Sec. 2.   The First Source Employment Agreement Act of 1984, effective June 29, 1984

9　(D.C. Law 5-93; D.C. Official Code § 2-219.01 *et seq.*) is amended as follows:

10　　　(a) Section 2 (D.C. Official Code § 2-219.01) is amended as follows:

11　　　　(1) Paragraph (1) is amended to read as follows:

12　　　　　(A) Subparagraph (A) is amended by striking the phrase ", or the successful

13　applicant for any street or alley closing pursuant to the Street and Ally Closing and Acquisition

14　Procedures Act of 1982, effective March 10, 1983 (D.C. Law 4-201; D.C. Official Code §

15　9-201.01 *et seq.*),".

16　　　　　(B) Subparagraph (B) is amended as follows:

17　　　　　　(i) Strike the phrase "A beneficiary" and insert the phrase "A recipient" in its

18　place.

19　　　　　　(ii) Strike the word "public".

20　　　　　　(iii) Strike the figure "$100,000" and insert the figure "$300,000" in

21　its place.

22　　　　　(C) Subparagraph (C) is amended as follows:

23　　　　　　(i) Strike the phrase "a direct beneficiary" and insert the phrase "a direct

24　recipient" in its place.

2

ABC033

1        (ii) Strike the figure "$100,000" and insert the figure "$300,000" in

2    its place.

3        (iii) Strike the phrase "; provided, that obligations imposed by this title shall

4    apply only for 5 years following the commencement of the tenant's initial lease date of the real

5    estate.   Developers of a government-assisted project with retail and commercial tenants that

6    directly benefitted from that assistance shall require those tenants to sign an agreement stating that

7    the tenants will adhere to the requirements of this act for 5 years following the commencement of

8    the tenant's initial lease date".

9        (2) Paragraph (3) is amended by striking the phrase "managerial, nonmanagerial," and

10   inserting the phrase "union and non-union managerial, nonmanagerial" in its place.

11       (3) Paragraph (5) is amended to read as follows:

12       "(5) "Government-assisted project or contract" means any construction or

13   non-construction project or contract receiving funds or resources from the District of Columbia, or

14   funds or resources which, in accordance with a federal grant or otherwise, the District of Columbia

15   government administers, including contracts, grants, loans, tax abatements or exemptions, land

16   transfers, land disposition and development agreements, tax increment financing, or any

17   combination thereof, that is valued at $300,000 or more.".

18       (4) New paragraphs (7), (8), and (9) are added to read as follows:

19       "(7) "Hard to employ" means a District resident who identifies himself as and is

20   confirmed by a District of Columbia government agency as:

21       "(A) Ex-offenders who have been released from prison within the last 10 years;

22       "(B) Participants of the Temporary Assistance for Needy Families program;

3

ABC034

1        "(C) Participants of the Supplemental Nutrition Assistance Program;

2        "(D) Residents who are living with a permanent disability verified by the Social

3  Security Administration or District vocational rehabilitation program;

4        "(E) Residents who have been unemployed for 6 months or more in the last

5  12-month period;

6        "(F) Homeless District residents;

7        "(G) Participants in or graduates of the Transitional Employment Program

8  established by section 2102 of the Transitional Employment Program and Apprenticeship

9  Initiative Establishment Act of 2005, effective October 20, 2005 (D.C. Law 16-33; D.C. Official

10  Code § 32-1331); and

11        "(H) Those individuals who qualified for inclusion in the Work Opportunity Tax

12  Credit Program as certified by the Department of Employment Services.

13        "(8) "Direct labor costs" means all costs, including wages and benefits, associated

14  with the hiring and employment of personnel assigned to a process in which payroll expenses are

15  traced to the units of output and are included in the cost of goods sold.

16        "(9) "Indirect labor costs" means all costs, including wages and benefits, that are part

17  of operating expenses and are associated with the hiring and employment of personnel assigned to

18  tasks other than producing products.".

19      (b) Section 4 (D.C. Official Code § 2-219.03) is amended as follows:

20      (1) Subsection (c) is amended to read as follows:

21      "(c) The Mayor shall transmit each employment agreement to the Department of

4

ABC035

1     Employment Services no less than 7 calendar days in advance of the project or contract start date,

2     whichever is later, and no work associated with the relevant government assistance can begin on a

3     project or contract until the employment agreement has been accepted by the Department of

4     Employment Services.".

5          (2) Subsection (d) is repealed.

6          (3) Subsection (e) is amended as follows:

7            (A) Paragraph 1 is amended to read as follows:

8            "(1) The Mayor shall include in each government-assisted project or contract that

9     receives government assistance totaling between $300,000 and $5,000,000, the provision that at

10    least 51% of the new employees hired to work on the project or contract shall be District residents.

11    Collective bargaining agreements shall not be the basis for a waiver from this requirement.

12            "(A) Prior to the employment agreement being accepted by the Department

13    of Employment Services, each beneficiary covered by this paragraph shall choose whether the

14    51% of the new employees hired shall be cumulative of all new hires, including those made by all

15    subcontractors at any tier who work on the project or contract, or whether the 51% of the new

16    employees hired shall be met by each beneficiary covered by this paragraph and each individual

17    subcontractor at any tier who works on the project or contract.

18            "(B) Each beneficiary covered by this paragraph shall submit to the

19    Department of Employment Services each month following the start of the project or the execution

20    of the contract a hiring compliance report for the project or contract that includes the:

21            "(i) Number of employees who worked on the project or contract;

22            "(ii) Number of current employees transferred;

ABC036

1    "(iii) Number of new job openings created;

2    "(iv) Number of job openings created by employee attrition;

3    "(v) Number of job openings listed with the Department of

4    Employment Services;

5    "(vi) Total monthly direct and indirect labor costs associated with the

6    project or contract;

7    "(vii) Total number of all District residents hired for the reporting

8    period and the cumulative total number of District residents hired; and

9    "(viii) Total number of all employees hired for the reporting period and

10   the cumulative total number of employees hired, including each employee's:

11   "(I) Name;

12   "(II) Social security number;

13   "(III) Job title;

14   "(IV) Hire date;

15   "(V) Residence; and

16   "(VI) Referral source for all new hires.

17   "(C)(i) Government-assisted construction projects or contracts covered by

18   this paragraph shall be subject to the hiring and reporting requirements set forth in this paragraph

19   until construction is completed and a final certificate of occupancy has been issued.

20   "(ii) Government-assisted non-construction projects or contracts

21   covered by this paragraph shall be subject to the hiring and reporting requirements set forth in this

22   paragraph for as long as the benefit is being received.

6

ABC037

1       "(iii) A retail or commercial tenant that is a beneficiary as defined

2   under section 2(1)(C) and is covered by this paragraph shall be subject to the hiring and reporting

3   requirements set forth in this paragraph for 5 years following the commencement of the tenant's

4   initial lease date.

5       (B) New paragraphs (1A), (1B), and (1C) are added to read as follows:

6       "(1A)(A) The Mayor shall include in each government-assisted construction

7   project or contract that receives government assistance totaling $5 million or more, the provision

8   that:

9       "(i) At least 20% of journey worker hours by trade shall be

10   performed by District residents;

11       "(ii) At least 60% of apprentice hours by trade shall be

12   performed by District residents;

13       "(iii) At least 51% of the skilled laborer hours by trade shall be

14   performed by District residents; and

15       "(iv) At least 60% of common laborer hours shall be performed by

16   District residents.

17       "(B) Collective bargaining agreements shall not be a basis for a waiver

18   from this requirement.

19       "(C) As part of the employment plan pursuant to subparagraph (F)(ii) of this

20   paragraph, each beneficiary covered by this paragraph shall choose whether all residency work

21   requirements shall be cumulative of all hours worked, including those hours worked by

22   subcontractors at any tier who work on the project or contract, or whether all residency work

7

ABC038

1    requirements shall be met by each beneficiary covered by this paragraph and each individual

2    subcontractor at any tier who works on the project or contract.

3              "(D) Each month following the start of the project or the execution of the

4    contract, beneficiaries covered by this paragraph shall submit to the Department of Employment

5    Services copies of their monthly and cumulative certified payrolls, monthly and cumulative

6    certified payrolls from all subcontractors at any tier working on the project or contract, as well as a

7    report of the total monthly direct and indirect labor costs associated with the project or contract.

8              "(E) Government-assisted construction projects or contracts covered by this

9    paragraph shall be subject to the hiring and reporting requirements set forth in this paragraph until

10    construction is completed and a final certificate of occupancy has been issued.

11             "(F)(i) Bids and proposals responding to a solicitation for a

12    government-assisted project or contract covered by this paragraph shall include an initial

13    employment plan outlining the bidder's or offeror's strategy to meet the local hiring requirements

14    as part of its response to the solicitation. These plans shall be evaluated and scored by the Mayor

15    based on the criteria listed in sub-sub-subparagraphs (I), (II), and (III) of this sub-subparagraph.

16    The evaluation shall be worth 10% of the overall score of the bid or proposal.   The employment

17    plan shall include the following:

18             "(I) Descriptions of the health and retirement benefits provided to

19    employees who worked on any of the bidder's or offeror's past 3 completed projects or contracts;

20             "(II) A description of the bidder's or offeror's efforts to provide

21    District residents with ongoing employment and training opportunities after they complete work

22    on the job for which they were initially hired; and

8

ABC039

1                 "(III) A disclosure of past compliance with this act and the

2 Davis-Bacon Act of 1931 ("Davis-Bacon Act"), approved March 3, 1931 (46 Stat. 1494; 40 U.S.C.

3 § 3141 *et seq.*), where applicable, on projects or contracts completed within the last 2 years.

4                 "(ii) The winning bidder or offeror shall submit a revised employment

5 plan to the Mayor for approval prior to beginning work on the project or contract.

6 The employment plan shall include:

7                 "(I) A projection of the total number of hours to be worked on the

8 project or contract by trade;

9                 "(II) A projection of the total number of journey worker hours, by

10 trade, to be worked on the project or contract and the total number of journey worker hours, by

11 trade, to be worked by District residents;

12                 "(III) A projection of the total number of apprentice hours, by

13 trade, to be worked on the project or contract and the total number of apprentice hours, by trade, to

14 be worked by District residents;

15                 "(IV) A projection of the total number of skilled laborer hours, by

16 trade, to be worked on the project or contract and the total number of skilled laborer hours, by

17 trade, to be worked by District residents;

18                 "(V) A projection of the total number of common laborer hours to

19 be worked on the project or contract, and the total number of common laborer hours to be worked

20 by District residents;

21                 "(VI) A timetable outlining the total hours worked by trade over

22 the life of the project or contract and an associated hiring schedule;

ABC040

1    "(VII) Descriptions of the skills requirements by job title or

2    position, including industry-recognized certifications required for the different positions;

3    "(VIII) A strategy to fill the hours required to be worked by

4    District residents pursuant to this paragraph, including a component on communicating these

5    requirements to contractors and subcontractors and a component on potential community outreach

6    partnerships with the University of the District of Columbia, the University of the District of

7    Columbia Community College, the Department of Employment Services, Jointly Funded

8    Apprenticeship Programs, or other government approved community-based job training providers;

9    "(IX) A remediation strategy to ameliorate any problems

10   associated with meeting these hiring requirements, including any problems encountered with

11   contractors and subcontractors;

12   "(X) The designation of a senior official from the general

13   contractor who will be responsible for implementing the hiring and reporting requirements;

14   "(XI) Descriptions of the health and retirement benefits that will

15   be provided to District residents working on the project or contract;

16   "(XII) A strategy to ensure that District residents who work on

17   the project or contract receive ongoing employment and training opportunities after they complete

18   work on the job for which they were initially hired and a review of past practices in continuing to

19   employ District residents from one project or contract to the next;

20   "(XIII) A strategy to hire graduates of District of Columbia

21   public schools, District of Columbia public charter schools, community-based job training

22   providers, and hard-to-employ residents; and

10

ABC041

1    "(XIV) A disclosure of past compliance with this act's

2    employment requirements and the Davis-Bacon Act, where applicable, and the bidder's or

3    offeror's general District resident hiring practices on projects or contracts completed within the

4    last 2 years.

5    "(iii) The Mayor shall require all beneficiaries of government-assisted

6    projects or contracts covered by this paragraph that are not awarded through the contracting

7    process to develop and submit to the Department of Employment Services the employment plan

8    required in sub-subparagraph (ii) of this subparagraph.

9    "(iv) Once approved, the employment plan required by

10   sub-subparagraph (ii) of this subparagraph shall not be amended except with the approval of the

11   Mayor.

12   "(G) For the purpose of calculating hours worked by District residents,

13   beneficiaries covered by this paragraph may receive a double-credit of hours worked by District

14   residents who are certified by the Department of Employment Services as hard to employ as long

15   as they include the resident's hard-to-employ certification as part of the monthly reporting.

16   No more than 15% of the total hours worked by District residents may be comprised of

17   double-credit hours.

18   "(H) For the purpose of calculating hours worked by District

19   residents, beneficiaries covered by this paragraph may count any hours worked by District

20   residents on other completed projects or contracts subject to this act that were in excess of the

21   completed project's or contract's own hiring requirements and that are certified by the Mayor.

11

**ABC042**

1    "(I) The Mayor shall regularly, but at least once every 3 years, review the

2    hiring and reporting requirements set forth by this paragraph to determine the appropriateness of

3    each percentage and make relevant findings of the determination in a report to the Council.

4    "(J) The Department of Employment Services shall consider requests from

5    beneficiaries to recommend to the D.C. Apprenticeship Council to alter the ratio of journey worker

6    to apprentice positions as long as the request does not jeopardize the quality or safety of the project

7    or contract and there is a compelling District resident hiring rationale.

8    "(1B) Within one year of the effective date of the Workforce Intermediary

9    Establishment and Reform of First Source Amendment Act of 2011, the Mayor shall issue rules

10   establishing enhanced hiring and reporting requirements for government-assisted

11   non-construction projects or contracts that receive government assistance totaling $5 million or

12   more.

13   (A)(i) These rules shall include industry specific requirements by

14   percentage of total hours worked for hourly wage employees and by percentage of total workforce

15   for salaried employees, broken out by job category.   The proposed rules shall also establish the

16   length of time that these projects or contracts shall comply with the hiring and reporting

17   requirements.

18   (ii) The proposed rules shall be submitted to the Council for a

19   45-day period of review, excluding Saturdays, Sundays, legal holidays, and days of Council

20   recess.   If the Council does not approve the proposed rules within this 45-day review period, the

21   proposed rules shall be deemed disapproved.

12

ABC043

1      (iii) Until the proposed rules have been adopted and approved by the

2      Council, government-assisted non-construction projects or contracts that receive government

3      assistance totaling $5 million or more shall be subject to the hiring and reporting requirements set

4      forth in paragraph (1) of this subsection.

5      (1C) Once final rules have been adopted after Council approval pursuant to

6      paragraph (1B) of this subsection, the Mayor shall include these District hiring and reporting

7      requirements in each government assisted non-construction project or contract that receives

8      government assistance totaling $5 million or more.   These government assisted non-construction

9      projects or contracts shall be subject to the procedures set forth in this paragraph.

10      "(A)(i) Bids and proposals responding to a solicitation for a

11      government-assisted project or contract covered by this paragraph must include an initial

12      employment plan outlining the bidder's or offeror's strategy to meet the local hiring requirements

13      as part of its response to the solicitation.   These plans shall be evaluated and scored by the Mayor

14      based on the criteria listed in sub-sub-subparagraphs (I), (II), and (III) of this sub-subparagraph.

15      The evaluation shall be worth 10% of the overall score of the bid or proposal.   The employment

16      plan shall include the following:

17      "(I) Descriptions of the health and retirement benefits provided to

18      employees who worked on any of the bidder's or offeror's past 3 completed projects or contracts;

19      "(II) A description of the bidder's or offeror's efforts to provide

20      District residents with ongoing employment, training, and career advancement opportunities; and

21      "(III) A disclosure of past compliance with this act's employment

22      requirements, where applicable, on projects or contracts completed within the past 2 years.

13

ABC044

1    "(ii) The winning bidder or offeror shall submit a revised employment

2    plan to the Mayor for approval, before beginning work on the project or contract.   The revised

3    employment plan shall include:

4    "(I) A projection of the total number of hours to be worked on an

5    annual basis by job category and the total number of hours to be worked by District residents;

6    "(II) A timetable outlining the total hours worked by job category

7    over the duration of the life of the hiring requirements set forth by the Department of Employment

8    Services and an associated hiring schedule which predicts when specific job openings will be

9    available;

10    "(III) Descriptions of the skill requirements, including

11    industry-recognized certifications required for the different positions;

12    "(IV) A strategy to fill the hours required to be worked by

13    District residents, including whether the bidder plans to pursue potential community outreach

14    partnerships with the University of the District of Columbia, the University of the District of

15    Columbia Community College, the Department of Employment Services, or other government-

16    approved community-based job training providers;

17    "(V) A remediation strategy to ameliorate any problems

18    associated with meeting these hiring requirements;

19    "(VI) The designation of a senior official from the beneficiary

20    who will be responsible for implementing the hiring and reporting requirements;

21    "(VII) Descriptions of the health and retirement benefits that will

22    be provided to District residents working on the project or contract;

14

ABC045

1      "(VIII) A strategy to hire graduates of District of Columbia

2  public schools, District of Columbia public charter schools, community-based job training

3  providers, and hard-to- employ residents.

4      "(IX) A disclosure of past compliance with this act's

5  employment requirements, where applicable, and the bidder's or offeror's general District hiring

6  practices on projects or contracts completed within the past 2 years.

7      "(iii) The Mayor shall require all beneficiaries of government-assisted

8  projects or contracts covered by this paragraph that are not awarded through the contracting

9  process to develop and submit to the Department of Employment Services the employment plan

10  required in sub-subparagraph (ii) of this subparagraph.

11      "(iv) Once approved, the employment plan required by

12  sub-subparagraph (ii) of this subparagraph shall not be amended except with the approval of the

13  Mayor.

14      "(B) For the purpose of calculating hours worked by District residents,

15  beneficiaries covered by this paragraph may receive a double-credit of hours worked by District

16  residents who are certified by the Department of Employment Services as hard to employ as long

17  as they include the resident's hard-to-employ certification as part of the monthly reporting.

18  No more than 15% of the total hours worked by District residents may be comprised of

19  double-credit hours.

20

21

22

15

ABC046

1    "(C) For the purpose of calculating hours worked by District residents,

2  beneficiaries covered by this paragraph may count any hours worked by District residents on other

3  completed projects or contracts subject to this act's hiring requirements that were in excess of the

4  completed project's or contract's own hiring requirements and that are certified by the Mayor.

5    "(D) The Mayor shall regularly, but at least once every 3 years, review the

6  hiring and reporting requirements set forth by this paragraph to determine the appropriateness of

7  each percentage and make relevant findings of the determination in a report submitted to the

8  Council.".

9    (C) Paragraph (2) is amended to read as follows:

10    "(2) With the submission of the final request for payment from the District, the

11  beneficiary shall:

12    "(A) Document in a report to the Mayor its compliance with paragraph (1),

13  (1A), (1B), or (1C) of this subsection; or

14    "(B) Submit a request to the Mayor for a waiver of compliance with

15  paragraphs (1), (1A), (1B), or (1C) of this subsection and include the following documentation:

16    "(i) Material supporting a good faith effort to comply;

17    "(ii) Referrals provided by the Department of Employment Services

18  and other referral sources; and

19    "(iii) Advertisement of job openings listed with the Department of

20  Employment Services and other referral sources.".

21

22

16

ABC047

1     (D) Paragraph (3) is amended to read as follows:

2     "(3)(A) The Mayor may waive the provisions of paragraph (1), (1A), (1B), or

3 (1C) of this subsection if the Mayor finds that:

4     "(i) The Department of Employment Services has certified that a good-

5 faith effort to comply has been demonstrated by the beneficiary.

6     "(ii) The beneficiary is located outside of the Washington Standard

7 Metropolitan Statistical Area, none of the contract work is performed inside the Washington

8 Standard Metropolitan Statistical Area, the beneficiary published each job opening or part-time

9 work needed for 7 calendar days in a District newspaper of city-wide circulation, and the

10 Department of Employment Services certifies that there are insufficient eligible applicants from

11 the First Source Register that possess the skills required by the positions, or the eligible applicants

12 are not available for part-time work or do not have a means to travel to the onsite job; or

13     "(iii) The beneficiary enters into a special workforce development

14 training or placement arrangement with the Department of Employment Services.

15     "(B) The Department of Employment Services shall consider the following

16 when making a determination of a good faith effort to comply:

17     "(i) Whether the Department of Employment Services has certified

18 that there is an insufficient number of District residents in the labor market who possess the skills

19 required to fill the positions that were created as a result of the contract;

20     "(ii) Whether the beneficiary posted the jobs on the Department of

21 Employment Services job website for a minimum of 10 calendar days;

17

ABC048

1    "(iii) Whether the beneficiary posted each job opening or part-time

2    work needed in a District newspaper with city-wide circulation for a minimum of 7 calendar days;

3    "(iv) Whether the beneficiary has substantially complied with the

4    relevant monthly reporting requirements set forth in this section;

5    "(v) For government-assisted projects or contracts covered by

6    paragraph (1A) or (1C) of this subsection, whether the beneficiary has submitted and substantially

7    complied with its most recent employment plan that has been approved by the Department of

8    Employment Services; and

9    "(vi) Any additional documented efforts.".

10   (E) Paragraph (4) is amended to read as follows:

11   "(4)(A) Willful breach of the employment agreement, or failure to submit the

12   required hiring compliance report pursuant to paragraph (1), (1A), (1B), or (1C) of this subsection,

13   or deliberate submission of falsified data, shall be enforced by the Mayor through the imposition of

14   penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs

15   of the project or contract.

16   "(B) Failure to meet the required hiring requirements pursuant to paragraph

17   (1), (1A), (1B), or (1C) of this subsection or failure to receive a good-faith waiver pursuant to

18   paragraph (3) of this subsection may result in the Mayor imposing a penalty equal to 1/8 of 1% of

19   the total amount of the direct and indirect labor costs of the project or contract for each percentage

20   by which the beneficiary fails to meet the hiring requirements.

21   "(C) Upon a third violation within a 10-year time frame of the required

22   hiring or reporting requirements set forth within paragraphs (1), (1A), (1B), or (1C) of this

18

ABC049

1   subsection or failure to receive a good-faith waiver pursuant to paragraph (3) of this subsection,

2   the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts

3   with the District of Columbia for a period of not more than 5 years.".

4           (F) Paragraph (5) is amended to read as follows:

5           "(5) The beneficiary may appeal any decision of the Mayor regarding a contract

6   pursuant to paragraph (4) of this subsection to the Contract Appeals Board.   For those projects

7   that are not awarded through the contracting process, the Mayor shall identify an administrative

8   appeals process that allows the beneficiary to appeal any decision of the Mayor pursuant to

9   paragraph (4) of this subsection.".

10        (c) New sections 5a, 5b, and 5c are added to read as follows:

11        "Sec. 5a. Modernization of First Source recordkeeping.

12        "The Department of Employment Services shall provide public access on its website to

13   all employment agreements entered into in 2009 thru the present within 120 days of the effective

14   date of this section and shall make available online all future employment agreements and their

15   status of compliance and the project's or contract's assigned Contracting Officer or First Source

16   Compliance Officer and their contact information.

17        "Sec. 5b. Establishment of a District of Columbia workforce intermediary pilot program.

18        "(a)(1) By April 1, 2012, the Mayor shall establish a workforce intermediary pilot program

19   for Fiscal Year 2012 based on Council and Mayor-approved recommendations made by the

20   Workforce Intermediary Task Force established by the Workforce Intermediary Task Force

21   Establishment Second Emergency Act of 2011, effective October 18, 2011 (D.C. Act 19-167; 58

22   DCR 8900 ) or succeeding legislation.

19

1          "(2) The workforce intermediary pilot program shall act as an intermediary between

2    employers and training providers to provide employers with qualified District resident job

3    applicants.

4          "(3) The workforce intermediary pilot program shall have a start-up budget not to

5    exceed $2 million, which shall be funded by all funds deposited in the District of Columbia Jobs

6    Trust Fund ("Fund"), established in 5c, and other existing local funds.

7          "(4) At the end of the pilot program, the Deputy Mayor for Planning and Economic

8    Development, in consultation with the Department of Employment Services and the workforce

9    intermediary, shall develop a progress report and recommendations for continued operations of the

10   workforce intermediary that take into account the Council and Mayor-approved recommendations

11   made by the Workforce Intermediary Task Force.

12   "Sec. 5c. Establishment of the District of Columbia Jobs Trust Fund.

13         "(a) There is established, a non lapsing fund, the District of Columbia Jobs Trust Fund,

14   which shall be administered by the Deputy Mayor for Planning and Economic Development.

15   The funds in the Fund shall be used solely for purposes of establishing and operating the workforce

16   intermediary pilot program, established in section 5b, or any succeeding program. The following

17   shall be deposited into the Fund:

18         "(1) Voluntary and negotiated contributions and donations, including past

19   contributions for similar purposes that have yet to be collected or expended; and

20         "(2) All outstanding monetary fines for breach of this act.

21         "(b) All funds deposited into the Fund, and any interest earned on those funds, shall not

22   revert to the unrestricted fund balance of the General Fund of the District of Columbia at the end of

20

ABC051

1    a fiscal year, or at any other time, but shall be continually available for the uses and purposes set

2    forth in subsection (a) of this section, subject to appropriation by Congress.".

3         Sec. 3. Rulemaking.

4         Except for paragraph (1B) of subsection (e), within 180 days of the effective date of this

5    act, the Mayor shall issue rules to implement the programs of this act.   The proposed rules shall be

6    submitted to the Council for a 45-day period of review, excluding Saturdays, Sundays, legal

7    holidays, and days of Council recess. If the Council does not approve or disapprove the proposed

8    rules, in whole or in part, by resolution within this 45-day review period, the proposed rules shall

9    be deemed approved.

10        Sec. 4. Fiscal impact statement.

11        The Council adopts the fiscal impact statement in the committee report as the fiscal impact

12   statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved

13   December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).

14        Sec. 5. Effective date.

15        This act shall take effect following approval by the Mayor (or in the event of veto by the

16   Mayor, action by the Council to override the veto), a 30-day period of Congressional review as

17   provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24,

18   1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of

19   Columbia Register.

ABC052

Government of the District of Columbia
Office of the Chief Financial Officer



**Natwar M. Gandhi**
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Vincent C. Gray**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | Natwar M. Gandhi<br>**Chief Financial Officer** |
| **DATE:** | **November 1, 2011** |
| **SUBJECT:** | **Fiscal Impact Statement – "District of Columbia Workforce**<br>**Intermediary Establishment and Reform of First Source Act of 2011"** |
| **REFERENCE:** | **Bill Number 19-50,  Draft Committee Print as Shared with the OCFO on**<br>**October 31, 2011** |

**Conclusion**

Funds are sufficient in the FY 2012 through FY 2015 budget and financial plan to implement the proposed legislation. The proposed legislation is expected to cost approximately $267,400 in FY 2012 and $682,527 over the FY 2012 through FY 2015 budget and financial plan. Funds available from the District's short-term borrowing fund will be reprogrammed by the Mayor to cover the costs of implementation.[1]

**Background**

The proposed legislation amends the "First Source Employment Agreement Act of 1984"[2] to make significant changes to the hiring and reporting requirements of the First Source Program administered by the Department of Employment Services (DOES); establish a workforce intermediary pilot program for Fiscal Year 2012; and establish a "Jobs Trust Fund."

Modification of First Source Hiring and Reporting Requirements:

Current law requires all construction and non-construction projects receiving $100,000 or more in government assistance to enter into a First Source Agreement with the District promising that 51 percent of all new hires will be District residents.

---

[1] Fund ZA0 "Repayment of Interest on Short-term Borrowing Fund".
[2] Effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code §2-219.03(e)).

ABC053

The Honorable Vincent C. Gray
FIS: Draft B19-50 "District of Columbia Workforce Intermediary Establishment and Reform of First Source Act of 2011" as Shared with the OCFO on October 31, 2011.

The proposed legislation modifies these requirements by increasing the minimum dollar threshold for which a government-assisted project would be subject to First Source from $100,000 to $300,000. Also, it no longer requires applicants for street and alley closing to comply with First Source.

Finally, the bill sets forth separate hiring and reporting requirements for construction and non-construction projects receiving $5 million or more in government assistance.

*For government-assisted construction and non-construction projects receiving less than $5 million, the legislation would:*

- Continue to require at least 51 percent of new hires are District residents;
- Allow the beneficiary the option of meeting the 51 percent hiring requirement by counting the cumulative of all new hires, including those made by all subcontractors who work on the project. Currently, subcontractors are required to enter into FSAs with DOES independently from the general contractor and are responsible for adhering to the requirements of the law. This provision provides the general contract the option of assuming complete responsibility for meeting the requirements, therefore exempting subcontractors from entering into separate FSAs;
- Require projects to submit monthly compliance reports detailing certain hiring information, such as the number of jobs created and number of District residents hired;
- Require construction projects comply with the First Source requirements until construction is complete and a final certificate of occupancy is issued.
- Require non-construction projects comply with the First Source requirements as long as the benefit is received.

*For government-assisted construction projects receiving $5 million or more, the legislation would:*

- Require government-assisted construction projects hire DC residents to work a minimum number of total labor hours by type of labor and trade;[3]
- Allow the beneficiary the option of meeting the minimum works hour requirement by counting the cumulative of hours worked by all new hires, including those of subcontractors who work on the project;
- Require the beneficiary to submit each month the monthly and cumulative certified payrolls for the beneficiary and their subcontractors;
- Require the beneficiary to submit monthly reports of the total monthly direct and indirect labor costs associated with the project;
- Require construction projects of this size comply with the First Source requirements until construction is complete and a final certificate of occupancy is issued;

---

[3] The bill would require DC residents to perform at least: 20 of journey worker hours, 51 percent of apprentice hours, 51 percent of the skilled laborer hours, and 60 percent of common laborer hours.

ABC054

The Honorable Vincent C. Gray
FIS: Draft B19-50 "District of Columbia Workforce Intermediary Establishment and Reform of First Source
Act of 2011" as Shared with the OCFO on October 31, 2011.

- Require bids and proposals to include an employment plan outlining the bidder's strategy for meeting the local hiring requirements. This would plan would be worth 10 percent of the overall score of the bid proposal;
- Allow beneficiaries to receive a double-credit of hours worked by District residents who are certified by DOES as "hard to employ;"[4]
- Allow beneficiaries to count any hours worked by District residents on other completed projects subject to First Source that were in excess of the completed project's own hiring requirements.

The legislation requires DOES to develop enhanced hiring and reporting requirements for projects receiving $5 million or more in assistance within one year of the effective date of the legislation. Until new rules are proposed and approved by the Council, non-construction projects receiving $5 million or more would be subject to the hiring and reporting requirements set forth for projects receiving less than $5 million.

The legislation also establishes the rules for waiving the hiring requirements set forth in the legislation, as well as the penalties, including monetary fines,[5] that the Mayor is authorized to impose if a beneficiary fails to comply with First Source requirements.

Establishment of a Workforce Intermediary Pilot Program:

The bill would require the creation workforce intermediary pilot program by April 1, 2012. The purpose of the intermediary is to act as a liaison between employers and training providers to help employers identify qualified District resident job applicants.

The start-up budget for the pilot is not to exceed $2 million. The bill would require all funds deposited into the "Jobs Trust Fund" to be dedicated to the operations of the intermediary.

Establishment of the Jobs Trust Fund:

The bill establishes a non-lapsing fund called the Jobs Trust Fund ("Fund"), which would be administered by the Deputy Mayor for Planning and Economic Development. All revenue deposited into the Fund would be used to pay for the operation of the workforce intermediary pilot program. Revenues deposited into the Fund would include fines paid for violation of First Source and any contributions received for the workforce intermediary.

---

[4] "Hard to Employ" is defined in the bill as District residents who identify as, and are confirmed by a District of Columbia government agency as returning citizens who have returned from prison within the last 10 years, participants of the Temporary Assistance for Needy Families program (TANF), participants of the Supplemental Nutrition Assistance Program (SNAP), residents who are living with a permanent disability, or residents who have been unemployed for 6 or more months in the last 12 month period. No more than 15 percent of total hours worked by DC residents could be double-counted hours.

[5] The Mayor is authorized to impose a fine of 5 percent of the total amount of the direct and indirect labor costs of the contract for willful breach of the employment agreement, or failure to submit the relevant hiring compliance report, or deliberate falsification of data. Additionally, the Mayor may impose a penalty of 1/8 of 1 percent of the total amount of the direct and indirect labor costs of the contract for each percentage by which the beneficiary fails to meet the hiring requirement. Three violations within a 10-year period could result in debarment for up to 5 years.

ABC055

The Honorable Vincent C. Gray
FIS: Draft B19-50 "District of Columbia Workforce Intermediary Establishment and Reform of First Source
Act of 2011" as Shared with the OCFO on October 31, 2011.

**Financial Plan Impact**

Funds are sufficient in the FY 2012 through FY 2015 budget and financial plan to implement the proposed legislation. The proposed legislation is expected to cost approximately $267,400 in FY 2012 and $682,527 over the FY 2012 through FY 2015 budget and financial plan. These costs could be absorbed in the District's existing budget and financial plan. The detailed costs are described below.

To implement the enhanced reporting requirements for projects receiving $5 million or more in assistance, DOES will need one additional compliance officer. Currently, DOES tracks approximately 1700 FSAs and has two compliance officers dedicated to monitoring compliance. The enhanced requirements are expected to double the number of staff hours dedicated to FSAs for construction projects receiving this level of assistance.[6] While the workload for monitoring FSA for construction projects will increase, the overall caseload is expected to decline significantly as a result of the increase in the minimum threshold to $300,000.[7] This reduction in the overall number of FSAs will help to offset some of the additional staff hours required.

DOES would also need an additional IT budget of approximately $400,000 over the course of two years to upgrade its systems. These upgrades will allow DOES to track project hiring requirements, verify employees designated as "hard to employ," and allow DOES to use the system to determine which employers would need site visits. The upgrades will also allow employers to continue to submit electronically the hiring information required under First Source.

DOESs staffing and IT costs are detailed in the table below.

| Estimated Expenditures for DOES under B19-50, FY 2012 – FY 2015 | | | | | |
|---|---|---|---|---|---|
| | **FY 2012** | **FY 2013** | **FY 2014** | **FY 2015** | **Four Year Total** |
| IT Budget[a] | $200,000 | $200,000 | $0 | $0 | $400,000 |
| Personnel Budget[b c] | $17,400 | $70,644 | $71,704 | $72,779 | $232,527 |
| **Total Expenditures** | **$217,400** | **$270,644** | **$71,704** | **$72,779** | **$632,527** |

**Table Notes:**
[a] DOES IT Department estimates a total budget of $400,000 to make the necessary upgrades over the course of two years.
[b] Total personnel costs include the salary and fringe benefits for one Workforce Development Specialist. The estimate assumes step and cost-of-living increase in FY 2013-FY 2015. Staffing costs are prorated in FY2012 due to the fact that DOES is required to issue rules within 180 days of the effective date before the new hiring requirements take effect. The estimate assumes a start date of July 2012.

---

[6] The number of FSAs for construction projects receiving $5 million or more comprises a relatively small percentage (approximately 3 percent); however, each construction projects often has 10 to 15 subcontracts which are also required to file FSAs with DOES.
[7] Approximately 60 percent of FSA are estimated to be for projects receiving less than $300,000 in assistance.

ABC056

The Honorable Vincent C. Gray
FIS: Draft B19-50 "District of Columbia Workforce Intermediary Establishment and Reform of First Source
Act of 2011" as Shared with the OCFO on October 31, 2011.

In addition to staffing and IT costs, there are costs associated with the requirement to establish a workforce intermediary pilot program in FY 2012. The scope of the pilot program will be defined by the Workforce Intermediary Taskforce[8] with Council approval. However, because the taskforce is not set to convene until November 1, 2011, the scope of the pilot program has not yet been determined so it is not possible to reliably estimate the implementation costs. [9] Therefore, the operations of the pilot program will be defined by its local appropriation of $50,000 and the amount of funding the program may receive from the Jobs Trust Fund. At the time of this analysis, there were no plans to deposit revenue from fines or other sources into the Jobs Trust Fund once it is established; therefore no revenue is currently available for this source.

These costs could be absorbed in the District's existing budget and financial plan. Additional funds are available due to more favorable interest rates for short-term borrowing; these monies will be reprogrammed by the Mayor to cover the costs of implementation.

---

[8] Established pursuant to the Workforce Intermediary Task Force Establishment Second Emergency Act of 2011, enacted October 11, 2011. D.C. Act 19-167, 58 DCR 31.

[9] The annual budget for on-going workforce intermediary programs can vary, but it is reasonable to expect approximately$1 to $2 million in local funds would be dedicated to such a program initially. For example, current year budget for San Francisco's CityBuild program is approximately $3.5 million, of which $1.2 million is dedicated to training and includes supportive services and case management services. (Email communication, Marc Majores, Workforce Development Manager, San Francisco Mayor's Office of Economic and Workforce Development, on October 6, 2011.) Additionally a recent report issued by the DC Fiscal Policy Institute and DC Appleseed found the cost of successful programs in other cities to range from $1 to $2 million. (See: Reforming First Source: Strengthening the Link Between Economic Development and Jobs, issued December 2010).

ABC057

1
2
3
4   _____                    _____
    Councilmember Michael A. Brown                     Chairman Kwame R. Brown
5
6   _____
7   Councilmember Harry Thomas, Jr.
8                                          A BILL
9                                    _____

10              IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

11                              _____

12        Chairman Brown, Councilmember Brown, and Councilmember Thomas introduced the
13   following bill, which was referred to the Committee on _____.

14   To amend the First Source Employment Agreement Act of 1984  to require that for each
15        government-assisted project or contract, totaling $300,000 or more, 20% of all non-
16        construction hours worked shall be performed by District residents; to require that in each
17        government assisted construction project, totaling $300,000 or more, that at least 25% of
18        journey workers hours by trade shall be performed by District residents, at least 50% of
19        apprentice hours by trade shall be performed by District residents, at least 60% of the
20        skilled laborer hours by trade shall be performed by District residents, and at least 70% of
21        common laborer hours shall be performed by District residents, to require documentation
22        evidencing best efforts to comply with First Source requirements prior to obtaining a
23        waiver from the First Source act, to increase fines for willful breach of First Source
24        agreements from 5% to 10% of the total amount of the direct and indirect labor costs of
25        the contract, to require the Mayor to implement all of the major recommendations in the
26        D.C. Auditor's May 6, 2010 Report on Compliance with the First Source Act and the
27        Living Wage Act and apply such to all government assisted projects in the District
28        totaling $300,000 or more, to modernize First Source recordkeeping, improve controls
29        and procedures, and provide online public access to executed First Source Employment
30        Agreements, establish a task force to review workforce intermediary programs
31        implemented by the governments of Boston, Minneapolis, San Francisco, and any other
32        similar programs implemented in other cities; to establish a workforce intermediary
33        program  which shall engage beneficiaries of proposed government-assisted projects prior
34        to the disbursement of District funds or the disposition of District property and develop
35        an in-depth employment plan, to establish a workforce trust fund in which in kind
36        contributions and monetary fines for willful breach of First Source agreements shall be
37        deposited for the purposes of establishing and operating a District of Columbia workforce
38        intermediary program.

ABC058

1        BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

2   act may be cited as the "District of Columbia Workforce Intermediary Establishment and Reform

3   of First Source and Living Wage Amendment Act of 2011".

4        Sec. 2.   Section 4(e) of the First Source Employment Agreement Act of 1984, effective

5   June 29, 1984 (D.C. Law 5-93; D.C. Official Code § 2-219.03 (e)) is amended as follows:

6        (a) Paragraph (1) is amended to read as follows:

7        "(1)(A)  The Chief procurement Officer and each District Contracting Officer shall

8   include in each government-assisted project or contract, totaling $300,000 or more, the provision

9   that 20% of all non-construction hours worked on the government assisted project shall be

10  performed by District residents.

11       "(B)   The Chief procurement Officer and each District Contracting Officer shall

12       include in each government assisted construction project, totaling $300,000 or more, that:

13       "(i)   At least 25% of journey worker hours by trade shall be performed by

14       District residents;

15       "(ii)   At least 50% of apprentice hours by trade shall be performed by

16       District residents;

17       "(iii)  At least 60% of the skilled laborer hours by trade shall be performed

18       by District residents; and

19       "(iv)  At least 70% of common laborer hours shall be performed by

20       District residents .".

21       (b) Paragraph (3)(A) and (B) is amended to read as follows:

22       "(A) A good faith effort is demonstrated by the beneficiary by providing documentation

23  evidencing a search of the First Source Register, a certification from the Department of

ABC059

1    Employment Services ("DOES") that no District residents are eligible and no District  residents

2    are available.  When making a determination of good faith waiver, DOES can consider the

3    following:

4              "(i)  A post on the DOES job website for 7 days;

5              "(ii) The publication of each job opening or part-time work needed in a District

6         newspaper with city-wide circulation for a minimum of 7 calendar days; and

7              "(iii) Written notice of each job opening or part-time work needed to the advisory

8         neighborhood commission located within the project's Advisory Neighborhood

9         Commission area no less than 7 calendar days prior to publication in a District newspaper

10        of city-wide circulation.

11        "(B) The beneficiary is located outside the Washington Standard Metropolitan Statistical

12   Area, none of the contract work is performed inside the Washington Standard Metropolitan

13   Statistical Area, the beneficiary searched the First Source registry for applicants, the beneficiary

14   published each job opening or part-time work needed for 7 calendar days in a District newspaper

15   of city-wide circulation, and the Department of Employment Services certifies that eligible

16   applicants from the First Source Registry do not possess either the skills required by the positions

17   or part-time available, or their own means to travel to the onsite job; or.".

18        (c) Paragraph (4) is amended by striking the phrase "monetary fines of 5 % of the

19   total amount of the direct and indirect labor costs of the contract" and inserting the phrase

20   "monetary fines of 10% of the total amount of the direct and indirect labor costs of the contract."

21   in its place.

22        (d)  A new section 5a. is added to read as follows:

23        "Sec. 5a. Modernization of First Source recordkeeping, controls and procedures.

ABC060

1    "(a)The Mayor shall implement all of the major recommendations in the D.C. Auditor's

2    May 6, 2010 Report on Compliance with the First Source Act and the Living Wage Act to all

3    government assisted projects in the District totaling $300,000 or more by establishing an

4    oversight program. The oversight program shall:

5        "(1)  Enforce compliance record keeping and monitoring process;

6        "(2)   Require that Contractors meet their obligations under land disposition and

7            development agreements, other contractual documents, and pursuant to the First

8            Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law

9            5-93; D.C. Official Code § 2-219.01 *et seq.*);

10        "(3)  Create and implement regulations for the Living Wage Act.

11    "(b)  Each District agency shall report on a quarterly basis, by using certified payrolls, to

12        the Council, the percentage of hours worked by the District residents on each of their

13        projects, by trade and by category.

14    "(c) The Department of Employment Services shall provide public access on its website

15    to all employment agreements entered into in 2009 and 2010 within 120 days of the effective

16    date of this section, and shall  make available online all future employment agreements.".

17    Sec. 3. Establishment of a District of Columbia workforce intermediary task force and

18    program.

19    (a)(1) Within 30 days of the effective date of this section, the Mayor shall establish a

20    Workforce Intermediary Task Force ("Task Force") for the purposes of reviewing best practices

21    for workforce intermediary programs.

ABC061

1          (2)  The Task Force shall review similar programs implemented by the governments

2     of Boston, Minneapolis, San Francisco, and any other cities that have implemented

3     similar programs.

4          (3)  Within 60 days of the establishment of the Task Force, the Task Force shall

5     recommend to the Mayor a workforce intermediary program for the District.

6     (b) The Task Force shall consist of 9 members appointed as follows:

7          (1) The Mayor, or his designee.

8          (2)  The Chairman of the Council or his designee;

9          (3)  The Director of the Department of Employment Services;

10          (4)  The Director of Small and Local Business Development;

11          (5)  The Deputy Mayor for Planning and Economic Development;

12          (6)  Two citizen members appointed by the Mayor; and

13          (7)Two citizen members appointed by the Chairman of the Council.

14     (c)  The director of each District agency and instrumentality that engages in

15     capital construction shall advise and assist the task force.  The Mayor and the Chairman of the

16     Council shall serve as co-chairs.

17     (d)(1) Within 120 days of the effective date of this act, the Mayor shall establish a

18     workforce intermediary program for the District.

19     (2) The workforce intermediary program shall:

20          (A)  Engage beneficiaries of proposed government-assisted projects prior

21          to the disbursement of District funds or the disposition of District property; and

22          (B)  Develop an in-depth employment plan that defines the number and

23          types of jobs or part-time work hours needed for the project that will be created,

ABC062

1       associated hiring schedules, job or part-time work descriptions, and standard hard

2       and soft skills requirements, including industry-recognized certifications, in

3       advance of the actual hiring date.

4    Sec. 4. Establishment of the District of Columbia Jobs Trust Fund.

5       (a)  There is established a nonlapsing fund the District of Columbia Jobs Trust Fund

6    ("Fund"), which shall be administered by the Department of Employment Services.  The funds in

7    the Fund shall be used solely for purposes of establishing and operating the workforce

8    intermediary program in section 3.  The following shall be deposited into the fund:

9       (1)  Contributions and donations; and

10      (2)  All outstanding monetary fines for willful breach of the First Source

11   Employment Agreement Act of 1984, effective date June 29, 1984 (D.C. Law 5-93; D.C.

12   Official Code § 2-219.01 *et seq.*).

13      (b)  All funds deposited into the Fund, and any  interest earned on those funds, shall not

14      revert to the unrestricted fund balance of the General Fund of the District of Columbia at

15      the end of a fiscal year, or at any other time, but shall be continually available for the uses

16      and purposes set forth in subsection (a) of this section.

17   Sec. 5.  Fiscal impact statement.

18      The Council adopts the fiscal impact statement in the committee report as the fiscal

19   impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,

20   approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206(c)(3)).

21

22   Sec. 6.  Effective date.

1        This act shall take effect following approval by the Mayor (or in the event of veto by the

2        Mayor, action by the Council to override the veto), a 30-day period of Congressional review as

3        provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December

4        24, 1973 (87 Stat 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of

5        Columbia Register.

**ABC064**

OFFICE OF THE GENERAL COUNSEL
COUNCIL OF THE DISTRICT OF COLUMBIA

1350 Pennsylvania Avenue NW, Suite 4, Washington, DC  20004 • (202) 724-8026

2011 MAY 11  PM 1:00

## MEMORANDUM

To:       Michael A. Brown, Councilmember, At-Large
From:   V. David Zvenyach, General Counsel
Date:    June 20, 2011
Re:       Constitutionality of the District's First Source Law

You requested an opinion about the constitutionality of the
District's "First Source" law. As discussed below, it is my opinion
that the law is constitutional.[1]

### QUESTION PRESENTED

Whether the District's "First Source" law runs afoul of the
Privileges and Immunities Clause of the Constitution?

### SHORT ANSWER

The District's First Source law does not violate the Privileges and
Immunities clause.

### DISCUSSION

In April 1984, the Council passed the First Source Employment
Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93;
D.C. Official Code 2-219.01 *et seq.*), which established a residency
preference for new hires on District-funded projects. Two months
earlier, the Supreme Court raised serious doubts about the
constitutionality of a residency preference hiring ordinance in
Camden, New Jersey, under an analysis of Privileges and
Immunities Clause. *United Bldg. and Const. Trades Council of
Camden County and Vicinity v. Mayor and Council of City of Camden*
("*Camden*"), 465 U.S. 208 (1984). To my knowledge, no court has
addressed the constitutionality of the District's First Source law.

---

[1] Although I have limited the discussion below to consideration of the
Privileges and Immunities Clause, it is also constitutional under both the
Commerce Clause and the Equal Protection Clause. If necessary, I can
supplement this opinion

ABC065

Under a close analysis of *Camden*, it is my opinion that it is constitutionally permissible.

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States. U.S. Const. art. IV, § 2, cl. 1. The purpose of the Clause is to prevent one state from discriminating against residents of another state in order "to help fuse into one Nation a collection of independent, sovereign States." *Toomer v. Witsell*, 334 U. S. 385, 395 (1948).

The Supreme Court has established a two-part test to determine whether residency preference laws run afoul of the Privileges and Immunities Clause:

(1)  The restriction on non-residents must encroach on an interest that is "fundamental to the promotion of interstate harmony." *Camden*, 465 U.S. at 218.

(2)  If it does, then the burden is on the jurisdiction seeking to justify the restriction to show that there is a "substantial reason" for the differential treatment and that the "degree of discrimination bears a close relation" to that reason. *Id.* at 222.

In its decision in *Camden*, the Supreme Court left no doubt that residency preference laws for hiring on public works projects meet the first part of the test. Specifically, the Court held that "[t]he opportunity to seek employment with such private employers is sufficiently basic to the livelihood of the Nation, as to fall within the purview of the Privileges and Immunities Clause even though the contractors and subcontractors are themselves

ABC066

engaged in projects funded in whole or part by the city."*Camden*, 465 U.S. at 221-22.[2]

With respect to second part of the test, though, the Court held that the record did not adequately show that nonresidents constituted "a peculiar source of the evil at which the statute is aimed." *Id.* at 222 (quoting Toomer, 334 U.S. at 398). Although the city of Camden claimed that the law was necessary to "increase the number of employed persons living in Camden and to arrest the 'middle class flight' currently plaguing the city," the Court remanded the case because there was insufficient facts in the record to determine whether the law was justified. *Id.*

Significantly, the Court distinguished the situation in *Camden* from that of an earlier decision, *Hicklin v. Orbeck*, 437 U.S. 518 (1978), in which the Court invalidated an "Alaska Hire statute" that attempted "to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents." *Hicklin*, 437 U.S. at 531. In contrast to the Alaska Hire statute, the Court explained that "[n]o similar 'ripple effect' appears to infect the Camden ordinance. It is limited in scope to employees working directly on city public works projects." *Camden*, 465 U.S. at 223.

Since *Camden*, most courts have struck down residency preference laws because the jurisdictions failed to sufficiently justify the need for a preference. For example, a District Court in Massachusetts recently granted a preliminary injunction against a city's residency requirement ordinance after finding that the ordinance did not have a close relationship to the city's economic woes. *Utility Contractors Ass'n of New England, Inc. v. City of Worcester*, 236 F. Supp. 2d 113 (D. Mass. 2002). Similarly, a District Court in New Jersey found that a residency preference hiring law was not valid

---

[2] In so holding, the Court distinguished the Privileges and Immunities Clause analysis from the longstanding "market participant" exception to the Commerce Clause.

*Constitutionality of the District's First Source Law*
June 20, 2011
Page 3 of 5

ABC067

because the city failed to show "that out-of-state workers are a source of unemployment and poverty within its borders." *Hudson County Bldg. and Const. Trades Council, AFL-CIO v. City of Jersey City*, 960 F. Supp. 823 (D.N.J. 1996). These courts usually find that the jurisdictions seeking to justify a preference law fail to demonstrate that "nonresidents were a 'peculiar source' . . . of the unemployment evil the residency statute was intended to address." *A.L. Blades & Sons, Inc. v. Yerusalim*, 121 F.3d 865, 872 & n.12 (3d Cir. 1997).

Despite the trend, at least one jurisdiction has upheld a residency preference very similar to the District's. In particular, shortly after *Camden* was decided, the Wyoming Supreme Court held that a residency preference did not infringe the Privileges and Immunities Clause because it "narrowly addresses the goal of reduced unemployment among the state's taxpayers by preferring available, qualified residents for government-funded positions." *State v. Antonich*, 694 P.2d 60, 64 (Wyo. 1985).

One way of reconciling these outcomes is to look to the type of evidence needed to justify the preference law. Ultimately, a number of factors can be used to support the conclusion that a residency preference is necessary to address the "evil" of out-of-state residents, including:

- The unemployment rate in the jurisdiction's construction industry;

- The cost of unemployment to the jurisdiction;

- Whether the cost of unemployment would be "significantly increased by throwing open public construction projects to nonresidents"; and

- "Whether the costs – if any – to the jurisdiction of allowing nonresident labor on such projects, costs in higher unemployment or welfare benefits paid unemployed construction workers or their families, were likely to

ABC068

exceed any cost savings in public construction from hiring
nonresident workers."

Benjamin S. Beach, *Using government policy to create middle class
green construction careers*, 18 J.L. & POL'Y 1, 50 (2009) (citing *W.C.M.
Window Co. v. Bernardi*, 730 F.2d 486, 498 (7th Cir. 1984)).

Accordingly, when considering amendments to the First Source
law, it may be helpful to include specific findings in the
Committee report about these statistics, if they are available.

Beyond the interest in reducing unemployment, the District has a
unique interest in ensuring a broad income-tax base. Unlike any
other jurisdiction in the country, the District is prohibited from
taxing income of non-residents. Accordingly, the District
government has a special interest in maximizing the amount of
income earned by residents, especially when derived from public
funds, and therefore imposing a residency preference meets the
substantial purpose of capturing the maximum return on its
investment on public works projects.

In conclusion, although many courts have rejected residency
preference laws after *Camden*, the situation in the District is
different. Here, the economic realities would likely support a
conclusion that a residency preference law is closely related to the
unemployment problem in the construction industry.
Furthermore, the District's inability to tax the income of out-of-
state residents creates a unique justification for a residency
preference in hiring beyond the traditional interests in promoting
a property tax base. Accordingly, in my opinion, the First Source
law does not violate the Privileges and Immunities Clause.

I am available if you have any questions.

VDZ

*Constitutionality of the District's First Source Law*
June 20, 2011
Page 5 of 5

ABC069

# DEPARTMENT OF EMPLOYMENT SERVICES



Testimony of Dr. Rochelle Webb
Acting Director
Department of Employment Services

## Vincent C. Gray
Mayor

Before the

### COMMITTEE ON HOUSING & WORKFORCE DEVELOPMENT

### Honorable Councilmember Michael Brown, Chairman

Public Hearing

on

Bill 19-50 "District of Columbia Workforce Intermediary Establishment and
Reform and Living Wage Amendment Act of 2011"

**Monday, March 14, 2011**
**10:00 a.m.**
**Room 120**
**John A. Wilson Building**
**1350 Pennsylvania Avenue, NW**
**Washington, DC 20004-3003**

ABC070

Public Hearing
Committee on Housing & Workforce Development
Monday, March 14, 2011, 10:00 am Room 120

Good afternoon Chairperson Brown and members of the Committee on Housing & Workforce Development. I am Dr. Rochelle L. Webb, Acting Director of the Department of Employment Services. I am happy to be before you to provide remarks for the Bill 19-50 "District of Columbia Workforce Intermediary Establishment and Reform and Living Wage Amendment Act of 2011."

I'd like to start by thanking both you and Chairman Kwame Brown for starting the workforce development conversation. By introducing Bill 19-50 as one of the first bills in this Council period, you have demonstrated your commitment to increasing the opportunities for the citizens of the District. It is vital for the executive and legislative branches to work in concert in order to lower our unemployment rates. The Mayor and I are dedicated to the same cause and we look forward to working with you.

The proposed bill covers a number of large workforce development pieces, including revising the local First Source law (increasing employer/contractor fines; establishing requirements for journey worker, skilled, common labor, apprentices, and non-construction hours by District residents; reviewing certified payrolls; and requiring job posting with the community). This proposed bill also includes changes to the Living Wage Act, creates a workforce intermediary, a task force, and a DC Jobs Trust Fund.

The intent of all these measures -to get District residents employed on projects that are funded by the District - is commendable. Representing the Department of Employment Services, I am committed to doing our part to help facilitate significant improvement and reform in this area.

I'd like to talk a bit about the workforce system in general before I comment on some specifics of the bill.

**A Strong Workforce System**
Mayor Gray is committed to ensuring that the District has a strong workforce system and that job training for District residents is focused on in demand and high growth occupations. Additionally, the Mayor is committed

Page 2 of 6

ABC071

to the development of industry partnerships by leveraging existing resources.The Mayor appointed me to ensure that DOES ensures contractor accountability in meeting the District's workforce development requirements.

As you know, the District's Workforce Investment Council (WIC) has not been effective. In the most recent past, the ineffectiveness of the WIC was due to a lack of leadership. My job includes eliminating the inefficiencies and ineffectiveness of the WIC through the provision of clear and knowledge guidance.

The role of the WIC to workforce development is straightforward – to carry out the strategic vision of the mayor as it relates to workforce. The Mayor has committed to make certain we appointments to the WIC who are knowledgeable of and committed to workforce and economic development. To this end, I have already hired a highly capable and experienced executive director for the WIC and an analyst starts this week to provide additional staff support for the WIC. The Mayor's Office of Boards and Commissions has put a high priority on ensuring that the appointments and reappointments of the WIC membership are made expeditiously. With a fully-functioning WIC, many of the workforce development concerns voiced today can be mitigated.

### Industry Advice

The Mayor has committed to convene Industry Advisory Councils focused on specific core industries with recommendations due within six months. These Industry Advisory Councils will develop specific recommendations on how the District can improve the business climate for core industries within the District. By focusing on sector strategies, meaningful recommendations will be made by experts on issues from tax and regulatory changes to infrastructure improvements and targeted job training. This work will be done through several District agencies, including DOES.

### Early Seat on Construction Projects

The Deputy Mayor for Planning and Economic Development (DMPED) is also committed to providing DOES a seat at the table in the early stages of discussions on development projects in the city. This change is certainly a significant improvement from the past. This decision alone allows DOES to learn about construction projects – and project cycles – so we can plan for

Page 3 of 6

ABC072

the jobs that are coming and train workers appropriately for those jobs, which is critical to a good workforce system for the District.

For example, Hensel Phelps, the developers of the Marriott Marquis Convention Center Hotel project, have a comprehensive workforce plan that includes the operation of an onsite job office where individuals can learn about and apply for jobs on the project. Job-seekers can also apply for other construction jobs across the city at this site. Hensel Phelps has been forthcoming with DOES in all of their job needs and challenges. We even know when they are bidding out the next part of the project so we can line up potential residents to be hired.  The Department of Local, Small, and Disadvantaged Business (DSLBD) is also working closely with Hensel Phelps to match the developers with certified local businesses to do sub-contracting. The relationship with DSLBD is also a relationship that DOES will continue to nurture.

Nevertheless, the city cannot focus disproportionately on construction jobs as its primary source to hire District residents. While construction jobs do have entry-level jobs and pathways to grow in those careers -- and they are uniquely tied to District funds – we must also look at our workforce system as a whole from a targeted and focused perspective. Although we see many construction projects in the District, the occupation itself is declining-meaning that jobs in this industry is not stable and are decreasing based on the most recent labor market information.

DOES  has already aligned new training opportunities to emerging occupations. Our Labor Market Information team has analyzed the in demand, high growth and declining occupation data to assist us in targeting training toward careers that provide the most opportunities to employment. We have been very specific with our analysis – we will train for industries that have 100 or more annual openings (jobs that are growing) in addition to jobs that are contracted to come to the District.

**BILL 19-50**
With this, I'd like to briefly talk about the bill before us.

*FIRST SOURCE*
The Mayor and DOES is committed to enforcing the District's First Source law and improving the program so that it actually works. As I said at

ABC073

previous hearings before this Committee, hiring District residents on District funded projects is a natural relationship and it is a certainly two-way street for us – employers need to tell DOES in advance what employment needs they have and DOES needs to ensure we provide the training for District residents to meet those needs. DOES must also supply qualified job candidates to employers who need skilled workers. Employers who receive District funds but intentionally evade the law should not do business with the District.

Mayor's Order 2011-47, issued last month, gives the Mayor additional tools to oversee this program through the DMPED and the Office of Contracting & Procurement (OCP). DOES is already working with both entities to apply potential sanctions to  22 employers who have not met monthly First Source new hire requirements. Last month, the Mayor announced a pilot jobs program that incentivizes contractors to hire District residents on six District-funded school construction projects totaling over $55 million. The key with this pilot is that these are short-term construction projects that will be completed by the 2011-2012 school year – providing us a short window to learn whether the program is a better alternative to the First Source program.

## WORKFORCE INTERMEDIARIES

The bill before this Committee seeks to create a workforce intermediary. It is the Executive's position that not a single job-training dollar should be spent through the Workforce Investment Act (WIA) without making certain-with the relevant employers at the table- that training programs meet local hiring needs. Workforce intermediaries are generally useful mechanisms to support workforce development, but they must be used and viewed as part of a greater workforce development system that includes a fully functioning WIC and strategies to get unskilled workers, including those with literacy deficiencies, into adult basic education programs and support systems. Individuals with literacy barriers- language, computer, or financial- will not be served by  workforce intermediaries and will be left behind unless workforce intermediaries function as part of an integrated workforce system that provides a continuum of service to all unemployed and underemployed District residents.

Workforce intermediaries can assist in connecting residents to jobs. However, to avoid catastrophic results to federal performance, which ensures that federal workforce dollars flow to the District, a plan must be developed and implemented that allows the District to meet its performance

ABC074

standards by increasing the number of residents that enter employment. The process of restructuring DOES and the District's workforce and employment services will take time, but I am confident that with assistance from the Council and other stakeholders, we will succeed. Therefore, I urge the Council to allow more time for evaluation of the role of workforce intermediaries before implementing them in the district.

Again, thank you Chairman Brown and Council Chairman Kwame Brown for your early and strong leadership by introducing this bill. I look forward to many more conversations about workforce development, the First Source program, workforce intermediaries, and how we accomplish the goal of decreasing the number of unemployed District residents by placing them in good jobs within the District.

I very much appreciate the opportunity to provide remarks regarding the proposed bill. I am happy to answer any questions you may have.

ABC075

BEFORE THE COUNCIL OF THE DISTRICT OF COLUMBIA

**Committee on Housing and Workforce Development**

Public Hearing

Bill No. 19-50
*"District of Columbia Workforce Intermediary Establishment
And Reform of First Source and Living Wage Act of 2011"*

March 14, 2011

Testimony
of
Roderic L. Woodson, Esq.

Good day Chairman Brown members of the Committee. My name is Roderic L. Woodson, and I am a partner with the law firm of Holland & Knight LLP, co-chair of its DC Practice Group, and chair the legislative committee of the DCBIA. As counsel to various members of the building industry and the building construction industry, I have been involved with issues related to workforce development and First Source Hiring regulation for some years, and I appear before you today with comments on Bill No. 19-50, the *"District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Act of 2011"* (the "Bill"). My testimony will address several substantive issues.

First, we believe the idea of a workforce intermediary to connect graduates of programs operated by training providers to related employers has real merit. The question is what implementation model should be used. The Bill implies that the intermediary be a single entity, but there are other approaches. For example, a "distributed model" could have (a) an intermediary to handle large-scale projects

ABC076

with long development time-lines and/or (b) an intermediary or series of intermediaries whose individual focus would be on specific sectors of our local economy such as health-care, hospitality, government service, or educational institutions. Funding mechanisms could range from actual project-based contributions (as was the case with the Anacostia Waterfront Corporation projects); government appropriations; or through a donation program from private sector businesses and/or philanthropies. We also observe that the Bill calls for creation of a "task force" to make recommendations on an intermediary model. The task force, however, should be more broad-based and include employers and others with real-world experience.

DCBIA also cautions against the proposal to increase the penalty provisions currently in the First Source program. At the outset, we note tht the current penalty structure has never been utilized; and, we believe, for some good reason. The statutory construct of the penalty violates basic due process and is administratively burdensome on the government. No pathway exists for those who are targeted for non-compliance to dispute imposition of the penalty; and none of DOES, OCP, or the DC Auditor have the capacity to undertake such a compliance/enforcement program.

We also note that the percentage mandates for employment of District residents appears to apply to the entire workforce of an entity receiving "government assistance". Aside from the obvious and erroneous presumption in the Bill that building construction work will resolve unemployment in the District,

2

these mandates are extreme, and may well violate the Privileges and Immunities Clause of the Constitution. The City of Baltimore concluded as much in a similar situation last year. [1]

The record-keeping specifications also appear unworkable. For example, section 2(b) calls for each District agency to provide quarterly reports of "hours worked" by District residents on all contracts/projects to the City Council itself. If this is meant to apply to all First Source contracts, this will result in thousands upon thousands of pages of documents generated by the businesses (including most not for profit enterprises) sent to every government agency, to DOES, and then to the Council. Such a regime is totally impractical for everyone involved.

Finally, the Bill calls for the Mayor to "create and implement regulations" for the Living Wage law. Such a mandate is superfluous and unnecessary as the original law itself authorizes the Mayor to adopt appropriate regulations. [2]

The DCBIA concurs with the view that unemployment of District residents must be addressed, but we also urge this Council to reject the proposals in the current Bill. As noted by my colleagues, this bill does nothing to address the underlying issue driving unemployment -- the mismatch between the skills needed in the local economy and the abilities of so many District residents.

This concludes my prepared remarks, and I will be pleased to answer any questions the Committee may wish to ask.

#10186594_v1

---

[1] *See, Opinion of the city of Baltimore Department of Law*, July 19, 2010 regarding local law hiring preferences appended hereto.
[2] *See,* Section 110. *Way to Work Act of 2006*, DC Law No. 160118, 53 DCR 2602.

**ABC078**

CITY OF BALTIMORE

STEPHANIE RAWLINGS-BLAKE, Mayor



DEPARTMENT OF LAW

GEORGE A. NILSON, City Solicitor
101 City Hall
Baltimore, Maryland 21202

July 19, 2010

Honorable President and Members
of the City Council of Baltimore
Room 409, City Hall
100 N. Holliday Street
Baltimore, Maryland 21202

Attn: Karen Randle
Executive Secretary

Re: City Council Bill 10-0455
Community Partnership Agreements

Dear President and City Council Members:

You have requested the advice of the Law Department regarding City Council Bill 10-0455. City Council Bill 455 requires community partnership agreements for certain construction projects financed or funded by or through the City; defines certain terms; specifies the minimum contents of an agreement; provides for the creation of a model agreement; requires certain annual reports; provides for the automatic termination of the ordinance; and generally relates to community partnership agreements.

Bill 455 requires that the City include in all contracts for construction projects with a total cost of $5,000,000.00 or more in which the City has a certain financial role, a provision that requires contractors to enter into "Community Partnership Agreements" with the City and certain unions. The bill does not define "Community Partnership Agreement" but dictates its minimum contents. Each Community Partnership Agreement must require contractors to use the hiring halls of the signatory union as their first source of employees for 48 hours. The Agreement must also contain a no-strike clause and must require the signatory unions to "exert their best efforts" to recruit local workers for their hiring halls.

**Local Hiring Preference:**

The bill's requirement that signatory unions "exert their best efforts" to recruit local workers to their hiring halls combined with the requirement that contractors use those hiring halls exclusively

Printed on recycled paper with environmentally friendly soy based ink.

ABC079

for 48 hours on covered projects, results in a hiring preference for local workers. The Law Department has consistently advised the City that a direct preference for hiring Baltimore residents for City funded work would run afoul of the Privileges and Immunities Clause of the Constitution and would interfere with the City's Charter-mandated procurement process.

The Supreme Court in *United Bldg. and Const. Trades Council v. Camden*, 465 U.S. 208, 220 (1984), a case addressing a law similar to this one, held "a city's efforts to bias employment decisions in favor of its residents on construction projects funded with public monies" "discriminates against a protected privilege." *Camden*, 465 U.S. at 221-2. The Court held "[t]he opportunity to seek employment with such private employers is 'sufficiently basic to the livelihood of the nation.'" *Id.* at 221 (quoting *Baldwin*, 436 U.S. 371, 388 (1978)).

The fact that the bill requires the unions to "exert their best efforts" to recruit local workers to their hiring halls, as opposed to using quotas, is of no legal consequence. The *Camden* law was changed from a quota to a "goal" with which developers and contractors must make 'every good faith effort' to comply." *Id.* at 214. Like the law in *Camden*, the purpose of Bill 455 is to give local (union) workers first dibs on City projects. The fact that nonresidents could potentially join those hiring pools is also of no consequence.

"[S]tatutes or ordinances mandating local hire in publicly funded projects are meeting a negative response based on both Commerce Clause and the Privileges and Immunity clause rationales." 3 Local Government Law §22:12. "Residence in the area has been rejected as a basis for an award of a public construction contract where the award is based solely on the reasoning that a local firm will use local contractors, local labor and will patronize local supply houses." 13 McQuillin Mun. Corp. §37:104. Although there is authority in some jurisdictions to the contrary, it is factually distinguishable and/or the challenge brought was not based on the Privileges and Immunities Clause.

Furthermore, a local hiring preference would not withstand a Commerce Clause challenge if the City did not have a "proprietary interest" sufficient to make it a "market participant" under the law. Bill 455 defines "covered construction project" as one that the "City finances, in whole or in part, through a [TIF] or a tax abatement program" or "…that is funded, in whole or in part, through state or federal grants or loans administered by the City." § 23-1 (D). The City must bear substantial economic risk on a project to be considered a "market participant" sufficient to survive a Commerce Clause challenge. Playing a minor financial part in a project is not enough. As written, Bill 455 would require the City to enter into these agreements, thereby participating in preferential hiring in situations where it would not be considered a "market participant." This could be challenged as a violation of the Commerce Clause.

Even if the bill were stripped of the local hiring preference, it still violates the Charter and would likely be struck down by courts as preempted by the National Labor Relations Act ("NLRA").

ABC080

**Charter:**

The bill restricts the Board of Estimates' authority to award contracts and determine the fiscal policy of the City. Section 11(a) of Article VI of the Charter states that "The Board of Estimates shall be responsible for awarding contracts and supervising all purchasing by the City as provided in this section and elsewhere in the Charter." Bill 10-455 attempts to usurp the authority of the BoE by dictating which bidders are qualified to work on certain projects (only those willing or able to enter into these agreements. The City Council cannot by ordinance alter the authority granted in the Charter to the Board of Estimates. Furthermore, this law could have a negative impact on the ability of minority businesses to bid on City work, decreasing the effectiveness of the MWBE law. Bill 10-455, by requiring that all contractors on certain projects enter into what are essentially pre-hire collective bargaining agreements, restricting virtually all hiring, would impact the current bidding process significantly, thereby narrowing the Board's fiscal choices and potentially effecting the incentive to hire minority and women-run businesses for the same reasons.

Although there is an exception to the lowest responsible bidder standard in the Charter in Section 11(g)(1)(vi), which states that "notwithstanding the competitive bid provisions of this Charter, the Board of Estimates may adopt rules and regulations that establish uniform procedures for providing, on a neighborhood service, neighborhood public work, or neighborhood public improvement contract, limited bid preferences to responsive and responsible bidders who are residents of, or have their principal places of business in, that neighborhood", this exception was provided by Charter amendment and lies within the discretion of the Board of Estimates.

**NLRA Preemption:**

The bill is preempted by the NLRA. The NLRA preempts any local ordinance that regulates (*inter alia*) an area of labor relations that Congress intended to "be controlled by the free play of economic forces." *Bldg. and Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 34 (D.C. Cir. 2002) (quoting *Int'l Assoc. of Machinists & Aerospace Workers v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140 (1976)). "[T]he decisions of private employers and employees regarding whether or not, and with whom, to bargain" is an area of labor relations that Congress intended to be unregulated. *See Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 108 F. Supp. 2d 73, 81 (D.R.I. 2000).

The "Community Partnership Agreement" that is required by Bill 455 is essentially a project labor agreement, or a pre-hire collective bargaining contract. Local governments generally may not require by regulation that private parties negotiate collective bargaining agreements. *See Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277, 281 (7th Cir. 2005); *Associated Builders & Contractors of Rhode Island*, 108 F. Supp. 2d at 84 (holding that a city's policy requiring execution of a "project labor agreement" in exchange for favorable tax treatment was preempted). Bill 10-455 requires certain private parties to enter into project labor agreements. Therefore, it would regulate "the decisions of private employers and employees regarding whether or not, and with whom, to bargain." *Assoc. Bld. & Contractors of R.I.*, 108 F. Supp. 2d at 81. Consequently, the bill would be preempted by the NLRA, unless it fit within the "market participant" exception, which it does not. *See Allbaugh*, 295 F.3d at 34.

ABC081

Bill 455, in addition to requiring that contractors working on certain City projects enter into labor agreements, also dictates the terms of those agreements. <u>Unlike</u> the master agreement addressed in *Building & Construction Trades Council v. Associated Builders & Contractors of Mass.*, 507 U.S. 218 (1993) (the "Boston Harbor" case often cited by union proponents as validating project labor agreements), in which the public entity was under a court order to complete a project by a certain deadline in which it had a tremendous financial stake, Bill 10-455 applies to <u>all</u> projects of a certain value meeting certain financial descriptions and it therefore is a <u>regulatory</u>, rather than an economic measure. As stated in *Metropolitan Milwaukee Association of Commerce v. Milwaukee County*, 431 F.3d 277 (7th Cir. 2005), a case involving a restrictive labor peace law, **"[the law] is a pretext to regulate the labor relations of companies that happen, perhaps quite incidentally, to do some county work."** *Id.* at 282 (emphasis added).

Furthermore, Bill 455 arguably applies to situations in which the City's interest is taxation. This is simply "not sufficient participation in the marketplace to shield the action from federal preemption." *See Assoc. Blders & Contractors of R. I.*, 108 F. Supp. 2d at 83. In assessing taxes, a government is performing its "primeval governmental activity"; it is not "exhibiting behavior analogous to that of private parties in the marketplace." *Id.*

**Union Preference:**

"[U]nreasonable provisions limiting the contractor's right to select employees to perform the work under a municipal contract are contrary to public policy and invalid. Thus, a provision in a contract that none but union labor shall be employed by the contractor ... is generally held void." 10A McQuillin Mun. Corp. § 29:94 (3rd ed.). Bill 455 mandates that contractors on covered projects use union hiring halls as their primary source of labor. This obviously greatly restricts a private employer's right to select employees.

For the reasons above, the Law Department does not approve the bill for form and legal sufficiency.

Sincerely yours,

Ashlea H. Brown
Assistant City Solicitor

cc:  Angela Gibson, City Council Liaison, Mayor's Office
George Nilson, City Solicitor
Elena DiPietro, Chief Solicitor
Hilary Ruley, Assistant Solicitor
Terese Brown, Assistant Solicitor

ABC082

DISTRICT OF COLUMBIA BUILDING INDUSTRY ASSOCIATION

2011 Board of Directors

Executive Committee
Merrick T. Malone
DCBIA President
Metropolis Development Company LLC
Sean C. Cahill
DCBIA Vice President
Louis Dreyfus Property Group
Ernest Drew Jarvis
DCBIA Vice President
CB Richard Ellis, Inc.
Matthew J. Klein
DCBIA Vice President
Akridge
Deborah Ratner Salzberg
DCBIA Secretary
Forest City Washington
Todd Stokes
DCBIA Treasurer
Baker Tily
W. Christopher Smith, Jr.
DCBIA Immediate Past President
William C. Smith & Co., Inc.
Jeffrey H. Bellman
Saul Ewing LLP
Jair K. Lynch
Jair Lynch Development Partners
Jerry A. Moore III
Venable LLP
Debra D. Yogodzinski
Arent Fox LLP

Directors
James J. Abdo
Abdo Development, LLC
Freddie Lewis Archer
Lewis Real Estate Services
Mark Baughman
SKB Architecture & Design
Maybelle Taylor Bennett
Howard University Community Association
Robert B. Brarss
Paton Boggs LLP
Kenneth W. Broussard
KeyBank
Christopher R. Clarke
Terra Nova Title & Settlement Services
Donna Cooper
Pepco Region
Barry DePaepe
Clark Construction Group
Christopher J. Donatelli
Donatelli Development
Daniel P. Deeley
Tishman Speyer
Pamela Bundy Foster
Bundy Development Corporation
Gordon Fraley
Vornado/Charles E. Smith
Barbara Gertzog
SunTrust Bank
L. Henry Gifford
Gifford Corporation
Michele V. Hagans
Fort Lincoln New Town Corporation
Cheryl P. Hamilton
DC Housing Enterprises
Gary E. Humes
Arnold & Porter LLP
Godfrey W. Kieffer
Woodmark Commercial Services, LLC
Carey C. Majeski
DR Development Services, LLC
Deryl McKissack
McKissack & McKissack
Brett McMahon
Miller & Long Co., Inc.
Gregory B. Meyer
Brookfield Properties
Paul Nasersta
PN Hoffman, Inc.
Howard J. Riker
Hines
Susan Rogers
Bank of America Merill Lynch
Berkeley M. Shervin
The Wilkes Company
Kenneth F. Simmons
Boston Properties, Inc.
Suman Sorg
Sorg Architects
Joseph Sternlieb
EastBanc, Inc.
Steven A. Teitelbaum
Jones Day
Aakash R. Thakkar
EYA, LLC
Paul Tummonds
Goulston & Storrs
Robert W. Ward
Skanska USA Commercial Development Inc.
Roderic L. Woodson
Holland & Knight LLP

Counsel
Christopher H. Collins
Holland & Knight LLP

## Testimony of Merrick T. Malone, President
## District of Columbia Building Industry Association
## On Bill 19-50
## "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011"

### Before the Committee on Housing and Workforce Development
### Michael A. Brown, Chairman

#### Monday, March 14, 2011, 10:00 AM
#### Room 120, John A. Wilson Building

Good morning, Chairman Brown and members of the Committee on Housing and Workforce Development. I am Merrick Malone, President and CEO of Metropolis Development Company, a District-based real estate development firm. I am testifying today as President of the District of Columbia Building Industry Association (DCBIA) to register the deep reservations of our members with Bill 19-50, the "Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011."

In our view, Bill 19-50 is mis-titled. It does nothing to reform First Source as a failed program. Instead, it merely extends already excessive mandates and makes more severe already punitive penalties for non-compliance, none of which addresses the failings of First Source as a response to resident unemployment.

I would cite an editorial of The Washington Post (6/15/05): "The goal of connecting District residents with available jobs cannot be achieved through mandates when the potential workers do not have the readiness or interpersonal skills that make a fit possible. In addition, it is not clear the Department of Employment Services has the ability, capacity or track record to satisfactorily address workforce development issues such as the lack of skills, literacy and other aspects of job readiness."

That editorial appeared six years ago, and today almost thirty years since the start of First Source in 1983, we are still tinkering with a failed program that does not address the larger issues of workforce development.

Bill 19-50 mandates enlarged resident quotas for both non-construction and construction hours worked on government-assisted developments and contracts

| Past Presidents Council | | | Residential Council | | Advisory Committee | Executive Vice President |
|---|---|---|---|---|---|---|
| William B. Alsup III | Albert R. "Butch" Hopkins, Jr. | David W. Briggs | Douglas N. Jemal | J. Henry Ambrose | Gail Edwards |
| Hines | Anacostia Holding Company, Inc. | Holland & Knight LLP | Douglas Development Corp. | Verizon Communications, Inc. | |
| Charles K. Barber | Joseph R. Horning, Jr. | Tanja H. Castro | Harold M. "Harry" Johnson | Vera L. Fontana | |
| The George Washington University | Horning Brothers, Inc. | Holland & Knight LLP | Willis | Washington Gas | |
| Neal B. Blen | Philip R. Miller | Brian P. Coulter | Peter J. McKenna | Joseph D. Schell | |
| Blen/Paul Ventures, Inc. | MDC Land, Inc. | The JBG Companies | Baker Tily | Pepco | |
| Robert H. Braunohler | William O. Yoee | Peter G. Gartlan | Robert L. Moore | | |
| Louis Dreyfus Property Group | Real Estate Development Advisor | The Donohoe Companies, Inc. | Development Corporation of Columbia Heights | | |
| Gregory W. Fazakerley | Thomas W. Wilbur | H. Linda Goldstein | William H. Norton | | |
| CG Investments | Akridge | Goulston & Storrs | Northwestern Mutual Life Insurance Company | | |
| Steven A. Grigg | James S. Williams | Philip M. Horowitz | Darrel D. Rippeteau | | |
| Republic Properties Corporation | The Carlyle Group | Venable LLP | Rippeteau Architects, P.C. | | |
| | | Michael D. Huke | Raymond A. Ritchey | | |
| | | CH Properties, Inc. | Boston Properties, Inc. | | |

ABC083

totaling $300,000 or more. Those construction hour quotas are further defined along four different skill levels. The result is a level of micro-regulation that makes even more onerous the already burdensome monthly reporting requirements of First Source, which in their complexity have apparently already exceeded the ability of DOES to process.

In applying those mandates not to new hires but to the total staffing requirement of each project or contract, the bill worsens another serious problem of First Source – namely, workability. The bill seems to assume that contractors enter into new projects with a blank staffing slate to be filled on the spot project-by-project – much as kids approach a schoolyard pick-up game. But that obviously is not how businesses operate and raises the question of how First Source quota requirements are to be accommodated within a firm's existing permanent staff and long-term supplier relationships. Terminating existing staff to make way for quota hires is neither practical nor equitable; hiring redundant workers is only practical (though hardly sound) if the additional project costs are recognized and accepted as additional costs of First Source.

The purpose of other amending provisions, such as increasing fines for non-compliance and tightening of program controls, would seem to make sense only if the failings of First Source are assumed to arise from some overt refusal of businesses to hire District residents and the only remedy, therefore, is to crack down on compliance. But the experience of the past few decades does not support that assumption. The root cause of the disappointing results of First Source lies not in a shortage of jobs or some employer conspiracy but in a mis-match of job requirements, on the one hand, and the qualifications of First Source referrals on the other. Coercive compliance measures do not address that basic fact.

A previous presentation showed that even if all of the District's resident workforce were employed in District-based jobs, only some 45% of those jobs would be filled. The availability of jobs is there, but all too often the job readiness skills of District residents are not. The government's fixation on stricter First Source enforcement as a solution to resident underemployment skirts the real problem. What is needed is a realistic action plan for workforce development that includes job readiness training and the basic educational reforms to provide residents with adequate skills to compete in today's ever more demanding workplace.

2

ABC084

The application of First Source hiring mandates rests on a basic premise – which the stated resident quotas are achievable as a practical matter or, at least, can be made achievable through parallel and supporting workforce development efforts. In the District, we have the mandates and the quotas, but we do not have the parallel supporting efforts.

Fortunately, there is some hope for a fresh look and a more productive future for First Source in the District. Bill 19-50 also calls for the establishment of a "Workforce Intermediary Task Force" to review best practices among other cities. We strongly support this provision, but urge that the scope and make-up of the task force be expanded to provide for a more comprehensive review of current workforce development policies and recommendations for a re-structuring of those policies. We see this as an opportunity for a top-to-bottom re-evaluation of policy options that can result in a more constructive approach to resident underemployment in the District. We should seize it in the interests of our city and its residents.

That concludes my testimony. I would be pleased to answer any questions.

3

ABC085



DC Chamber of Commerce

**Testimony of
Barbara B. Lang, President & CEO of DC Chamber of Commerce
Before the Committees Housing & Workforce Development
On
Bills 19-50, Workforce Intermediary Establishment and Reform of First Source and
Living Wage Amendment Act of 2011
Monday, March 14, 2011**

Good morning, Councilmember Brown and staff. My name is Barbara Lang and I am the President and CEO of the DC Chamber of Commerce, the largest business organization in this region representing 1700 businesses across all industries.

I would like to state from the outset that employing DC residents is a top priority of the DC Chamber. Just two weeks ago we testified in-front of this committee regarding the Chamber's specific Return Returning Citizen Employment and Entrepreneurship Initiative. The issue before us today however is about how to put all District residents back to work. It is the Chamber's belief that it is both the private sector and District government's obligation to create an effective workforce development system. Job creation and job retention is the greatest economic driver for business and we must work together not to stifle this process. A workforce development strategy should not be based around penalties and mandates, but about attracting business with job growth potential and new industries ensuring residents are prepared so that we can employ current and future District residents.

I want to focus my testimony on workforce development and ways we can work together to incent business to hire more employees even during these tough economic times and prepare residents for those jobs. I strongly encourage you to focus your efforts on reinvigorating the Workforce Investment Council. I have spent several years trying to establish a fully-functioning WIC and I still whole-heartedly believe that a strong and aggressive WIC in the District would be a difference maker in creating a workforce pipeline.

In addition, without a proper job readiness plan, which the District government follows, to train and place workers in jobs that are currently available or that will be available in the coming 6, 12, and 18 months we will be right back here in two years with yet another piece of legislation purportedly to fix the problem of unemployment. What the District needs is a plan that targets job training and readiness to the District's high-growth and high-demand sectors. Putting hiring requirements on District businesses when the District has not taken the time to cultivate workforce training program for residents is setting business and residents for not achieving desired results. It is clear businesses stand to gain through the availability of qualified and trained local residents who are ready for employment – and all available District resources should be leveraged to improve local workforce development.

What this legislation should be focused on is a more general question and that is how to make the government more effective. DOES has to be more than just First Source Agreements and Living Wage compliance. I urge you to work with Dr. Webb to focus on her needs to make DOES a strong and vibrant workforce center that should not reliant upon First Source Agreements to find District residents jobs, but can cast a wider more effective net. Mandating

ABC086

hiring practices beyond just "new" jobs by District business will have a chilling effect on businesses across the District.  These are businesses that provide needed services to the District government and residents.

The new administration and this Council should make creating more jobs and job preparation its number one priority, but that must be done in a holistic approach and should focus on those most in need first and foremost.  As my good friends at the DC Fiscal Policy Institute stated in their June 25, 2010 report "The increase in unemployment in DC is affecting many of the residents who are least able to weather the economic recession: low-wage workers, low-income households, and residents with a high school diploma or less.  For these groups, poverty and unemployment have been persistent challenges – and have only become more challenging as a result of the current recession.  Given that the economic recovery is expected to take several years, it is important to consider ways that the District can support these workers, both in terms of ensuring that they have enough income supports to avoid falling further into poverty and access to any training they may need to reenter employment successfully."

I realize funding is limited to improve programs at DOES or add staff to the WIC and adding penalties and stiffening fines for non-compliance seems like a strong message to business and has the added benefit of adding revenue, but it comes with a cost to the District as I have seen my membership dwindle as companies fold or move out of the District.  Lowering unemployment can best be accomplished by promoting industries, helping them during economic downturns, incentivizing new industries to come to DC and start their business so that there are new economic opportunities.  Nothing in Bill 19-50 does that but it is being touted as a jobs bill.

While well intended, this bill is premature until the City has the infrastructure to support this effort.

Thank you again, for allowing me to testify and I will be happy to answer any questions.

ABC087

**TESTIMONY OF ROBERT H. BRAUNOHLER**
**Louis Dreyfus Property Group**
**Before the D.C. Council Committee on Housing and Workforce Development**
**March 14, 2011 at 10:00 AM**
**Bill Number 19-50; Workforce Intermediary Establishment and Reform of First**
**Source and Living Wage Amendment Act of 2011.**

Good morning, Chairman Brown and members of the Committee on Housing and Workforce Development. I am Robert Braunohler, Regional Vice President of Louis Dreyfus Property Group, a national real estate development company that is very active in Washington, DC. I am here to testify today in opposition to Bill #19-50, and I would like to explain my reasons.

Unemployment is relatively high in Washington, DC. This is a consequence of many factors; however, it is not because we have a weak job market. We have more than twice as many jobs in the District as we have residents in the workforce. District employers have to import workers from the surrounding jurisdictions; there is no evidence that District employers discriminate in hiring against District residents. The underemployment of many District residents is not an issue of job availability.

Let's look at where the jobs are in Washington. Out of 728,000 total jobs, about two-thirds are in the private sector and one-third is in the government sector. Of those in the private sector, the largest categories of employers are professional and business services, education, health care, and hospitality. Way down at the bottom of the list is construction, which accounts for 1.5% of total jobs.

What is the focus of Bill 19-50? It is on the 1.5% of available jobs that are in construction. It does not focus on the largest employers, which are primarily hospitals and universities. None of those employers have to file First Source paperwork with DOES.

The fact is, the economy of the District is dominated by service providers, not producers of hard goods. Yet Bill 19-50 seeks to increase quotas and penalties that will apply only

ABC088

to developers and contractors, the producers of buildings. This Bill takes a punitive approach to solving an underemployment problem, when the solution requires a much more integrated and thoughtful approach. Our unemployment problem is not due to contractors being unwilling to hire DC residents; rather, our unemployment problem is caused by a skills mismatch between an under-qualified workforce and the jobs that are available.

This problem has been studied for years. In 2008, DOES conducted a "best practices" review of the most effective job creation programs in other cities. They found, without exception, that cities with the most improvement in job placement were those that had abandoned a punitive, "quotas and penalties" approach to the problem. Instead, the most successful programs combined a coordinated, team effort involving city government, education resources, and the major employers, creating training and support programs to address the need for skills development. At that time, DOES proposed a First Source Advisory Group to suggest improvements to First Source, but that was never established.

Our current jobs placement system is completely broken. DOES has no ability to provide a qualified pool of applicants for employers who are looking to hire. The Workforce Investment Council, which is supposed to oversee the training programs that receive federal money, consists of a Director and a Deputy Director, but has no staff. Most importantly, all First Source legislation in the District exempts contractors who are signatories to collective bargaining agreements. This means that union contractors can hire from the union hall, as they do everywhere in the country, and District residency requirements do not apply to them. The effect of this exemption can be seen by our experience on one of our largest projects, Station Place. Only 38 out of 413 new hires during the construction of this 1.6 million square foot project were required to comply with First Source laws.

Ladies and gentlemen of the Council, we need a better approach. Increasing quotas and penalties associated with First Source is simply a bad idea. We need a broader, more cooperative workforce policy, not a bigger stick with which to threaten non-union

ABC089

contractors. Penalties of the type envisioned by Bill 19-50 would have a chilling effect on new development. Developers and capital sources all have other options for investing their time, energy and money, and driving development out of the District with the uncertainty of huge penalties would be in no one's best interest.

Bill 19-50 suggests setting up a First Source Task Force. We strongly support that concept, and we suggest that the composition of the Task Force be broadened to include representatives of the Mayor, the Council, union as well as non-union contractors, educators, large employers, economists, and labor market analysts. New First Source legislation should be proposed only as the result of the findings of that Task Force.

The public-private partnerships that already exist at Cardozo and at Phelps show that the private sector is ready and willing to join with the government to financially support vocational training for District youth. We don't need to be threatened; we would like to help solve the problem. We have already shown our commitment, of time and money, to improving the employment prospects of District residents. Let's fix our workforce development policies as members of the same team, and let's get it right this time.

Thank you for your attention. I am happy to answer your questions.

ABC090

Statement from Stephen White

God Morning Honorable Chairwomen:

My name is Stephen White, and I am a Staff Representative for the American Federation of State, County and Municipal Employees (AFSCME), District Council 20. My council represents over eight thousand District of Columbia workers, which include the Library aides at Howard University and the set-up and janitorial workers at the Washington Convention Center. It is the workers at the Convention Center that I would like to talk about today. We have two separate locals at the convention center; our members that do the set-up for the various events that that are scheduled there, and our members who do the janitorial and related services. The set-up members are regular convention center employees, who earn a decent wage and have excellent benefits. Our members who the janitorial and related services are not as fortunate. They work for a company named Aramark, whom the convention has contracted to do the janitorial and related services. They have been providing these services since 2004, when we negotiated our first collective bargaining agreement with them. When that agreement expired in 2007, we proposed during negotiations that they start paying our members the living wage. They were able to avoid doing it at that time because they had entered into their contract with the convention center before the law was implemented in 2006, which made them exempt until that contract expired in 2009. The convention center renewed their contract in 2009, and we began negotiations for a new agreement in 2010. We again proposed that they start paying our members the living wage, and they claimed this time that they were exempt because they come under the federal contactors exemption, which we are planning to challenge thru the Department of Employee Services (D.O.E.S). The majority of our members who work for Aramark are employed on a part-time basis, which means that they receive no health insurance. Combined with that fact, over half currently make less than the living wage. Even though we are going to file a complaint with D.O.E.S., we wanted to bring this situation to your attention to give you an example of the difficulty of making some of the contractors that do business in the District of Columbia, abide by its laws. We are also asking for your support in the upcoming fight that we know is about to come when we file our complaint against Aramark for not complying with this law. Thank you.

Stephen White
Staff Representative
AFSCME District Council 20

 **Wider Opportunities for Women**

**Testimony of Camille Cormier, Local NTO Programs & Policy DirectoBefore The Council of the District of Columbia**
**Committee on Housing & Workforce Development**
**Public Hearing on B19-50, the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011"**

Good morning Chairman Brown and members of the Committee. I am Camille Cormier, Director of Local Nontraditional Occupations for Women (NTO) Programs and Policy at Wider Opportunities for Women (WOW). Thank you for the opportunity to testify before the Committee at this vitally important public hearing on First Source and the establishment of a workforce intermediary.

WOW works nationally and in our home community of Washington, D.C. to build pathways to lifelong economic security for America's women, girls and families. For over 45 years, WOW has helped women learn to earn, with programs emphasizing literacy, technical and nontraditional skills, the welfare-to-work transition and career development in the District of Columbia as well as around the country. WOW in its community-based capacity has trained more than 10,000 women for well-paid work in the DC area since the 1970s, is an appointed member of the WIC, and served on the Nationals Stadium Project Labor Agreement Task Force in 2007-2008. WOW also chairs the DC Jobs Council (from whom you'll be hearing a bit later today) and the DC Women's Agenda, advocacy coalitions focused on the needs of District jobseekers and our women and girls, respectively. We are pleased to offer the following comments on reform and enhancement of the District's First Source and Living Wage legislation so that they may truly benefit the District's unemployed and underemployed residents (many of whom are women) and meet the needs of employers doing business in the city.

As you may know, WOW has developed income adequacy measures for the Metro DC Area and through out the country that looks at what it takes for families to make ends meet, first through the DC Family Economic Self-Sufficiency Standard, or DC FESS. The DC FESS presents self-sufficiency wage rates necessary for wage earners and their families to make ends meet each month– living on a bare-bones budget. The budget is based on the actual costs of living in a county or in this instance, the District of Columbia and its adjoining suburbs. The budget is based on family size and age of children and work supports like the cost of childcare and transportation. In 2006, the data from the DC FESS helped inform the wage increase authorized under the Living Wage provision in the Way to Work Act of and raised its hourly rate from $9.25 to $11.75 in the final legislation. We urge the Council to raise the Living Wage in 2011, beyond the annual percentage increase stipulated in the earlier legislation and in consideration of the increased costs of living in the District over the past five years. At the same time, the government should ensure that all District workers entitled to receive the living wage do in fact, receive it, through closer compliance monitoring of applicable contractors.

In October, WOW released its newest income measure in the DC Metro Area, Basic Economic Security Tables for the DC Metro Area (DC BEST), which assess the current costs of making ends meet in DC and adds the costs of savings for emergencies, retirement, public higher education and home ownership - income needed to build lifelong economic security for over 400 family types in the District. The BEST

ABC092

As noted earlier, job readiness and basic skills remediation needs of District low-income jobseekers should be incorporated into hard-skills job training or included as separate components within the training menu offered through the intermediary. This was borne out with WOW's experience in the building of the baseball stadium where the Project Labor Agreement's hiring requirements for journey worker positions fell far short of being met due to the dearth of DC residents with the requisite work skills and experience to fulfill the responsibilities of a journey worker. It will be incumbent upon an intermediary to coordinate and align training available to District residents with the workforce needs of employers doing business with the city.

In addition to identifying successful workforce intermediary models in other cities as the District restructures its First Source policies, the city has a timely, historic and highly relevant opportunity to develop a workforce intermediary focused on sustainable energy jobs creation through the pending award of the Sustainable Energy Utility (SEU) contract. The SEU contractor is already mandated to will serve as a contracting intermediary between contractors and the District government, and will coordinate the award and tracking of all sustainable energy contracts on behalf of the city in 2011 and most likely beyond. WOW is a named workforce development partner on the Sustainable Energy Partnership team's bid to become the SEU contractor which looks likely to be awarded this contract in the near future. Sustainable energy jobs at an historic level will be created in DC for sustainable energy contracts through the SEU this year, and this sustainable energy contracting "pipeline" will be monitored and transparent because one entity, the SEU contractor, will have all of the data on sustainable energy contracting work in the city.

WOW as a partner on the Sustainable Energy Partnership's bid advocates that a workforce development intermediary component be added to the existing SEU contracting intermediary functions in the ultimate award of the SEU project, and hopes that the SEU workforce intermediary which WOW is proposing here will in fact be added as a deliverable on the SEU contract and be aligned with the proposed First Source workforce intermediary legislative amendment under discussion today. Utilizing an SEU project workforce intermediary as the pilot, focused on one occupational sector with much potential for jobs creation, in the city's larger proposed First Source intermediary would be a very good thing, and is an opportunity that should not be missed. It is, for the District, a potential new "Best Practices" local hiring model that has not been done in any other major US city to-date, and could serve as a resource to other jurisdictions as they seek to implement their own workforce intermediaries. One thing is clear; in order for SEU contracts to create new jobs for District residents, the city's broader First Source hiring requirements must be improved and made more transparent through the legislative reforms under discussion today.

In closing, WOW urges that the First Source program be reformed through better accountability and monitoring of First Source contractors, strengthening the language and requirements around what constitutes a "Good Faith Effort" to hire District residents, and that a broad-based workforce intermediary be established with due haste.

Thank you for your time, and I'm happy to answer any questions.

ABC093

**DC Sustainable Energy Utility (SEU) Workforce Intermediary Flowchart**
Proposed by Wider Opportunities for Women

**Training Providers**

--Barrier-clearing assistance (childcare, transportation, photo ID, etc.)
--Pre-employment credentialing assistance (GED, Math Skills, Drivers' License, car purchase, etc.)
--Soft skills assessment, training
--Pre-apprenticeship skills identification, assessment, training
--Referrals for public benefits, academic remediation, etc.

**Sustainable Energy & General Contractors**

--Contracts
--Jobs
--Industry knowledge
--Job skill requirements
--Internships
--On-the-job training
--Apprenticeships
--Advisory board



**SEU Contracting & Workforce Intermediary Contractor**

--Career pathways development, implementation, Management
--Energy career information for jobseekers
--"Hiring Hall" for contractors & prepared jobseekers
--Barrier-clearing assistance: bonding, police clearance
--Pre-employment credentialing assistance
--Soft skills assessment, training
--Hard skills identification, assessment, training
--Post-employment case management, new worker job retention (WOW)
--Overall SEU contract management







**District Jobseekers**

--Unemployed, underemployed, low-wage workers
--Seeking fulltime, permanent, high-wage work with defined career paths and benefits
--Physically able to do active work in variable work environments

**District Government**

--Compliance monitoring: living/prevailing wage, business license, EEO, First Source, Registered Apprenticeship Programs (RAPs), WIA training contracts
--Certification:  new RAPs, CBE and LSDBE licensing, WIA training vendor certification
--Contracts let to SEU by DDOE
--Provides training and work supports to jobseekers, low-wage workers
--Provides services to returning ex-offenders, veterans, homeless jobseekers

ABC094


Stephen Courtien
Washington DC Building and
Construction Trades Council
5829 Allentown Road
Camp Springs, MD 20746

The Washington DC Building and Construction Trades Council asks that the council would amend the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment  Act of 2011"(1st source amendment) by including the Construction Career Creation Amendment (3C's).  I have included a copy of the amendment with my testimony.

The 3c's Amendment asks for among other things that potential bidders to qualify to bid the project  would submit a plan explaining how they will meet their first source requirement, strengthening the Good Faith Effort.  The potential bidder may develop these plans themselves or by working with the Workforce Intermediary Task Force.  These plans can then be reviewed before a Waiver is granted to see if a Best Effort was made in trying to fulfill the hiring requirements by the contractor.  These plans can also be used in the future to develop best-practices for the District of Columbia and to see where improvements could be made in the future.

ABC095

The plans would lay out where the contractor will get the employees to fill the requirements. What Workforce Development Organization they would be working with to have residents ready to go to work when the project begins. It will also explain how and where their apprentices are being trained. The Workforce Task Force can help the bidders with developing these plans by working with WDOs, unions and DOES to prepare potential employees to fulfill the hour requirements.

We have often heard of a new employee being hired and quitting or being let go after a short period of time because the employee did not relies how difficult the job was or what the job entailed. This is not a problem only for residents of the District but all over. By working with Workforce Development Organizations and the Workforce Intermediary Task Force the bidder will have access to a pool of potential employees that have received soft skills training and employees that know where their interests are. This would help with the retention rate of the employees with the companies creating not only a job for the residents but put them on a career path.

Many of the Building Trade Locals have been working with a variety WDOs doing what I have laid out above and have seen an increase in retention of employees and apprentices. Despite the drastic down fall in the economy especially in the construction industries locals continue working with these WDOs to help bring in new apprentices when they can. Our work with these WDOs is the beginnings of creating a seamless transition from working with DC Public Schools such as Phelps and the WDOs to create a seamless transition onto jobsites. This also allows the employee to know what is expected of them.

ABC096

The Building Trades would also like to see incentives for contractors bidding projects that have shown good performance on projects and who show a commitment to hiring and training District Residents which is why we would like for the committee to also consider adding Section 3 of the 3 Cs amendment.

The Washington Building and Construction Trades Council looks forward to continuing to training the city residents and getting DC residents on DC funded jobsites.  We look forward to working with the Council and the Mayor on this.

**Proposed CONSTRUCTION CAREERS CREATION (3C) AMENDMENT to the
"District of Columbia Workforce Intermediary Establishment and Reform of
First Source Living Wage Amendment of 2011"
(hereafter called "Amendment")**

In the "Amendment," the following wording shall replace the wording beginning with *(B) The Chief procurement Officer and each District Contracting Officer shall include in each government assisted construction project totaling $300,000* and ending with *... no less than 7 calendar days prior to publication in a District newspaper of city-wide circulation:*

**(Section One)** The District of Columbia establishes as a public policy goal the creation of seamless transitions from construction skill training programs in DC public schools and WDOs, to apprenticeships, to lifetime careers as journeymen employed in the construction trades.

(a) The District of Columbia recognizes that construction jobs are by their nature temporary jobs and that unless systems are put in place to create opportunities for entrance into lifetime construction careers, requirements for hiring DC residents for single jobs only will do little to address DC's chronic unemployment rate. Therefore, the District of Columbia establishes as public policy the encouragement of the creation of such systems.

(b) When DC public subsidies are used to finance construction services, the public in DC has a right to demand that these services not only produce excellent products but are used to ensure that DC residents have opportunities to enter life careers in construction.

**(Section Two)** Pre-qualifications

(a) To qualify to bid for participation in construction service projects supported by DC public subsidies totaling $300,000 or more, potential bidders must submit a plan for guaranteeing that they will ensure that:

(1) At least 25% of journey worker hours by trade shall be performed by District residents.

(2) At least 50% of apprenticeship hours by trade shall be performed by District residents.

(3) At least 60% of skilled laborer hours by trade shall be performed by District residents.

(4) At least 70% of unskilled laborer hours shall be performed by District residents.

(b) These plans can be developed by the bidders themselves or with the aid of the District of Columbia Workforce Intermediary Task Force.

1

ABC098

(c) Prime contractors shall require subcontractors bidding on contracts at all tiers to submit the plan described above.

(d) The CPO, Mayor, and the Director of the Department of Employment Services shall establish a procedure to address cases when, despite all good faith efforts, qualified DC residents cannot be found to fulfill the requirements set forth above.

(e) At the discretion of the CPO or his or her designee, contractors and subcontractors who have won jobs but who do not carry out the plans they submitted shall be covered by the penalties and the rights of appeal listed in Title IX and X of the Procurement Reform Act of 2010.

**(Section Three)** Evaluating bids

(a) The Chief Procurement Officer shall direct the establishment of a uniform point system by which the CPO and DC contracting officers shall evaluate competitive bids.

(b) For every standard listed below that they can fulfill, bidders for construction service contracts will be awarded extra evaluation points by the CPO and DC contracting officers:

(1) Operates or participates in an apprenticeship program that is part of a network that provides aid to apprentices in receiving employment opportunities after they complete the work on the job for which they were initially hired.

(2) Operates or participates in an apprenticeship program that provides apprentices with free training for life.

(3) Operates or participates in an apprenticeship program that trains participants in a variety of related crafts, rather than just the skills needed for the job for which the apprentice was hired.

(4) Operates or participates in an apprenticeship program that has had a significant graduation rate for at least three years

(5) Singly or through multi employer programs provides aid to journeymen in receiving employment opportunities after they complete the work on the job for which they were initially hired.

(6) Singly or through a multi employer program, provides employees with free health care benefits.

(7) Singly or through a multi employer program, provides employees with defined pension plans.

**ABC099**

(8) Provides all apprentices and journey workers with wages that are at least "prevailing wages" as set by the Davis-Bacon Act as it applies to DC.

(9) Gives preference in hiring to graduates of DC public school or WDO construction skill training programs.

**(Section Four)** Scope

(a) The above provisions shall apply to construction service projects supported by DC public subsidies totaling $300,000 or more.

(b) The provisions shall also apply in cases where DC contracts with a person, firm or corporation, including a developer or public-private partner, to enter into secondary contracts with other persons, firms or corporations for construction services.

(c) These provisions shall also apply to said secondary contracts at every tier.

3

**ABC100**



**Metro Washington Chapter**

**Chairman of the Board**
**Paul K. Barry**
Facchina Construction Company, Inc.

**Chairman-elect**
**Michael Burlas**
Miller & Long Co., Inc.

**Vice Chairman**
**Gregory E. Harraka**
Coakley & Williams Construction, Inc.

**Secretary**
**Bob Jones**
Ruppert Landscape

**Treasurer**
**Timothy Cummins CPA**
Aronson & Company

**Past Chairman**
**George R. Nash Jr.**
Facchina Development, LLC

**BOARD OF DIRECTORS**
**Jim Anglemyer**
WCS Construction, LLC

**John E. Barry**
John E. Barry Plumbing & Heating Corp.

**Mark W. Drury**
Shapiro & Duncan, Inc.

**Bruce A. Eppard**
SunTrust Bank

**Christopher L. Grant**
Attorney at Law

**Robert C. Henley**
Henley Construction Co., Inc.

**David R. Laib**
Balfour Beatty Construction

**Alison Lyons**
DPR Construction

**Kenneth V. Mallick Jr.**
Mallick Mechanical

**Adam C. Mattocks**
Safety Plus, LLC

**Donald H. Spence Jr.**
Greenburg, Spence & Taylor, LLC

**Eric P. Tievy**
Forrester Construction Company

**Louis M. Wicklein**
Kogok Corporation

**Joseph R. Wolf**
Alliant Insurance Services, Inc.

**Debra A. Schoonmaker CAE**
President/CEO

# Associated Builders and Contractors
## of Metropolitan Washington

March 14th, 2011

TO:  MEMBERS OF THE COMMITTEE ON HOUSING AND
WORKFORCE DEVELOPMENT.

MEMBERS OF THE COMMITTEE ON GOVERNMENT
OPEARTIONS AND THE ENVIRONMENT

FROM:  ASSOCIATED BUILDERS AND CONTRACTORS (ABC)
OF METRO WASHINGTON

RE:  BILL 19-0050 THE DISTRICT OF COLUMBIA WORKFORCE
INTERMEDIARY ESTABLISHMENT AND REFORM OF
FIRST SOURCE AND LIVING WAGE AMENDMENT ACT OF
2011

Good morning Chairman Brown and the members of the Committee on
Housing and Workforce Development.  I am Eric J. Jones and am here today
on behalf of the over 550 Contractors, Subcontractors, Suppliers and
Affiliated Businesses who are members of Associated Builders and
Contractors (ABC) of Metro Washington.  Today I and several members of
the association are present to bring you testimony related to bill 19-0050 "the
District of Columbia Workforce Intermediary Establishment and Reform of
First Source and Living Wage Amendment Act of 2011"

Within the business community, there is not another industry which has
worked harder to provide employment opportunities to the city's residents.
From our members' work in developing and funding the vocational program
at Cardozo High School many years ago, to our work with groups such as
Goodwill of Greater Washington and their PART and Green Pathways
Programs, ABC of Metro Washington and our members have been at the
forefront of hiring and training DC residents.  The construction industry has a
track record of working to provide employment opportunities across the city
and considers it a priority to not only build buildings, but build communities
as well.

This is why we are here today to share our concerns with this legislation.  As
an association we are concerned with the newly mandated percentages in this

bill. ~~We feel~~ that these new mandates are unrealistic considering the current business environment and will do little to create long term employment. Instead of forcing an industry to hire untested individuals who will disproportionately fail at a time in which the local industry is facing 22% unemployment we feel that the city should work to create a true pipeline to employment.

While we believe that the currently proposed establishment of the District of Columbia Jobs Trust Fund is a great idea, we see it as only part of the solution. We truly feel that it is time for the city to engage the local business community instead of regulating it to deal with the employment issues facing city residents. We would proposed that instead of the establishment of a majority government working group to deal with this problem that the Administrative and Legislative Bodies in partnership with the local business community through a outside group such as an independent Workforce Investment Council (WIC) develop a comprehensive strategy to deal with job training, placement and social issues facing the local workforce pool. This group would have representatives of the major private sector industries in the city including construction, hospitality, hospitals & hotels, etc. The group which would have government representatives as well would be tasked with:

1. Working with the chronically unemployed and underemployed to identify issues facing the community.
2. Working with businesses who to help identify issues related to hiring local employees
3. Identifying local best practices which have successfully found employment for district residents
4. Drafting a new set of plans to best support the Department of Employment Services (DOES) in supporting these communities And
5. And finally establishing a new set of guidelines for work force intermediaries who receive government support through the exclusive use of the Jobs Trust Fund.

We truly feel that the items listed above represent the only way to adequately deal with the unemployment problem facing the City's most vulnerable. If not, we will continue to see large rates of unemployment within certain segments of the community.

In closing, I would like to thank the Committee for the opportunity to discuss this important issue and ABC of Metro Washington looks forward to working with the City Council and Administration to come up with the best possible solution to this extremely important issue.

**ABC102**

Testimony for Bill 19-50
The DC Workforce Intermediary Establishment and Reform of First Source and Living Wage Act
March 14, 2011

By Michael Burlas, Vice President of Miller & Long Concrete Construction and Chair-Elect of the Associated
Builders and Contractors, Metro Washington Chapter

Good morning, members of the Council. The purpose of my testimony today is to let you know the effect
this bill would have on my company and other construction contractors who do work in the District and the
consequential effect this bill will have on the cost of development in the city.

While we sympathize with the frustration felt by many city residents in attempting to find work in the
construction industry, it is important to keep in mind that for the past two years, construction has been in a
depression, with unemployment within our industry reaching nearly 30% in 2010 and sitting at 22% today.
The employment numbers for my company, for example, have declined from a high of 3,300 people to 820
by the end of 2010.

Consequently, as a result of this lack of new construction, many construction companies have done little, if
any, new hiring over the last couple of years. Mandating DC resident percentages on jobsites will result in
contractors laying off experienced and trained personnel who do not live in DC and hiring new people who
do. At this point in the economic cycle, many of these employees have been with their respective
companies for a number of years. The unfairness inherent in this unintended consequence is a major
reason why we are opposed to the mandated percentages in the bill.

A side observation is relevant here. We have noticed over the years that many of the people we hire who
are District residents upon hire move to MD or VA after settling into their job. And we get no credit for
these folks once they have moved out of the District. The lack of affordable housing in the District for
middle income workers makes it hard for these people to find the kind of housing in the city that they
desire and can afford.

Increased cost of development is another big issue presented by this bill. Specifically, hiring new workers
with little or no experience with our operation will result in a significant decrease in our productivity.
Construction workers are not fungible. For example, in addition to skilled trades like carpenters,
ironworkers, finishers and equipment operators, our operation makes use of a large number of laborers.
But these positions are not unskilled either. Rather they are skilled positions which require training and
experience to be efficient. One cannot simply hire someone with little or no experience with our work and
expect the same level of productivity. Indeed, we estimate that if we were to achieve the percentages in
this bill, our field productivity would fall by 40%. For a typical office building in the District, this translates
into an additional labor and burden cost of $1,500,000. This additional cost will be passed directly on to the
developer of the project and will impact the economics of every new development in the city. And this is
just our trade. Every contractor who will work on the project will similarly increase their bids to take into
account the additional costs incurred as a result of the mandated percentages in this bill. One prominent
local developer has estimated that this bill will increase the cost of development by 25%.

In addition to the lost productivity associated with new, inexperienced workers, there are extra costs
incurred by the churn that will come about as referrals fail drug tests, quit, are terminated for cause, etc.
These churn costs are not insignificant. We estimate that just to handle the screening, interviewing, hiring,
drug testing and First Source reporting for the number of people we would need to maintain our DC

ABC103

jobsites with the requisite number of DC residents would add, conservatively, $150,000 to our HR department costs alone. Our industry, after suffering through several years of the worst building recession we have ever seen in our lives, simply cannot afford these costs.

Lastly, a less obvious but important issue we have with the existing First Source law is that union contractors do not believe they are required to comply with it. Therefore, it is important to amend the First Source law to make it clear that the current requirements as well as any future ones apply equally to union and merit shop contractors. We consider this lack of clarity to be a major loophole in the current law.

In closing, we strongly support efforts to hire DC residents. However, we do not believe that mandating percentages will achieve the desired results. Instead, we encourage the city to put more money into life skills and workforce development programs. For example, Goodwill of Washington has had their grant money from the District significantly cut over the last couple of years. This has directly affected the number of young people Goodwill has been able to enroll in ABC's apprenticeship program. Second, better pipelines matching city residents with positions in which they can succeed are needed. For example, we believe DOES should develop and implement a database and matching system in order to allow it to more effectively refer city residents who are looking for work in our industry. Third, we think community neighborhood organizations can play a role in referring local residents to jobs on projects in their Ward and we support those efforts.

Thank you for your consideration.

ABC104

TESTIMONY BEFORE THE COMMITTEE ON HOUSING AND
WORKFORCE DEVELOPMENT

BILL 19-50, DISTRICT OF COLUMBIA WORKFORCE INTERMEDIARY
ESTABLISHMENT AND REFORM OF FIRST SOURCE AND
LIVING WAGE ACT

MONDAY, MARCH 14, 2011

Presented by Sally W. Kram, Director of Public and Governmental Affairs
Consortium of Universities of the Washington Metropolitan Area

Good afternoon, Chairman Brown, Committee Members and staff.  My name is
Sally Kram and I am the Director of Government and Public Affairs for the
Consortium of Universities of the Washington Metropolitan Area.  I am pleased to
be here this afternoon to speak on behalf of the Consortium, which is comprised
of fourteen public, private and federal higher education institutions in the
Washington metropolitan region.  Eleven of these institutions are located in
Washington, DC but today, I will be representing the nine non-federal DC
institutions.

It is the Consortium's position that Bill 19-50 contains some important ideas to
promote better employment rates among District residents.  However, due to
restrictions proposed by provisions of this bill which would mandate DC resident
set-asides for all contracts of greater than $300,000 in value and all construction
projects funded by a "city benefit," the Consortium cannot support the bill as
drafted.  At the heart of our opposition to this bill and previous efforts to mandate
DC resident set-asides through the revenue bond program, the zoning process
and the city's procurement system is that job creation can best be achieved
through augmentation of individuals' access to education rather than workplace
related mandates.  Let me explain further.

The Consortium can support Section 3 of this bill which calls for the development
of intermediary task forces based on successful experiences elsewhere.  We
appreciate the recent report issued by the Brookings Institution and Appleseed
among others called "Strengthening the Link Between Economic Development
and Jobs."  The report says that "First Source should be a workforce
development continuum that anticipates hiring needs and helps train workers for
the jobs created through the city's public investments."

It is because we support the idea of revising the District's First Source,
procurement and related programs to create a better pipeline between DC
residents and the jobs being created in this jurisdiction as contemplated by
Section 3 of the bill that we cannot support Section 2 of this bill, which does not
further the objective.

Chairman Brown, as you know, Section 2 of this bill would extend the current First Source program's structure beyond the construction arena. It would require that all contracts of greater than $300,000 include DC residents, working 20% of all hours worked. On government-related construction projects of value greater than $300,000 or more, it would establish DC resident set-asides ranging from 25% for journeyman hours to 70% for common labor hours with a waiver permitted for good faith compliance efforts. Penalty for noncompliance increases from 5% of the total amount of the direct and indirect labor costs of the contract to 10% of the value.

The purpose of the program is to leverage the city's spending on contracts and projects to create more jobs for residents. The program has traditionally focused on construction projects because such jobs require a large pool of moderately skilled workers to physically be in the District of Columbia while the project is under construction. However, even as the District has struggled with a double-digit unemployment rate, according to the DC Auditor, the First Source program has been largely ineffective primarily because the government has not been able to adequately enforce it. Yet, Section 2 would expand the scope of projects and contracts regulated by the program—hardly a recipe for enhanced enforcement.

Even if the program was perfectly implemented at all times, it is unclear what value is added if the District expands the program to jobs unrelated to land-based projects. The phrase "government assisted project or contract" could cover everything from alley closings to contracts for new curriculum for DC public school teachers. Such contracts are not necessarily geographically based. If the city was seeking a contract to evaluate the economic value of its St. Elizabeth's holdings, for example, it could just as easily contract with a local university or do what it has already done—ask Carnegie Mellon University in Pittsburgh to take a look. But in the case of Carnegie Mellon, the First Source agreement wouldn't apply. Indeed, because the program only applies to beneficiaries located within the Washington Standard Metropolitan Statistical Area, and set-aside percentages only begin to be calculated if work is done within the region, the bill creates a perverse incentive for companies outside the region to bid on District contracts. Their bids could come in lower because their employment costs would be lower due to reduced cost-of-living elsewhere. And, they wouldn't have to go to the extra trouble of complying with the law, meeting the waiver requirements if necessary and being subject to possible penalty for violations.

Moreover, many of the contracts performed by local colleges and universities for the District government are not akin to construction projects. A new crew isn't brought in for a period of time to work on the project until it is done. Rather, a contract to evaluate the rate of AIDS infection in the District of Columbia, for example, will draw on existing expertise at our member campuses. Supervising professors will likely use the faculty on staff to complete the contract, perhaps

ABC106

relying on students and support staff already affiliated with the hospital or university.  Wholesale hiring of new staff to meet a contract's terms is rare.

Also rare is a faculty member devoting 100 percent of his or her time to any given contract.  Universities often manage multiple contracts and research grants simultaneously with faculty tracking how many hours they work on a specific contract, but not limiting themselves exclusively to any one contract.  It is unclear how the 20% set aside identified in the bill would be implemented.  Even if a professor lived in the District, if he allocated only 20% of his time to the project, but had a MD-based graduate student working on the project for 50% of his time, would that mean that it wouldn't meet the requirement even though, technically 50% of the workers on the project were DC residents?

More to the point, as universities hire faculty and researchers, they are competing for the best academic fit for their campuses.  The residency of the professor is rarely considered, but rather the focus is on his or her academic credentials.  Given that the unemployment rate in the United States for persons with a college degree is 4.7% as compared to the unemployment rate for those without a college degree at 14.9% or three times as high, it is unlikely that imposing this requirement on university contracts would improve the unemployment rate among highly educated District residents.  Rather, it would create a paperwork headache resulting in a disincentive for DC schools to bid on the DC contracts and possibly affect jobs already in existence.  In short, the purpose for which First Source was created and would be extended to research contracts would be voided.

This is particularly true because the bill would double fines for noncompliance from 5% to 10%.  In a contract with just a few people, if even one moved out of the District of Columbia during the terms of the contract, the university would be subject to a fine equal to 10% of the contract value.  Unlike a for-profit company, there are no "profits" from which to set aside money to pay for such fines.  Rather, universities would have to look at its operating resources--primarily tuition paid by students attending school in the District.

The Consortium has rigorously promoted the continued collaboration of the District government with its colleges and universities.  We continue to believe that our research professionals are among the greatest assets the District has and that they are overlooked when the District seeks to conduct research or other programs to improve the city's management or policy.  That said, should this bill pass, the danger of being subject to fine would outweigh the value in winning the contract.  Many schools might choose to avoid participation in District contracts.  Even my own association which several years ago collaborated with DCPS at the District's request to manage a curriculum training program for teachers, would be hesitant to enter an arrangement where a significant financial fine was just one employee's residential housing choice away.

ABC107

If Bill 19-50 was limited, as is the case now, to only construction projects funded through the city, such as a Revenue Bond Program funded project, the ability for universities to comply would still be problematic. Over the past years, many DC schools have used District revenue bonds to construct buildings on campus to accommodate new research, student housing, campus administration and student life. Such buildings are part of the campus's and by extension the District's vitality.   The goal of the bond program is to assist nonprofits in constructing buildings, many in the District's residential neighborhoods and neighborhood commercial strips, as part of the city's revitalization programs.

The program has been highly successful. The neighborhoods of Georgetown, AU Park, Foggy Bottom, Michigan Park and Brookland are among the most energetic in the District. It is no accident that each of these neighborhoods has a university at its heart. This university-generated construction funded through the program has been built at no risk to the city even as the District reaps the benefits of enhanced economic development and improved employment opportunities.

Even though revenue bond-financed projects include no direct city subsidy and indeed the city receives substantial fees for approving and managing bond issuances, this bill would apply to them, requiring the same set-asides ranging from 25% to 70% DC residents for the project. Such requirements make construction in the District more burdensome. As compliance with revenue-bond financed projects becomes more complicated, project costs increase. Unlike a commercial project, a university can't allocate the extra costs to its tenants. Rather, it will build a smaller building or fewer buildings. The purpose of the Revenue Bond Program wouldn't be served.

The District's colleges and universities are anxious to work with the District to create job opportunities for DC residents. We are working together as an outgrowth of Mayor Gray's job summit in December to conduct further research on how to better align the District's job market with its hardest-to-employ residents. In June, GW will be hosting a job fair inviting all interested DC residents to interview for jobs on university campuses and their affiliated hospitals.

We are proud of our role as one of the District's largest private employers. When last we reviewed data, we found that as a percentage, more university employees were District residents than employees of the District government. While the District government cannot politically institute DC resident set-aside requirements for its own front-line workers, it should be noted that universities face the same challenges faced by the District government in attracting DC residents—in some cases a dearth of qualified candidates but in many cases a lack of affordable housing. Many of our workers, as is true for the District government, can't afford to live here.

ABC108

We look forward to working with the District government as it faces the challenge of how to improve the city's First Source program and its other job training initiatives.  Focusing on how to create more job opportunity and expertise rather than mandating job set asides, we believe, is the better path to lower unemployment.  We stand ready to help the District in identifying that path.

I appreciate your willingness to listen to the Consortium testimony on this issue.  I stand ready for any questions you may have.

**ABC109**

First Source Oversight Hearing
Jason Edwards
ONE DC Member

Good Morning Council Members;

My name is Jason Edwards and I am a ONE DC member. I was born and raised in Washington DC. I am the youngest of three children and was educated in the DC Public School system. As is the case with many families, I was raised by parents in the Shaw community (Rhode Island Ave.) as well as my grandparents at 15th & Buchanan Street NW.

I attended the United House of Prayer for All People and served as a "Shout Band" member. I have always been active with sports but I also have a love for fixing an even owning cars that is unmatched.

Despite the love and support of my extended family, there were periods in my life when the lure of the streets threatened to claim me as it has claimed so many of my peers.

As a 26 year old, proud father of a 9 year old daughter, who is currently enrolled at Kenilworth Elementary school and who is recognized as an honor student, I now realize that one of the most important jobs I'll ever be responsible for is to provide my daughter with all the love, guidance and support that she deserves. I am also responsible for ensuring that she is raised to be a healthy, happy and a productive member of society and it is a labor of love. I have been granted the redemption necessary to do that and I am grateful for a second chance.

Although I have successfully completed programs with the Daily Reporting Center of CSOSA from 2009-2011, (which is for ex-offenders to further their education, seek employment and stay focused), I have completed Strive DC job training, I have also participated in Introductory Vocational Training Classes for Plumbing, Floor Care, Carpentry, Masonry and Landscaping, Child Wellness, Parenting & Teen Parenting, Employment Skills and Life Skills along with Anger Management and Drug Abuse Awareness programs, and even The Fatherhood Initiative Program. I have worked for temp agencies occasionally but have been unable to find permanent full-time employment for almost 2 years now.

All of the training programs were important learning experiences that taught me not only the importance of an education, but values in appearance, communication, hard work and determination.

Personally I feel that the title "ex-offender" has been my biggest barrier. Even with the Bonding Programs that the government has in place, employers simply are not willing to take a chance on ex-offenders.

With so many new development projects going on in the District of Columbia, it should be an incentive for these companies to employ ex-offenders. I believe one of the reasons I've been unable to find a job is my ex-offender status and prospective employers' reluctance to allow me to prove that I would, in fact be an asset to the company and a valuable employee. As a result of

**ABC110**

my continued unemployment despite my tireless efforts, I am unable to provide for my daughter as she deserves. I know beyond a shadow of a doubt that I will be a productive asset to my community if given the opportunity.

Although there is a significant unemployment rate in DC, millions of dollars worth of development is taking place all over the District of Columbia.  This development will create jobs.  Some of this development will receive major city subsidies and tax incentives.  Indeed some of this development will actually be carried out by the DC Government.

Development sponsored in part or in full by DC tax dollars should create jobs for DC residents as spelled out in the First Source hiring law.  This is not happening now and the law needs to be closely monitored, along with stiff penalties for non-compliance. Especially for those companies that hire DC residents initially, only to fire them after the company has been deemed in compliance.

Training opportunities that actually prepare DC residents for these jobs should be made available to any and all who seek them. Finally, individuals who have paid their debt to society and demonstrate a genuine desire and willingness to be productive citizens should be given the chance to do so without having their criminal backgrounds further stigmatize them.

In closing, I feel that the District's programs for ex-offenders are not just failing me now, but will fail future returning citizens.  As diligently as I have been in finding employment and substantial resources, I am convinced that these programs have been strategically placed just for the District to be able to say that there are programs available.  I am disheartened and infuriated to even consider that this may actually be the case.  I am here to be the face for many voices that are not being heard, turned away and losing hope.  I truly hope that after today, new doors will open to my population as well as me and that the District's First Source hiring policies benefit DC residents.

Thank you for allowing me to submit this testimony.

ABC111

Testimony for Bill 19-50
The DC Workforce Intermediary Establishment and Reform of First Source and Living Wage Act
March 14, 2011

By, Lawrence M. Prosen, Esquire, Partner, K&L Gates LLP and Member, Associated Builders and
Contractors, Metro Washington Chapter

Good morning Mr. Chairman and members of the Committee. I am an attorney who has practiced in Washington D.C., went to law school in Washington, D.C. and have lived in this area since 1989. My practice is based predominantly in the realm of government contracts and construction litigation, and in that capacity, I have had need to advise clients on all manner of issues, at both the Federal and District Level, ranging from contract to prevailing wage to protest to labor and employment issues. My clients are both local and national in scope and location. I have also played an active role in working with various members of this and former councils to work on bills and regulations addressing these issues. Lastly, I have been a member of the Department of Local Small Disadvantaged Business Enterprises' Construction Industry Advisory Counsel when it was active and have been invited to participate in Member Barry's up-coming LSDBE focus group

With this background, I am before you today to testify on Bill 19-50 the District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011. My testimony will cover certain legal concerns which we feel exists that raise significant questions as to the propriety and enforceability of mandates this legislation proposes for companies and employees.

At its most basic level, there are significant issues with Bill 19-50 from a constitutional perspective. As you are not doubt aware, the Constitution's Privileges and Immunities Clauses found in Article IV and the Fourteenth Amendment states that residents of each state hold the right to obtain professional endeavors within any given state as long as they meet the basic qualifications to do so. Furthermore the Privileges and Immunities Clause forbids a state from unjustly depriving citizens from other states of any rights derived from a state citizenship solely on the basis of nonresidence.

As a result of this most basic of rights, the United States Supreme Court has previously struck down state and local laws that infringed rights guaranteed by the Privileges and Immunities Clause of Article IV and has held that statutes such as that contemplated by Bill 19-50 are unconstitutional. For example, in *Hicklin v. Orbeck*, 437 U.S. 518 (1978), the Court ruled that the State of Alaska failed to show a reasonable purpose for a state law that required that employers give a hiring preference to in-state residents and suppliers who applied to work on the construction of oil or gas pipelines.

More recently and more importantly, in 1984 the Supreme Court again declared local hiring preferences to be potential violations of the clause. In the case of the *United Bldg and Const Trades Council v. Mayor and Council of Camden,* 465 U.S. 208 (1984), Justice Rehnquist delivered an opinion, supported by 8 of the 9 justices, ruling that the Camden proposed regulation resulted in "an out-of-state citizen who ventures into New Jersey will not enjoy the same privileges as the New Jersey citizen residing in Camden." *Id.* at 217. As a result, the Court found that while in-state residents outside of Camden did have the ability to remedy this problem at the polls, out-of-state citizens did not and as such, "the must not 'be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation.'" *Id.* at 217-18 (citations omitted). The Court concluded that the Camden-proposed bill, which closely mirrors this one, discriminated against "out-of-state residents on matters of fundamental concern which triggers the [Privileges and

ABC112

Immunities] Clause" *Id. at 220.* In its conclusion, the Court held that the City of Camden could not exercise its "power to bias the employment decisions of private contractors and sub-contractors against out-of-state residents [which would result in the City's being] called to account under the Privileges and Immunities Clause. ...The opportunity to seek employment with such primate employees is 'sufficiently basic to the livelihood of the Nation [citation omitted] as to fall within the purview of the Privileges and Immunities Clause even though the contractors and sub-contractors are themselves engaged in projects funded in whole or part by the City." *Id. at 221-22.*

While not controlling, it bears noting that the City Attorney for the City of Baltimore, Maryland, in a July 19, 2010 opinion provided to the City Council of Baltimore, for City Council Bill 10-0455 "Community Partnership Agreements" also conclude that a proposed local hiring preference was unconstitutional under the *Camden* line of cases.

In this case, given the District's unique position as a City/State, these decisions would undoubtedly control and likely hold this Bill unconstitutional.

There is also the possibility that this Bill violates the Commerce Clause, as it undoubtedly affects interstate commerce, and as defined the City does not have an adequate stake in some of the contracts that are covered by this agreement, thereby not making the City a market participant in some situations, but instead a market regulator, which in turn likely brings in the Commerce Clause concerns. Likewise, given the nature of this bill, it would likely be subject to Federal, not local, governance and regulations.

In addition, there are drafting concerns with the Bill, as written:

1.  "government-assisted project or contract" is undefined and could be read to include both D.C.-government AND federal government contracts. This renders the bill ambiguous and likely unenforceable. Likewise, if the project is D.C.-run but contains federal funding, it also appears that this Bill if enacted would be unenforceable as violative of the Supremacy Clause and Interstate Commerce Clause.
2.  The Project mandates certain apprentice hours. What if there is no apprentice program for the relevant labor/work category? There is no mechanism to surmount this mandate.
3.  Section 2(b) line 1 on 3 states that DOES can waive the Bill's requirement if there are "NO District residents" eligible AND available. This reads as a mandate that you must meet the bill's requirements so long as there is even one available and skilled resident. This should likely be changed to read "no or not enough" or some other like change. DOES should be able to determine that the Bill's requirements are waivable not only if there are no residents but also if there are not enough.
4.  Section 2b(B) should be made disjunctive not conjunctive. To hold that the beneficiary is out site the D.C. Standard Metropolitan Statistical Area and none of its work is being performed within that Area should be sufficient to waive the Bill's requirements,

In my capacity as a prior 3 year D.C. Legislative Chairman to ABC, I have sat in numerous meetings with members of this and former D.C. Councils and members of the executive branch, and have heard their concerns as well as those concerns of ABC's members. There is, and has always been, a strong desire to both support D.C. residents and support this Council's efforts. Mandating the percentages of that participation, however, is not a viable alternative and, for purposes of my testimony, likely illegal on its face.

Thank you for your time and consideration.

**ABC113**

**TESTIMONY OF THE DC JOBS COUNCIL
BEFORE THE COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON HOUSING & WORKFORCE DEVELOPMENT
REGARDING BILL 19-0050,
THE DISTRICT OF COLUMBIA
WORKFORCE INTERMEDIARY ESTABLISHMENT AND
REFORM OF FIRST SOURCE AND LIVING WAGE AMENDMENT ACT OF 2011**

**Marina Streznewski, DC Jobs Council
Monday, March 14, 2011**

Good morning/afternoon. I am Marina Streznewski, coordinator of the DC Jobs Council. I would like to thank Chairman Michael A. Brown and the members of the Council of the District of Columbia Committee on Housing & Workforce Development for convening this hearing regarding Bill 19-0050, the District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011.

As a coalition of more than 50 community-based training organizations whose clients are lower income residents of the District, the DC Jobs Council seeks to ensure that structures, systems, laws and regulations in the District of Columbia facilitate a strong and flexible workforce development system that meets the needs of those seeking jobs, as well as local employers. Our mission is to ensure that every District resident is able to prepare for, find, and keep a good job that offers a solid step on a career ladder to family-sustaining wages. We work with employers to match the training our members provide with the needs of employers in the metro DC area. Therefore, the First Source law is of great interest to us.

The District's First Source law has long been a source of controversy. Intended to give DC residents the first shot at jobs created by projects in which District taxpayers have a stake, the law has suffered from a lack of enforcement. No contractor has been fined for noncompliance since the law was enacted, yet the numbers of DC residents working on jobs financed or otherwise assisted by the District government have remained well below the 51 percent mandated by law. Part of the problem has been the loopholes in the current law – loopholes which have sometimes been exploited to great advantage, allowing some employers to comply with the letter of the law and simultaneously ignore its spirit. For the First Source Law to achieve its purpose, these loopholes must be closed and the city must commit to stronger enforcement.

The current bill takes some steps to improve the First Source law, to strengthen its enforcement, and to establish a complementary structure to ensure that qualified and trained District residents are connected with jobs on government-assisted projects. But we must emphasize that the First Source law alone – even if fully enforced -- will not, in and of itself, solve the District's unemployment problem.

We will use our testimony today to comment on parts of the bill with which we are in agreement, and to suggest parts of the bill that may benefit from further examination.

1

**ABC114**

First, we applaud the inclusion of a workforce intermediary in this legislation. We believe that an intermediary can function as an effective broker between employers and training programs. Well-constructed workforce intermediaries have been effective in other jurisdictions, ensuring congruity between available jobs and available training, to the benefit of local residents, employers, and, ultimately, local governments. We see the opportunity for an intermediary to help the District address unemployment systematically and effectively.

We suggest, however, that the legislation embrace the intermediary concept more fully – and enhance its chances for success -- by making certain revisions.

1.  The legislation should direct the Mayor to implement the workforce intermediary within 180 days of its effective date. That will allow 60 days for the task force to make recommendations for establishing a workforce intermediary. These recommendations should include guidance as to industries most likely to benefit from the assistance of an intermediary, particularly in developing strong systems to assist the District's under- and unemployed residents. Once the task force issues its recommendations, the Mayor then will have 120 days to establish the workforce intermediary by creating its organizational structure, identifying and securing initial funding, and identifying an executive director.

2.  If a workforce intermediary is to be effective, it must have strong support and commitment from the employer, labor, and job training communities. To ensure the early and ongoing support of these diverse communities, we suggest expanding the membership of the task force to include: two (2) employers or representatives of business organizations, one appointed by the Mayor and one appointed by the Council Chair; two (2) representatives of job training organizations, one appointed by the Mayor and one appointed by the Council Chair; and two (2) representatives of organized labor, one appointed by the Mayor and one appointed by the Council Chair, to include one representative from the building trades and one representative from another labor organization.

3.  The workforce intermediary must have a stable funding source. We do not believe that fines alone will generate sufficient revenue to fund an effective intermediary. Other jurisdictions have funded workforce intermediaries with general funds, and we encourage the Mayor and the Council to express their commitment to the workforce intermediary concept by finding money in the District's budget to support it. But we understand current fiscal challenges. Therefore, we suggest exploring how other jurisdictions have funded intermediaries. One possibility might be to require developers to contribute some percentage of the value of the contract to fund the intermediary – which they will then be able to use to meet their hiring needs. We believe, too, that there may be money remaining from funds set aside for creation of a workforce intermediary for the Anacostia Waterfront Initiative.

The workforce intermediary also has the potential to close one of the earlier mentioned loopholes in the First Source law that is created by the lack of a definition of a "good faith effort" to hire DC residents. The current law requires only that employers run ads in the newspaper and post job notices within the District's Virtual One-Stop System (VOSS). The bill before us today only

2

ABC115

adds one more mechanism – notification of local Advisory Neighborhood Commissions of the availability of jobs. We believe that, even though these requirements are good ideas, they do not demonstrate good faith to an appropriate degree.

Fortunately, the bill plants the seeds for another, more concrete way for employers to demonstrate good faith. By contributing to and working with the workforce intermediary, an employer clearly demonstrates a strong commitment to making its best effort to hire District residents. If an employer and the intermediary work together to develop a project employment plan, then the intermediary staff can reach out to job training providers. With clear information on the responsibilities of each job, and the timing of the hiring process, job training providers can prepare clients specifically for available jobs. And the intermediary can offer a quality control mechanism, thereby ensuring that employers who cooperate with the intermediary get exactly the employees they need.

An effective workforce intermediary will have utility beyond just the government-assisted projects subject to the First Source law. We believe – and other jurisdictions offer evidence – that an intermediary (or intermediaries) can help a broad range of employers find a broad range of qualified employees. The essential components of the process – development of an employment plan, the interface with job training providers, and screening potential employees for quality – can be replicated and applied in a variety of circumstances. Essential to the success of an intermediary process is the neutrality of the intermediary, both in appearance and in fact. If either an employer or an organization providing job training were to try and serve as an intermediary, its neutrality rightly would be questioned, and its effectiveness diminished.

The proposed bill also effectively addresses another loophole. By defining compliance in terms of a percentage of hours worked, as opposed to number of new hires, this bill helps to ensure that contractors hire DC residents, rather than simply bringing in crews from other jurisdictions and claiming the jobs on a particular project are not "new."

We understand that the current bill is a work in progress and that other stakeholders are proposing changes, and amendments – and even, possibly, entirely new bills. As different bills emerge, it will be important to examine them in the context of other policies like the recently-announced Workforce Incentive Program, which will offer financial rewards to employers working on government-assisted projects who hire DC residents for at least 35 percent of available jobs. We are prepared to offer additional comments and to work with District leaders to establish an effective First Source law that will benefit all stakeholders.

Our mission as the DC Jobs Council, is to help ensure all District residents can prepare and compete for good jobs. Good jobs – those that offer solid footing on ladders to family-sustaining careers – not only help workers and their families, they also generate tax revenue for the District. Such revenue, in turn, will contribute to the city's coffers and those of our neighborhoods. Employees who are able to keep jobs are better poised to move from consumers of public services to taxpayers. And perhaps more importantly, these workers help prepare their children for good jobs in a growing economy, and for healthy and productive lives for many generations.

Thank you for this opportunity. I will be pleased to answer any questions.

3

**ABC116**

Statement of the Iron Workers Employers Association

of Washington, D.C. (IWEA) on

First Source

I am Fred Codding and I am here on behalf of the members of the Iron Workers Employers Association of Washington, D.C.   The IWEA represents contractors whose businesses are impacted by the First Source legislation.  The IWEA is a member of the Alliance for Construction Excellence, ACE, which strongly supports the establishment of incentives to comply with First Source.

The IWEA's contractor members are those who erect and install the structural steel, the reinforcing steel, the architectural window walls and curtainwalls throughout the District.  They primarily employ Iron Workers.  Their projects range from the Nationals Baseball Stadium and the Verizon Center to office buildings and residential projects.

These contractors who employ structural, ornamental and rigging Iron Workers fund recruitment and training programs for apprentices and journeymen through a 45¢ payment for every Iron Worker hour worked.  They make that payment to a Joint Labor Management Program with Iron Workers Local 5.  Contractors who employ reinforcing Iron Workers pay 58¢ per hour worked for recruitment and training programs.  They make that payment to a Joint Labor Management Program with Iron Workers Local 201.

In 2009 - 2010, these contractors paid $1.2 million into those Iron Worker recruitment and training programs.

These Iron Worker contractors through their payments to the Joint Local 5 and 201 Recruitment and Training Committees pay for instructors and other personnel to conduct classes at Phelps and to participate in job fairs throughout the District of Columbia.

As examples, these include the YWCA, the Young Womens' Conferences on Non-Traditional Careers, the Temple of Praise Employment Ministry, the Florida Avenue Baptist Church in Northwest and numerous others.

Since 2005 the Joint Labor/Management Training Committee for Local 5 has conducted a fourteen (14) week pre-apprenticeship training session for District of Columbia residents. Participants are provided training materials, tools and other equipment.  Those classes are underway at this moment.

We cite these efforts to reflect our commitment to actively recruit, train and employ D.C. residents.  As noted by other parties here today, we welcome the development by the District of Columbia of economic incentives for contractors to expand work opportunities for District of Columbia residents.

We welcome the opportunity to work with you.

ABC117

**Council of the District of Columbia**
Comments by
Bernie Brill
Executive Director of SMACNA Mid-Atlantic Chapter

## Proposed Amendment to the First Source Employment Agreement Act of 1984
## March 14, 2011

My name is Bernie Brill and I am the executive director of the Sheet Metal and Air Conditioning Contractors' Association in the Mid-Atlantic Region. We represent nearly 50 area union contractors whose members fabricate and install state-of-the-art environmental systems in buildings, as well as install metal roofing, and manufacture and install specialty metal products such as kitchen equipment.

Our members were involved with the rebuilding of the Pentagon following 9/11, the new baseball stadium, the Capitol Visitors Center, Ford's Theater, the Department of Employment Services' new facility, Anacostia and Woodrow Wilson High Schools, Verizon Center, Smithsonian Museum, the Arena Stage, along with many other office buildings and area hospitals.

Like the electricians, mechanical contractors, ironworkers and the other trades, our industry invests in its workers. Sheet metal contractors in the DC area spend nearly $2 million a year training apprentices and providing continuing education opportunities. They have an excellent training center and a dedicated group of instructors who teach a curriculum that is nationally accredited. Following the successful completion of the program, students may apply for and receive college credits. On average, the cost of training a union sheet metal contractor is approximately $25,000.00.

To make this happen, $0.55 per every hour worked by a journeyperson is dedicated to apprenticeship. An additional $0.17 is paid into a national training fund bringing the total to $0.74 per hour worked. And by the way, a journeyperson's compensation exceeds $100,000.00 per year.

To attract qualified candidates to the this program, the training center's professional recruiter has been travelling throughout the area, including the Phelps School, on numerous occasions and participating in job fairs such as the one coming up on March 26th at the Greater First Baptist Church at 2701 13th St., NW.

ABC118

To be successful, our industry demands a talented, educated, and motivated workforce. Candidates for the position must have a solid educational background, be able to pass a drug test, physically capable of performing certain tasks, and be able to attain a security clearance. As you know, much of this area's work is in government buildings and military installations.

Interestingly, because there have been such shortages in the number of qualified apprentices, the average age of today's apprentice is 29 years.

In addition to recruiting at the high schools, our industry is also expanding its searches to community colleges and to veterans. You are probably aware of "Helmets to Hardhats," a program that helps discharged vets find job opportunities in the construction trades. Our contractors have been successful in hiring these veterans as they seem to have the discipline and maturity to be successful in this craft.

It is encouraging to hear city leaders discuss an incentive program whereby construction companies hiring D.C. workers would be properly rewarded. Companies need to be encouraged for "doing the right thing" through tax incentives. Those businesses that actively recruit, provide or support local training programs, should receive an advantage when it comes to winning city funded jobs.

SMACNA Mid-Atlantic and Sheet Metal Workers Union Local 100 Joint Apprenticeship Committee is committed to providing apprenticeship opportunities for District of Columbia residents. Our "Step-Up Apprenticeship Initiative can be a viable training initiative for D.C. residents who are presently unable to meet the requirements for regular apprenticeship in the trade. Step-Up Apprentices would receive supplemental training to meet eligibility requirements for regular apprenticeship, such as math skills, job readiness, and drug prevention.

During the construction of D.C. Convention Center District residents who did not meet the eligibility requirements of the Fund's regular apprenticeship program were employed under this program. Residents received related instruction in the trade and attended supplemental training to meet eligibility requirements for apprenticeship.

Our contractors are anxious to work with city officials on creating a positive environment to allow all District residents who want to work to find work with competitive wages and benefits.

Testimony before the Committee on Housing and Workforce Development

Michael Brown, Chair

Monday, March 14, 20011

The John A Wilson Building

1350 Pennsylvania Avenue, NW

Washington, DC

Good morning, Chairman Brown and Members of the Committee on Housing and Workforce Development. I am, Thomas M. Blanton, Deputy Public Affairs Director, Mid-Atlantic Regional Council of Carpenters and a resident of Ward 4. I am also a 30 year member of MARCC local 491 and a former member of the DC Council staff for 7 years.

I am here today to support enactment of Bill 14-0050, the District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011" and to propose amendments specific to the construction industry. Without such amendments, the new law like the old will continue to allow District residents to take turns being unemployed. That is the nature of the construction industry. One resident will go to a project to be hired the first time and then another resident will go to the next project to be hired the first time.

We all know that the Mayor has announced a Workforce Incentive Program. His initiative will provide contractors who work on DC Public School projects to be paid an additional sum for hiring DC residents. In addition, the Mayor has stated that he intends to do more and promote careers and not just jobs.

We salute the Mayor and the Council for taking these steps to strengthen First Source and provide incentives for hiring District residents. We encourage you to look further at our proposal that creates a seamless path for entry into the construction industry. A pathway that provides training, career opportunities, and a decent quality of life,

What we proposed is based on our work and the system that currently operates in a significant portion of the industry.

Our proposal encourages employers to link up;

Our proposal provides opportunities to receive training;

Our proposal encourages workforce development and stability that benefits Washington, DC.

**ABC120**

We know that this system will work because it has worked for us for over 125 years.  It will encourage better quality and broad participation in building DC's workforce.

Thank you for allowing me to speak.  I welcome the opportunity to answer any questions.

**Proposed CONSTRUCTION CAREERS CREATION (3C) AMENDMENT to the
"District of Columbia Workforce Intermediary Establishment and Reform of
First Source Living Wage Amendment of 2011"
(hereafter called "Amendment")**

In the "Amendment," the following wording shall replace the wording beginning with *(B) The Chief procurement Officer and each District Contracting Officer shall include in each government assisted construction project totaling $300,000* and ending with *... no less than 7 calendar days prior to publication in a District newspaper of city-wide circulation:*

**(Section One)** The District of Columbia establishes as a public policy goal the creation of seamless transitions from construction skill training programs in DC public schools and WDOs, to apprenticeships, to lifetime careers as journeymen employed in the construction trades.

(a) The District of Columbia recognizes that construction jobs are by their nature temporary jobs and that unless systems are put in place to create opportunities for entrance into lifetime construction careers, requirements for hiring DC residents for single jobs only will do little to address DC's chronic unemployment rate. Therefore, the District of Columbia establishes as public policy the encouragement of the creation of such systems.

(b) When DC public subsidies are used to finance construction services, the public in DC has a right to demand that these services not only produce excellent products but are used to ensure that DC residents have opportunities to enter life careers in construction.

**(Section Two)** Pre-qualifications

(a) To qualify to bid for participation in construction service projects supported by DC public subsidies totaling $300,000 or more, potential bidders must submit a plan for guaranteeing that they will ensure that:

(1) At least 25% of journey worker hours by trade shall be performed by District residents.

(2) At least 50% of apprenticeship hours by trade shall be performed by District residents.

(3) At least 60% of skilled laborer hours by trade shall be performed by District residents.

(4) At least 70% of unskilled laborer hours shall be performed by District residents.

(b) These plans can be developed by the bidders themselves or with the aid of the District of Columbia Workforce Intermediary Task Force.

1

ABC122

(c) Prime contractors shall require subcontractors bidding on contracts at all tiers to submit the plan described above.

(d) The CPO, Mayor, and the Director of the Department of Employment Services shall establish a procedure to address cases when, despite all good faith efforts, qualified DC residents cannot be found to fulfill the requirements set forth above.

(e) At the discretion of the CPO or his or her designee, contractors and subcontractors who have won jobs but who do not carry out the plans they submitted shall be covered by the penalties and the rights of appeal listed in Title IX and X of the Procurement Reform Act of 2010.

**(Section Three)** Evaluating bids

(a) The Chief Procurement Officer shall direct the establishment of a uniform point system by which the CPO and DC contracting officers shall evaluate competitive bids.

(b) For every standard listed below that they can fulfill, bidders for construction service contracts will be awarded extra evaluation points by the CPO and DC contracting officers:

(1) Operates or participates in an apprenticeship program that is part of a network that provides aid to apprentices in receiving employment opportunities after they complete the work on the job for which they were initially hired.

(2) Operates or participates in an apprenticeship program that provides apprentices with free training for life.

(3) Operates or participates in an apprenticeship program that trains participants in a variety of related crafts, rather than just the skills needed for the job for which the apprentice was hired.

(4) Operates or participates in an apprenticeship program that has had a significant graduation rate for at least three years

(5) Singly or through multi employer programs provides aid to journeymen in receiving employment opportunities after they complete the work on the job for which they were initially hired.

(6) Singly or through a multi employer program, provides employees with free health care benefits.

(7) Singly or through a multi employer program, provides employees with defined pension plans.

2

ABC123

(8) Provides all apprentices and journey workers with wages that are at least "prevailing wages" as set by the Davis-Bacon Act as it applies to DC.

(9) Gives preference in hiring to graduates of DC public school or WDO construction skill training programs.

**(Section Four)** Scope

(a) The above provisions shall apply to construction service projects supported by DC public subsidies totaling $300,000 or more.

(b) The provisions shall also apply in cases where DC contracts with a person, firm or corporation, including a developer or public-private partner, to enter into secondary contracts with other persons, firms or corporations for construction services.

(c) These provisions shall also apply to said secondary contracts at every tier.

3

**ABC124**

# High pay!  Lifetime careers!

More than 300 DC-area construction employers and the Mid-Atlantic Regional Council of Carpenters (MARCC) are creating opportunities for DC residents to enter secure, high paying, lifetime careers.

MARCC is working with DC Public Schools and agencies to provide pre-apprenticeship training. Graduates of the programs can start apprenticeships at the second year level and at second year pay and benefits.

*APPRENTICES DO NOT PAY FOR TRAINING – THEY GET PAID.* And they get assistance in completing high school or the equivalent. They can also receive associate degrees from area colleges.

*THEY RECEIVE FULLY-PAID HEALTH CARE FOR THEMSELVES AND THEIR FAMILIES.* As they advance through the program and become journeymen, they enjoy secure pensions, annuities, free advanced training and the services of representatives who identify new jobs for them.

*EMPLOYERS SIGN A CONTRACT THAT COVERS EMPLOYEES.*
*IT GUARANTEES WAGES, BENEFITS AND PROTECTIONS. NOTHING CAN BE TAKEN AWAY ON A WHIM.*
*HERE'S WHAT THE CURRENT CONTRACT GUARANTEES EMPLOYEES COVERED BY IT OR ITS SECTIONS:*

## HOURLY PAY

| Apprentice | |
|---|---|
| First year | $15.83 |
| Second year | 18.47 |
| Third year | 21.10 |
| Fourth year, 1st six months | 23.74 |
| Fourth year, 2nd six months | 25.06 |
| | |
| Journeyman | $26.38 |

## TOTAL HOURLY EARNINGS

With health care, annuity, pensions and other benefits, total hourly earnings are:

| Apprentice | |
|---|---|
| First year | $21.24 |
| Second year | 23.88 |
| Third year | 28.16 |
| Fourth year, 1st six months | 30.80 |
| Fourth year, 2nd six months | 32.12 |
| | |
| Journeyman | $33.44 |

### And covered workers receive:
* Free advanced training programs
* Protection against being unjustly fired or disciplined
* Overtime pay




**Washington, DC District**
**Mid-Atlantic Regional Council of Carpenters**
United Brotherhood of Carpenters and Joiners of America
8500 Pennsylvania Avenue • Upper Marlboro, MD 20772 • 301-735-6660

ABC125



**CNHED**
Coalition for Nonprofit Housing and Economic Development

**Testimony of Robert Pohlman, Executive Director**
**Coalition for Nonprofit Housing & Economic Development**
**"District of Columbia Workforce Intermediary Establishment and Reform of**
**First Source and Living Wage Amendment Act of 2011"**
**Before the Committee on Housing and Workforce Development**
**Monday, March 14, 2011**
**District of Columbia Council Chamber**

Good morning Chairman Brown and members of the Committee. My name is Robert Pohlman. I am the executive director of the Coalition for Nonprofit Housing and Economic Development (CNHED). The 125 member organizations of the Coalition fund, finance, produce, preserve and provide affordable housing and neighborhood based economic development in the District of Columbia.

Our membership includes many small housing developers who frequently use small contractors and subcontractors to renovate existing buildings for affordable housing. So my testimony is from the perspective of small, mostly non-profit developers, who are looking for every way possible to cut costs in order to make the housing they produce as affordable as possible while maintaining high standards of quality construction.

I want to commend the introducers of the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011" for recognizing the need for change in the District's workforce development efforts. I think we all recognize that the current First Source law does not work – both because it aims too low, requiring hiring of DC residents only for newly created jobs, and because it has been so abysmally administered.

Having said that, I would like to comment on specifics in the bill before us. We support the creation of a workforce intermediary to work with companies with District funded contracts to identify their need for workers. Simultaneously the workforce intermediary must interact with job trainers to ensure that residents are given the appropriate training to fill these jobs, and the intermediary should play a role in matching trained workers with appropriate jobs. We believe that the "broker" role a workforce intermediary would play is essential if the District hopes to eventually achieve anything near the ambitious goals for employment of DC residents set forth in this bill. I liken the workforce intermediary broker's role to that of a good real estate broker. The most successful real estate brokers do an equally good job representing the buyer as well as the seller. Similarly with a workforce intermediary, we need someone who is truly committed to helping employers find qualified employees while at the same time being focused on helping residents get the training and job placement they need to succeed.

We also have several concerns regarding this bill as written. First, the percentages of hours worked by category which must be filled by DC residents appear to us to be highly ambitious, particularly for small contractors working on smaller projects. Contractors already have experienced crews in place. If a small contractor performs a significant part of their work outside of DC, they would very likely not bid on jobs within the District that required them to make wholesale changes in their construction crews. If that is the

case, the net effect will be to reduce competition and increase the cost of construction. This is of particular concern to affordable housing developers who are already struggling to come up with sufficient financing to cover the cost of acquisition and rehabilitation of buildings.

Secondly, while the stated goals are laudable, there must be a realistic timeframe for achieving these goals. The District must prepare workers for these jobs. Does anyone know how many jobs and hours of work would be affected if this bill went into effect immediately? Do we know the number of DC residents ready, able and qualified to fill these positions? While there are some excellent job readiness and skills training programs in the District, some of them operated by CNHED members, we are not confident that there are sufficient training resources available at this time to prepare the number of DC workers that would be needed to fill these jobs. The District has had a dysfunctional workforce development effort for years, and it cannot be fixed overnight.

Finally, the start time for implementation is a concern. As I've already stated, we do not believe the District is prepared to begin this program immediately. First of all, a workforce intermediary has not been established and the timeline for creating one and making it fully functional as envisioned by this bill appears to be unrealistic. The role of the intermediary is critical. It must analyze the need for various types of workers and attempt to match that need with a well trained supply of workers. The intermediary should also play a key role in determining whether a contractor has made a good faith effort to hire District residents.

In summary, the District must determine the number of positions that will be affected by this bill, assess whether there is an adequate supply of trained District workers to fill those positions, and if not commit to adult job training, including readiness and specific skills training, in order to prepare workers for available jobs. Consideration should be given to the impact of the bill on smaller construction projects. Finally, the District should move forward quickly to put a workforce intermediary in place to identify the need for various types of workers, assess the current supply of workers, ensure that there is adequate training for DC residents to qualify for jobs and match trained workers with jobs.

Thank you for this opportunity to testify.

# BROOKINGS

1775 Massachusetts Avenue, NW
Washington, DC 20036
telephone  202.797.6000
fax  202.797.6004
web  brookings.edu

Greater Washington
Research

**Testimony Re: District of Columbia Workforce Intermediary Establishment and
Reform of First Source and Living Wage Amendment Act of 2011**

March 14, 2011

Councilmember Brown and Members of the Committee:

Thank you for the opportunity to testify. My name is Martha Ross and I am Deputy Director of
Greater Washington Research at Brookings.  I'm pleased to speak today on the District of Columbia
Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment
Act of 2011.

As you well know, the goal of First Source is to leverage city subsidies on contracts and development
project to open up job opportunities for District residents, but it's hard to find someone who thinks
it's doing a good job.  Not policymakers, not employers, not training providers, and least of all
residents.  It's an important tool to direct the benefits of economic development to residents and I'm
glad we're having this discussion about how to improve it.

I think we should start with the proposition that a successful First Source program will do more than
monitor employers' compliance with the law – it will take active steps to HELP employers comply
with the law, by developing a pipeline of qualified, work-ready District residents it can refer to
employers.  My understanding is that DOES' efforts related to First Source has consisted of
monitoring  employers' compliance with their First Source agreements (and has been under-staffed to
do this), holding job fairs, and sending lists of job-seekers to employers, probably pulled from
Unemployment Insurance records and residents who register for services at the One Stop Career
Centers.  This seems to me to be totally inadequate.  Key elements are missing:  an understanding of
what jobs are coming online and what the skill requirements are, screening job candidates before
referring them to employers, and as necessary, providing feedback to training providers to ensure
they produce job-ready candidates.

We don't need to develop a big new bureaucracy office to carry out this work:  a couple of
entrepreneurial staff people could do this kind of screening, referring and matching, but it requires a
rethinking of what First Source is.  First Source should provide value to employers by improving
their access to a pool of qualified job candidates who are ready to be hired.  It should also provide
value to residents by linking them to job opportunities.  First Source staffers need to understand both
the supply and demand side of the labor market, in a very localized and specific way.  Which training
providers produce the most job-ready workers?  Which jobs require cars?  Which jobs bar applicants
with criminal records?  Which jobs have variable hours that would make it difficult to find regular
child care?  Which employers and occupations provide opportunities for advancement?  In order to
be useful to both the job seeker and the employer by creating successful referrals, First Source needs
to address these kinds of questions.

Of course, First Source should also focus on enforcement and compliance, but that alone is insufficient. We have focused on compliance alone for some time now without also developing a mechanism to screen and match candidates with employers, and no one is satisfied with the results.

The creation of a Workforce Intermediary Task Force is an important step to strengthening First Source's ability to meet employer needs and create job opportunities for District residents. I urge you to consider appointing several private sector employers to the task force. One of the problems of First Source – of the whole public workforce system, in fact – is that employers do not perceive DOES as providing valuable services. The intermediary needs to be credible with employers, both in fact and in perception, and private sector task force members can provide useful input on that score. .

Lastly, we need to be realistic about what First Source can accomplish. It is one tool in a toolkit related to education, training and job placement. It has developed symbolic importance that is out of proportion with what it alone, divorced from other workforce development improvements, can accomplish. It affects a small proportion of the total jobs in the city, and primarily focuses on construction jobs, a relatively small sector in the regional economy. The symbdolism is due to residents' frustration that the city's prosperity is passing them by (a frustration which is warranted, I believe). I urge the Council to consider this First Source legislation as part of a larger commitment to building educational and career pathways to help District residents increase their skills, work-readiness, and employment.

A pathways approach, as the name suggests, involves developing a continuum of educational, training and employment experiences, the end point of which is a family-supporting job. It means intentionally building up the capacity of various institutions – community colleges, high school career and technical education (CTE) programs, nonprofit training organizations – so that they become part of the talent pipeline for regional employment. That means that not only do these institutions run good training and educational programs, but they are meaningfully connected to each other and to employers in a dramatically ramped up way. Inherent in the concept of pathway is that where you stand now is connected to the previous step and to the next step.

GED programs should think about how they connect students to post-secondary education, skills training, or employment. High school CTE programs should have heavy employer involvement in curriculum design and lead to job opportunities, apprenticeships, or further education. CCDC or an occupational skills training program, say, in carpentry, may partner with a community-based organization to help recruit students and provide wraparound supportive services. There are a lot of players in the education and workforce field -- government agencies, nonprofits, employers, and educational institutions -- and a pathways approach can provide a shared framework for to work together, define shared goals and identify their respective roles.

Thank you for the opportunity to speak and I look forward to answering any questions you may have.



**Alliance for**
**Construction Excellence:** A Coalition of the Premier Construction Specialty Contractor Associations

Council of the District of Columbia

March 14, 2011

Comments by Marla McIntyre, DC Metropolitan Subcontractors Association, a member of the Alliance for Construction Excellence (ACE) on the Proposed Amendment to First Source Employment Agreement Act of 1984

Good afternoon, I am Marla McIntyre representing the Alliance for Construction Excellence. ACE is a coalition of eight trade associations representing more than 1,200 specialty construction contractors and subcontractors in every construction trade in Washington DC and the surrounding metropolitan area. ACE member-companies employ more than 55,000 highly-skilled technicians for field construction work, and have combined gross sales of more than $6 billion per year. Much of that work takes place in the District of Columbia. On behalf of ACE, I offer the following remarks relevant to the proposed First Source legislation currently before this Honorable Council.

ACE member associations recognize the importance of the District's First Source Agreement program. By hiring District residents to work on District construction projects, ACE member companies are contributing to a better community and a stronger city. ACE members also believe that employee morale is best served when people can work in the jurisdiction where they live. However, despite many outreach and training programs implemented by ACE members, it is still difficult for us to comply with the First Source Agreement requirements. For years, our associations have been involved in efforts to recruit District residents for the apprenticeship programs for our various trades. We have established pre-apprentice programs and step-up programs. The reality is that when we find solid candidates, after an apprentice has a few years of experience and is earning more money, he or she moves out of the District. In the electrical trade, for example, more than 16% of the first-year apprentices are City residents; the total (five year) apprentice population includes 7% residents; the percentage of City residents in the journeyman classification is less than 2%. We want to comply with First Source; there are simply not enough *skilled* District residents available to meet the demand for the projects that involve a First Source Agreement.  So that you understand the scope of training and recruitment programs offered by ACE members, I will turn the floor over to ACE members **Bernie Brill**, SMACNA Mid-Atlantic Chapter; **Fred Codding**, Iron Workers Employers Association; and sheet metal contractor **Edward Hershon**, Stromberg Metals.

ACE would like to work with the City Council and the Department of Employment Services to ensure that legislation and the resultant regulations are realistic, while providing employment opportunities for District residents. We favor an incentive program whereby construction companies hiring D.C. workers would be properly rewarded. Companies need to be encouraged for "doing the right thing" through tax incentives for hours worked by DC residents, or giving contractors preferred prequalification status based on their hiring record.  Those that actively recruit, provide or support local training programs, should receive an advantage when it comes to winning city funded jobs. At the same time, the city also has the responsibility of making sure the schools are producing students with attitude and aptitude to be productive workers.

We thank you for allowing the Alliance for Construction Excellence to share its views with you today.

2010 Kendall Street, N.E. • Washington, DC 20002

ABC130

**Council of the District of Columbia**
**Committee on Housing and Workforce Development**
**Notice of Public Hearing**
1350 Pennsylvania Ave., NW, Washington, D.C. 20004

## COUNCILMEMBER MICHAEL BROWN, CHAIRPERSON
## COMMITTEE ON HOUSING AND WORKFORCE DEVELOPMENT

### ANNOUNCES A PUBLIC HEARING ON

**B19-50, the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011"**

Councilmember Michael Brown, Chairperson of the Committee on Housing and Workforce Development, announces a public hearing on B19-50, the "District of Columbia Workforce Intermediary Establishment and Reform of First Source and Living Wage Amendment Act of 2011". The public hearing will be held on, March 14, 2011, at 10:00 a.m., in Room 120 of the John A. Wilson Building, 1350 Pennsylvania Ave., NW, Washington, D.C. 20004.

**Monday, March 14, 2011, 10:00 a.m.**
**Room 120, John A. Wilson Building**
**1350 Pennsylvania Ave., NW**
**Washington, D.C. 20004**

Those who wish to testify should contact Drew Hubbard at (202) 727-8230 or dhubbard@dccouncil.us, and provide your name, organizational affiliation, and title of organization by 5:00 p.m. on Friday, March 11, 2011. Witnesses should bring 20 copies of their written testimony to the hearing. The Committee allows each individual 3 minutes to provide oral testimony in order to permit each witness an opportunity to be heard. Additional written statements are encouraged and will be made part of the official record. The official record will close ten days following the conclusion of the hearing.

Council of the District of Columbia
Committee on Housing and Workforce Development
Witness List- Public Hearing
1350 Pennsylvania Ave., NW, Washington, D.C. 20004

Revised

# COUNCILMEMBER MICHAEL BROWN, CHAIRPERSON
# COMMITTEE ON HOUSING AND WORFORCE DEVELOPMENT

B19-50, the "District of Columbia Workforce Intermediary Establishment and
Reform of First Source and Living Wage Amendment Act of 2011"

### Monday, March 14, 2011, 10:00 a.m.
### Room 120, John A. Wilson Building
### 1350 Pennsylvania Ave., NW
### Washington, D.C. 20004

Public Witnesses

Panel I
1. Barbara Lang, President & CEO, DC Chamber of Commerce
2. Merrick T. Malone, President, DCBIA
3. Roderic L. Woodson, Chair, DCBIA Legislative/Government Affairs Committee
4. Robert H. Braunohler, Past President, DCBIA

Panel II
1. Joslyn Williams, President, Metropolitan Washington Council, AFL-CIO
2. Steve White, Council 20 AFSCME
3. Al Billik, Council 20 AFSCME
4. Camille Cormier, Director of Local Women in Trades Programs and Policies,
   Wider Opportunities for Women

Panel III
1. Thomas M. Blanton, Mid-Atlantic Regional Council of Carpenters
2. Larry Rubin, Mid-Atlantic Regional Council of Carpenters
3. Stephen W. Courtien, Business/Legislative Representative, Washington DC
   Building Trades Council
4. Martha Ross, Deputy Director, Greater Washington Research at Brookings

Panel IV
1. Eric J. Jones, Associate Director of Government Affairs, ABC of Metro Washington
2. Mike Burlas, Vice President, Miller and Long Construction
3. Lawrence Prosen, Partner, K & L Gates, LLP
4. Eric Shatzer, President, Hawkins Electrical Service, Inc.

Panel V
1. Marina Streznewski, Coordinator, DC Jobs Council
2. Sally Kram, Director Of Public & Governmental Affairs, Consortium Of Universities
3. Walter Smith, Executive Director Of DC Appleseed
4. Mackenzie Baris, DC Jobs With Justice

Panel VI
1. Jerome Peloquin, Co-Director, National Capital Jobs Coalition
2. Sarah Looney Oldmixon, Director - Workforce Initiatives, The Community Foundation For The National Capital Region
3. David Loda, Advocacy Associate, DC Employment Justice Center
4. Alan Page, DC Statehood Green Party

Panel VII
1. Jason Edwards
2. Monica Bowles
3. Tammy Winslow
4. Ron Harris, Organizer SMART DC

Panel VIII
1. Bernie Brill, Alliance for Construction Excellence
2. Maria Macintyre, Alliance for Construction Excellence
3. Fred Codding, Alliance for Construction Excellence

Panel IX
1. Tom Brown, Training Grounds, Inc.
2. Bob Pohlman, Executive Director, CNHED
3. Elissa Silverman, DC Fiscal Policy Institute

Government Witness

1. Dr. Rochelle Webb, Acting Director, Department of Employment Services

ABC133

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

## ADMINISTRATIVE ISSUANCE SYSTEM

Mayor's Order   83-265
November 9, 1983

SUBJECT:  Employment Agreement Goals and Objectives for All District of
Columbia Projects

ORIGINATING AGENCY: Department of Employment Services

By virtue of the authority vested in me as Mayor of the District of Columbia
by Section 422 of the D.C. Self-Government and Governmental Reorganizational
Act of 1973, as amended, D.C. Code Section 1-242 (1981 Edition), it is hereby
ORDERED that:

1.  For any project funded in whole or in part with District of
Columbia funds, or funds which, in accordance with a federal grant
or otherwise, the District of Columbia administers, and on which the
District of Columbia is signatory to any agreement of a contractual
nature, the project shall reflect the goal of this Administration to
enhance business and economic development by increasing jobs for
District residents and broadening the District of Columbia's tax
base.  Accordingly, all projects shall provide for increased
employment opportunities for District residents by requiring all
contracts and subcontracts to include the provisions set forth
below.

2.  Any agreement of a contractual nature shall contain the following
basic goals and objectives for utilization of bona fide residents of
the District of Columbia in each project's labor force:

    (a)  At least fifty-one percent of all jobs created are to be
    performed by employees who are residents of the District of
    Columbia.

    (b)  At least fifty-one percent of apprentices and trainees employed
    shall be residents of the District of Columbia registered in
    programs approved by the D.C. Apprenticeship Council.

3.  Any agreement of a contractual nature shall include for each project
a requirement that the employer negotiate an Employment Agreement
with the Department of Employment Services.



DEPOSITION
EXHIBIT
#6
10/24/16

J-3147—75

-2-

4. Any agreement of a contractual nature shall include a requirement that employers on the project utilize the Job Service operated by the Department of Employment Services as a first source of referral for qualified applicants, trainees, and other workers in the implementation of the employment goals contained in this Order. Each contractor shall include in all subcontracts executed in connection with a project the same requirement.

5. Implementation:

   (a) All requests for bids and proposals issued by departments or agencies of the Government of the District of Columbia that will create jobs, in the District of Columbia, through a contract, subcontract, grant, financial loan or bond, shall include notification to potential employers that they will be required to hire fifty-one percent D.C. residents and enter into a first source Employment Agreement with the Department of Employment Services.

   (b) The Director of the District of Columbia Department of Employment Services is directed to implement this Order and is authorized to fashion such procedures as may be necessary to accomplish its purposes. The Director is also authorized to request the assistance of any District department or agency for support services in carrying out the imperatives of this Order.

6. To the extent that this Order is inconsistent with the provisions of any other Commisssioners' Order, Order of the Commissioner or Mayor's Order, the provisions of this Order shall prevail and super-sede the provisions thereof.

7. Effective Date:  This Order shall become effective immediately.


MARION BARRY, JR.
MAYOR


ATTEST:
DWIGHT S. CROPP
SECRETARY, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | Civil Action No. 12-00853 (EGS) |

## THE DISTRICT OF COLUMBIA'S RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES AND <u>FIRST REQUEST FOR PRODUCTION OF DOCUMENTS</u>

The District of Columbia (the District), under Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, submit these objections and responses to Plaintiffs' First Set of Interrogatories and First Request for Production of Documents.

Each response is made subject to the general objections made below, regardless of whether a General Objection or specific objection is stated in the response. The explicit reference to a General Objection or the making of a specific objection in response to a particular discovery request is not intended to constitute a waiver of General Objections not specifically referred to in that response. The District's objections and responses to discovery shall not prejudice any objection and/or assertion of privilege it may later assert in any context.



DEPOSITION EXHIBIT #7 10/24/16 PENGAD 800-631-6989

(1)     The information supplied in these responses is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agents, representatives, and attorneys, unless privileged.

(2)     The word usage and sentence structure may be that of the attorneys assisting in the preparation of these responses and do not purport to be the precise language of the executing party.

## GENERAL OBJECTIONS

The District's General Objections are continuing objections and/or assertions of privilege and responses to every specific discovery request that follows. That some are not restated in response to particular requests does not waive the assertion and application of the General Objections. The District responds to the instant discovery subject to the accompanying objections, without waiving and expressly preserving all objections.

1.     The District objects to the instructions propounded by plaintiffs to the extent they seek or purport to impose obligations that exceed those required by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Columbia. Included in the instructions objected to are Plaintiffs' definitions, to the extent they purport to assign to words and phrases meanings other than those understood or used in common parlance.

2.     The District objects to this discovery if it inquires into matters privileged from disclosure under the attorney-client privilege, executive privilege, deliberative-process privilege, legislative privilege, informant's privilege, law

2

enforcement privilege, prosecutorial privilege, spousal privilege, Privacy Act, District of Columbia Municipal Regulations, D.C. Office of Personnel rules and/or regulations, the work-product doctrine, and/or any other applicable privilege or similar protection.  Inadvertent production of any information or documents so privileged constitutes no waiver of such privilege or any other grounds for objecting to the discovery request.

3.    The District objects to this discovery if it seeks disclosure of confidential material or information absent a protective order.

4.    In responding to these requests, the District does not waive, but retains and preserves all objections to the materiality, and/or relevance of the information provided.

5.    In responding to this discovery, the District does not concede or admit any premise, proposition, or characterizations in any document or any pleading in this or any other matter.

6.    In seeking the disclosures Plaintiffs seek, Plaintiffs are understood to waive all privileges, protections or claims regarding or relating to the subject of the disclosures.

7.    The District objects to this discovery where it is overbroad, unduly burdensome or vexatious on grounds, including, but not limited to, seeking materials without limitation on time period or over a time period too lengthy or seeking information immaterial, irrelevant to, or otherwise inadmissible.

8.     This response to these requests is accurate to the best of the District's knowledge by this date.  The District's investigation, however, is continuing, and the District may obtain additional information relevant to the matter through discovery and review of documents.  The District will produce additional responsive documents it discovers and reserves the right to rely on subsequently discovered information. The District will not provide copies of documents that are a matter of public record or already in plaintiffs' (or their attorneys') possession, which includes the public legislative record of any legislation challenged or referenced in the Complaint.

9.     The District reserves the right to object to the use of its responses to these requests in any proceedings other than this case.

10.     Every response is made subject to the foregoing General Objections, regardless of whether a General Objection or specific objection is stated in the response.  The explicit reference to a General Objection or making a specific objection in response to a particular discovery response is not intended to constitute a waiver of General Objections not specifically referred to in that response.

## ANSWERS TO INTERROGATORIES

**Interrogatory 1.** With reference to the "Amended First Source Act" — meaning the First Source Employment Agreement Act (currently codified at D.C. Official Code §2-219.01 et seq. (the "Original Act"), as amended by the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (effective date February 24, 2012) (the "2011 Amendments") — identify any construction or development projects for which the District has taken the position that the terms of the Amended First Source Act apply.

**Response:**    Under Fed. R. Civ. P. 33(d), plaintiffs are referred to the file "List of

new Law Projects.xlsx," Bates No. DC-MWC00000229, a spreadsheet containing information responsive to this interrogatory.

**Interrogatory 2.** For the period from January 1, 2012, to June 1, 2016, have there been construction projects with government assistance totaling $5 million or more for which the District has taken the position that the terms of the Amended First Source Act do <u>not</u> apply? If so, please identify the relevant project.

**Response:** During that time, there was only one such project—the So Others Might Eat (SOME)/Benning Road mixed-used development project.

**Interrogatory 3.** For any project identified in response to Interrogatory No. 2, please describe why the District took the position and what factors it considered in making that decision.

**Response:** DOES took this position due to the establishment of a special hiring agreement under Section 2-219.03a. SOME negotiated with DOES to hire above and beyond the legislated percentage of new hires and provided DC residents with access to its extensive training programs and services at no cost. Please see the folder labeled "Addendum," beginning at Bates No. DC-MWC00000226, for a copy of the special hiring agreement executed with SOME.

**Interrogatory 4.** For the period from January 1, 2012, to June 1, 2016, have there been construction projects with government assistance totaling $5 million or more for which waivers of the requirements of the Amended First Source Act were granted? If so, please identify the relevant projects and describe why the District granted waivers.

**Response:** There have been no such projects.

**Interrogatory 5.** Identify all construction contractors penalized or threatened with penalties for noncompliance with the Amended First Source Act from 2012 to the present.

**Response:** Under Fed. R. Civ. P. 33(d), plaintiffs are referred to Bates Nos. DC-MWC00009310-DC–MWC00009406, which contains information responsive to this

interrogatory.

**Interrogatory 6.** Identify all facts that support the District's position that the Amended First Source Act's residential-hiring preferences are "narrowly tailored to address the unique evil of the District's inability to levy a commuter tax."

**Response:** Under Fed. R. Civ. P. 33(d), the plaintiffs are referred to Bates Nos. DC-MWC00000002 to 00000217, which contain information responsive to this interrogatory. Some of the "facts" sought may also be found in the District's previous briefing.

**Interrogatory 7.** For any expert or opinion witness from which the District expects to elicit testimony, please provide the information described in Rule 26(a)(2).

**Response:** The District objects to this interrogatory as vague, because Rule 26(a)(2) encompasses other types of experts than the one named by the District. The District also objects to this interrogatory as improper, because it attempts to impose obligations exceed those required by Fed. R. Civ. P. 26(a)(2)(c); the information required to be provided under that rule was disclosed on June 24, 2016.

**Interrogatory 8.** For the years 2012-2016, approximately how many people were employed by the District whose responsibilities (more than 50% of the time) were administering or monitoring the First Source Act program?

**Response:** The total staff responsible for administering or monitoring the First Source Program has increased over the years. During 2012, there were approximately four (4) staff. During 2013, there were approximately five (5) staff. During 2014, there were approximately six (6) staff. During 2015 and 2017, there have been approximately seven (7) staff.

**Interrogatory 9.** Attached as <u>Exhibit 1</u> is a copy of a page from the District's DOES website regarding the First Source program and in particular the 2011 amendments. With regard to this page:

(a)     Is it correct (as stated) that the 2011 amendments were "[c]rafted to increase the number of D.C. residents hired on projects funded by D.C. taxpayer dollars…"?

(b)     If the answer to that question is "yes," please describe what things in the 2011 amendments were "crafted" to have that effect, and what has been the net number of increased D.C. resident employment for each year from 2012-2016.

(c)     On page 2 of the sheet, DOES sets forth percentages of employment categories for certain government-assisted construction projects. Have there been any such projects meeting or exceeding those percentage requirements since the Amended Act was adopted? If so, which projects?

(d)     Has the District attempted to quantify or monitor the number of District residents meeting the employment categories set forth on page 2 (e.g., journey workers, apprentices, etc.)? If yes, which agency has compiled or maintained such information? And for each year (2012–2016), what has been the approximate number of District residents in each category?

**Response 9(a):**  Yes, in part. The original intent of the First Source Act was to increase the number of D.C. residents hired to work on government-assisted projects, including both construction and non-construction projects. The amendments to the First Source Act were crafted to increase the total hours worked by District residents on government-assisted projects by requiring beneficiaries to report the percentage of hours worked by journey workers, apprentices, skilled laborers, and common laborers.

**Response 9(b):**  Please see Response 9(a). The hoped-for "effects" of the amended law are contained in its legislative history. DOES does not track "the net number of increased D.C. resident employment." DOES has not evaluated the impact of the Amended First Source Act, but it is exploring ways to conduct a formal evaluation and analysis.

**Response 9(c):**  Under Fed. R. Civ. P. 33(d), plaintiffs are referred to the file

"Projects Meeting or Exceeding Goals.xlsx," Bates No. DC-MWC00009282, which contains information responsive to this interrogatory.

**Response 9(d):**  DOES has not attempted to quantify or monitor the number of District residents meeting the employment categories on page 2. The Amended First Source Act is based on the percentage of hours worked by all employees within the specified classifications; it does not require the District to quantify, monitor, or track the specific number of District residents. DOES uses the LCP Tracker system to collect certified payroll and aggregate reports to determine percentage compliance.

## VERIFICATION OF INTERROGATORY RESPONSES

I, Drew E. Hubbard, Chief Administrative Officer, Department of Housing and Community Development, state under the penalty of perjury I have read the foregoing Responses to Plaintiffs' First Set of Interrogatories and know its contents; that the information in the answers was gathered from numerous sources within the Department of Employment Services and no one has complete information regarding all matters; however, answers, subject to inadvertent or undiscovered errors, are based on and therefore limited by the records and information still in existence recollected, and discovered to prepare these answers; that I reserve the right to change the answers if omissions or errors have been made or that more accurate information is available; that subject to these limitations, the answers to these interrogatories are true to the best of my knowledge, information, and belief.

Dated: <u>September 29</u>, 2016.

_____
Drew E. Hubbard


Objections as noted.

8

Dated: September 29, 2016.         Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, DC 20001
Telephone: (202) 442-5868
Facsimile: (202) 741-0579
conrad.risher@dc.gov

*Attorneys for the District of Columbia*

---

* Appearing pursuant to LCvR 83.2(f).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> Defendant. | Civil Action No. 12-00853 (EGS) |

## THE DISTRICT OF COLUMBIA'S OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**Request for Production 1.** All documents reflecting the legislative history of the "Amended First Source Act"— meaning the First Source Employment Agreement Act (currently codified at D.C. Official Code §2-219.01 et seq. (the "Original Act"), as amended by the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (effective date February 24, 2012) (the "2011 Amendments")—including all documents or reports considered by the District Council's Committee on Housing and Workforce Development during its consideration of the 2011 Amendments.

**Response:**   The District will not provide copies of public-record documents, which includes the legislative histories of the First Source Act and any amending legislation. Those documents are equally accessible to plaintiffs.

**Request for Production 2.** All construction contracts that have been subject to the requirements of the Amended First Source Act from 2012 to the present.

**Response:** The District does not have the requested documents.

**Request for Production 3.** All waivers of the requirements of the Amended First Source Act granted for construction projects from 2012 to the present.

**Response:** No waiver has been granted for any First Source project.

10

**Request for Production 4.** All requests for waivers of the requirements of the Amended First Source Act granted for construction projects from 2012 to the present.

**Response:** Please see the folder labeled "Waiver Requests," Bates Nos. DC-MWC00009283–DC-MWC00009309. Four (4) employers submitted a Waiver Request.

**Request for Production 5.** All documents reflecting penalties threatened or imposed for noncompliance with the Amended First Source Act from 2012 to the present.

**Response:** Please see the folder labeled "Warning Letters," Bates Nos. DC-MWC00009310-DC–MWC00009406.

**Request for Production 6.** All reports prepared by or for the District which purport to describe compliance or noncompliance with the Amended First Source Act from 2012 to the present.

**Response:** Please see the folder labeled "New Law Reports," Bates Nos. DC-MWC00006576–DC-MWC00009281.

**Request for Production 7.** All documents regarding the financial impact of the First Source Act program on the District's economy and unemployment rate.

**Response:** There are no such pre-existing documents. The analyses conducted by Dr. Fitzroy Lee for this litigation are attached.

**Request for Production 8.** All documents which support the allegations and claims raised by the District in its Answer.

**Response:** All such documents have been or will be provided.

**Request for Production 9.** All documents referred to in your Answers to Interrogatories.

**Response:** All such documents have been or will be provided.

**Request for Production 10.** All documents that Dr. Fitzroy Lee considered in developing his opinions in this matter.

**Response:** All such documents have been provided. *See* Bates Nos. DC-

11

MWC00000002-DC–MWC00000224.

**Request for Production 11.** All reports prepared by the District or its agencies (including the Department of Employment Services, or the Department of Labor) that quantify or monitory the number of District residents within the job classifications relevant to construction contracts (*e.g.*, journey workers, apprentice etc.)

**Response:** The new law requirements are based on the percentages of hours worked per each classification, not the total District residents within the specific job classification. Please see the folder labeled "New Law Reports," Bates Nos. DC-MWC00006576–DC-MWC00009281, for all documents that list employees and their respective classifications.

Dated: September 29, 2016.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Assistant Attorney General
Equity Section
441 Fourth Street, N.W., 6th Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Facsimile: (202) 730-1470
E-mail: andy.saindon@dc.gov

12

/s/ Conrad Z. Risher
CONRAD Z. RISHER
Assistant Attorney General
441 Fourth Street, N.W.
Sixth Floor South
Washington, DC 20001
Telephone: (202) 442-5868
Facsimile: (202) 741-0579
conrad.risher@dc.gov

*Attorneys for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was caused to be served by electronic mail, this 29th day of September, 2016, upon:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987

13

| | # number of agreements | # of job openings listed with DOES as a result of First Source agreements | total number hired as a result of First Source agreements | Number of DC rsidents hired as a result of First Source agreements | % of DC residents hired | Number of unemployed DC residents on the First Source register | |
|---|---|---|---|---|---|---|---|
| July 1, 2013 to December 31, 2013 | 116 | 1,546 | 1,033 | 344 | 33.3 | | 0.333011 |
| January 1, 2014 to June 30, 2014 | 178 | 2,361 | 1,072 | 491 | 45.8 | | |
| July 1, 2014 to December 31, 2014 | 290 | 1,651 | 2,064 | 837 | 40.5 | | |
| January 1, 2015 to June 30, 2015 | 518 | 1,498 | 1,174 | 553 | 47.3 | 12,737 | |
| | | | | | | | |
| 2 year total | 1,102 | 7,056 | 5,343 | 2,225 | 41.6 | | |
| 1 yr  avg. | 551 | 3,528 | 2,672 | 1,113 | 41.6 | | |

AC S DC resident % of industry jobs

| | |
|---|---|
| Construction | 18% |
| Other professional and tech | 63% |
| restaurants | 49% |
| medical nursing home | 44% |
| business services | 39% |
| scientific R and D | 37% |
| Legal | 36% |
| Travelor accomodation | 35% |
| Medical outpatient centers | 35% |
| medical hospitals | 28% |
| Administration of human resource | 25% |
| Truck transportation | 27% |
| Computer systems and related | 24% |
| Adminin of justice and public safety | 19% |
| **All industry average** | **32%** |

Average annual salaries

Average Annual Wage (NAICS), Total Nonfarm (Thous. $)          87.5315

| | |
|---|---|
| Average Annual Wage (NAICS), Construction and Mining (Thous. $) | 66.42375 |
| Average Annual Wage (NAICS), Construction (Thous. $) | 66.42375 |
| Average Annual Wage (NAICS), Service Providing Private (Thous. $) | 80.77975 |
| Average Annual Wage (NAICS), Manufacturing (Thous. $) | 98.65875 |
| Average Annual Wage (NAICS), Wholesale Trade (Thous. $) | 123.14725 |
| Average Annual Wage (NAICS), Retail Trade (Thous. $) | 33.9335 |
| Average Annual Wage (NAICS), Transportation, Warehousing, & Utili | 108.535 |
| Average Annual Wage (NAICS), Transportation & Warehousing (Thou | 109.18275 |
| Average Annual Wage (NAICS), Utilities (Thous. $) | 107.831 |
| Average Annual Wage (NAICS), Information (Thous. $) | 122.233 |
| Average Annual Wage (NAICS), Financial Activities (Thous. $) | 122.67525 |
| Average Annual Wage (NAICS), Finance and Insurance (Thous. $) | 141.57825 |
| Average Annual Wage (NAICS), Real Estate and Rental & Leasing (T | 95.76825 |
| Average Annual Wage (NAICS), Professional & Business Svcs (Thou | 109.5325 |
| Average Annual Wage (NAICS), Professional, Scientific, and Technic | 129.769 |
| Average Annual Wage (NAICS), Management of Companies & Enterp | 339.27925 |
| Average Annual Wage (NAICS), Admin/Support and Waste Mgmt/Rer | 51.84575 |
| Average Annual Wage (NAICS), Educational & Health Svcs (Thous. $ | 53.78925 |
| Average Annual Wage (NAICS), Educational Services (Thous. $) | 45.28225 |
| Average Annual Wage (NAICS), Healthcare and Social Assistance (T | 61.60825 |
| Average Annual Wage (NAICS), Leisure & Hospitality (Thous. $) | 38.35225 |
| Average Annual Wage (NAICS), Arts, Entertainment & Recreation (Th | 63.363 |
| Average Annual Wage (NAICS), Accommodation & Food Svcs (Thou: | 35.439 |
| Average Annual Wage (NAICS), Other Services (Thous. $) | 89.902 |
| Average Annual Wage (NAICS), Total Government (Thous. $) | 103.2915 |
| Average Annual Wage (NAICS), Federal Government (Thous. $) | 109.21175 |
| Average Annual Wage (NAICS), State & Local Government (Thous. $ | 73.9725 |
| Average Annual Wage (NAICS), Agriculture, Foresty, & Fishing (Thou | 0 |

source: Global Insight   for  cy 2015

**Estimated net Revenue to DC if DC imposes a 1% commuter wage tax and the MD and VA reciprocated**

|  | Total | Commuting from/to: | | 1% commuter wage tax | | Total revenue |
|---|---|---|---|---|---|---|
|  |  | MD | VA | MD | VA |  |
| # of MD and VA residents working in DC | 544,832 | 316,219 | 228,613 |  |  |  |
| Total wages of MD and VA residents working in DC | $46,192,474,490 | $23,891,095,340 | $22,301,379,150 | $238,910,953 | $223,013,792 | $461,924,745 |
| Average wage of MD and VA residents working in DC | $84,783 | $75,552 | $97,551 |  |  |  |
| # of DC residents working MD or VA | 83,057 | 43,463 | 39,594 |  |  |  |
| Wages of DC residents working in MD or VA | $5,541,467,420 | $2,658,698,620 | $2,882,768,800 | ($26,586,986) | ($28,827,688) | ($55,414,674) |
| Average wage of DC residents working in MD or VA | $66,719 | $61,172 | $72,808 |  |  |  |
| Net revenue to DC |  |  |  | $212,323,967 | $194,186,104 | $406,510,071 |

Source: U.S. Census Bureau American Community Survey; ORA calculations

$       61,172

**Hypothetical impact of first source program**

| | |
|---|---|
| Average annual number of First Source hires over past 2 years | 2,672 |
| Average % hired that were DC residents  (41.6%) | 0.416 |
| number of DC residents hired with First Source | 1,111 |

Hypothetical impact if construction (low DC resident industry average)

| | |
|---|---|
| If construction project | |
| average % of industry employees that are DC residents (18%) | 0.18 |
| number of DC residents at industry average without First Source | 481 |
| Increase in number of DC residents due to First Source | 630 |
| Average annual contruction salary | 66,424 |
| additional earnings due to increase in DC resident workers | 41,878,605 |
| Average DC tax burden for a family of 3 in DC at $75,000  (8.83%) | 0.0883 |
| Additional taxes collected by DC government | 3,697,881 |

Hypothetical impact if business services (low DC resident industry average)

| | |
|---|---|
| average % of industry employees that are DC residents (39%) | 0.39 |
| number of DC residents at industry average without First Source | 1,042 |
| Increase in number of DC residents due to First Source | 69 |
| Average annual non-professional bus salary | 51,846 |
| additional earnings due to increase in DC resident workers | 3,601,171 |
| Average DC tax burden for a family of 3 in DC at $75,000  (8.83%) | 0.0883 |
| Additional taxes collected by DC government | 317,983 |

Hypothetical impact at DC average (for all industries)

| | |
|---|---|
| average % of industry employees that are DC residents (32%) | 0.32 |
| number of DC residents at industry average without First Source | 855 |
| Increase in number of DC residents due to First Source | 256 |
| Average annual DC salary | 87,532 |
| additional earnings due to increase in DC resident workers | 22,448,807 |
| Average DC tax burden for a family of 3 in DC at $75,000  (8.83%) | 0.0883 |
| Additional taxes collected by DC government | 1,982,230 |

# FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2009 to June 30, 2009

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2009 to June 30, 2009. | 1,301 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2009 to June 30, 2009, as a result of First Source Employment Agreements. | 363 |
| Total number of individuals hired, from January 1, 2009 to June 30, 2009, as a result of First Source Employment Agreements. | 6,693* |
| Number of District residents hired, from January 1, 2009 to June 30, 2009, as a result of First Source Employment Agreements. | 2,077 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2009 to June 30, 2009. | 31% |

*Number includes District residents and hires from other jurisdictions.



DEPOSITION
EXHIBIT
# 8
10/24/16

# FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### July 1, 2009 to December 31, 2009

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2009 to December 31, 2009. | 563 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2009 to December 31, 2009, as a result of First Source Employment Agreements. | 2,432 |
| Total number of individuals hired, from July 1, 2009 to December 31, 2009, as a result of First Source Employment Agreements. | 3,986* |
| Number of District residents hired, from July 1, 2009 to December 31, 2009, as a result of First Source Employment Agreements. | 1,343 |
| The percentage of District residents hired as a result of First Source Employment Agreements from July 1, 2009 to December 31, 2009. | 34% |

*Number includes District residents and hires from other jurisdictions.

# FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

## Semiannual Report
## January 1, 2010 to June 30, 2010

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2010 to June 30, 2010. | 363 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2010 to June 30, 2010, as a result of First Source Employment Agreements. | 665 |
| Total number of individuals hired, from January 1, 2010 to June 30, 2010, as a result of First Source Employment Agreements. | 1,603* |
| Number of District residents hired, from January 1, 2010 to June 30, 2010, as a result of First Source Employment Agreements. | 485 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2010 to June 30, 2010. | 30% |

*Number includes District residents and hires from other jurisdictions.

# FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### July 1, 2010 to December 31, 2010

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2010 to December 31, 2010. | 628 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2010 to December 31, 2010, as a result of First Source Employment Agreements. | 1,312 |
| Total number of individuals hired, from July 1, 2010 to December 31, 2010, as a result of First Source Employment Agreements. | 2,277 |
| Number of District residents hired, from July 1, 2010 to December 31, 2010, as a result of First Source Employment Agreements. | 1039 |
| The percentage of District residents hired as a result of First Source Employment Agreements from July 1, 2010 to December 31, 2010. | 46% |

*Number includes District residents and hires from other jurisdictions.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

## Department of Employment Services

VINCENT C. GRAY
MAYOR



LISA M. MALLORY
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2011 to June 30, 2011

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2011 to June 30, 2011. | 624 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2011 to June 30, 2011, as a result of First Source Employment Agreements. | 1390 |
| Total number of individuals hired, from January 1, 2011 to June 30, 2011, as a result of First Source Employment Agreements. | 2383 |
| Number of District residents hired, from January 1, 2011 to June 30, 2011, as a result of First Source Employment Agreements. | 1060 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2011 to June 30, 2011. | 44% |

*Number includes District residents and hires from other jurisdictions.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

VINCENT C. GRAY
MAYOR



LISA M. MALLORY
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### July 1, 2011 to December 31, 2011

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2011 to December 31, 2011. | 481 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2011 to December 31, 2011, as a result of First Source Employment Agreements. | 1560 |
| Total number of individuals hired, from July 1, 2011 to December 31, 2011, as a result of First Source Employment Agreements. | 2369* |
| Number of District residents hired, from July 1, 2011 to December 31, 2011, as a result of First Source Employment Agreements. | 844 |
| The percentage of District residents hired as a result of First Source Employment Agreements from July 1, 2011 to December 31, 2011. | 36% |

*Number includes District residents and hires from other jurisdictions.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

VINCENT C. GRAY
MAYOR



LISA M. MALLORY
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2012 to June 30, 2012

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2012 to June 30, 2012 | 317 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2012 to June 30, 2012, as a result of First Source Employment Agreements. | 1808 |
| Total number of individuals hired, from January 1, 2012 to June 30, 2012, as a result of First Source Employment Agreements. | 814* |
| Number of District residents hired, from January 1, 2012 to June 30, 2012, as a result of First Source Employment Agreements. | 428 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2012 to June 30, 2012. | 52.58% |

*Number includes District residents and hires from other jurisdictions.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

VINCENT C. GRAY
MAYOR



LISA M. MALLORY
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### July 1, 2012 – December 31, 2012

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2012 to December 31, 2012 | 446 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2012 to December 31, 2012, as a result of First Source Employment Agreements. | 1188 |
| Total number of individuals hired, from July 1, 2012 to December 31, 2012, as a result of First Source Employment Agreements. | 779* |
| Number of District residents hired, from July 1, 2012 to December 31, 2012, as a result of First Source Employment Agreements. | 358 |
| The percentage of District residents hired as a result of First Source Employment Agreements from July 1, 2012 to December 31, 2012. | 45.96% |

*Number includes District residents and hires from other jurisdictions.

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

VINCENT C. GRAY
MAYOR



LISA M. MALLORY
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2013 – June 30, 2013

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2013 to June 30, 2013 | 412 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2013 to June 30, 2013, as a result of First Source Employment Agreements. | 1444 |
| Total number of individuals hired, from January 1, 2013 to June 30, 2013, as a result of First Source Employment Agreements. | 1286 |
| Number of District residents hired, from January 1, 2013 to June 30, 2013, as a result of First Source Employment Agreements. | 443 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2013 to June 30, 2013. | 34.5% |

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Department of Employment Services

VINCENT C. GRAY
MAYOR



F. THOMAS LUPARELLO
INTERIM DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### July 1, 2013 – December 31, 2013

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2013 to December 31, 2013 | 116 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2013 to December 31, 2013, as a result of First Source Employment Agreements. | 1546 |
| Total number of individuals hired, from July 1, 2013 to December 31, 2013, as a result of First Source Employment Agreements. | 1033 |
| Number of District residents hired, from July 1, 2013 to December 31, 2013, as a result of First Source Employment Agreements. | 344 |
| The percentage of District residents hired as a result of First Source Employment Agreements from July 1, 2013 to December 31, 2013. | 33.3% |

# GOVERNMENT OF THE DISTRICT OF COLUMBIA

## Department of Employment Services

VINCENT C. GRAY
MAYOR



F. THOMAS LUPARELLO
INTERIM DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2014 – June 30, 2014

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2014 to June 30, 2014 | 178 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2014 to June 30, 2014, as a result of First Source Employment Agreements. | 2,361 |
| Total number of individuals hired, from January 1, 2014 to June 30, 2014, as a result of First Source Employment Agreements. | 1072 |
| Number of District residents hired, from January 1, 2014 to June 30, 2014, as a result of First Source Employment Agreements. | 491 |
| The percentage of District residents hired as a result of First Source Employment Agreements from January 1, 2014 to June 30, 2014. | 45.8% |

# FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

## Semiannual First Source Report
## July 1, 2014 – December 31, 2014

The following is submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from July 1, 2014 to December 31, 2014 | 290 |
| Number of job openings listed with the Department of Employment Services, from July 1, 2014 to December 31, 2014, connected to First Source Employment Agreements. | 1651 |
| Total number of individuals hired, from July 1, 2014 to December 31, 2014, on contracts subject to First Source Employment Agreements. | 2064 |
| Number of District residents hired, from July 1, 2014 to December 31, 2014, on contracts subject to First Source Employment Agreements. | 837 |
| The percentage of hires, from July 1, 2014 to December 31, 2014, on contracts subject to First Source Employment Agreements who reside in the District. | 40.5% |
| The number of names of unemployed District residents on the First Source Register. | 16265* |

*Employment status at application time = Not Employed: 16,155. Employment status at application time = Employed, but received notice of termination of employment or military separation: 110

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

MURIEL BOWSER
MAYOR



DEBORAH A. CARROLL
DIRECTOR

## FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

### Semiannual Report
### January 1, 2015 – June 30, 2015

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received from January 1, 2015 to June 30, 2015 | 518 |
| Number of job openings listed with the Department of Employment Services, from January 1, 2015 to June 30, 2015, connected to First Source Employment Agreements. | 1498 |
| Total number of individuals hired, from January 1, 2015 to June 30, 2015, on contracts subject to First Source Employment Agreements. | 1174 |
| Number of District residents hired, from January 1, 2015 to June 30, 2015, on contracts subject to First Source Employment Agreements. | 553 |
| The percentage of hires, from January 1, 2015 to June 30, 2015, on contracts subject to First Source Employment Agreements who reside in the District. | 47.32% |
| The number of unemployed District residents on the First Source Register. | 12737* |

*Employment status at application time = Not Employed: 12,663. Employment status at application time = Employed, but received notice of termination of employment: 74

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Employment Services

MURIEL BOWSER
MAYOR



DEBORAH A. CARROLL
DIRECTOR

### FIRST SOURCE EMPLOYMENT AGREEMENT ACT OF 1984

**Semiannual Report**
**July 1, 2015 – December 31, 2015**

The following data are submitted pursuant to D.C. Law 5-93, Section 5:

| | |
|---|---|
| Total number of First Source Employment Agreements received, from July 1, 2015 to December 31, 2015. | 267 |
| Number of job openings listed with the Department of Employment Services from, July 1, 2015 to December 31, 2015, connected to First Source Employment Agreements. | 861 |
| Total number of individuals hired, from July 1, 2015 to December 31, 2015, on contracts subject to First Source Employment Agreements. | 1120 |
| Number of District residents hired, from July 1, 2015 to December 31, 2015, on contracts subject to First Source Employment Agreements. | 579 |
| The percentage of hires, from July 1, 2015 to December 31, 2015, on contracts subject to First Source Employment Agreements who reside in the District. | 51.7% |
| The number of names of unemployed District residents on the First Source Register. | 6780* |

*Employment status at application time = Not Employed: 6732.  Employment status at Application time = Employed, but received notice of termination of employment: 48.

**First Source Program**
**Monitoring Compliance Process**

- First Source conducts desk reviews on a daily basis of the First Source projects, reviewing the hours worked percentages via the LCP Tracker. The LCP Tracker is trusted solution software that produces, verifies and manages compliance of certified data from the prime contractors and Employers. The City Workforce Report created in the LCP Tracker totals the hours worked per trade (classification) from the certified payrolls uploaded by the general contractor and Employers. The certified payrolls uploaded are signed and verified that the information reported is accurate. First Source reviews the following to ensure the Employer compliance to the First Source Employment Agreement hours worked percentages requirement:
    - Are Employers uploading certified payrolls in the LCP Tracker weekly.
    - The First Source Citywide Workforce Utilization report to review the subcontractor's total hours worked percentages by classification.
    - The Employers that are below the required hours worked percentages goals by classification.

- First Source conducts site visits to meet with the General Contractor to review the subcontractor's compliance to the First Source Employment Agreement requirements. The following is reviewed:
    - Do all Employers have an executed First Source Employment Agreement.
    - Are all Employers registered in the LCP Tracker.
    - Are Employers uploading certified payrolls in the LCP Tracker.
    - The First Source Citywide Workforce Utilization report to review the subcontractor's total hours worked percentages by classification.
    - The Employers that are below the required hours worked percentages goals by classification.
    - Discuss the next steps to bring the contractor into compliance.

| Project name | | | | | |
|---|---|---|---|---|---|
| Company Name | Trade (Work Classification) | Hours Worked Percentages Goal | Total Hours Worked | Total Hours Worked by DC Residents | DC Hours Worked Actual percentages |
| | Journey Workers | 20% | | | |
| | Apprentices | 60% | | | |
| | Skilled Laborers | 51% | | | |
| | Common Laborers | 70% | | | |

- First Source conducts desk reviews on a daily basis of the First Source government assisted project/contract. First Source reviews the following to ensure the Employer compliance to the First Source Employment Agreement hiring requirement.
    - Are Employers reporting monthly the FS on-line reporting system.

- o Are the Employers subject to the First Source Agreement meeting the 51% new hiring of District resident goal.
- o Did the Employer create employee statuses.
- o Did Employer submit an Employee Upload spreadsheet for each employee to go through the SSA verification. *(See SSA Verification Process)*

- First Source conducts site visits to meet with the General Contractor to review the subcontractor's compliance to the First Source Employment Agreement requirements. The following is reviewed:
  - o Are Employers reporting monthly in the FS on-line reporting system.
  - o Are the Employers subject to the First Source Agreement meeting the 51% new hiring of District resident goal.
  - o Employers that did not create employee statuses.
  - o Did Employers meet the 51% DC Resident New Hiring Goal.
  - o Employers that have not met the 51% DC Resident New Hiring goal.
  - o Discuss next steps to bring the contractor into compliance.

| Name of Project: | | Name of General Contractor: | | | |
|---|---|---|---|---|---|
| Employer Name | | Total DC New Hires Goal | Total DC New Hire Actual Participation | Total # of New Hires | Total # of DC Resident New Hires |
| | | 51% | | | |

- Provide formal notification of non-compliance with the required hiring or hours worked percentages, or any alleged breach of the First Source Law to all contracting agencies and stakeholders.

| First Source Desk Review | Letters Submitted to Employer |
|---|---|
| Employers did not submit their report by the 10th of the month. | Warner letter is sent to the Employer for Failure to Submit Monthly Reports |
| Employers are below the 51% New DC Hire goal. | Warning Letter is sent to the Employer if below the 51% New DC Hire goal |
| Employers that are not meeting hours worked percentages. | Warning Letter is sent to the Employer if Hours worked percentages are not met |
| Employer did not meet hiring or hours worked percentages by the end of their scope of work or project. | Non-compliance letter will go out to the Employer |

| Project |
| --- |
| Achievement Prep PCS - Wahler Campus |
| Ballou Senior High School |
| Ballou SHS Athletic Field & Site Improvement |
| Barry Farms Recreation Center |
| Brookland Middle School |
| Chuck Brown Memorial * |
| DC Scholars PCS |
| DC United Stadium *(Construction Haven't Started)* |
| DC Water Sites *(Construction Haven't Started)* |
| Design Build for Roosevelt High School |
| Duke Ellington School of the Arts |
| Edgewood Terrace  Apartments |
| FEMS Engine House #16 |
| Hearst Elementary School |
| Horace Mann Elementary School |
| Hyde-Addison Elementary School |
| Janney Elementary School* |
| Johnson Middle School* |
| Juniper Heights - Phase I |
| Kenilworth Recreation Center |
| Kipp Blain PCS |
| Kramer Middle School |
| Lafayette Elementary School |
| Langdon Education Campus |
| Mamie D Lee School |
| Martin Luther King Jr. Memorial Library *(Construction Haven't Started)* |
| Merritt Middle School MPD * |
| Metro Village Apartments |
| Monument Academy PCS |
| Murch Elementary *(Construction Haven't Started)* |
| Payne Elementary School * |
| Plummer Elementary School |
| Powell Elementary School |
| Ridge Road Recreation Center |
| River Terrace Campus |
| Ron Brown High School |



PENGAD 800-631-6989

DEPOSITION
EXHIBIT
# 9
10/24/16

| |
|---|
| Shepherd Elementary School |
| Southeast Tennis and Learning Center* |
| Stanton Elementary School |
| Stuart Hobson Middle School |
| Two Rivers Public Charter School |
| Van Ness Elementary School |
| Watkins elementary School/ Swing Space @ Eliot Hine Middle School *(Construction Haven't Started)* |
| Woodridge Neighborhood Library |
| **\* Project initiated before reporting system was established** |

_____
Councilmember Marion Barry

_____
Councilmember Carol Schwartz

## AN AMENDMENT

### #1

## IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

DATE                        June 3, 2008
Amendment offered by       Councilmembers Marion Barry and Carol Schwartz

to    Bill No.             17-0678 – "Fiscal Year 2009 Budget Support Act of 2008."

        P.R. No. _____
        Bill No.  17-753
        Other  _____

Version:    Introduced
            Committee Print
            First Reading          _____
            Amended First Reading
            Engrossed                 X
            Enrolled               _____
            Unidentified
            Emergency Legislation  _____


   Councilmembers Marion Barry and Carol Schwartz recommends adoption of the following amendment in the form of a substitute to Title I of the Fiscal Year 2009 Budget Support Act of 2008:

Add a new Subtitle X the reads as follows:

"SUBTITLE X. FIRST SOURCE COMPLIANCE.

        Sec. xxx1.  Short title.



**ABC008**

This subtitle may be cited as the "First Source Compliance Act of 2008".

Sec. xxx2.  Definitions.

For the purpose of this act, the term:
(1) "District "means the District of Columbia.
(2) "Executive Director" means the Executive Director of the Office of First Source Compliance.
(3) "Office" means the Office of First Source Compliance.
(4) "First Source Employment Agreement" means the requirements of the "First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Code § 2-219.01 et seq.).

Sec. xxx3.  Establishment of the Office of First Source Compliance.

Pursuant to section 404(b) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 787; D.C. Official Code § 1-204.04(b)), the Council establishes, as of October 1, 2008, the Office of First Source Compliance, as a single administrative unit within the Department of Employment Services, to enforce, monitor, and ensure compliance with the First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code §2-219.01 eg seq.), by each beneficiary of government-assisted projects in the District of Columbia.

Sec. xxx4.  Functions and Duties.

(a) The Office shall:
(1) Monitor and track each beneficiary of government-assisted projects in the District to ensure compliance with the First Source Employment Agreement;
(2) Ensure that each beneficiary who is presently working on a governmental-assisted project or is bidding on a governmental-assisted project is in compliance with the First Source Employment Agreement;
(3) Shall require the beneficiary to submit to the Office a report on the 15th of each month on a form proposed by the Mayor; and
(4) Shall submit to the Council and the Mayor a quarterly report on a form proposed by the Mayor.
(b) The Department of Employment Services shall meet with the Council's Committee on Workforce Development and Government Operations and the members of the affected business community. Based on such meetings, the Department of Employment Services shall prepare recommendations regarding additional proposed function and duties of the Office and shall submit the recommendations to the Mayor.
(c) Based upon the recommendations submitted to the Mayor pursuant to subsection (b) of this section, on or before October 31, 2008, the Mayor shall submit an act to the Council:
(1) Establishing any additional functions and duties of the Office;

(2) Propose penalties under section 4(e)(4) of the First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code §2-219.03(e)(4), for beneficiaries of government-assisted projects who do not comply with the requirements of the First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code §2-219.01 *et seq.*) and any monetary penalties proposed shall be used for job training programs; and

(3) Propose appeal process which may include the Contract Appeals Board appellate process, including its scope, under section 4(e)(5) of the First Source Employment Agreement Act of 1984, effective June 29, 1984 (D.C. Law 5-93; D.C. Official Code §2-219.03(e)(5)).

Sec. xxx5. Executive Director.

The Office shall be headed by an Executive Director appointed by the Mayor. The Director shall be a resident of the District of Columbia or agree to become a resident of the District of Columbia within 180 days of appointment by the Mayor. The Executive Director shall employ staff as needed, in accordance with annual appropriations.

Sec. xxx6. Appropriations.

$780,000 has been appropriated in the Department of Employment Services' budget for Fiscal Year 2009 for the establishment of the Office of First Source Compliance,

**Rationale:**
More attention and funding are needed to ensure strict compliance with the First Source Employment Agreement among businesses contracting with the District of Columbia. Sufficient oversight over government contracts will help ensure that District residents are benefiting from government contracts through employment opportunities.

**Fiscal Impact:**

There is no fiscal impact for this amendment.

**ABC010**

## FIRST SOURCE BEST PRACTICES REVIEW

The Department of Employment Services (DOES) has reviewed First Source best practices from other states to identity initiatives that might be applied to the District. DOES staff initially researched eight jurisdictions likely to have first source and/or similar hiring programs. The cities were: Atlanta, GA, Boston, MA, Jackson, MS, New York City, Minneapolis, MN, New Haven, CT, Portland, OR, and San Francisco, CA.

Substantive discussions were conducted with state officials in departments of workforce development, human resources, and planning and economic development. During these discussions, the following questions were asked

- What are the program purposes and hiring goals?
- When was the program created?
- What are the penalties and who enforces?
- What are the successes, failures, and challenges?
- What is the program budget and staff composition?

From discussions and materials, staff narrowed the review to four cities with the most innovative and transforming programs that could be relevant to the District. Those cities are Boston, Minneapolis, Portland and San Francisco.

### Preliminary Findings

The approaches used by Boston, Minneapolis, San Francisco and Portland are tied to targeted economic development, workforce needs, and training. Each of the 4 cities has taken steps to improve program performance by revising, realigning resources, and/or replacing them with what they consider successful alternatives to first source.

*BOSTON*:

In Boston, First Source has been replaced by the Neighborhood Jobs Trust Program that obligates all developers of commercial construction projects greater than 100,000 square feet to pay an up-front fee to the Job Trust Fund and Housing Trust. Business is booming and 100% of contractors are bound by the Neighborhood Jobs Trust Program requirements.

*MINNEAPOLIS*:

The city of Minneapolis has a Job Linkage Program where any business that receives financial assistance from the city is required to sign a five-year, good faith agreement to hire/retain residents for entry-level jobs. There is a 60% hiring goal for all job linkage projects. The city's Workforce Coordinator stated that companies do not view the government as its primary source for hiring because of the many other ways to find workers. Residents are trained at colleges and universities and at non-profit institutions to qualify for industry demand jobs in construction, goods and services, and professional occupations.

**ABC011**

*PORTLAND*:

Portland's First Source program is managed by Worksystems, Inc., a non-profit that operates the state's One Stop Career Centers. The program requires employers to hire city residents when they receive municipal funding from the following sources:

- Quality Jobs Program, which provides forgivable low-interest loans on 2-year, public develop contracts (PDC).
- Enterprise Zone, that offers tax abatements for 5-year PDC contracts. Businesses and job seekers must be located within the E-zone.
- The Oregon Economic Development Dept., that offers $50K in economic development funds from the OR State Lottery, Strategic Investment Funds, and other state funds.

All contracts are monitored through the state's automated system, annual reviews, and UI wage records. City officials support the first source program but do not fund. WIA non-discretionary funds are used. Jobs must be posted with the Worksource Center for 10 days.

*SAN FRANCISCO*:

San Francisco has a First Source Hiring Program and a "CityBuild Program." CityBuild trains and places low-income residents in construction jobs. Plans are underway to expand to professional service, entry level jobs. CityBuild is the operational arm of the First Source Program, which is housed in One Stop Career Centers. Officials cite this co-location as a major factor in the program's success.

Over a two-year period, San Francisco First Source hires increased from 25 to 800 residents. Community-based organizations are paid $1,000 for every client who is referred to and completes training, and who is placed in a job.

CityBuild has an Advisory Council of their contractors. Staff was realigned from Welfare-To-Work and Project Empowerment, and is comprised of two contract compliance officers, two job developers, two database assistants, and three training instructors who are employees of the carpenters union.

### Commonalities

Boston and San Francisco have moved from first source programs of the 1980s to initiatives they feel better meet today's workforce needs. Program leaders focus on leveraging internal and external resources and obtaining total buy-in and support from the Mayors and City Councils.

Boston and Minneapolis have attached employer hiring requirements to their Jobs and Living Wage ordinances as additional strategies for hiring residents.

- Each city reports that transitioning from or modifying First Source was essential to meeting the changing needs of today's market and workforce.
- The trend is away from strict hiring quotas and penalties, although each city remained committed to some style of hiring preference program.
- Each city has a training component to prepare residents for FS jobs.
- Each city credits linking First Source to One Stop Systems, realigning staff using WIA discretionary funds, and business partnerships to program successes.

**ABC012**

**First Source Compliance Working Group**

*CONFIDENTIAL - DRAFT – FOR DISCUSSION PURPOSES ONLY*

| | Type of Contractual Agreement | Estimated Number Executed In FY2008 | Estimated Number Executed In FY2007 | List Two Examples | Major Industries Using Contractual Agreement Type | Suggested Incentive/Penalty |
|---|---|---|---|---|---|---|
| 1 | IRB's | 122 | 30 | American University & National Rehab. Hospital | Education, Healthcare | |
| 2 | Tax Increment Financing (TIF) | 106 | 30 | Pyramis Hotels Site LC & Gallery Place | Retail, Hospitality | |
| 3 | Zoning Applications | 59 | 38 | ABC Builders & Clark Construction | Construction | |
| 4 | Street & Alley Closings | 25 | 64 | Convention Center & Ball Park | Construction & Hospitality | |
| 5 | Leasing of Real Property for One Year or More | 4 | 5 | Howard Theatre Development Group | Renovation | |
| 6 | Exclusive Rights Agreements | 8 | 54 | Grandmaster of DC Inc & Reliant Drywall Inc | Construction | |
| 7 | Contracts & Subcontracts | 2021 | 1050 | Diverse Agencies | Security, Care Services, Data Services | |
| 8 | Retail (tax abatement) | 9 | 2 | Harris Teeter & Home Depot | Retail | |

ABC013

September 24, 2008



The DC Department of Employment Services (DOES)

## THE D.C. DEPARTMENT OF EMPLOYMENT SERVICES
## FIRST SOURCE EMPLOYMENT AGREEMENT PROGRAM

### EMPLOYER FACT SHEET

**PURPOSE**
The purpose of the First Source Employment Agreement (FSEA) Program is to ensure that District residents are given priority for new jobs created by municipal financing and development programs.

**LEGISLATIVE AUTHORITY**
Mayor's Order 83-265, D.C. Law 5-93 as amended, D.C. Law-14-24 and the Way to Work Amendment Act of 2006.

**WHAT IS A FIRST SOURCE EMPLOYMENT AGREEMENT?**
You will complete and sign the First Source Employment Agreement as part of your contractual documents with the District of Columbia Government. For the purposes of First Source, contractual documents are considered financial loans, bonds, tax increment financing, zoning applications, financial banking institutions which serve as a repository for $1 million or more of District funds, street or alley closings, leasing agreements of real property for one year or more, Exclusive Right Agreements, grants, contracts, and subcontracts. The only retail or commercial tenants that must comply with First Source Agreements are ones that are the direct beneficiaries of District government economic development action, including tax abatement and land transfers for public development.

Signing a First Source Employment Agreement means you agree to use the D.C. Department of Employment Services (DOES) as your *first source* in recruiting and hiring for new jobs created by the government-assisted project.

**REQUIREMENTS & EXEMPTIONS**
Requirements
- Beneficiaries of government-assisted projects of $100,000 or more must enter into a First Source Employment Agreement.
- 51% of <u>new</u> hires must be District residents.
- 51% of <u>new</u> apprentices and trainees must be DC residents.
- These provisions apply to contractors as well as subcontractors.
- DOES requiring employer to submit monthly contract compliance reports and are subject to on-site monitoring.

Exemptions
- Nonprofit organizations with 50 or less employees.
- Jobs to be filled by current employees.
- Contractors outside the Washington Standard Metropolitan Statistical Area that will perform no work in the area.
- Jobs to be filled by laid-off workers.
- If a labor agreement conflicts with any labor or government regulation, these laws prevail.

ABC014

## WAIVERS

By law, the Contracting Officer may waive the provision that 51% of new employees must be District residents if:

- A good faith effort to comply is demonstrated by the employer.
- Employer enters into a workforce development training or placement arrangement with DOES.
- DOES certifies an insufficient number of DC residents in the labor market possess the required skills.

## PENALTIES AND APPEALS PROCESS

The Contracting Officer may impose penalties, including monetary fines of 5% of the direct and indirect costs of the contract, for the following:

- Willful breach of the employment agreement.
- Failure to submit contract compliance reports.
- Deliberate submission of falsified data.

Employers may appeal a decision of the Contracting Officer to the Contract Appeals Board as provided in the contract.

## BENEFITS TO EMPLOYERS

- **Recruitment** – Your jobs will be advertised through the DOES' Virtual One-Stop System at www.dcnetworks.org , schools, including colleges, Advisory Neighborhood Commissions, community organizations, and various media outlets.
- **Reduce interviewing time** – DOES will recruit, pre-screen, and refer qualified applicants to fulfill your hiring needs, while employer maintains its privilege to make all decisions on hiring new employees.
- **Tax Credits** – Successful hiring from several targeted groups can qualify businesses for tax credits through the Work Opportunity Tax Credit Program: up to $2,400 per eligible employees during the first year of employment and up to $1,200 for summer youth.

*Interested?*  Contact The D.C. Department of Employment Services, Office of Employer Services, First Source Employment Agreement Program, 609 H Street, N.E. Rm. 429. Washington, DC 20002.  T: 202.698.6001/F: 202.698.5717

Government of the District of Columbia
Adrian M. Fenty, Mayor



## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Department of Employment Services



MURIEL BOWSER
MAYOR

DEBORAH A. CARROLL
DIRECTOR

Date:  July 14, 2016

Steve Sody
President
Sody Concrete Construction
2037 York Road
Timonium, MD 21093

Dear Mr. Sody,

After reviewing your final First Source statistics for the Woodridge Neighborhood Library project it shows that you achieved the required percentage of work hours for Journeymen with 22% of the hours worked by District residents.  The requirement was 20%.  However, you fell short in the skilled labor category with only 7% of the hours worked by District residents, the requirement is 51%.  This creates a shortage of 44% of work hours that must be made up on a future project.

After meeting with you on Wednesday, July 13th at DOES headquarters, you stated that you will be working on another project in the District for Pepco.  As discussed, I will need a plan of action outlining how you plan to make up the skilled labor hours on this upcoming project.  You also stated that you will be working on your apprentice program and will attempt to move your skilled laborers into the program.  The First Source office will also count those apprentice hours to make up the shortage in skilled labor hours.  If your plan of action is accepted, you will not be subject to any fines and penalties for the Woodridge Neighborhood Library project.

Thank you for your time and attention to this matter.

Sincerely,

*Alex Underwood*

Alex Underwood
First Source Compliance Monitor

CC: Anetta Graham, Supervisor, First Source



DEPOSITION
EXHIBIT
#11
10/24/16

4058 Minnesota Ave, N.E.  •  Suite 5000  •  Washington, D.C. 20019  •  Office: 202.671.1900

DC-MWC00009374R