1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL

+ + + + +

```
                               :
IN THE MATTER OF:              :
                               :
METROPOLITAN WASHINGTON        :
CHAPTER, ASSOCIATED BUILDERS:
AND CONTRACTORS, INC.,         :
et al.,                        :
                               :
           Plaintiffs,         :
                               :
     v.                        :   Civil Action No.
                               :   12-00853 (EGS)
DISTRICT OF COLUMBIA,          :
                               :
           Defendant.          :
                               :
                               :
```

Tuesday,
October 25, 2016

Washington, D.C.

DEPOSITION OF:

**DAIRON UPSHUR**

called for examination by Counsel for the
Plaintiffs, pursuant to Fed. R. Civ. P. 30, in
the Office of the Attorney General, located at
441 4th Street, N.W., Suite 600 South,
Washington, D.C. 20001, when were present on
behalf of the respective parties:

2

APPEARANCES:

On Behalf of Plaintiffs:

PAUL J. KIERNAN, ESQ.
Holland & Knight, LLP
800 17th Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276
paul.kiernan@hklaw.com


On Behalf of Defendant:

ANDREW J. SAINDON, ESQ.
CONRAD RISHER, ESQ.
Office of the Attorney General
441 4th Street, N.W.
Suite 600 South
Washington, D.C. 20001
(202) 724-6643
andy.saindon@dc.gov

3

CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Dairon Upshur | 4 | 26 | 27 | |

| EXHIBIT NO. | | PAGE |
|------|------|------|
| 2 | Plaintiffs' Responses and Objections to Defendants' First Set of Interrogatories   . . . . . . . . . . | 18 |
| 14 | Amended Complaint for Declaratory and Injunctive Relief   . . . . . . . . | 7 |
| 15 | Notice of Deposition   . . . . . . . . . | 9 |

4

1                    P-R-O-C-E-E-D-I-N-G-S

2                                          11:11 a.m.

3     WHEREUPON,

4                       DAIRON UPSHUR

5     was  called  as  a  witness  by  Counsel  for  the

6     Plaintiffs  and,  having  been  first  duly  sworn,

7     assumed  the  witness  stand,  was  examined  and

8     testified as follows:

9                    DIRECT EXAMINATION

10               BY MR. RISHER:

11          Q    Good  morning,  will  you  please  state

12     your name for the record?

13          A    Dairon Upshur.

14          Q    Would you spell it, please?

15          A    D-A-I-R-O-N U-P-S-H-U-R.

16          Q    Okay,  my  name  is  Conrad  Risher,  and

17     I'm  an  attorney  for  the  District  of  Columbia.

18     I'll  give  you  just  a - well,  have  you  ever  been

19     deposed before?

20          A    I don't know what that means.

21          Q    Okay, so what we're doing this morning

22     is a deposition.  That means that you are - well,

1    that I'm going to ask you a series of questions.

2    These questions are going to be recorded, and

3    that record will be part of the court record in

4    this case.  Does that make sense to you?

5         A    Yes, it does.

6         Q    Okay, is this something that you have

7    done similarly in the past?  Have you ever done

8    anything like this before?

9         A    No.

10        Q    Okay, so I'll just give you a brief

11   rundown of sort of how things will move along.

12   As you see, we have a court reporter who is going

13   to be taking down everything that we say.  He's

14   doing so by typing it out, so it's very important

15   that we provide verbal responses, or verbally

16   everything that we say, so "yes" or "no" rather

17   than simply "uh-huh" or a nod, which may not be

18   clear in the record.  Is that clear?

19        A    Yes, sir.

20        Q    Okay, it also means that we want to

21   make sure that you understand exactly what I'm

22   asking you, so if any question that I ask is

1   unclear, just say that it is unclear, and we'll

2   figure out how to make sure that you understand.

3   And if you don't - so if you answer a question, I

4   will presume that you have understood what that

5   question was.  Does that make sense?

6        A     Yes, sir.

7        Q     Okay, very good.  If you need a break

8   at any time, just let me know.  My only request

9   is that if there is a question pending, you

10  answer that before we take a break, okay?

11       A     No problem.

12       Q     Very good.  So do you understand why

13  you are here today?

14       A     Yes, sir.

15       Q     Okay, and what is your understanding

16  of why you are here?

17       A     To do a deposition.

18       Q     Okay, you have - are one of the

19  plaintiffs in a case that was brought against the

20  District of Columbia, is that correct?

21       A     To my knowledge.

22       Q     Okay, and why did you bring this case?

1          A     I'm a resident of the State of

2     Maryland.  My jobs are mostly in D.C.  I've had

3     an experience where I wasn't able to work on a

4     job because it was for D.C. residents.

5               MR. RISHER:  Okay, so I'd like to mark

6     this Exhibit 12.

7               MR. KIERNAN:  No, it's -

8               MR. RISHER:  No, are we on 13?

9               MR. KIERNAN:  14.

10              MR. RISHER:  There we go.

11              MR. KIERNAN:  I have copies of it.

12              (Whereupon, the above-referred to

13    document was marked as Exhibit No. 14 for

14    identification.)

15              BY MR. RISHER:

16         Q    If you would take a moment to examine

17    that document and let me know if you recognize

18    it?

19         A    No, what is this?

20         Q    That is the first amended complaint

21    that you have filed in this case.  Okay, so we'll

22    move on from that.  To get a sense of your

1   background, where were you born?

2          A     Washington, D.C.

3          Q     Did you grow up here?

4          A     In Montgomery County.

5          Q     So you were born in the District, but

6   grew up in Montgomery County, is that correct?

7          A     Yes.

8          Q     Have you lived anywhere else than

9   Montgomery County?

10         A     No.

11         Q     Have you ever been what's classified

12  as hard to hire, for example, if you're an ex-

13  offender, if you were ever on TANF or welfare

14  benefits, if you ever had a long-term period of

15  unemployment?

16         A     I don't understand the relevance of

17  the question.

18         Q     So the issue of being hard to hire is

19  something that is a factor in the case, so people

20  who are hard to hire, there are benefits to them,

21  sort of hiring incentives.  I'm trying to figure

22  out if that's something that you'd ever been

1    qualified for one of those incentive programs.

2         A    I can't remember at this time.

3              MR. RISHER:   Okay, and mark this as

4    Exhibit 15, please.

5              (Whereupon,   the   above-referred   to

6    document   was   marked   as   Exhibit   No.   15   for

7    identification.)

8              BY MR. RISHER:

9         Q    If  you  would,  take  a  look  at  this

10   document and let me know if you recognize it?

11        A    I really can't remember at this time.

12        Q    Okay,  is that a Notice of Deposition

13   of you dated October 17?

14        A    I can't really remember.   That's what

15   it says on the paper.

16        Q    Okay,  how did you find out that your

17   presence was requested for this deposition today?

18        A    I  received  a  notice,  but  I  can't

19   remember what it looks like.

20        Q    From whom did you receive the notice?

21        A    I can't remember at this time.

22        Q    Okay,  could  it  have  been  from  your

1   Counsel?

2          A    I really can't remember.

3          Q    Okay, did you do anything to prepare

4   for your deposition today?

5          A    I met with Counsel, my Counsel.  That

6   was it.

7          Q    Okay, did you talk to anyone else

8   other than your Counsel?

9          A    No.

10         Q    Okay, did you review any documents to

11  prepare for your deposition?

12         A    I can't really remember.

13         Q    Does that mean you can't remember

14  which documents you reviewed?

15         A    It means I can't really remember at

16  this time.

17         Q    You cannot remember if you reviewed

18  any documents at all?

19         A    I don't really remember.

20         Q    Switching to the work that you do,

21  what kind of kinds of work do you do?

22         A    I started in labor and now I'm safety

1    for a construction company.

2         Q    Okay, which construction company?

3         A    Miller & Long.

4         Q    Okay, and how long have you been with

5    Miller & Long?

6         A    62 months.

7         Q    And what were you doing before you

8    joined Miller & Long?

9         A    I was working in concrete finishing.

10        Q    Okay, for whom were you doing that

11   work?

12        A    A family business.

13        Q    Is that your family or another family?

14        A    Friends.

15        Q    A single group of friends or was this

16   multiple companies that you were working with?

17        A    It was a friend's parents' business.

18        Q    Okay, can you tell me who their

19   parents were or the name of that company?

20        A    I don't know.

21        Q    You don't - I'm sorry, you said you

22   don't know the name of that company?

1       A      I don't remember.  I forgot.

2       Q      Okay.

3       A      It was a long time ago.

4       Q      Okay, did you work for another company

5    before then?

6       A      No.

7       Q      That was your first job?

8       A      Mm-hmm.

9       Q      Okay, and your jobs at Miller & Long,

10   can you give me a sense of the timelines of when

11   you were doing - when did you start your current

12   position?

13      A      My current position was a couple of

14   years ago.  I don't remember the exact time.

15      Q      Okay, and so the previous job was for

16   all of your time with Miller & Long before a

17   couple of years ago?

18      A      Mm-hmm.

19      Q      Okay.

20      A      Yes, sir.

21      Q      And can you explain to me the nature

22   of the work that you have done in both positions?

1      A      As a laborer, it's physical labor

2   work.  You carry material, carry material around

3   the job.  With safety, you kind of just enforce

4   the rules, the safety rules of the job, look for

5   potential hazards and try to protect employees.

6      Q      Is there a classification that applies

7   to your work, something along the lines of master

8   electrician or journeyman carpenter?  Is there

9   any term like that?

10     A      I'm not familiar at this time.

11     Q      Have you ever been a member of any

12   union?

13     A      No.

14     Q      At what kind of job sites do you

15   typically work?

16     A      Construction.

17     Q      Is there any distinction you would

18   draw between the types of construction sites at

19   which you work or any variation?

20     A      I don't understand the question.

21     Q      For example, do you work only at major

22   construction jobs or do you also work some small

1    jobs?

2           A      It's commercial concrete construction.

3           Q      Do you have any idea of the average

4    value of the projects you work on, whether these

5    are hundreds of thousands or millions of dollars?

6           A      I don't know.

7           Q      Did you happen to do any work on the

8    construction of Nationals Park?

9           A      I'm not familiar.

10          Q      You're    not    familiar    with    the

11   District's baseball stadium?

12          A      No, what area are you talking about?

13          Q      There is a stadium located on South

14   Capitol Street in Southeast Washington, D.C.

15          A      I can't remember.  I don't know where

16   it is.

17          Q      Do you do your work mainly in the

18   District of Columbia, Maryland, and Virginia?

19          A      Me personally, I mainly work in the

20   District.

21          Q      Okay, mainly suggests that you do some

22   work in other jurisdictions, is that correct?

1          A     I personally, I'm not sure.  I mean,

2     I've only worked in the District.

3          Q     You've only worked in the District,

4     okay.  And how long does a job typically last?

5          A     I'm not sure.  It varies.

6          Q     Are you set to work - are you working

7     on a single site currently?

8          A     Personally, yes.

9          Q     Okay, and which site are you currently

10    working on for Miller & Long?

11         A     I'm in the office right now.

12         Q     Okay, does your current job keep you

13    in the office permanently, or do you get tied to

14    specific construction sites?

15         A     I don't - I float between job site to

16    job site.

17         Q     Okay, and what was the last job site

18    where you were working?

19         A     I was at The Wharf the other day.

20         Q     Okay, you said the other day.  Does

21    that mean that it was just one day that you were

22    at The Wharf that time?

1       A     With safety, you travel from job site

2     to job site, wherever you need to go if there's a

3     safety issue.

4       Q     Okay, do you travel to different job

5     sites sometimes in a single day?

6       A     It's possible.

7       Q     And is the work Monday through Friday?

8       A     Yes.

9       Q     Have you ever been treated differently

10     from people who do work similar to yours because

11     of the First Source Act?

12       A     Yes.

13       Q     How were you treated differently?

14       A     When I was a laborer, I wasn't able to

15     work on a job site because it had to have a

16     certain amount of D.C. residents and I was a

17     Maryland resident.

18       Q     And which job site was that?

19       A     The Marriott Marquis.

20       Q     And how did you find out that you were

21     treated differently?

22       A     I was told when I came down there.

1    They asked me was I with Miller & Long and did I

2    live in Maryland or D.C.

3         Q    Who was it that asked you?

4         A    I can't remember exactly.

5         Q    Do you recall whether that was a

6    Miller & Long employee, whether that was a

7    Marriott employee?

8         A    I said I can't remember exactly.

9         Q    So you don't have any knowledge, okay.

10        A    No, I said I can't remember exactly.

11        Q    If you're saying "exactly" does that

12   mean you have some idea, but -

13        A    I can't remember.  It's been a long

14   time.

15        Q    Okay, about how long ago was that?

16        A    I really can't remember.  At the

17   beginning of my career, I was a laborer.

18        MR. RISHER:  Okay, would you mark this

19   as Exhibit 2?  Okay, so that's the interrogatory

20   response and you have a copy?

21        MR. KIERNAN:  Yes, thanks.

22        MR. RISHER:  Okay.

1               (Whereupon, the above-referred to

2      document was marked as Exhibit No. 2 for

3      identification.)

4               BY MR. RISHER:

5          Q    Please take a look at this document

6      and see if it's familiar to you.  Do you

7      recognize this document?

8          A    Yes.

9          Q    And what is it?

10         A    It says, "Plaintiffs' responses and

11     objections to defendants' first set of

12     interrogatories."

13         Q    Okay, if you would, turn to

14     interrogatory number five starting on page four,

15     I believe, and if you want to take a moment to

16     read through the question and answer?  And you'll

17     notice that interrogatory number five references

18     paragraph 14 of the amended complaint.  If you

19     would, take a moment to look through that just to

20     refresh your memory.  Have you now read through

21     paragraph 14 and interrogatory number five and

22     the response?

1        A      Yes.

2        Q      Okay, do you agree with everything in

3   the response to interrogatory number five?

4        A      Yes.

5        Q      And  if  you  would  take  a  look  at

6   interrogatory  number  13  and  the  response  there

7   too, and let me know when you've had a chance to

8   re-read it?

9        A      Okay.

10        Q      You're finished?

11        A      Mm-hmm.

12        Q      And,  excuse  me,  I  said  re-read  it.

13   Have you read that response before?

14        A      Yes.

15        Q      So you mentioned your experience being

16   turned away from work at the Marriott Marquis, is

17   that correct?

18        A      Yes.

19        Q      Were  you  ever  discouraged  from  even

20   applying to work on a job because you do not live

21   in the District?

22        A      I don't understand the question.

1    Q    As I understand it, when you were a

2    laborer, you applied to work on the Marriott

3    Marquis project, is that correct?

4    A    No, I work for Miller & Long.

5    Q    Okay, so what was the procedure?  Who

6    - did someone tell you that you should go to the

7    Marriott Marquis site to do work?

8    A    Employees are transferred from site to

9    site depending on what the site needs.

10    Q    Okay, so you received notification of

11    transfer to the Marriott Marquis site?

12    A    Yes.

13    Q    You received that notice from Miller

14    & Long?

15    A    Yes.

16    Q    And when you arrived at the site, that

17    was when you were told - pardon me.  When you

18    arrived at the Marriott Marquis site, you were

19    asked where you live, is that correct?

20    A    When I got to the site, I was asked

21    where I live at, yes.

22    Q    Okay, your response was what?

1          A     Germantown, Maryland.

2          Q     Okay, and what was the response when

3     you said Germantown, Maryland?

4          A     The first thing they told me was that

5     they needed more D.C. residents.

6          Q     Okay, what happened to you as far as

7     work?

8          A     From what I remember, nothing.  I just

9     went straight to HR upset.

10          Q     Okay, and what happened when you got

11     to HR?

12          A     I had to go to another job when the

13     word came back, but I can't remember all of that.

14     It was like - oh, it was like 2012, somewhere

15     around like 2012 approximately.

16          Q     Okay.

17          A     Yeah.

18          Q     You say you had to go to another job.

19     Does that mean you waited until you received a

20     transfer notice from Miller & Long to that other

21     job?

22          A     That was like four years ago.  I can't

1    remember exactly how it went.  I know I left that

2    and  I  went  back  to  our  main  office  because  I

3    didn't - I couldn't work.

4         Q    When  you  were  not  able  to  work  that

5    day, would you have received pay for that day?

6         A    No.

7         Q    So when you were a laborer, your pay

8    structure  was  based  on  the  number  of  hours  that

9    you worked at a job site each day?

10        A    Yes.

11        Q    Now  that  you  handle  safety,  is  your

12   pay set by the number of hours you work each day?

13        A    I don't understand the question.

14        Q    Some  employees  receive  salaried  work,

15   meaning that they are paid for a given period of

16   time.  Other employees receive work based on the

17   number  of  hours  that  they  work  each  given  day.

18   Do you know whether your pay is salaried pay or

19   hourly?

20        A    I get paid by the hour.

21        Q    Okay, is the number of hours you work

22   each day consistent?

1        A     I don't understand the question.  What

2     do you mean "consistent?"

3        Q     Okay, if you don't understand the

4     question, that's certainly fine to say.  Do you

5     work - do you start work at the same time each

6     day?

7        A     I start work when I'm told to come in,

8     so it varies.

9        Q     Can you give me a sense of how that

10    is, like what times you might be told to come in,

11    just rough examples?

12       A     It depends on what time if I'm needed

13    at a job site or if I'm going to the office.

14       Q     Okay, if you're going to the office,

15    is there a consistent time that you should arrive

16    at the office each day?

17       A     At 6:30.

18       Q     Okay, if you're going to a job site,

19    can you give me roughly the earliest you might be

20    told to show up at that job site?

21       A     Whenever the concrete pours, so it

22    could be overnight.  It could be first thing in

1    the morning, 2:00 a.m.   It's whenever the

2    concrete pour is, first man there, last man to

3    leave.

4         Q    Okay, thank you.  And as last man to

5    leave, can you give me a sense of how long you

6    might be on a job site in a given day?

7         A    It's whatever is required.

8         Q    Can you give me the longest you've

9    been on a job site while you've been in safety?

10        A    In safety, probably about 12 hours.

11        Q    Okay, and when you were working at the

12   office, do you stay a consistent number of hours

13   each day?

14        A    That also, being safety, it depends on

15   the field, so.

16        Q    Okay, can you give me a sense of what

17   the longest day you have spent in the office?

18        A    Similar, approximately the same thing.

19        Q    Does that mean about 12 hours?

20        A    Yes.

21             MR. RISHER:  Okay, all right, can we

22   go off the record?

1    (Whereupon, the above-entitled matter

2    went off the record at 11:36 a.m. and resumed at

3    11:42 a.m.)

4    BY MR. RISHER:

5    Q    Okay, let's talk just briefly about

6    your pay.  When you were a laborer, how did you

7    receive your pay from Miller & Long?

8    A    Weekly.

9    Q    Did you receive a check in the mail?

10    A    The pay stub in the mail and direct

11    deposit.

12    Q    When, as a laborer, you were turned

13    away from the Marriott Marquis site, how long was

14    it before you were transferred to another job?

15    A    I can't remember, a day or two.

16    Q    Did you receive any less pay that week

17    than you had for the previous week?

18    A    Yes.

19    Q    And how much less?

20    A    For every hour I missed of each one of

21    those days.

22    Q    Did any of the travel time to the

1    Marriott Marquis site or to human resources count

2    as labor on that day?

3         A    No.

4         Q    Does travel time to or from a site

5    ever count as labor?

6         A    As a laborer?

7         Q    When you were a laborer, exactly.  Do

8    you get paid for that time or only for the time

9    you were on site?

10        A    For the time you're on site working.

11        Q    Okay, was there ever another time than

12   the Marriott Marquis site when you were turned

13   away from a job because you were not a District

14   resident?

15        A    Not that I can remember today.

16             MR. RISHER:  Okay, I believe that's

17   all the questions we have.

18             MR. KIERNAN:  Let me just ask one or

19   two follow-up questions if I could.

20                  CROSS EXAMINATION

21             BY MR. KIERNAN:

22        Q    Are there certain jobs that are known

1          to be good jobs for laborers to make overtime on?

2               A     Yes.

3               Q     Was the Marriott Marquis one of those

4          overtime jobs?

5               A     Yes.

6               Q     And then since you live in Maryland,

7          are you eligible to be on the District's First

8          Source registry?  Do you know?

9               A     Not to my knowledge.

10                    MR.  KIERNAN:    All  right,  I  have

11         nothing further.

12                    MR. RISHER:  One follow-up.

13                       REDIRECT EXAMINATION

14                    BY MR. RISHER:

15              Q     Have you ever attempted to be on the

16         District's First Source registry?

17              A     What do you mean?

18              Q     Did you reach out to the Department of

19         Employment Services or any other District agency

20         to ask?

21              A     I'm not a D.C. resident.

22              Q     Okay, did you ever reach out to them?

1          A      Yeah, they disqualified me because I'm

2     not a D.C. resident.

3          Q      Who     told    you     that    you     were

4     disqualified?

5          A      DOES.

6          Q      Okay, when did you ask them?

7          A      Oh, it was years ago.

8          Q      This was when you were a laborer?

9          A      Yes.

10         Q      Was that while you were with Miller &

11    Long?

12         A      I don't think I was hired yet.   I'm

13    not sure.  I don't remember.

14         Q      Okay, do you remember the name of the

15    friend you were working with before you started

16    at Miller & Long?

17         A      I don't remember the name of the

18    company.

19         Q      Do you remember the friend's name?

20         A      I'm not giving his name.   I don't

21    remember the name of the company.

22                MR.  RISHER:   Unfortunately,  you're

1    actually required by law to state the name of the

2    friend.  If you have concerns about it -

3             MR. KIERNAN:  Well, let me - can I

4    talk with him and see what the issue is?

5             MR. RISHER:  Certainly.

6             MR. KIERNAN:  I don't think there's a

7    question pending or is there?

8             MR. RISHER:   There is.   I will

9    withdraw the question so there is not a question

10   pending, and we can go off the record.

11             (Whereupon, the above-entitled matter

12   went off the record at 11:46 a.m. and resumed at

13   11:50 a.m.)

14             MR. RISHER:   So  we'll  leave  that

15   question  withdrawn,  and  we  have  no  further

16   questions at this time.  Excuse me, we have no

17   further questions, period.

18             MR. KIERNAN:  Right, right.

19             MR. UPSHUR:  Thank you.

20             MR. KIERNAN:  Okay, thank you.

21             (Whereupon, the above-entitled matter

22   went off the record at 11:51 a.m.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Civil Action No. 12-00853 (EGS) |

NOTICE OF DEPOSITION OF PLAINTIFFS MILLER & LONG COMPANY, INC.
AND METROPOLITAN CHAPTER, ASSOCIATED BUILDERS AND
<u>CONTRACTORS, INC.</u>

TO:   Miller & Long Company, Inc.
Metropolitan Washington Chapter, Associated Builders & Contractors, Inc.
c/o Paul Kiernan, Esq.
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006
paul.kiernan@hklaw.com

Pursuant to Fed. R. Civ. P. 30(b)(6), the District of Columbia will take the

deposition of plaintiff Miller & Long Company, Inc. ("Miller & Long") and plaintiff

Metropolitan Chapter, Associated Builders and Contractors, Inc. ("ABC Metro"), at

the offices of defendant's counsel specified below, on October 21, 2016, beginning at

10:00 A.M. (for ABC Metro), and on October 25, 2016, beginning at 10:00 A.M. (for

Miller & Long), continuing until completed, including adjournments to such times

and places as may be required.

1



The depositions will occur before an officer or other person duly authorized to administer oaths, and will be recorded by audio and stenographic means.

In accordance with Rule 30(b)(6), plaintiff Miller & Long and plaintiff ABC Metro, are each required to designate and fully prepare one or more officers, directors, managing agents or other persons with the most knowledge concerning the following designated matters, or other persons who consent to testify on their respective behalves, and whom plaintiffs will fully prepare to testify regarding the following designated matters and such information that is known or reasonably available to those plaintiffs:

## SUBJECTS OF DEPOSITION

1. Plaintiffs' Responses and Objections to the Defendant's First Set of Interrogatories and Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission, and the efforts to respond to them.

2. Plaintiff Miller & Long's efforts to comply with the First Source Act and costs associated with those efforts.

3. Plaintiff ABC Metro's members' efforts to comply with the First Source Act and costs associated with those efforts.

4. Plaintiff ABC Metro's members' efforts to obtain a waiver from the requirements of the First Source Act.

5. Plaintiff ABC Metro's members who decided to "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint.

6. Plaintiff Miller & Long's operations over the last five years, including financial information (revenue, profits, losses), projects in the District (including those covered by the First Source Act), employee hiring and firing, and corporate structure.

DATE: October 12, 2016.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General
Public Interest Division

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON
D.C. Bar No. 453765
Chief, Equity Section

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

## CERTIFICATE OF SERVICE

I certify that, on October 12, 2016, a copy of this Notice was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW

Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Andrew J. Saindon
ANDREW J. SAINDON
Senior Assistant Attorney General

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., | )<br>)<br>)<br>) |
| Plaintiffs | ) |
| v. | ) |
| DISTRICT OF COLUMBIA, | ) |
| Defendant. | ) |

No. 12-CV-00853 (EGS)

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Request for Admissions, as follows:

## GENERAL OBJECTIONS

1.      Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.      Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

---

[1]      Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.


EXHIBIT
3

3.      In responding to this discovery, Plaintiffs do not waive the foregoing general

objections or the specific objections that are set forth in the responses to particular requests.  By

making their responses, Plaintiffs do not concede that the information requested is relevant to

this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly

reserve the right to object to further discovery into the subject matter of any of these requests, to

the introduction into evidence of any response or portion thereof, and to supplement their

responses should further investigation disclose responsive information.

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1:**  No plaintiff has been fined for a violation of the First Source Act.

**Response:**  Admit.

**REQUEST NO. 2:**  No member of plaintiff MWC has been fined for a violation of the
First Source Act.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of

this request.

**REQUEST NO. 3:**  No member of plaintiff MWC who requested a waiver under the
First Source Act has been denied a waiver.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of

this request.

**REQUEST NO. 4:**  Beginning in 2010, DOES developed an online system to allow
qualifying companies to register and provide the data and information required by the First Source
Act.

**Response:**  Admit.

2

**REQUEST NO. 5:** The online system referenced in Request for Admission No. 4 reduced the administrative burden on qualifying companies, as compared to when the data and information was required to be submitted on paper.

**Response:** Denied.


**REQUEST NO. 6:** The online system referenced in Request for Admission No. 4 is easier and less time consuming, as compared to the previous, paper reporting requirements.

**Response:** Denied.


Dated: June 27, 2016                                   Respectfully submitted,

                                                       /s/ Paul J. Kiernan
                                                       Paul J. Kiernan (Bar #385627)
                                                       Christine N. Walz (Bar # 996643)
                                                       HOLLAND & KNIGHT, LLP
                                                       800 17th Street, N.W., Suite 1100
                                                       Washington, D.C. 20006
                                                       (202) 663-7276 (phone)
                                                       (202) 955-5564 (facsimile)
                                                       Paul.Kiernan@hklaw.com (email)
                                                       Christine.Walz@hklaw.com(email)

3

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

4

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., | ) ) ) ) | |
| Plaintiffs | ) | No. 12-CV-00853 (EGS) |
| v. | ) ) | |
| DISTRICT OF COLUMBIA, | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.      Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.      Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

3.      In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]      Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.


EXHIBIT
2

By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be called as an expert witness or your attorneys, having knowledge or information relating to the allegations set forth in the Amended Complaint, and describe that knowledge or information for each person identified.

**RESPONSE:** Mike Burlas, Chief Financial Officer of Miller & Long, has information about the impact of the First Source Act on business, including what steps the company has taken to comply with the Act regarding tracking of employees, bidding on work, assignment of tasks, recruiting and retention programs, and experience with the Act. Mr. Burlas has also served on the Board of ABC-Metro Washington and has information about how the members of ABC-Metro Washington have been affected by the Act. He is aware of the lobbying and educational efforts undertaken by ABC-Metro Washington and information received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for human resources and employee-training programs at the company. He has information about the hiring efforts and attrition rates involving District of Columbia residents employed by Miller & Long. He also has information about the steps Miller & Long takes to comply with the Act and the costs associated with those efforts. He can also testify about the specific work

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.


**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**    The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:** Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:** Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:** Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are therefore not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live. And individuals who live in Maryland or Virginia are more susceptible to being laid off or let go in the event that work subject to First-Source requirements predominates in the company's job list.

**INTERROGATORY NO. 6**:  State all facts and circumstances supporting your contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:**  Taking Miller & Long as an example, the company spends roughly 30% of its human-resources efforts to meet the unique requirements of the District's First Source Act. That is, the human-resources personnel of the company spend time participating in job fairs and similar recruiting efforts; compiling and tracking unique employee information; preparing, submitting, and following up on reporting requirements—all for First Source requirements. Similar efforts are not required to recruit and manage employees resident in Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to $200,000 on just the cost to the company of the additional work of its human-resources department to deal with First Source obligations. And that cost does not include the costs of actually running job fairs or advertising for positions limited to District residents or conducting apprenticeship programs or paying wages to new employees. The apprenticeship requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

5

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act.  Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

6

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

7

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:**  The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**: State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:**  The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

8

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**:  State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:**  See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**: State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:**  Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**: State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:**      Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

9

Washington. The case was filed as the new Act was coming into effect, As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:**  By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:**  Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:**  Plaintiffs are not aware of any.

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June **24**, 2016.

Metropolitan Washington Chapter,
Associated Builders and Contractors, Inc.

By: _Debra D. Livingston_

#46959519_v1

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June 2⁄7, 2016.

Miller & Long Co., Inc.

By: _M. Du_____

MICHAEL RUMAS, CFO

Dated: June 27, 2016

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 996643)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)
Paul.Kiernan@hklaw.com (email)
Christine.Walz@hklaw.com(email)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al.,         ) ) ) )<br><br>            Plaintiffs   )<br>     v.               )<br>                 )<br>DISTRICT OF COLUMBIA,    )<br>                 )<br>            Defendant.   )<br> | No. 12-CV-00853 (EGS) |

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS'**
**FIRST SET OF INTERROGATORIES**

    Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

**GENERAL OBJECTIONS**

    1.    Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

    2.    Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

    3.    In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]    Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be called as an expert witness or your attorneys, having knowledge or information relating to the allegations set forth in the Amended Complaint, and describe that knowledge or information for each person identified.

**RESPONSE:** Mike Burlas, Chief Financial Officer of Miller & Long, has information about the impact of the First Source Act on business, including what steps the company has taken to comply with the Act regarding tracking of employees, bidding on work, assignment of tasks, recruiting and retention programs, and experience with the Act. Mr. Burlas has also served on the Board of ABC-Metro Washington and has information about how the members of ABC-Metro Washington have been affected by the Act. He is aware of the lobbying and educational efforts undertaken by ABC-Metro Washington and information received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for human resources and employee-training programs at the company. He has information about the hiring efforts and attrition rates involving District of Columbia residents employed by Miller & Long. He also has information about the steps Miller & Long takes to comply with the Act and the costs associated with those efforts. He can also testify about the specific work

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.


**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**     The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:**  Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:**  Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:**  Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are therefore not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live. And individuals who live in Maryland or Virginia are more susceptible to being laid off or let go in the event that work subject to First-Source requirements predominates in the company's job list.

**INTERROGATORY NO. 6**: State all facts and circumstances supporting your contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:** Taking Miller & Long as an example, the company spends roughly 30% of its human-resources efforts to meet the unique requirements of the District's First Source Act. That is, the human-resources personnel of the company spend time participating in job fairs and similar recruiting efforts; compiling and tracking unique employee information; preparing, submitting, and following up on reporting requirements—all for First Source requirements. Similar efforts are not required to recruit and manage employees resident in Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to $200,000 on just the cost to the company of the additional work of its human-resources department to deal with First Source obligations. And that cost does not include the costs of actually running job fairs or advertising for positions limited to District residents or conducting apprenticeship programs or paying wages to new employees. The apprenticeship requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

5

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act.  Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

   One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

7

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:**  The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**:  State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:**  The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

8

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**: State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**: State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:** Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**: State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:** Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

9

Washington. The case was filed as the new Act was coming into effect, As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:**  By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:**  Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:**  Plaintiffs are not aware of any.

11

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June **24**, 2016.

                                       Metropolitan Washington Chapter,
                                       Associated Builders and Contractors, Inc.

                                       By: _Debra D. Livingston_____

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury

that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my

knowledge, information, and belief.

Executed on June 2‑4, 2016.

Miller & Long Co., Inc.

By: _M. Aul_____
    _MICHAEL BULLAS, CFO_

#46959507_v1

Dated: June 27, 2016                    Respectfully submitted,

                                        /s/ Paul J. Kiernan
                                        Paul J. Kiernan (Bar #385627)
                                        Christine N. Walz (Bar # 996643)
                                        HOLLAND & KNIGHT, LLP
                                        800 17th Street, N.W., Suite 1100
                                        Washington, D.C. 20006
                                        (202) 663-7276 (phone)
                                        (202) 955-5564 (facsimile)
                                        Paul.Kiernan@hklaw.com (email)
                                        Christine.Walz@hklaw.com(email)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the

foregoing was served via email and first class mail, postage prepaid, on the following:

  Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

                                        /s/ Paul J. Kiernan
                                        Paul J. Kiernan



3. **First Source: Should the provisions of DC Code §§ 2-219.03 (e)(1A), (e)(1B), (e)(1C) and (e)(2) apply, then this proposal is withdrawn.**

4. If the General Contractor uses an internet-based platform to post contract documents, MLDC must be notified when such changes are posted.

5. This Bid is based on mutually agreeable contract terms and conditions to be executed in a contract

   a. If the General Contractor chooses to use a standard contract form, MLDC's proposal shall be included as an attachment to that form.

   b. MLDC reserves the right to negotiate a mutually acceptable contract.

   c. This proposal assumes the previously negotiated standard contract including any exhibits, forms and attachments between MLDC and the General Contractor will be used, except that MLDC uses 2004 form (07/04) for Additional Insured.

   d. The General Contractor is to provide a copy of the Builders Risk policy for the project to MLDC to verify that there is a waiver of subrogation on the policy, and that MLDC is included as an additional named insured on the policy.

   e. Sales and use taxes are included.

   f. This bid assumes a constant tax rate for the entire duration of MLDC's scheduled work.  If this rate, as established by the federal, state, or local authorities, changes during the course of MLDC's scheduled work, MLDC will adjust the Bid accordingly.

6. MLDC assumes no design responsibility for any component of the project.

7. MLDC specifically excludes any responsibility for liquidated damages. The General Contractor shall not be entitled to consequential damages resulting from any delays, or in any sum in excess of such amount as may be specifically named in this proposal. Liquidated damages, which are in lieu of all consequential and other damages, may be assessed against MLDC in the amount of $100.00 per day for unexcused delays. MLDC shall not be responsible for delays or defaults occasioned by any cause to the extent that such cause is beyond its control, including but not limited to: those caused by the Owner, general contractor, architect and/or engineers; delays in transportation; shortages of raw materials; civil disorders; labor difficulties; vendor allocations; fires; floods; accidents; or acts of God. It is understood that such causes would be applicable industry-wide, not exclusively associated with the MLDC. MLDC shall be entitled to equitable adjustment in the subcontract time and amount due to such unanticipated causes.  In the event that delays, defaults or interference to MLDC are caused by other subcontractors, the General Contractor warrants that terms are contained in other such subcontracts which allow MLDC to bring claims against other subcontractors through the General Contractor.

8. MLDC shall be entitled to remittance of progress payments from the General Contractor within fifteen (15) days from the date of approval of its monthly invoices by the Owner, and final payment within fifteen (15) days from the date of approval of its final invoice. Payment shall be conditioned solely on the satisfactory performance of the work by MLDC in accordance with the contract documents. If the General Contractor does not receive payment from the Owner for any cause which is not the fault of MLDC, the General Contractor shall pay MLDC, on demand, a progress or final payment properly invoiced.

   a. If for any reason not the fault of MLDC, a progress payment is not paid within seven (7) days after due, then MLDC, upon giving three (3) days written notice to the General Contractor, and without prejudice to and in addition to any of its other legal remedies, may stop work until payment of the full amount owing has been received. In such case, the contract sum shall be increased by the amount of MLDC's reasonable costs of shut down, delay, and start up, which costs shall be paid in the following billing period.

   b. If MLDC's work has been stopped because MLDC has not received progress payments as required, or should the Owner suspend or terminate the General Contractor for default, MLDC may terminate further subcontract work under these agreements upon giving the General Contractor an additional seven (7) days written notice and recover its reasonable damages.

EXHIBIT
12

EXHIBIT 12
PENGAD 800-631-6989

First Source Jobs Since 2005

| Year | Job site# | Name | Address |
|------|-----------|------|---------|
| 2005 | 1-5800 | 1101 New York Ave. | 1101 New York Ave., NW Washington, D.C. 20005 |
| 2005 | 1-5830 | Capitol Plaza I | 1200  First Street NE, Washington, D.C. 20002 |
| 2005 | 1-5910 | Chase Point | 5401 Western Ave., NW Washington, D.C. 20015 |
| 2005 | 1-5410 | The Columbia Residences | 2425 L Street, NW Washington, D.C. 20037 |
| 2005 | 1-6150 | Senate Square Towers | 201 North I street, NE Washington, D.C. 20002 |
| 2006 | 1-5920 | Flats At Union Row | 2515 14th Street, NW Washington, D.C. 20009 |
| 2006 | 5-1290 | 1010 Massachusetts Ave. | 1010 Massachusetts Ave., NW  Washington, D.C. 20001 |
| 2006 | 1-6240 | Cityvista | 501 K Street, NW Washington D.C. 20001 |
| 2006 | 1-5810 | Kenyon Square Condos, | 1390 Kenyon Street, NW Washington, D.C. 20009 |
| 2006 | 1-6100 | Highland Park Condos | 1400 Irving Street, NW Washington, D.C. 20009 |
| 2006 | 1-6430 | Anacostia Gateway | 1800 Martin Luther King Ave., SE Washington, D.C. 20020 |
| 2007 | 1-6800 | 100 M Street | 100 M Street, SE Washington, D.C. 20003 |
| 2007 | 1-6720 | 1331 L Street | 1331 L Street, NW Washinton, D.C. 20002 |
| 2007 | 1-6640 | Station Palace 3 | 725 2nd Street, NE Washington, D.C. 20002 |
| 2008 | 1-7350 | 1015 Half Street | 1015 Half Street, SE Wahington D.C. 20003 |
| 2008 | 1-7360 | Waterfront Southwest- East BLDG | 401 M street, SW Washington D.C. 20024 |
| 2008 | 1-7250 | West End 1229- 25th Street | 1229 25th Street, NW Washington D.C. 20037 |
| 2008 | 1-7020 | 1999 K Street | 1999 K Street, NW Washington, D.C. 20006 |
| 2008 | 1-7390 | Woodrow Wilson Aquatic Center | 3950 Chesepeake Street, NW Washington, D.C. 20016 |
| 2009 | 1-7500 | 800 17th Street | 800 17th Street, NW Washington, D.C. 20006 |
| 2009 | 1-7515 | Square 54-Phase 3 Residential | 900 22nd Street, NW Washington, D.C. 20024 |
| 2009 | 1-7570 | Georgetown Safeway | 1855 Wisconsin Avenue, NW Washington D.C. 20007 |
| 2010 | 1-7720 | 733 10th Street | 733 10th Street, NW Washington, D.C. 20001 |
| 2010 | 1-7800 | Georgetown University Science Center | 3700 O street, NW Lot T Trailer, Washington, D.C. 20057 |
| 2010 | 1-7810 | Rhode Island Station | 919 Rhode Island Ave, NE Washington, D.C. 20001 |
| 2010 | 1-7830 | Waterfront Station- Phase 3 | 400 M street, SW Washington, D.C. 20024 |
| 2011 | 1-7880 | Meridian At Mount Vernon Square | 425 L Street, NW Washington, D.C. 20001 |
| 2011 | 1-7960 | 14th & W (YMCA) | 1325 W Street, NW Washington, D.C. |
| 2011 | 1-7980 | Janney Elementary School | 4130 Albemarle Street, NW Washington  D.C. 20016 |
| 2012 | 1-1010 | 2 M Street | 2 M Street, NE Washington, D.C. 20002 |

| | | | |
|---|---|---|---|
| 2013 | 1-7650 | Marriott Marquis | 90 Massachusetts Ave., NW Washington, D.C.  20001 |
| 2013 | 1-1070 | Washington Gateway | 100 Florida Ave., NE Washington D.C. 20002 |
| 2014 | 5-1270 | Republic Square Phase II | 660 North Capitol Street, NW Washington, D.C. 20001 |
| 2015 | 5-1310 | 1000 F Street | 1000 F Street, NW Washington, D.C. 20004 |
| 2015 | 5-1370 | The Lab School | 4759 Reservior Road, NW Washington, D.C. 20007 |
| 2015 | 5-1330 | The Wharf | 1100 Maine Ave, SW Washington, D.C. 20024 |
| 2015 | 5-1410 | Hine School North | 770 C Street, SE Washington, D.C. 20003 |
| 2015 | 5-1420 | Hine School South | 700 Pennsylvania Ave., SE Wahington, D.C. 20003 |

ML003

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

METROPOLITAN WASHINGTON CHAPTER,    )
ASSOCIATED BUILDERS AND CONTRACTORS, INC. )
1725 I Street, N.W.       )
Suite 300       )
Washington, D.C. 20006,       )
      )
MILLER & LONG CONCRETE CONSTRUCTION, INC. )
4824 Rugby Avenue       )
Bethesda, Maryland 20814       )
      )     Case No. 1:12-cv-00853
HAWKINS ELECTRICAL CONSTRUCTION       )
OF DC, LLC       )
3303 Stanton Road, S.E.       )
Suite J       )
Washington, D.C. 20020       )
      )
EMMETT MORRIS, JR.       )
18016 Terrace Run Road       )
Orange, Virginia 22960,       )
      )
DAIRON UPSHUR       )
9711 Skyhill Way #212       )
Rockville, MD 20850       )
      )
     Plaintiffs,       )
      )
     v.       )
      )
DISTRICT OF COLUMBIA,       )
a municipal corporation,       )
MURIEL BOWSER, in her official       )
capacity as Mayor of the District of Columbia       )
1350 Pennsylvania Avenue, N.W., Suite 316       )
Washington, D.C. 20004,       )
      Defendant.       )

## <u>AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiffs seek declaratory and injunctive relief against the Mayor and the District of Columbia

(the "District") to strike down as unconstitutional the District's First Source Employment Act and to block

its enforcement. As discussed at the December 4, 2015 hearing on the District's Motion for Judgment on



EXHIBIT

14

the Pleadings, Plaintiffs submit this Amended Complaint for Declaratory and Injunctive Relief in order to

clarify and streamline the issues that remain before this Court at this time.[1]

## INTRODUCTION

The right to pursue one's calling free from discrimination is a fundamental American right.  Under

the Constitution, a jurisdiction cannot erect barriers that prevent qualified workers who live in another

jurisdiction from practicing their trades.  But the District's First Source Employment Act imposes on

employers and employees harmful discriminatory requirements.  For employers, it creates an expensive

and unworkable caste system in which some of their employees must be denied the right to work on certain

projects because of where they live.  It squeezes employers when they bid for work and when they deliver

services to their clients and customers.  Employers are subject to audits, threats from the District

Government, and pressure to provide jobs, training, and work conditions that apply to District residents

alone.  For employees, the law burdens their ability to secure employment and denies them opportunities

to succeed.  For everyone, the law creates higher costs and attendant intrusive red tape, reports, and delays,

while skewing the job market in a way that ultimately hurts District residents.

The District of Columbia's "employment problem" is not that there are too many residents chasing

too few jobs.  By some measures, there are over 800,000 jobs in this city of 600,000 people.  The

"problem" is that the District lags behind its neighbors in educating and training the workforce the

construction industry needs.

The First Source Employment Act has never created a single job—and never will.  Instead, it

infringes on the fundamental American right to pursue employment free from discrimination.  It violates

---

[1] Plaintiffs file this Amended Complaint to facilitate a decision on the merits of their claim that the First Source Employment Act is unconstitutional under the Due Process Clause, which incorporates the protections of the Privileges and Immunities Clause.  By filing this Amended Complaint, Plaintiffs do not waive their rights to appeal the Court's July 14, 2015 Order dismissing Counts II-VII of Plaintiffs' Complaint.  *See* Dkt. 21.  As of this filing, the Court has not ruled on the District's Motion for Judgment on the Pleadings, where the District challenged the viability of a claim against the District based directly on the Privileges and Immunities Clause.

the Civil Rights Act and numerous constitutional protections, including the Privileges and Immunities Clause and the Due Process Clause of the Fifth Amendment, which incorporates the protections of the Privileges and Immunities Clause.  Indeed, it is flatly inconsistent with the stated policy in the District's Human Rights Act that there should be "an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of …place of residence or business."[2]

For too many years, developers, contractors, and other employers have been forced to endure and work around the Act, afraid of the public outcry that would follow if a purported "jobs bill" were challenged, and afraid of the retribution of District officials with a vested interest in pretending that the First Source Employment Act is a solution to the District's chronic underemployment in certain areas of the city.  But with the recent amendments to the First Source Act, contractors cannot possibly comply with the Act's hiring and quota requirements, and they are threatened with job losses, business failures, and debarment from government contracting.  The uncertainties surrounding how the District will enforce the Act—How does it apply to awarded contracts? Projects still being bid? How will the Mayor exercise her unfettered discretion in deciding whether contractors have made a "good-faith effort" to comply with the statute's requirements?—have further complicated the situation for ethical employers who would try to comply with the Act.  And the business-destroying fines and penalties in the Amended Act have pushed this debate past a tipping point.  The amended First Source Employment Act puts the plaintiffs' very livelihoods at risk, and they need judicial redress.

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.  This action arises under 42 U.S.C. § 1983 and the United States Constitution.

---

[2]     *See D.C. Official Code* §2-1401.01.

2.       Plaintiffs are asking this Court to declare their rights and other legal relations under the

Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

3.       Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

4.       Plaintiff Metropolitan Washington Chapter, Associated Builders and Contractors, Inc.

("ABC-Metro Washington") is a not-for-profit corporation organized under the laws of the State of

Maryland with offices in the District of Columbia and in Maryland.  ABC-Metro Washington is the

leading commercial-construction association in the Washington metropolitan area.  ABC-Metro

Washington has approximately 529 member organizations, including corporations and sole

proprietorships.  ABC-Metro Washington members function throughout the construction industry as

general contractors, specialty contractors, industry (professional) associates, and suppliers.  These

members live and work in the Greater Washington area, including in the District of Columbia, Virginia,

and Maryland.  Established in 1958, ABC-Metro Washington is one of 75 chapters in a nationwide

federation of more than 23,000 construction and construction-related firms with nearly two million

employees.  ABC-Metro Washington members are generally dedicated to free enterprise, open

competition, and having a level playing field in securing work.  Most ABC-Metro Washington members

tend to have permanent or long-term workforces.  ABC-Metro Washington has long stood for the

principles that companies should reward employees based on individual merit and performance and that

contracts should be awarded based on safety, quality, value, and results.  ABC-Metro Washington has

advocated for its members on these issues, including through lobbying government officials and

promoting business practices consistent with the organization's philosophy.  ABC-Metro Washington played a lead role in lobbying against the amended First Source Employment Act.

5.      Plaintiff Miller & Long Concrete Construction, Inc. ("Miller & Long") is a privately held corporation with its principal place of business in Bethesda, Maryland.  Miller & Long is a member of ABC-Metro Washington and adheres to the organization's philosophy.  Miller & Long regularly bids on work projects in the District of Columbia that are affected by the First Source Employment Act.

6.      Plaintiff Hawkins Electrical Construction of Washington, D.C., LLC ("Hawkins Electrical") is a limited-liability company organized under the laws of the District of Columbia.  Hawkins Electrical is a member of ABC-Metro Washington.  Hawkins Electrical provides professional electrical construction and consulting services, primarily on commercial projects.  Hawkins Electrical is recognized by the District as a Certified Business Enterprise.  Hawkins Electrical regularly bids on work projects in the District of Columbia that are affected by the First Source Employment Act.

7.      Plaintiff Emmett Morris, Jr. is a resident of the Commonwealth of Virginia and is a qualified Carpenter Foreman.  Plaintiff Dairon Upshur is a resident of the State of Maryland and is a construction safety manager.  Each of these individual plaintiffs has worked on projects that are affected by the requirements of the First Source Employment Act or has sought work on projects that are affected by the requirements of the First Source Employment Act.  Each of these plaintiffs has demonstrated a desire and ability to be employed on work projects that are affected by the requirements of the First Source Employment Act.

8.      Muriel Bowser is the current Mayor of the District of Columbia and is sued in her official capacity.  The District of Columbia is a municipal corporation.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. The First Source Employment Agreement Act of 1984

5

9.     In 1984, the District of Columbia adopted the First Source Employment Agreement Act (the "Act") (D.C. Law 5-93, currently codified at *D.C. Official Code* §2-219.01 *et seq.*) This action seeks to strike down the Act as amended.  (The recent amendments are discussed in **Section B**, below.) Plaintiffs are challenging on their face and as-applied the following four requirements or elements of the Act and the penalties associated with them: (i) employment agreements; (ii) construction contracts; (iii) targeted-hiring contracts; and (iv) reporting requirements.

*(i)       Employment Agreements*

10.     The Act defines a "government-assisted project" as "any project funded in whole or in part with District of Columbia funds, or funds which, in accordance with a federal grant or otherwise, the District of Columbia government administers, and on which the District of Columbia is signatory to any agreement of a contractual nature, including leasing agreements of real property for 1 year or more, or the initial project, development, or construction facilitated by any street or alley closing pursuant to Chapter 2 of Title 9." *See D.C. Official Code* § 2-219.01(5) (2011).

11.     The Act defines a "beneficiary" to include

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, ... and which details the number and description of all jobs created by a government-assisted project for which the beneficiary is required to use the First Source Register, [and]

(b) a beneficiary of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for public redevelopment, or tax increment financing that results in a financial benefit of $100,000 or more from an agency, commission,

instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds. *D.C. Official Code* § 2-219.01(1)(A)-(1)(B) (2011).

12.     Under the Act, the Mayor includes for every "government-assisted project" a requirement that the "beneficiary" enter into an employment agreement ("Employment Agreement") with the District with the beneficiary agreeing that (a) the first source for finding employees to fill all jobs created by the government-assisted project will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an Employment Agreement will be the First Source Register. *See D.C. Official Code* § 2-219.03(a) (2011). The "First Source Register" is "the Department of Employment Services Automated Applicant Files, which consists of the names of unemployed District residents registered with the Department of Employment Services." *D.C. Official Code* § 2-219.01(4) (2011). People who do not live in the District cannot be listed on the First Source Register.

13.     On government-assisted projects, Employment Agreements require contractors and subcontractors to fill jobs and vacancies from the First Source Register. In other words, the impact of the Act's requirements flow through to beneficiaries, contractors, and subcontractors. "Willful breach of the employment agreement," can be enforced by the Contracting Officer "through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C. Official Code* § 2-219.03(e)(4) (2011).

14.     The individual plaintiffs, as nonresidents of the District of Columbia, are prohibited from registering on the First Source list, do not satisfy the residency hiring requirements, and, therefore, are at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list.

15.    ABC-Metro Washington's members, including the contractor Plaintiffs, have been "beneficiaries" within the meaning of the Act, and have also been required to execute or agree to be bound by Employment Agreements. Because of the Act, they have been obligated to fill jobs and vacancies from the First Source list. They therefore have been forced to deviate from their individual-merit, level-playing-field business philosophy by hiring or staffing individuals based on where they live instead of exclusively because of their qualifications for the job. And because ABC-Metro Washington's members typically have a permanent workforce (as distinct from a per-project workforce), the Act essentially requires ABC-Metro Washington members to withhold work from nonresident employees because they have to hire District residents to meet the Act's hiring quotas, or decline to bid on additional work because of the relative shortage of qualified District residents.

16.    As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred increased costs for employee recruiting, training, hiring, and supervision that they would not have had to incur absent the strictures of the Act. These additional costs include the expenses for additional staff committed solely to District-resident recruitment—such as attending job fairs targeted at District residents during the recession when construction workers from Maryland and Virginia are being laid off in large numbers. ABC-Metro Washington's members spend inordinate time and resources dealing with the administrative demands of dealing with the Department of Employment Services ("DOES") referral system; screening numerous District applicants trying to find employable ones; drug testing with respect to potential hires; committing significant resources to training newly hired District residents, only to have a large percentage of the new hires quit or fail to meet minimal job requirements such that they have to be fired; and the inefficiency and expense of having to repeat the entire recruitment process again in order to hire another District resident to replace the District resident employee that was terminated or left. (For example, Plaintiff

Miller & Long's experience under the First Source Act is that typically it has to screen about 60 District applicants in order to find 25 workers, the majority of whom wind up not being employed six months later. These screening numbers and percentages for District residents are approximately three times higher than for residents of other jurisdictions such as Maryland and Virginia.)

17.     As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred additional costs that they would not have had to incur absent the strictures of the Act including:

(a) less productivity on jobsites as the result of having to hire less-qualified or less-experienced employees in order to increase the percentage of District-resident employees required by the Act, creating higher overall labor costs to the subcontractors, general contractor, and the entire project;

(b) employee morale problems on the jobsite related to the more lenient treatment necessarily given to District-resident employees compared to other employees with respect to absenteeism, tardiness, attitude, and work performance;

(c) higher legal fees for legal guidance on the First Source rules and their attendant obligations, interpretations of the ABC-Metro Washington member's legal rights under the First Source Employment Agreements including possible modifications thereto and legal defenses should they be targeted with a First Source Act investigation and potential fines or other penalties;

(d) additional costs as contractors were publicly and falsely maligned for lack of compliance with the First Source, statements generated in part by the misinformation espoused by the City Council and repeated in the press that the 51% requirement for District-resident employment applied to the entire workforce on a project, not just to the new hires required for a particular job.

(e) the costs and impacts discussed in Paragraph 76, below.

9

18.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions.

### (ii)     Construction Contract "New Hires" Requirement

19.     The Act requires the Chief Procurement Officer and each District Contracting Officer to include in government-assisted projects costing $100,000 or more "the provision that 51% of the new employees hired for the project shall be District residents," unless the Contracting Officer waives this requirement upon a finding that:

(a) the beneficiary made a good-faith effort to comply;

(b) the beneficiary is located outside the Washington Standard Metropolitan Statistical Area (the "Area") and none of the contract work is performed inside the Area;

(c) the beneficiary enters into a special workforce-development training or placement arrangement with DOES; or

(d) DOES certifies that there are insufficient numbers of District residents in the labor market possessing the skills required by the positions created as a result of the contract.

See D.C. Official Code § 2-219.03(e)(3) (2011). Deliberate submission of falsified data may "be enforced by the Contracting Officer through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." D.C. Official Code § 2-219.03(e)(4) (2011).

20.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been construction contractors and subcontractors for beneficiaries of government-assisted projects costing in excess of $100,000. Consequently, the Act has required ABC-Metro Washington's members, contrary to their individual-merit and level-playing-field philosophy, to enter into construction contracts

("Construction Contracts") with the District or with beneficiaries which mandate that 51% of the new employees hired for the project be District residents.

21.     In an effort to comply fully with the Act, ABC-Metro Washington's members must also document good-faith efforts to hire District residents or enter into special workforce-development training or placement arrangements with DOES.  As a direct result of the "new hires" requirement of the Act, ABC-Metro Washington's members have incurred costs they would not have had to incur but for the strictures of the Act, including increased employee recruiting, training, hiring, reporting, and supervision costs.

22.     On information and belief, no general contractor has been able to meet on a regular basis the 51% new-hire requirement with respect to an overall project (that is, including all of the project's subcontractors).  There are subcontractors, such as Plaintiff Miller & Long, that have consistently made significant efforts to satisfy the First Source hiring requirements, but have still fallen short for reasons beyond their control, including:

(a) an insufficient number of skilled construction workers who live in the District;

(b) DOES's consistent failure to provide acceptable candidates for particular job requirements, and failure to adequately vet the candidates and their representations as to their skills—for example, sending an applicant who represents that he is a carpenter when he is not;

(c) District residents' lack of the transportation necessary to get to jobsites at the times required;

(d) the disproportionately high "fail" rate by District-resident applicants of required drug tests, and DOES's failure to screen the applicants before submitting them to prospective employers;

(e) disproportionate number of District-resident applicants who quit within the first few weeks or months on the job, break work rules about attendance; or have poor job performance and have to be terminated for that reason; and

(f) the burdens and costs of going through the screening process yet again whenever a District resident quits or is terminated.

23.     As a direct result of the "new hires" requirements of the Act, the individual Plaintiffs have been discriminated against in obtaining employment opportunities simply because they are not residents of the District, while the contractor Plaintiffs have been discriminated against because existing trained employees cannot be assigned to work on projects if they cannot help satisfy the "new hires" obligations. For example, Miller & Long favored District resident workers (over nonresidents) when it had to make layoffs during the recession of the last few years.  Plaintiff Miller & Long also made an effort to hire District residents, even when it was laying off nonresident employees because of the slowdown in construction work.

### (iii)     *Targeted-Hiring Contracts*

24.     Under the Act, "[w]henever the Mayor determines that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects," the Mayor can "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *See D.C. Official Code* § 2-219.03a(a) (2011).  The Act does not define how or when the Mayor can determine that the goal could be "better served," nor does the Act constrain the Mayor's discretion.

25.     Beneficiaries of government-assisted projects who enter into these targeted-hiring contracts ("Targeted-Hiring Contracts") routinely require their contractors and subcontractors to provide for increased hiring in specific job categories, so that the beneficiary may, in turn, comply with the Act. Noncompliance with a Targeted-Hiring Contract is "treated in the same manner as a violation of any other requirement" of the Act. *See D.C. Official Code* § 2-219.03a(a) (2011).  In other words, the impact of the

12

Act's requirements about Targeted-Hiring Contracts flows through the beneficiaries to contractors and subcontractors.

26.     ABC-Metro Washington's members, including the contractor Plaintiffs, have entered into Targeted-Hiring Contracts.  ABC-Metro Washington's members are also contractors and subcontractors for beneficiaries of government-assisted projects subject to Targeted-Hiring Contracts.  Consequently, ABC-Metro Washington's members have been required, contrary to their merit-shop philosophy, to enter into Targeted-Hiring Contracts with the District.

27.     As a direct result of the requirements of the Act and the Targeted-Hiring Contracts, ABC-Metro Washington and its members, including the contractor Plaintiffs, have incurred increased costs such as those alleged in Paragraphs 16 and 17.

28.     Because of the higher costs and the impact of the Act on their ability to bid and staff jobs, ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or argue for exemption.  They also suffer competitive disadvantage compared to companies that receive favorable treatment from the Mayor in the setting of specific job targets or that employ District residents in specific affected job categories.

*(iv)*     ***Reporting Obligations***

29.     The Act requires a "beneficiary" to submit to DOES every month following the execution of a contract subject to the Act, a contract-compliance report ("Contract-Compliance Report") for the project, including the following information:

(a) number of employees needed;

(b) number of current employees transferred;

13

(c) number of new job openings created;

(d) number of job openings listed with DOES;

(e) total number of all District residents hired for the reporting period and the cumulative total

number of District residents hired; and

(f) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including name, social-security number, job title, hire date, residence, and

referral source for all new hires.

*See D.C. Official Code* § 2-219.03(d) (2011).

30.     In addition, with the submission of the final request for payment from the District, the Act

requires the beneficiary to (a) document to the Contracting Officer its compliance with the Act, or (b)

submit a request to the Contracting Officer for a waiver of compliance.  The waiver request must include

(i) material demonstrating a good-faith effort to comply with the Act, (ii) referrals provided by DOES and

other referral sources, and (iii) advertisements of job openings listed with DOES and other referral sources.

*See D.C. Official Code* § 2-219.03(e)(3) (2011).

31.     Beneficiaries who are required to submit Contract-Compliance Reports to the District

routinely require contractors and subcontractors on these government-assisted projects to report the

information required of the beneficiary under the Act, so that the beneficiary may, in turn, try to comply

with the Act.  In other words, the impact of the Act's requirements flows through the beneficiary to

contractors.  The "failure to submit the contract compliance report…or deliberate submission of falsified

data" could "be enforced by the Contracting Officer through the imposition of penalties, including

monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract."  *D.C.*

*Official Code* § 2-219.03(e)(4) (2011).

14

32.     ABC-Metro Washington's members, including the contractor Plaintiffs, have to submit Contract-Compliance Reports and other reports on their compliance with the Act.  Keeping and reporting such information is contrary to the members' individual-merit philosophy.

33.     As a direct and proximate result of the reporting obligations under the Act, ABC-Metro Washington's members have incurred reporting and other costs which they would not have had to incur absent the strictures of the Act, including increased costs for monitoring, reporting, and supervising related to the hiring of District residents.  As an example, members incur higher administrative costs for the time spent completing the monthly reporting form required under the Act; adapting to the changes made by DOES—sometimes in the middle of a job—in the reporting requirements and the forms that are required; and engaging with DOES on reporting issues via phone, email, jobsite meetings and meetings at DOES' offices, as well as increased attorneys' fees related to interpreting the legal requirements for reporting under the Act.

34.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements, including the Act's reporting obligations.

**B.     The Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011**

35.     Effective on or about February 24, 2012, the District of Columbia amended the Act by adopting the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (the "Amended Act").  The Amended Act is more far-reaching, intrusive, and unlawful than its predecessor, including in the four respects carried over from the original Act.  The Amended Act exacerbates unconstitutional discrimination, imposes onerous restrictions on the bidding process, threatens stiffer penalties, and burdens larger projects with new requirements as discussed below.

### (i)      *Amended Employment Agreements*

36.      The Amended Act expands the applicability of Employment Agreements ("Amended Employment Agreements") by requiring the Mayor to include for every government-assisted project <u>or contract</u> a requirement that the beneficiary enter into an Employment Agreement with the District stating that: (a) the first source for finding employees to fill all jobs created by the government-assisted project or contract will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an employment agreement will be the First Source Register.  *See D.C. Official Code* § 2-219.03(a)(1)-(a)(2) (2012) (amended).

37.      For projects valued in excess of $300,000, the Amended Act defines "government assisted project or contract" more broadly as "any construction <u>or non-construction</u> project <u>or contract</u> receiving funds or resources from the District of Columbia, or funds or resources which, in accordance with a federal grant or otherwise, the District of Columbia government administers, <u>including contracts, grants, loans, tax abatements or exemptions, land transfers, land disposition and development agreements, tax increment financing, or any combination thereof, that is valued at $300,000 or more</u>."  *D.C. Official Code* § 2-219.01(5) (2012) (amended).

38.      For projects valued in excess of $300,000, the Amended Act also defines a "beneficiary" more broadly to include not only a party who has signed a contract with the District but also "recipients" of District "actions."  The Act now reaches:

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, … and which details the number and description of all jobs created by a government-assisted project <u>or contract</u> for which the beneficiary is required to use the First Source Register,

16

[and]

(b) a <u>recipient</u> of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for redevelopment, or tax increment financing that results in a financial benefit of $300,000 or more from an agency, commission, instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds.

*D.C. Official Code* § 2-219.01(1)(B) (2012) (amended)(emphasis added).

39.     The Amended Act threatens harsher penalties for noncompliance, including potential debarment. "Willful breach of the employment agreement," shall be enforced by the Mayor through the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A) (2012) (amended). "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(D) (2012) (amended).

40.     ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts valued in excess of $300,000 and recipients of District-government economic-development action including contracts valued at in excess of $300,000, all within

the meaning of the Amended Act. ABC-Metro Washington's members, including the contractor Plaintiffs, also reasonably expect to be bidders on or contractors on government-assisted projects or contracts valued in excess of $300,000, and recipients of government economic-development actions affected by the Amended Act.

41.     ABC-Metro Washington's members, including the contractor Plaintiffs, will now be required by the Amended Act to enter into Amended Employment Agreements with the District of Columbia and to continue to fill jobs associated with government-assisted projects from the First Source Register, all contrary to the philosophy of the members and the organization to promote individual merit and a level playing field for all employers and employees.

42.     As a direct and proximate result of the Amended Act and the Amended Employment Agreements, ABC-Metro Washington's members will continue to incur costs of the type and nature identified above in Paragraphs 16 and 17.  The threat of increased penalties, including the threat of debarment and the ripple effect of such a debarment on other contracting opportunities (including contracting with the federal government) will require ABC-Metro Washington's members to incur even more costs to ensure scrupulous adherence to the Amended Act.  But adhering to the hiring requirements of the Amended Act is virtually impossible based on the scarcity of qualified District-resident workers.  Thus, contractors have to gamble on obtaining a waiver at the end of the job, with no reliable way to predict whether the waiver will be granted.  The Amended Act's continuation of the discriminatory requirements of the old law, its significant expansion of those hiring and reporting requirements, and the unpredictable and severe consequences of noncompliance, put employers and contractors in an even more perilous spot than under the original Act.

43.     As a direct result of the requirements of the Amended Act and the Amended Employment Agreements, the individual Plaintiffs are likely to be discriminated against in obtaining or retaining

employment simply because they are not residents of the District, while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act. The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

44.     ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Employment Agreements that link hiring to residency, that do not have permanent workforces, or that are able to secure waivers or exemptions.

*(ii)     Amended Construction Contracts*

45.     The Amended Act requires the Mayor to include in each government-assisted project <u>or contract</u> that receives government assistance totaling between $300,000 and $5 million, "a provision that at least 51% of the new employees hired to work on the project <u>or contract</u> shall be District residents," unless the Mayor waives this requirement upon additional findings that:

(a) DOES has certified that the beneficiary made a "good faith effort to comply";

(b) the beneficiary is located outside the Area, none of the contract work is performed inside the Area, the beneficiary published each job opening or part-time work needed for 7 calendar days in a District newspaper of city-wide circulation, and DOES certifies that there are insufficient eligible applicants from the First Source Register that possess the skills required by the positions, or the eligible applicants are not available for part-time work or do not have a means to travel to the onsite job; or

(c) the beneficiary enters into a special workforce development training or placement arrangement with DOES.

*See D.C. Official Code* § 2-219.03(e)(3)(A)(i)-(A)(iii) (2012) (amended).

46.     ABC-Metro Washington's members, including the contractor Plaintiffs, are contractors and subcontractors participating in government-assisted projects and entering into contracts that receive government assistance totaling between $300,000 and $5 million.  Consequently, the Amended Act will require ABC-Metro Washington's members, contrary to their employment philosophy, to enter into Amended Construction Contracts ("Amended Construction Contracts") with the District or beneficiaries, incorporating a requirement that 51% of the new employees hired for the project or contract shall be District residents.

47.     The Amended Act requires the Mayor to include in each government-assisted project or contract that receives government assistance totaling $5 million or more, a new provision that:

(a) at least 20% of journey worker hours by trade shall be performed by District residents;

(b) at least 60% of apprentice hours by trade shall be performed by District residents;

(c) at least 51% of the skilled laborer hours by trade shall be performed by District residents; and

(d) at least 70% of common laborer hours shall be performed by District residents.

*See D.C. Official Code* § 2-219.03(e)(1A)(A) (2012) (amended).

48.     Prior to DOES accepting the Amended Construction Contract, the beneficiary must choose whether the 51% of new employees hired will be (a) cumulative of all new hires, including those made by all subcontractors at any tier who work on the project or contract, or (b) met by each beneficiary covered by the paragraph and each individual subcontractor at any tier who works on the project or contract.  *See D.C. Official Code* § 2-219.03(e)(1)(A)(i)-(A)(iii) (2012) (amended).

49.     DOES must consider the following when making a determination of a "good faith effort to comply":

(a) whether DOES has certified that there is an insufficient number of District residents in the labor market who possess the skills required to fill the positions that were created as a result of the project or contract;

(b) whether the beneficiary posted the jobs on the Department of Employment Services job website for a minimum of ten calendar days;

(c) whether the beneficiary posted each job opening or part-time work needed in a District newspaper with city-wide circulation for a minimum of seven calendar days;

(d) whether the beneficiary has substantially complied with the relevant monthly reporting requirements set forth in this section;

(e) whether the beneficiary has submitted and substantially complied with its most recent employment plan that has been approved by the Department of Employment Services; and

(f) any additional documented efforts.

*See D.C. Official Code* § 2-219.03(e)(3)(B) (2012) (amended).

50.    "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the required hiring requirements (or failure to receive a good-faith waiver), (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

51.     The beneficiaries of these projects are compelled by the Amended Act's mandates to apply the local hiring requirement to all individual subcontractors at any tier that work on the project or contract, or pressure all subcontractors to come as close as possible to meeting the local hiring requirements. Consequently, ABC-Metro Washington's members must agree that (a) at least 20% of journey work hours by trade are performed by District residents, (b) at least 60% of apprentice hours by trade are performed by District residents, (c) at least 51% of the skilled-laborer hours by trade are performed by District residents; and (d) at least 70% of common-laborer hours are performed by District residents.

52.     As a direct result of the Amended Act, ABC-Metro Washington's members, including the contractor Plaintiffs, will incur costs of enhanced employee recruiting, training, hiring, reporting, and supervising costs that they would not have had to incur but for the strictures of the Amended Act and the Amended Construction Contracts, including of the types alleged in Paragraphs 16 and 17 above.

53.     As a direct result of the Amended Construction Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District, while the contractor Plaintiffs, face imminent discrimination and risk because they cannot satisfy the obligations of the Act.   The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

54.     ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Amended Construction Contracts or adhering to those requirements, or that are able to obtain waivers or exemptions.

(iii)     *Amended Targeted-Hiring Contracts*

55.     Under the Amended Act, "[w]henever the Mayor determine[s] that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects <u>or contracts</u>," the Mayor may "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *D.C. Official Code* § 2-219.03a(a) (2012) (amended).  The Amended Act still does not define how or when the Mayor can determine that the goal could be "better served," nor does the Amended Act constrain the Mayor's unlimited discretion.

56.     ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts and District-government economic-development action. They are also contractors and subcontractors for beneficiaries of government-assisted projects or contracts and District-government economic-development action.   Consequently, ABC-Metro Washington's members will be required, contrary to their business philosophy, to enter into amended targeted-hiring contracts ("Amended Targeted Hiring Contracts") with the District.

57.     "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the required-hiring requirements (or failure to receive a waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

23

58.     As a direct and proximate result of the Amended Act, ABC-Metro Washington's members will incur costs including increased employee recruiting, training, hiring, reporting, and supervising costs, and other costs outlined above in Paragraphs 16 and 17.

59.     As a direct result of the Amended Targeted-Hiring Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act.  The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

### *(iv)*     *Amended Beneficiary Reporting Obligations*

60.     The Amended Act requires a "beneficiary" to submit to DOES every month following the start of the project or contract until construction is completed and a final certificate of occupancy has been issued, a hiring compliance report ("Amended Contract-Compliance Report") for the project or contract including additional information about the

   (a) number of employees who worked on the project or contract;

   (b) number of current employees transferred;

   (c) number of new job openings created,

   (d) number of job openings created by employee attrition;

   (e) number of job openings listed with DOES;

   (f) total monthly direct and indirect labor costs associated with the project or contract;

   (g) total number of all District residents hired for the reporting period and the cumulative total number of District residents hired; and

(h) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including each employee's name, social-security number, job title, hire date,

residence, and referral source for all new hires.

*See D.C. Official Code* § 2-219.03(e)(1) (2012) (amended).

61.    In addition, for each government-assisted project or contract that receives government

assistance totaling $5 million or more, there is a new requirement that each month following the start of

the project or contract until construction is completed and a final certificate of occupancy has been issued,

beneficiaries submit to DOES copies of their monthly and cumulative certified payrolls, monthly and

cumulative certified payrolls from all subcontractors at any tier working on the project or contract, as well

as a report of the total monthly direct and indirect labor costs associated with the project or contract. *D.C.*

*Official Code* § 2-219.03(e)(1A) (D)-(E) (2012) (amended).

62.    With each submission of a final request for payment from the District, the Amended Act

requires the beneficiary to (a) document in a report to the Mayor the beneficiary's compliance with the

Act, or (b) submit a request to the Mayor for a waiver of compliance incorporating (i) material supporting

the argument that there has been a good-faith effort to comply, (ii) referrals provided by DOES and other

referral sources, and (iii) advertisement of job openings listed with DOES and other referral sources. *See*

*D.C. Official Code* § 2-219.03(e)(2) (2012) (amended).   The "failure to submit the required hiring

compliance report…or the deliberate submission of falsified data," shall be enforced by the Mayor through

the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the

project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A)

(2012) (amended).

63.    Beneficiaries require contractors and subcontractors on government-assisted projects or

contracts to report the information required of the beneficiary under the Act, so that the beneficiary may,

in turn, comply with the Act. Thus, the requirements of the Amended Act flow through to contractors and subcontractors, including ABC-Metro Washington's members, including the contractor Plaintiffs.

64.     Consequently, ABC-Metro Washington's members must submit Amended Contract-Compliance Reports and other reports supportive of the Act and contrary to their business philosophy.

65.     As a direct result of the Amended Act, ABC-Metro Washington and its members have and will incur additional costs, including reporting expenses and other costs which they would not have had to incur absent the reporting obligations of the Amended Act, including the costs described above in Paragraphs 16 and 17.

66.     ABC-Metro Washington's members also suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements.

### *(v)     Bids and Proposals*

67.     For government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, the Amended Act requires bids and proposals responding to a solicitation for them to "include an initial employment plan outlining the bidder or offeror's strategy to meet the local hiring requirements as part of its response to the solicitation. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended). The evaluation of the initial employment plan (the "Employment Plan") is worth 10% of the overall score of the bid or proposal. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended).

68.     The Employment Plan must include (a) descriptions of the health and retirement benefits provided to employees who worked on any of the bidder or offeror's past three completed projects or contracts; (b) a description of the bidder or offeror's efforts to provide District residents with ongoing employment and training opportunities after they complete work on the job for which they were initially hired; and (c) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act (40 U.S.C.

§ 3141 *et seq.*) ("Davis-Bacon Act"), where applicable, on projects or contracts completed within the last two years. D.C. Official Code § 2-219.03(e)(1)(F)(i) (2012) (amended).

69.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been beneficiaries of government-assisted projects or contracts valued the contractor in excess of $5 million, and recipients of District-government economic-development actions including contracts valued in excess of $5 million, and they reasonably anticipate being beneficiaries or recipients within the meaning of the Amended Act in the near future.

70.     ABC-Metro Washington's members, including the contractor Plaintiffs, are qualified, licensed, and able bidders who are ready to respond to or participate in responses to future solicitations and bids on government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, except that the Amended Act requires ABC-Metro Washington's members, contrary to their business philosophy, to prepare Employment Plans outlining their strategy to meet local hiring requirements.

71.     As a direct result of the Amended Act, it will be more difficult for ABC-Metro Washington's members to be successful bidders or to participate in successful bids on government-assisted projects or contracts that receive government assistance totaling $5 million or more.

72.     In addition, ABC-Metro Washington and its members will incur additional costs, including the costs to prepare and reply to solicitations and bids on government-assisted construction projects incorporating Employment Plans, to offer health and retirement benefits to employees, and to offer member and employee training.

73.     ABC Metro's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that:

(a) do not share their philosophy of individual merit and a level playing field and do not oppose submitting Employment Plans requiring hiring employees on the basis of their residency,

(b) have a higher percentage of District residents as employees, or

(c) offer certain health and retirement benefits, and

(d) offer certain employee-training opportunities.

74.     The winning bidder, as well as beneficiaries of government-assisted projects or contracts that are not awarded through the contracting process, must submit a revised Employment Plan to the Mayor "for approval prior to beginning work associated with the relevant government project or contract." The revised Employment Plan has to include:

(a) a projection of the total number of hours to be worked on the project or contract by trade;

(b) a projection of the total number of journey worker hours, by trade, to be worked on the project or contract and the total number of journey worker hours, by trade, to be worked by District residents;

(c) a projection of the total number of apprentice hours, by trade, to be worked on the project or contract and the total number of apprentice hours, by trade, to be worked by District residents;

(d) a projection of the total number of skilled laborer hours, by trade, to be worked on the project or contract and the total number of skilled laborer hours, by trade, to be worked by District residents;

(e) a projection of the total number of common laborer hours to be worked on the project or contract and the total number of common laborer hours to be worked by District residents;

(f) a timetable outlining the total hours worked by trade over the life of the project or contract and an associated hiring schedule;

28

(g) descriptions of the skill requirements by job title or position, including industry-recognized certifications required for the different positions;

(h) a strategy to fill the hours required to be worked by District residents pursuant to this paragraph, including a component on communicating these requirements to contractors and subcontractors and a component on potential community outreach partnerships with the University of the District of Columbia, the University of the District of Columbia Community College, the Department of Employment Services, Jointly Funded Apprenticeship Programs, or other government-approved, community-based job training providers;

(i) a remediation strategy to ameliorate any problems associated with meeting these hiring requirements, including any problems encountered with contractors and subcontractors;

(j) the designation of a senior official from the general contractor who will be responsible for implementing the hiring and reporting requirements;

(k) descriptions of the health and retirement benefits that will be provided to District residents working on the project or contract;

(l) a strategy to ensure that District residents who work on the project or contract receive ongoing employment and training opportunities after they complete work on the job for which they were initially hired and a review of past practices in continuing to employ District residents from one project or contract to the next;

(m) a strategy to hire graduates of District of Columbia Public Schools, District of Columbia public charter schools, and community-based job training providers, and hard-to-employ residents;

(n) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act, where applicable; and

(o) the bidder or offeror's general District-resident hiring practices on projects or contracts completed within the last 2 years.

*See D.C. Official Code § 2-219.03(e)(1A)(F)(ii) (2012) (amended).*

75.     ABC-Metro Washington's members win bids and are awarded contracts outside the contracting process for government-assisted projects or contracts valued in excess of $5 million. ABC-Metro Washington's members reasonably anticipate bidding on and being awarded contracts following the effective date of the Amended Act.

76.     As a direct result of the requirements of the Amended Act, ABC-Metro Washington and its members, including the contractor Plaintiffs, will incur increased costs including increased employee recruiting, training, hiring, reporting, and supervising costs. The Association's additional costs include higher administrative costs to educate and train its members with respect to the new requirements under the Amended Act; increased communication costs for engaging the District of Columbia's Mayor and Councilmembers; public-relations damages related to allegations of lack of concern for District residents by association members and of noncompliance; decreases in membership as individual members are forced out of business or are forced to reduce their number of projects so that their income is reduced and they can no longer afford ABC-Metro Washington membership dues.

## C.      Damages and the Burdens of the Amended Act

77.     As a direct and proximate result of the requirements of the Amended Act, ABC-Metro Washington's members will incur damages that they otherwise would not have incurred including

(a) Total loss of business. Those firms that do not have sufficient District residents and who cannot get a waiver will be forced to close.

(b) Loss of volume of work and business earnings. The Amended Act's requirements will limit how many jobs a company can bid on and perform, and fewer jobs means less profit.

30

(c) <u>Loss of work due to uneven bidding requirements</u>.  There is no way to bid ethically and intelligently when a bidder does not know in advance whether the "hours worked" requirements will be strictly enforced or will be ignored or waived by the District.  A bidder who assumes that "hours worked" requirements will be strictly enforced must submit higher bids to reflect the increased costs and risk of noncompliance; a bidder who assumes it will get a waiver or that the District will turn a blind eye will presumably bid lower.

(d) <u>Significant fines</u>.  The "hours worked" requirements of the Amended Act are not achievable on any kind of scale and the failure to meet the requirements results in fines and other penalties.

(e) <u>Debarment</u> after two violations.

(f)  <u>Increased costs of construction</u> for the developer members of ABC-Metro Washington, such that fewer projects may be proposed, financed, approved, or built, hurting every aspect of the construction industry in the District.

(g) <u>Increased bid costs</u> of general and specialty contractors as a result of (a) fewer bids being received per project (less competition) as subcontractors will bid fewer jobs in order to meet the hours requirements on the jobs they do bid, and (b) those bids that are received will reflect the increased labor costs resulting from the Amended Act's requirements.

(h) <u>Fewer projects</u> to bid or work on.  The significant increase in labor costs cannot be absorbed by deals made in today's very tight financing environment, so that a number of development deals simply will not go forward at the higher price tag, hurting all of the ABC-Metro Washington members.

(i) <u>Layoffs</u> of employees resulting from general contractors and subcontractors putting in fewer bids and less construction work being conducted overall.

(j) <u>Reduced productivity and profit</u> because of the incentive to lay off employees who are Maryland and Virginia residents first, as opposed to choosing which employees to retain based on merit and productivity alone.

(k) <u>Increased costs</u> to try to comply with requirements for labor. Specially trained workers cannot always be available among District residents and are often available only from outside the region. As a result, there have to be negotiations with DOES or the Mayor's Office over exceptions to the requirements for specialty contractors that perform, for example, exterior façade work, curtain walls, glass work/glazing, roofing, water-proofing, air barrier placement, steel erection and specialty flooring system installation, since these services require special training and/or certifications, sometimes available only from the manufacturer.

78.     The projected damages and ill effects of the Amended Act are readily apparent based on the experience of the downtown "Marquis" project. Although that project does not specifically incorporate the requirements of the Amended Act, as of January 2012 it was under construction with requirements similar to the Amended Act. Even at the early stages of the project, it has been widely reported that contractors have not been able to meet the District-resident worker percentages. Once the Amended Act is applied throughout the District, there are likely to be mass defaults on the District-resident hours requirements because the pool of labor is simply too shallow.

79.     "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the required-hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District

of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C) (2012) (amended).

80.     As a direct result of the Amended Act, ABC Metro Washington's members, including the contractor Plaintiffs, risk penalties, as well as disqualification or debarment from bidding on projects not only in the District of Columbia, but also all other United States jurisdictions which inquire about disqualification and debarments elsewhere.

81.     Furthermore, the District started to impose the Amended Act's extensive bid-and-proposal requirements **retroactively** on ABC-Metro Washington's members as winning bidders or contract awardees before they may begin work.  In fact, even before the Amended Act passed its Congressional-review period, DOES informed ABC-Metro Washington members and staff that the new requirements would apply to all ongoing projects at the conclusion of that period. Although the District may be re-evaluating what provisions of the Amended Act will be enforced retroactively, it remains unclear what impact the Amended Act has on current business.  As a direct result, ABC-Metro Washington's members will incur increased costs to complete already bid projects, thus depriving them of their vested interests in their contracts.

**D.     The Real-World Impact of the Act and the Amended Act.**

82.     The Act and the Amended Act have been touted as promoting job-creation.  Of course, the Act does not create jobs and never could.  Instead, it uses unlawful and unconstitutional means to try to shift to a preferred group of people—District residents—first dibs on jobs already created.  The Act does not of itself increase the pool of qualified job applicants nor does it address underlying issues of education, job-training, apprenticeships, or other matters which are needed to increase the number of qualified job applicants.

83.     Unlike other jurisdictions where first-source legislation has been implemented (and, when challenged, almost always overturned), the District does not suffer from a shortage of jobs but a shortage of trained and ready applicants to fill the jobs. Indeed, by most studies, there are more jobs in the District than there are people. District employers must reach outside the city limits to fill all the jobs in the District. This is a far different situation from one where the residents outnumber the jobs and the jurisdiction seeks to channel limited jobs to its own residents first, although even in that situation, economic protectionism is unconstitutional.

84.     For nonresidents of the District, like the individual Plaintiffs, the impact of the Act is to exclude them from consideration as part of a team of laborers on significant District jobs not because of their skills or desires but simply because they do not live in the District. Moreover, their employers or potential employers cannot freely bid on or accept work if they do not believe that they can staff such jobs with the required District residents. Where a company has the overall capacity to work on, say, seven jobs at any given time, that same company could only support three jobs because of the requirements of the Act and the Amended Act and the inability to fulfill required staffing needs with District residents. This leads to an overall decrease in available work for all laborers regardless of where the laborers live. For employers, including the contractor Plaintiffs, the Act already adversely affects the workplace. The scarce District workers are given first choice on new work, and they enjoy a privileged position within the workplace. A company which has available to it only a finite number of District-resident employees has little choice but to hire, promote, train, and discipline them differently from nonresident employees.

85.     In response to the unrealistic expectations for District-resident work hours in the Amended Act, ABC Metro Washington's members will be forced to bid less work in the District, in order to have enough District residents to fulfill the requirements on those jobs. For example, Plaintiff Miller & Long has determined that it can only perform two concrete jobs in the District at a time with its existing

workforce.  Other members have reported that they will not bid on jobs if the new policies are required since they could not (or could only barely) satisfy the earlier, less-stringent standards.  The Act impacts job-staffing decisions of ABC-Metro Washington member organizations.  Bidders do not know how to account for the potential impacts of the Act.  Companies who hire and train employees then have to sideline their "star performers" because of where they live, thereby giving up the competitive advantage (talent) in which they have invested.  General contractors will similarly bid fewer jobs in the District, as they will be receiving fewer bids from their subcontractors.  This decrease in bidding means a decrease in competition for bids, which means higher prices.  Moreover, the uncertainty about the ability to secure a future waiver from unachievable employment targets makes the bidding process for contractors more perilous and more expensive.

86.     Contractors will also increase their prices to cover the cost of compliance, maybe even hiring District residents who they do not reasonably expect to perform much work but who will allow the contractor to meet the Amended Act's requirements.  Developers and general contractors will also pass along, via indemnification provisions to their subcontractors, the costs associated with their exposure to potential fines or other penalties existing under the Amended Act.  Likewise, the costs of covering these penalties will be built into the subcontractors' and general contractors' bids on a project—all leading to higher prices for the District projects and contracts paid for by District taxpayers.  While clearly discriminating against nonresidents, the Act does not even benefit the District's own residents.

87.     For ABC-Metro Washington and its members, the Act and the Amended Act are a direct assault on their economic philosophy, their financial viability, and their ability to recruit and retain members and employees.

88.     ABC-Metro Washington itself has incurred substantial damages associated with addressing on behalf of its members the impacts of the Act and the Amended Act, including training, legal fees,

publicity to respond to false stories regarding the contracting community, and extra efforts to maintain membership of the organization.

## COUNT I
### Violation of Substantive Due Process

89.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

90.     The Fifth Amendment of the United States Constitution incorporates the protections of the Privileges and Immunities Clause, including the fundamental right of nonresidents to pursue a common calling in any jurisdiction.

91.     The Act and the Amended Act discriminate against the individual Plaintiffs as well as members of ABC-Metro Washington based exclusively on their status as nonresidents of the District of Columbia.

92.     As a result of Defendants' acts, practices, customs, laws, and rules, the individual Plaintiffs have been deprived of their fundamental right to pursue a common calling in the District of Columbia in which they are not a resident or citizen, such right being protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

93.     ABC-Metro Washington's members have been deprived of their fundamental right to pursue a common calling as protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

94.     The Act and the Amended Act discriminate against ABC-Metro Washington's members and the individual Plaintiffs based on their status as noncitizens and nonresidents of the District of Columbia or employers of nonresidents of the District of Columbia.

95.     Defendants have no substantial justification for enacting and enforcing a program which discriminates against people on the basis of residence.  Nonresidents are not a particular source of

unemployment in the District, nor are they the source of any other local "evil" that the District may purport to remedy with the Act and Amended Act.

96.     The Defendants' acts, practices, customs, laws, and rules, including the Act and the Amended Act, are not closely tailored to achieve any legitimate local purpose.

WHEREFORE, Plaintiffs request that the Court (i) declare that the Act and the Amended Act violate the Due Process Clause of the Fifth Amendment to the United States Constitution, which incorporates the protections of the Privileges and Immunities Clause of the United States Constitution; (ii) issue a temporary restraining order and preliminary injunction preventing the District from enforcing the Act and the Amended Act; (iii) issue a permanent injunction preventing the District from enforcing the Act; and (iv) award Plaintiffs any other relief that the Court determines is appropriate.

## COUNT II
### Declaratory and Injunctive Relief

97.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

98.     Plaintiffs are in doubt as to their rights, privileges, and immunities with respect to the conduct at issue herein.  Plaintiffs require a judgment declaring their rights, privileges, and immunities. There is a clear, present, actual, substantial, and bona-fide justiciable controversy between the parties.

99.     Plaintiffs have no adequate remedy at law.  No amount of money damages could adequately compensate the Plaintiffs for the irreparable harm described herein.  Plaintiffs in this case wish to exercise rights that are guaranteed to them under the United States Constitution.  No legal remedy would ever suffice to properly address state action that ultimately results in denying citizens rights guaranteed by the Due Process Clause of the United States Constitution, which incorporates the rights protected by the Privileges and Immunities Clause.

100.   Plaintiffs and the public-at-large will suffer irreparable injury if injunctive relief is not granted and Defendants are further permitted to enforce the customs, policies, practices, and impermissible laws and rules at issue herein.

101.   The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of customs, policies, practices, laws and rules that are designed to and do exhibit a callous indifference to Plaintiffs' constitutional rights.

102.   All conditions precedent to the institution and maintenance of this cause of action has occurred or has been performed.

103.   The acts and practices of Defendants as set forth herein, were and are being performed under color of District law and, therefore, constitute state action within the meaning of the Fifth Amendment to the Constitution of the United States.

WHEREFORE Plaintiffs request entry of a judgment declaring that the Act and the Amended Act are unconstitutional and unenforceable, and that the Plaintiffs are not required to comply with the terms of these Acts. Plaintiffs request entry of temporary, preliminary, and permanent injunctive relief necessary to implement the judgment, and an award of attorneys' fees, costs, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 99664)
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)

Nathan A. Adams (Of Counsel)
HOLLAND & KNIGHT, LLP
315 South Calhoun Street
Suite 600
Tallahassee, Florida 32301
(850) 224-7000 (phone)
(850) 224-8832 (fax)

Min K. Cho (Of Counsel)
HOLLAND & KNIGHT, LLP
200 South Orange Ave
Suite 2600
Orlando, Florida 32801
(407) 425-8500 (phone)
(407) 244-5288 (fax)

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

/s/ Paul J. Kiernan
Paul J. Kiernan

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2015, I electronically filed the Joint Request for Status Conference via the ECM-ECF System.

I certify that all participants in the case are registered ECM-ECF users and that service will be accomplished by the ECM-ECF System.

/s/ Paul J. Kiernan
Paul J. Kiernan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br> *Defendant*. | Civil Action No. 12-853 (EGS) |

<u>NOTICE OF DEPOSITION</u>

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Dairon Upshur shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of plaintiff Emmett Morris, Jr. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section



/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, | |
| *Plaintiffs,* | Civil Action No. 12-853 (EGS) |
| v. | |
| DISTRICT OF COLUMBIA, *et al.,* *Defendant.* | |

## NOTICE OF DEPOSITION

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Emmett Morris, Jr., shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of the witness for Miller & Long. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section



EXHIBIT
15

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).