1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL

+ + + + +

_____        :
                                  :
IN THE MATTER OF:                 :
                                  :
METROPOLITAN WASHINGTON           :
CHAPTER, ASSOCIATED BUILDERS:
AND CONTRACTORS, INC.,            :
et al.,                           :
                                  :
            Plaintiffs,           :
                                  :
      v.                          :    Civil Action No.
                                  :    12-00853 (EGS)
DISTRICT OF COLUMBIA,             :
                                  :
            Defendant.            :
                                  :
_____        :

                  Tuesday,
                  October 25, 2016

                  Washington, D.C.


DEPOSITION OF:

            **OTONIEL GIR BORRAYO**

called for examination by Counsel for the
Plaintiffs, pursuant to Fed. R. Civ. P.
30(b)(6), in the Office of the Attorney General,
located at 441 4th Street, N.W., Suite 600
South, Washington, D.C. 20001, when were present
on behalf of the respective parties:

2

APPEARANCES:

On Behalf of Plaintiffs:

PAUL J. KIERNAN, ESQ.
Holland & Knight, LLP
800 17th Street, N.W.
Suite 1100
Washington, D.C. 20006
(202) 663-7276
paul.kiernan@hklaw.com


On Behalf of Defendant:

ANDREW J. SAINDON, ESQ.
CONRAD RISHER, ESQ.
Office of the Attorney General
441 4th Street, N.W.
Suite 600 South
Washington, D.C. 20001
(202) 724-6643
andy.saindon@dc.gov

CONTENTS

WITNESS                    DIRECT  CROSS  REDIRECT  RECROSS

Otoniel Gir Borrayo  4        45       52


EXHIBIT NO.                                        PAGE

1    Notice of Deposition  . . . . . . . . . 16

2    Plaintiffs' Responses and Objection
     to Defendants' First Set of
     Interrogatories   . . . . . . . . . . . 19

3    Plaintiff's Responses and Objections
     to Defendant's First Set of Requests
     for Admissions   . . . . . . . . . . . . 38

12   Miller and Long Letterhead  . . . . . . 40

13   List of First Source Projects   . . . . 41

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE , N W
(202) 234-4433          WASHINGTON, D C  20005-3701          www.nealrgross.com

```
1                    P-R-O-C-E-E-D-I-N-G-S

2                                        10:03 a.m.

3    WHEREUPON,

4                    OTONIEL GIR BORRAYO

5    was  called  as  a  witness  by  Counsel  for  the

6    Plaintiffs  and,  having  been  first  duly  sworn,

7    assumed  the  witness  stand,  was  examined  and

8    testified as follows:

9                    DIRECT EXAMINATION

10                   BY MR. SAINDON:

11         Q    Would  you  state  your  name  for  the

12   record, please?

13         A    Otoniel Gir Borrayo.

14         Q    And can you spell that?

15         A    O-T-O-N-I-E-L G-I-R B-O-R-R-A-Y-O.

16         Q    Are you currently employed Mr. Gir?

17         A    Yes, sir.

18         Q    Thank  you.   My  name  is  Andy  Saindon.

19   I'm  an  attorney  for  the  District  of  Columbia.

20   You're  here  for  a  case  filed  by  your  boss,  your

21   employer,  Miller  &  Long,  and  other  folks

22   challenging  the  First  Source  Act,  correct?
```

1          A      Yes.

2          Q      Have you ever been deposed before?

3          A      Yes.

4          Q      How did that come about?

5          A      It was probably more than 12 years ago

6     in working for Miller & Long.

7          Q      And what was the case about?

8          A      I don't remember.  I don't remember

9     roughly.   It was a long time ago, but I do

10    remember doing the deposition.

11         Q      Were you deposed for the plaintiff or

12    the defendant?

13         A      For the defendant.

14         Q      Okay, was it a work-related suit?

15         A      Yes.

16         Q      Mr. Gir, it's very important you

17    answer with verbal responses.   "Uh-huh,"

18    sometimes those can't be recorded accurately,

19    likewise a nod.   Sometimes those can't be

20    reported accurately, so please try and answer

21    verbally.  As I said, if you need a break at any

22    time, just let me know.   I just ask that you

1    don't take a break in the middle of a question.

2              And it's very important that you

3    understand the questions to give accurate

4    answers.  So if there's any question you don't

5    understand, please ask me to repeat it or

6    rephrase it.  So I'll assume that if you answer a

7    question, you understood it, and you're answering

8    it completely and accurately.  Is that fair?

9         A    Yes.

10         Q    Okay, Mr. Gir, how long have you

11    worked at Miller & Long?

12         A    Almost 18 years.

13         Q    And what is your educational

14    background?

15         A    What do you mean?

16         Q    You graduated from high school?

17         A    Yes.

18         Q    Did you have any college?

19         A    Yes.

20         Q    And what did you do?

21         A    I went to school at George Washington

22    University.  I did three years there.

1        Q    Okay, and what were your studies

2   generally?

3        A    Spanish literature and culture.

4        Q    Okay, and what are your duties at

5   Miller & Long?

6        A    I'm Vice President of Human Resources.

7        Q    And what does that involve?

8        A    Do you have all day?

9        Q    I do, but keep it short, just

10  generally.

11       A    What other heads of HR do.  We

12  oversee, you know, hiring, compliance with local

13  and federal laws, employee relations.  Do you

14  want me to keep going?

15       Q    That's fine.  Where were you that you

16  worked before you went to Miller & Long?

17       A    Marriott.

18       Q    Marriott, and what did you do there?

19       A    I was finishing college.  It was a

20  part-time gig.

21       Q    Was that part-time or full-time?

22       A    Part-time, and it was full-time

1    sometimes.  And prior to that, I was with the

2    United States Navy.

3        Q    And how long were you in the Navy?

4        A    Three-and-a-half years.

5        Q    Now, are you familiar, Mr. Gir, with

6    the First Source Act?

7        A    Yes.

8        Q    Do  your  duties  include  assisting

9    Miller & Long in complying with the First Source

10   Act?

11       A    Yes.

12       Q    And how do you do that specifically?

13       A    Can you be a little more specific?

14       Q    Sure,  what  are  your  duties  in

15   complying with the First Source Act?  And by that

16   I mean do you compile the data yourself, or do

17   you supervise others that do that?

18       A    No, I supervise others and make sure

19   that it is being done correctly.

20       Q    Do you know how long the First Source

21   Act has been in place?

22       A    A long time.

1          Q     A long time, 20 years?

2          A     Yeah, I've been working doing First

3    Source stuff, to my knowledge, at least 12, 15

4    years.

5          Q     Okay, so almost since you started?

6          A     Yes.

7          Q     Okay, Mr. Gir, how many full-time

8    employees does Miller & Long have?

9          A     Right now?

10         Q     Yes.

11         A     To the best of my knowledge, probably

12   around 1,500 right now.

13         Q     And how many part-time employees?

14         A     None.

15         Q     None, okay.   How many construction

16   workers does Miller & Long employ?

17         A     Probably around 1,400.   There's, you

18   know, I can't give you an exact number.

19         Q     Sure.

20         A     It changes.

21         Q     It varies on a regular basis.   I

22   understand.   So around that, but now, there are

1    1,400 construction workers, and the rest of the

2    workers are, would you say, classify them as

3    white collar professional folks?

4         A    Yes, you have roughly about 100 people

5    who work in the main office in some capacity.

6         Q    And the rest are blue collar, the

7    folks that swing the hammers, construction

8    workers?

9         A    Yes, with a number of different

10   trades.

11        Q    Right, okay.  Does that proportion

12   change at all over the year?

13        A    Yes.

14        Q    And how does it do that?

15        A    It depends on the workload.  So, you

16   know, earlier this year, we had close to 2,000.

17        Q    2,000 employees total?

18        A    Mm-hmm.

19        Q    Okay.

20        A    Yes.

21        Q    And that is mainly on the construction

22   side where the number fluctuates?

1        A       Yes.

2        Q       The number that you said, about 100

3    people working in the office, that is relatively

4    stable?

5        A       Yes, it goes up a little bit, or goes

6    down a little bit, but mostly the changes happen

7    with the work force in the field.

8        Q       Okay, so the plaintiff here is Miller

9    & Long Company, is that right?

10       A       Yes.

11       Q       I'm going to ask you a little bit

12   about corporate structure.  What is Miller & Long

13   DC?

14       A       Miller  &  Long  DC  is  a  separate

15   company.

16       Q       And who owns Miller & Long DC?

17       A       Brett McMahon and John Paleologos are

18   the principles for Miller & Long DC.

19       Q       And does Miller & Long Company have

20   any ownership interest in Miller & Long DC?

21       A       I think the - well, the owners of

22   Miller & Long are the parents of the owners of

1  Miller & Long DC.

2           MR. KIERNAN:  Can I just clarify?  I

3  think his question was did Miller & Long Company

4  have an ownership interest in Miller & Long DC?

5           MR. GIR BORRAYO:  I don't know.

6           MR. SAINDON:  Okay, that's fine.

7           BY MR. SAINDON:

8       Q    What about Miller & Long Concrete?

9       A    Well, now, there's Miller & Long - the

10 name of the company officially is Miller & Long

11 Company, Inc.

12      Q    Right, that's the plaintiff here.

13      A    Yes.

14      Q    Is Miller & Long Concrete related to

15 Miller & Long Company?

16      A    There is no Miller & Long Concrete.

17      Q    Okay.

18      A    Miller & Long Company, Inc. is Miller

19 & Long Concrete.

20      Q    That's fine.  Thank you.  Does Miller

21 & Long Company have any subsidiaries?

22      A    To my knowledge, no.

1     Q     How many jobs is Miller & Long working

2     on right now in the District?

3     A     Can you clarify? Because for example,

4     The Wharf is considered one project, but it's

5     really not, so what do you mean by how many

6     projects?

7     Q     However you want to count it.  I mean,

8     if you want to count the wharf as one project,

9     that's fine.  You can tell me how many smaller

10    projects are counted within there.  That's fine

11    too.

12          MR. KIERNAN:  How about if you count

13    how many you track as separate jobs or something

14    like that?

15          MR. SAINDON:  Sure, that's fine.

16    Approximate numbers are fine.

17          MR. GIR BORRAYO:  I'd say more than

18    10.

19          MR. SAINDON:  More than 10, okay.

20          BY MR. SAINDON:

21    Q     And you said earlier at the wharf,

22    there may be some smaller projects included

1   there.  Does that include those, that number?

2        A    Yes.

3        Q    Okay, does Miller & Long have any

4   projects ongoing now in Maryland?

5        A    Yes.

6        Q    And how many there?

7        A    Three right now.

8        Q    And the same question for Virginia?

9        A    It's about eight.

10       Q    Is that split typical, that most

11  projects are in the District, the next most in

12  Virginia, and then -

13       A    No.

14       Q    No?

15       A    It varies.  We've had some projects

16  finish up in Maryland and Virginia.  It varies.

17       Q    Year to year.  Would you say the

18  number of jobs that Miller & Long are working on

19  now is consistent with its usual work load?

20       A    No.

21       Q    No, and why not?

22       A    It's slowed down.

1          Q    So Miller & Long would typically have

2     more projects going?

3          A    Correct.

4               MR. SAINDON:  I'm going to hand you

5     what I'd like the reporter to mark as Number 12

6     or 13.  You are numbering -

7               MR. KIERNAN:  Is this Exhibit 1?

8               MR. SAINDON:  Yes.

9               MR. KIERNAN:  Can we just use 1 or do

10    you care?

11              MR. SAINDON:  No, that's fine.

12              MR. KIERNAN:  Yeah, well, I'm just

13    going to use 1, but I can show him my copy.

14              MR. SAINDON:  Okay, we'll go back to

15    Exhibit 1.  Never mind.

16              COURT REPORTER:  Do you want me to

17    mark it again or -

18              MR. SAINDON:  Yeah, mark it number one

19    again and we'll just use the same one.  We'll

20    just have an extra.

21              MR. KIERNAN:  Yeah, that's fine, just

22    that way we don't have to - that's fine.  I'll

1   just show him my copy.

2                  (Whereupon, the above-referred to

3   document was marked as Exhibit No. 1 for

4   identification.)

5                  BY MR. SAINDON:

6        Q     Can you take a look at that, Mr. Gir,

7   and let me know if you have seen that before?

8        A     Yes, I have.

9        Q     And this is the Notice of Deposition

10  to plaintiffs Miller & Long, and Metropolitan

11  Washington Chapter, and Associated Builders and

12  Contractors in this case.  Is that right?

13       A     Yes.

14       Q     So you would have been designated to

15  testify as to certain of these topics, is that

16  right?

17       A     Yes.

18       Q     You are here for topics - well, why

19  don't you tell me what topics you are here to

20  testify on?

21                  MR. KIERNAN:  Well, maybe I should

22  since he's - since he has a copy.  Yeah, one,

1    two, and six, but not including the portion about

2    financial information (revenue, profits, losses).

3                    We have, on that one part of item six,

4    we have objected to producing a witness.  Mr. Gir

5    is not prepared to be that witness, and he's not

6    being designated for that.  Now, obviously the

7    matter is currently before the Judge on resolving

8    that.

9                    MR. SAINDON:  Okay, thank you.

10                   BY MR. SAINDON:

11        Q      So aside from that, you are here to

12   testify about all information known to Miller &

13   Long on those other topics, is that right?

14        A      Yes, sir.

15        Q      Okay, and you're aware that your

16   testimony will be binding on Miller & Long on

17   those topics, is that right?

18        A      Yes.

19        Q      When did you first find out you would

20   be designated to testify on behalf of Miller &

21   Long?

22        A      A few months ago.

1        Q      Did you have any involvement in this

2    case before you were designated?

3        A      What do you mean?

4        Q      Did you, for instance, help respond to

5    the written discovery request?

6        A      Yes.

7        Q      Did you do anything else?  Did you

8    help gather documents for production to the

9    District?

10        A      Yes.

11        Q      What did you do to get ready for the

12    deposition today?

13        A      Not much, just reviewed the previous

14    answers.

15        Q      The previous answers, the discovery

16    answers -

17        A      Yes.

18        Q      - that Miller & Long provided?

19        A      Mm-hmm.

20        Q      Okay, aside from Counsel, did you

21    speak to anybody about this deposition?

22        A      No.

1      Q      Did you look at Miller & Long's

2      financial documents?

3              (No audible response.)

4      Q      Did you talk to anybody at Miller &

5      Long about this deposition?

6      A      Just the CFO.

7      Q      The CFO.

8      A      With Counsel.

9      Q      Okay, and that's Mister -

10     A      Mr. Burlas.

11     Q      Burlas, okay, could you spell that for

12     our reporter?

13     A      B-U-R-L-A-S.

14     Q      Did you talk to anybody else at Miller

15     & Long?

16             (No audible response.)

17             MR. SAINDON:  We are at number two.

18             (Whereupon, the above-referred to

19     document was marked as Exhibit No. 2 for

20     identification.)

21             MR. SAINDON:  I'm going to have you

22     look at this document number two.  And again,

1    same question, just tell me if you've seen this

2    before.

3              MR. KIERNAN:  Mine has some notes that

4    I wrote on it.

5              MR. SAINDON:  That's fine.

6              MR. KIERNAN:  I can give him the clean

7    copy if you want.

8              MR. SAINDON:  All right, thank you.

9              BY MR. SAINDON:

10        Q    Would you look at that, Mr. Gir, and

11   tell me if you've seen that before?

12        A    Yes.

13        Q    And these are - this document is

14   plaintiffs' responses and objections to

15   defendants' first set of interrogatories.  Is

16   that right?

17        A    Yes.

18        Q    If you'll turn to page five of that

19   document for me, please?  Interrogatory number

20   six, it says, "State all facts and circumstances

21   supporting a contention of increased costs as

22   alleged in paragraph 16 of the admitted

1     complaint."  Do you see that?

2            A     Yes, sir.

3            Q     Now,  plaintiffs'  response  says,

4     "Miller & Long spends roughly 30 percent of its

5     human  resources  efforts  to  meet  the  unique

6     requirements of the District's First Source Act,"

7     right?  Do you see that?

8            A     Yes.

9            Q     How many people at Miller & Long work

10    on First Source Act compliance?

11           A     Including myself?

12           Q     Yes.

13           A     There's four.

14           Q     Are those all full-time employees?

15           A     Yes.

16           Q     Do  you  have  any  part-time  employees

17    working on the First Source Act?

18           A     No.

19           Q     Okay, I think we covered a little of

20    this  earlier.   Miller  &  Long  has  the  most

21    projects in D.C., second most in Virginia, and

22    third in Maryland.  Was that about the same last

1    year?

2         A    No,  there  were  more  projects  in

3    Maryland and more in Virginia.

4         Q    More than this year or more than in

5    the District?

6         A    I don't remember.

7         Q    So, if you could flip over to page six

8    at the top, it says, "In the last four years,

9    Miller & Long hired 653 District residents and

10   lost 531 District residents."  Do you see that?

11        A    Yes.

12        Q    What  does  that  mean,  that  Miller  &

13   Long lost them?

14        A    Turn over.

15        Q    Turn over, and what does that mean?

16        A    They quit, were fired, moved out of

17   the District.

18        Q    Are any of those 531 re-employed by

19   Miller & Long?

20        A    Yes.

21        Q    And do you know how many?

22        A    No, I don't.

1     Q   Did some of those, that number, start

2  as District residents, then moved out of the

3  District?

4     A   What do you mean?

5     Q   You said you had lost some, some fired

6  - some were fired and some quit. Some moved out

7  of the District. Okay, do you know how many of

8  those might have moved out of the District?

9     A   I don't know the exact number.

10    Q   Okay, but you track that number?

11    A   Roughly.

12    Q   Roughly, okay. Now, at the bottom of

13  page six, right at the bottom, it says, "Another

14  increased cost to companies is the decision not

15  to bid on work because of a shortage of qualified

16  District resident employees." Do you see that?

17    A   Yes, sir.

18    Q   Has Miller & Long decided not to bid

19  on projects in the District for this reason?

20    A   Decide to bid on First Source projects

21  or - I don't understand your question.

22    Q   Any project, and then we'll go to

1    First Source project.

2           A     Repeat the question again.

3           Q     Sure.

4           A     I don't want to give you -

5           Q     No   problem.    It   says,   "Another

6    increased cost to companies is the decision not

7    to bid on work because of a shortage of qualified

8    District resident employees."  Has Miller & Long

9    decided not to bid on projects for that reason?

10          A     There  are  certain  projects  that  we

11   don't bid on because we don't have the people to

12   meet that requirement.

13          Q     Okay,  which  projects,  if  you  can

14   remember?

15          A     I don't know which projects because

16   that's not my job, but I do know that there are

17   certain projects we don't bid on.

18          Q     Do  you  remember  when  Miller  &  Long

19   first - when you first became aware there was a

20   project that Miller & Long didn't bid on because

21   of a lack of qualified District residents?

22          A     Was that a question?

1        Q     Yes.

2        A     Sorry.

3        Q     That's all right.  You said there are

4   projects  that  Miller  &  Long  doesn't  bid  on

5   because they can't find enough qualified District

6   residents.  Is that right?

7        A     Mm-hmm.

8        Q     And I'm asking when was the first time

9   you had heard that that happened?

10        A     I would say a couple of years ago.

11        Q     Do you know how many projects in total

12   Miller & Long has decided not to bid on for that

13   reason?

14        A     No.

15        Q     But  presumably  somebody  in  your

16   company tracks that information?

17        A     Yes.

18        Q     All right, if you could look over to

19   page seven of that document?  It's kind of the

20   last - I believe it's the last sentence of the

21   first  paragraph.   It  says, "And  should  the

22   building industry economy falter and layoffs were

1    required, companies would choose to lay off

2    people who do not live in the District in order

3    to maximize our opportunities to work in the

4    District."  Do you see that?

5         A    Yes.

6         Q    What does that mean?

7         A    If the First Source requirement that

8    mandates certain jobs percentage-wise, certain

9    jobs, you know, the certain percentage of the

10   hours performed, have to be performed by District

11   of Columbia residents.  If that's the only work

12   that's available, we wouldn't be able to do all

13   of that work.

14        And so we would be forced to not have work,

15   and, you know, if this - if people who can do the

16   work, but they don't live in the District, how

17   are they going to be able to keep employed?

18        Q    Okay, and that's for First Source Act

19   covered projects?

20        A    Yes.

21        Q    Would a reason to do that would be to

22   stay - to lay off the non-District residents,

1    would be to stay eligible for District projects?

2         A    If the requirement hasn't changed.

3         Q    Has Miller & Long done that and laid

4    off non-District residents?

5         A    What do you mean?

6         Q    For that reason laid off non-District

7    residents so that they could qualify for First

8    Source Act projects?

9         A    We hold onto District residents so we

10   can comply with the law.

11        Q    Okay, all right, if you'll flip to

12   page eight of that document, interrogatory number

13   nine asked for, among other things, "the names of

14   company that do not oppose entering into

15   employment agreements," and no companies that met

16   that description were listed.  Do you know of any

17   such companies that do that?

18        A    That -

19        Q    Do not oppose entering into employment

20   agreements with the District.

21        A    I know of companies that don't take

22   all of the good faith efforts that Miller & Long

1    takes, but I can't say that they - you know, I

2    don't know if they comply with the law or not.

3        Q     Do you know what companies or plants

4    they're referring to in that response?  Well, in

5    the -

6              MR. KIERNAN:  Can he read - why don't

7    you read the question?

8              MR. SAINDON:  Sure, I'm sorry.

9              MR. KIERNAN:  Then answer.

10             MR.  SAINDON:     Interrogatory  number

11   nine.

12             MR.   GIR   BORRAYO:     What   was   the

13   question again?

14             BY MR. SAINDON:

15       Q     Sure,  the  plaintiff  said  there  are

16   companies that do not try to comply with the Act,

17   and I'm saying do you know what companies those

18   are?

19       A     Well,  they're  the  competitors  for

20   Miller & Long.  I can't certainly list those, but

21   I can't say for sure if - I don't know if they -

22   what they do or don't do to comply with the Act.

1      Q     Okay, so you're - was plaintiffs'
2  answer here more of a hypothetical that they're
3  assuming that there are companies out there that
4  don't comply with the Act?

5      A     I don't know.

6      Q     Do you know of any companies that
7  voluntarily enter employment agreements that link
8  hiring to residency?

9      A     What do you mean?

10     Q     You said you also - in the amended
11 complaint, you said that Miller & Long is at a
12 competitive disadvantage because there are some
13 companies that don't oppose voluntarily entering
14 into employment agreements.  Do you know what
15 companies those are?

16     A     Companies that oppose entering -

17     Q     That do not oppose, that will
18 willingly enter an employment agreement.

19     A     I don't know of - I don't know - I
20 can't - I don't know what other companies do.

21     Q     Okay.

22     A     I only know what we do.

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433          WASHINGTON, D.C. 20005-3701          www.nealrgross.com

1    Q    Right, right, well, this answer talked
2  about other companies, and I'm trying to figure
3  out if you know what other companies that the
4  plaintiff, Miller & Long, was referring to.

5    A    I don't know.

6    Q    Okay, Mr. Gir, are you familiar with
7  the federal Davis-Bacon Act?

8    A    Yes.

9    Q    What is that?

10    A    Scale wages.  It's projects that are
11  done   that   the   Government   imposes   paying
12  prevailing wages for certain classes of laborers
13  and mechanics or journeymen.

14    Q    Do you know how often a company has to
15  report data under that law?

16    A    What do you mean by report data?  What
17  kind of data?

18    Q    The   prevailing   wage   data   and   the
19  employment data.   They have to report to the
20  federal Government some data?

21    A    Oh, yeah, do you mean like payroll
22  data?

1       Q     Yes.

2       A     Well, I don't want to put words in

3   your mouth.

4       Q     No, that's what I'm asking, yes.

5       A     Well, on Davis-Bacon projects, you

6   have to do certified payroll.  That's every two

7   weeks.

8       Q     Every two weeks you report that data

9   to the federal Government, okay.  Does Miller &

10  Long ever have projects that are subject to the

11  Davis-Bacon Act requirements?

12      A     Yes.

13      Q     How often would you say?

14      A     I don't know how often.  We are a

15  federal contractor, so we do do Davis-Bacon work

16  from time to time.

17      Q     Would you say it's half your projects?

18      A     No.

19      Q     No, maybe a quarter?

20      A     I don't know the percentage.

21      Q     Okay, less than half?

22      A     I know we did one about a year ago.

1          Q     Okay, all right, if you'll look at

2     page 10 of Exhibit 2 again, please?  It says, the

3     second line down, it says, "It appears that the

4     District  has  not  actively  enforced  the

5     requirements of the amended act."  Do you see

6     that?

7          A     Where?

8          Q     The  second  line,  "It  appears  the

9     District  has  not  actively  enforced  the

10    requirements of the amended act."  Do you see

11    that?

12         A     Mm-hmm.

13         Q     Is that still true?

14         A     The appearance?

15         Q     Yes.

16         A     In my opinion, yes.

17         Q     Then later in that response it says,

18    "Plaintiffs say that the District has found ways

19    to grandfather in projects to the old act or to

20    create exceptions or exclusions for projects that

21    would otherwise be subject to the First Source

22    Act."  Has Miller & Long ever been grandfathered

1    in that sense?

2         A     To my knowledge, no.

3         Q     Do you know if Miller & Long has ever

4    been granted any exceptions or exclusions?

5         A     To my knowledge, no.

6         Q     Has Miller & Long ever been fined for

7    failure to comply with the First Source Act?

8         A     I believe we have.

9         Q     You have.  Do you know how much the

10   fine was?

11        A     I don't remember.  It was years ago.

12        Q     Were you still there when it happened?

13        A     I was there, but in my capacity at the

14   time, I wasn't - you know, I was way, way at the

15   bottom.

16        Q     Further down the food chain, okay.

17        A     Yes.

18        Q     Do you know if Miller & Long has ever

19   requested a waiver from the First Source Act?

20        A     We have.

21        Q     You haven't?

22        A     We have.

1       Q     You have, okay, and which projects?

2       A      There was never a specific project.

3  I have requested on more than one occasion and

4  asked how a waiver could be granted.

5       Q      But what were the results of those

6  requests?

7       A     I was told it could not be granted.

8       Q     And how did you ask for the waiver

9  request?

10       A      There   is   a   provision   in   the

11  regulations that says that if an employer enters

12  into a workforce development agreement, that a

13  waiver could be obtained.   I asked what the

14  process was, and the response I was given, "Well,

15  no one has ever asked for it."

16       Q     Do you remember who you asked?

17       A     I spoke to DeCarlo Washington.

18       Q     And that's a District employee?

19       A     Yes.

20       Q     And he works at -

21       A     He's the one who does the First Source

22  -

1      Q    Okay.

2      A    - compliance.

3      Q    Do you remember was this by phone?

4  Did you write to him?

5      A    In person.

6      Q    In person, okay, and that's what he

7  told you, that no one's ever asked for a waiver

8  before.  Do you remember when this happened?

9      A    A couple of years ago.

10     Q    One more question on this exhibit if

11 you'll take a look again on page 10,

12 interrogatory number 14, the District asked for,

13 "Which of plaintiffs' members have not bid on

14 jobs," as that phrase was used in the amended

15 complaint.

16          So the plaintiffs' listed Miller &

17 Long as you can see from 10 going over to 11.  It

18 says, "In May of 2016, Miller & Long declined to

19 bid on the WASA F1 block cinema job."  Are there

20 any other projects on which Miller & Long

21 declined to bid?

22     A    Yes.

1        Q      Which ones?

2        A      I don't know.

3        Q      You don't know, but there have been

4    some?

5        A      Yes.

6        Q      How many within the last year?

7        A      I don't know.

8        Q      And you also state in that answer,

9    "Miller & Long would be unable to perform

10   simultaneously two or more projects for which the

11   First Source requirements apply." Is that right?

12       A      That's correct.

13       Q      Is that still true?

14       A      Yes.

15       Q      Is Miller & Long unable to perform

16   simultaneously two District projects right now?

17       A      Were projects - well, can you clarify

18   which types of projects?

19       Q      Well, that's what I'd like to ask you

20   because earlier, in your earlier answer, you said

21   there were, what, a number of projects going in

22   the District now, and that's why I'm confused as

1    it says you can't do two simultaneously, but

2    there are, like, 10 going, so that's what I'm

3    trying to understand.

4          A     The District First Source law has a

5    threshold.

6          Q     Yes.

7          A     And over a certain threshold of the

8    value of the project, it creates a requirement

9    where a percentage of the hours of the work

10   performed have to be performed by District

11   residents.

12         Q     Right.

13         A     Those are the projects we're unable to

14   perform.   So we can do a First Source project

15   that has a hiring requirement, but the ones that

16   have the requirement where you have to meet

17   certain percentages, that you're forced to meet

18   certain percentages, there aren't enough skilled

19   people to meet those percentages.

20              MR. SAINDON:  All right, Mr. Gir, I'm

21   going to give you what's been marked number

22   three.

1          (Whereupon, the above-referred to

2    document was marked as Exhibit No. 3 for

3    identification.)

4          BY MR. SAINDON:

5     Q    And the same thing, I'll ask you to

6    take a look at it and let me know if you've seen

7    it before.   I think it's the same thing, but

8    please take a look and let me know if you've seen

9    that before.

10     A    Yes, I have.

11     Q    Okay, now if you'll flip to page two,

12    request number four, it says, "At the beginning

13    of 2010, DOES developed an online system to allow

14    qualifying companies to register and provide the

15    data and information required by the First Source

16    Act."   Do you see that?

17     A    Yes.

18     Q    Are you familiar with that online

19    system?

20     A    Yes.

21     Q    Okay, and do you use it yourself?

22     A    People on my staff have used it.

1        Q    And if you'll flip over to the next

2    page, request number five, it says, "The online

3    system   referenced   above   reduced   the

4    administrative burden on qualifying companies as

5    compared to when the data and information was

6    required to be submitted on paper," and the

7    response was denied.  Do you see that?

8        A    Yes.

9        Q    Why did plaintiffs deny that?

10       A    It's actually more burdensome than the

11   paper reporting.

12       Q    Okay, and how?

13       A    So under the old reporting, you just,

14   you compiled your data and you submitted it.  The

15   new way, you have to submit everything through a

16   portal, each person that works on a particular

17   job, and each name and social security number has

18   to be cleared by the District, and if you

19   misspell the name or you mistype a social

20   security number, the whole thing gets rejected

21   out.

22                 And we run a weekly payroll, so you

1   only have 10 days to get the report done.  If you

2   have to submit every name to the District before

3   you  can  submit  the  report,  and  they  have  to

4   approve  it,  and  you  don't  get  the  names  back,

5   then  you  run  into  being  late  with  the  reporting,

6   so I have to have more people.  Actually, I have

7   to  have  two  people  sometimes  crunch  and  get  this

8   stuff  out  to  them  to  get  the  names  approved  back

9   before  you  can  submit  the  report  online.

10          Q      And  how  did  the  paper  system  work  in

11   comparison?

12          A      You  save  a  few  days  of  work.

13          Q      With  the  paper  system?

14          A      Yes,  but  the  paper  system  didn't  work

15   for  the  person  who  was  in  the  D.C.  office  who  has

16   to  read  all  of  these  reports.

17          Q      You're  assuming  a  DOES  employee?

18          A      Mm-hmm.

19          MR.  SAINDON:    Is  that  what  you  mean?

20   Okay,  and  I  think  we  can  go  to  Exhibit  number  12.

21          (Whereupon,   the   above-referred   to

22   document   was   marked   as   Exhibit   No.   12   for

1  identification.)

2          MR. SAINDON:  Same thing, I'll ask you

3  to take a look at it and let me know if you've

4  seen it before?

5          COURT REPORTER:  You said 12?

6          MR. SAINDON:  Yes.

7          BY MR. SAINDON:

8      Q    Do you recognize that document?

9      A    I recognize the letterhead.  I don't

10  recognize the document.

11     Q    Okay, and marked on the bottom ML-001.

12  So you haven't seen this before?

13     A    No.

14         MR. SAINDON:  Okay, let's go to the

15  last exhibit.  This will be Exhibit 13.

16         (Whereupon, the above-referred to

17  document was marked as Exhibit No. 13 for

18  identification.)

19         BY MR. SAINDON:

20     Q    There's something on the back as well.

21  If you'll take a look at that and let me know if

22  you recognize this?

1      A     Yes.

2      Q     Okay, and what is this?

3      A     This is a list of First Source

4  projects that have been performed by Miller &

5  Long in the last 10 years or so.

6      Q     It says, "First Source jobs since

7  2005," at the top.  Do you see that?

8      A     Yes.

9      Q     It's marked ML-002, and on the other

10  side, ML-003.  Is this all Miller & Long jobs

11  subject to the First Source Act since 2005?

12      A     No, well, this is all of the jobs that

13  Miller & Long worked on in this time, but it's

14  not all of the First Source jobs since 2005.

15      Q     Right, all of those that Miller & Long

16  worked on?

17      A     Yes.

18      Q     Okay, and are you aware is this the

19  complete list?  Are there others that are not on

20  this list?

21      A     No, to the best of my knowledge, this

22  is it.

1               MR. SAINDON:   I think that's it, Mr.

2     Gir.  If you'll give me about five minutes and go

3     off  the  record?   Take  a  little  break  and  come

4     back, and I think we're just about done.

5               (Whereupon, the above-entitled matter

6     went off the record at 10:43 a.m. and resumed at

7     10:51 a.m.)

8               MR.  SAINDON:   Just  a  few  follow-up

9     questions, Mr. Gir.

10              BY MR. SAINDON:

11         Q    We talked about different projects in

12    the District, Maryland, and Virginia.  Are they

13    all about the same size?

14         A    No project is the same.  I'm sorry.

15         Q    That's okay.  What are the bigger ones

16    that are currently going on in the District?

17         A    The Wharf is one large one.

18         Q    Do  you  know  how  many  cranes  are

19    involved in that project?

20         A    Six.

21         Q    Six.  Are any projects of similar size

22    to that one that Miller & Long are undertaking in

1  Virginia?

2      A     Yes.

3      Q     Which ones?

4      A     Capital One.

5      Q     And what is that?

6      A     Capital One headquarters.

7      Q     Okay, and where is that happening?

8      A     McLean.

9      Q     You also testified, Mr. Gir, when I

10  asked if Miller & Long had ever been granted an

11  exception or exclusion for the First Source Act,

12  you said, "To my knowledge, no."  Do you remember

13  that?

14     A     Yes.

15     Q     Would that be part of your job duties

16  to know that?

17     A     Yes, but I don't know what happened

18  prior.  I mean, I wasn't always the head of HR.

19     Q     Sure.

20     A     So things that happened prior to when

21  I became the head of HR, I really don't know.

22     Q     Okay,  and  tell  me  again  when  you

1    became the head of HR?

2         A    I've been the head of HR now for about

3    six years.

4         Q    Okay, you testified earlier, you said

5    there are, including you, four people full-time

6    working on First Source Act compliance.  Is that

7    right?

8         A    Yes.

9         Q    What  percentage  of  those  peoples'

10   duties are First Source Act compliance?

11        A    More than half.

12        Q    Each person works more than half on

13   First Source?

14        A    In some capacity, yes.

15             MR. SAINDON:  Okay, and that's all I

16   have.

17             MR.  KIERNAN:   I  have  a  couple  of

18   follow ups, if I could.

19                   CROSS EXAMINATION

20             BY MR. KIERNAN:

21        Q    On the - in response to Mr. Saindon's

22   questions, you were asked about whether Miller &

1      Long had requested a waiver, and you discussed in

2      conversation with the DeCarlo Washington at DOES,

3      and  I  just  want  to  clarify  why  were  you

4      requesting a waiver at that point?

5           A    We  have  entered  into  a  workforce

6      development  agreement  each  year  for  the  last

7      three  years,  and  I  thought  that  that  was  a

8      provision that qualified for a waiver from having

9      to do the reporting.

10          Q    But  was  your  conversation  with  Mr.

11     Washington in relation to a particular project or

12     something else?

13          A    It was in general.  How is this - in

14     other words, I asked, "How can a company get a

15     waiver?"

16          Q    And what was his response?

17          A    No one had ever asked.

18          Q    And  to  your  understanding,  is  an

19     advance waiver available under the amended First

20     Source Act?

21          A    No.

22          Q    Is  there  any  form  of  waiver  that's

47

1     available under the statute, to your knowledge?

2          A    My understanding is if after the

3     project is over, and if you don't meet your

4     requirement, then maybe a waiver is given.

5          Q    Do you still have Exhibit 12 in front

6     of you?

7          A    Yes, sir.

8          Q    The one that says, "ML-001."    In

9     response to Counsel's questions, you said you had

10    not seen this document before, but let me direct

11    your attention to paragraph three at the top.

12    First it says, "Should the provisions of D.C.

13    Code," and there are certain sections there,

14    "apply, then this proposal is withdrawn."

15               And I'll represent I don't think

16    there'll be dispute about it, but the sections

17    referred to there are under the amended First

18    Source Act.  And my question is are you familiar

19    with whether there is a policy at Miller & Long

20    Company as to not submitting a proposal in which

21    the amended First Source Act would apply?

22          A    That's correct.

1    Q    And how are you familiar with that

2    policy?

3    A    If the new provisions apply to a First

4    Source job, we will not bid on the job.

5    Q    And this particular document says,

6    "Miller & Long DC, Inc." on it.  Does Miller &

7    Long DC have a similar policy?

8    A    Yes.

9    Q    If you could go back to Exhibit 2,

10   which was the interrogatory responses, on page

11   eight, you were being asked about interrogatory

12   number nine, and I - interrogatory number nine

13   refers to a specific paragraph in the amended

14   complaint.  So first let me ask you, have you

15   ever read the amended complaint in this case?

16   I'm holding it in my hand.

17   A    Yes.

18   Q    Okay, let me, if I may, I'm just going

19   to put it in front of you - I'm not going to mark

20   it, but I'm going to put in front of you the

21   paragraph that's referenced in the interrogatory

22   which is 18, and just ask you to read that.

1    Okay, have you read that?

2         A    Yes, I have.

3         Q    And also in connection with answering

4    the question, I think the term, "employment

5    agreements," is defined in paragraph 12 of the

6    complaint.  That's also used in paragraph 18.

7         A    Yes.

8         Q    Okay, so with that as a background,

9    let me direct your attention then back to

10   interrogatory number nine.  You were asked about

11   the competitive disadvantage, and Counsel asked

12   whether there were construction companies that do

13   not - that to your knowledge, or Miller & Long's

14   knowledge, do not oppose entering into employment

15   agreements that link hiring to residency.  Are

16   there any such companies that you know of?

17        A    That willingly - I don't understand

18   the question, sorry.

19        Q    Okay, Counsel asked - well, let me do

20   it this way.  Counsel - let me go back to

21   interrogatory number nine.  Paragraph 18 of the

22   amended complaint refers to construction - refers

1    to, "a competitive disadvantage in comparison to

2    construction companies that do not try to comply

3    with the act, that do not oppose entering into

4    employment    agreements    that    link    hiring    to

5    residency, or they're able to secure waivers or

6    exceptions."   So let me take this in sequence.

7    Are there construction companies that, to your

8    observation, do not try to comply with the act?

9          A     Yes.

10         Q     And what does that mean to say, "not

11    try to comply with the act"?

12         A     They don't take the good faith steps

13    that we take.   We go to job fairs.   We have

14    relationships with agencies like CSOSA, halfway

15    houses.   You know, we have relationships with the

16    business development agents at DOES.   We do work

17    hiring    events,    and    we    don't    see    other

18    construction companies at these job fairs.   You

19    know, the people who we have relationships tell

20    us, "Hey, well, you're the only one who does

21    these things."

22         Q     There's in - again, paragraph 18 of

1    the amended complaint refers to companies that do

2    not oppose entering into employment agreements

3    that link hiring to residency.   Does Miller &

4    Long as a company, is it opposed philosophically,

5    if  you  will,  to  entering  into  employment

6    agreements that link hiring to residency?

7          A    We are, and as an HR professional, you

8    know, it's contrary to what, you know, the way we

9    do our jobs.  We try and hire the most qualified

10   people, and, you know, to be forced to kind of

11   not  hire  the  qualified  person  because  we  have

12   this residency requirement doesn't sit well.

13         Q    And  are  there  companies  to  your

14   knowledge that do not share that view, or who do

15   not  oppose  entering  into  employment  agreements

16   that link hiring to residency?

17         A    There probably are.

18         Q    Lastly, I wasn't going to mark them.

19   If you weren't going to mark them, I wasn't going

20   to mark them, but I was going to just refer to

21   the exhibits or the documents that were produced

22   by Miller & Long with the Bates stamps starting

1    at about ML-006 and going forward that refer to

2    hiring and termination logs, and have lists of

3    people, and dates of employment and such.   Just

4    to confirm, were those documents that were

5    prepared by you?

6         A    They were prepared by my staff.

7         Q    And did you review them in connection

8    with this case?

9         A    Yes.

10             MR.  KIERNAN:   And  I  have  nothing

11   further.   Thanks.

12             MR.  SAINDON:   Just  a  couple  more

13   questions here.

14             MR. GIR BORRAYO:  Sure.

15                  REDIRECT EXAMINIATION

16             BY MR. SAINDON:

17        Q    You talked about Exhibit 12.   I'm

18   going to ask you some follow-up questions.   That

19   was that document right there.   Do you know when

20   Miller & Long put that into proposals, that line?

21        A    I don't know.

22        Q    Do you know when Miller & Long adopted

1    this policy on bidding on jobs to which the

2    amended First Source Act applies?

3         A    Probably a couple of years ago,

4    probably more than three years.

5         Q    You talked - you answered some of Mr.

6    Kiernan's questions about certain companies that

7    don't try to comply with the First Source Act and

8    put in the good faith efforts that Miller & Long

9    does.  Which companies were you referring to?

10        A    There are companies that sometimes do

11   First Source work and they don't have an approved

12   apprenticeship program.

13        Q    I understand general what the

14   description's going to be, but I want to know

15   what specific companies you're referring to by

16   name.

17        A    Miller & Long competitors, from

18   Schuster, Belfast Alley.

19        Q    Are those the only two?

20        A    There are probably more.  I don't know

21   all of the competitors.

22        Q    Okay, then how do you know they don't

1  comply or they don't put out the good faith

2  efforts that Miller & Long does?

3       A    We - I don't.

4       Q    You also said that there are companies

5  that do not share Miller & Long's views regarding

6  residency and hiring.  Which companies were you

7  referring to there?

8       A    I can't say for sure which companies

9  do or don't.

10      Q    But you know there are companies out

11  there that don't share?

12      A    There probably are.

13      Q    Can you think of any other companies

14  that don't try to comply with the Act in addition

15  to, I think you said, Belfast and Schuster, that

16  you know of?

17      A    Yeah, those are - there are other

18  concrete companies in the area, obviously.

19           MR. SAINDON:  All right, that's all I

20  have.  Thank you.

21           (Whereupon, the above-entitled matter

22  went off the record at 11:04 a.m.)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, | |
| Plaintiffs, | Civil Action No. 12- 00853 (EGS) |
| v. | |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

NOTICE OF DEPOSITION OF PLAINTIFFS MILLER & LONG COMPANY, INC.
AND METROPOLITAN CHAPTER, ASSOCIATED BUILDERS AND
<u>CONTRACTORS, INC.</u>

TO:    Miller & Long Company, Inc.
Metropolitan Washington Chapter, Associated Builders & Contractors, Inc.
c/o Paul Kiernan, Esq.
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006
paul.kiernan@hklaw.com

Pursuant to Fed. R. Civ. P. 30(b)(6), the District of Columbia will take the

deposition of plaintiff Miller & Long Company, Inc. ("Miller & Long") and plaintiff

Metropolitan Chapter, Associated Builders and Contractors, Inc. ("ABC Metro"), at

the offices of defendant's counsel specified below, on October 21, 2016, beginning at

10:00 A.M. (for ABC Metro), and on October 25, 2016, beginning at 10:00 A.M. (for

Miller & Long), continuing until completed, including adjournments to such times

and places as may be required.



1

The depositions will occur before an officer or other person duly authorized to administer oaths, and will be recorded by audio and stenographic means.

In accordance with Rule 30(b)(6), plaintiff Miller & Long and plaintiff ABC Metro, are each required to designate and fully prepare one or more officers, directors, managing agents or other persons with the most knowledge concerning the following designated matters, or other persons who consent to testify on their respective behalves, and whom plaintiffs will fully prepare to testify regarding the following designated matters and such information that is known or reasonably available to those plaintiffs:

## SUBJECTS OF DEPOSITION

1. Plaintiffs' Responses and Objections to the Defendant's First Set of Interrogatories and Plaintiffs' Responses and Objections to Defendant's First Set of Requests for Admission, and the efforts to respond to them.

2. Plaintiff Miller & Long's efforts to comply with the First Source Act and costs associated with those efforts.

3. Plaintiff ABC Metro's members' efforts to comply with the First Source Act and costs associated with those efforts.

4. Plaintiff ABC Metro's members' efforts to obtain a waiver from the requirements of the First Source Act.

5. Plaintiff ABC Metro's members who decided to "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint.

6. Plaintiff Miller & Long's operations over the last five years, including financial information (revenue, profits, losses), projects in the District (including those covered by the First Source Act), employee hiring and firing, and corporate structure.

DATE: October 12, 2016.          Respectfully submitted,

                                 KARL A. RACINE
                                 Attorney General for the District of Columbia

                                 ELIZABETH SARAH GERE
                                 Deputy Attorney General
                                 Public Interest Division

                                 /s/ Toni Michelle Jackson
                                 TONI MICHELLE JACKSON
                                 D.C. Bar No. 453765
                                 Chief, Equity Section

                                 /s/ Andrew J. Saindon
                                 ANDREW J. SAINDON, D.C. Bar No. 456987
                                 Senior Assistant Attorney General
                                 441 Fourth Street, N.W., Suite 600 South
                                 Washington, D.C. 20001
                                 Telephone: (202) 724-6643
                                 Email: andy.saindon@dc.gov

## CERTIFICATE OF SERVICE

I certify that, on October 12, 2016, a copy of this Notice was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW

3

Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Andrew J. Saindon
ANDREW J. SAINDON
Senior Assistant Attorney General

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al., )<br><br>Plaintiffs )<br>v.<br><br>DISTRICT OF COLUMBIA, )<br><br>Defendant. ) | No. 12-CV-00853 (EGS) |

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Request for Admissions, as follows:

### GENERAL OBJECTIONS

1.      Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.      Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

---

[1]      Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



EXHIBIT
3

3.      In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.  By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## REQUESTS FOR ADMISSIONS

**REQUEST NO. 1:**  No plaintiff has been fined for a violation of the First Source Act.

**Response:**  Admit.

**REQUEST NO. 2:**  No member of plaintiff MWC has been fined for a violation of the First Source Act.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of this request.

**REQUEST NO. 3:**  No member of plaintiff MWC who requested a waiver under the First Source Act has been denied a waiver.

**Response:**  Plaintiffs are without information sufficient to form a belief as to the truth of this request.

**REQUEST NO. 4:**  Beginning in 2010, DOES developed an online system to allow qualifying companies to register and provide the data and information required by the First Source Act.

**Response:**  Admit.

2

**REQUEST NO. 5:**   The online system referenced in Request for Admission No. 4 reduced the administrative burden on qualifying companies, as compared to when the data and information was required to be submitted on paper.

**Response:**  Denied.


**REQUEST NO. 6:**   The online system referenced in Request for Admission No. 4 is easier and less time consuming, as compared to the previous, paper reporting requirements.

**Response:**  Denied.


Dated: June 27, 2016                        Respectfully submitted,

                                            /s/ Paul J. Kiernan
                                            Paul J. Kiernan (Bar #385627)
                                            Christine N. Walz (Bar # 996643)
                                            HOLLAND & KNIGHT, LLP
                                            800 17th Street, N.W., Suite 1100
                                            Washington, D.C. 20006
                                            (202) 663-7276 (phone)
                                            (202) 955-5564 (facsimile)
                                            Paul.Kiernan@hklaw.com (email)
                                            Christine.Walz@hklaw.com(email)

#46928422_v1

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the foregoing was served via email and first class mail, postage prepaid, on the following:

Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

METROPOLITAN WASHINGTON CHAPTER, )
ASSOCIATED BUILDERS AND )
CONTRACTORS, INC., et al., )
            )
           Plaintiffs )     No. 12-CV-00853 (EGS)
    v. )
            )
DISTRICT OF COLUMBIA, )
            )
           Defendant. )
            )

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

### GENERAL OBJECTIONS

1.     Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.     Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

3.     In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]     Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



By making their responses, Plaintiffs do not concede that the information requested is relevant to this action or is calculated to lead to the discovery of admissible evidence. Plaintiffs expressly reserve the right to object to further discovery into the subject matter of any of these requests, to the introduction into evidence of any response or portion thereof, and to supplement their responses should further investigation disclose responsive information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be called as an expert witness or your attorneys, having knowledge or information relating to the allegations set forth in the Amended Complaint, and describe that knowledge or information for each person identified.

**RESPONSE:** Mike Burlas, Chief Financial Officer of Miller & Long, has information about the impact of the First Source Act on business, including what steps the company has taken to comply with the Act regarding tracking of employees, bidding on work, assignment of tasks, recruiting and retention programs, and experience with the Act. Mr. Burlas has also served on the Board of ABC-Metro Washington and has information about how the members of ABC-Metro Washington have been affected by the Act. He is aware of the lobbying and educational efforts undertaken by ABC-Metro Washington and information received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for human resources and employee-training programs at the company. He has information about the hiring efforts and attrition rates involving District of Columbia residents employed by Miller & Long. He also has information about the steps Miller & Long takes to comply with the Act and the costs associated with those efforts. He can also testify about the specific work

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.

**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**    The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:**  Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:**  Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:**  Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are therefore not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live. And individuals who live in Maryland or Virginia are more susceptible to being laid off or let go in the event that work subject to First-Source requirements predominates in the company's job list.

**INTERROGATORY NO. 6**:  State all facts and circumstances supporting your contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:**  Taking Miller & Long as an example, the company spends roughly 30% of its human-resources efforts to meet the unique requirements of the District's First Source Act. That is, the human-resources personnel of the company spend time participating in job fairs and similar recruiting efforts; compiling and tracking unique employee information; preparing, submitting, and following up on reporting requirements—all for First Source requirements. Similar efforts are not required to recruit and manage employees resident in Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to $200,000 on just the cost to the company of the additional work of its human-resources department to deal with First Source obligations. And that cost does not include the costs of actually running job fairs or advertising for positions limited to District residents or conducting apprenticeship programs or paying wages to new employees. The apprenticeship requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act.  Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

6

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:** The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**: State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:** The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

8

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**:  State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:**  See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**: State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:**  Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**: State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:**       Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

9

Washington. The case was filed as the new Act was coming into effect, As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:**  By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:**  Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:**  Plaintiffs are not aware of any.

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June **24**, 2016.

Metropolitan Washington Chapter,
Associated Builders and Contractors, Inc.

By: _Debra D. Livingston_

#46959519_v1

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June 2̲4̲, 2016.

Miller & Long Co., Inc.

By: _M. Aul_____
    MICHAEL RULLAS, CFO

Dated: June 27, 2016                    Respectfully submitted,

                                        /s/ Paul J. Kiernan
                                        Paul J. Kiernan (Bar #385627)
                                        Christine N. Walz (Bar # 996643)
                                        HOLLAND & KNIGHT, LLP
                                        800 17th Street, N.W., Suite 1100
                                        Washington, D.C. 20006
                                        (202) 663-7276 (phone)
                                        (202) 955-5564 (facsimile)
                                        Paul.Kiernan@hklaw.com (email)
                                        Christine.Walz@hklaw.com(email)

### CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the

foregoing was served via email and first class mail, postage prepaid, on the following:

   Andrew J. Saindon
Toni Michelle Jackson
Senior Assistant Attorney General
441 Fourth Street, N.W.
Suite 600 South
Washington, D.C. 20001

                                        /s/ Paul J. Kiernan
                                        Paul J. Kiernan

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

METROPOLITAN WASHINGTON CHAPTER,   )
ASSOCIATED BUILDERS AND            )
CONTRACTORS, INC., et al.,         )
                              )
                Plaintiffs   )   No. 12-CV-00853 (EGS)
     v.                        )
                              )
DISTRICT OF COLUMBIA,              )
                              )
                Defendant.   )

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiffs[1] Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington"), Miller & Long Co., Inc., Emmett Morris, Jr., and Dairon Upshur reply to the District's First Set of Interrogatories, as follows:

## GENERAL OBJECTIONS

1.     Plaintiffs object to the discovery requests, including the definitions and instructions, to the extent they (a) contain requests that exceed the scope and requirements of the applicable federal and local rules and (b) purport to require discovery not provided for by these rules, including but not limited to discovery on subjects not at issue in this case.

2.     Plaintiffs object to the discovery requests to the extent they seek information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other rule of privilege or confidentiality provided by law.

3.     In responding to this discovery, Plaintiffs do not waive the foregoing general objections or the specific objections that are set forth in the responses to particular requests.

---

[1]     Hawkins Electrical Construction of Washington DC, LLC is withdrawing as a plaintiff.



EXHIBIT

2

By making their responses, Plaintiffs do not concede that the information requested is

relevant to this action or is calculated to lead to the discovery of admissible evidence.

Plaintiffs expressly reserve the right to object to further discovery into the subject matter of

any of these requests, to the introduction into evidence of any response or portion thereof,

and to supplement their responses should further investigation disclose responsive

information.

## INTERROGATORIES

**INTERROGATORY NO. 1**: Identify each person, other than a person intended to be
called as an expert witness or your attorneys, having knowledge or information relating to the
allegations set forth in the Amended Complaint, and describe that knowledge or information
for each person identified.

**RESPONSE:**  Mike Burlas, Chief Financial Officer of Miller & Long, has

information about the impact of the First Source Act on business, including what steps the

company has taken to comply with the Act regarding tracking of employees, bidding on work,

assignment of tasks, recruiting and retention programs, and experience with the Act. Mr.

Burlas has also served on the Board of ABC-Metro Washington and has information about

how the members of ABC-Metro Washington have been affected by the Act. He is aware of

the lobbying and educational efforts undertaken by ABC-Metro Washington and information

received from membership about the impact of the Act.

Otto Girr, Vice President for Human Resources at Miller & Long, is responsible for

human resources and employee-training programs at the company. He has information about

the hiring efforts and attrition rates involving District of Columbia residents employed by

Miller & Long. He also has information about the steps Miller & Long takes to comply with

the Act and the costs associated with those efforts. He can also testify about the specific work

situations involving Mr. Morris and Mr. Upshur, who are both employees of Miller & Long.

Mr. Morris is employed by Miller & Long as a qualified Carpenter Foreman. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Mr. Upshur is employed by Miller & Long as a Construction Safety Manager. He has information about his work history and qualifications. He can testify about situations and bids in which he is not allowed to participate because he is not a District of Columbia resident.

Various District of Columbia officials have information about the First Source Act program, how the First Source list is compiled, how the law is enforced, how and to whom waivers or exemptions are granted, and the number of projects affected by the law. Included among these officials are the Director of the Department of Employment Services; Drew Hubbard, formerly of DOES; the workforce development specialists in DOES who work in particular on the construction industry aspect of the First Source Program (for example, Terry Kenner and DeCarlo Washington); and other individuals in the Department to be identified.

Plaintiffs reserve the right to supplement this interrogatory based on additional inquiry as well as discovery that may be provided by the District.


**INTERROGATORY NO. 2**: Identify each person, by discovery request, who was contacted, supplied information, or drafted the response or any part of any response, for all discovery requests in this matter.

**Response:**     The responses were drafted by counsel for the Plaintiffs with the review and input of (a) Mike Burlas and Otto Girr from Miller & Long, (b) Debbie Livingston and Buddy Henley from ABC-Metro Washington. The Miller & Long representatives provided information in particular about Interrogatories 5-10, 14. In addition,

3

Eric Shatzer from Hawkins Electrical of Washington, DC, LLC provided information for

Interrogatory No. 14.

**INTERROGATORY NO. 3**: Identify each person you expect to call as an expert witness and state the subject matter on which the expert is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**Response:**  Plaintiffs have not yet identified an expert or determined whether they

will call one. This answer will be supplemented as required.

**INTERROGATORY NO. 4**: Identify any oral or written communications between Plaintiffs and the District (or any person, agent or representative purporting to act on its behalf) relating to the claims as alleged in the Amended Complaint. Describe the content of each communication, including the date, and provide each person's full name, address and telephone number, and position or title.

**Response:**  Plaintiffs object to the Interrogatory as burdensome and as seeking

information that is not relevant to any claim or defense in this matter. The claim that the

Amended Act is unconstitutional under the Privileges and Immunities Clause or under the

Due Process Clause is not affected by communications between any plaintiff and any District

official or agent. Without waiving the objection, plaintiffs state that when the amendment of

the First Source Act was being discussed before the Council, representatives for ABC-Metro

Washington spoke and wrote against the bill, identifying the impacts the amended legislation

would have on their members' businesses and their own business. Copies of the written

materials are being produced in response to the document requests.

**INTERROGATORY NO. 5**: State all facts and circumstances supporting your contention that "[t]he individual plaintiffs . . . are at a significant disadvantage" as alleged in paragraph 14 of the Amended Complaint.

**Response:**  Because the individual plaintiffs are not residents of the District of

Columbia, they cannot be included on the First Source List. They cannot be counted towards

the goals set forth in the Act or in a First-Source Agreement for a particular project. They are therefore not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live. And individuals who live in Maryland or Virginia are more susceptible to being laid off or let go in the event that work subject to First-Source requirements predominates in the company's job list.

**INTERROGATORY NO. 6**:  State all facts and circumstances supporting your contention of "increased costs" as alleged in paragraph 16 of the Amended Complaint.

**Response:**  Taking Miller & Long as an example, the company spends roughly 30% of its human-resources efforts to meet the unique requirements of the District's First Source Act. That is, the human-resources personnel of the company spend time participating in job fairs and similar recruiting efforts; compiling and tracking unique employee information; preparing, submitting, and following up on reporting requirements—all for First Source requirements. Similar efforts are not required to recruit and manage employees resident in Maryland or Virginia. Annually, on this one aspect alone, Miller & Long spends close to $200,000 on just the cost to the company of the additional work of its human-resources department to deal with First Source obligations. And that cost does not include the costs of actually running job fairs or advertising for positions limited to District residents or conducting apprenticeship programs or paying wages to new employees. The apprenticeship requirements under District law are themselves also expensive to operate.

Further, there is a substantial increased cost associated with the attrition rate for

5

District residents. According to its records, Miller & Long hired 653 District residents over the last four years and, during that same time, lost 531 District residents. That attrition rate of 81% is far higher than the attrition rate associated with its Maryland or Virginia hires. Moreover, because the District's labor pool has historically had less experience with construction work, District-resident employees tend to have a higher on-job accident rate than their peers from other jurisdictions. Miller & Long has had to hire additional staff just to compile data on First-Source compliance and to prepare required reports. All told, there is a higher labor cost associated with the employment of District residents than residents of other jurisdictions.

Subcontractors dealing with owners and general contractors subject to First Source requirements must also incur additional costs to comply with those entities' requirements. For example, owners and general contractors have hired third-party consulting firms to assist them in monitoring compliance with the Act and with the percentages and quotas set forth in the Act. Those entities and monitors want personal information about the subcontractors' employees—for example, social-security numbers and telephone numbers—so that they can monitor the employees. Moreover, an owner will hold back final payment to a subcontractor until the District's First-Source office gives the all-clear to the owner regarding compliance. During the time that the District is reviewing final compliance, the subcontractors are having final payments withheld by owners, driving the subcontractors' cost of borrowing and of the project up. This is another increased cost from the Act—and one that is virtually impossible to budget for at the front end because the scope and duration of the compliance review is unknown at the front end of the project.

Another increased cost to the companies is the decision not to bid on work because of a shortage of qualified District-resident employees. Miller & Long, and most other similarly

situated companies, do not employ enough District residents to meet multiple First-Source projects—not because they don't want to employ such residents, but simply because there are not enough such residents. The District itself estimates that there are about 1300 carpenters living in the District, entry-level carpenter being generally considered one of the trades that requires the least training or prior experience to fill. The figures regarding more skilled or more senior trades—ironworkers, concrete finishers, master electricians, crane operators—are smaller and smaller. As a result, companies that employ District-resident tradespeople and craftspeople that are deployed on First-Source-covered projects cannot take on additional work covered by the Act. And should the building industry economy falter and layoffs were required, companies would choose to lay off people who do not live in the District in order to maximize their opportunities to bid for work in the District.

One other cost that companies have observed has to do with the reality of the area housing market. The District remains an expensive jurisdiction in which to live. Construction workers who live in the District and may receive some form of housing subsidy from the District stand to lose that benefit when they become employed and become more financially stable. But the companies receive no "credit" for helping a District resident with a job and with promotions. Instead, once that employee is on his or her feet and drawing a paycheck, and the employee chooses to or is essentially required to move out of the District (especially if the housing subsidy is lost), the employee becomes another out-of-District employee that the company cannot count on for First Source requirements. Miller & Long, for example, has 5-10 people every month who stay employed by the company but who move out of the District to nearby Maryland or Virginia for economic reasons or for more affordable housing. The company's success in employing District residents winds up counting against the company when the next First-Source Act job opportunity comes along.

**INTERROGATORY NO. 7**: State with particularity the efforts encompassed by "screening" as that term is used in paragraph 16 of the Amended Complaint.

**Response:**  The reference in Paragraph 16 refers to efforts made at job fairs and similar events to identify potential employees who reside in the District. The "screening" includes inquiries into their skills sets, past experience, and educational background.

**INTERROGATORY NO. 8**:  State all facts and circumstances supporting your contention of "additional costs" as alleged in paragraph 17 of the Amended Complaint.

**Response:** See Response to Interrogatory No. 6.

**INTERROGATORY NO. 9**: State all facts and circumstances supporting your contention of "a competitive disadvantage" as alleged in paragraph 18 of the Amended Complaint, including identifying any "construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions."

**Response:**  The "competitive disadvantage" referred to in Paragraph 18 refers to companies that choose to gamble on later obtaining a waiver from First-Source requirements as well as companies who do not share the philosophy of ABC-Metro Washington members regarding freedom of employment. Because there are simply not enough District-resident tradespeople and craftspeople to meet the targets and quotas of the current Act (assuming that the District required compliance with the Act for the relevant projects), a subcontractor knowing that it did not employ sufficient people to meet those targets and quotas is faced with the question: Do I bid on work and hope I can secure a waiver later or do I not bid on the work because I know I cannot satisfy the requirements? Companies that are not willing to gamble on the waiver that may or may not be granted later by the District are at a disadvantage in the market.

8

Henley Construction, for example, does a substantial business elsewhere in construction of school buildings (K-12) but it does not work on school projects in the District where the Amended First Source Act requirements might apply. The Act is a barrier to the company's ability to bid on work and it does not have the money to hire the employees and the administrative staff that would be necessary to deal with the requirements of the Amended Act.

**INTERROGATORY NO. 10**:  State all facts and circumstances supporting your contentions of "significant efforts" and "reasons beyond their control" as alleged in paragraph 22 of the Amended Complaint, in relation to Miller & Long.

**Response:**  See Response to Interrogatory No. 6.

**INTERROGATORY NO. 11**:  State all facts and circumstances supporting your contention that plaintiffs have been "discriminated against" as alleged in paragraph 23 of the Amended Complaint.

**Response:**  Plaintiffs object to Interrogatory No. 11 to the extent that the question asks plaintiffs to draw the legal conclusion about "discrimination." Without waiving the objection, when a person is denied his constitutional rights under the privileges-and-immunities clause or the due-process clause, plaintiffs submit that that constitutes unlawful discrimination. See also Responses to Interrogatories 5 and 6.

**INTERROGATORY NO. 12**:  State all facts and circumstances supporting your contention that MWC's members will incur damages as alleged in paragraph 77 of the Amended Complaint, specifying which members and detailing which subcategories of alleged damages were or are being incurred.

**Response:**       Plaintiffs object to the Interrogatory to the extent that it treats the allegations of Paragraph 77 as "damages suffered" rather than, as alleged, damages that flow from the requirements of the Act and its application to the members of ABC-Metro

Washington. The case was filed as the new Act was coming into effect. As a practical matter, it appears that the District has not actively enforced the requirements of the Amended Act. Instead, it has found ways to "grandfather in" projects to the old Act or to create exceptions or exclusions for projects that would otherwise be subject to the Amended Act. However, when this lawsuit is resolved or if there is a change in the enforcement priorities of the District, companies and individuals will still be subject to discrimination based on employees' residences.

Notwithstanding the District's lack of vigorous enforcement, Miller & Long, for example, has incurred increased labor and other costs associated with the Act, as detailed in response to other interrogatories.

**INTERROGATORY NO. 13**: State with particularity any incident where the individual plaintiffs were "exclude[d]" from a "District job" as those terms are used in paragraph 84 of the Amended Complaint.

**Response:**  By definition, the individual employees are not eligible to be counted towards compliance with First Source Act work.

**INTERROGATORY NO. 14**: State with particularity which of MWC's members have "not bid on jobs" as that phrase is used in paragraph 85 of the Amended Complaint, identifying which companies and the details of each incident.

**Response:**  Plaintiffs object to Interrogatory No. 14 to the extent that it treats the statement in Paragraph 85 as a report about "damages suffered" rather than, as alleged, a statement about damages that will flow from the Act if enforced as written. Without waiving the objection, plaintiffs state that Miller & Long would be unable to perform simultaneously two or more projects for which the First Source requirements applied. It therefore would not bid on performing such work.

As recently as May 2016, Miller & Long declined to bid on a job because of the First

Source Act requirements. That job is known as the "WASA F1 Block Cinema" job.

ABC-Metro Washington member Hawkins Electric has withdrawn entirely from seeking work on projects to which First Source applies. After the enactment of the Amended Act, and in light of the shortage of District residents able to perform the work, Hawkins will not risk the costs and the potential penalties associated with seeking such work in the District. Hawkins has essentially been driven out of that segment of the market because of the Amended Act.

**INTERROGATORY NO. 15**: If you contend that the District (or anyone acting on its behalf) has made any admissions or declarations against interest which pertain to this litigation, describe each admission or declaration against interest, include the identity of any person involved, the date it was made, and identify all documents relating or referring to any admission or declaration against interest.

**Response:** Plaintiffs are not aware of any.

11

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June **24**, 2016.

Metropolitan Washington Chapter,
Associated Builders and Contractors, Inc.

By: *Debra D. Livingston*

#46959519_v1

Pursuant to the requirements of 28 U.S.C. § 1746(b), I hereby declare under penalty of perjury that the foregoing Responses to Defendant's Interrogatories are true and correct to the best of my knowledge, information, and belief.

Executed on June 2̲4̲, 2016.

Miller & Long Co., Inc.

By: _M. Aul_____
MICHAEL BURAS, CFO

#46959507_v1

Dated: June 27, 2016

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 996643)
HOLLAND & KNIGHT, LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)
Paul.Kiernan@hklaw.com (email)
Christine.Walz@hklaw.com(email)

## CERTIFICATE OF SERVICE

I hereby certify that, on this 27th day of June, 2016, a true and accurate copy of the
foregoing was served via email and first class mail, postage prepaid, on the following:

   Andrew J. Saindon
   Toni Michelle Jackson
   Senior Assistant Attorney General
   441 Fourth Street, N.W.
   Suite 600 South
   Washington, D.C. 20001

/s/ Paul J. Kiernan
Paul J. Kiernan

13



3.  **First Source: Should the provisions of DC Code §§ 2-219.03 (e)(1A), (e)(1B), (e)(1C) and (e)(2) apply, then this proposal is withdrawn.**

4.  If the General Contractor uses an internet-based platform to post contract documents, MLDC must be notified when such changes are posted.

5.  This Bid is based on mutually agreeable contract terms and conditions to be executed in a contract

    a.  If the General Contractor chooses to use a standard contract form, MLDC's proposal shall be included as an attachment to that form.

    b.  MLDC reserves the right to negotiate a mutually acceptable contract.

    c.  This proposal assumes the previously negotiated standard contract including any exhibits, forms and attachments between MLDC and the General Contractor will be used, except that MLDC uses 2004 form (07/04) for Additional Insured.

    d.  The General Contractor is to provide a copy of the Builders Risk policy for the project to MLDC to verify that there is a waiver of subrogation on the policy, and that MLDC is included as an additional named insured on the policy.

    e.  Sales and use taxes are included.

    f.  This bid assumes a constant tax rate for the entire duration of MLDC's scheduled work. If this rate, as established by the federal, state, or local authorities, changes during the course of MLDC's scheduled work, MLDC will adjust the Bid accordingly.

6.  MLDC assumes no design responsibility for any component of the project.

7.  MLDC specifically excludes any responsibility for liquidated damages. The General Contractor shall not be entitled to consequential damages resulting from any delays, or in any sum in excess of such amount as may be specifically named in this proposal. Liquidated damages, which are in lieu of all consequential and other damages, may be assessed against MLDC in the amount of $100.00 per day for unexcused delays. MLDC shall not be responsible for delays or defaults occasioned by any cause to the extent that such cause is beyond its control, including but not limited to: those caused by the Owner, general contractor, architect and/or engineers; delays in transportation; shortages of raw materials; civil disorders; labor difficulties; vendor allocations; fires; floods; accidents; or acts of God. It is understood that such causes would be applicable industry-wide, not exclusively associated with the MLDC. MLDC shall be entitled to equitable adjustment in the subcontract time and amount due to such unanticipated causes. In the event that delays, defaults or interference to MLDC are caused by other subcontractors, the General Contractor warrants that terms are contained in other such subcontracts which allow MLDC to bring claims against other subcontractors through the General Contractor.

8.  MLDC shall be entitled to remittance of progress payments from the General Contractor within fifteen (15) days from the date of approval of its monthly invoices by the Owner, and final payment within fifteen (15) days from the date of approval of its final invoice. Payment shall be conditioned solely on the satisfactory performance of the work by MLDC in accordance with the contract documents. If the General Contractor does not receive payment from the Owner for any cause which is not the fault of MLDC, the General Contractor shall pay MLDC, on demand, a progress or final payment properly invoiced.

    a.  If for any reason not the fault of MLDC, a progress payment is not paid within seven (7) days after due, then MLDC, upon giving three (3) days written notice to the General Contractor, and without prejudice to and in addition to any of its other legal remedies, may stop work until payment of the full amount owing has been received. In such case, the contract sum shall be increased by the amount of MLDC's reasonable costs of shut down, delay, and start up, which costs shall be paid in the following billing period.

    b.  If MLDC's work has been stopped because MLDC has not received progress payments as required, or should the Owner suspend or terminate the General Contractor for default, MLDC may terminate further subcontract work under these agreements upon giving the General Contractor an additional seven (7) days written notice and recover its reasonable damages.

EXHIBIT
12

EXHIBIT
12
PENGAD 800-631-6989

First Source Jobs Since 2005

| Year | Job site# | Name | Address |
|---|---|---|---|
| 2005 | 1-5800 | 1101 New York Ave. | 1101 New York Ave., NW Washington, D.C. 20005 |
| 2005 | 1-5830 | Capitol Plaza I | 1200  First Street NE, Washington, D.C. 20002 |
| 2005 | 1-5910 | Chase Point | 5401 Western Ave., NW Washington, D.C. 20015 |
| 2005 | 1-5410 | The Columbia Residences | 2425 L Street, NW Washington, D.C. 20037 |
| 2005 | 1-6150 | Senate Square Towers | 201 North I street, NE Washington, D.C. 20002 |
| 2006 | 1-5920 | Flats At Union Row | 2515 14th Street, NW Washington, D.C. 20009 |
| 2006 | 5-1290 | 1010 Massachusetts Ave. | 1010 Massachusetts Ave., NW  Washington, D.C. 20001 |
| 2006 | 1-6240 | Cityvista | 501 K Street, NW Washington D.C. 20001 |
| 2006 | 1-5810 | Kenyon Square Condos, | 1390 Kenyon Street, NW Washington, D.C. 20009 |
| 2006 | 1-6100 | Highland Park Condos | 1400 Irving Street, NW Washington, D.C. 20009 |
| 2006 | 1-6430 | Anacostia Gateway | 1800 Martin Luther King Ave., SE Washington, D.C. 20020 |
| 2007 | 1-6800 | 100 M Street | 100 M Street, SE Washington, D.C. 20003 |
| 2007 | 1-6720 | 1331 L Street | 1331 L Street, NW Washinton, D.C. 20002 |
| 2007 | 1-6640 | Station Palace 3 | 725 2nd Street, NE Washington, D.C. 20002 |
| 2008 | 1-7350 | 1015 Half Street | 1015 Half Street, SE Wahington D.C. 20003 |
| 2008 | 1-7360 | Waterfront Southwest- East BLDG | 401 M street, SW Washington D.C. 20024 |
| 2008 | 1-7250 | West End 1229- 25th Street | 1229 25th Street, NW Washington D.C. 20037 |
| 2008 | 1-7020 | 1999 K Street | 1999 K Street, NW Washington, D.C. 20006 |
| 2008 | 1-7390 | Woodrow Wilson Aquatic Center | 3950 Chesepeake Street, NW Washington, D.C. 20016 |
| 2009 | 1-7500 | 800 17th Street | 800 17th Street, NW Washington, D.C. 20006 |
| 2009 | 1-7515 | Square 54-Phase 3 Residential | 900 22nd Street, NW Washington, D.C. 20024 |
| 2009 | 1-7570 | Georgetown Safeway | 1855 Wisconsin Avenue, NW Washington D.C. 20007 |
| 2010 | 1-7720 | 733 10th Street | 733 10th Street, NW Washington, D.C. 20001 |
| 2010 | 1-7800 | Georgetown University Science Center | 3700 O street, NW Lot T Trailer, Washington, D.C. 20057 |
| 2010 | 1-7810 | Rhode Island Station | 919 Rhode Island Ave, NE Washington, D.C. 20001 |
| 2010 | 1-7830 | Waterfront Station- Phase 3 | 400 M street, SW Washington, D.C. 20024 |
| 2011 | 1-7880 | Meridian At Mount Vernon Square | 425 L Street, NW Washington, D.C. 20001 |
| 2011 | 1-7960 | 14th & W (YMCA) | 1325 W Street, NW Washington, D.C. |
| 2011 | 1-7980 | Janney Elementary School | 4130 Albemarle Street, NW Washington  D.C. 20016 |
| 2012 | 1-1010 | 2 M Street | 2 M Street, NE Washington, D.C. 20002 |

ML002

| | | | |
|---|---|---|---|
| 2013 | 1-7650 | Marriott Marquis | 90 Massachusetts Ave., NW Washington, D.C. 20001 |
| 2013 | 1-1070 | Washington Gateway | 100 Florida Ave., NE Washington D.C. 20002 |
| 2014 | 5-1270 | Republic Square Phase II | 660 North Capitol Street, NW Washington, D.C. 20001 |
| 2015 | 5-1310 | 1000 F Street | 1000 F Street, NW Washington, D.C. 20004 |
| 2015 | 5-1370 | The Lab School | 4759 Reservior Road, NW Washington, D.C. 20007 |
| 2015 | 5-1330 | The Wharf | 1100 Maine Ave, SW Washington, D.C. 20024 |
| 2015 | 5-1410 | Hine School North | 770 C Street, SE Washington, D.C. 20003 |
| 2015 | 5-1420 | Hine School South | 700 Pennsylvania Ave., SE Wahington, D.C. 20003 |

ML003

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER,<br>ASSOCIATED BUILDERS AND CONTRACTORS, INC.<br>1725 I Street, N.W.<br>Suite 300<br>Washington, D.C. 20006,<br><br>MILLER & LONG CONCRETE CONSTRUCTION, INC.<br>4824 Rugby Avenue<br>Bethesda, Maryland 20814<br><br>HAWKINS ELECTRICAL CONSTRUCTION<br>OF DC, LLC<br>3303 Stanton Road, S.E.<br>Suite J<br>Washington, D.C. 20020<br><br>EMMETT MORRIS, JR.<br>18016 Terrace Run Road<br>Orange, Virginia 22960,<br><br>DAIRON UPSHUR<br>9711 Skyhill Way #212<br>Rockville, MD 20850<br><br>Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br>a municipal corporation,<br>MURIEL BOWSER, in her official<br>capacity as Mayor of the District of Columbia<br>1350 Pennsylvania Avenue, N.W., Suite 316<br>Washington, D.C. 20004,<br>Defendant. | Case No. 1:12-cv-00853 |

## AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs seek declaratory and injunctive relief against the Mayor and the District of Columbia

(the "District") to strike down as unconstitutional the District's First Source Employment Act and to block

its enforcement. As discussed at the December 4, 2015 hearing on the District's Motion for Judgment on



EXHIBIT
14

the Pleadings, Plaintiffs submit this Amended Complaint for Declaratory and Injunctive Relief in order to clarify and streamline the issues that remain before this Court at this time.[1]

## **INTRODUCTION**

The right to pursue one's calling free from discrimination is a fundamental American right. Under the Constitution, a jurisdiction cannot erect barriers that prevent qualified workers who live in another jurisdiction from practicing their trades. But the District's First Source Employment Act imposes on employers and employees harmful discriminatory requirements. For employers, it creates an expensive and unworkable caste system in which some of their employees must be denied the right to work on certain projects because of where they live. It squeezes employers when they bid for work and when they deliver services to their clients and customers. Employers are subject to audits, threats from the District Government, and pressure to provide jobs, training, and work conditions that apply to District residents alone. For employees, the law burdens their ability to secure employment and denies them opportunities to succeed. For everyone, the law creates higher costs and attendant intrusive red tape, reports, and delays, while skewing the job market in a way that ultimately hurts District residents.

The District of Columbia's "employment problem" is not that there are too many residents chasing too few jobs. By some measures, there are over 800,000 jobs in this city of 600,000 people. The "problem" is that the District lags behind its neighbors in educating and training the workforce the construction industry needs.

The First Source Employment Act has never created a single job—and never will. Instead, it infringes on the fundamental American right to pursue employment free from discrimination. It violates

---

[1] Plaintiffs file this Amended Complaint to facilitate a decision on the merits of their claim that the First Source Employment Act is unconstitutional under the Due Process Clause, which incorporates the protections of the Privileges and Immunities Clause. By filing this Amended Complaint, Plaintiffs do not waive their rights to appeal the Court's July 14, 2015 Order dismissing Counts II-VII of Plaintiffs' Complaint. *See* Dkt. 21. As of this filing, the Court has not ruled on the District's Motion for Judgment on the Pleadings, where the District challenged the viability of a claim against the District based directly on the Privileges and Immunities Clause.

the Civil Rights Act and numerous constitutional protections, including the Privileges and Immunities Clause and the Due Process Clause of the Fifth Amendment, which incorporates the protections of the Privileges and Immunities Clause. Indeed, it is flatly inconsistent with the stated policy in the District's Human Rights Act that there should be "an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of ...place of residence or business."[2]

For too many years, developers, contractors, and other employers have been forced to endure and work around the Act, afraid of the public outcry that would follow if a purported "jobs bill" were challenged, and afraid of the retribution of District officials with a vested interest in pretending that the First Source Employment Act is a solution to the District's chronic underemployment in certain areas of the city. But with the recent amendments to the First Source Act, contractors cannot possibly comply with the Act's hiring and quota requirements, and they are threatened with job losses, business failures, and debarment from government contracting. The uncertainties surrounding how the District will enforce the Act—How does it apply to awarded contracts? Projects still being bid? How will the Mayor exercise her unfettered discretion in deciding whether contractors have made a "good-faith effort" to comply with the statute's requirements?—have further complicated the situation for ethical employers who would try to comply with the Act. And the business-destroying fines and penalties in the Amended Act have pushed this debate past a tipping point. The amended First Source Employment Act puts the plaintiffs' very livelihoods at risk, and they need judicial redress.

## JURISDICTION AND VENUE

1.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343. This action arises under 42 U.S.C. § 1983 and the United States Constitution.

---

[2]     *See D.C. Official Code* §2-1401.01.

2.     Plaintiffs are asking this Court to declare their rights and other legal relations under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*

3.     Venue is proper in this Court under 28 U.S.C. § 1391(b).

## PARTIES

4.     Plaintiff Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("ABC-Metro Washington") is a not-for-profit corporation organized under the laws of the State of Maryland with offices in the District of Columbia and in Maryland. ABC-Metro Washington is the leading commercial-construction association in the Washington metropolitan area. ABC-Metro Washington has approximately 529 member organizations, including corporations and sole proprietorships. ABC-Metro Washington members function throughout the construction industry as general contractors, specialty contractors, industry (professional) associates, and suppliers. These members live and work in the Greater Washington area, including in the District of Columbia, Virginia, and Maryland. Established in 1958, ABC-Metro Washington is one of 75 chapters in a nationwide federation of more than 23,000 construction and construction-related firms with nearly two million employees. ABC-Metro Washington members are generally dedicated to free enterprise, open competition, and having a level playing field in securing work. Most ABC-Metro Washington members tend to have permanent or long-term workforces. ABC-Metro Washington has long stood for the principles that companies should reward employees based on individual merit and performance and that contracts should be awarded based on safety, quality, value, and results. ABC-Metro Washington has advocated for its members on these issues, including through lobbying government officials and

4

promoting business practices consistent with the organization's philosophy. ABC-Metro Washington played a lead role in lobbying against the amended First Source Employment Act.

5.    Plaintiff Miller & Long Concrete Construction, Inc. ("Miller & Long") is a privately held corporation with its principal place of business in Bethesda, Maryland. Miller & Long is a member of ABC-Metro Washington and adheres to the organization's philosophy. Miller & Long regularly bids on work projects in the District of Columbia that are affected by the First Source Employment Act.

6.    Plaintiff Hawkins Electrical Construction of Washington, D.C., LLC ("Hawkins Electrical") is a limited-liability company organized under the laws of the District of Columbia. Hawkins Electrical is a member of ABC-Metro Washington. Hawkins Electrical provides professional electrical construction and consulting services, primarily on commercial projects. Hawkins Electrical is recognized by the District as a Certified Business Enterprise. Hawkins Electrical regularly bids on work projects in the District of Columbia that are affected by the First Source Employment Act.

7.    Plaintiff Emmett Morris, Jr. is a resident of the Commonwealth of Virginia and is a qualified Carpenter Foreman. Plaintiff Dairon Upshur is a resident of the State of Maryland and is a construction safety manager. Each of these individual plaintiffs has worked on projects that are affected by the requirements of the First Source Employment Act or has sought work on projects that are affected by the requirements of the First Source Employment Act. Each of these plaintiffs has demonstrated a desire and ability to be employed on work projects that are affected by the requirements of the First Source Employment Act.

8.    Muriel Bowser is the current Mayor of the District of Columbia and is sued in her official capacity. The District of Columbia is a municipal corporation.

## ALLEGATIONS COMMON TO ALL COUNTS

### A. The First Source Employment Agreement Act of 1984

9.     In 1984, the District of Columbia adopted the First Source Employment Agreement Act (the "Act") (D.C. Law 5-93, currently codified at *D.C. Official Code* §2-219.01 *et seq.*)  This action seeks to strike down the Act as amended.  (The recent amendments are discussed in **Section B**, below.)  Plaintiffs are challenging on their face and as-applied the following four requirements or elements of the Act and the penalties associated with them: (i) employment agreements; (ii) construction contracts; (iii) targeted-hiring contracts; and (iv) reporting requirements.

*(i)      Employment Agreements*

10.     The Act defines a "government-assisted project" as "any project funded in whole or in part with District of Columbia funds, or funds which, in accordance with a federal grant or otherwise, the District of Columbia government administers, and on which the District of Columbia is signatory to any agreement of a contractual nature, including leasing agreements of real property for 1 year or more, or the initial project, development, or construction facilitated by any street or alley closing pursuant to Chapter 2 of Title 9." *See D.C. Official Code* § 2-219.01(5) (2011).

11.     The Act defines a "beneficiary" to include

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, ... and which details the number and description of all jobs created by a government-assisted project for which the beneficiary is required to use the First Source Register, [and]

(b) a beneficiary of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for public redevelopment, or tax increment financing that results in a financial benefit of $100,000 or more from an agency, commission,

instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds. *D.C. Official Code* § 2-219.01(1)(A)-(1)(B) (2011).

12.     Under the Act, the Mayor includes for every "government-assisted project" a requirement that the "beneficiary" enter into an employment agreement ("Employment Agreement") with the District with the beneficiary agreeing that (a) the first source for finding employees to fill all jobs created by the government-assisted project will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an Employment Agreement will be the First Source Register. *See D.C. Official Code* § 2-219.03(a) (2011). The "First Source Register" is "the Department of Employment Services Automated Applicant Files, which consists of the names of unemployed District residents registered with the Department of Employment Services." *D.C. Official Code* § 2-219.01(4) (2011). People who do not live in the District cannot be listed on the First Source Register.

13.     On government-assisted projects, Employment Agreements require contractors and subcontractors to fill jobs and vacancies from the First Source Register. In other words, the impact of the Act's requirements flow through to beneficiaries, contractors, and subcontractors. "Willful breach of the employment agreement," can be enforced by the Contracting Officer "through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C. Official Code* § 2-219.03(e)(4) (2011).

14.     The individual plaintiffs, as nonresidents of the District of Columbia, are prohibited from registering on the First Source list, do not satisfy the residency hiring requirements, and, therefore, are at a significant disadvantage in seeking to fill jobs and vacancies which are required under the Act to be filled from the First Source list.

7

15.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been "beneficiaries" within the meaning of the Act, and have also been required to execute or agree to be bound by Employment Agreements.  Because of the Act, they have been obligated to fill jobs and vacancies from the First Source list.  They therefore have been forced to deviate from their individual-merit, level-playing-field business philosophy by hiring or staffing individuals based on where they live instead of exclusively because of their qualifications for the job.  And because ABC-Metro Washington's members typically have a permanent workforce (as distinct from a per-project workforce), the Act essentially requires ABC-Metro Washington members to withhold work from nonresident employees because they have to hire District residents to meet the Act's hiring quotas, or decline to bid on additional work because of the relative shortage of qualified District residents.

16.     As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred increased costs for employee recruiting, training, hiring, and supervision that they would not have had to incur absent the strictures of the Act.  These additional costs include the expenses for additional staff committed solely to District-resident recruitment—such as attending job fairs targeted at District residents during the recession when construction workers from Maryland and Virginia are being laid off in large numbers.  ABC-Metro Washington's members spend inordinate time and resources dealing with the administrative demands of dealing with the Department of Employment Services ("DOES") referral system; screening numerous District applicants trying to find employable ones; drug testing with respect to potential hires; committing significant resources to training newly hired District residents, only to have a large percentage of the new hires quit or fail to meet minimal job requirements such that they have to be fired; and the inefficiency and expense of having to repeat the entire recruitment process again in order to hire another District resident to replace the District resident employee that was terminated or left.  (For example, Plaintiff

8

Miller & Long's experience under the First Source Act is that typically it has to screen about 60 District applicants in order to find 25 workers, the majority of whom wind up not being employed six months later. These screening numbers and percentages for District residents are approximately three times higher than for residents of other jurisdictions such as Maryland and Virginia.)

17.     As a direct result of the requirements of the Act and the Employment Agreements, ABC-Metro Washington's members, including the contractor Plaintiffs, have incurred additional costs that they would not have had to incur absent the strictures of the Act including:

(a) less productivity on jobsites as the result of having to hire less-qualified or less-experienced employees in order to increase the percentage of District-resident employees required by the Act, creating higher overall labor costs to the subcontractors, general contractor, and the entire project;

(b) employee morale problems on the jobsite related to the more lenient treatment necessarily given to District-resident employees compared to other employees with respect to absenteeism, tardiness, attitude, and work performance;

(c) higher legal fees for legal guidance on the First Source rules and their attendant obligations, interpretations of the ABC-Metro Washington member's legal rights under the First Source Employment Agreements including possible modifications thereto and legal defenses should they be targeted with a First Source Act investigation and potential fines or other penalties;

(d) additional costs as contractors were publicly and falsely maligned for lack of compliance with the First Source, statements generated in part by the misinformation espoused by the City Council and repeated in the press that the 51% requirement for District-resident employment applied to the entire workforce on a project, not just to the new hires required for a particular job.

(e) the costs and impacts discussed in Paragraph 76, below.

18.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or exemptions.

(ii)     *Construction Contract "New Hires" Requirement*

19.     The Act requires the Chief Procurement Officer and each District Contracting Officer to include in government-assisted projects costing $100,000 or more "the provision that 51% of the new employees hired for the project shall be District residents," unless the Contracting Officer waives this requirement upon a finding that:

(a) the beneficiary made a good-faith effort to comply;

(b) the beneficiary is located outside the Washington Standard Metropolitan Statistical Area (the "Area") and none of the contract work is performed inside the Area;

(c) the beneficiary enters into a special workforce-development training or placement arrangement with DOES; or

(d) DOES certifies that there are insufficient numbers of District residents in the labor market possessing the skills required by the positions created as a result of the contract.

*See D.C. Official Code* § 2-219.03(e)(3) (2011).  Deliberate submission of falsified data may "be enforced by the Contracting Officer through the imposition of penalties, including monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract." *D.C. Official Code* § 2-219.03(e)(4) (2011).

20.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been construction contractors and subcontractors for beneficiaries of government-assisted projects costing in excess of $100,000.  Consequently, the Act has required ABC-Metro Washington's members, contrary to their individual-merit and level-playing-field philosophy, to enter into construction contracts

("Construction Contracts") with the District or with beneficiaries which mandate that 51% of the new employees hired for the project be District residents.

21.     In an effort to comply fully with the Act, ABC-Metro Washington's members must also document good-faith efforts to hire District residents or enter into special workforce-development training or placement arrangements with DOES. As a direct result of the "new hires" requirement of the Act, ABC-Metro Washington's members have incurred costs they would not have had to incur but for the strictures of the Act, including increased employee recruiting, training, hiring, reporting, and supervision costs.

22.     On information and belief, no general contractor has been able to meet on a regular basis the 51% new-hire requirement with respect to an overall project (that is, including all of the project's subcontractors). There are subcontractors, such as Plaintiff Miller & Long, that have consistently made significant efforts to satisfy the First Source hiring requirements, but have still fallen short for reasons beyond their control, including:

(a) an insufficient number of skilled construction workers who live in the District;

(b) DOES's consistent failure to provide acceptable candidates for particular job requirements, and failure to adequately vet the candidates and their representations as to their skills—for example, sending an applicant who represents that he is a carpenter when he is not;

(c) District residents' lack of the transportation necessary to get to jobsites at the times required;

(d) the disproportionately high "fail" rate by District-resident applicants of required drug tests, and DOES's failure to screen the applicants before submitting them to prospective employers;

(e) disproportionate number of District-resident applicants who quit within the first few weeks or months on the job, break work rules about attendance; or have poor job performance and have to be terminated for that reason; and

(f) the burdens and costs of going through the screening process yet again whenever a District resident quits or is terminated.

23.     As a direct result of the "new hires" requirements of the Act, the individual Plaintiffs have been discriminated against in obtaining employment opportunities simply because they are not residents of the District, while the contractor Plaintiffs have been discriminated against because existing trained employees cannot be assigned to work on projects if they cannot help satisfy the "new hires" obligations. For example, Miller & Long favored District resident workers (over nonresidents) when it had to make layoffs during the recession of the last few years.  Plaintiff Miller & Long also made an effort to hire District residents, even when it was laying off nonresident employees because of the slowdown in construction work.

### (iii)     *Targeted-Hiring Contracts*

24.     Under the Act, "[w]henever the Mayor determines that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects," the Mayor can "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *See D.C. Official Code* § 2-219.03a(a) (2011).  The Act does not define how or when the Mayor can determine that the goal could be "better served," nor does the Act constrain the Mayor's discretion.

25.     Beneficiaries of government-assisted projects who enter into these targeted-hiring contracts ("Targeted-Hiring Contracts") routinely require their contractors and subcontractors to provide for increased hiring in specific job categories, so that the beneficiary may, in turn, comply with the Act. Noncompliance with a Targeted-Hiring Contract is "treated in the same manner as a violation of any other requirement" of the Act. *See D.C. Official Code* § 2-219.03a(a) (2011).  In other words, the impact of the

Act's requirements about Targeted-Hiring Contracts flows through the beneficiaries to contractors and subcontractors.

26.     ABC-Metro Washington's members, including the contractor Plaintiffs, have entered into Targeted-Hiring Contracts.  ABC-Metro Washington's members are also contractors and subcontractors for beneficiaries of government-assisted projects subject to Targeted-Hiring Contracts.  Consequently, ABC-Metro Washington's members have been required, contrary to their merit-shop philosophy, to enter into Targeted-Hiring Contracts with the District.

27.     As a direct result of the requirements of the Act and the Targeted-Hiring Contracts, ABC-Metro Washington and its members, including the contractor Plaintiffs, have incurred increased costs such as those alleged in Paragraphs 16 and 17.

28.     Because of the higher costs and the impact of the Act on their ability to bid and staff jobs, ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that do not try to comply with the Act, that do not oppose entering into Employment Agreements that link hiring to residency, or that are able to secure waivers or argue for exemption.  They also suffer competitive disadvantage compared to companies that receive favorable treatment from the Mayor in the setting of specific job targets or that employ District residents in specific affected job categories.

*(iv)     Reporting Obligations*

29.     The Act requires a "beneficiary" to submit to DOES every month following the execution of a contract subject to the Act, a contract-compliance report ("Contract-Compliance Report") for the project, including the following information:

(a) number of employees needed;

(b) number of current employees transferred;

(c) number of new job openings created;

(d) number of job openings listed with DOES;

(e) total number of all District residents hired for the reporting period and the cumulative total

number of District residents hired; and

(f) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including name, social-security number, job title, hire date, residence, and

referral source for all new hires.

*See D.C. Official Code* § 2-219.03(d) (2011).

30.     In addition, with the submission of the final request for payment from the District, the Act

requires the beneficiary to (a) document to the Contracting Officer its compliance with the Act, or (b)

submit a request to the Contracting Officer for a waiver of compliance.  The waiver request must include

(i) material demonstrating a good-faith effort to comply with the Act, (ii) referrals provided by DOES and

other referral sources, and (iii) advertisements of job openings listed with DOES and other referral sources.

*See D.C. Official Code* § 2-219.03(e)(3) (2011).

31.     Beneficiaries who are required to submit Contract-Compliance Reports to the District

routinely require contractors and subcontractors on these government-assisted projects to report the

information required of the beneficiary under the Act, so that the beneficiary may, in turn, try to comply

with the Act.  In other words, the impact of the Act's requirements flows through the beneficiary to

contractors.  The "failure to submit the contract compliance report...or deliberate submission of falsified

data" could "be enforced by the Contracting Officer through the imposition of penalties, including

monetary fines of 5% of the total amount of the direct and indirect labor costs of the contract."  *D.C.*

*Official Code* § 2-219.03(e)(4) (2011).

32.     ABC-Metro Washington's members, including the contractor Plaintiffs, have to submit Contract-Compliance Reports and other reports on their compliance with the Act.  Keeping and reporting such information is contrary to the members' individual-merit philosophy.

33.     As a direct and proximate result of the reporting obligations under the Act, ABC-Metro Washington's members have incurred reporting and other costs which they would not have had to incur absent the strictures of the Act, including increased costs for monitoring, reporting, and supervising related to the hiring of District residents.  As an example, members incur higher administrative costs for the time spent completing the monthly reporting form required under the Act; adapting to the changes made by DOES—sometimes in the middle of a job—in the reporting requirements and the forms that are required; and engaging with DOES on reporting issues via phone, email, jobsite meetings and meetings at DOES' offices, as well as increased attorneys' fees related to interpreting the legal requirements for reporting under the Act.

34.     ABC-Metro Washington's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements, including the Act's reporting obligations.

**B.      The Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011**

35.     Effective on or about February 24, 2012, the District of Columbia amended the Act by adopting the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 (the "Amended Act").  The Amended Act is more far-reaching, intrusive, and unlawful than its predecessor, including in the four respects carried over from the original Act.  The Amended Act exacerbates unconstitutional discrimination, imposes onerous restrictions on the bidding process, threatens stiffer penalties, and burdens larger projects with new requirements as discussed below.

###### (i)    *Amended Employment Agreements*

36.     The Amended Act expands the applicability of Employment Agreements ("Amended Employment Agreements") by requiring the Mayor to include for every government-assisted project <u>or contract</u> a requirement that the beneficiary enter into an Employment Agreement with the District stating that: (a) the first source for finding employees to fill all jobs created by the government-assisted project or contract will be the "First Source Register"; and (b) the first source for finding employees to fill any vacancy occurring in all jobs covered by an employment agreement will be the First Source Register.  *See D.C. Official Code* § 2-219.03(a)(1)-(a)(2) (2012) (amended).

37.     For projects valued in excess of $300,000, the Amended Act defines "government assisted project or contract" more broadly as "any construction <u>or non-construction</u> project <u>or contract</u> receiving funds or resources from the District of Columbia, or funds or resources which, in accordance with a federal grant or otherwise, the District of Columbia government administers, <u>including contracts, grants, loans, tax abatements or exemptions, land transfers, land disposition and development agreements, tax increment financing, or any combination thereof, that is valued at $300,000 or more</u>."  *D.C. Official Code* § 2-219.01(5) (2012) (amended).

38.     For projects valued in excess of $300,000, the Amended Act also defines a "beneficiary" more broadly to include not only a party who has signed a contract with the District but also "recipients" of District "actions."  The Act now reaches:

(a) the signatory to a contract executed by the Mayor which involves any District of Columbia government funds, or funds which in accordance with a federal grant or otherwise, the District government administers, … and which details the number and description of all jobs created by a government-assisted project <u>or contract</u> for which the beneficiary is required to use the First Source Register,

16

[and]

(b) a <u>recipient</u> of a District government economic development action including contracts, grants, loans, tax abatements, land transfers for redevelopment, or tax increment financing that results in a financial benefit of $300,000 or more from an agency, commission, instrumentality, or other entity of the District government, including a financial or banking institution which serves as the repository for $1 million or more of District of Columbia funds.

*D.C. Official Code* § 2-219.01(1)(B) (2012) (amended)(emphasis added).

39.     The Amended Act threatens harsher penalties for noncompliance, including potential debarment. "Willful breach of the employment agreement," shall be enforced by the Mayor through the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A) (2012) (amended). "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(D) (2012) (amended).

40.     ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts valued in excess of $300,000 and recipients of District-government economic-development action including contracts valued at in excess of $300,000, all within

17

the meaning of the Amended Act. ABC-Metro Washington's members, including the contractor Plaintiffs, also reasonably expect to be bidders on or contractors on government-assisted projects or contracts valued in excess of $300,000, and recipients of government economic-development actions affected by the Amended Act.

41.     ABC-Metro Washington's members, including the contractor Plaintiffs, will now be required by the Amended Act to enter into Amended Employment Agreements with the District of Columbia and to continue to fill jobs associated with government-assisted projects from the First Source Register, all contrary to the philosophy of the members and the organization to promote individual merit and a level playing field for all employers and employees.

42.     As a direct and proximate result of the Amended Act and the Amended Employment Agreements, ABC-Metro Washington's members will continue to incur costs of the type and nature identified above in Paragraphs 16 and 17.  The threat of increased penalties, including the threat of debarment and the ripple effect of such a debarment on other contracting opportunities (including contracting with the federal government) will require ABC-Metro Washington's members to incur even more costs to ensure scrupulous adherence to the Amended Act.  But adhering to the hiring requirements of the Amended Act is virtually impossible based on the scarcity of qualified District-resident workers.  Thus, contractors have to gamble on obtaining a waiver at the end of the job, with no reliable way to predict whether the waiver will be granted.  The Amended Act's continuation of the discriminatory requirements of the old law, its significant expansion of those hiring and reporting requirements, and the unpredictable and severe consequences of noncompliance, put employers and contractors in an even more perilous spot than under the original Act.

43.     As a direct result of the requirements of the Amended Act and the Amended Employment Agreements, the individual Plaintiffs are likely to be discriminated against in obtaining or retaining

employment simply because they are not residents of the District, while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act.  The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

44.     ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Employment Agreements that link hiring to residency, that do not have permanent workforces, or that are able to secure waivers or exemptions.

*(ii)     Amended Construction Contracts*

45.     The Amended Act requires the Mayor to include in each government-assisted project <u>or contract</u> that receives government assistance totaling between $300,000 and $5 million, "a provision that at least 51% of the new employees hired to work on the project <u>or contract</u> shall be District residents," unless the Mayor waives this requirement upon additional findings that:

(a) DOES has certified that the beneficiary made a "good faith effort to comply";

(b) the beneficiary is located outside the Area, none of the contract work is performed inside the Area, the beneficiary published each job opening or part-time work needed for 7 calendar days in a District newspaper of city-wide circulation, and DOES certifies that there are insufficient eligible applicants from the First Source Register that possess the skills required by the positions, or the eligible applicants are not available for part-time work or do not have a means to travel to the onsite job; or

(c) the beneficiary enters into a special workforce development training or placement arrangement with DOES.

*See D.C. Official Code* § 2-219.03(e)(3)(A)(i)-(A)(iii) (2012) (amended).

46.   ABC-Metro Washington's members, including the contractor Plaintiffs, are contractors and subcontractors participating in government-assisted projects and entering into contracts that receive government assistance totaling between $300,000 and $5 million.  Consequently, the Amended Act will require ABC-Metro Washington's members, contrary to their employment philosophy, to enter into Amended Construction Contracts ("Amended Construction Contracts") with the District or beneficiaries, incorporating a requirement that 51% of the new employees hired for the project or contract shall be District residents.

47.   The Amended Act requires the Mayor to include in each government-assisted project or contract that receives government assistance totaling $5 million or more, a new provision that:

(a) at least 20% of journey worker hours by trade shall be performed by District residents;

(b) at least 60% of apprentice hours by trade shall be performed by District residents;

(c) at least 51% of the skilled laborer hours by trade shall be performed by District residents; and

(d) at least 70% of common laborer hours shall be performed by District residents.

*See D.C. Official Code* § 2-219.03(e)(1A)(A) (2012) (amended).

48.   Prior to DOES accepting the Amended Construction Contract, the beneficiary must choose whether the 51% of new employees hired will be (a) cumulative of all new hires, including those made by all subcontractors at any tier who work on the project or contract, or (b) met by each beneficiary covered by the paragraph and each individual subcontractor at any tier who works on the project or contract.  *See D.C. Official Code* § 2-219.03(e)(1)(A)(i)-(A)(iii) (2012) (amended).

49.   DOES must consider the following when making a determination of a "good faith effort to comply":

20

(a) whether DOES has certified that there is an insufficient number of District residents in the labor market who possess the skills required to fill the positions that were created as a result of the project or contract;

(b) whether the beneficiary posted the jobs on the Department of Employment Services job website for a minimum of ten calendar days;

(c) whether the beneficiary posted each job opening or part-time work needed in a District newspaper with city-wide circulation for a minimum of seven calendar days;

(d) whether the beneficiary has substantially complied with the relevant monthly reporting requirements set forth in this section;

(e) whether the beneficiary has submitted and substantially complied with its most recent employment plan that has been approved by the Department of Employment Services; and

(f) any additional documented efforts.

*See D.C. Official Code* § 2-219.03(e)(3)(B) (2012) (amended).

50.     "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the required hiring requirements (or failure to receive a good-faith waiver), (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

51.     The beneficiaries of these projects are compelled by the Amended Act's mandates to apply the local hiring requirement to all individual subcontractors at any tier that work on the project or contract, or pressure all subcontractors to come as close as possible to meeting the local hiring requirements. Consequently, ABC-Metro Washington's members must agree that (a) at least 20% of journey work hours by trade are performed by District residents, (b) at least 60% of apprentice hours by trade are performed by District residents, (c) at least 51% of the skilled-laborer hours by trade are performed by District residents; and (d) at least 70% of common-laborer hours are performed by District residents.

52.     As a direct result of the Amended Act, ABC-Metro Washington's members, including the contractor Plaintiffs, will incur costs of enhanced employee recruiting, training, hiring, reporting, and supervising costs that they would not have had to incur but for the strictures of the Amended Act and the Amended Construction Contracts, including of the types alleged in Paragraphs 16 and 17 above.

53.     As a direct result of the Amended Construction Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District, while the contractor Plaintiffs, face imminent discrimination and risk because they cannot satisfy the obligations of the Act.  The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

54.     ABC-Metro Washington's members, including the contractor Plaintiffs, are at a competitive disadvantage in comparison to construction companies that do not try to comply with the Amended Act, that do not oppose entering into Amended Construction Contracts or adhering to those requirements, or that are able to obtain waivers or exemptions.

(iii)   *Amended Targeted-Hiring Contracts*

55.    Under the Amended Act, "[w]henever the Mayor determine[s] that the goal of increasing employment opportunities for District residents may be better served by establishing hiring goals in specific job categories for specific government-assisted projects <u>or contracts</u>," the Mayor may "enter into agreements with beneficiaries or their contractors and subcontractors to provide for increased hiring in specific job categories." *D.C. Official Code* § 2-219.03a(a) (2012) (amended).  The Amended Act still does not define how or when the Mayor can determine that the goal could be "better served," nor does the Amended Act constrain the Mayor's unlimited discretion.

56.    ABC-Metro Washington's members, including the contractor Plaintiffs, are beneficiaries of government-assisted projects or contracts and District-government economic-development action. They are also contractors and subcontractors for beneficiaries of government-assisted projects or contracts and District-government economic-development action.    Consequently, ABC-Metro Washington's members will be required, contrary to their business philosophy, to enter into amended targeted-hiring contracts ("Amended Targeted Hiring Contracts") with the District.

57.    "Failure to meet the required hiring requirements…or failure to receive a good-faith waiver…may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended).  Upon a second violation of the required-hiring requirements (or failure to receive a waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity ineligible of consideration for government-assisted projects with the District of Columbia for a period of not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C)-(4)(D) (2012) (amended).

58.     As a direct and proximate result of the Amended Act, ABC-Metro Washington's members will incur costs including increased employee recruiting, training, hiring, reporting, and supervising costs, and other costs outlined above in Paragraphs 16 and 17.

59.     As a direct result of the Amended Targeted-Hiring Contract requirements of the Amended Act, the individual Plaintiffs face imminent discrimination in obtaining or retaining employment simply because they are not residents of the District while the contractor Plaintiffs face imminent discrimination and risk because they cannot satisfy the obligations of the Act.   The terms of the Amended Act are currently affecting the contractor Plaintiffs' ability to bid on jobs or secure employment.

### (iv)     *Amended Beneficiary Reporting Obligations*

60.     The Amended Act requires a "beneficiary" to submit to DOES every month following the start of the project or contract until construction is completed and a final certificate of occupancy has been issued, a hiring compliance report ("Amended Contract-Compliance Report") for the project or contract including additional information about the

(a) number of employees who worked on the project or contract;

(b) number of current employees transferred;

(c) number of new job openings created,

(d) number of job openings created by employee attrition;

(e) number of job openings listed with DOES;

(f) total monthly direct and indirect labor costs associated with the project or contract;

(g) total number of all District residents hired for the reporting period and the cumulative total number of District residents hired; and

24

(h) total number of all employees hired for the reporting period and the cumulative total number

of employees hired including each employee's name, social-security number, job title, hire date,

residence, and referral source for all new hires.

*See D.C. Official Code* § 2-219.03(e)(1) (2012) (amended).

61.     In addition, for each government-assisted project or contract that receives government

assistance totaling $5 million or more, there is a new requirement that each month following the start of

the project or contract until construction is completed and a final certificate of occupancy has been issued,

beneficiaries submit to DOES copies of their monthly and cumulative certified payrolls, monthly and

cumulative certified payrolls from all subcontractors at any tier working on the project or contract, as well

as a report of the total monthly direct and indirect labor costs associated with the project or contract. *D.C.*

*Official Code* § 2-219.03(e)(1A) (D)-(E) (2012) (amended).

62.     With each submission of a final request for payment from the District, the Amended Act

requires the beneficiary to (a) document in a report to the Mayor the beneficiary's compliance with the

Act, or (b) submit a request to the Mayor for a waiver of compliance incorporating (i) material supporting

the argument that there has been a good-faith effort to comply, (ii) referrals provided by DOES and other

referral sources, and (iii) advertisement of job openings listed with DOES and other referral sources. *See*

*D.C. Official Code* § 2-219.03(e)(2) (2012) (amended).   The "failure to submit the required hiring

compliance report…or the deliberate submission of falsified data," shall be enforced by the Mayor through

the imposition of "a monetary fine of 5% of the total amount of the direct and indirect labor costs of the

project or contract, in addition to other penalties provided by law." *D.C. Official Code* § 2-219.03(e)(4)(A)

(2012) (amended).

63.     Beneficiaries require contractors and subcontractors on government-assisted projects or

contracts to report the information required of the beneficiary under the Act, so that the beneficiary may,

in turn, comply with the Act.  Thus, the requirements of the Amended Act flow through to contractors and subcontractors, including ABC-Metro Washington's members, including the contractor Plaintiffs.

64.     Consequently, ABC-Metro Washington's members must submit Amended Contract-Compliance Reports and other reports supportive of the Act and contrary to their business philosophy.

65.     As a direct result of the Amended Act, ABC-Metro Washington and its members have and will incur additional costs, including reporting expenses and other costs which they would not have had to incur absent the reporting obligations of the Amended Act, including the costs described above in Paragraphs 16 and 17.

66.     ABC-Metro Washington's members also suffer a competitive disadvantage in comparison to construction companies that receive a waiver of the compliance requirements.

*(v)     Bids and Proposals*

67.     For government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, the Amended Act requires bids and proposals responding to a solicitation for them to "include an initial employment plan outlining the bidder or offeror's strategy to meet the local hiring requirements as part of its response to the solicitation. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended).  The evaluation of the initial employment plan (the "Employment Plan") is worth 10% of the overall score of the bid or proposal. *D.C. Official Code* § 2-219.03(e)(1A)(F) (2012) (amended).

68.     The Employment Plan must include (a) descriptions of the health and retirement benefits provided to employees who worked on any of the bidder or offeror's past three completed projects or contracts; (b) a description of the bidder or offeror's efforts to provide District residents with ongoing employment and training opportunities after they complete work on the job for which they were initially hired; and (c) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act (40 U.S.C.

26

§ 3141 *et seq.*) ("Davis-Bacon Act"), where applicable, on projects or contracts completed within the last two years.  D.C. Official Code § 2-219.03(e)(1)(F)(i) (2012) (amended).

69.     ABC-Metro Washington's members, including the contractor Plaintiffs, have been beneficiaries of government-assisted projects or contracts valued the contractor in excess of $5 million, and recipients of District-government economic-development actions including contracts valued in excess of $5 million, and they reasonably anticipate being beneficiaries or recipients within the meaning of the Amended Act in the near future.

70.     ABC-Metro Washington's members, including the contractor Plaintiffs, are qualified, licensed, and able bidders who are ready to respond to or participate in responses to future solicitations and bids on government-assisted construction projects or contracts that receive government assistance totaling $5 million or more, except that the Amended Act requires ABC-Metro Washington's members, contrary to their business philosophy, to prepare Employment Plans outlining their strategy to meet local hiring requirements.

71.     As a direct result of the Amended Act, it will be more difficult for ABC-Metro Washington's members to be successful bidders or to participate in successful bids on government-assisted projects or contracts that receive government assistance totaling $5 million or more.

72.     In addition, ABC-Metro Washington and its members will incur additional costs, including the costs to prepare and reply to solicitations and bids on government-assisted construction projects incorporating Employment Plans, to offer health and retirement benefits to employees, and to offer member and employee training.

73.     ABC Metro's members, including the contractor Plaintiffs, suffer a competitive disadvantage in comparison to construction companies that:

(a) do not share their philosophy of individual merit and a level playing field and do not oppose submitting Employment Plans requiring hiring employees on the basis of their residency,

(b) have a higher percentage of District residents as employees, or

(c) offer certain health and retirement benefits, and

(d) offer certain employee-training opportunities.

74.     The winning bidder, as well as beneficiaries of government-assisted projects or contracts that are not awarded through the contracting process, must submit a revised Employment Plan to the Mayor "for approval prior to beginning work associated with the relevant government project or contract." The revised Employment Plan has to include:

(a) a projection of the total number of hours to be worked on the project or contract by trade;

(b) a projection of the total number of journey worker hours, by trade, to be worked on the project or contract and the total number of journey worker hours, by trade, to be worked by District residents;

(c) a projection of the total number of apprentice hours, by trade, to be worked on the project or contract and the total number of apprentice hours, by trade, to be worked by District residents;

(d) a projection of the total number of skilled laborer hours, by trade, to be worked on the project or contract and the total number of skilled laborer hours, by trade, to be worked by District residents;

(e) a projection of the total number of common laborer hours to be worked on the project or contract and the total number of common laborer hours to be worked by District residents;

(f) a timetable outlining the total hours worked by trade over the life of the project or contract and an associated hiring schedule;

28

(g) descriptions of the skill requirements by job title or position, including industry-recognized certifications required for the different positions;

(h) a strategy to fill the hours required to be worked by District residents pursuant to this paragraph, including a component on communicating these requirements to contractors and subcontractors and a component on potential community outreach partnerships with the University of the District of Columbia, the University of the District of Columbia Community College, the Department of Employment Services, Jointly Funded Apprenticeship Programs, or other government-approved, community-based job training providers;

(i) a remediation strategy to ameliorate any problems associated with meeting these hiring requirements, including any problems encountered with contractors and subcontractors;

(j) the designation of a senior official from the general contractor who will be responsible for implementing the hiring and reporting requirements;

(k) descriptions of the health and retirement benefits that will be provided to District residents working on the project or contract;

(l) a strategy to ensure that District residents who work on the project or contract receive ongoing employment and training opportunities after they complete work on the job for which they were initially hired and a review of past practices in continuing to employ District residents from one project or contract to the next;

(m) a strategy to hire graduates of District of Columbia Public Schools, District of Columbia public charter schools, and community-based job training providers, and hard-to-employ residents;

(n) a disclosure of past compliance with the Workforce Act and the Davis-Bacon Act, where applicable; and

(o) the bidder or offeror's general District-resident hiring practices on projects or contracts completed within the last 2 years.

*See D.C. Official Code § 2-219.03(e)(1A)(F)(ii) (2012) (amended).*

75.    ABC-Metro Washington's members win bids and are awarded contracts outside the contracting process for government-assisted projects or contracts valued in excess of $5 million.  ABC-Metro Washington's members reasonably anticipate bidding on and being awarded contracts following the effective date of the Amended Act.

76.    As a direct result of the requirements of the Amended Act, ABC-Metro Washington and its members, including the contractor Plaintiffs, will incur increased costs including increased employee recruiting, training, hiring, reporting, and supervising costs.  The Association's additional costs include higher administrative costs to educate and train its members with respect to the new requirements under the Amended Act; increased communication costs for engaging the District of Columbia's Mayor and Councilmembers; public-relations damages related to allegations of lack of concern for District residents by association members and of noncompliance; decreases in membership as individual members are forced out of business or are forced to reduce their number of projects so that their income is reduced and they can no longer afford ABC-Metro Washington membership dues.

C.    **Damages and the Burdens of the Amended Act**

77.    As a direct and proximate result of the requirements of the Amended Act, ABC-Metro Washington's members will incur damages that they otherwise would not have incurred including

(a) Total loss of business.  Those firms that do not have sufficient District residents and who cannot get a waiver will be forced to close.

(b) Loss of volume of work and business earnings.  The Amended Act's requirements will limit how many jobs a company can bid on and perform, and fewer jobs means less profit.

(c) <u>Loss of work due to uneven bidding requirements</u>.  There is no way to bid ethically and intelligently when a bidder does not know in advance whether the "hours worked" requirements will be strictly enforced or will be ignored or waived by the District.  A bidder who assumes that "hours worked" requirements will be strictly enforced must submit higher bids to reflect the increased costs and risk of noncompliance; a bidder who assumes it will get a waiver or that the District will turn a blind eye will presumably bid lower.

(d) <u>Significant fines</u>.  The "hours worked" requirements of the Amended Act are not achievable on any kind of scale and the failure to meet the requirements results in fines and other penalties.

(e) <u>Debarment</u> after two violations.

(f)  <u>Increased costs of construction</u> for the developer members of ABC-Metro Washington, such that fewer projects may be proposed, financed, approved, or built, hurting every aspect of the construction industry in the District.

(g)  <u>Increased bid costs</u> of general and specialty contractors as a result of (a) fewer bids being received per project (less competition) as subcontractors will bid fewer jobs in order to meet the hours requirements on the jobs they do bid, and (b) those bids that are received will reflect the increased labor costs resulting from the Amended Act's requirements.

(h) <u>Fewer projects</u> to bid or work on.  The significant increase in labor costs cannot be absorbed by deals made in today's very tight financing environment, so that a number of development deals simply will not go forward at the higher price tag, hurting all of the ABC-Metro Washington members.

(i) <u>Layoffs</u> of employees resulting from general contractors and subcontractors putting in fewer bids and less construction work being conducted overall.

(j) <u>Reduced productivity and profit</u> because of the incentive to lay off employees who are Maryland and Virginia residents first, as opposed to choosing which employees to retain based on merit and productivity alone.

(k) <u>Increased costs</u> to try to comply with requirements for labor. Specially trained workers cannot always be available among District residents and are often available only from outside the region. As a result, there have to be negotiations with DOES or the Mayor's Office over exceptions to the requirements for specialty contractors that perform, for example, exterior façade work, curtain walls, glass work/glazing, roofing, water-proofing, air barrier placement, steel erection and specialty flooring system installation, since these services require special training and/or certifications, sometimes available only from the manufacturer.

78.     The projected damages and ill effects of the Amended Act are readily apparent based on the experience of the downtown "Marquis" project. Although that project does not specifically incorporate the requirements of the Amended Act, as of January 2012 it was under construction with requirements similar to the Amended Act. Even at the early stages of the project, it has been widely reported that contractors have not been able to meet the District-resident worker percentages. Once the Amended Act is applied throughout the District, there are likely to be mass defaults on the District-resident hours requirements because the pool of labor is simply too shallow.

79.     "Failure to meet the required hiring requirements...or failure to receive a good-faith waiver...may result in the Mayor imposing a penalty equal to 1/8 of 1% of the total amount of the direct and indirect labor costs of the project or contract for each percentage by which the beneficiary fails to meet the hiring requirements." *D.C. Official Code* § 2-219.03(e)(4)(B) (2012) (amended). Upon a second violation of the required-hiring requirements (or failure to receive a good-faith waiver) (a) "the Mayor shall debar a person or entity from consideration for award of contracts or subcontracts with the District

32

of Columbia for a period of not more than 5 years" and (b) "the Mayor may deem a person or entity

ineligible of consideration for government-assisted projects with the District of Columbia for a period of

not more than 5 years." *D.C. Official Code* § 2-219.03(e)(4)(C) (2012) (amended).

80.     As a direct result of the Amended Act, ABC Metro Washington's members, including the

contractor Plaintiffs, risk penalties, as well as disqualification or debarment from bidding on projects not

only in the District of Columbia, but also all other United States jurisdictions which inquire about

disqualification and debarments elsewhere.

81.     Furthermore, the District started to impose the Amended Act's extensive bid-and-proposal

requirements **retroactively** on ABC-Metro Washington's members as winning bidders or contract

awardees before they may begin work.  In fact, even before the Amended Act passed its Congressional-

review period, DOES informed ABC-Metro Washington members and staff that the new requirements

would apply to all ongoing projects at the conclusion of that period. Although the District may be re-

evaluating what provisions of the Amended Act will be enforced retroactively, it remains unclear what

impact the Amended Act has on current business.  As a direct result, ABC-Metro Washington's members

will incur increased costs to complete already bid projects, thus depriving them of their vested interests in

their contracts.

**D.     The Real-World Impact of the Act and the Amended Act.**

82.     The Act and the Amended Act have been touted as promoting job-creation.  Of course, the

Act does not create jobs and never could.  Instead, it uses unlawful and unconstitutional means to try to

shift to a preferred group of people—District residents—first dibs on jobs already created.  The Act does

not of itself increase the pool of qualified job applicants nor does it address underlying issues of education,

job-training, apprenticeships, or other matters which are needed to increase the number of qualified job

applicants.

83.     Unlike other jurisdictions where first-source legislation has been implemented (and, when challenged, almost always overturned), the District does not suffer from a shortage of jobs but a shortage of trained and ready applicants to fill the jobs. Indeed, by most studies, there are more jobs in the District than there are people. District employers must reach outside the city limits to fill all the jobs in the District. This is a far different situation from one where the residents outnumber the jobs and the jurisdiction seeks to channel limited jobs to its own residents first, although even in that situation, economic protectionism is unconstitutional.

84.     For nonresidents of the District, like the individual Plaintiffs, the impact of the Act is to exclude them from consideration as part of a team of laborers on significant District jobs not because of their skills or desires but simply because they do not live in the District. Moreover, their employers or potential employers cannot freely bid on or accept work if they do not believe that they can staff such jobs with the required District residents. Where a company has the overall capacity to work on, say, seven jobs at any given time, that same company could only support three jobs because of the requirements of the Act and the Amended Act and the inability to fulfill required staffing needs with District residents. This leads to an overall decrease in available work for all laborers regardless of where the laborers live. For employers, including the contractor Plaintiffs, the Act already adversely affects the workplace. The scarce District workers are given first choice on new work, and they enjoy a privileged position within the workplace. A company which has available to it only a finite number of District-resident employees has little choice but to hire, promote, train, and discipline them differently from nonresident employees.

85.     In response to the unrealistic expectations for District-resident work hours in the Amended Act, ABC Metro Washington's members will be forced to bid less work in the District, in order to have enough District residents to fulfill the requirements on those jobs. For example, Plaintiff Miller & Long has determined that it can only perform two concrete jobs in the District at a time with its existing

workforce. Other members have reported that they will not bid on jobs if the new policies are required since they could not (or could only barely) satisfy the earlier, less-stringent standards. The Act impacts job-staffing decisions of ABC-Metro Washington member organizations. Bidders do not know how to account for the potential impacts of the Act. Companies who hire and train employees then have to sideline their "star performers" because of where they live, thereby giving up the competitive advantage (talent) in which they have invested. General contractors will similarly bid fewer jobs in the District, as they will be receiving fewer bids from their subcontractors. This decrease in bidding means a decrease in competition for bids, which means higher prices. Moreover, the uncertainty about the ability to secure a future waiver from unachievable employment targets makes the bidding process for contractors more perilous and more expensive.

86.     Contractors will also increase their prices to cover the cost of compliance, maybe even hiring District residents who they do not reasonably expect to perform much work but who will allow the contractor to meet the Amended Act's requirements. Developers and general contractors will also pass along, via indemnification provisions to their subcontractors, the costs associated with their exposure to potential fines or other penalties existing under the Amended Act. Likewise, the costs of covering these penalties will be built into the subcontractors' and general contractors' bids on a project—all leading to higher prices for the District projects and contracts paid for by District taxpayers. While clearly discriminating against nonresidents, the Act does not even benefit the District's own residents.

87.     For ABC-Metro Washington and its members, the Act and the Amended Act are a direct assault on their economic philosophy, their financial viability, and their ability to recruit and retain members and employees.

88.     ABC-Metro Washington itself has incurred substantial damages associated with addressing on behalf of its members the impacts of the Act and the Amended Act, including training, legal fees,

publicity to respond to false stories regarding the contracting community, and extra efforts to maintain membership of the organization.

**COUNT I**
**Violation of Substantive Due Process**

89.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

90.     The Fifth Amendment of the United States Constitution incorporates the protections of the Privileges and Immunities Clause, including the fundamental right of nonresidents to pursue a common calling in any jurisdiction.

91.     The Act and the Amended Act discriminate against the individual Plaintiffs as well as members of ABC-Metro Washington based exclusively on their status as nonresidents of the District of Columbia.

92.     As a result of Defendants' acts, practices, customs, laws, and rules, the individual Plaintiffs have been deprived of their fundamental right to pursue a common calling in the District of Columbia in which they are not a resident or citizen, such right being protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

93.     ABC-Metro Washington's members have been deprived of their fundamental right to pursue a common calling as protected under the Fifth Amendment of the United States Constitution and subject to 42 U.S.C. § 1983.

94.     The Act and the Amended Act discriminate against ABC-Metro Washington's members and the individual Plaintiffs based on their status as noncitizens and nonresidents of the District of Columbia or employers of nonresidents of the District of Columbia.

95.     Defendants have no substantial justification for enacting and enforcing a program which discriminates against people on the basis of residence.  Nonresidents are not a particular source of

unemployment in the District, nor are they the source of any other local "evil" that the District may purport to remedy with the Act and Amended Act.

96.     The Defendants' acts, practices, customs, laws, and rules, including the Act and the Amended Act, are not closely tailored to achieve any legitimate local purpose.

WHEREFORE, Plaintiffs request that the Court (i) declare that the Act and the Amended Act violate the Due Process Clause of the Fifth Amendment to the United States Constitution, which incorporates the protections of the Privileges and Immunities Clause of the United States Constitution; (ii) issue a temporary restraining order and preliminary injunction preventing the District from enforcing the Act and the Amended Act; (iii) issue a permanent injunction preventing the District from enforcing the Act; and (iv) award Plaintiffs any other relief that the Court determines is appropriate.

## COUNT II
### Declaratory and Injunctive Relief

97.     Plaintiffs incorporate by reference the allegations of Paragraphs 1-88.

98.     Plaintiffs are in doubt as to their rights, privileges, and immunities with respect to the conduct at issue herein.  Plaintiffs require a judgment declaring their rights, privileges, and immunities. There is a clear, present, actual, substantial, and bona-fide justiciable controversy between the parties.

99.     Plaintiffs have no adequate remedy at law.  No amount of money damages could adequately compensate the Plaintiffs for the irreparable harm described herein.  Plaintiffs in this case wish to exercise rights that are guaranteed to them under the United States Constitution.  No legal remedy would ever suffice to properly address state action that ultimately results in denying citizens rights guaranteed by the Due Process Clause of the United States Constitution, which incorporates the rights protected by the Privileges and Immunities Clause.

100.    Plaintiffs and the public-at-large will suffer irreparable injury if injunctive relief is not granted and Defendants are further permitted to enforce the customs, policies, practices, and impermissible laws and rules at issue herein.

101.    The public interest would best be served by the granting of injunctive relief, and indeed, the public interest is disserved by permitting the enforcement of customs, policies, practices, laws and rules that are designed to and do exhibit a callous indifference to Plaintiffs' constitutional rights.

102.    All conditions precedent to the institution and maintenance of this cause of action has occurred or has been performed.

103.    The acts and practices of Defendants as set forth herein, were and are being performed under color of District law and, therefore, constitute state action within the meaning of the Fifth Amendment to the Constitution of the United States.

WHEREFORE Plaintiffs request entry of a judgment declaring that the Act and the Amended Act are unconstitutional and unenforceable, and that the Plaintiffs are not required to comply with the terms of these Acts. Plaintiffs request entry of temporary, preliminary, and permanent injunctive relief necessary to implement the judgment, and an award of attorneys' fees, costs, and such other and further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Paul J. Kiernan
Paul J. Kiernan (Bar #385627)
Christine N. Walz (Bar # 99664)
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
(202) 663-7276 (phone)
(202) 955-5564 (facsimile)

Nathan A. Adams (Of Counsel)
HOLLAND & KNIGHT, LLP
315 South Calhoun Street
Suite 600
Tallahassee, Florida 32301
(850) 224-7000 (phone)
(850) 224-8832 (fax)

Min K. Cho (Of Counsel)
HOLLAND & KNIGHT, LLP
200 South Orange Ave
Suite 2600
Orlando, Florida 32801
(407) 425-8500 (phone)
(407) 244-5288 (fax)

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

/s/ Paul J. Kiernan
Paul J. Kiernan

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2015, I electronically filed the Joint Request for Status Conference via the ECM-ECF System.

I certify that all participants in the case are registered ECM-ECF users and that service will be accomplished by the ECM-ECF System.

/s/ Paul J. Kiernan
Paul J. Kiernan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> DISTRICT OF COLUMBIA, *et al.*, <br> *Defendant.* | Civil Action No. 12-853 (EGS) |

<u>NOTICE OF DEPOSITION</u>

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Dairon Upshur shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of plaintiff Emmett Morris, Jr. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016      Respectfully submitted,

                          KARL A. RACINE
                          Attorney General for the District of Columbia

                          ELIZABETH SARAH GERE
                          Deputy Attorney General

                          /s/ Toni Michelle Jackson
                          TONI MICHELLE JACKSON, Bar No. 453765
                          Chief, Equity Section



/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| METROPOLITAN WASHINGTON CHAPTER, ASSOCIATED BUILDERS AND CONTRACTORS, INC., *et al.*,<br><br>  *Plaintiffs*,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br>  *Defendant*. | Civil Action No. 12-853 (EGS) |

## NOTICE OF DEPOSITION

Defendant the District of Columbia, under Federal Rule of Civil Procedure 30, provides notice that the deposition of Emmett Morris, Jr., shall be taken at the Office of the Attorney General for the District of Columbia, 441 Fourth Street, N.W., Sixth Floor South, Washington, D.C. 20001, commencing on October 25, 2016, after the conclusion of the deposition of the witness for Miller & Long. The deposition shall occur before a duly qualified officer authorized to administer oaths and shall be recorded for all proper purposes under the Federal Rules of Civil Procedure.

Dated: October 17, 2016        Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

ELIZABETH SARAH GERE
Deputy Attorney General

/s/ Toni Michelle Jackson
TONI MICHELLE JACKSON, Bar No. 453765
Chief, Equity Section



EXHIBIT
15

/s/ Andrew J. Saindon
ANDREW J. SAINDON, D.C. Bar No. 456987
Senior Assistant Attorney General
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
Telephone: (202) 724-6643
Email: andy.saindon@dc.gov

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General
441 Fourth Street, N.W., Suite 600S
Washington, D.C. 20001
Phone: (202) 442-5868
Email: conrad.risher@dc.gov

*Counsel for the District of Columbia*

## CERTIFICATE OF SERVICE

I certify that, on October 17, 2016, a copy of the foregoing was served by electronic mail to:

Paul J. Kiernan, Esq.
Christine N. Walz, Esq.
HOLLAND & KNIGHT, LLP
800 17th Street, NW
Suite 1100
Washington, D.C. 20006
Paul.Kiernan@hklaw.com
Christine.Walz@hklaw.com

/s/ Conrad Z. Risher
CONRAD Z. RISHER*
Assistant Attorney General

---

* Appearing pursuant to LCvR 83.2(f).