**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

METROPOLITAN WASHINGTON
CHAPTER, ASSOCIATED BUILDERS
AND CONTRACTORS, INC., *et al.*,

                Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.*,

                Defendants.

No. 12-cv-853 (EGS)

---

**MEMORANDUM OPINION**

## I.    Introduction

Plaintiffs Metropolitan Washington Chapter, Associated Builders and Contractors, Inc. ("Association"); Miller & Long Concrete Construction, Inc. ("Miller & Long"); Emmett Morris, Jr.; and Dairon Upshur (collectively "Plaintiffs") bring this action against Defendants District of Columbia and Mayor Muriel Bowser (collectively "Defendants" or the "District") alleging that the District's First Source Employment Agreement Act of 1984, as amended by the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011, D.C. Code § 2-219.01 *et. seq.*, (hereinafter "First Source Act" or "Act") discriminates against nonresidents of the District of Columbia in violation of Plaintiffs' Substantive Due Process rights under the U.S. Constitution's Fifth Amendment incorporation of the

protections of the Privileges and Immunities Clause. Pending before the Court are the parties' cross motions for summary judgment. *See* Defs.' Mot., ECF No. 63;[1] Pls.' Mot., ECF No. 65. The Court has carefully considered the motions, oppositions, replies thereto, the supplement and response thereto, the applicable law, and the entire record herein. For the reasons explained below, the Court **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 63; and **DENIES** Plaintiffs' Cross Motion for Summary Judgment, ECF No. 65.

## II. Background

Much of the relevant background concerning the District of Columbia's unique position as the "only jurisdiction in the country that is legally barred from imposing a commuter tax on non-residents who come into the city to work" was described in this Court's *Memorandum Opinion* responding to the District's Motion to Dismiss. *See Metro. Washington Chapter v. D.C. ("MTD Mem. Op.")*, 57 F. Supp. 3d 1, 7 (D.D.C. 2014). The Court will briefly summarize the facts relevant to the pending motions, and then set forth the procedural background.

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

A. **Factual Background**

Except where indicated, the following facts are not in dispute. The First Source Act traces its roots to the District of Columbia Mayor's Order 83-265, signed by Mayor Marion Barry in 1983. *See* Pls.' Statement of Material Facts ("SOMF"), ECF No. 65-1 at 7-8 ¶¶ 12-14; Defs.' Resp. to Pls.' SOMF, ECF No. 67-2 at 4 ¶¶ 12-14; *Employment Agreement Goals and Objectives for All District of Columbia Projects*, District of Columbia Mayor's Order, No. 83-265 (Nov. 9, 1983) ("Mayor's Order"), ECF No. 65-4. Under the Mayor's Order "any project funded  . . . [by] District of Columbia funds . . . [had to] reflect the goal of  . . . enhanc[ing] business and economic development by increasing jobs for District residents and broadening the District of Columbia's tax base." *Id.* To reflect this goal, agreements with the District were required to contain the following:

> [G]oals and objectives for utilization of bona fide residents of the District of Columbia in each project's labor force:
>
> (a) At least fifty-one percent of all jobs created are to be performed by employees who are residents of the District of Columbia.
>
> (b) At least fifty-one percent of apprentices and trainees employed shall be residents of the District of Columbia registered in programs approved by the D.C. Apprenticeship Council.

*Id*. The Mayor's Order was a precursor to the District's First Source Employment Agreement Act of 1984, formerly codified as

D.C. Law 5-93. *See* Testimony of Drew Hubbard, Former Associate Director at the District's Department of Employment Services ("DOES") and Former Legislative Aide with the District of Columbia City Council ("Hubbard Test."), ECF No. 73-4 at 7 at 21:1-22:19. In the ensuing years, prior to the adoption of the Amended Act, there were no penalties imposed for violations of the original, 1984 Act. *See* Pls.' SOMF, ECF No. 65-1 at 8 ¶ 16; Hubbard Test., ECF No. 73-4 at 21 at 77:20-78:5.

In 2011, Bill 19-50, entitled the Workforce Intermediary Establishment and Reform of First Source Amendment Act of 2011 was introduced. *See* Michael Brown, Chair Council of The D.C. Comm. on Housing and Workforce Dev. ("Workforce Committee"), Comm. Rep. (2011) ("DCHW Report"), ECF No. 65-3 at 2. The Workforce Committee studied the "issues related [to] the reform of the District's First Source law for over a year." *Id*. at 3. Throughout this period, the Workforce Committee took in "witness testimony" and "stakeholder feedback", which led the Workforce Committee to conclude that new legislation was needed because, *inter alia*,

1. High levels of unemployment have persisted citywide for multiple years . . . ;

2. Sustained high levels of unemployment typically lead to severe financial hardships for those affected;

3. In the District . . . the Food Stamp program has increased by 54% . . .; the TANF

caseload has increased by 18% . . .; the
combined Medicaid and Healthcare Alliance
caseload increased by 16% . . .; the number
of homeless residents accessing services
from [the District's] continuum of care has
increased by 20% . . .; and the number of
residents living in deep poverty (incomes
less than half of the federal poverty rate
or $11,000 a year for a family of 4) has
increased by 37% . . . ;

4. [T]here are over 700,000 jobs in the
District and yet approximately 72% of those
jobs are held by people living outside of
the city's borders;

5. The District's Congressionally-imposed ban
on taxing any of the income that leaves the
city means that the District is subsidizing
surrounding jurisdictions to the tune of $1
billion to $2 billion a year in lost
revenue; and

6. [E]nforcement and applying proscribed
penalties [of the 1984 Act] is nearly
impossible because showing evidence of
noncompliance with the statute's 'best
efforts' to meet the 51% new hire
requirement is a very low legal standard.

*Id.* at 4-5 (internal quotation marks omitted). In addition, the

Workforce Committee found that with "more than 70% of [the

District's] jobs . . . filled by nonresidents . . . coupled with

city's inability to tax the income of nonresidents, along with

several other related negative indicators, support[ed] the

argument" that its law was constitutionally valid. *Id.* at 10.

The D.C. City Council eventually passed the Amended Act,

which became effective on February 24, 2012. Pls.' SOMF, ECF No.

65-1 at 8 ¶ 17; Defs.' Resp. to Pls.' SOMF, ECF No. 67-2 at 4 ¶

17. After the Act became effective, it was "transmitted to Congress for review" on March 23, 2012. Defs.' Mot., ECF No. 63 at 10. In its current form, the Mayor is required to maintain the "First Source Register," which "is the Department of Employment Services Automated Applicant File, which consists of the names of unemployed District residents registered with the Department of Employment Services." D.C. Code § 2-219.02(a). Under the law,

> (a) The Mayor shall include for every government-assisted project or contract a requirement that the beneficiary enter into an employment agreement with the District of Columbia government which states that:
>
>> (1) The first source for finding employees to fill all jobs created by the government-assisted project or contract will be the First Source Register; and
>>
>> (2) The first source for finding employees to fill any vacancy occurring in all jobs covered by an employment agreement will be the First Source Register.
>
> (b) In selecting unemployed District residents from the First Source Register for interviews for all jobs covered by each employment agreement, the Mayor shall:
>
>> (1) Give first preference to unemployed District residents pursuant to § 2-219.01(6)(A); and
>>
>> (2) Give second preference to unemployed District residents pursuant to § 2-219.01(6)(B).

D.C. Code § 2-219.03(a). In addition, for any project totaling

between $300,000 and $5,000,000, the Mayor must also include a
"provision that at least 51% of the new employees hired to work
on the project or contract shall be District residents," *see*
D.C. Code § 2-219.03(e); and for projects totaling $5 million or
more, the Mayor must include a provision requiring that at least
"20% of journey worker hours by trade", "60% of apprentice hours
by trade", "51% of the skilled laborer hours by trade", and "70%
of common laborer hours" shall be performed by District
residents. D.C. Code § 2-219.03(e)(1A)(A).

If a beneficiary is unsuccessful in meeting its First
Source Law requirements, it can request a waiver if, *inter alia*,
DOES certifies that (1) the beneficiary made a "good-faith
effort to comply" or (2) "there are insufficient eligible
applicants from the First Source Register that possess the
skills required by the position." D.C. Code § 2-219.03(e)(3)(A).

On the other hand, if the beneficiary fails "to meet the
required hiring requirements" and fails "to receive a good-faith
waiver" the District may impose "a penalty equal to ⅛ of 1% of
the total amount of the direct and indirect labor costs of the
project or contract for each percentage by which the beneficiary
fails to meet the hiring requirements." D.C. Code § 2-
219.03(e)(4)(A). Further, if the beneficiary is found to be in
"willful breach of the employment agreement," fails "to submit
the required hiring compliance report", or deliberately submits

"falsified data," the District can impose a "monetary fine of 5% of the total amount of the direct and indirect labor costs of the project or contract, in addition to other penalties provided by law." *Id*. Similar to the 20 years prior to the Amended Act, the District has not imposed any penalties or fines. *See* Pls.' Mot., ECF No. 65 at 23; *see also* Pls.' Suppl., ECF No. 71 at 1 (noting the District has "sought to enforce" the First Source Act, but has not actually enforced any fines or penalties).

### B. Procedural History

Plaintiffs filed their initial complaint on May 25, 2012. *See* Compl., ECF No. 1. After a full round of briefing at the motion to dismiss stage, the Court dismissed all but the claims arising under the Privileges and Immunities Clause, on July 14, 2014. *See MTD Mem. Op.*, 57 F. Supp. 3d at 26. Thereafter, the District filed a motion for judgment on the pleadings on July 28, 2014. *See* Defs.' Mot. for J. on Pleadings, ECF No. 26. After yet another round of briefing, including an Amicus Brief, *see* Amicus Br., ECF No. 35, and Supplemental Brief, *see* Suppl. Br., ECF No. 41, filed by Dean Erwin Chemerinsky;[2] and a hearing on the motion on December 4, 2015, *see* Min. Entry, Dec. 4, 2015; the Court ordered Plaintiffs to file an amended complaint to clarify the remaining claim. *See* Min. Order, Dec. 4, 2015.

---

[2]  The Court expresses its sincere appreciation to Amicus.

Plaintiffs filed their Amended Complaint on December 14, 2015 clarifying that the sole remaining claim is that the First Source Act deprives nonresidents of their fundamental right to pursue a common calling in any jurisdiction, in violation of the "Fifth Amendment of the United States Constitution [which] incorporates the protections of the [Privileges and Immunities] Clause." *See* Am. Compl., ECF No. 46 at 36. The District filed its Motion for Summary Judgment on December 5, 2016, *see* Defs.' Mot., ECF No. 63; and Plaintiffs filed their Cross-Motion for Summary Judgment on that same day. *See* Pls.' Mot., ECF No. 65. Both Plaintiffs and the District filed their Oppositions on December 21, 2016. *See* Pls.' Opp'n, ECF No. 66; Defs.' Opp'n, ECF No. 67. On January 24, 2017, both the District and Plaintiffs filed their Replies. *See* Defs.' Reply, ECF No. 69; Pls.' Reply, ECF No. 70. On July 17, 2017, Plaintiffs filed a Supplemental Brief, *see* Pls.' Suppl., ECF No. 71; and the District filed its Response on July 21, 2017, *see* Defs.' Resp., ECF No. 72. The cross motions are ripe for the Court's consideration.

## III. Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C.Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In ruling on cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F.Supp.2d 217, 224 (D.D.C. 2009) (Sullivan, J.). Summary judgment will be granted, therefore, if the plaintiff fails to submit evidence that creates a genuine factual dispute or entitlement to judgment as a matter of law. *Adair v. Solis*, 742 F. Supp. 2d 40, 50 (D.D.C. 2010) (Sullivan, J.), *aff'd*, 473 F. App'x 1 (D.C. Cir. 2012).

## IV.  Analysis

### A. Standing

Article III limits the judicial power of the United States to the resolution of cases or controversies. *See Gettman v. Drug Enf't Admin.*, 290 F.3d 430, 432 (D.C. Cir. 2002). To meet the

"irreducible constitutional minimum of standing," *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan*, 504 U.S. at 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561 (citations omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

### a. Individual Plaintiffs

The District argues that the individual plaintiffs, Mr. Morris and Mr. Upshur, should be dismissed because they have provided no evidence of an injury in fact. *See* Defs.' Mot., ECF No. 63 at 22. Specially, the District contends that since the "First Source Act imposes its limitations on new hires, not existing employees . . . the individual plaintiffs lack standing because they are already employed by Miller & Long (and have been so for years)." *Id*. at 22-23. Furthermore, while "the

individual plaintiffs assert that they are 'treated differently than their peers' and are at a 'significant disadvantage' because of where they live, and 'are more susceptible to being laid off or let go . . . discovery revealed that neither individual plaintiff suffered *any* injury as a result of the operation of the First Source Act." *Id.* (quoting Defs.' Ex. 3 at 5). Plaintiffs fail to respond to the District's arguments, asserting merely that the individual Plaintiffs have standing because "individuals as well as the companies that might employ them are adversely impacted by the First Source Act" and observe that "[j]ust as other laws targeting nonresidents are filled by those nonresidents and not by residents who do not meet other criteria under the act, so too here the law is properly challengeable by nonresidents whose opportunities for employment are impinged by the reach of the law." Pls.' Opp'n, ECF No. 66 at 9.

In the Court's *MTD Mem. Op.*, the Court found that the "individual plaintiffs had alleged a sufficient injury in fact for the purposes of Article III standing" because "as non-District residents, they [could] not register for the First Source Register and that their ability to compete for construction jobs therefore has been and will continue to be adversely impacted by the Act." 57 F. Supp. 3d at 16. However, at the summary judgment stage a plaintiff can no longer rest on

"mere allegations," but "must set forth by affidavit or other evidence the specific facts which will be taken as true." *Lujan*, 504 U.S. at 561 (internal quotation marks and citations omitted).

Here, the individual Plaintiffs have failed to provide evidence of injury in fact. The individual Plaintiffs claim injury as a result of being excluded from the First Source Register. Defs.' Ex. 3 at 4. The First Source Act requires that the "First Source Register . . . consists of the names of unemployed District residents registered with the Department of Employment Services." D.C. Code § 2-219.02(a). The individual Plaintiffs cannot be included on that list for two reasons. First, neither is a resident of the District of Columbia. *See* Am. Compl., ECF No. 46 ¶ 7 ("Emmett Morris Jr. is a resident of the Commonwealth of Virginia and . . . Dairon Upshur is a resident of the State of Maryland … ."). Second, even if they were District of Columbia residents, they could not be included on the list because they are already employed by Miller & Long, and have been for years. *See* Morris Dep., ECF No. 73-1 at 10-11 at 10:21–11:1, 15:12-16, 14:8-19 (Mr. Morris testifying that he had worked as a carpenter for Miller & Long for 35 years, has not been unemployed or laid off, and has worked as much as he likes); *See* Upshur Dep., ECF No. 73-5 at 11 at 11:2-3 (Mr. Upshur testifying that he had worked for Miller & Long for more

than 5 years except for a single incident when Miller & Long erroneously sent him to the Marriot Marquis construction site, and so he was sent away and then assigned to another project within a day or two.).

Furthermore, the individual plaintiffs claim that they "are at a significant disadvantage," Am. Compl., ECF No. 46 ¶ 14; because "[t]hey are [] not eligible to be included by Miller & Long in its bids or proposals for projects covered by the First Source Act for which certain quotas are required. They are treated differently from their peers for purposes of being included on such projects, which places them at a significant disadvantage based not on their skills or talents but based solely on where they live," Pls.' Responses and Objections to Defs.' First Set of Interrogatories, ECF No. 64-4 at 6. However, the individual Plaintiffs have provided no evidence to support these claims. Mr. Morris testified that he has "never" "felt that it's ever harder for [him] to get work," Defs.' Ex. 4 at 16:2-5; he has never been "treated differently from [his] peers because of the First Source Act," *id*. at 15:17-20; and has never "been sent away from a job site because [he] lived in Virginia," *id*. at 19:9. Mr. Upshur's sole evidence of alleged discrimination occurred when Miller and Long erroneously sent him to the wrong construction site, which it corrected within a

day or two. Defs.' Ex. 5 at 15:12-15.[3] However, any injury Mr. Upshur may have suffered was not suffered directly by him, rather by Miller & Long, as it is his employer, not he, is subject to the local business preference. This indirect injury is insufficient to establish standing. *See Lojo v. Paulos*, 1997 U.S. App. LEXIS 3174, 1997 WL 68544 (D.C. Cir. Jan. 16, 1997 (*per curiam*) (employees lack standing where their injury "was incidental to corporation's injury").

For these reasons, neither individual Plaintiff has standing to maintain this action and they are **HEREBY DISMISSED** from this action.

### b. Association Plaintiff

The District also challenges the standing of the Association, contending that neither it nor, with the exception of Miller & Long, any of its members suffered an injury. *See* Defs.' Mot., ECF No. 63 at 27. The District states that out of the Association's 550 member companies, it could "not name a single project on which a member had declined to bid because of the First Source Act" or "a single company that competes for First Source Act jobs that does not try to comply with the Act." *Id*. However, an Association may establish that it has standing by demonstrating that "(1) at least one of its members would

---

[3] This site was not covered by the First Source Act. ECF No. 46 ¶ 78.

have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Chamber of Commerce v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011). Here, the District does not challenge Miller & Long's[4] standing to maintain this lawsuit. *See generally* Defs.' Mot., ECF No. 63. According, because one of its members has standing to sue, the Association has standing to use.

### B. There Is No Basis for Incorporating the Rights Protected by the Privileges and Immunities Clause into the Fifth Amendment's Due Process Clause

It has long been recognized in this Circuit that the Privileges and Immunities Clause does not apply to the District of Columbia, which as a federal territory, sits under the exclusive authority of Congress.[5] *See Duehay v. Acacia Mut. Life Ins. Co.*, 105 F.2d 768, 775 (D.C. Cir. 1939) (stating that the Privileges and Immunities Clause is "inapplicable to the District of Columbia [because] it is a limitation upon the powers of the states and in no way affects the powers of

---

[4] Miller & Long is a member of ABC Metro-Washington. Am. Compl., ECF No. 46 ¶ 5.

[5] Plaintiffs observe that this Court has determined that pursuant to this precedent, the Privileges and Immunities Clause does not apply to actions of the District of Columbia government and treats this ruling as law of the case. Pls.' Mot., ECF No. 65 at 17.

16

Congress over the territories and the District of Columbia.");
*see also e.g., Pollack v. Duff*, 958 F. Supp. 2d 280, 288 (D.D.C.
2013), *aff'd*, 793 F.3d 34 (D.C. Cir. 2015) ("The case law in
this Circuit confirms that the Privileges and Immunities Clause
does not apply to the federal government.").

Accordingly, Plaintiffs argue that the First Source Act
"can [] be challenged under the Fifth Amendment which applies to
the District of Columbia" because "[t]he rights protected by the
Privileges and Immunities Clause are the rights of individuals
to be free from discrimination based on where they live in the
United States." Pls.' Mot., ECF No. 65 at 17. Conceding that
they could find 'no decision "discussing the 'incorporation' of
the rights protected by the Privileges and Immunities Clause
into the Fifth Amendment"; Plaintiffs assert that "because the
rights protected are fundamental rights, their protection must
also be available through the Fifth Amendment." *Id*. at 18.
Plaintiffs observe that "[t]he Supreme Court has recognized the
Privileges and Immunities Clause protects individual rights,"
*id*. (citing cases); arguing that "the individual right in this
case—the right to pursue a common calling in another part of the
United States—has been repeatedly recognized as a fundamental
right," *id*. (citing *United Bldg. & Const. Trades Council*, 465
U.S. at 219.

The "Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)) (internal quotation marks omitted). The Due Process "Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* at 720; *see, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (finding a state law against interracial marriage in violation of the Due Process Clause); *Griswold v. Connecticut*, 381 U.S. 479, 485 (1965) (finding a state law forbidding the use of contraceptives in violation of the Due Process Clause).

Courts are "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Washington*, 521 U.S. at 720. "Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively," *id.* at 721; "so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105, (1934). Furthermore, they are "implicit in the concept of ordered liberty," "such that

18

neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). Second, Courts require (1) a "careful description of the asserted fundamental liberty interest." G*lucksberg*, 521 U.S. at 721.

Neither party has cited authority that persuades the Court that there is a basis for incorporating the rights protected by the Privileges and Immunities Clause into the Fifth Amendment's Due Process protections. The Court is unpersuaded by the assertion that *Truax v. Corrigan*, 257 U.S. 313 (1921) provides such a basis. *Truax* concerned a labor dispute where state law limited the state court's authority to grant plaintiff, the owners of a restaurant, from obtaining injunctive relief against their picketing employees. In noting that the restaurant owners could have sued other restaurant owners who interfered with their business, but not their own employees, the Supreme Court stated, "The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society." *Id*. at 332. The primary purpose of the Privileges and Immunities Clause

"was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy. For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948). Accordingly, the purpose of the Clause is specific to the American experiment; it does not amount to the "immunities under the protection of the general rules which govern society." *Truax*, 257 U.S. at 332.

Nor does *Bolling v. Sharpe*, 347 U.S. 497 (1954) provide a basis. In *Bolling*, a companion case to *Brown v. Board of Education*, 347 U.S. 483 (1954), which prohibited segregation based on race in District of Columbia schools, the Supreme Court held that the Due Process Clause of the Fifth Amendment can incorporate equal-protection principles. *Bolling*, 347 U.S. at 500. But as Defendants persuasively argue, it does not follow from this holding that all of the individual rights encompassed by the Privileges and Immunities Clause are incorporated into the Fifth Amendment.

Furthermore, the Privileges and Immunities Clause does not bar all discrimination against non-residents; rather the inquiry would be whether there is a "substantial reason" for treating

citizens of different states differently. *United Bldg. & Const. Trades Council of Camden County and Vicinity v. Mayor and Council of the City of Camden,* 465 U.S. 208, 221 (1984). Were the Court to incorporate the protections of the Privileges and Immunities Clause into the Fifth Amendment, this could result in greater protection than the explicit text of the Constitution. *See Bolling*, 347 U.S. at 694-95 (unjustifiable discrimination is a denial of the due process of law guaranteed by the Fifth Amendment).

Plaintiffs overstate Supreme Court precedent when they assert that "the right to pursue a common calling in another part of the United States—has been repeatedly recognized as a fundamental right." In *United Bldg. & Const. Trades Council*, the Supreme Court's "[a]pplication of the Privileges and Immunities Clause to a particular instance of discrimination against out-of-state residents" entailed an inquiry into whether: (1) the ordinance in question burdens a privilege and immunity protected by the Clause; and (2) whether there is a "substantial reason" for treating citizens of different states differently. 465 U.S. at 221. In determining the answer to the first question, the Supreme Court stated that "the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause." *Id*. at 219. This fundamental "privilege" was specifically tied to the purpose of the Clause; it is not akin

to the fundamental rights and liberties protected by the Due Process Clause. *See Snyder*, 291 U.S. at 105 (the right or liberty must be "so rooted in the traditions and conscience of our people as to be ranked as fundamental"); *Palko*, 302 U.S. at 325 ("implicit in the concept of ordered liberty," "such that neither liberty nor justice would exist if they were sacrificed").

Because the Court has determined that there is no basis upon which to incorporate the Privileges and Immunities Clause into the Fifth Amendment, the Court need not reach the questions of whether the Act passes constitutional muster, nor the appropriate level of scrutiny to apply to that inquiry.

V.  **Conclusion**

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment, ECF No. 63, and **DENIES** Plaintiffs' Cross Motion for Summary Judgment, ECF No. 65. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:   Emmet G. Sullivan**
           **United States District Judge**
           **12/30/2021**